## In The Matter Of:

*UNITED STATES OF AMERICA, v*

*DAVID ORTIZ,*

---

*May 13, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File D5DTORTC.txt

Min-U-Script® with Word Index

D5DTORTC                                                     Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                         12 CR 336 (NRB)
 5   DAVID ORTIZ,
 6                 Defendant..
 7   ------------------------------x
 8                                       New York, N.Y.
                                         May 13, 2013
 9                                       11:00 a.m.
10
     Before:
11
               HON. NAOMI REICE BUCHWALD,
12
                              -  District Judge
13
14                    APPEARANCES
15   PREET BHARARA
           United States Attorney for the
16           Southern District of New York
     JESSICA LONERGAN
17   ANDREA SURRATT
           Assistant United States Attorneys
18
     FEDERAL DEFENDERS OF NEW YORK
19       Attorneys for Defendant
     MARK GOMBINER
20   SARAH BAUMGARTEL
21   DAVID GORDON
           Attorney for Defendant
22
23
24
25
```

D5DTORTC                                                     Page 2

 1           (In open court)
 2           LAW CLERK: This is 12 Criminal 336, United States of
 3   America versus David Ortiz.
 4           Is the government present and ready to proceed?
 5           MS. LONERGAN: Yes, for the government, Jessica
 6   Lonergan and Andrea Surratt, and with us at counsel table, with
 7   the Court's permission, an intern in our office, Matthew Regan.
 8           Good morning, your Honor.
 9           LAW CLERK: Defense present and ready to proceed?
10           MR. GOMBINER: Yes, Mark Gombiner and Sarah
11   Baumgartel, Federal Defenders, for Mr. Ortiz.
12           THE COURT: Sit down, please.
13           MR. GOMBINER: Thank you.
14           THE COURT: As I think everybody is aware, on Friday
15   afternoon sometime after 6 o'clock we had a telephone
16   conference, and it was the, I think, considered judgment of all
17   counsel that Federal Defenders had a conflict of interest that
18   requires a change of counsel for Mr. Ortiz with respect to the
19   trial of this case that was supposed to commence this morning.
20   The CJA of the day was Mr. Gordon, and I was able to contact
21   him by phone after the conference and ascertained that he was
22   available to try this case on July 15, which I thought was a
23   reasonable gap in time to let new counsel prepare.
24           So I would think that the first order of business is
25   to appoint Mr. Gordon.

D5DTORTC                                                     Page 3

 1           MR. GOMBINER: Judge, before we're relieved as
 2   counsel, I want to put something on the record. And we have an
 3   application to the Court, if that's possible.
 4           THE COURT: Sure.
 5           MR. GOMBINER: First, I just want to summarize a
 6   little bit of -- now this doesn't --
 7           THE COURT: One second, just before you do it, one
 8   matter I was going to raise was in a way technical, but maybe
 9   not technical issue was whether the transcript of Friday could
10   be made available to Mr. Gordon, or whether that actually would
11   put you in a conflict position with your prior counsel, even
12   though I realize whatever is in there is now Brady material
13   that the government has to produce, it seems to me.
14           So just before you say anything, I thought I would
15   toss that idea.
16           MR. GOMBINER: Judge, anything we said at the
17   conference on Friday or anything I say here is based
18   exclusively on public records, either transcripts or documents
19   that were filed in a court. We have not made any attempt to
20   contact -- or get the file for Kevin Morrissey or to make any
21   other inquiries in any way to try to learn anything connected
22   with the Federal Defenders' prior representation of
23   Mr. Morrissey, so I don't think there's any need.
24           THE COURT: I just wanted to be sure because it was
25   never a hundred percent clear to me that you had that

D5DTORTC                                                     Page 4

 1   information.
 2           MR. GOMBINER: I want to explain that a little bit,
 3   maybe.
 4           What happened here is that Monday evening, the last
 5   Monday evening, pursuant to a request by Ms. Baumgartel, the
 6   Court ordered the government to make available the 3500
 7   material for the confidential informant. And we previously did
 8   not know his name, although our client I think knew he was
 9   talking to someone named Kevin, we didn't know who this person
10   was.
11           In any event, subsequent to that -- first it turns out
12   Mr. Morrissey used many, many, many different names, but that
13   was part of the 3500 material. But I was doing some -- in the
14   3500 material it indicated that Mr. Morrissey had been a paid
15   informant for the ATF since 2010, and that he previously had
16   been a witness in two cases in the Bronx. I think they
17   referred to them as homicide prosecutions.
18           In any event, that struck me as kind of unusual that
19   someone might be a witness in two different cases, and the
20   government gave us the names of two cases. One, it turned out,
21   was not the actual true name of the case that Mr. Morrissey was
22   a witness in a case, defendant Felipe Figuerel, in fact the
23   defendant's name was Felipe Arroyo. In any event, based on
24   that, that struck me as someone who might be a little more --
25   it's very unusual that any defendant would be a witness in two

1  separate homicide cases unless he was a professional
2  informant -- a jailhouse snitch or professional informant of
3  some kind. And based on that, I went on Westlaw, put in
4  Mr. Morrissey's name, and found an unpublished opinion by Judge
5  Oetken in which one of the defendants in one of the homicide
6  cases, the Ricardo Jimenez case, had a pending 440 motion which
7  one of the contentions is the state prosecutor failed to
8  disclose Brady material about Mr. Morrissey.
9       And after that, I went on PACER, I pulled up the
10  documents, looked at the filings in the case before Judge
11  Oetken, and found that there's a presently pending state court
12  440 proceeding in which the Office of the Federal Defender
13  represents Mr. Jimenez. And I called the attorney for
14  Mr. Jimenez and she said oh, yes, we have a lot of material on
15  Mr. Morrissey, public records, and in any event, she provided
16  those materials to me.
17       So what we learned, among other things, is that in
18  1992 Mr. Morrissey sent a letter to Judge Leo Glasser of the
19  Eastern District in which he announced that there was a person
20  named Ray Sanchez living inside his body who was making him do
21  all the bad and illegal things he was doing. He wrote some
22  other letters to judges saying he was schizophrenic and taking
23  17 pills a day which caused him memory loss.
24       There were some psychiatric evaluations based on the
25  request of what was then the Federal Defenders. They filed a

1  motion for competency evaluation for Mr. Morrissey. There was
2  a report produced that Judge Sifton characterized as stating to
3  a medical certainty that Mr. Morrissey was a malingerer and
4  faker and someone who lied for his advantage.
5       In that the same proceeding, the United States
6  Attorney's Office for Eastern District of New York sought an
7  upward adjustment at sentencing on the grounds Mr. Morrissey
8  had obstructed justice by, among other things, threatening his
9  wife and child with a gun to get them to change their story,
10  that he lied about being the subject of threats by John Gotti,
11  who had a trial pending at that time, in an effort to get
12  transferred to another jail. And I think -- there were some
13  other allegations, too, that they described as numerous
14  instances of making false statements to advance his cause at
15  sentencing.
16       Since that case, Mr. Morrissey has been, as was
17  revealed by the very extensive rap sheet we have for him, has
18  been committing crimes at a rather staggering rate, probably
19  about 35 separate convictions, violations of supervised
20  release. He was prosecuted by the United States Attorney's
21  Office in 2000 here and the case was sent -- in this district,
22  but then there was a Rule 20 to the Eastern District of New
23  York.
24       In 2008, Mr. Morrissey, when he was testifying in one
25  of these homicide trials in the Bronx, testified that he has

1  been a cooperator for a long period of time, that most of his
2  cooperation has been with the federal government. He's
3  testified he was working with the FBI, the Secret Service, and
4  that he had a United States marshal named Craig Michael Kane
5  who was assigned as a personal handler. He also testified that
6  in fact he has supposedly received some information about
7  homicides in four separate cases, not just the government
8  saying two cases where he testified at trial, but at this
9  proceeding saying there were four separate cases in which he
10  supposedly acquired -- somebody confessed or he somehow
11  acquired information about homicides.
12       And it seems to me that none of this information was
13  reflected in what we got from the government. And in fact,
14  although one would think when they say he's been a confidential
15  informant for the ATF since 2010, which is when this case
16  started, that by implication -- at least we initially read it
17  that he wasn't an informant before that.
18       And putting aside the fact that this conflict wasn't
19  discovered, which was actually not that hard to realize there
20  was one because the docket sheet for his case said that he was
21  initially represented by a Community Defender organization,
22  which is the Federal Defender's Office, but putting that issue
23  to one side, I do think that the Court should undertake some
24  sort of inquiry of the prosecutors, the government in this
25  case, as to what steps they have taken to investigate their own

1  witness. This is not -- we're not talking about somebody who
2  is working for a little police department down in Georgia or
3  something, this guy, by his own testimony, has been working
4  extensively for the federal government for many years now and
5  seems to have been able to do that despite like a really pretty
6  amazing criminal record including getting arrested for drug
7  possession and pleading guilty during the very time that he was
8  working as a confidential informant on this case.
9       But it seems to me that there were definitely
10  enough -- even based on the very limited disclosures that we
11  received in the 3500 material, there were definitely enough red
12  flags there to make anyone who had any interest in actually
13  finding out who their witness was to take some further
14  investigation. And since this all has got to be in the
15  Department of Justice files, because they prosecuted him in
16  1992, the same information I'm talking about was -- I mean
17  they're the ones who moved for an upward adjustment for
18  obstruction of justice, they got these letters, and there's a
19  letter from Judge Glasser sending it to the prosecutor. So
20  it's not like they didn't have this information.
21       I know we have to get off this case, which I deeply
22  regret, but before we get off, I do think that the Court
23  should, even if it's in camera, in some way make some kind of
24  inquiry as to what is going on here. We're reading in the
25  Times, there's a front page story about how in Brooklyn there's

D5DTORTC                                                Page 13

1   corroboration of what he says in his -- what the federal
2   defender says that he put in the transcript that he was also a
3   paid informant for the FBI and the Secret Service. We clearly
4   at this point, now that we have been made aware of that, we'll
5   look into it to learn more about that.
6       THE COURT: And was Mr. Morrissey acting in his role
7   as a paid informant for the ATF in the context of the case
8   before me?
9       MS. LONERGAN: Yes, your Honor, except for the very
10  initial interaction between him and the defendant, which was he
11  was not a paid informant at that point. But based on what he
12  learned from that initial interaction, he reached out to people
13  in law enforcement and became a paid informant with ATF.
14      THE COURT: Teach me, when ATF or another agency
15  engages somebody as a paid informant, what kind of
16  investigation do they do before they decide to utilize the
17  individual's services?
18      MS. LONERGAN: Your Honor, I know that they pull the
19  confidential informant's criminal history. Beyond that, I
20  can't speak for what ATF does.
21      THE COURT: And you knew that he had a marshal
22  handler?
23      MS. LONERGAN: We didn't know -- he was not referred
24  to as a handler in our conversations. What we did learn was
25  that after the initial interaction with the defendant in this

D5DTORTC                                                Page 14

1   case he reached out to someone he knew in the Bronx, and when
2   he did not get a response from that person in the Bronx he
3   reached out to someone that he knew at the marshal's Service.
4       THE COURT: There is someone by the name of Craig
5   Michael Kane?
6       MS. LONERGAN: I do not know. We know that he reached
7   out to a deputy U.S. marshal, and that deputy U.S. marshal
8   is someone who ultimately put him in contact with the ATF.
9       MS. BAUMGARTEL: Your Honor, may I say, this is very
10  troubling, because what the government disclosed to us, the
11  very limited amount they disclosed is from one meeting they
12  have in their notes: Reached out to Bronx detective, another
13  contact, in touch with ATF. Now the government is saying they
14  did in fact know that he had a deputy marshal contact who he
15  was in touch with, but they didn't disclose that in even the
16  3500 material that they produced.
17      And if you look at, for example, the docket that we
18  were just discussing, it references on there the Kevin
19  Morrissey -- the informant's competency proceeding. So even
20  looking at the docket you should notice there's something
21  there. What we're concerned about is the 3500 that the
22  government produced presented a picture that this is an
23  individual whose first contact with law enforcement in terms of
24  cooperation was in November 2010 when allegedly he first had
25  this interaction with Mr. Ortiz.

D5DTORTC                                                Page 15

1       And in fact, when you look at this individual's own
2   sworn state trial testimony, he spells out a long record of
3   cooperation prior to that. And the government, even just by
4   the individual saying that he had a contact in the deputy
5   marshal's service, which the government did not disclose that
6   they knew until just this moment, they should have at least
7   done some further inquiry to determine how he had that contact.
8       And your Honor, they didn't disclose his name, they
9   didn't disclose his connection with the Bronx detective who he
10  had reached out to. And so the disclosures that they made
11  painted a picture of a person who had never before cooperated.
12  They didn't even disclose that in his prior state trial
13  testimony that he was acting as a cooperator. From their notes
14  he could have just been an unlucky or lucky witness to two
15  murders. They didn't even specifically say that it was
16  pursuant to state cooperation. That really puts a different
17  slant on an individual's testimony and credibility, and it's
18  really very important disclosure material.
19      THE COURT: You didn't notice that it said that there
20  was a competency hearing ordered?
21      MS. LONERGAN: No, your Honor.
22      THE COURT: Mr. Gombiner, you said that there's a case
23  currently before Judge Oetken, right?
24      MR. GOMBINER: Yes.
25      THE COURT: But you also said that there's currently a

D5DTORTC                                                Page 16

1   440 pending in state court?
2       MR. GOMBINER: Yeah.
3       THE COURT: They should not both be happening at the
4   same time.
5       MR. GOMBINER: I'm not a total expert on this case,
6   but I think Judge Oetken stayed the proceedings in the federal
7   case to allow the 440 motion to be proceeding.
8       The defendant is pro se in federal court, and there
9   was a lengthy, complex, procedural history here, but I think
10  the end result is that case is stayed so the 440 motion could
11  be --
12      THE COURT: I thought you said he was represented by
13  the --
14      MR. GOMBINER: Appellate Defenders. That's in state
15  court, he's pro se in federal court.
16      Don't hold me -- I'm pretty sure that's right. It's
17  Jimenez versus somebody. I could get the docket number. I
18  think, from my memory, it's 11 Civ. 6468
19      MR. GORDON: Your Honor, may I have one moment with
20  Mr. Gombiner?
21      THE COURT: Sure.
22      (Pause)
23      MR. GORDON: Thank you, Judge.
24      THE COURT: So is the bottom line here that an
25  overwhelming percentage of what defense counsel has recited

1 a detective who had a witness who seemed to come up with
2 testimony about one homicide case after another. This is how
3 miscarriages of justice occur when you have got a government
4 that doesn't seem to have any concern -- I don't want to be --
5 I'm not going to engage in any -- just based on the record
6 here, there does not seem to have been any effort at all to
7 check into the background of a witness who, even through the
8 very limited notes we had, is somebody who you would have to
9 think there might be something else up with this guy.
10     That's something that I would think -- or if he lied
11 to them, that's probably Brady material, too. If they asked
12 him have you ever been an informant and he said no, that would
13 be a pretty substantial lie. That would be a crime for one
14 thing. It would be Brady material. And if they didn't ask
15 him, I mean that's pretty -- I think that's fairly extremely
16 negligent. So we're asking the Court to make some kind of
17 inquiry as to what happened.
18     MS. BAUMGARTEL: Your Honor, I just want to add, so
19 it's a hundred percent clear, there were many things that
20 happened that were distant in time, but also some of this is
21 much more recent. So in the documents that we obtained, again
22 from public sources, he claimed as recently as November 2003 to
23 be mentally ill and incompetent. And his letters -- his
24 testimony in these cases talking about his extensive federal
25 cooperation, that occurred in March 2008. And there are

1 records on file where he was sending letters to the United
2 States Attorney's Office and to his U.S. marshal, Craig Michael
3 Kane, as recently as 2006. So while many of these events --
4 while there's been a long pattern of this conduct dating back
5 many years, it's also important for the Court to see it's
6 continued even much more recently.
7     THE COURT: Before we get to this, the question that I
8 had was how did the U.S. Attorney's Office not figure out this
9 conflict at the beginning? Based on the rather simple notion
10 that someone prosecuted in federal court in the Southern
11 District, now I learned in the Eastern District -- that there
12 must be something like a 50 percent chance, 40 percent chance,
13 I don't know what exactly your percentage of representation is,
14 but it's enormous -- likely had Federal Defenders/Legal Aid as
15 their counsel.
16     MR. GOMBINER: Judge, to be clear -- I think I was
17 clear, we did not represent him in the Southern District
18 case but in the Eastern District case.
19     THE COURT: But this material is the Eastern District
20 case.
21     MR. GOMBINER: Yes.
22     THE COURT: I'm not an expert on reading these rap
23 sheets, but it doesn't take a genius to figure out that it's a
24 federal case and it's you.
25     So how did you guys not figure that out?

1     MS. LONERGAN: Your Honor, the representation on the
2 docket sheet of who he was represented by in the 1992 case had
3 the lawyer's name, who currently works at Dreier, and --
4     THE COURT: Works where?
5     MS. LONERGAN: Dreier LLP, which is a Pennsylvania
6 firm.
7     THE COURT: OK.
8     MS. LONERGAN: And then underneath at the very bottom
9 in italics it said designation, Community Defenders. We did
10 not recognize that is the same organization as Federal
11 Defenders of New York. It didn't say Federal Defenders of New
12 York, it said Community Defenders. That is something now that
13 we're aware means Federal Defenders, but we did not know that
14 when we looked at that.
15     THE COURT: No one teaches you that?
16     MS. LONERGAN: No. I have never been told if it says
17 Community Defenders that means Federal Defenders of New York.
18     THE COURT: You never read --
19     MR. GOMBINER: Judge, it would say --
20     THE COURT: It's in our CJA plan. It's in the statute
21 involving representation of indigents in federal court. I mean
22 do they teach you, by the way, that it used to be that what we
23 now call Federal Defenders was sort of the federal section of
24 the Legal Aid Society so that you would know if you saw Legal
25 Aid in this court it's them?

1     MS. LONERGAN: Yes, your Honor.
2     THE COURT: That's good. And you never read -- after
3 you saw the docket sheet, you never went and read any of the
4 transcripts or other things that are referenced or got the
5 file, in which case presumably at some point the lawyer would
6 have said I'm so-and-so from Federal Defenders? Never read any
7 of that stuff? No?
8     MS. LONERGAN: No, your Honor.
9     THE COURT: Why not? You have a guy here who has the
10 longest rap sheet I have ever seen in any of the trials I have
11 had. I don't have the necessary the greatest lifetime
12 experience, but this is my 34th year on the bench here. And
13 don't you think it's your responsibility to learn everything
14 about your witness's criminal history so that, A, you can
15 evaluate whether you want to use him and trust him, and B, so
16 that you can be sure that you have given the defense everything
17 that they're entitled to know?
18     MS. SURRATT: It's true, your Honor, we did not pull
19 every transcript from every state and federal proceeding on his
20 rap sheet, which you noticed is lengthy.
21     THE COURT: Do you now know that Mr. Morrissey was a
22 paid informant for at least one federal agency?
23     MS. LONERGAN: Your Honor, we know that Mr. Morrissey
24 had contact with the United States marshal. We know that he
25 was a paid informant for the ATF. We do not have any

1 this morning and I guess on Friday came as a surprise to the
2 government?
3      MS. LONERGAN: Yes, your Honor.
4      THE COURT: Is Mr. Morrissey involved in all of the
5 transactions charged in this case?
6      MS. LONERGAN: No, your Honor.
7      THE COURT: How many?
8      MS. LONERGAN: He is involved in three of the four.
9 In one of those three, the undercover officer -- the undercover
10 agent is also involved, and all four transactions are recorded.
11      THE COURT: Is the evidence of the interaction between
12 Mr. Ortiz and Mr. Morrissey limited to the recordings or would
13 Mr. Morrissey be testifying about conversations that were not
14 recorded?
15      MS. LONERGAN: About 90 percent of his testimony would
16 be about the recorded conversations, approximately ten
17 percent -- those percentages are not -- those are ballpark.
18 There are some conversations that he had with the defendant
19 that were not recorded. Some of those conversations are
20 corroborated in other ways because, for example, they came in
21 between two recorded conversations, so what Mr. Morrissey is
22 saying happened in the unrecorded conversation makes sense by
23 what happened before and what happened after that's recorded,
24 if that makes sense.
25      MS. BAUMGARTEL: Your Honor, I would like to address

1 this. I mean there are a couple of points. One is that during
2 the period of time that we're talking about, my client was
3 working with Kevin Morrissey at a tow truck company, and so
4 they had interactions virtually every day. They had a lot of
5 conversations that were not recorded in any way.
6      I don't even -- I don't think that our defense is a
7 mystery, but I think that some very important aspects of this
8 trial will be instances that were not recorded, and I can name
9 a few. One is just how it starts, because Mr. Morrissey is
10 going to have one story about that, and our client's account
11 will be very different, and that's not something that is
12 recorded. That's something that Mr. Morrissey initiates that
13 begins well before he ever contacts anyone from the ATF. And
14 in a case like this where one of the jury instructions the
15 Court -- the government submitted to the Court is if Mr. Ortiz
16 held himself out, for example, as a firearms dealer, that will
17 depend on Mr. Morrissey's testimony in large part.
18      Another thing that springs to mind, and we brought
19 this up in the last conference, on the recordings you can hear
20 my client saying to Mr. Morrissey the value his guns, one gun
21 is worth, he says, about 500. Days later the price that
22 Mr. Morrissey ends up paying for it is a thousand. That is
23 going to be a big point for the government. They want to call
24 an expert witness to talk about how that was above market as
25 evidence that my client was a firearms dealer. Mr. Morrissey

1 will have one story about why the price of that gun went up,
2 when the simple true account is simply my client didn't want to
3 sell it and so he offered to pay him more than double in order
4 to get him to sell it.
5      So there are going to be a lot of important components
6 of the trial that are not recorded and that go directly to our
7 defense and where Mr. Morrissey's credibility is going to be
8 important.
9      THE COURT: Well, it seems to me the government has a
10 lot of work ahead of it to follow through on all the leads to
11 possible Brady and Giglio material that the defendant has
12 brought to your attention. Is there any reason why it should
13 take you more than two weeks to do that investigation?
14      MS. LONERGAN: Your Honor, we don't know how long that
15 investigation will take. We will start on it immediately, but
16 it will involve things such as getting records from the state
17 court, reaching out to see potentially this deputy U.S.
18 marshal. I think at this point we would want to do a thorough
19 investigation to look into what we have now learned, and I
20 don't want to put a time frame on that.
21      THE COURT: Well, I think there are two good reasons
22 to put a time frame on it. How about three. One, that you
23 didn't do it before, so therefore, if you are under a little
24 pressure, it's OK with me; two, the defendant should have known
25 about this, so there shouldn't be a delay; and three, you ought

1 to learn a little bit more about your witness for your sake.
2      I will give you until the end of the month. I don't
3 see any reason that you shouldn't work hard to do this. The
4 other thing is that I think it would not be inappropriate for
5 the chief of the criminal division to send the Court an ex
6 parte letter explaining in a sense what went wrong and what is
7 going to be done to make sure this doesn't happen again. At a
8 minimum, tremendous resources were invested by the Federal
9 Defenders, who are operating under a sequester, who don't have
10 the time to work on cases in which they can't represent the
11 defendant. The work that the Court did is easily reasonable,
12 and what they did may in the end help Mr. Ortiz, but
13 nonetheless, they're not in the position to use their time on
14 defendants who they're not able to represent. And I don't
15 really understand fully how it is that the U.S. Attorney's
16 Office failed to explore more closely the representation issue
17 of any witness who has been indicted in the Southern and
18 Eastern Districts of New York, because there ought to be a
19 presumption, almost, that their lawyers were the Federal
20 Defenders.
21      And I think that what is clear is that with the wealth
22 of information that came out of the Eastern District case that,
23 had you done your homework in the first case, this whole
24 situation would never have arisen because you would have
25 learned about the competency exam and you would have learned

1  about the remarks of the judges and you would have learned
2  about the government's request for an upward adjustment, and I
3  assume other things would have flowed from that.
4      So is there anything else before I officially appoint
5  Mr. Gordon?
6      MR. GOMBINER: No, Judge, thank you.
7      MS. BAUMGARTEL: Your Honor, as a housekeeping matter,
8  we have a transportation order for the Court. I can hand it
9  off to Mr. Gordon or hand it up.
10     MS. LONERGAN: Your Honor, if I may, earlier in asking
11 defense counsel about Friday's conference call, the Court
12 referred to whether there was any Brady material in that
13 conference call. I think that it's actually whether there was
14 any Giglio material in that conference call, not Brady.
15     THE COURT: OK. I'm not going to --
16     MS. BAUMGARTEL: Your Honor, I don't want to quibble,
17 but I mean the Supreme Court has made very clear that
18 impeachment material is Brady material. That's what it is.
19 The mechanism that requires the government to turn it over, and
20 I will cite probably the easiest is Kyles v. Whitley, 514 U.S.
21 419, but Brady material is material that tends towards
22 impeachment. It's the same. Whatever precise language --
23     THE COURT: Let's say that psychiatric report says
24 that Mr. Morrissey is incapable of telling the difference
25 between truth and fiction, you don't think that's Brady

1  material? Because if your case, as defense counsel argues, has
2  a substantial component of you've got to believe this witness,
3  and the witness has been medically examined and been found --
4  let's say he was found to be a pathological liar. I'm not sure
5  he was, but that report, which of course I have never seen, may
6  just be in a sense a statement that he was manipulating all the
7  tests, consciously doing so. The way those psychological
8  testing protocols work, you can tell whether someone is
9  manipulating them, and that may be all it said. But
10 nonetheless, I certainly think I could come up, at least, with
11 a hypothetical where issues going to the witness's credibility
12 rise to the level of Brady and aren't just simply ways to stick
13 pins in the witness.
14     So one question. I'm going to appoint Mr. Gordon to
15 be Mr. Ortiz's counsel, but have you and Mr. Ortiz talked about
16 whether he should stay here for another day to talk to you or
17 should he go home? What are you planning on? Because simply
18 before I sign this order I think that's a practical detail I'm
19 going to think about.
20     MR. GORDON: Your Honor, I know he wants to get home.
21 I could initially talk to him on the phone and then have him
22 come back up again closer to trial.
23     But with respect to your asking the government to
24 investigate further with respect to the informant, if they
25 can't do it adequately and completely by the end of the month,

1  I would ask that you give them more time so they do a thorough
2  job and learn what they can about this guy. And if that means
3  the trial date would have to be changed -- it may not have to
4  be changed, but if it may have to be changed, we could deal
5  with that later.
6      THE COURT: I think that I have the confidence that,
7  with a fire having been lit under the U.S. Attorney's Office,
8  that they will be able to contact essentially a whole bunch of
9  law enforcement agencies and courts to get this information. I
10 really don't see why, if they put their minds to it, that they
11 can't achieve it. Because we're talking about contacting ATF,
12 contacting the marshal's service, finding out if the witness
13 ever worked for the FBI. They have got a list of their
14 informants or confidential sources. And as far as getting --
15 he testified twice apparently, in the state court.
16     MR. GOMBINER: Yes.
17     THE COURT: And they were murder cases, so they
18 probably have transcripts. They're not like little cases which
19 they never make the transcript.
20     MR. GOMBINER: They do have transcripts.
21     MR. GORDON: Obviously if the government decides that
22 they don't want to go to trial on a case that depends on a
23 witness like this and they want to nolle the case before July,
24 we would have no objection.
25     THE COURT: That's one of the reasons I want them to

1  work hard. I'm not telling them what to do, but that was the
2  import. The defendant needs to know, you need to know, and the
3  government needs to know. They have to make a decision,
4  because I take the assistants at their word that this comes as
5  much as a surprise to them as it does to me, and so I'm
6  assuming that this was not part of the whole decision making
7  process. And I don't know whether it should change it. I
8  don't know what the evidence is. I don't know what's on tape,
9  I don't know what is -- how much of this is dependent on
10 whether you believe Mr. Morrissey or not, I have no idea.
11     So they're in the best position to ask themselves the
12 theoretical question: If the jury decides that he is a total
13 liar and they don't wish to believe anything that he says
14 that's not corroborated, what would happen to their case? They
15 should obviously go through that thought process.
16     MR. GORDON: May I have one moment with Mr. Ortiz?
17     THE COURT: Sure.
18     (Pause)
19     MR. GORDON: Mr. Ortiz would like to go home, and I
20 think I should get up to speed before my talks with him so I
21 could talk to him intelligently.
22     THE COURT: We only like intelligent conversations.
23     So I assume there's no objection to waiving the speedy
24 trial time until July 15.
25     MR. GORDON: No objection.

1          THE COURT: OK. I have signed your transportation
2    order.
3          MS. BAUMGARTEL: Thank you.
4          THE COURT: I think that's it for today.
5          MR. GORDON: Your Honor, will we have a conference
6    before the trial?
7          THE COURT: We'll do something.
8                    oOo
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3287-00

## AFTER CARE LETTER

Date: 1|8|07

Whom It May Concern:

Patient __Kevin Morrissey__ has been under our care for the following conditions:

| Health Problems | II. Treatments, Medications, Date, Follow-Up Needs |
|---|---|
| Schizophrenia, Undifferentiated Type | Zyprexa 20 MG HS |
| Polysubstance Dependence | |
| Hypertension | Toprol XL 50MG |
| History of motor vehicle accident, splenectomy 1997 | |
| Fracture - 10th rib posteromedially | Motrin 400 MG BID |

Follow-up care is required for the above conditions(s)

Clinic Tel. # Mental Health 718 546 4698

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX – PART __

-------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK, :

                                           :        AFFIRMATION OF
                                           :       PATRICK L. BRUNO

           -against-                         :

                                           :

RICARDO JIMENEZ,                      :       Ind. 3825/2006

                                           :

           Defendant.                  :
-------------------------------------------------------------x

PATRICK L. BRUNO, ESQ., an attorney duly admitted to practice in the

State of New York, does hereby affirm under penalty of perjury that the following

is true:

1.      I was appointed to represent Ricardo Jimenez on Indictment No.

3825/2006. Mr. Jimenez was charged with second degree murder for a shooting

that occurred in July of 1989. The case proceeded to trial and jury selection began

on June 20, 2007.

2.      As part of discovery, I requested that the prosecution provide me with

the prior convictions and bad acts for any of their witnesses.

3.      I received a one-page memo from Assistant District Attorney Lisa

Mattaway, dated June 8, 2007, informing me of promises made to two incarcerated

witnesses, Andrew O'Brien and Kevin Morrissey. Specifically, the memo stated

1

that Mr. O'Brien "[h]as asked for a letter to be prepared by the undersigned that he can have put in his file stating that he testified for the Bronx District Attorney's Office." As to Mr. Morrissey, the memo stated that he had pending cases in Nassau, Queens and Brooklyn, that prosecutors in Nassau and Brooklyn had apparently agreed to give him a sentence of one to three years, but the Queens prosecutor had not and that Mr. Morrissey "asked for a phone call to be made to Queens if he testified for the Bronx District Attorney's Office." I was not informed of any other promises made to these witnesses.

4.     On June 20, 2007, the day jury selection began, I received from ADA Mattaway a one-page document listing convictions for prosecution witnesses Andrew O'Brien, Kevin Morrissey and Esco Blaylock. I was not informed of any other convictions or bad acts for these witnesses.

5.     Due to the timing of these disclosures, which occurred as the trial was beginning, I did not conduct any independent investigation of criminal backgrounds of these three witnesses, nor did I request additional time to do so. In preparing my cross-examination of these witnesses, regarding their prior convictions, bad acts and promises made to them in exchange for their testimony, I relied solely on these disclosures.

2

6.      Trial testimony began on June 28, 2007 and, after lengthy

deliberations, the jury returned a guilty verdict on July 13, 2007.

Dated:      September 21, 2011                    _____
                                                 PATRICK L. BRUNO, ESQ.

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: CRIMINAL TERM
- - - - - - - - - - - - - - - - - - - -X
THE PEOPLE OF THE STATE OF NEW YORK
Ex. Rel., RICARDO JIMENEZ
  a.k.a. - RICARDO SILLIE

               Defendant,

     -AGAINST-

THE PEOPLE OF THE STATE OF NEW YORK
               Plaintiffs,
- - - - - - - - - - - - - - - - - - - -X

**NOTICE OF MOTION
TO DISSMISS**

Ind. # 3825/2006
Grand Jury # 44395/2006

SIRS:

    **PLEASE TAKE NOTICE,** that upon the annexed affirmation of
RICARDO JIMENEZ, and upon all prior pleadings and proceedings had
herein, the undersugned will move this court, in part *10* thereof,
at 851 Grandconcourse, Bronx, New York 10451, on the 7th day of
*May* 2007, at 9:30 a.m. or as soon thereafter as counsel may be
heard, for an order dismissing the indictment herein on the
grounds that the defendant has been denied due process of law
under the NEW YORK STATE CONSTITUTION and the UNITED STATES CONS-
TITUTION, by the lengthy and unjustifiable delay in commencing
the prosecution herein, and granting such other and further
relief as to the Court may seem just and proper.

Dated: April 12, 2007.
     Bronx, County

                   Respectfully Submitted,

                   *Ricardo Jimenez*
                   RICARDO JIMENEZ
                   Defendant,

RECEIVED
APR 25 2007
SUPREME COURT CLERK'S OFFICE
BRONX COUNTY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: CRIMINAL TERM
- - - - - - - - - - - - - - - - - - -X
THE PEOPLE OF THE STATE OF NEW YORK        :
Ex. Rel., RICARDO JIMENEZ                   :
    a.k.a. - RICARDO SILLIE                 :
                        Defendant,          :        **AFFIRMATION**
                                            :        **IN**
                                            :        **SUPPORT OF**
            -AGAINST-                        :        **MOTION**
                                            :        **TO**
THE PEOPLE OF THE STATE OF NEW YORK         :        **DISSMISS**
                        Plaintiffs,         :
- - - - - - - - - - - - - - - - - - -X
                                                     Ind.# 3825/2006
                                                     Grand Jury # 44395/2006


        I, RICARDO JIMENEZ,duly sworn deposes and says:

1. That I am the defendant in the above captioned action.

2. That I make this affirmation in support of the within
   motion.

3. That under the instant indictment, the defendant JIMENEZ
   was charged with the crime of Murder in the second degree.

4. That the instant indictment is based upon an incident that
   occured on or about July 3, 1989, nearly eighteen years
   prior to the indictment herein, in the County of the Bronx
   in which the victim was shot and killed in the course of
   an altercation inside the Whitestone Cinema, 2505 Bruckner
   Boulevard, in Bronx County.

5. An examination of the records of this case reveals that
   RICARDO JIMENEZ, was arrested a couple of days after the
   incident and held 3-4 hours and then released, interestingly
   neither the police nor the prosecution followed-up on any
   interogation/information implicating JIMENEZ, despite the
   record indicating that July of 2001 the people claim that
   the defendant was again identified from multiple photo

array, then again in two (2) seperate occasions in 2006 witnesses claim to have identified JIMENEZ, as well as the first witness that prosecutors claim identified the defendant in 1989 after only being showed one single photo of defendant JIMENEZ, however despite all this that is reflected throughout the entire proceedings from the inception and the records of this case the people never showed any interest, nor followed up on any aspect of this case, it must be emphasized that at all critical stages concerning this incident defendant JIMENEZ, was either present in New York State Department of Corrections, or after being released in 1994, and his subsequent arrest (4) four months later for an unrelated offense in the State of New Jersey, and throughout his transfers to various facilities, all known to the prosecution, prior to being released and returning to New York City.

6. It is clearly evident that in addition to this lengthy delay in prosecuting the offense charged, the memories of the witnesses could possibly be dulled by the passage of time, and this in effect has caused actual prejudice to the defendant, inherently hindering and or impairing the ability of the defendant to adequately prepare and mount a defense against the allegations being made with regards to these proceedings.

7. Due to the lengthy delay in prosecuting defendant JIMENEZ is unreasonable and unjustified and has resulted in a violation of his right to Due Process of Law pursuant to the NEW YORK CONSTITUTION article 1 § 6, and the UNITED

STATES CONSTITUTIONAL AMENDMENT  14, and as such requires
the dismissal of the present indictment see: People v.
Singer, 44 N.Y.2d 241, 405 N.Y.S.2d 2217(1978), People v.
Washington , 43 N.Y.2d 772, 401 N.Y.S.2d 1007(1977), People v.
Andine, 214 A.D.2d 373, 624 N.Y.S.2d 594 (1 Dept. 1995),
People v. Rodriguez, 205 A.D.2d 417, 613 N.Y.S.2d 398( 1
Dept. 1994), People v. Allen, 13 A.D.2d 639, 789 N.Y.S.2d 56
(2nd Dept. 2004), People v. Morales, (N.Y. COunty 2006 Ind
# 1721/2005).

8. By definition, the people have met the heaviest burden the
law imposes- the burden of proof beyond a reasonable doubt.
But aside from that, the passage of time takes a toil on
Criminal cases. A re-trial of any matter, fifteen years
after the fact, can never be wholly fair, witnesses memo-
ries can hardly be what they once were.

9. Some witnesses, have been contacted by individuals who have
been contacted by individuals who have not hestitated to
express a point of view; their communication and their
questioning have not been nuetral, and the danger that
witnesses, however since, have been tainted by such contacts
is very real.

10. Furthermore, defendant JIMENEZ was never placed in a line-up
during his arrest in July of 1989, and the people never
persisted in not arresting JIMENEZ, and not placing JIMENEZ
in a line-up, and not following up any leads in any way.

11. Failure to place JIMENEZ, in a line-up or to create a photo
array negates any claim of a good faith investigation(s),

despite the fact that the description of JIMENEZ in 1989 warranted enough to compose a photo-array, line-up, or even seek an indictment at that time.

12. Moreover, eventhough their is no statute of limitations for the offense charged (Murder 2°) however where the prosecution knows of the whereabouts, they have to show good cause, and justification for the delay in commencing the proceedings against a defendant.

**WHEREFORE,** it is respectfully requested that the Court dismiss the indictment herein and grant such other and further relief as to the Court may seem just and proper.

Dated: April 13, 2007
Bronx, New York

_Ricardo Jimenez_
RICARDO JIMENEZ
Defendant

Sworn to me before this
/2 day of April____, 2007.

NOTARY     PUBLIC

JOSEPH CORREA
Commissioner of Deeds
City of New York - No. 4-5401
Cert. Filed in Queens County
Commission Expires Dec. 29, 2008

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: CRIMINAL TERM
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,
Ex. Rel., RICARDO JIMINEZ a.k.a RICARDO
SILLIE,

DEFENDANT

    - against -                            **AFFIDAVIT**

Indictment No. 3825/2006

THE PEOPLE OF THE STATE OF NEW YORK,

PLAINTIFFS.

-------------------------------------------------------------------X


PATRICK L. BRUNO, an attorney at Law, duly admitted to practice in the State of New York, hereby affirms under penalty of perjury:

1.    That I am the attorney of record having been assigned by the Appellate Division.

2.    That this Affirmation is submitted in support of the Defendant's prayers for relief as enumerated in the annexed Notice of Motion.

3.    That the statements made herein are true to your affiant's own knowledge, except as to those statements made upon information

4.    That the sources of your affiant's information and belief are the Court records, the defense file, conversations with the Defendant and the Voluntary Disclosure Form submitted by the People.

5.    That the defendant is charged in the indictment with the crime of Murder in the Second Degree and related crimes.

6.    I have adopted Defendant's Motion, which is submitted herein.

Dated:   Floral Park, New York
         April 24, 2007

Respectfully submitted,

_____
PATRICK L. BRUNO

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF BRONX: CRIMINAL TERM: PART M30

 3    ---------------------------------------x

 4    THE PEOPLE OF THE STATE OF NEW YORK    : Indictment

 5                                           : 3825-06
                                               252311-06
 6                -against-                   :

 7    RICARDO JIMENEZ,                        :

 8                    Defendant.              :

 9    ---------------------------------------x

10                        851 Grand Concourse
                          Bronx, New York 10451
11                        May 21, 2007

12

      B E F O R E:      HONORABLE WILLIAM MOGULESCU
13

14    A P P E A R A N C E S:

15
                   FOR THE PEOPLE:
16                 ROBERT T. JOHNSON, ESQ.
                   District Attorney, Bronx County
17                 BY:  LISA MATTAWAY, ESQ.
                   Assistant District Attorney
18

19                 FOR THE DEFENDANT:
                   PATRICK L. BRUNO, ESQ.
20

21

22

23

24
                          Maria Esther Rivera, RPR
25                        Senior Court Reporter
```

1       THE CLERK:  This is number 35 and 40,

2  Ricardo Jimenez.

3       MR. BRUNO:  Patrick L. Bruno, 99 Tulip

4  Avenue, Floral Park, New York, for Mr. Jimenez.

5       Your Honor, I'm ready for trial.

6       MS. MATTAWAY:  Lisa Mattaway, for the

7  Office of the District Attorney.

8       THE COURT:  And?

9       MS. MATTAWAY:  People are not ready

10  for trial.

11       THE COURT:  Why?

12       MS. MATTAWAY:  There are a number of

13  reasons.  First, I recently got off trial

14  myself.  I was on a six-week trial in Part T-16.

15  Then I got off that trial about a week ago, and

16  I was ordered by Justice Bernstein to start a

17  three defendant 2005 in case and not to take

18  anything that would conflict with that.

19       This case is a late 2006.  He was

20  arrested August 31, 2006.

21       THE COURT:  In other words, he's only

22  been in jail for 10 months.

23       MR. BRUNO:  It's a murder that

24  occurred 18 years ago.

25       THE COURT:  But he's only been in jail

1   10 months.

2            MS. MATTAWAY:  The three defendant

3   other case is a full year older than that.

4            THE COURT:  I understand that.  And

5   obviously those three defendants who have been

6   in jail for 20 months or 22 months should have a

7   trial.  If your office doesn't have sufficient

8   people to try these cases within a reasonable

9   time period, they should hire more people or

10  consent to bail.

11           MS. MATTAWAY:  Now that I'm off trial

12  with the case I just finished, I'm actively

13  working on getting this case to trial.  I met

14  with a witness only a week ago.  I'm meeting

15  with another witness tomorrow.  The longer I

16  work with the case, the better.

17           THE COURT:  If it's getting better,

18  somebody else should --

19           MS. MATTAWAY:  Do you want to call

20  Judge Bernstein?

21           THE COURT:  When is that case

22  scheduled for?

23           MS. MATTAWAY:  June 6th.

24           THE COURT:  If you start the case

25  now --

1          MS. MATTAWAY:  There is no way that I

2     can start.

3          THE COURT:  When can you start it?

4          MS. MATTAWAY:  Well, Your Honor, how

5     about we put this case on for shortly after --

6     this is a three defendant case.  Now, I am

7     abiding by Justice Bernstein's order not to take

8     anything else.  I don't know if defense would

9     agree to go forward or will be ready.  If we can

10    put this on after that, then perhaps this will

11    be the next case that goes.  He told me on the

12    2005 case --

13          THE COURT:  June 4th?

14          MS. MATTAWAY:  Sorry, Judge?

15          THE COURT:  June 4th?

16          MS. MATTAWAY:  No.  June 6th.  That

17    case is on in M20.  He told me don't take

18    anything between now and then.  If this case

19    doesn't go, why don't we put it on for the

20    Monday after?

21          MR. BRUNO:  It is not a personal

22    attack with this A.D.A., but on the last date,

23    May 14th, the message was she's ready, but for

24    the fact that one of the officers had a death in

25    his family and it wasn't a close relative, so we

1    postulated.  For this reason we put it on a week

2    later.  You know, now an entirely different

3    issue that would drag this case out another

4    three weeks is being offered.  I submit that we

5    try this case between now and June 6th.

6              THE COURT:  When can you be ready?

7              MS. MATTAWAY:  I actually think the

8    date I just gave the Court is probably a

9    reasonable date.  I'm actually still speaking to

10   witnesses.  There were several witnesses.  It is

11   18 years old.  I have to get a new medical

12   examiner to testify about the 18 year old

13   autopsy.

14             THE COURT:  This is a gunshot wound.

15   You don't need the world's most foremost --

16             MS. MATTAWAY:  I need to lay

17   foundation, and I need to let the various agents

18   know.  I need somebody who is working in 2007,

19   so I'm working --

20             THE COURT:  The People said they were

21   ready months ago.

22             MS. MATTAWAY:  Yes, that's true.

23             THE COURT:  If they were ready

24   eight months ago, this is -- what does this have

25   to do with anything?  How could you have been

1     ready eight months ago?

2          MS. MATTAWAY: Because I am ready.

3          THE COURT: What are you proposing on

4     the way of bail?

5          MR. BRUNO: I would suggest $10,000

6     bail. The family would have no hopes of making

7     much more than that.

8          THE COURT: I'm not prepared to do

9     $10,000 bail.

10         MS. MATTAWAY: This defendant has 10

11    warrants from New York and New Jersey. He is

12    not any kind of bail risk. The People can be

13    ready in a very short time. He's only been in

14    since August 31st.

15         MR. BRUNO: Only?

16         THE COURT: Only in the Bronx, he has

17    only been in for 10 months and, oh, that's okay

18    another year or two -- that's not acceptable to

19    me. I will give you this adjournment. You will

20    find somebody else to try the case, if you try

21    that multiple defendant case. June 8th.

22         MR. BRUNO: May we set this for

23    June 6th? If the case doesn't go, we can start

24    this immediately.

25         THE COURT: June 8th.

RJ-000543

1          THE DEFENDANT:  Excuse me, Your Honor.

2          THE COURT:  You have a lawyer, and,

3    Mr. Jimenez, I'm not prepared at this moment to

4    set $10,000 bail.

5          MR. BRUNO:  Your Honor, my client

6    submitted a pro se motion, which I adopted,

7    that's also about five weeks ago.  May we have

8    some decision so that doesn't become an

9    efficient delay?

10         THE COURT:  Let me see.

11         THE CLERK:  (Handing.)

12         THE COURT:  The motion to dismiss on

13   constitutional grounds is denied.

14         MR. BRUNO:  Note my exception.  We are

15   on for June 8th for trial.

16         MS. MATTAWAY:  Hearings and trial.

17         MR. BRUNO:  Could that be a date

18   certain, Your Honor?

19         THE COURT:  I hope so.

20         MR. BRUNO:  Are you setting any bail,

21   Your Honor?

22         THE COURT:  At the moment I'm not

23   setting bail.  You said he can't make more than

24   $10,000, and I'm not prepared to set $10,000.

25         MR. BRUNO:  May we approach?

1      THE COURT:  Yes.

2           (Whereupon, there is a discussion held

3      off the record.)

4           THE COURT:  Mr. Jimenez, at this point

5      the bail will remain on remand status.  We will

6      reevaluate this.  I'm asking you and Mr. Bruno

7      to put together a maximum bail package that you

8      are able to get together.  On the adjourn date

9      if the People are not prepared for trial, I will

10     reconsider your bail application and I will

11     reconsider it, but I am not prepared to do it

12     today.  The People have said that within two

13     weeks or so Ms. Mattaway or somebody else will

14     be in a position to try this case.

15          MS. MATTAWAY:  Yes.  The misdemeanor

16     is tracking, Judge?

17          THE COURT:  Yes.

18           *        *        *        *

19

20          Certified to be a true and accurate

21     transcript of the stenographic minutes taken

22     within.

23

24          Maria Esther Rivera, RPR
            Senior Court Reporter

25

| | | HOMICIDE | Pct 45 | JB | Complaint No. 5948 | Date of This Report 7/3/89 |
|---|---|---|---|---|---|---|

| Date of Orig Report 7/3/89 | Date Assigned 7/3/89 | Case No. 840 | Unit Reporting 45 Sqd. | | Follow-Up No. 9 |
|---|---|---|---|---|---|

Complainant's Name - Last, First, M.I.

D.S.N.Y.

Victim's Name - If Different

| Last Name, First, M.I. Blaylock, Esco | Address, Include City, State, Zip | | Apt. No. |
|---|---|---|---|

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|---|---|

| Total No. of Perpetrators 1 | Wanted | Arrested | Weapon ☒ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) Hand gun |
|---|---|---|---|---|

| Wanted ☒ | Arrested | Last Name, First, M.I. UNKNOWN firts name Leon | Address, Include City, State, Zip 1057 Boynton Ave R.I., N.Y. | Apt. No. | Res. Pct. 43 |
|---|---|---|---|---|---|

| Sex M | Race B | Date of Birth | Age | Height | Weight | Eye Color | Hair Color Bk with gold stripes | Hair Length | Facial Hair | NYSID No. |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses
Nickname, First Name, Alias

Clothing Description, Scars, Marks, M.O., Etc. (Continue in "Details"): has a gold tooth, white shirt, white shorts, bk sneakers with no socks.

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. | Res. Pct. |
|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses
Nickname, First Name, Alias

Clothing Description, Scars, Marks, M.O., Etc. (Continue in "Details"):

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) |
|---|---|---|---|---|---|

| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) |
|---|---|---|---|---|---|

| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date. Evidence Obtained |
|---|---|---|---|

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) |
|---|---|---|---|

If Closing Case "No Results," Check Appropriate Box and State Justification in Details.
☐ C-1 Improper Referral  ☐ C-2 Inaccurate Facts  ☐ C-3 No Evidence / Can't ID  ☐ C-4 Uncooperative Complainant

DETAILS: UF61# 59XX48     CASE# 840     HOMICIDE

INVESTIGATION: HOMICIDE
SUBJECT: INTERVIEW OF WITNESS ESCO BLAYLOCK

1. On 7/3/89 at 0415 hrs. the undersigned who was morning a night watch interviewed Esco Blaylock at the 43 Pct. Det. Sqd. Office at which time he was also shown photos with negative results. He stated that he has been working at the Whitestone Cinema for about ——   gotten off about 2400 hrs. he was waiting for his girlfr——   lso works in the concession stand and was still working.   at about 0010 hrs. and talking to Lisa when an argument brok——   orn because the popcorn was runn- ing out and the victim got the   of the popcorn was just crumbs and the shooter claimed to be   tar said I'm going to get my pistol the victim said go get   aft the theater and the victim went into the movie theater nu——   showing.

Esco then went into the th——   ood in the back on the right side. The shooter came in the t——   tarted and sat in the back row in the middle, then he spotted   ng on the other side (the right sidesabout four rows up), the s——   —— you the one with the popcorn. The shooter stood up and said " I got my mother fucking gun now" and shot at victim and missed,the victim was sitting down, the victim got up to pull out his guns and as he turned around the shooter shot at him again and hit him in the head as the victim went down his gun fired and he layed dead in the aisle a couple of rows from were he was sitting. Every one was rushing out and he was carried off with the crowd. Esco went on to say that he knows the shooter for two years from his friends, they introduced me to him,his first name is Leon he did not know his last name. The shooter after the shooting stood there for about 5 seconds and then left the theater by going out the side door. Both subject and victim were there by them selves. The victim was lying face down.

2. In view of the above the using this case is still active.

| Reporting Officer's Rank, Signature - Command Christopher R. Horn 45 Sqd | Name Printed C. Horn | Tax Registry No. 865786 | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|

Choice / Choice     Perp 1 / Perp 2

| Date of Orig Report 7-3-89 | Date Assigned 7-3-89 | e No 840 | Unit Reporting 45 Det. Squad | Follow-Up No 18 | PEF |

| Complainant's Name - Last, First, M.I. PSNY. | Victim's Name - If Different Sean Victor Worrell | |

Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. | PER

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age | PER

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (if firearm, give color, make, calibre, type, model, etc.) |

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. | Res. Pct. | 16 CHO

| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHO 2

☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias | Clothing Description, Scars, Marks, M.O., Etc. (Continue in "Details"):

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. | Res. Pct. | 17

| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHO 2

☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias | Clothing Description, Scars, Marks, M.O., Etc. (Continue in "Details"):

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ ☐ | CHO 2

| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ ☐ |

| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results: | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained | 18 CHOICE 1

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: | CHOICE

| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: | 20

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) | PERP 1

| If Closing Case "No Results," Check Appropriate Box and State Justification in Details: ☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant | PERP 2

DETAILS:

### HOMICIDE

Subject:     INTERVIEW OF E███ BLAYLOCK DOB.

                    Sister: B█
              Girlfriend: L█

                  Mother:
             Grandmother:

On July 3, 1989, at approximately 2130 hrs., I received a telephone call from Mr. E██ Blaylock, indicating that he wished to meet with the undersigned.

I responded ██ ███ ██████████████████████E. and met with Mr. Blaylock and his girlfriend L██ McGainey. Since the initial investigation revealed that Mr. Blaylock is a witness, and Ms. McGainey a possible witness, the undersigned transported them to CATCH. in the company of Det. Lugo, Bronx,Task Force. Both witnesses viewed photos but no identification was made from photos viewed.

At approximately 2330 hrs., July 3, 1989, I interviewed Mr. Blaylock at the 48th Pct., Bronx Detective Area Office. He stated the following:
        That he has been working at the Whitestone Cinemas for four weeks; that he lives with his sister ████████ at above address, having moved from █████████████████, with mother Deborah- Tel. # 8██████6.

Continued on page # 2

| Reporting Officer's Rank - Signature - Command Det. ███ 45 Sqd | Name Printed Serrano | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |

RJ-000084

DETAILS

## HOMICIDE-CASE # 840     FOLLOW UP # 18

He said that on the date, time and location, and at approximately 12:00 Mid., July 2, 1989, he went to get a soda at the concession stand after he had finished work. (he works the pop corn machine upstairs)

He saw two men arguing, one of them was Leon, a M/B/about 5' 10", 175 Lbs., high-top haircut with shaved sides, and two blond streaks running along the side of the head but not meeting in the back. Leon wore a white shirt, white shorts, black sneakers, (no socks) has a gold tooth on the upper right side of the mouth that can be taken off. Mr. Blaylock said that Leon <u>looks Puerto Rican,</u> and can <u>mimick a Jamaican accent.</u> Leon is a violent guy and heavily involved into selling drugs. He said that he has seen Leon engaged in <u>fists fights in at least five occasions.</u> He met Leon through a <u>friend.</u> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. He has known Leon for about 2 years He said that Leon was arrested for possession of a rifle in February, 1989, on Boynton and Story Avenues. He said that Leon drove a Maxima-Grey, 1989, and before that, Leon drove a white beat-up car. He said that Leon had a girlfriend, Sharon, who had been reported missing by her mother about 4 months ago.

Mr. Blaylock said that Leon got in front of the popcorn line and began to argue with another Black male. That Leon made fun of the other male's Jamaican accent. He said that Leon told the male that he was going to get his pistol, and that the victim said "go get your pistol". Leon then asked the victim to go outside, but instead, the victim got his food and went to the movies. Leon then went outside.

Mr. Blaylock then went into the movie playing Batman-theater #1. he stayed to the rear of the theater, standing. Ten minutes into the movie, he saw Leon walk in and he recognized him. Leon looked around, and recognizing the victim said, " are you the one with the popcorn ". He said the victim turned around but did not get up. Leon then stood up and continued to argue-the argument lasted for about three minutes. Mr. Blaylock said that he saw Leon take a gun out from his back and then firing a shot. The victim turned around and starts getting up while pulling a gun and pointing it at Leon. Leon then fires another shot hitting the victim in the forehead, and at the same time the victim's gun went off. Mr. Blaylock said that the victim fell on his stomach. Leon then ran out of the theater.

He said he went over to look at the victim; the victim had a big revolver; Leon had something like a pistol.

Mr. Blaylock said that Leon lived at 1057 Boynton Avenue, that he normally parked his car on Bronx River Avenue and Elder Avenue, that Leon' corner was Boynto and Watson., and that Leon had had the gold streaks on his hair for about a year.

He said that the victim was darker than Leon.

Case active.

INFORMATIONAL
PD-313-081A (Rev. 1-86p31

| Crime | Pct | Occ | Complaint No. | Date of This Report | |
|---|---|---|---|---|---|
| ...micide | 45 | | 5948 | 7-4-89 | 14 PERP 1 |

| Date of Orig. Report | Date Assigned | Case No. | Unit Reporting | | Follow-Up No. | |
|---|---|---|---|---|---|---|
| 7-3-89 | 7-3-89 | 840 | | 45 Det. Squad | 22 | PERP 2 |

| Complainant's Name - Last, First, M.I. | Victim's Name - If Different | |
|---|---|---|
| PSNY. | Sean Victor Worrell | 15 PERP 1 |

Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No. PERP 1

Home Telephone — Business Telephone — Position / Relationship — Sex — Race — Date of Birth — Age — PERP 2

Total No. of Perpetrators — Wanted — Arrested — Weapon — ☐ Used ☐ Possessed — Describe Weapon (If firearm, give color, make, calibre, type, model, etc.)

Wanted ☐ Arrested ☐ Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No. — Res. Pct. — 16 CHOICE 1

Sex — Race — Date of Birth — Age — Height — Weight — Eye Color — Hair Color — Hair Length — Facial Hair — NYSID No — CHOICE 2

☐ Eyeglasses ☐ Sunglasses — Nickname, First Name, Alias — Clothing Description, Scars, Marks, M.O. Etc. (Continue in "Details")

Wanted ☐ Arrested ☐ Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No. — Res. Pct. — 17 CHOICE 1

Sex — Race — Date of Birth — Age — Height — Weight — Eye Color — Hair Color — Hair Length — Facial Hair — NYSID No — CHOICE 2

☐ Eyeglasses ☐ Sunglasses — Nickname, First Name, Alias — Clothing Description, Scars, Marks, M.O. Etc. (Continue in "Details")

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

Comp. Interviewed ☐ Yes ☐ No — In Person ☐ — By Phone ☐ — Date — Time — Results: Same as Comp. Report - Different (Explain in Details) ☐

Witness Interviewed ☐ Yes ☐ No — In Person ☐ — By Phone ☐ — Date — Time — Results: Same as Comp. Report - Different (Explain in Details) ☐

Canvass Conducted ☐ Yes ☐ No — If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results — Crime Scene Visited ☐ Yes ☐ No — If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future — Results:

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future — Results:

Crime Scene Dusted ☐ Yes ☐ No — By (Enter Results in Details) — Crime Scene Photos ☐ Yes ☐ No — By (Enter Results in Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant

DETAILS:

## HOMICIDE

Subject:    ATTEMPTS TO IDENTIFY "LEON"

Efforts to identify the perpetrator known as Leon, was made this date, July 4, 1989:

1.  Contact with other units, CARS., ETAL.

2.  Canvassing of the vicinity of Boynton Avenue and Watson Avenue.

3.  Canvass of vicinity of Bx. River Avenue and Elder Avenue.

4.  All attempts proved negative.

Case active.

| Reporting Officer's Rank - Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | Arch's Initials |
|---|---|---|---|---|
| Det. | 45 Sqd. | Serrano | 845145 | |

| Date of Orig | Date Assigned | Case No | Unit Reporting | | Follow-Up No. | PE2 |
|---|---|---|---|---|---|---|
| 7-3-○ | 7-3-89 | 840 | | 45 Det. Squad | 26 | |

| Complainant's Name - Last, First, M.I. | | Victim's Name - If Different | | PEF |
|---|---|---|---|---|
| PSNY | | Sean Victor Worrell | | |

| Last Name, First, M.I. | | Address, Include City, State, Zip | | Apt. No. | PEF |
|---|---|---|---|---|---|
| | | | | | |

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age | PEF |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Perpetrators**

Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.)

**Perp No. 1**

Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No | Res. Pct.

Sex | Race | Date of Birth | Age | Height Ft In | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.

☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias | Clothing Description, Scars, Marks, M.O., Etc. (Continue In "Details")

**Perp No. 2**

Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No | Res. Pct.

Sex | Race | Date of Birth | Age | Height Ft In | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.

☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias | Clothing Description, Scars, Marks, M.O., Etc. (Continue In "Details")

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results:

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results:

Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral   ☐ C-2 Inaccurate Facts   ☐ C-3 No Evidence / Can't ID   ☐ C-4 Uncooperative Complainant

DETAILS:

## HOMICIDE

Subject;   EFFORTS TO IDENTIFY LEON, AND SHARON RAMROOP

On July 7, 1989, the undersigned and Det. Horn responded to the 43rd. Det. Sqd., and researched missing persons reports in search of Sharon Ramroop, and complaint reports relative possession of rifles and/or firearms in the vicinity of Watson and Boynton Avenues.

This search revealed that a Sharon Bassant, ~~P, ~~ ~~a~~, had been arrested for attempted murder on April 4, 1989, and that a missing/ unidentified report was filed because the family of this juvenile had not been notified. It was further revealed that Sharon Bissant had given an address of ~~____~~ ~~Avenue~~. (see attached-61 # 6863, 43 Pct.)

(The search for Leon proved negative at this time.)

Sharon Bassant had been arrested with three other companions; Melody Rivera, of ~~____~~, Monica Bridgall, of ~~____~~, and Shakib Live, of ~~____~~.

Case active.

Reporting Officer's Rank - Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials
Det. ____ 45 Sqd | Serrano | 845145 | |

| | | Crime | OMICIDE | | Pct 45 | OCI | Complaint No. 5948 | Date of This Report 7-7-89 |
|---|---|---|---|---|---|---|---|---|

| Date of Orig Report 7-3-89 | Date Assigned 7-3-89 | Case No. 840 | Unit Reporting | 45 Det. Squad | | Follow-Up No. 28 |
|---|---|---|---|---|---|---|

| Complainant's Name - Last, First, M.I. PONY | Victim's Name - if Different Sean Victor Worrell |
|---|---|

| Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. |
|---|---|---|

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|---|---|

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc) |
|---|---|---|---|---|

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | Address, Include City, State, Zip | Apt. No. | Res. Pct |
|---|---|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |
| ☐Eyeglasses ☐Sunglasses Nickname, First Name, Alias | Clothing Description; Scars, Marks, M.O. Etc (Continue in "Details") | | | | | | | | | |

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | Address, Include City, State, Zip | Apt. No. | Res. Pct |
|---|---|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |
| ☐Eyeglasses ☐Sunglasses Nickname, First Name, Alias | Clothing Description; Scars, Marks, M.O. Etc (Continue in "Details") | | | | | | | | | |

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) |
|---|---|---|---|---|---|
| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) |
| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained | |
| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results | | | | |
| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results | | | | |
| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) | |

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant

DETAILS:

## HOMICIDE

Subject:     MEETING WITH MR. ESCO BLAYLOCK

In an attempt to further identify "Leon", the undersigned met with Mr. Blaylock at the Whitestone Cinema on July 6, 1989, at approximately 2200 hrs. He was further questioned about Leon. Mr. Blaylock said that Leon had a girlfriend named Sharon Ramroop, an Indian girl about 5' 7", thinly built, and long black hair, who lived on Watson Avenue and Manor Avenue. He said that Ms. Ramroop had been reported missing earlier this year; that she was missing for about four months; that she usually met Leon on the corner of Watson and Boynton Avenue; and that he used to see them together, on an average of three times a week.

Mr. Esco Blaylock said that Leon had been arrested for possession of a rifle in February, 1989.

Following this interview, the undersigned conducted a canvass of the vicinity of Watson and Manor Aves., but met with negative results.

Case active.

| Reporting Officer's Rank - Signature - Command Det. | | 45 Sqd | Name Printed Serrano | Tax Registry No. 845145 | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|---|---|

RJ-000917

| Date of Orig Report | Date Assigned | Co | Unit Reporting | Follow-Up No. |
|---|---|---|---|---|
| 7-3-89 | 7-3-89 | ,0 | 45 Det. Squad | 33 |

| Complainant's Name - Last, First, M.I. | Victim's Name - If Different |
|---|---|
| PSNY. | Sean Victor Worrell |

| Last Name, First, M.I. | Address, include City, State, Zip | | Apt. No. |
|---|---|---|---|
| | | | |

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age | PERP |
|---|---|---|---|---|---|---|---|

Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.)

**Perp No 1**

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | Address, include City, State, Zip | Apt. No | Res. Pct. | 16 CHOICE 1 |
|---|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height Ft in | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHOICE 2 |

☐ Eyeglasses ☐ Sunglasses   Clothing Description,
Nickname, First Name, Alias   Scars, Marks, M.O., Etc. (Continue in "Details"):

**Perp No 2**

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | Address, include City, State, Zip | Apt. No | Res. Pct. | 17 CHOICE 1 |
|---|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height Ft in | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHOICE 2 |

☐ Eyeglasses ☐ Sunglasses   Clothing Description,
Nickname, First Name, Alias   Scars, Marks, M.O., Etc. (Continue in "Details"):

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ |
|---|---|---|---|---|---|
| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ |

| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained |
|---|---|---|---|

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|
| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) |
|---|---|---|---|

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral   ☐ C-2 Inaccurate Facts   ☐ C-3 No Evidence / Can't ID   ☐ C-4 Uncooperative Complainant

*Right margin choice boxes: CHOICE 1, CHOICE 2 (18); 19 CHOICE 1, CHOICE 2 (20); PERP 1, PERP 2 (21); PERP 1, PERP 2 (22); PERP 1, PERP 2 (23); PERP 1, PERP 2 (24)*

**DETAILS:**

HOMICIDE

Subject:    IDENTIFICATION OF S█████ RAMROOP.

      On July 10, 1989, at approximately 0930 hrs., I responded
██████████████, ████████████████████████, and interviewed Mrs. J████████
Bhimsen, of ███████████████████████████████████████ Mrs.
Bhimsen stated that she was the mother of S█████ Ramroop; that she had
reported her daughter missing in the 49th Pct., and that her daughter
had a boyfriend by the name of Anthony, a M/H/ █████ 5' 1", who moved
to Puerto Rico.

      I then interviewed Ms. S█████ Ramroop, from above location,
in the presence of Mrs. Bhimsen. S█████ said she knew B████ Blaylock,
having attended PS. 123 with him. She said that she knew a Leon, a
M/ of Jamaican and Indian Extraction, who drove a gold Maxima; a flashy
dresser who wore baggy pants and sprted a flat top haircut. She said
that Leon usually came around at night and hung around the record store
on Westchester Avenue. She said that Leon had a girlfriend named Tamy,
who went to California. She said that Leon had a brother who drove a
Black Maxima; she further described Leon as 5' 10" tall. Ms. Ramroop
said that the last time she had seen Leon was in April, 1989.

Case active.

| Reporting Officer's Rank - Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det. ████████ 45 Sqd. | Serrano | ████████ | ████████ | |

Choice 1 | Choice 2 | Perp 1 | Perp 2 | Perp 1 | Perp 2

33

RJ-000925

PICTURE FILE SEARCH
REPORT
PD 373-092 (9-87)-24

WITNESS SURNAME    FIRST NAME    M/I    CASE NO.    OFFICER ASSIGNED

RES. PCT.    CRIME

DATE APPEARED    TIME    APPOINTMENT    MEANS OF TRANSPORT    FILE USED    □ CATCH □ ORACLE □ I.D. SUBSTANTIATED
                 □ YES □ NO

WITNESS RESULTS
□ POSITIVE I.D.    □ PROBABLE I.D.    □ POSSIBLE I.D.    □ NO I.D.
□ I.D. UNDETERMINED    NUMBER OF PICTURES SEEN (REEL NO., FILE NO., ETC.)

ARREST EFFECTED □ YES □ NO.    BASED ON I.D. □ YES □ NO.    NO. OF PERSONS ARRESTED

REMARKS:

INVESTIGATOR ASSIGNED    RANK    NAME

WHITE - C.I.U. UNIT    PINK - INVESTIGATOR ASSIGNED    BLUE - HQ'S COORDINATOR

---

PICTURE FILE SEARCH
REPORT
PD 373-092 (9-87)-24

WITNESS SURNAME    FIRST NAME    M/I    CASE NO.    OFFICER ASSIGNED

RES. PCT.    CRIME

DATE APPEARED    TIME    APPOINTMENT    MEANS OF TRANSPORT    FILE USED    □ CATCH □ ORACLE □ I.D. SUBSTANTIATED
                 □ YES □ NO

WITNESS RESULTS
□ POSITIVE I.D.    □ PROBABLE I.D.    □ POSSIBLE I.D.    □ NO I.D.
□ I.D. UNDETERMINED    NUMBER OF PICTURES SEEN (REEL NO., FILE NO., ETC.)

ARREST EFFECTED □ YES □ NO.    BASED ON I.D. □ YES □ NO.    NO. OF PERSONS ARRESTED

REMARKS:

INVESTIGATOR ASSIGNED    RANK    NAME

WHITE - C.I.U. UNIT    PINK - INVESTIGATOR ASSIGNED    BLUE - HQ'S COORDINATOR

---

REPORT
PD 373-092 (9-87)-24

WITNESS SURNAME    FIRST NAME    M/I    CASE NO.    OFFICER ASSIGNED

RES. PCT.    CRIME

DATE APPEARED    TIME    APPOINTMENT    MEANS OF TRANSPORT    FILE USED    □ CATCH □ ORACLE □ I.D. SUBSTANTIATED
                 □ YES □ NO

WITNESS RESULTS
□ POSITIVE I.D.    □ PROBABLE I.D.    □ POSSIBLE I.D.    □ NO I.D.
□ I.D. UNDETERMINED    NUMBER OF PICTURES SEEN (REEL NO., FILE NO., ETC.)

ARREST EFFECTED □ YES □ NO.    BASED ON I.D. □ YES □ NO.    NO. OF PERSONS ARRESTED

REMARKS:

INVESTIGATOR ASSIGNED    RANK    NAME

WHITE - C.I.U. UNIT    PINK - INVESTIGATOR ASSIGNED    BLUE - HQ'S COORDINATOR

---

REQUEST FOR RECORDS CHECK
PD 349-161 (6-86)-24

TO:

ITEMS
REQUESTED:
□ Aided &           □ Criminal         □ Identifi-        □ Photo          □ Youth          □ Other
  Accident            Records            cation            Unit             Records            (Specify)
  Section             Section            Section                            Unit
□ Aided             □ Complaint        □ Arrest          □ Prop(s)/       □ Criminal       □ Other
  Case                Report             Report            Dispn.           Record             (Specify)

LAST NAME                    FIRST                    MIDDLE                    ALIASES / MAIDEN NAME

SOCIAL SECURITY NUMBER

AGE          DATE OF BIRTH          SEX          RACE          OCCUPATION

CURRENT ADDRESS

DETAILS: (Include previous arrest information, if known, with date, precinct, arrest number and charge.)

RANK    NAME (PRINTED)                    SIGNATURE                    SINC

COMMAND / UNIT (COMPLETE NAME)    CASE LOG or COMM. No.    SIGNATURE OF COMMANDING

DATE

| Date of Orig Report | Date Assigned | | Unit Reporting | | Follow-Up No. | PERP 2 |
|---|---|---|---|---|---|---|
| 7-3-89 | 7-3-89 | +0 | 45 Det. Squad | | 34 | |

| Complainant's Name - Last, First, M.I. | Victim's Name - If Different | | 15 |
|---|---|---|---|
| PSNY. | Sean Victor Worrell | | PERP 1 |

| Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. | PERP 1 |
|---|---|---|---|

Witness No. 1

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age | PERP 2 |
|---|---|---|---|---|---|---|---|

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc) | |
|---|---|---|---|---|---|

Perpetrators

Perp No. 1

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | | Address, Include City, State, Zip | Apt. No | Res. Pct. | 16 |
|---|---|---|---|---|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height ft in | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHOICE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses
Nickname, First Name, Alias

Clothing Description.
Scars, Marks, M.O., Etc.
(Continue in "Details"):

CHOICE 2

Perp No. 2

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | | Address, Include City, State, Zip | Apt. No | Res. Pct. | 17 |
|---|---|---|---|---|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height ft in | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | CHOICE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses
Nickname, First Name, Alias

Clothing Description.
Scars, Marks, M.O., Etc.
(Continue in "Details"):

CHOICE 2

**AREA WITHIN BOX FOR DETECTIVE/LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

18 CHOICE 2

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ |
|---|---|---|---|---|---|

| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ |
|---|---|---|---|---|---|

P 1

| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained | 19 CHOICE 1 |
|---|---|---|---|---|

P 2

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: | CHOICE 2 |
|---|---|---|

P 1

| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: | 20 |
|---|---|---|

P 2

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) | PERP 1 |
|---|---|---|---|---|

| If Closing Case "No Results," Check Appropriate Box and State Justification in Details: ☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant | PERP 2 |
|---|---|

DETAILS:

21 PERP 1

### HOMICIDE

PERP 2

**Subject:** CONFRONTATION OF E___ BLAYLOCK AND S___ RAMROOP.

On July 11, 1989, in an effort to further identify " Leon", E___ and S___ were confronted in this office. E___ and S___ exchanged information relative to the description originally furnished by various witnesses. It now appears that E___ Blaylock knows the perpetrator as Leon, and S___ Ramroop knew the perpetrator as <u>Ricky</u>.

22 PERP 1

PERP 2

Case active.

23 PERP 1

PERP 2

24 PERP 1

PERP 2

| Reporting Officer's Rank - Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det. ___ 45Sqd | Serrano | | | |

Choice 1 | Choice 2 | Perp 1 | Perp 2 | Perp 1 | Perp 2

RJ-000088

34

| late of Orig Report | Date Assigned | Cass | Unit Reporting | Follow-Up No. |
|---|---|---|---|---|
| 7-3-89 | 7-3-89 | 840 | 45 Det. Squad | 35 |

Complainant's Name - Last, First, M.I.    **PSNY.**

Victim's Name - If Different    **Sean Victor Worrell**

Last Name, First, M.I.    Address, Include City, State, Zip    Apt. No.

Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age

---

**DETAILS:**      HOMICIDE

**Subject:**      IDENTIFICATION OF " LEON ".

        On July 11, 1989, at approximately 2030 hrs., E████ Blaylock and S████ Ramroop were taken to CATCH. by the undersigned in the company of Det. Horn.

        Both, E████ and S████ viewed photos. S████ Ramroop identified a photo as that of Manuel Jimenez, indicating that his brother was Ricky, the person being sought. A search of the files produced a photograph of Ricardo Jimenez, M/H/, DOB. 3-30-68, NISIS # 5522945Z.

        Mr. E████ Blaylock identified the photo of Ricardo Jimenez as the shooter in this case, and the person known to him as "Leon". Ms. S████ Ramroop stated that she knew this individual as "Ricky ".

        Investigation revealed that Ricardo Jimenez' last known address is 875 Taylor Avenue.

**Case active.**

---

Reporting Officer's Rank - Signature - Command    Det. ████ 45 Sqd.    Name Printed    Serrano    Tax Registry No.    Supervisor's Signature    C.O.'s Initials

| | Cls | omicide | Pct 45 | O. | Complaint No 5948 | Date of This Report 7-3-89 |
|---|---|---|---|---|---|---|

| Date of Orig Report 7-3-89 | Date Assigned 7-3-89 | Case No 840 | Unit Reporting 45 Det. Squad | | | Follow-Up No 14 |
|---|---|---|---|---|---|---|

| Complainant's Name - Last, First, M.I. | Victim's Name - If Different |
|---|---|
| PSNY. | Unidentified |

Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No.

Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age

Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (if firearm, give color, make, calibre, type, model, etc)

**Perp No. 1**
Wanted ☐ Arrested ☐ Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No — Res. Pct.
Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.
☐ Eyeglasses ☐ Sunglasses — Clothing Description — Nickname, First Name, Alias — Scars, Marks, M.O., Etc. (Continue in "Details")

**Perp No. 2**
Wanted ☐ Arrested ☐ Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No — Res. Pct.
Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.
☐ Eyeglasses ☐ Sunglasses — Clothing Description — Nickname, First Name, Alias — Scars, Marks, M.O., Etc. (Continue in "Details")

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results:

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results:

Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Notes ☐ Yes ☐ No | By (Enter Results in Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't I.D. ☐ C-4 Uncooperative Complainant

DETAILS:

HOMICIDE

Subject: INTERVIEW OF WITNESS: JAMES WILLIAMS ~~████~~8
~~████████~~
~~████████~~90

On July 3, 1989, and about 1630 hrs., I interviewed Mr. Williams at the Whitestone Cinema. He said that at the time of this incident he was working behind the counter, opposite to where the argument erupted. Two males, Black, were arguing about who was in line first. One guy said "I'll come back and shoot your ass", he had already purchased some pop-corn and then left the building. The other male stayed, got his food and went back to the theater.

He said that the argument lasted for a minute or so, and that they had words in Rastafarian.

He said that Linda served the male who exited the building, and Shawn served the male who went back into the theater.

Case active.

Reporting Officer's Rank / Signature - Command: 45 Sqd. | Name Printed: Serrano | Tax Registry No. 845145 | Supervisor's Signature | C.O.'s Initials

| Date of Orig Report | Date Assigned | G. | Unit Reporting | | Follow-Up No. | |
|---|---|---|---|---|---|---|
| 7-3-89 | 7-3-89 | .840 | 45 Det. Squad | | 40 | PERP 2 |

| Complainant's Name - Last, First, M.I. | Victim's Name - if Different | 15 |
|---|---|---|
| PSNY. | Sean Victor Worrell | PERP 1 |

| | Last Name, First, M.I. | | Address, Include City, State, Zip | | | | Apt. No. | PERP 1 |
|---|---|---|---|---|---|---|---|---|
| Witness No. 1 | | | | | | | | |

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age | PERP 2 |
|---|---|---|---|---|---|---|---|

| Total No. of Perpetrators | Wanted | Arrested | Weapon | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) |
|---|---|---|---|---|
| | | | ☐ Used ☐ Possessed | |

| Perp. No. 1 | Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | | Address, Include City, State, Zip | | | Apt. No | Res. Pct. | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | | CHOICE 1 |
| | ☐ Eyeglasses ☐ Sunglasses | Clothing Description, Scars, Marks, M.O., Etc. (Continued in "Details"): | | | | | | | | | | | CHOICE 2 |
| | Nickname, First Name, Alias | | | | | | | | | | | | |

| Perp. No. 2 | Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | | | | Address, Include City, State, Zip | | | Apt. No | Res. Pct. | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | | CHOICE 1 |
| | ☐ Eyeglasses ☐ Sunglasses | Clothing Description, Scars, Marks, M.O., Etc. (Continued in "Details"): | | | | | | | | | | | CHOICE 2 |
| | Nickname, First Name, Alias | | | | | | | | | | | | |

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

| Comp. Interviewed | In Person | By Phone | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) | CHOICE 1 |
|---|---|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ | ☐ | | | | CHOICE 2 |

| Witness Interviewed | In Person | By Phone | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) | |
|---|---|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ | ☐ | | | | |

| Canvass Conducted | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained | 19 |
|---|---|---|---|---|
| ☐ Yes ☐ No | | ☐ Yes ☐ No | | CHOICE 1 |

| Complainant Viewed Photos | Results: | CHOICE 2 |
|---|---|---|
| ☐ Yes ☐ Refused ☐ Future | | |

| Witness Viewed Photos | Results: | 20 |
|---|---|---|
| ☐ Yes ☐ Refused ☐ Future | | PERP 1 |

| Crime Scene Dusted | By (Enter Results in Details) | Crime Scene Photos | By (Enter Results in Details) | |
|---|---|---|---|---|
| ☐ Yes ☐ No | | ☐ Yes ☐ No | | PERP 2 |

| If Closing Case "No Results," Check Appropriate Box and State Justification in Details: | 21 |
|---|---|
| ☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant | PERP 1 |

DETAILS:

HOMICIDE

Subject: INTERVIEW OF MRS. L████ SALTER ████

On July 17, 1989, at about 1250 hrs., I interviewed Mrs. L████ Salter at her residence. She said that she was working behind the counter at the concession stand on the night of this incident.

She said that she overheard a verbal altercation between two males whom she described as sporting flat-top haircuts, and wearing a lot of gold. After the argument, the tall Black male left the stand but returned later and demanded to be served by Shawn. Shawn refused to serve him, and words were exchanged. She said that she served the tall male to avoid any further confrontation.

Mrs. Salter said that both, the victim and the other male had Jamaican accents, and described them as follows:

# 1. M/B/ Jamaican, tall and thin, approximately 5' 10", 160 to 165 Lbs., in his early twenties, and wearing a white, long sleeve shirt and long pants. (wore 2 gold teeth) (connected rings on both hands)

# 2. The victim, very light complexion, approximately 5' 9", and wore a lot of gold

Mrs. Salter said that she was an amateur artist and will attempt to draw the face of the tall and skinny male.

I showed Mrs. Salter a photo of Ricardo Jimenez. She said that she had seen the male on other occasions but he was not one the males which had the argument at the concession stand. CASE ACTIVE.

| Reporting Officer's Rank / Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det. ████ 45 Sqd. | Serrano | | | |

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: PART __
--------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,          :
                                              :
                    Respondent,               :
                                              :        AFFIDAVIT
                                              :
        -against-                             :        Ind. No.  3825/06
                                              :
                                              :
RICARDO JIMENEZ,                              :
                                              :
                    Defendant.                :
--------------------------------------------------------------------x

STATE OF NEW YORK  )
                   )
ROCKLAND  COUNTY   )

      LINDA SALTER, being duly sworn, under penalty of perjury hereby
deposes and says:

      1.    In July, 1989, I was employed at the Whitestone Cinemas, located at
2505 Bruckner Boulevard, in the Bronx.  I was working at the concession stand
the night of July 3, 1989.  That night, I saw an argument between two black men
with Jamaican accents.

      2.    In 1989, I was acquainted with Ricardo Jimenez.

      3.    I spoke to a detective in my home about two weeks after the shooting.
I have reviewed the police report that is attached to this affidavit and it accurately
describes what I told the detective about what I saw at the theater on July 3, 1989.
As indicated in the report, I was shown a photo of Ricardo Jimenez and I told the

RJ-000880

detective that Mr. Jimenez was not one of the men involved in the argument at the concession stand on July 3, 1989.

4.  Until now, I have not been contacted by anyone representing Mr. Jimenez. If I had been asked to testify about what I saw at the theater on July 3, 1989, I would have been willing to do so.

LINDA SALTER

Sworn before me this 27th
day of October, 2011

NOTARY PUBLIC

KATHLEEN A. HOOD
Notary Public, State of New York
No. 02HO6006373
Qualified in Rockland County
Commission Expires May 4, 2014

2

| | | | vol. | DE | | Pct | No | Complaint No | Date of This Report |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 043 | | 5948 | 7/3/89 |

| Date of Orig. Report | Date Assigned | Case No | Unit Reporting | | Follow Up No |
|---|---|---|---|---|---|
| 7/3/89 | 7/3/89 | 840 | 43rd DET. SQD | | 6 |

| Complainant's Name (Last, First, M.I.) | Victim's Name - If Different |
|---|---|
| P.S.N.Y. for | Unidentified Male |

| Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No |
|---|---|---|

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|---|---|

Details of Perpetrators / Wanted / Arrested / Weapon / Describe Weapon (if firearm, give color, make, calibre, type, model, etc.)

Used ☐ Possessed ☐

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

DETAILS

INVESTIGATION: HOMICIDE/GUN          ACTIVE CASE

SUBJECT: INTERVIEW OF HEAD OF SECURITY, Mr Gregory Jones at Whitestone Cinemas

1. On this date 7/3/89 at about 02:10 Hrs., the undersigned officer interviewed head of Security, Mr. Gregory Jones, ~~████████~~ at the Whitestone Cinemas Tel. 409-0166. He works for Aero-Investigations and Security Services, Inc. 2110-4 Smithtown Ave., Ronkonkoma, N.Y. 11779 Tel. 516 737-3366 at night and during the day is a N.Y.S. Correction Officer, S~~████~~ and works at Sing Sing Prison, Tel. 914 941-0108.

2. He states the following. He was on outside patrol duty in a company auto #188, N.Y.S. Plate # FXE 339 and was parked in a Handicapped parking spot located near outside door next to main office. When he received over his radio, reports of shots fired inside theater #1. I then back out of spot and another security guard, ~~████████~~ got inside auto. We then proceeded to rear of theater #1 looking for the person in white clothes who may have shot the victim inside theater. But hundreds of people were running out of both rear doors,.We both then entered theater #1 and noticed a victim, a black male, was lying on the floor in the Aisle, face up, head of body was facing down toward stage/screen. An off duty Police Officer, Perez recovered a 38 cal. revolver from victim and handed over to me. He further states that there were two off duty E.M.S. administing C.P.R. I then opened the 38 cal. revolver which contained 4 live rounds, one spent round and one empty chamber, them removed rounds from weapon which I later handed over to Uniform Police Officers from the 43th Pct. Nothing further was stated at this time.

3. Request case remain active pending further investigation.

ACTIVE CASE

| Reporting Officer's Rank / Signature / Command | Name Printed | Tax Registry No | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| DET. ~~████████~~ 43SQD | WHITING | 953456 | | |

| Date of Orig Report | Date Assigned | Case No | Unit Reporting | Follow-Up No. | |
|---|---|---|---|---|---|
| 7-3-89 | 7-3-89 | 840 | 45 Det. Squad | 15 | PERP 2 |

Complainant's Name - Last, First, M.I.  
**PSNY.**

Victim's Name - If Different  
**Unidentified**

Last Name, First, M.I.    Address, Include City, State, Zip    Apt. No. | PERP 1

Home Telephone | Business Telephones | Position / Relationship | Sex | Race | Date of Birth | Age | PERP 2

Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ If used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.)

Wanted ☐ Arrested ☐ Last Name, First, M.I.    Address, Include City, State, Zip   Apt. No | Res. Pct.

Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.

☐ Eyeglasses ☐ Sunglasses  
Nickname, First Name, Alias  
Clothing Description,  
Scars, Marks, M.O., Etc.  
(Continue in "Details")

CHOICE 2 / CHOICE 2 / CHOICE 2 / CHOICE 2 / CHOICE 2 / CHOICE 2 / CHOICE 2

Wanted ☐ Arrested ☐ Last Name, First, M.I.    Address, Include City, State, Zip   Apt. No | Res. Pct.

Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No.

☐ Eyeglasses ☐ Sunglasses  
Nickname, First Name, Alias  
Clothing Description,  
Scars, Marks, M.O., Etc.  
(Continue in "Details")

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details)

Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results

Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:  
☐ C-1 Improper Referral / ☐ C-2 Inaccurate Facts   ☐ C-3 No Evidence / Can't ID   ☐ C-4 Uncooperative Complainant

DETAILS:

## HOMICIDE

Subject:    INTERVIEW OF WITNESS: ▓▓▓▓▓▓▓▓▓▓ M/B  
            Chief of Security at the  
            Whitestone Cinema. 409-0208

     On July 3, 1989, and about 1700 hrs., I interviewed Mr. ▓▓▓▓ at the Whitestone Cinema. He said that he was on duty on the date and time of this incident, when he heard that someone had been shot in theater # 1. He then ran over to the theater and saw a male Black, dark skin, wearing white shorts and a white top, he was approximately 5' 8" to 5' 10", 175-180 Lbs. Mr. ▓▓▓▓▓ followed this male and saw him getting into a 2 Dr. small car, maybe a Sentra. Mr. ▓▓▓▓ exited via the side door of the theater.

Case active.

Reporting Officer's Rank - Signature - Command   Det. ▓▓▓▓ 45 Sqd. | Name Printed   Serrano | Tax Registry No.   845145 | Supervisor's Signature | C.O.'s Initials

15

RJ-000908

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: PART T23
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,   :
  :
      Respondent,       :
  :     AFFIDAVIT
  :
    -against-       :     Ind. No. 3825/06
  :
  :
RICARDO JIMENEZ,   :
  :
      Defendant.     :
------------------------------------------------------------------x

STATE OF PENNSYLVANIA  )
         )
COUNTY OF MONROE     )

     GREGORY JONES, being duly sworn, under penalty of perjury hereby deposes and says:

     1.     On July 3, 1989, I was the Chief of Security at the Whitestone Cinemas, located at 2505 Bruckner Boulevard, in the Bronx. I was employed by Aero Investigations and Security Services, the company that handled security at the theater. At that time, I was also working as a New York State Corrections Officer.

     2.     On July 3, 1989, I was at work at the Whitestone Cinemas. I was outside of the theater in a security vehicle. I received a radio report of shots fired inside Theater Number 1. I was joined by another security guard, Harold Hazely, and we went to the rear of the theater.

1

RJ-000883

3.    I saw a large number of people running out of the theater.  Among those people was a black male who appeared to be in his 20s, dark complexion, approximately 5 feet 8 inches to 5 feet 10 inches tall, with a slim face.  The man was dressed all in white.  I noticed him because he had a gun in his hand.  I saw the man get into a small car.

4.    I went into Theater Number 1, where I saw the victim lying in the aisle.  He head was facing down, toward the screen.  Off-duty EMS workers were giving him CPR.  An off-duty police officer had recovered a .38 caliber revolver from the victim and gave it to me.  I removed four live rounds from the gun and I later gave it to a uniformed officer.

5.    I spoke to the police after the shooting and told them what I saw.  I was not contacted by anyone from the defense at any time prior to now.  I would have been willing to testify about what I saw that night.

_____
GREGORY JONES

Sworn before me this __O9__
day of __February__, 2012

_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
KIMBERLY PETTIGREW, NOTARY PUBLIC
MT. POCONO BORO, MONROE CTY.
MY COMMISSION EXPIRES SEPT. 06, 2015

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: PART H92
--------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

          -against-

**DECISION AND ORDER**
**Ind. 2777/07**

**RAED AYYASH,**
               Defendant.
--------------------------------------------------------------------------X
**WEBBER, J. :**

    Defendant is charged by indictment with Murder in the Second Degree (PL § 125.25[1]).

By Notice of Motion dated February 19, 2008, defendant moves to dismiss the indictment on the

grounds that the 19- year delay between the alleged commission of the crime in 1988 and

defendant's re-arrest and indictment in 2007 violated his due process right to a prompt

prosecution under New York State and United States Constitutions. Pursuant to defendant's

motion, a *Singer* hearing was held before the court on August 10, 2011. The People called one

witness, Detective Kevin Tracy. I find Detective Tracy credible and I make the following findings

of fact and conclusions of law.

**FINDINGS OF FACT**

    In December  2005, Detective Kevin Tracy of the Bronx Homicide Task Force, was

assigned the unsolved homicide of Hassan Abusalem as an apprehension case.  In reviewing the

file, Detective Tracy learned that on September 11, 1988, two males entered the location of 2040

Bronxdale Avenue, Apt. 4J in Bronx County. In the apartment were Hassan Abusalem and his

wife, Brunilda Toro-Abusalem.  Hassan Abusalem was shot and killed while his wife, Brunilda,

was shot, but survived the attack.  The case file indicated that Ms. Toro-Abusalem stated that she

and her husband, Hassan Abusalem, were inside their residence when at approximately at 12:30 a.m. the doorbell rang. Abusalem went to the door leaving Ms. Toro-Abusalem behind in the kitchen. An unidentified male entered the residence. Ms. Toro-Abusalem heard a commotion and a loud bang. When she looked, she saw her husband on the floor. The unidentified male chased her into the bedroom. She attempted to hide under the bed but the unidentified male shot her in the head. Ms. Toro-Abusalem suffered a graze wound to the head. Abusalem crawled into the hallway and fell in front of Apt. 4G. He suffered a gunshot wound to the chest as well as a severe laceration to his throat, and puncture wounds to his torso.

Following the shooting, Ms. Toro-Abusalem as well as a neighbor, Iaisheh Mustafa, spoke to the investigating detectives. According to Detective Tracy, the case file indicated that although the two witnesses were frightened and upset, both cooperated with the detectives. Ms. Toro-Abusalem gave several interviews to the police and gave a detailed description of the two men involved. She also identified Muhammad "Mike" Abuhweig as one of the individuals involved who was known to both her and her husband.

On September 13, 1988, Iaisheh Mustafa was shown a photographic array and identified the defendant, Ayyash, as one of the two individuals involved in the shooting. Based upon her identification, defendant, Ayyash, was arrested and placed in a line-up. On September 14, 1988, Ms. Mustafa viewed the line-up and again identified Ayyash.

Despite the eyewitness accounts and the identification by Ms. Mustafa, Assistant District Attorney Risa Sugarman, chief of the Bronx District Attorney's Homicide Bureau at the time, did not authorize the arrest of Ayyash and his arrest was voided. According to Detective Tracy's review of the case file, Assistant District Attorney Sugarman was apparently displeased that the

2

arresting detectives did not consult with her prior to making the arrest. She also appears to have been concerned that the eyewitnesses were scared or terrified and could not be counted on to cooperate in the future. Interestingly, on October 3, 1988, after ADA Sugarman's refusal to authorize the arrest, Ms. Toro-Abusalem also viewed a photographic array and identified Ayyash as having been involved in the shooting. No further action was taken as to the defendant or the co-defendant, identified as "Mike" Abuhweig.

According to Detective Tracy, in 1997, there were some attempts to locate the witnesses as well as "Mike." These attempts were fruitless. Subsequently, in 1997, the case was transferred from the Apprehension Team to the Homicide Task Force. In 2005, when Detective Tracy took over the case, he made attempts to locate the witnesses, Ms. Toro-Abusalem and Ms. Mustafa. Ms. Toro-Abusalem was still living in New York, however, she was using a different name and was living at a different location. Ms. Mustafa was located in Jordan. Based on a license plate number as well as finger prints and a photograph for "Mike" Abuhweig, Detective Tracy was able to locate him under a different name, living in San Diego, California. Defendant Ayyash was also located in San Diego, where he was residing under his own name. Before arrangements could be made to arrange for "Mike's" return to New York, he returned to his home in Jordan. Attempts to "lure" him from Jordan to the Untied States and ultimately, to New York, were unsuccessful. According to Detective Tracy, no attempts were made to arrest Ayyash until "Mike" was arrested so as to not compromise the attempts to lure "Mike" back to the Untied States. Once it was determined that those attempts failed, Ayyash was arrested in California and extradited to New York on June 5, 2007. He was indicted on the instant charge on July 13, 2007. He was released on bail on July 22, 2008.

## CONCLUSIONS OF LAW

As stated, defendant moves to dismiss the indictment on grounds that the delay between the alleged commission of the crime in 1988 and defendant's re-arrest and indictment in 2007 violated his due process right to a prompt prosecution under New York State and United States Constitutions. For the reasons stated below, defendant's motion is granted.

An unreasonable delay in prosecuting a defendant constitutes denial of due process of law (*People v Winfrey*, 20 NY 2d 138 [1967]; *People v Singer*, 44 NY2d 241 [1978]). In *Singer*, the Court of Appeals stated:

> "Delay in bringing the defendant to trial after indictment or arrest is measured against Sixth Amendment speedy trial requirement which takes into account a number of factors, including actual or potential prejudice to the defendant's case through the loss of witnesses and the dulling of memory (citations omitted). Preindictment delay, on the other hand, is governed by the due process clause which generally requires a showing of actual prejudice before dismissal would be warranted (citations omitted) . . ."

Indeed, the Court of Appeals has long held that an "unreasonable delay in prosecuting a defendant constitutes a denial of due process of law" requiring dismissal of the charges (*People v Staley*, 41 NY2d 789 [1977] ). In *People v Taranovich* (37 NY2d 442 [1975]), the Court of Appeals examined a defendant's right to a speedy trial under both the federal constitution as well as New York's speedy trial statute, CPL § 30.20. The Court held that in assessing a due process right to prompt prosecution, the analysis must be in substantially the same manner as the analysis of the right to speedy trial. In *Taranovich*, the Court established five factors to be considered in determining whether there has been a denial of defendant's right to a speedy trial, which are: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not

4

there is any indication that the defense has been impaired by reason of the delay (*id*).

**Extent and Reason For Delay**

It is well established that when there has been a protracted delay, the burden rests solely on the People to establish good cause for the delay (*Singer*, 44 NY2d at 254; *Staley*, 41 NY2d at 792; *see also Winfrey*, 20 NY2d 138; *People v Prosser*, 309 NY 353 [1955]). Delays caused by difficulty in amassing evidence sufficient to arrest, indict or prepare the prosecution do not deprive the defendant of due process of law, even if the delay may have caused some prejudice to the defense (*Singer*, 44 NY2d at 254; *Staley*, 41 NY2d at 792; *Winfrey*, 20 NY2d at 138). Similarly, delays due to difficulties in locating a suspect may be justified as well (*See Staley* at 792). Fundamental to the analysis is that "once a person stands accused of crime, he must be prosecuted promptly. Sheer neglect or trifling however, . . . is not permissible" (*id.*).

Here, the record does not indicate any good cause excusing the 19- year delay. The record does not indicate any basis for the delay in the prosecution other than the refusal by the chief of the Bronx District Attorney's Homicide Bureau to authorize the arrest in 1988. This however, does not explain or excuse the fact that no action was taken until 2005 which led to the defendant's ultimate arrest in 2007.

While Detective Tracy testified that Assistant District Attorney Sugarman believed that the witnesses would not cooperate in the future due to fear for their personal safety, this testimony was apparently based upon some vague notation in the case file reviewed by Detective Tracy. The original investigating detectives did not testify at the hearing. Nor, did Assistant District Attorney Sugarman. Thus the record is devoid of any clear indication of fear on the part of the witnesses. There is also no indication that either witness was ever asked either by law enforcement or by

Assistant District Attorney Sugarman whether they would or would not be willing to testify. The record does show that both witnesses spoke to the investigating detectives on numerous occasions. Both viewed photographic arrays and line-ups following the incident. Ms. Toro-Abusalem also contacted law enforcement and gave information regarding the defendant as well as "Mike." Ms. Toro-Abusalem also "cooperated" with the police and viewed a photographic array of the defendant following the voiding of defendant's arrest.

The People's argument that the case required enhanced investigation is belied by the fact that the exact same information which was available and known to law enforcement in 2005 and 2007, was also known to them in 1988. In 2005, Detective Tracy, did nothing more than review the 1988 case folder, contact those same witnesses, obtain photographic identifications of the defendant from those witnesses and arrest the defendant. There were no additional witnesses located, nor was there any additional physical or forensic evidence found. The witnesses were available to law enforcement and to the prosecution in 1988 and 2005. The fact that there was no follow-up on the case from 1988 to 2005 appears to the court to be the result of "sheer neglect."

This Court would certainly agree that investigating and prosecuting agencies have a strong interest in conducting a complete and thorough investigation and are entitled to do so prior to arresting and charging a suspect. The need to investigate and obtain evidence is reasonable and legitimate, even if it may cause some prejudice to the defense (*People v Singer*, 44 NY2d at 254; *People v Vernace*, 96 NY2d 886 [2001]). Here, however, there is nothing to suggest that the delay was precipitated by anything other than inattention (*People v LeGrand*, 28 AD3d 318 [1st Dept 2006]).

Rather than a concern that the witnesses would not cooperate or a desire to conduct further

investigation, it appears that the case was not prosecuted in 1988 solely based upon Assistant

District Attorney Sugarman's having felt "slighted" that she was not consulted prior to the

defendant's arrest. This appears true given the lack of any conversation between Assistant District

Attorney Sugarman and the witnesses regarding their willingness to cooperate. Additionally, there

was no change in the People's position following the subsequent positive identification of the

defendant by Ms. Toro-Abusalem[1].

The People argue that while the 19- year delay is certainly protracted, that fact alone does

not require dismissal. The court agrees. It is not only the period of the delay, it is also the fact that

no reasonable justification for the delay has been shown. The People cite three cases in support of

their argument that defendant's motion should be denied. First, they cite *People v Vernace* (274

AD 2d 595 [2d Dept 2000]). In *Vernace*, the Court found a 17- year delay was reasonable where

the witnesses were initially fearful of coming forward and their fears alleviated over the passage

of time. *Vernace* involved a 1981 vicious double murder in a Queens bar, for which no one was

prosecuted. Three individuals linked to organized crime were thought to be suspects. While 20 to

25 people allegedly were in the bar at the time of the murders, virtually all of them denied seeing

the crime. Shortly after the murders, the main witness either fled the jurisdiction or hid from the

police, refusing to cooperate. Another witness recanted her identification of one of the defendants,

resulting in dismissal of the indictment against him. Another defendant was never located. In

finding the delay reasonable, the Court noted that the record supported the conclusion that at the

time of the incident, the witnesses were in fear of reprisal. However, that fear dissipated over the

---

[1]It should be noted that it does not appear that defendant's 2005 arrest was pre-authorized by the Bronx District Attorney's Office.

years. As stated above, the record does not substantiate any such fear on the part of the witnesses.

The People also cite *People v Telese* (1 Misc. 3d 490 [County Ct, Nassau County 2003]). *Telese* involved an 18- year delay. In *Telese*, after some 18 years, law enforcement was able to match two latent thumb prints recovered from a homicide crime scene. In finding the delay reasonable, the court noted that prior to the matching of the latent thumb prints to those of defendant, the People lacked proof to connect the defendant to the commission of the murders. According to the court, the ultimate matching of the prints resulted from the upgrading of the computerized search systems over the 18-year time period. Again, here, as stated above, the same evidence available in 1988 was available and ultimately relied upon in 2005 and 2007.

Finally, the People cite *People v Denis* (276 AD2d 237 [3rd Dept 2000]). In *Denis*, the Court held a six (6) year delay was not unreasonable where a newly elected district attorney reviewed evidence available six (6) years prior and decided it was sufficient to proceed. In upholding the conviction, the Appellate Division, Third Department, noted that the record on appeal fully supported the conclusion that the delay was justified. Here, the record fails to support such a finding.

**The Nature of the Charge**

As stated above, the defendant is charged with Murder in the Second Degree (PL § 125.25 [1]), an extremely serious charge. The defendant is charged with acting with another in shooting two individuals, and killing one person. While, the Court is loathe to dismiss this charge, given the failure of the People to establish the reasonableness of the 19- year delay in this case, dismissal is warranted.

8

**Pre-Trial Incarceration**

Defendant was incarcerated from the date of his arrest on June 5, 2007 until bail was set and he was released on that bail on June 22, 2008. While the People argue that this was not out of the norm for the pre-trial incarceration of defendants, they concede that it is a substantial period of time.

**Impairment of Defense As a Result of the Delay**

Where there is a finding of undue delay, a finding of actual prejudice to the defense is not necessary (*People v Taranovich*, 37 NY2d at 447). Here, defendant does allege that given the delay, the memories as well as the availability of witnesses who may have assisted the defendant have been negatively affected.

The court, after having applied the *Taranovich* factors, finds that the delay has violated defendant's constitutional right to speedy trial.

## CONCLUSION

Defendant's motion to dismiss the indictment is granted.

The aforesaid constitutes the opinion, decision and order of the Court.


Dated: January 24, 2012
     Bronx, N.Y.
                                          **Troy K. Webber J.S.C.**