UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICARDO JIMENEZ,<br><br>       Petitioner,<br><br>    — against —<br><br>HAROLD GRAHAM, as Superintendent of Auburn Correctional Facility, and THE ATTORNEY GENERAL OF THE STATE OF NEW YORK,<br><br>       Respondent. | 11-cv-6468 (JPO)<br><br>SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY AND CONSOLIDATED MEMORANDUM OF LAW |

**SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

   Petitioner Ricardo Jimenez, by and through undersigned counsel, files this Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. 2254:

**PRELIMINARY EXPLANATION**

1.   Ricardo Jimenez initiated habeas proceedings in this Court on January 9, 2011. *See* 11-cv-6468 (Doc. 1).

2.   In a memorandum and order filed on December 14, 2011, this Court ordered that said proceedings be stayed and held in abeyance pending the conclusion of state-court proceedings. *See* 11-cv-6468 (Doc. 12). This order is attached as Exhibit A. This Court further directed that, within thirty (30) days after the state court renders its final decision on Mr. Jimenez's claims, Mr. Jimenez may submit a new amended petition that properly raises any timely claims exhausted by the state-court proceedings. *Id.*

3.      Mr. Jimenez's state-court proceedings concluded on **March 26, 2019**. *See People v. Jimenez*, M-6159 (A.D.1 Mar. 26, 2019) (denying leave to the Court of Appeals).

4.      This Amended Petition is submitted pursuant to this Court's December 14, 2011 order, and pursuant to 28 U.S.C. § 2242.

5.      The allegations of this petition are in the form dictated by the Model Form for use in applications for habeas corpus under 28 U.S.C. § 2254 cases in the United States District Courts.

## PROCEDURAL HISTORY

6.      The name of the court which entered the judgment of conviction and sentence under attack is:  Supreme Court of the State of New York, Bronx County. The indictment was 3825-06.

7.      The date of the judgment of conviction and sentencing was August 16, 2007.

8.      Mr. Jimenez is currently incarcerated, pursuant to this judgment, at Sullivan Correctional Facility in Fallsburg, New York, under the custody of William Keyser, Jr., Superintendent.[1] Petitioner's prison number is 07-A-4969. Mr. Jimenez is not serving any sentence other than the sentence under attack in this proceeding. He does not have any future sentence to serve after the sentence under attack in this proceeding.

9.      Mr. Jimenez was convicted of one count of murder in the second degree, N.Y. Penal Law § 125.25, and sentenced to a prison term of 22 years to life. Mr. Jimenez was not sentenced on more than one indictment in the same court at the same time.

10.     Mr. Jimenez pleaded not guilty and was convicted after a jury trial. Mr. Jimenez did not testify at trial. Mr. Jimenez was represented at his pre-trial suppression hearing, trial and sentencing by Patrick Bruno, 99 Tulip Avenue, Floral Park, New York, 11001. Mr. Jimenez was represented on

---

[1] When this petition was commenced in 2011, Mr. Jimenez was incarcerated at Auburn Correctional Facility under the custody of Harold Graham. Since that date, Mr. Jimenez has been under the continuous custody of the Department of Corrections and Community Supervision.

appeal by Richard M. Greenberg, Office of the Appellate Defender, 11 Park Place, Suite 1601, New York, New York, 10007. Mr. Jimenez was represented in post-conviction proceedings by Rosemary Herbert and Anastasia Heeger, Office of the Appellate Defender, 11 Park Place, Suite 1601, New York, New York, 10007.

11.     Mr. Jimenez appealed his conviction and sentence. Mr. Jimenez timely presented all of the claims in this Amended Petition to the highest available New York court. The history of his state court litigation is as follows:

a.     Mr. Jimenez filed a direct appeal on January 5, 2009. *See* V6-A. Mr. Jimenez's conviction was affirmed on March 11, 2010, *People v. Jimenez*, 71 A.D.3d 483 (1st Dep't 2010), and leave to appeal to the Court of Appeals was denied on June 30, 2010, 15 N.Y.3d 752 (2010). On appeal, Mr. Jimenez claimed that the unjustifiable seventeen year pre-indictment delay violated his constitutional rights to due process and a speedy trial. This claim is raised in this Amended Petition.

b.     Mr. Jimenez, by counsel, filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10 ("CPL § 440.10) on September 23, 2011. *See* V2-B. Mr. Jimenez asserted several claims of *Brady* violations, prosecutorial misconduct and ineffective assistance of counsel. These claims are raised in this Amended Petition. On March 4, 2014, a Justice of Bronx County Supreme Court issued a decision and order denying Mr. Jimenez's motion without a hearing. *See* V2-A.

c.     On June 23, 2014, an Associate Justice of the Appellate Division, First Department ("Appellate Division"), granted permission to appeal the denial of the CPL § 440.10 motion, and that appeal was perfected on December 18, 2014. In a decision and order dated July 21, 2016, the Appellate Division reversed, "on the law," the order denying the CPL § 440.10

motion, and ordered a hearing into one of Mr. Jimenez's *Brady* claims. *See People v. Jimenez*, 142 A.D.3d 149 (1st Dep't 2016).

d. The hearing commenced on May 5, 2017, and concluded on October 18, 2017. On June 29, 2018, a Justice of Bronx County Supreme Court issued a decision and order finding that no *Brady* violation had occurred. *See* V1-A. Mr. Jimenez timely moved to reargue the hearing court's decision.[2] Concurrently, Mr. Jimenez sought leave to appeal the June 29, 2018 decision to the Appellate Division. In an order entered on November 1, 2018, an Associate Justice of the Appellate Division denied leave to appeal the June 29, 2018 *Brady* decision. *See* Certificate Denying Leave, M-3891 (A.D.1 Nov. 1, 2018) (V1-I). Mr. Jimenez then timely moved, concurrently, for reargument on the motion for leave to appeal, and in a separate application to Justice Rolando T. Acosta, pursuant to N.Y. Criminal Procedure Law § 460.20(2)(a), for leave to appeal to the Court of Appeals the un-remanded claims in his original CPL § 440.10 appeal. On February 26, 2019, the motion to reargue was denied. *See* Order Denying Leave Upon Reargument, M-6119 (A.D.1 Feb. 26, 2019) (V1-J). On March 26, 2019, Mr. Jimenez's motion for leave to appeal to the Court of Appeals was denied. *See* Order Denying Leave to Appeal, M-6159 (A.D.1 Mar. 26, 2019) (V3-I).

e. Mr. Jimenez has filed no other proceedings pending in state or federal court challenging his judgment of conviction and sentence.

## CITATIONS TO PETITIONER'S EXHIBITS

12. Undersigned counsel is filing, contemporaneously with this Amended Petition, relevant documents from the record. An index of all documents is attached as Exhibit B.

---

[2] The motion for reargument was fully submitted on August 10, 2018. On or about April 3, 2019, undersigned counsel was informed by the hearing judge's court attorney that the motion would be denied. However, as of the date of filing of this Amended Petition, undersigned counsel has not received a written decision.

a.  Volume 1: Decision, Transcript, and Filings from the CPL § 440.10 Hearing

b.  Volume 2: Decision and Filings from the CPL § 440.10 Litigation

c.  Volume 3: Decision and Filings from the Direct Appeal of the CPL § 440.10 Denial

d.  Volume 4: Selected Exhibits from the CPL § 440.10 Proceedings

e.  Volume 5: Trial Transcript

f.  Volume 6: Filings from the Direct Appeal of the Conviction

## CLAIMS FOR RELIEF

13.    This Amended Petition contains the basic facts in support of the constitutional issues

presented by this case. On the constitutional issues raised in this petition, the state courts'

"adjudication of the claim . . . resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law as determined by the Supreme Court of

the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding," 28 U.S.C. § 2254(d)(2).

14.    Mr. Jimenez asserts the following claims, which have been exhausted in the state courts:

## I.    *BRADY* AND *NAPUE* CLAIMS

- The Prosecution Violated *Brady* by Not Disclosing Andrew O'Brien's Efforts to Cut His Federal Sentence and that a Letter About His Cooperation Would Be Sent to the Federal Prosecutor with Whom the Bronx Prosecutor Had Discussed Sentence Reductions. The Prosecution Violated *Brady and Napue* by Eliciting Misleading Testimony from O'Brien About the Agreement.

- The Prosecution Violated *Brady* by Not Disclosing an Investigative Report that Would Have Discredited Andrew O'Brien's Identification Testimony and Detective Wendell Stradford's Claim that O'Brien Provided Substantive Information on the Shooting Years Before the Trial.

- The Prosecution Violated *Brady* by Not Fully Disclosing the Extent of Andrew O'Brien's Convictions and Bad Acts and that He Had Been a Cooperator in Another Prosecution.

- The Prosecution Violated *Brady* by Not Timely Disclosing a Document Indicating that Andrew O'Brien Had Been Considered a Suspect in this Case.

- The Prosecution Violated *Brady* by Failing to Disclose Kevin Morrissey's Full Criminal History, His Past History of Mental Illness and Mendacity in Federal Proceedings, and His History as an Informant.

- The Prosecution Violated *Brady* by Not Timely Disclosing Key Documents from the 1989 Investigation.

- The Prosecution Violated *Brady* by Failing to Disclose Ballistics Evidence that Indicated that a Third Gun Was Involved in this Incident.

## II.    CONSTITUTIONAL SPEEDY TRIAL CLAIM

- The Unjustifiable Seventeen Year Pre-Indictment Delay, Violated Mr. Jimenez's Constitutional Rights to Due Process and a Speedy Trial.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

- As an Alternative Ground, Counsel Was Ineffective For Failing to Renew Mr. Jimenez's Move to Dismiss the Indictment on Constitutional Speedy Trial Grounds.

- Counsel Was Ineffective for Failing to Strike Detective Wendell Stradford's Testimony at the *Wade* Hearing as Baseless Conjecture.

- Counsel Was Ineffective for Failing to Call Two Witnesses Who Would Have Provided Identification Testimony Exculpatory of Mr. Jimenez.

- Counsel Was Ineffective For Failing to Cross-Examine O'Brien with His Written Statement that Was Inconsistent With His Trial Testimony.

## <u>INTRODUCTION</u>

15.    This case involves the prosecution of Petitioner Ricardo Jimenez for the homicide of Sean

Worrell, who was killed in the opening minutes of "Batman" at the Whitestone Movie Theater in the

Bronx on July 3, 1989. Even to a city numbed by rampant gun violence, the "Batman" shooting was

notable for its brazenness. The police quickly learned that, earlier that evening, the shooter had argued with Worrell at a lobby concessions stand. The many people who witnessed either the argument or the shooting described the perpetrator as a black man with bleached blond stripes along the sides of his head.

16.     Weeks after the shooting, in an extremely unorthodox and largely undocumented single photo identification procedure, Mr. Jimenez was identified as a suspect and arrested. However, the eyewitness who made the identification, Esco Blaylock, failed to show up for a lineup and recanted his claim of seeing the shooting. None of the many other eyewitnesses were called in to view Mr. Jimenez's lineup, and he was released. The police investigation turned to Worrell and the people he was with the night he was killed, a group of men later identified as members of a large, Brooklyn-based drug trafficking organization called the Poison Clan. Among the group at the theater was Dean Beckford, the leader of the gang, and his childhood friend, Andrew O'Brien.

17.     Approximately six years later, a Brooklyn homicide detective investigating the Poison Clan advised Bronx detectives that O'Brien might be charged with Worrell's murder. O'Brien never was charged with the Worrell homicide, but, in 1996, he and 22 other Poison Clan members were indicted on RICO charges in Virginia. The following year, O'Brien became a cooperating witness for federal prosecutors. He pleaded guilty and was sentenced to a life term, which was later reduced to 30 years, pursuant to a Rule 35 motion, for his assistance in the Poison Clan case.

18.     Approximately two years later, while serving his federal sentence, O'Brien spoke with NYPD Cold Case Detective Wendell Stradford and, in 2001, purportedly identified Mr. Jimenez—with whom he had no familiarity—as the Whitestone shooter in a photo array. Inexplicably, however, the case lay dormant for another five years until Stradford re-interviewed Blaylock, who recanted his earlier recantation, said he saw the shooting and selected Mr. Jimenez in a photo array.

19.     Mr. Jimenez was arrested in August 2006, more than 17 years after the Worrell shooting, and indicted for murder. Mr. Jimenez's *pro se* motion to dismiss the indictment on constitutional speedy trial grounds was summarily denied and trial commenced in June 2007. There was no physical evidence. Rather, the case rested on identifications of Mr. Jimenez by Blaylock and O'Brien, and the testimony of Kevin Morrissey, a prolific jailhouse informant who emerged after Mr. Jimenez's highly-publicized arrest. After a lengthy trial and five days of deliberations, Mr. Jimenez was convicted of second-degree murder and sentenced to 22 years to life. At sentencing—as he does to this day—Mr. Jimenez insisted that he was innocent. S. 13.

20.     On direct appeal, Mr. Jimenez asserted, *inter alia*, that his federal constitutional rights to due process and a speedy trial had been violated. The Appellate Division affirmed the conviction.

21.     After Mr. Jimenez's conviction was affirmed on direct appeal, appellate counsel commenced a full reinvestigation of the case.[3] Among the facts discovered was that O'Brien had, several months after testifying against Mr. Jimenez, been the beneficiary of a second Rule 35 reduction in his federal sentence. The basis for the reduction was O'Brien's cooperation with the Jimenez prosecution. Appellate counsel also discovered that the prosecution had failed to disclose a raft of information about O'Brien and Morrissey's criminal histories, and evidence of Morrissey's significant mental illness and repeated mendacity in federal court proceedings. Appellate counsel filed a CPL §440.10 motion in Bronx County Supreme Court, asserting numerous *Brady* violations, claims of

---

[3] This included interviews with Dean Beckford, the former head of the Poison Clan, and Maxine "Wingie" Littlejohn, both of whom were at the theater and witnessed the shooting. Littlejohn told an OAD investigator that the shooter was "brown" and "Jamaican," and, after viewing a photo of Mr. Jimenez taken in 1989, said she had never seen him before. Beckford viewed the same photo of Mr. Jimenez and signed a statement that he was not the perpetrator, and that the shooter was a "black individual." *See* Affirmation of Anastasia Heeger, dated May 25, 2012 (V4-1); Statement of Dean Beckford, dated May 25, 2012 (V4-2); Letter of Rosemary Herbert and Anastasia Heeger to Hon. Robert A. Sackett, dated Jan. 22, 2014 (V4-3).

prosecutorial misconduct, ineffective assistance of counsel, and actual innocence. Without a hearing, the CPL §440.10 motion was denied.

22.     Mr. Jimenez was granted leave to appeal that denial to the Appellate Division. After briefing and argument, the Appellate Division found that the prejudice arising from most of the claims raised by Mr. Jimenez did not warrant vacatur of the conviction. Nonetheless, the court reversed the lower court's denial of the CPL §440.10 motion, and remanded for a hearing into whether the prosecutor violated *Brady* by failing to disclose an agreement to assist O'Brien with a sentence reduction.

23.     The hearing court heard testimony from Lisa Mattaway, the Bronx prosecutor who brought the case against Mr. Jimenez, Stradford, and O'Brien. The testimony of a fourth witness—David Novak, a federal magistrate judge in the Eastern District of Virginia, formerly an Assistant United State Attorney, who had prosecuted O'Brien as part of the Poison Clan case in the 1990s and who, after Mr. Jimenez's trial in 2007, had filed the Rule 35 motion seeking to reduce O'Brien's sentence—was entered into the record by stipulation.

24.     The hearing testimony established that, before Mr. Jimenez's trial, Mattaway agreed to provide a letter on O'Brien's behalf to Novak, and that the full circumstances and context of this agreement were not disclosed. The testimony also showed that O'Brien had, in pre-trial meetings with Stradford, told him of his hopes of getting a time cut, and that, when he testified, a time cut was the "only thing[]" he could hope for in return for cooperation.

25.     In a 3½-page decision, the hearing court found that "there was no *quid pro quo* agreement between the Bronx prosecutor's office and Mr. O'Brien and/or the federal prosecutor. The Court further finds no *Brady* violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor." The hearing court made no mention of Judge Novak's testimony, nor did it discuss the legal standards employed in its analysis. Leave to appeal the decision

to the Appellate Division was denied. Subsequently, an application for leave to appeal the un-remanded claims in Mr. Jimenez's CPL § 440.10 also was denied.

<u>**SPECIFIC CLAIMS**</u>

**I.     Mr. Jimenez's Due Process Rights Were Violated Under *Brady* and *Napue*.**

26.     The prosecution has a due process duty to provide to defendants all information in its possession or control that is exculpatory to guilt, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or relevant to the reliability of a witness whose credibility may be determinative of guilt or innocence, *Giglio v. United States*, U.S. 150, 153 (1972), *citing Napue v. Illinois*, 360 U.S. 264, 269 (1959). In sum, both impeachment and exculpatory evidence must be disclosed. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

27.     To establish a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Green*, 527 U.S. 263, 281-82 (1999).

28.     Further, "evidence is material … if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 683; *accord Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "Several well-established propositions guide a materiality analysis." *Boyette v. Lefevre*, 246 F.3d 76, 91-92 (2d Cir. 2001). Initially, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995). Instead, the court must determine whether, in the absence of the undisclosed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Next, the "defendant need not demonstrate that after discounting the inculpatory

evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Third, "once a reviewing court ... has found constitutional error, there is no need for further harmless-error review." *Id.* at 435. Fourth, the reviewing court must consider the suppressed evidence "collectively, not item by item." *Id.* at 436; *accord Turner v. U.S.*, __ U.S. __, 137 S.Ct. 1885, 1893 (2017); *Wearry v. Cain*, __ U.S. __, 136 S.Ct. 1002, 1007 (2016).

29.     A prosecutor has a related duty not to allow false testimony by its witnesses to go uncorrected. *Napue*, 360 U.S. at 269; *United States v. Agurs*, 427 U.S. 97, 112 (1976). This principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269; *see also Jenkins v. Artuz*, 294 F.3d 284, 292-93 (2d Cir. 2002)(recognizing that *Napue*'s holding that a conviction obtained through the knowing use of false evidence, including evidence going to witness credibility, violates the Fourteenth Amendment is "clearly established law" under 28 U.S. C. § 2254)).

## A.     *BRADY* AND *NAPUE* VIOLATIONS AS TO ANDREW O'BRIEN

**1.     The Prosecution Violated *Brady* by Not Disclosing O'Brien's Efforts to Cut His Federal Sentence and that a Letter About His Cooperation Would Be Sent to the Federal Prosecutor with Whom the Bronx Prosecutor Had Discussed Sentence Reductions. The Prosecution Violated *Brady and Napue* by Eliciting Misleading Testimony from O'Brien About the Agreement.**

### a.     Andrew O'Brien's Testimony

30.     On June 8, 2007, about 10 days before the start of jury selection in Mr. Jimenez's case, ADA Lisa Mattaway gave the defense a memo stating that she would be presenting testimony from:

> Andrew O'Brien – currently jailed in Federal Custody for Murder (unrelated) and serving 30 years. Has asked for a letter to be prepared by the undersigned that he can have put in his file stating that he testified for the Bronx District Attorney's Office.

*See* Memo from ADA Lisa R. Mattaway to Patrick Bruno, dated June 8, 2007 (V4-4).

31.     Three weeks later, on June 29, 2007, O'Brien began his testimony by telling jurors that he was currently incarcerated for a 1990 murder, and was facing 18 more years in prison. T. 179.[4]

32.     O'Brien testified about traveling with some "other guys," including Sean Worrell, to the Whitestone Movie theatre in 1989 to see a late night showing of "Batman." T. 180. At a lobby concessions stand, he and Worrell argued with a man who "aggressively" asked them if they were in line. T. 191. Later, the man approached them in the theater, challenged O'Brien to a fight, and began to walk away towards the back of the theater, away from the screen. T. 199-200. O'Brien and his friends, who were sitting close to the screen, T. 197, followed the man up the aisle, 200-01. O'Brien said his friend "Patchy" walked up the aisle first, followed by O'Brien, with Worrell bringing up the rear. T. 202-03. The man from the concessions stand caught sight of O'Brien, pulled out a gun and began shooting. T. 201-02. Worrell, who was behind O'Brien, was struck and killed. T. 202-03, 208, 211. O'Brien identified Mr. Jimenez as the person who had fired the gun. T. 207. He said the last time he had seen Mr. Jimenez "personally" was in 1989. T. 217-19.

33.     O'Brien did not initially speak to the police about the shooting because he was "living in the street." T. 222. He said that he was put in touch with Detective Wendell Stradford in about 1999, and had spoken with him "ten times, fifteen times over the years." T. 223. O'Brien first met with Mattaway in 2006 or late 2005, and had not seen her again until the day of his testimony. T. 223-24. This questioning followed:

> [Mattaway]:     What is your understanding of what if anything I can or will do for you in exchange for your testifying here today for us?
>
> [O'Brien]:     Well, my understanding is that you'll just tell the Federal prosecutors that I cooperated with ya'll and that's it.
>
> [Mattaway]:     Are you a sentenced prisoner?

---

[4] O'Brien's testimony is in V5-B of the trial transcript.

[O'Brien]:         Yes.

[Mattaway]:        And you said you have 18 years to go?

[O'Brien]:         Yes.

[Mattaway]:        Are you presently doing this for anybody else?

[O'Brien]:         Doing what? What I'm doing here?

[Mattaway]:        Yes.

[O'Brien]:         I'm basically doing it just because it's a lot of different reasons.

[Mattaway]:        Why are you doing this?

[O'Brien]:         Well, one is that I felt guilty because, you know, I kind of like started the argument with the guy, with the person.

[Mattaway]:        At the popcorn line?

[O'Brien]:         I started an argument. Basically I felt like I got the guy killed.

[Mattaway]:        [Worrell]?

[O'Brien]:         Yes. I got [Worrell] killed and I never really tried to help his family, you know. And second is that because I cooperated with the Federal Government and they said that my agreement that I had to cooperate with all law enforcement and everything else and so that's the reason why I started talking to the New York NYPD.

[Mattaway]:        This was part of your original agreement?

[O'Brien]:         Yes.

[Mattaway]:        On your Federal case?

[O'Brien]:         Yes.

[Mattaway]:        You have to cooperate with any law enforcement people, is that what you're telling us?

13

| [O'Brien]: | Of crimes I may have been part of, or know of, if I kept it to myself they could rip up my agreement and everything else. |
| [Mattaway]: | You currently have an agreement, but it's with the Feds? |
| [O'Brien]: | Yes. |
| [Mattaway]: | A full written thing that you signed? |
| [O'Brien]: | Yes. |
| [Mattaway]: | Do I have any written thing with you? |
| [O'Brien]: | No. |

T. 224-25.

### b.  Information Regarding O'Brien and His Cooperation that was Discovered or Disclosed Post-Conviction

*34.*    Appellate counsel discovered that, several months after Mr. Jimenez's trial, Mattaway wrote an effusive letter to then–AUSA David Novak, lauding O'Brien's role in securing Mr. Jimenez's conviction and encouraging Novak "to give Mr. O'Brien whatever consideration you can in your position." *See* Letter of ADA Lisa R. Mattaway to AUSA David Novak, dated Oct. 16, 2007 (V4-5). Novak went on to file a successful Rule 35 motion in federal court to reduce O'Brien's sentence on the basis of his cooperation in the Jimenez prosecution. *See* Government's Second Motion for Reduction of Sentence, *U.S. v. O'Brien*, 96cr66 (E.D.V.A.), filed Dec. 10, 2007 (V4-6).

35.    Later, during CPL § 440.10 motion practice, the prosecution disclosed a large amount of material regarding O'Brien that had not been given to defense counsel, including emails between Mattaway and Novak, *see* Emails between AUSA David Novak and ADA Lisa Mattaway, dated June 7, June 8, June 13, and Nov. 26, 2007 (V4-7); and a package of discovery material regarding O'Brien that Novak sent to Mattaway before Mr. Jimenez's trial. These documents included a 32-page FBI 302-report on interviews with O'Brien in 1997 in which O'Brien said that Worrell was killed at the

14

Whitestone Theatre, but did not indicate that he had witnessed the shooting or that he had any information about the incident. *See* FBI-302 report on interview with Andrew O'Brien, dated Jan. 29, 30, 31 and Feb. 11, 1997 (V4-8).

36.     The materials also included the federal plea agreement that O'Brien entered into in 1997, his testimony as a cooperator in the Poison Clan case, the 1998 order to reduce his federal sentence from a life term to 30 years on the basis of this cooperation, and letters from O'Brien to Judge Robert E. Payne of the U.S. District Court for the Eastern District of Virginia seeking a sentence reduction. *See* Plea agreement for Andrew O'Brien, *U.S. v. Beckford, et. al.*, 96cr66 (E.D.V.A.), filed Jan. 28, 1997 (V4-9); Testimony of Andrew O'Brien, *U.S. v. Beckford, et. al.*, Jan. 24, 2007 (V4-10); Order Granting Motion for Reduction of Sentence, *U.S. v. O'Brien*, 96cr66 (E.D.V.A.), dated June 10, 1998 (V4-11); Letters of Andrew O'Brien to Hon. Robert E. Payne, dated March 20, 2006 (2) and March 21, 2007 (V4-12).

37.     The most recent letter was March 2007, after O'Brien had met with Mattaway, and a few months before his testimony against Mr. Jimenez. In this letter, O'Brien described himself as a "desperate man" who deserved a time cut. V4-12.

### c.     The CPL § 440.10 Motion

38.     In a CPL § 440.10 motion,[5] Mr. Jimenez asserted that the prosecutor violated *Brady* by not accurately disclosing the benefit provided to Andrew O'Brien for his testimony, failing to disclose that O'Brien was seeking to cut his federal sentence when he testified against Mr. Jimenez, and by eliciting testimony from O'Brien that implied that did not stand to receive any sentencing benefit for his testimony.

---

[5] Mr. Jimenez's CPL § 440 pleadings can be found in Volume 2 of the Appendix.

39.     After the CPL § 440 court denied this claim on the papers, the Appellate Division reversed

and remanded for a hearing into whether ADA Mattaway had violated *Brady* "by not disclosing the

terms of an agreement to assist in a sentence reduction for People's witness Andrew O'Brien, if such

agreement existed." *Jimenez*, 142 A.D.3d at 164. The Appellate Division also held that "[w]ere

defendant to establish at a hearing that the prosecutor knew that O'Brien had been given a specific

quid pro for his testimony," reversal would be required under New York's materiality standard for

*Brady* claims involving undisclosed material that was specifically requested by the defense. *Id.* at 163

(citing *People v. Vilardi*, 76 N.Y.2d 67 (1990)).

### d.     The Hearing

#### i.     Cold Case Detective Wendell Stradford

40.     At the hearing, Stradford testified that he did not "make any promises" to O'Brien for his

testimony. H. 8.[6] He said that AUSA Novak contacted him, after Mr. Jimenez's trial, to ask if he was

going to write a letter for O'Brien. H. 8. Stradford said he would have to "check with [his]

supervisor" and was subsequently advised not to write it. H. 9. Stradford never got back to Novak.

H. 45.  On cross-examination, Stradford changed his testimony and said that he did not recall who

had initiated the post-trial contact. H. 43.  He said that Novak told him that the letter might be used

for "a 5K[7] . . . something to do with his sentence or whatever. I'm not sure." H. 44. Stradford later

denied that Novak told him what the letter was for, adding "I didn't ask. It's just assumed." H. 44.

---

[6] The transcript of the CPL § 440.10 hearing is in Volume 1 of the Appendix. Citations preceded by H. refer to the proceedings on May 5, 2017 (V1-B); citations preceded by H2. refer to proceedings on July 21, 2017 (V1-C).

[7] A Rule 35 motion is similar in purpose to a § 5K1.1 motion; "[t]he only practical difference between Rule 35(b) and U.S.S.G. § 5K1.1 is a matter of timing: The latter is based on substantial assistance before sentencing while the former is based on substantial assistance after sentencing." *United States v. Gangi*, 45 F.3d 28, 30 (2d Cir. 1995).

### ii. Bronx ADA Lisa Mattaway

41.　　Mattaway said she made no promise to O'Brien other than to give him a letter. H. 47-50.

42.　　Mattaway was asked about an email she wrote to Novak, before Mr. Jimenez's trial, in which she requested any cooperation agreements O'Brien had made, and noted that she was "aware that he has written numerous letters to the judge in his case requesting leniency," and added that "if any of those letters mention the possibility he may testify here in Bronx Supreme Court for me, I imagine I will need copies of those letters too." V4-7. Mattaway acknowledged at the hearing that she was aware of O'Brien's letters to the judge "[a]t that time." H. 56. She also acknowledged that she knew that O'Brien might have mentioned his potential cooperation in the Jimenez case in those letters. H. 69.

43.　　Mattaway said she did not disclose to defense counsel that O'Brien was seeking leniency from a federal judge because "[h]e wasn't seeking it from me," and that "the only thing he wanted from me was a letter after he testified and that's what he got." H. 83; *see also* H. 84 ("I don't know or don't remember what the extent of what he wanted federally was. What's in this memo dated June 8th is what it says, what he wants from me.").

44.　　Mattaway also conceded that, before Mr. Jimenez's trial, she had agreed to write a letter for O'Brien and understood that it was to be sent to Novak. H. 60-61.

45.　　Mattaway did not remember if she looked at the discovery materials that Novak sent to her before trial, but agreed that she had sworn in an affirmation for the CPL § 440.10 litigation that she "must have inadvertently neglected to look at and disclose" those documents. H. 74; *see also* Affirmation of ADA Lisa Mattaway, dated Jan. 10, 2012  (V4-13).

46.　　Mattaway said Novak contacted her on October 1, 2007, after Mr. Jimenez's trial and asked her to write a letter. H. 86. She did not ask what the letter was for, but understood that this letter

was the "same letter" that O'Brien requested before trial. H. 86, 88. Mattaway said "[w]hat Mr. Novak did with [the letter], I don't know." H. 91. Mattaway also claimed that she did not know that the letter would be used in support of a sentence reduction. H. 92.

47.     Mattaway insisted that O'Brien's testimony at trial—that the only understanding he had with her is that she would "tell the federal prosecutors that I cooperated with y'all and that's it"—was not misleading because, "[t]here's nothing [in O'Brien's testimony] about a letter []. Telling is not a letter." She also insisted that the letter she later wrote to Novak was "memorializing what I told him, him meaning Novak." H. 94.

### iii.    Cooperating Witness Andrew O'Brien

48.     O'Brien said that when he cooperated in the 1997 Poison Clan case, he did not have a "promise" from federal prosecutors that they would file a Rule 35 motion, or that a federal judge would grant the motion. H2. 15, 43. O'Brien knew that any relief would be at the prosecutor's and the court's discretion. H2. 15, 43. Nonetheless, O'Brien conceded, the possibility of getting a sentence reduction was of value to him. H2. 43.

49.     O'Brien said that, when he testified against Mr. Jimenez, he knew he was getting a letter from Mattaway to Novak about his cooperation, and he hoped that Novak would file another Rule 35 motion on the basis of this cooperation. H2. 43-44, 46.

50.     O'Brien recalled meeting with Stradford and said he had told Stradford his hopes of getting a time cut. H2. 18. When asked what, in those discussions, he said he would want for cooperation, O'Brien responded: "I would want—only things I could hope for is a reduction in my sentence." H2. 19. He said he discussed this with Stradford "to a certain extent," by "probably . . . complain[ing] to him about my sentence, you know, my situation." H2. 19.

51.     O'Brien said that he had kept in touch with AUSA Novak after the Poison Clan case and agreed that, over the years, he had asked if there was anything he could to do to reduce his sentence. H2. 21. O'Brien was hopeful that something could be done, and understood that any relief would have to be done through a Rule 35 motion. H2. 21. O'Brien said that, after his initial Rule 35 sentence reduction, Novak told him "[a]t some point" that he would consider a second one. T2. 23. He hoped that Novak would consider his assistance in the Jimenez case as a basis for a second Rule 35. H2. 26.

52.     O'Brien said that, in return for his testimony, he wanted Mattaway to tell the federal prosecutors—specifically in a letter to Novak—that he had cooperated. H2. 25-26. Asked if he told Mattaway of his hopes that his cooperation with her case would lead to a time cut, O'Brien responded: "I don't recall saying that to her in particular. I can't say that I did, I can't say that I didn't." H2. 26.

53.     O'Brien acknowledged writing a letter to Judge Payne, who had presided over the Poison Clan case, in March 20, 2006 in which he argued that, when Novak made the Rule 35 motion to reduce O'Brien's sentence in 1998, there were "a number of mitigating circumstances which no one took into consideration." H2. 31. O'Brien said, by writing that, he meant that he had been unfairly given too much time, and had the "harshest sentence of anybody" he'd ever met. H2. 31.

54.     This 2006 letter, as well as a second letter written on March 21, 2007, were received by Judge Payne on March 27, 2007. V4-12. O'Brien agreed that when he mailed the letters in 2007 he "d[id]n't know if [he] was expecting" that a Rule 35 motion would be filed, but he "might have hoped for one." H2. 38.

**Magistrate Judge David Novak, U.S. District Court Eastern District of Virginia**

55.     The testimony of former AUSA David Novak, now a federal magistrate judge for the Eastern District of Virginia, was entered into evidence by stipulation on October 18, 2017. *See* Stipulation of Novak Testimony (V4-14).

56.     Novak recalled being in contact with O'Brien after the Poison Clan case. V4-14 at 1. O'Brien was "hopeful" that he would receive a further "cut" or "cuts," and asked Novak if there was anything he could do to get one. *Id.* O'Brien wanted to help himself "in any possible way." *Id.* O'Brien did not specifically mention the Jimenez case in their discussions. *Id.* Novak recalled that he must have informed O'Brien at some point that second Rule 35 reductions are "strongly disfavored," but that he could not say a reduction would "never" happen. *Id.* at 2.

57.     To obtain a second Rule 35 reduction on behalf of a witness, Novak would have to agree, and then obtain consent from a supervisor in the U.S. Attorney's Office, and then get court approval, none of which was guaranteed. V4-14 at 1. Thus, no one could promise O'Brien that he would receive a further reduction. *Id.*

58.     Pursuant to his federal cooperation agreement, O'Brien was required to cooperate with all law enforcement, including state and federal prosecutions. V4-14 at 2. The failure to cooperate would constitute a "breach" of his agreement. *Id.* However, Novak did not recall this requirement to be a factor in O'Brien's testimony in the Jimenez case and recalled that O'Brien wanted to cooperate in this case. *Id.*

59.     Novak's "surmise" was that Mr. O'Brien wanted to testify to get a time cut. He did not believe O'Brien was cooperating to be a "good citizen." V4-14 at 2.

60.     Novak recalled a phone call with Mattaway about O'Brien's production to Mr. Jimenez's trial and telling Mattaway to email him if she needed anything else. He believed he received a request for

*Brady* material from Mattaway on a Monday, and then accumulated the paperwork on O'Brien and mailed it to her that Thursday. V4-14 at 2. It was a "big deal" for Novak to get the O'Brien documents together on short notice. *Id.*

61.     Novak did not recall whether he discussed a letter with Mattaway before trial. Novak at 2. He was "pretty sure" he told Mattaway that second Rule 35 motions or second sentence reductions are "disfavored," and advised her, "Don't promise him anything," or "You can't promise him anything." *Id.* His recollection was based on a prior experience he had where someone made a promise to a cooperating witness of a sentence reduction, and when the witness did not get the promised reduction, a "contract" was put out on Novak's life. *Id.*

62.     Novak believed that, in October 2007, Mattaway contacted him about the result of Mr. Jimenez's trial and wanted to do something for O'Brien. Novak told Mattaway a further reduction was disfavored, but could not say "for sure." His reaction was "send me a letter." V4-14 at 2-3.

63.     Mattaway sent Novak a "pretty strong" letter, detailing O'Brien's cooperation, the results of trial, and seeking consideration. V4-14 at 3. At the time of receipt, Novak was not sure whether he was going to ask for a reduction on behalf of O'Brien. He "did not know" what he "would do," and did not "know [Ms.] Mattaway from a hole in the wall." *Id.*

64.     Novak recalled that Mattaway was the "initiator" of the letter.  V4-14 at 3. There was "no one else it could have been." Novak decided to support what Mattaway did. The second motion was "driven by her, not me," he recalled. *Id.*

65.     As a result of Mattaway's letter, Novak filed the second Rule 35 reduction motion. V4-14 at 3. Mattaway's letter and O'Brien's testimony in the Jimenez trial were the basis upon which the sentence reduction was sought. The motion was granted and O'Brien's sentence was reduced by five years. *Id.*

### e. The Hearing Court's Decision

66.     In a 3½ page decision,[8] the hearing court concluded that there was "no *quid pro quo* agreement" between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor and, accordingly there was "no *Brady* violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor." *See* Decision and Order, *People v. Ricardo Jimenez*, (June 29, 2018, Torres, J.) (V1-A). It found that "the People accurately disclosed that they would write a letter to be placed in O'Brien's federal file stating that he had testified for the Bronx District Attorney's office in its case of *People v. Jimenez*." The hearing court also found "no evidence of any agreement of any kind other than what the parties disclosed at trial . . . [or] to support the defendant's contention that there was any other agreement made between ADA Mattaway and Andrew O'Brien." *Id.*

67.     In its findings of fact, the hearing court briefly mentioned Stradford, Mattaway and O'Brien's testimonies. It noted that Mattaway "did affirmatively testify that she had no other agreement or gave no further promise to Mr. O'Brien other than the promise to write a letter on his behalf. When questioned regarding Mr. O'Brien's quest to seek leniency from the federal judge on his federal matter Mattaway responded that the only relief she was aware Mr. O'Brien was seeking was the letter from her office." *Id.*

68.     As to O'Brien, the hearing court noted only that he "testified that Det. Stradford made no promises to him that AUSA Novak made no promises to him and that ADA Mattaway made no other promises to him other than to write a letter on his behalf." *Id.*

69.     The court deemed that "[a]ll three witnesses testified credibly about their roles as investigator of the murder, the prosecutor of the murder, and a witness to the murder." *Id.*

---

[8] This decision is contained in Volume 1 of the Appendix.

70.     The decision made no mention of Judge Novak, nor his stipulated testimony.

71.     The Appellate Division denied leave to appeal the hearing court's decision.

     **f.     The Appellate Division's Determination that Evidence Relevant to O'Brien's Motive and Intent in Testifying Did Not Fall Under *Brady* Was an Unreasonable Application of Supreme Court Case Law.**

72.     In its July 21, 2016 decision, the Appellate Division[9] rejected Mr. Jimenez's claim that Mattaway violated *Brady* by failing to disclose the materials that Novak sent to her before trial (including O'Brien's 1997 federal plea agreement and copies of his 2006 and 2007 letters to Judge Payne seeking a further sentence reduction), and an email from Mattaway to Novak stating that she was aware that O'Brien was seeking a sentence reduction in federal court. *See Jimenez*, 142 A.D.3d at 160-63. The CPL § 440.10 court did not specifically address this claim, instead making the general conclusion that "the prosecutor clearly met her *Brady* obligation with regard to disclosure of the complete agreements between her office and O'Brien." V2A (at 34). Mr. Jimenez asserted before the Appellate Division that the information was relevant, under *Brady*, to O'Brien's "motivations for testifying." V3-B at 59, 80-81; *cf. Giglio*, ("[The witness'] credibility as a witness was [] an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.").

73.     Instead, the Appellate Division concluded that a *Brady* violation would lie only if Mr. Jimenez could demonstrate that O'Brien "had been given a specific quid pro quo for his testimony." 142 A.D.3d at 162.

74.     While, as argued *infa*, Mr. Jimenez did establish at the hearing that there *was* an understanding between O'Brien and Mattaway that was not disclosed within the mandate of *Brady*, the Appellate Division's failure to recognize that the Novak material, and evidence that Mattaway

---

[9] Westlaw citations are used in this Petition. A slip copy of the Appellate Division's decision, as well as the Appellate Division filings, can be found in Volume 3 of the Appendix.

was aware of O'Brien's sentence reduction efforts, was itself *Brady* material relevant to O'Brien's credibility was an unreasonable application of Supreme Court case law. 28 U.S.C. § 2254(d)(1).

75.     All of this information was germane to understanding why O'Brien came forward and testified against Mr. Jimenez and was, accordingly, impeachment evidence requiring disclosure. *Brady* and *Giglio* require the prosecution to disclose evidence impeaching a witness' credibility, including evidence relevant to a witness' motive, bias or interest. *Bagley*, 473 U.S. at 683 (finding *Brady* violation where prosecution failed to disclose the "possibility of a reward [which] gave[witnesses] a direct, personal stake in respondent's conviction"); *Napue*, 360 U.S. at 270 (recognizing that evidence of a witness' motive to falsely accuse a defendant to help himself with his own legal problem is relevant to credibility); *cf. Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) ("We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); *Annunziato v. Manson*, 566 F.2d 410, 414(2d Cir. 1977)( "In evaluating bias and interest, the jury should be informed that the witness hopes for leniency on current charges and that the prosecution has a present leverage over the fate of the witness.").

76.     Cross-examination was particularly critical with a witness like O'Brien—who was claiming to be able to make an eyewitness identification—some 18 years after the crime—of the stranger with whom he briefly argued with at a movie concession stand. *See Greene v. McElroy*, 360 U.S. 474, 496 (1959) (discussing the importance of cross-examination of testimony by "individuals whose memory might be faulty or who, in fact, might be perjurers."). All evidence of a motive for O'Brien to falsify testimony in the 2006 trial should have been before the jury, especially since he did not immediately come forward with this information. As discussed *infra,* O'Brien failed to mention that he had

information about this case when he was debriefed in 1997 by federal investigators about his knowledge of criminal activity.

77.    In addition, the undisclosed plea agreement provided a clear roadmap for how O'Brien could benefit from his testimony against Mr. Jimenez and, more importantly, was evidence that O'Brien had previously been incentivized to testify without a firm promise that a prosecutor would support a motion to reduce his sentence, exactly the situation in this case. *See* V4-9. Disclosure of the plea agreement also would have revealed that that federal prosecutor who had entered into a cooperation agreement with O'Brien, which included an agreement to file a Rule 35 motion if satisfied with his cooperation, was Novak, the person to which Mattaway's letter was to be sent. *Id.* The package also contained the 2006 and 2007 letters from O'Brien to Judge Payne, in which O'Brien described himself as a "desperate man" who deserved a time cut. *See* V4-12.

78.    All of this information required disclosure under *Brady* and *Giglio*. The material would have been used on cross-examination to explore O'Brien's motivations for testifying even if, for the sake of argument, he did not have any firm agreement with anyone for assistance in his time cut efforts. *See Wearry*, 136 S. Ct. at 1006-07 (noting that a juror who found a witness credible "might have thought differently" had they known of "the possibility of a reduced sentence on an existing conviction," and citing *Napue*).

79.    Such a disclosure also would have alerted defense counsel to the existence of the 1997 FBI-302. *See* V4-8. If counsel was aware that O'Brien was seeking a further sentence cut, he would have deduced that the only way to do this would be through a Rule 35 motion. Eligibility for a Rule 35 motion rests on when the information is given by a defendant to the government. Under subsection (b), the provision under which Novak eventually moved to reduce O'Brien's sentence, sentence reductions are based upon "information provided by the defendant to the government within one

year of sentencing, but which did not become useful to the government until more than one year after sentencing." Thus, to benefit from a Rule 35 sentence reduction motion in 2007, O'Brien must have provided the relevant information "within one year" of his 1997 sentencing. Counsel would have moved for production of whatever information was provided within one year of O'Brien's sentencing—which would have, inevitably, resulted in the production of the 1997 FBI-302, discussed *infra* at §§ 107-08. Counsel would have seen that O'Brien had not given any substantive information about the shooting in 1997.

80.    Yet, despite purportedly evaluating the non-disclosure under *Brady*, the Appellate Division did not undertake the requisite inquiry, namely whether the undisclosed information was favorable and whether it should have been disclosed. Instead, it concluded that, as a matter of law, such material was not *Brady* in the absence of some *specific quid pro quo* for a benefit. This is contrary to and an unreasonable application of the Supreme Court's *Brady* case law. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

> **g.    The Hearing Court's Determination that There Was No Undisclosed *Quid Pro Quo* Agreement Was an Unreasonable Application of Supreme Court Case Law.**

81.    After the remand, the hearing court's decision that there was no *Brady* violation because there was no undisclosed *quid pro quo* between the Bronx prosecutor and O'Brien was "contrary to, and involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

82.    As explained above, *Brady* and *Giglio* require the prosecution to disclose evidence impeaching a witness' credibility. *Bagley*, 473 U.S. at 676. Moreover, full disclosure is a constitutional requirement. *See Strickler*, 527 U.S. at 281 (noting prosecution's broad duty of disclosure); *accord Kyles*, 514 U.S. at 439 ("[A] prosecutor anxious about tacking too close to the wind will disclose a

favorable piece of evidence."). The prosecution also has a duty to learn of favorable evidence known to others working on its behalf, *Kyles* 514 U.S. at 437, and applies even to evidence known only to police investigators, *Strickler*, 527 U.S. at 280–81.

83.     Ultimately, it is incumbent upon the prosecutor—especially when, like here, she has made affirmative representations of an inducement for a witness' testimony, *see* V4-4, and that it is in compliance with its *Brady*[10]—to not omit the context of the agreement to the extent that it renders the disclosure inaccurate or misleading. As the Supreme Court noted in *Bagley*:

> The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner.

473 U.S. at 682-83.

84.     The hearing court's determinations that there was "no *quid pro quo* agreement" and, thus, "no *Brady* violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor" was contrary to and an unreasonable application of these well-established principles. At bottom, the *actual* agreement between Mattaway and O'Brien was not disclosed within the meaning of *Brady*. The bare fact that Mattaway would write O'Brien "a letter" for *placement* in a "Federal file" was not a substantively accurate explanation of the understanding between them. *See e.g., Leka v. Portunondo*, 257 F.3d 89, 103 (2d Cir. 2001) (finding *Brady* requires "substantive disclosure"). Under *Brady*, *Napue*, *Bagley*, and *Strickler*, Mattaway was obliged to fully inform the defense that O'Brien was actively seeking sentencing relief when he testified against Mr. Jimenez, and that the letter Mattaway promised to write about his assistance was to be sent to the federal prosecutor who had previously made a Rule 35 motion on O'Brien's behalf, and who could

---

[10] *See* People's Opposition to Defendant's Omnibus Motion, filed May 11, 2007 (V4-15).

make a decision as to whether O'Brien was deserving of a further motion for a sentence reduction.[11] However, instead of examining this claim in light of the cases above—and asking whether the full scope of the O'Brien and Mattaway agreement was favorable and should have been disclosed—the hearing court confined its review to a cabined inquiry into whether Mattaway promised to give O'Brien anything *other* than a letter. This is not the inquiry called for by long-standing Supreme Court case-law.

85.     Accordingly, the hearing court's determination the prosecutor's limited disclosure was sufficient under *Brady* to convey the actual agreement between the parties was an unreasonable application of federal law. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Williams*, 529 U.S. at 406. Further, as argued in the next section, "where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

> **h.     The Hearing Court's Determination That There Was No Undisclosed *Quid Pro Quo* for O'Brien's Testimony Was an "Unreasonable Determination of the Facts."**

86.     In addition to being contrary to established Supreme Court case law, the hearing court's decision that there was no undisclosed *quid pro quo* between the Bronx prosecutor and O'Brien was also based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2); *Fernandez v. Capra*, 916 F.3d 215, 227 (2d Cir. 2019).

87.     As an initial matter, it was *per se* unreasonable for the hearing court to have not weighed or considered Judge Novak's testimony at all. Indeed, in its findings, the court entirely ignored Judge Novak's testimony, as well as any evidence of his role in the relevant events. *See Lewis v. Connecticut*

---

[11] Notably, under Department of Justice guidelines, expectation of a "motion for reduction of sentence" is a benefit to a witness subject to *Giglio* disclosure. *See* Memorandum for Department of Justice Prosecutors, Guidance for Prosecutors Regarding Criminal Discovery, dated Jan. 4, 2010 ("DOJ Guidance"), available at: https://www.justice.gov/archives/dag/memorandum-department-prosecutors.

*Com'r of Correction*, 790 F.3d 109, 123 (2d Cir. 2015) (finding that "in failing to note, much less consider, [] key facts, the state habeas court based its decision on an unreasonable determination of the facts"); *Newman v. Harrington*, 726 F.3d 921, 930 (7th Cir. 2013) ("By ignoring [] key expert witness evidence . . . . the state appellate court's application of Strickland . . . was unreasonable and its factual determinations . . . were also unreasonable."); *Crew v. Davis*, ___F.3d___, (9th Cir. 2019), 2019 WL 498751, at *8 ("An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence central to a petitioner's claim that was properly presented and made part of the state-court record."); *cf. Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision").

88.     Judge Novak's stipulated testimony was probative and relevant to the issues of O'Brien's motivations for testifying, and of the nature of the agreement between Mattaway and O'Brien, and contradicted Mattaway on key issues. For example, at the hearing, Mattaway acknowledged signing a sworn affirmation stating that she had "no knowledge" of federal Rule 35 or that O'Brien "was testifying with the hope or understanding that a Rule 35 motion would be filed on his behalf." *See* H. 63, V4-13 (at ¶ 12).

89.     But Judge Novak recalled speaking to Mattaway about O'Brien and sentence reductions before Mr. Jimenez's trial, and said that, concerned that O'Brien would be upset if he did not ultimately receive a sentence cut, he advised Mattaway not to promise him that he would receive one. *See* V4-14.

90.     Judge Novak also said that Mattaway initiated the process that led to O'Brien getting a sentence reduction, going so far as to say that the sentence reduction motion was "driven by her, not me." V4-14. For her part, Mattaway insisted just the opposite—that then-AUSA Novak had called

her out of the blue, after the trial, and asked her for a letter about O'Brien, and that she did not know what it would be used for. *See* H. 86-87, V4-13 (at ¶ 12).

91.     Judge Novak also corroborated important parts of O'Brien's testimony—including that O'Brien had been angling for a sentence reduction for years and that Novak had never ruled out the possibility of second Rule 35 motion. V4-14.

92.     Given the highly probative testimony that Judge Novak provided on material, factual issues central to Mr. Jimenez's claim, and the fact this evidence was before the hearing court but apparently ignored, the court's decision is not deserving of deference. Even taking Mattaway's testimony at face value, it was clear that the full scope and context of her agreement with O'Brien was not disclosed. But, had the hearing court also properly considered Novak's testimony, it would have found additional persuasive evidence buttressing Mr. Jimenez's claim that the prosecution failed to meet its *Brady* obligation to disclose the understanding between O'Brien and Mattaway for his testimony, which would have required the court to grant relief.

93.     The hearing court also ignored email communications between Novak and Mattaway, introduced into evidence at the hearing, that further corroborated that Mattaway was aware that her letter would be used in support of O'Brien's efforts to reduce his sentence. *See* V4-7. Likewise, the hearing court failed to mention or consider the letters from O'Brien to Judge Payne that demonstrated that—at the time he was testifying against Mr. Jimenez—he was seeking sentencing relief in federal court. *See* V4-12. Like Novak's testimony, all of this evidence supported Mr. Jimenez's claim that the prosecution failed to meet its *Brady* obligations to disclose the full understanding between O'Brien and Mattaway for his testimony, which would have required the court to grant relief.  It was unreasonable of the court to excise this evidence from consideration .

94.    In addition to turning a blind eye to hearing evidence and testimony, several of the court's

minimal factual findings were uncontrovertibly contrary to the hearing evidence. For example, the

court found that, after Mr. Jimenez's trial, Mattaway "had no further contact with Mr. O'Brien." V1-

A. Yet, at the hearing, the prosecution introduced into evidence the letter to Novak, dated October

16, 2007, weeks after Mr. Jimenez was convicted, in which Mattaway wrote, "[j]ust this morning, Mr.

O'Brien telephoned me from jail to tell me he had chatted up another inmate who has some

information on two (2) cold Bronx homicide cases." *See* V4-5.

95.    The hearing court also found that "the only relief [Mattaway] was aware Mr. O'Brien was

seeking was the letter from her office." V1-A. But, at the hearing, Mattaway testified that she was

aware, before Mr. Jimenez's trial, that O'Brien was writing letters to the federal judge seeking

sentencing leniency and knew that he might have mentioned his Jimenez testimony in those letters.

H. 56.[12]

96.    Where the court based its legal conclusions on facts that that were simply wrong, the court's

decision must be deemed to have been based on an "unreasonable determination of the facts in light

of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

     i.    **The State Courts' Implicit Determinations That Mattaway Did Not Violate
       *Brady* By Eliciting Testimony that Led Jurors to Believe O'Brien Did Not
       Stand to Receive a Sentencing Benefit for His Testimony Were Unreasonable
       Applications of Supreme Court Case Law.**

97.    In its decision, the Appellate Division acknowledged that Mattaway had elicited from

O'Brien on direct examination that he was a "sentenced prisoner" with "18 years to go." *Jimenez*, 142

A.D.3d at 162.  The remand hearing court did not address these facts. And both courts failed to

---

[12] In another example, the hearing court concluded that O'Brien was testifying to keep compliant with his 1997 plea agreement. Without referring to Novak by name, the court found that Stradford had received a request for a letter from "the federal prosecutor handling O'Brien's federal cooperation obligation," and noted that O'Brien was "required" to cooperate with criminal matters pursuant to his plea deal. *See* V1-A. Novak, however, explicitly stated that he "did not recall this requirement to be a factor in this case and recalled that O'Brien wanted to cooperate in this case." V4-14.

address Mr. Jimenez's claim that, in further violation of her *Brady* obligations, Mattaway actively

obscured the true nature of her deal, thus leading the defense and the jury to believe that O'Brien

did not stand to reap any sentencing benefit from his testimony.

98.     The courts' implicit rejection of this claim was an unreasonable application of Supreme

Court case law. 28 U.S.C. § 2254(d)(1). In N*apue v. Illinois*, 360 U.S. 264, the Supreme Court made

clear that the prohibition on the government's use of false evidence applies to testimony that goes to

the credibility of a witness.  *Id.* at 269. Invoking the standards set out by New York's Court of

Appeals in *People v. Savvides*, 1 N.Y.2d 554, 557 (1956), the High Court endorsed *Savvides*'s statement

that "it is of no consequence that the falsehood bore upon the witness' credibility rather than

directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way

relevant to the case, the district attorney has the responsibility and duty to correct what he knows to

be false and elicit the truth." *Id.* at 269.

99.     Mattaway was well aware that O'Brien hoped his testimony against Mr. Jimenez would lead

to a time cut, yet she affirmatively elicited testimony that he was a "sentenced prisoner" with "18

years to go." This testimony came *immediately* after Mattaway elicited her "agreement" with O'Brien.

The only purpose to such questioning was to convey to the jury that, whatever they thought about

O'Brien, he still had 18 years still to serve, and had nothing to gain by testifying. Such conclusions

could only heighten O'Brien's credibility. Yet, they were not true. O'Brien *did* stand to gain a

sentencing benefit for his testimony (and, in fact, *did benefit*).

100.    Mattaway was obliged under *Napue* and *Brady* to not elicit false and misleading testimony that

obscured the fact that O'Brien's testimony was a potential basis for a future benefit. Yet, the

Appellate Division's reasoning that, like the undisclosed Novak materials, no violation had occurred

absent a "specific quid pro quo" was, for the reasons explained above, an unreasonable application

of Supreme Court case law. 28 U.S.C. § 2254(d)(1). Likewise, the hearing court's failure to address

this aspect of Mr. Jimenez's *Brady* claim was also unreasonable.

j.      **The Non-Disclosure of the Substantive Agreement Between O'Brien and Mattaway and Other Information Going to His Motivations for Testifying Were Material and Undermines Confidence in Mr. Jimenez's conviction.**

101.    The prosecution's failure to disclose the true extent of its understanding with O'Brien for his

testimony and other evidence going to his motivations for testifying undermines confidence in Mr.

Jimenez's conviction. *Wearry*, 136 S.Ct. at 1006. Even without considering all of the withheld

evidence cumulatively, as discussed *infra* at §§ 185-88, *see Kyles*, 514 U.S. at 411, there can be no

confidence that the jury, if aware of O'Brien's significant incentive to falsely accuse Mr. Jimenez,

would still have voted to convict him. *Smith v. Cain*, 565 U.S. 73, 76-77 (2012). As the Supreme

Court explained in *Napue*: "Had the jury been apprised of the true facts, . . . it might well have

concluded that [the witness] had fabricated testimony in order to curry the favor of the very

representative of the State who was prosecuting the case in which [the witness] was testifying." 360

U.S. at 270. Accordingly, the likelihood of a different result is great enough to "undermine[]

confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434.

2.      **The Prosecution Violated *Brady* by Not Disclosing an Investigative Report that Would Have Discredited Andrew O'Brien's Identification Testimony and Detective Wendell Stradford's Claim that O'Brien Provided Information on the Shooting Years Before the Trial.**

a.      **Det. Stradford and O'Brien's Testimonies**

102.    Both Stradford and O'Brien testified that O'Brien first offered information about the

Worrell homicide years before the 2007 trial.

103.    Stradford testified that, after first speaking to O'Brien on the phone in 2000, he contacted

federal authorities in Virginia and obtained files from the U.S. Drug Enforcement Agency (DEA).

T. 322. Stradford said that, after reviewing the paperwork, he decided to meet O'Brien in 2001. The clear import of this testimony was that whatever Stradford had seen in the DEA file convinced him that O'Brien was a potentially valuable witness.

104.     O'Brien told the jury that he first told federal law enforcement about the Worrell shooting in 1996.[13] He said he was advised to give his information to the NYPD Cold Case squad, and that he first spoke with Stradford in 1999. O'Brien went on to speak with Stradford "ten, times, fifteen times over the years." T. 223.

105.     Despite Stradford's testimony that O'Brien had offered tangible information about the Worrell shooting nearly a decade before Mr. Jimenez's trial, neither the DEA paperwork he mentioned, nor *any* reports about O'Brien's interviews with federal authorities were ever provided to the defense.[14]

106.     In fact, the only paperwork disclosed regarding O'Brien's "information" about the Worrell homicide was an FBI-302 report from 2001 which memorialized an interview of O'Brien by

---

[13] O'Brien presumably meant 1997, when he pleaded guilty and was fully debriefed by federal and NYPD investigators. From the docket for the Poison Clan case, *U.S. v. Beckford, et al.*, 98-cr-66 (E.D.V.A.), it appears that O'Brien did not begin cooperating with federal investigators until after his 1997 plea. As discussed in the CPL § 440.10 motion, in April 1996, when brought before the Richmond, Va. grand jury that was investigating the Poison Clan, O'Brien refused to answer questions. *See* Grand jury testimony of Andrew O'Brien, *U.S. v. Beckford, et. al.*, 96cr66 (E.D.V.A.), Apr. 3, 1996 (V4-16).

Also, it is unclear the basis of the Appellate Division's finding that O'Brien "revived" the investigation in 1996 by allegedly telling FBI agents that "he was with Worrell when Worrell was killed, and was prepared to assist in bringing the perpetrator to justice." *Jimenez*, 142 A.D.3d at 152. O'Brien never testified to this, nor did Det. Stradford. O'Brien testified only to being questioned by federal agents about "certain things I knew about"—presumably the questioning reflected in the FBI-302. *See* T. 222. And, as argued in this Petition, there is nothing in that report about O'Brien saying that he was with Worrell and that he had information to offer and was prepared to offer information.

[14] The one document from this time period that was disclosed, on the eve of trial, was a handwritten note about a message from Detective David Carbone of Brooklyn North Homicide to a Sergeant Steve Larkin in the Bronx which states that O'Brien was a *suspect* in the Worrell homicide. *See* Message to Sgt. Larkin from Det. Dave Carbone, dated Mar. 18, 1996 (V4-17). This note is discussed *infra* at §§ 130-39.

Stradford and an FBI agent,[15] *see* FBI-302 report on interview with Andrew O'Brien, dated Jan. 17,

2001 (V4-19), and a handwritten statement by O'Brien about the shooting that he wrote after this

interview in which he did not give any description of the shooter, *see* Handwritten letter by Andrew

O'Brien, undated (V4-20). According to the 2001 FBI-302, O'Brien gave only the most generic

description of the perpetrator ("male, slim build, taller than O'BRIEN, squarish haircut") and did

not mention the assailant's race, nor the distinctive stripe in the gunman's hair that other

eyewitnesses reported. V4-18. The report said O'Brien selected Mr. Jimenez's photo out of a photo

array. *Id.*

   b.  **The FBI-302 Memorializing Information O'Brien Gave to Federal Authorities
        in 1997 that was Disclosed Post-Conviction**

107.    As explained, *supra*, in ¶ 35, among the documents disclosed by the prosecution in the CPL §

440.10 litigation was a 32-page report on O'Brien's 1997 interviews with NYPD detectives and FBI

agents. *See* V4-8. The interviews were done after O'Brien entered a plea in the Poison Clan case,

during the time period when O'Brien testified at Mr. Jimenez's trial that he first told authorities his

information about the Worrell shooting. The report on the interrogations contained detailed

descriptions of criminal activity that O'Brien had participated in or was aware of.

108.    There is, however, nothing substantive in the report about the Worrell homicide. The report

states only that O'Brien was shown a photo of Worrell, and that O'Brien told investigators that

Worrell "was killed in the Bronx, White Stone Movie Theatre, and his mother lived on 45th Street in

---

[15] Notably, even before Stradford did any investigation into the Worrell homicide, and before he visited O'Brien, he had
settled on Mr. Jimenez as the perpetrator. In a form request to interview O'Brien, who was in a Bureau of Prisons
protected witness program, the FBI agent working with Stradford asserted that O'Brien had "first hand knowledge" of
the Worrell homicide, "[s]pecifically," the agent wrote, "[O'Brien] *witnessed the murder being committed by RICARDO
JIMENEZ*." *See* Request for Interview of Andrew C. O'Brien (V4-18) (emphasis added). O'Brien, however, did not
know Mr. Jimenez, so he could not have named him a suspect prior to the interview, and the first time he ever saw a
photograph of Mr. Jimenez was, purportedly, at this interview.

Brooklyn." V4-8. There was no indication that O'Brien even witnessed the crime, much less that he had any important information about it.

        **c.**    **The State Courts' Decisions Were Contrary to, and Involved an Unreasonable Application of, Clearly Established Federal law as Determined by the Supreme Court of the United States and Were Based on an Unreasonable Determination of the Facts.**

109.    In the CPL § 440.10 litigation, Mr. Jimenez asserted that the FBI-302 about O'Brien's statements to investigators was *Brady* material relevant to the credibility of O'Brien's identification of Mr. Jimenez as the shooter. The lower court did not specifically discuss this claim. *See* V2-A.

110.    In its July 2016 decision, the Appellate Division rejected this claim, finding that, had the report been disclosed before trial, there was no "reasonable possibility of changing the outcome." The court continued:

> The FBI report that defendant asserts contained a suspiciously cursory description of Worrell's murder is not material. The report was primarily about O'Brien's involvement in gang activity and the people who traveled in the same orbit with him. At one point in the interview he was asked to identify photographs of approximately 40 of those people. One of them was Worrell, and O'Brien gave the same short description of him as he gave for each of the other people. *There is no indication that it would have been appropriate, in the context of the interview, for O'Brien to describe Worrell's murder in detail or to offer that he had witnessed it.*

142 A.D.3d at 160-61.

111.    At the outset, the Appellate Division's decision was an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). There was abundant evidence that, in the interviews memorialized in the 1997 FBI-302 report, O'Brien was expected to give information on *any* crimes of which he had knowledge, which certainly would have included Worrell's murder, *if he had such knowledge*. V4-8. This obligation was spelled out in O'Brien's plea agreement (which also was not disclosed to trial counsel, but was before the Appellate Division), V4-9, and by O'Brien himself at Mr. Jimenez's trial when he testified that he originally gave information about the Worrell shooting when he was being

questioned by federal agents "of certain things that I knew about," T. 222. Moreover, the full FBI-302 makes clear that, in the interviews, O'Brien did not only give information about his own involvement in gang activity as the Appellate Division found. To the contrary, O'Brien provided detailed accounts of many crimes, including ones in which he was not involved. *See* V4-8. Thus, it was not just "appropriate" for O'Brien to have described Worrell's homicide and to offer any information that he had on it to investigators in 1997, he was expected and obligated to do so under the terms of his cooperation agreement.

112.     Second, the Appellate Division misapplied established Supreme Court *Brady* law by concluding that the undisclosed information had no "reasonable possibility of changing the outcome." 28 U.S.C. § 2254(d)(1). Indeed, the court does not even explain its reasoning.

113.     The Supreme Court has been clear that evidence qualifies as material under *Brady* when there is "'any reasonable likelihood' " it could have "'affected the judgment of the jury.' " *Giglio,* 405 U.S. at 154 (quoting *Napue,* 360 U.S.at  271). Certainly this is such evidence.[16] The undisclosed FBI-302 was compelling proof that O'Brien did not give *any* important information to investigators in 1997, a fact that was critical to evaluating O'Brien's credibility and the weight the jury should accord his identification testimony. It also directly contradicted Stradford's testimony that there was memorialized information about the incident that led him to seek O'Brien out as a witness, and would have cast doubt on Stradford's credibility and his investigation into this case. Counsel could have cross-examined Stradford and asked him what in the report had led him to believe that O'Brien witnessed the shooting. If Stradford responded that he was speaking of another report, counsel could have made a demand for that information.

---

[16] DOJ guidelines specifically advise prosecutors that they have an obligation to disclose witness statement variations as "the information [a witness] may provide may broaden or change considerably over the course of time," and such statements are considered *Giglio* information. *See* DOJ Guidance.

114.    If counsel had the 1997 FBI-302 report, he also could have effectively cross-examined O'Brien about why he had not come forward with information about the shooting when he was debriefed by FBI agents and NYPD detectives. *See People v. Savage*, 50 N.Y.2d 673, 679 (1980) ("It is an elementary rule of evidence, and of common sense, in our State and almost every other jurisdiction, that, when given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is itself admissible for purposes of impeachment (3A Wigmore, Evidence [Chadbourn rev ed], § 1042; Richardson, Evidence [10th ed--Prince], § 222)).

115.    And, of course, if counsel knew the full context of O'Brien's understanding with Mattaway, the fact that O'Brien was proffering this information while seeking a second Rule 35 sentence reduction would be an additional reason for the jury to reject his testimony.

116.    In sum, had the jury been aware that O'Brien failed to give any substantive information about the shooting in 1997 to NYPD and federal investigators when he was tasked with giving a full accounting of all criminal activity of which he was aware, and of his efforts for a sentence reduction at the time he was testifying against Mr. Jimenez, it would have put his testimony in a substantially different light, and cast doubt on the accuracy and veracity of his identification of Mr. Jimenez as the shooter. This murder prosecution was heavily dependent on O'Brien's testimony—indeed, in her letter to AUSA Novak that was the basis of the second Rule 35 motion, Mattaway declared that she "personally believed that Mr. O'Brien's testimony was crucial to the People's case." V4-5. Where the full provenance of O'Brien's "information," and the understanding under which it was proffered was not before the jury, it cannot be said that Mr. Jimenez "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434.

**3.** **The Prosecution Violated *Brady* by Not Fully Disclosing the Extent of Andrew O'Brien's Convictions and Bad Acts and that He Had Been a Cooperator in Another Prosecution.**

    **a.** **The Prosecution's Disclosures of O'Brien's Convictions and Bad Acts.**

117.    On June 20, 2007, the prosecution gave the defense a list of "known convictions and bad acts" of its witnesses, including O'Brien, who was referred to only by the initials "A.O." *See* Prosecution's § 240.45 disclosure (V4-21). For O'Brien, the prosecution disclosed a 1988 weapons conviction from Kings County, a 1989 cocaine possession conviction in "Richmond Circuit Court," and a 1993 murder conviction in Virginia Beach. *Id.*

    **b.** **Information Not Disclosed as to O'Brien's Convictions and Bad Acts.**

118.    This was not all of the information about O'Brien's past that was known to the prosecutor. Left undisclosed were O'Brien's 1997 federal RICO conviction from the Poison Clan case and two other weapons convictions that O'Brien received *after* the Worrell shooting. *See U.S. v. Beckford, et al.,* 96cr66 (E.D.V.A.). One of these weapons convictions—a 1992 conviction for criminal possession of a weapon in Brooklyn—arose from allegations that O'Brien had shot a man named Wayne Daniel in 1988 in retaliation for a derogatory comment about O'Brien's then-girlfriend. *See* Indictment, *People v. O'Brien,* Ind. 265/91 (Kings Co.) (V4-22); V4-8 (at 6).

119.    Also undisclosed were key documents that Novak had given Mattaway before trial: (1) the 79-page federal indictment in the Poison Clan case in which O'Brien was a named defendant, (2) the 1997 FBI-302 discussed above that contained O'Brien's exhaustive accounting of his criminal past, (3) the 1997 plea agreement which included a detailed recitation of the facts underlying O'Brien's guilty plea and (3) O'Brien's trial testimony in the Poison Clan case. *See* Indictment, *U.S. v. Beckford, et.al.,* 96cr66 (E.D.V.A.) (V4-23); V4-8; V4-9; V4-10. In fact, at no point did the prosecutor even disclose that O'Brien was a key figure in the Poison Clan, nor that his friend and co-defendant Dean

Beckford, who was with O'Brien and Worrell at the movie theater on the night of the shooting, was the leader of that gang

120.    In his testimony in the Poison Clan case, O'Brien's described his numerous crimes and bad acts, as well as his prolific drug use, around the time of the Worrell homicide. *See* V4-10. O'Brien testified extensively about his involvement with one murder and admitted that he had attempted to kill another person. *See id.* O'Brien also revealed that, at the time of the Worrell shooting, others involved in the drug trade were actively trying to kill Beckford and his associates. *Id.*

      c.    **The State Courts' Decision Was Contrary to, and Involved an Unreasonable Application of, Clearly Established Federal law as Determined by the Supreme Court of the United States and Was Based on an Unreasonable Determination of the Facts.**

121.    In the CPL § 440.10 litigation, Mr. Jimenez asserted that the prosecution violated *Brady* by suppressing the full extent of O'Brien's crimes and bad acts and his drug use—specifically the documents and testimony from the Poison Clan case which detailed that history. The CPL § 440.10 dismissed this non-disclosure as cumulative of information the defense already possessed. *See* V2-A (17-18, 20-21).

122.    Likewise, the Appellate Division rejected this claim finding:

> [N]one of these materials, had they been available to the defense before the trial, had a reasonable possibility of changing the outcome. . . . Defense counsel's cross-examination of O'Brien amply elicited the *unsavory elements of his character*, manifested by his racketeering conviction, which, by his own admission at trial, involved a conspiracy to distribute narcotics, a conspiracy perpetuated by murder where necessary. Further, the cross-examination revealed O'Brien's convictions, shortly before Worrell's murder, for weapons and drug possession. Any further impeachment material would merely have been cumulative, and as such, *cannot be considered material* for purposes of finding a *Brady* violation.

*Jimenez*, 142 A.D.3d at 160 (emphasis added).

123.    Again, decisions of the state courts were based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). On direct examination, O'Brien testified to a sanitized and misleading

version of his past. He said that he had been convicted of murder, an apparent reference to his Virginia conviction, and had 18 years to go on his sentence. T. 179. But, O'Brien's criminal activity in his RICO case was not fully disclosed, nor were the details of the cooperation deal that led to him escaping a life sentence.

124.     More concerning, defense counsel's cross-examination hardly elicited the true extent of O'Brien's violent and self-serving behavior. Nothing was elicited about O'Brien shooting someone on the street for disrespecting his girlfriend, or of traveling to Virginia to assassinate a drug rival, or of shooting into an house while drunk, or his crack use in the late 1980s and early 1990s, or of the massive amounts of cocaine that the Poison Clan trafficked into New York City and, later, Virginia or of the shockingly depraved details of the murder of which he was convicted. *See* V4-8; V4-9; V4-10; V4-22.

125.     Worse, O'Brien muddied the waters on cross-examination. In response to defense counsel's question of whether he was serving 30 years for "a murder related in some way, shape, or form to the drug industry," O'Brien effectively corrected defense counsel by responding, "technically I'm doing 30 years for racketeering." T. 226-27. When defense counsel went on to ask whether "one aspect of the racketeering enterprise was the murder of people," O'Brien interjected, "[p]erson, a person." T. 227. Thus, the jury was left with the incorrect impression that O'Brien had not himself committed a murder, but had merely been part of a racketeering enterprise in which "a person" had been killed. However, not only had O'Brien himself killed one person and tried to another person, several other murders had been attributed to the racketeering enterprise, a/k/a the Poison Clan, of which he was an integral part.  Thus, contrary to the state court findings, the jury did not get a full and accurate view of the extent of O'Brien's criminal past.

126.     Moreover the Appellate Division's sweeping conclusion that the undisclosed material could not, as a matter of law, be considered material under *Brady* was an unreasonable application of established Supreme Court law. 28 U.S.C. § 2254(d)(1). That some impeachment evidence was available to defense counsel does not automatically render additional impeachment evidence immaterial. *Turner*, 137 S.Ct. at 1887 ("This is not to suggest that impeachment evidence is immaterial with respect to a witness who has already been impeached with other evidence"). *Napue*, 360 U.S. at 269-70 (finding that "we do not believe that the fact that the jury was appraised of other grounds for believing that the witness [] may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one"). Put simply, just because a witness's credibility has been impeached to some degree, it does not follow that, as a matter of law, any further impeachment is immaterial. *See Wearry*, 136 S.Ct. at 1006 (noting that undisclosed impeachment evidence would further erode the credibility of a witness whose credibility was "already impugned by his many inconsistent stories").

127.     Under *Brady,* if withheld evidence is of a different kind than disclosed evidence, then the evidence is more likely to be material. *Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir. 2003) ("When a witness's credibility has already been substantially called into question *in the same respects* by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.")(*emphasis added*); *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005) ("[T]he undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind.").

128.     This is such evidence. First, it could have been used to discredit O'Brien's testimony that he was not carrying a firearm the night of the shooting, and had not initiated the shootout in the theater. T. 229. In his Poison Clan testimony, O'Brien described a life in which he was consistently

armed and quick to use his weapon. *See, e.g.,* V4-10 at 3622 (O'Brien testifying to an incident where he responded to a disrespectful comment by some people on the street by first punching one of them, and then, later, shooting at them). This would have undermined O'Brien's testimony that he was the only member of the Poison Clan group that did not bring a gun into the theater. T. 228-30, 233. This claim by O'Brien deserved scrutiny by the jurors in light of forensic evidence showing that Worrell, who was carrying a gun, T. 84, 94-95,[17] had been shot from behind while his arm was elevated, which supported the strong possibility that Worrell had been killed by friendly fire.[18] And, had the message from Detective Carbone identifying O'Brien as a suspect in Worrell's death been timely disclosed so counsel could have made effective use of the information, s*ee* V4-17 (*discussed infra at §§ 131-32*), information about O'Brien's hair-trigger temper and habit of carrying a gun would have been critical.[19]

129.    Second, the evidence would have clarified that, far from being a participant in a criminal enterprise that was collectively responsible for "a murder," O'Brien was capable of extraordinary viciousness. In carrying out the murder for which he was convicted, O'Brien hunted down a man he believed had stolen drugs and money from him, kicked in the door of the man's hotel room, and then shot him 12 times with a MAC-10 semi-automatic weapon *in front of two teenage girls. See* V4-10 (at 3701-02); V4-9. At the Poison Clan trial, O'Brien went on to explain how, after committing that

---

[17] Detective Victoria Burton testified that a .38 calibre firearm was recovered from Worrell's body.

[18] Dr. Susan Ely of the Office of the Chief Medical Examiner testified that that Worrell had been shot in his upper back/shoulder region, and in the back of his head. He also suffered abrasions to his face consistent with falling forwards onto his face after being shot. T. 617. Ely also testified that Worrell's arm was elevated at the time he was shot in the back, and it was "more likely than not that that wound preceded the wound to the head." T. 623. Police Officer Ruben Velazquez reported at the time that there was a gun in Worrell's right hand, and that Worrell's finger was on the trigger guard. T. 295-96.

[19] In his written account of the shooting, *see* V4-20, O'Brien described a different course of events than at trial. *See ¶ 33*. In the written account, he said that he and Patchy were "side by side" at the top of the left aisle in the theater, while the shooter was at the top of the right aisle, facing them. He said that "from the corner of [his] eye" he saw Worrell (aka Shaka) moving toward the shooter. He said Worrell got "real close" to the shooter and then shots rang out.

murder, he fled from Virginia to New York and, angry that the police were looking for him, went to the home of a man he blamed for his predicament and shot into that man's home. *See* V4-10 (at 3708-09).

130.    All of this evidence demonstrated that O'Brien was not merely an "unsavory" character, but someone who had spent his entire adult life before being incarcerated committing extremely violent acts and, above all, prioritizing himself. Under the circumstances of *this* case, the undisclosed evidence regarding O'Brien's past crimes and bad acts must be deemed material. *Turner*, 137 S.Ct. at 1887. Accordingly, the Appellate Division's decision that this evidence could not be considered material as a matter of law was an unreasonable application of established Supreme Court law. 28 U.S.C. § 2254(d)(1).

**4.      The Prosecution Violated *Brady* by Not Timely Disclosing a Document Indicating that O'Brien Had Been Considered a Suspect in this Case.**

131.    On June 25, 2007, *three days before the start of testimony*, and in the middle of *voir dire*, the prosecution revealed that, in 1996, O'Brien—one of the main witnesses against Mr. Jimenez—had been considered a suspect in the Worrell shooting. *See* Discovery Receipts (V4-24); V4-17.

132.    Detective David Carbone of Brooklyn North Homicide, an expert on the activities of the Poison Clan who was working closely with federal investigators, identified O'Brien as a suspect in the Whitestone shooting and reached out to Bronx detectives in 1996 with his information.  A message, taken by someone identified only as "George" or "Gerard," and addressed to Sgt. Steve Larkin says that Detective Carbone:

> [H]as been investigating numerous homicides from N.Y. to Virginia.  He has information on one of our homicides from 1989 [identifying the July 3, 1989 murder of Sean Victor Worrell at the Whitestone Cinema] Perps name is Andy O'Brien – Virginia He is going to charge him with other homicides and one of them is ours. He will send us his paperwork.

*See* V4-17.[20] Not only was this note withheld from defense counsel until the eve of trial, *none* of the "paperwork" referred to in the note, which was generated by, and in the possession of, the New York City Police Department was ever turned over to the defense.

> **The Appellate Division's Decision Was Contrary to, and Involved an Unreasonable Application of, Clearly Established Federal law as Determined by the Supreme Court of the United States and Was Based on an Unreasonable Determination of the Facts.**

133.     In the CPL § 440.10 motion, Mr. Jimenez asserted that belated disclosure of this note, in the middle of *voir dire* and three days before the start of testimony, was not compliance with *Brady*. This claim was not addressed by the motion court. *See* V2-A.

134.     The Appellate Division, however, reasoned that the claim did not even warrant a hearing:

> [T]he 1996 handwritten note relaying a telephone message from a Detective Carbone, who was investigating O'Brien's gang activity, and referring to both the 1989 shooting a the Bronx theater, and to O'Brien as "our perp," was apparently obtained by defense counsel before trial, given that counsel made explicit reference to the note during O'Brien's cross-examination. In any event, the note is too equivocal and vague in its language to constitute material that potentially calls into question defendant's guilt or even O'Brien's credibility as a witness.

*Jimenez*, 142 A.D.3d at 162-63.

135.     This was an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), and a unreasonable application of established Supreme Court *Brady* law, 28 U.S.C. § 2254(d)(1).

136.     First, the Appellate Division did not address Mr. Jimenez's actual claim, but appeared to dismiss it as an unfounded non-disclosure claim since defense counsel had the message at trial. In his cross-examination of O'Brien, defense counsel tried asking O'Brien if he had been "brought in as a suspect" for Worrell's murder. T. 236-37. But, after O'Brien said he never knew anything about that, counsel simply moved on. T. 237.

---

[20] This document was listed on the discovery receipt as "Continuing investigation of homicide, 3/18/1996." *See* V4-24.

137.    Mr. Jimenez did not assert that the document was not disclosed, but that—as documented

by the discovery receipts—the highly exculpatory evidence was disclosed to defense counsel far too

late for him to make any use of it. *See* V3-B (at 83-84); V2-F-2 (at 105-07, 109-11). The message,

more than a decade old, would have required a substantial amount of time and resources to

investigate.

138.    This was not compliance with *Brady. See Leka*, 257 F.3d at 101 (delayed disclosure of

evidence tends to impair the opportunity of the defense to use it); *Grant v. Alldredge*, 498 F.2d 376,

381-82 (2d Cir. 1974) (finding that a "full disclosure [of a police report] could have, indeed probably

would have, led to defense discovery of all the information involving [another man]. That

information, in the aggregate, could then have been used by [the defendant's]  attorney to support a

theory that it was likely that [the other man] had committed the crime."); *see also See United States v.

Blood,* 435 F.3d 612, 627 (6th Cir.2006) (delay may violate *Brady* when the "delay itself causes

prejudice").

139.    The Appellate Division also made the unreasonable conclusion that the note was not *Brady*

material at all. This finding is not deserving of deference by this Court. The note was not

ambiguous—the caller, Detective David Carbone, clearly stated that O'Brien was going to be

charged with the Worrell homicide.[21] And while, in the CPL § 440.10 proceedings, the prosecution

made the conclusory declaration that the note did not name O'Brien as a suspect, V3-C (at 67), the

Appellate Division's dismissal of the note as "too equivocal and vague in its language" to constitute

material evidence was improper.  To the extent that the Appellate Division found the note

"equivocal and vague," it should have ordered an evidentiary hearing, rather than to deem it

---

[21] Detective Carbone had long been regarded as an expert in Brooklyn-based drug gangs and was one of the first NYPD detectives to discover the nascent Poison Clan operation in Flatbush, and, as early as 1989, had begun to connect the group to homicides in New York City. *See* Harvey Rachlin, THE MAKING OF A DETECTIVE, W.W. Norton & Co. 1995, at 169-75. O'Brien testified at Mr. Jimenez's trial that he knew Detective Carbone. T. 236.

innocuous. *See Taylor*, 366 F.3d at 1001 (If "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts.").

140.     The prejudice arising from this belated disclosure was significant. *Brady* requires a showing that there is a "reasonable probability" that had the evidence been timely disclosed to the defense the outcome would have been different. The value of the note the defense was extraordinary: (1) it was exculpatory of Mr. Jimenez's guilt; (2) it was evidence that O'Brien, one of Mr. Jimenez's main accusers was, himself, once a suspect in this crime—a fact that would have lead the jury to discredit O'Brien's accusation; and (3) it strongly undercut the inference from Stradford's testimony that O'Brien had given helpful information about the shooting to investigators a decade earlier.

141.     In sum, the explosive "Sgt. Larkin" note was exculpatory and was directly relevant to O'Brien's testimony. The Appellate Division's decision otherwise was counter to established Supreme Court law, and an unreasonable determination of the facts.

**B.     *BRADY* VIOLATIONS AS TO KEVIN MORRISSEY**

**1.     The Prosecution Violated *Brady* by Failing to Disclose Morrissey's Full Criminal History, His Past History of Mental Illness and Mendacity in Federal Proceedings, and His History as an Informant.**

   **a.     Kevin Morrissey's Successfully Interjects Himself into the Jimenez Prosecution.**

142.     Just months before the start of Mr. Jimenez's trial, an informant named Kevin Morrissey, a grifter with numerous larceny and fraud convictions, came to attention of Bronx prosecutors. *See* Letter of Kevin Morrissey to Craig Caine, undated (V4-25). Morrissey had been trying to interject himself into the Jimenez case for months. On September 28, 2006, he sent a letter to Assistant United States Attorney Alan Bode of the Eastern District of New York. *See* Letter of Kevin Morrissey to AUSA Allen Bode, undated, and Note of AUSA Allen Bode to ADA Lisa Mattaway,

undated (V4-26). In this letter, Morrissey, who had twice been prosecuted by the Eastern District office, claimed that he had information on the "Batman" shooting, including a confession from Mr. Jimenez. *Id.* In the first line of his letter, Morrissey begged AUSA Bode to contact ADA "Anna Villa" in the Bronx, who Morrissey claimed was handling the case, and to pass along his information. *Id.*

143.  At some point thereafter, having received no response from AUSA Bode,[22] Morrissey sent his information to his federal handler, Craig Caine, an inspector with the U.S. Marshals Service. *See* V4-25. In this letter, Morrissey also asked Caine to contact "Ana Villa" in the Bronx DA's office, and related again what he claimed were details of Mr. Jimenez's confession. *Id.* The letter made its way to Mattaway and Stradford met and they met with Morrissey and his attorney. *See id.*

144.  On June 8, 2007, about 10 days before the start of jury selection, the defense first learned of Morrissey, who Mattaway disclosed, was "currently facing several cases in Nassau, Queens and Brooklyn," and had asked for a phone call to be made to Queens if he testified. *See* V4-4. On June 20, a day into *voir dire* and seven days before the start of testimony, Mattaway disclosed a list of "known convictions and bad acts" of Morrissey. *See* V4-21. It listed 10 prior forgery and larceny convictions between 1994 and 2004, and the existence of three open New York state cases. *Id.*

b.  **Kevin Morrissey's Testimony**

145.  At trial, Morrissey claimed that while he was jailed with Mr. Jimenez in New York City, Mr. Jimenez confided in him that he had been at the movies when he had an argument with a Jamaican

---

[22] This was unsurprising as there was no ADA in the Bronx named Ana or Anna Villa. There was, however, an ADA named Ana Vizzo, who had just been recently admitted to the bar when she had a small role in the case representing the prosecution at Mr. Jimenez's arraignment on September 1, 2006. *See* Transcript, *People v. Jimenez*, Sept. 1, 2006 (V4-27). This appearance earned Vizzo a mention in a September 6, 2006, article in the *New York Post* about the case. *"'Batman' Cold Case Solved,"* NY POST, Sept. 6, 2006 (V4-28). The *Post* article also included details of the crime, many of which appeared in Morrissey's letter.

man who made motions towards his waist. T. 32. Morrissey said Mr. Jimenez told him that,

believing the man to be armed, he ran out to his car. T. 32. Mr. Jimenez then purportedly returned

to the theater and spotted the man "in the lower row." T. 32. Morrissey testified: "He said, 'Hey

you', [sic] the kid turned and shot at him. He shot back at the kid, hit the kid, ran out to his vehicle,

took off and went back home." T. 32.

146.    On cross-examination, Morrissey said he had plea agreements for three pending felony cases

for the minimum term of 1½ to 3 years, but that the prosecutor in a fourth case, in Queens County,

was "holding out" for more time. T. 46-47. Morrissey hoped his cooperation against Mr. Jimenez

would convince Queens to agree to the minimum as well. T. 46-47. Morrissey also acknowledged

seven prior state larceny convictions.  T. 47.

      **c.**      **A Post-Conviction Investigation Turns Up Morrissey's Lengthy Criminal Record, Mental Health Issues, and History of Mendacity in Federal Proceedings.**

147.    After Mr. Jimenez's conviction, appellate counsel discovered that the prosecution failed to

fully disclose Morrissey's vast criminal record, including three convictions in U.S. District Court for

the Eastern District of New York.[23] A review of the court files for those cases by appellate counsel

revealed prolific documentation that Morrissey suffered from schizophrenia, had repeatedly been

evaluated for competency, and had been reprimanded by a federal judges for his mendacity.

148.    For example, in *U.S. v. Morrissey*, CR-92-1257 (E.D.N.Y.), Morrissey's mental illness and

schizophrenia diagnosis were noted multiple times in proceedings. *See* Transcript, *U.S. v. Morrissey*,

June 2, 1993 (V4-30); Transcript, *U.S. v. Morrissey*, Dec. 2, 1992 (V4-31). And, in a letter to a federal

---

[23] In fact, the prosecution used Morrissey as a witness informant in another murder case, just weeks after Mr. Jimenez's, and in that case, made a more comprehensive disclosure of his criminal history. *See* People's Witness' Criminal History Information [Kevin Morrissey], *People v. Arroyo* (V4-29).

judge, Morrissey tried to withdraw a plea on the ground that he was not, in fact, competent when he pled. Letter to Kevin Morrissey to Judge Charles P. Sifton, dated Dec. 5, 1992 (V4-32).

149.    Judge Charles P. Sifton  later noted:

> We've got here a report from a psychiatrist who says, within the bounds of medical certainty, that Morrissey is a faker, a malingerer *who lies for his own advantage*, and that he is not to be trusted and simply manipulates medical matters for what he considers to be his own benefit.

Transcript, *U.S. v. Morrissey*, Jan. 14, 1993 (V4-33) (emphasis added).

150.    Later, Morrissey told the judge that he was taking "11 different medications to control my mental illness. On[e] of the drugs that I currently take is an antipsychotic that causes me to have memory losses." Letter of Kevin Morrissey to Judge Sifton, dated Feb. 9, 1993 (V4-34). In this same letter, Morrissey requested an evaluation from a "team of psychiatrists who specialize in psychotic disorders." *Id.*

151.    In two other letters to federal judges, Morrissey asserted that he suffered from split-personality disorder and that there was another person, named Ray Sanchez, living inside his body. Letter of Kevin Morrissey to Judge Glasser, undated (V4-35); Letter of Kevin Morrissey to Judge Carter, dated Nov. 19, 1992 (V4-36). Morrissey contended that"[Sanchez] and only he is doing all these bad illegal things," and offered that "Ray [Sanchez] is willing to confess that he did all these things and I didn't."  *Id.*

152.    Four years later, after violating the terms of his supervised release, Morrissey again appeared before Judge Sifton, who expressed skepticism that Morrissey was committed to completing a drug treatment program, noting that Morrissey "*has a history that on the streets you might call being a scammer, somebody who is perhaps too intelligent for his own good and figures out what he thinks are better ways of doing things than other people invented*."  Transcript, *U.S. v. Morrissey*, Sept. 18, 1997 (V4-37) (emphasis added).

153.    Likewise, Bureau of Prisons medical records, located in the publicly-available court file, made numerous references to Morrissey's schizophrenia, psychiatric medications and mental health interventions. *See* Bureau of Prisons records for Kevin Morrissey (V4-38). And, in *U.S. v. Morrissey*, 00-CR-485, 01-CR-510 (E.D.N.Y.), Morrissey was convicted in 2002 of forging money orders and uttering forged and counterfeit securities.  The court file from this case contains a judicial order, dated Sept. 2, 2003, directing a competency examination of Morrissey to be conducted.  *See* Competency examination order, *U.S. v. Morrissey*, 00-CR-485, 01-CR-510 (E.D.N.Y.) (V4-39).

### d.    Morrissey's Penchant for Informing is Uncovered

154.    Appellate counsel also uncovered that, undisclosed to defense counsel, Morrissey had an unusual and extensive history as an informant. While testifying for the prosecution in yet another case in the Bronx, just months after Mr. Jimenez's trial, Morrissey boasted that he had provided information in three homicide cases, and had served as an informant in as many as 10 cases, not including federal investigations. *See* Transcript, *People v. Felipe Arroyo* (Kevin Morrissey testimony), Feb. 29, 2008 (V4-40).

155.    And, in one particularly relevant instance, Morrissey attempted to offer false information to federal authorities prosecuting John Gotti in an effort to get transferred out of the Connecticut state prison system and into federal custody.[24]  This behavior was cited by a federal prosecutor as one of several bases for seeking an upward "obstruction of justice" adjustment to Morrissey's sentence on a fraud scheme. *See* V4-30 (at 27).[25]

---

[24] At the time, *United States v. John Gotti, et al.,* 90-CR-01051 was pending before Judge Glasser in the Eastern District of New York.

[25] As was argued to the state courts, more recently, Morrissey was noticed as a witness in the federal prosecution of David Ortiz in the Southern District in New York.  *See U.S. v. Ortiz,* 12cr336 (NRB). When made aware of several

e. **The State Courts' Decisions Were Contrary to, and Involved an Unreasonable Application of, Clearly Established Federal law as Determined by the Supreme Court of the United States.**

156.    In his CPL § 440.10 motion, Mr. Jimenez asserted that the prosecution violated *Brady* by failing to fully disclose Morrissey's criminal history, and by making an affirmative representation of Morrissey's background that omitted the federal convictions that ultimately precluded the discovery of his substantial mental health issues *and* that he had been reprimanded by federal courts for being untruthful.

157.    As it did with the O'Brien non-disclosures, the CPL § 440.10 dismissed this undisclosed information about Morrissey's criminal background as "an extension of his deceitful, criminal past," that was already known to the defense. *See* V2-A at 17-18. The court also reasoned that there was nothing in the record "that screams that [the prosecution] committed the grossest kind of *Brady* violation—one that is designed to conceal the truth about the case from the factfinder." *Id.* The court did not discuss the non-disclosure of Morrissey's actions in the federal cases, but rejected that there had been any *Brady* issue regarding Morrissey's mental illness because Mattaway had, in her affirmation, *see* V4-13, stated that "during her various interactions with him, Mr. Morrissey was very well spoken, intelligent and exhibited no sign of mental illness." *Id.* at 28.

158.    Likewise, the Appellate Division also rejected these claims, concluding that the facts of Morrissey's federal crimes were merely cumulative because they were similar to the crimes that were

---

aspects of Morrissey's past, all of which were raised in Mr. Jimenez's 440.10 motion, Judge Naomi Reice Buchwald told federal prosecutors:

> You have a guy here who has the longest rap sheet I have ever seen in any of the trials I have had. I don't have [] necessar[ily] the greatest lifetime experience, but this is my 34th year on the bench here. And don't you think it's your responsibility to learn everything you can about your witness' criminal history so that, A, you can evaluate whether you want to use him and trust him, and B, so that you can be sure that you have given the defense everything that they're entitled to know?

Transcript of *U.S. v. Ortiz*, 12cr336 (S.D.N.Y.), dated May 13, 2013 (T4-41). The court ordered federal prosecutors to do a thorough background check of Morrissey. *See id.* Morrissey was subsequently dropped from the prosecution's witness list. *See* Reply Aff. at ¶ 40 (V2-I).

disclosed and "established him as a con artist." Moreover, the court found, this reasoning "applies to any false testimony Morrissey may have given in those trials, since his basic untrustworthiness was evident and undisputed."

159. And while Appellate Division conceded that the federal records "undoubtedly contained references to mental illness," it rejected Mr. Jimenez's *Brady* claim on the reasoning that the defense could have learned about Morrissey's mental illness from the court file in Morrissey's then-pending Queens case which included an "After Care" letter stating that Morrissey had schizophrenia and had undergone a competency exam.

160. Like its dismissal of the claim involving O'Brien's undisclosed convictions and bad acts, the Appellate Division's pat conclusion that the undisclosed material as to Morrissey could not, as a matter of law, be considered material under *Brady* was an unreasonable application of established Supreme Court law. 28 U.S.C. § 2254(d)(1). *Turner*, 137 S.Ct. at 1887; *Napue*, 360 U.S. at 269-70

161. This evidence was qualitatively different than the disclosed evidence. *Shabazz*, 336 F.3d at 166 (2d Cir. 2003). First, while the disclosed evidence supported a baseline finding that Morrissey was a "con artist," it did not establish that Morrissey was a prolific liar *in legal proceedings*. That Morrissey was willing to lie to courts and law enforcement, and had been criticized by federal judges and prosecutors for doing so, was directly relevant to his credibility in this case. *Cf. U.S. v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011) (noting that the Second Circuit has upheld a district court's ruling that a witness could be cross-examined based on "prior occasions when his testimony in other cases had been criticized by [a] court as unworthy of belief." and that "[p]roof that a judge ... before whom [the witness] had testified ... had found that [the witness] had 'guessed under oath' was probative of the weight to be accorded his testimony." (*quoting United States v. Terry,* 702 F.2d 299, 316 (2d Cir.1983)); *see also U.S. v. Hector*, 2008 WL 2025069 (C.D. Calif. 2008), at *20 ("had the jury heard

that other law enforcement officials had in fact long considered the informant to be manipulative and willing to lie, it would have been less likely to believe him").

162.    The court's conflating of the impeachment arising from evidence that Morrissey was a "professional con man," (ie. that he would employ scams to take financial advantage of people), with the impeachment that would result from evidence that Morrissey was untruthful to courts and law enforcement to better his legal situation was patently unreasonable. The latter fact was especially important given Morrissey's pious claim at Mr. Jimenez's trial that he came forward because "it was the right thing to do." T. 66.

163.    Second, the fact that Morrissey was a prolific repeat informant—who, after Mr. Jimenez's trial, bragged about offering information on numerous cases, including homicides—would have been another red flag for jurors. Morrissey testified at Mr. Jimenez's trial that he had cooperated in *two* prior cases. T. 70. Yet, at another trial in the Bronx just months later, Morrissey stated that he served as an informant in as many as 10 cases, not including federal investigations. Thus, as a matter of law, Morrissey's prolific past as an informant and the details of his participation in other investigations and prosecutions was relevant to his credibility and should have been disclosed under *Brady. See Maxwell v. Roe*, 628 F.3d 486, 511 (9th Cir. 2010) (evidence that witness was a "sophisticated informant" with "developed connections and relationships" with law enforcement, was impeachment evidence subject to *Brady* disclosure); *accord Benn v. Lambert*, 283 F.3d 1040, 1058 (9th Cir. 2002).

164.    The information that Morrissey had attempted to offer *false* information on the John Gotti case, in order to get a benefit, was especially important. *See Maxwell*, 628 F.3d at 512 (evidence that witness was "an experienced informant with a history of lying," would have provided "additional

grounds for a jury to question [the witness'] credibility").[26] In sum, the courts' rejection of this claim, especially without an evidentiary hearing, was an unreasonable application of the relevant law and of the facts. *See* 28 U.S.C. § 2254(d)(1),(2).

165.    Finally, the Appellate Division's conclusion that the prosecution did have an obligation to disclose information about Morrissey's possible mental illness, but that it was relieved of that duty because there was some information about Morrissey's mental illness in the court file of the Queens case, was also unreasonable. *See Jimenez*, 142 A.D.3d at 159-60.

166.    One, the single-page After Care letter in the Queens file containing a two-word mention that Morrissey was being treated for schizophrenia with the drug Zyprexa, *see* After Care Letter, dated Jan. 8, 2007(V4-42),  and a court jacket entry that Morrissey underwent a competency hearing was not qualitatively the same as the federal information, which reflected that Morrissey reported suffering from schizophrenia for years, claimed he was taking 10 different medications, including one that caused memory lapses, believed he suffered from split-personality disorder and that another entity in his body—Ray Sanchez—caused him to commit bad acts. Thus, as argued above, the

_____

[26] Notably, Justice Sonya Sotomayor's opinion on the Supreme Court's denial of certiorari in this case further illustrates why Morrissey's past history as an informant was important and why the Appellate Division's decision otherwise was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). *See Cash v. Maxwell*, __ U.S. __, 132 S.Ct. 611 (2012). In that case, Bobby Joe Maxwell alleged that one of the witnesses against him, Sidney Storch, fabricated his account of getting a confession from Maxwell. Justice Sotomayor noted that Storch had a particular M.O., wherein he would "fashion inmates' supposed confessions from publicly available information in newspaper articles." *Id.* at 611.

There were clear concerns about a similar problem with Morrissey. As explained in footnote 22, Morrissey was curiously fixated on directing his information to a prosecutor whose only contact with Mr. Jimenez's case was at arraignment. While the prosecutor's name was in the *New York Post*, no one actually familiar with Mr. Jimenez's case would ever have mistaken her for being the assistant handling it. As the transcript of the arraignment reflects, ADA Vizzo did not even notice her appearance in Mr. Jimenez's presence. *See* V4-27. This was compelling evidence that Morrissey was basing Mr. Jimenez's "confession" on the newspaper article.

Morrissey was questioned at trial about whether he had gotten his information about Mr. Jimenez from the newspaper, or from looking through Mr. Jimenez's discovery. T. 61-66. Morrissey repeatedly denied this. However, the defense should have had the opportunity to investigate whether—in the 10 plus cases that he had offered information on—he *had* or was suspected of using media and case material to fashion confessions to barter for relief. The Appellate Division's categorical dismissal of the relevance of this information was unreasonable, especially without a hearing. *Taylor*, 366 F.3d at 1001.

evidence in the federal files was of a different kind than the sparse information in the Queens file. Even if counsel was provided with the bare fact that Morrissey suffered from schizophrenia and had undergone a competency exam, he would not have known about the additional information about his other medications, nor of his claim of split-personality disorder, an entirely different psychiatric condition.

167.    Two, it was unreasonable for the court to presume that counsel could have found this information and fully investigated it when it learned of the Queens conviction just about a week before Morrissey testified, during *voir dire*.[27] As counsel explained in his affidavit, "[d]ue to the timing of these disclosures, which occurred as the trial was beginning, I did not conduct any independent investigation of criminal backgrounds of these three witnesses," and relied on the disclosures for his cross-examination. Affirmation of Patrick Bruno, dated Sept. 28, 2011 (V4-43). Notably, Mattaway did not provide any indictment numbers for the cases she revealed, V4-21, and even she claimed to be unaware that Morrissey had any mental health issues, V4-13 (at ¶ 11). Thus, there was no independent access to the relevant impeachment evidence under *Brady* as the Appellate Division found. There is no reason defense counsel "knew" or "should have known" of the essential facts of Morrissey's mental illness. *See U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1983); *see also Leka*, 257 F3d at 101 ("the limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The

---

[27] In the *Ortiz* case, when Judge Buchwald learned of the information regarding Morrissey's background, she noted that "the government has a lot of work ahead of it to follow through on all the leads to possible Brady and Giglio material that the defendant has brought to your attention." The judge gave prosecutors two weeks to complete their work. Judge Buchwald also noted that "had you done your homework in the first case, this whole situation would never have arisen because you would have learned about the competency exam and you would have learned about the remarks of the judges and you would have learned about the government's request for an upward adjustment, and I assume other things would have flowed from that." V4-40.

defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case").

## C. *BRADY* VIOLATIONS AS TO THE POLICE INVESTIGATION

**The Prosecution Failed to Comply with its *Brady* Obligations in its Disclosures of Critical Case Information.**

### a. Documents Relating to the Original 1989 Investigation

168. As discussed fully *infra* in Section III-B, Mr. Jimenez was initially identified as a suspect in this case after a strange, largely undocumented photo identification procedure on July 11, 1989—about a week after the crime—with two teenagers: Esco Blaylock and Sharon Ramroop, the latter of whom was not at the theater the night of the shooting. Up until that point, the police had been unsuccessfully chasing down information about a man named "Leon" who Blaylock claimed was the Whitestone shooter. Blaylock also insisted that "Leon" was dating Ramroop.

169. After Mr. Jimenez was charged, 17 years later, a *Wade* hearing was granted as to*, inter alia*, Blaylock's expected identification of Mr. Jimenez at trial. At issue were the circumstances leading up to Mr. Jimenez being identified as the "Leon" that police had been looking for in the days after the shooting.

170. On June 13, 2007, just two days *before* the suppression hearing, the prosecution turned over two critical DD5s from 1989. In DD5 #33, Ramroop said she knew *a* Leon who was Jamaican and Indian, and in DD5 #39, Blaylock recanted his claim of seeing the shooting. *See* V4-44; DD5 39 (Interview of Esco Blaylock) (V4-45).

171. Notably, the prosecution had turned over *every other DD5 from 1989*, which included other interviews with Ramroop and Blaylock, months before. *See* V4-24. Only these two documents were withheld until the eve of the suppression hearing, and, when they were disclosed, they were buried in

a document dump of all 40 of the 1989 DD5s. The previously disclosed DD5s were simply resubmitted to defense counsel on June 13, along with the two new documents. *See id.*

172.     Twelve days later, on June 25, 2007, three days before the start of testimony, and still in the middle of *voir dire*, the prosecution *finally* revealed critical information, *see* V4-24, regarding the 1989 investigation, including the Det. Carbone note discussed above and other material from the 1989 investigation. *See, e.g.*, V4-17; Detective's memobook notes (V4-46).

173.     This material contained a wealth of information tending to show that Mr. Jimenez had been *rejected* as a suspect in 1989; that Blaylock had been deemed to have serious credibility problems; and that the police had turned their focus to Brooklyn, where Worrell and his friends lived and, it was learned later, selling drugs as part of the Poison Clan enterprise.

174.     The CPL § 440.10 court did not specifically address those claims. On appeal, the Appellate Division unreasonably ruled that it "perceive[d] no *Brady* issue" with the material that "was disclosed no later than during jury selection." *Jimenez*, 142 A.D.3d at 163. The Appellate Division further found that Mr. Jimenez had "fail[ed] to specify how the material might have reasonably altered the trial's outcome had it been furnished in a more timely manner." *Id.*

175.     This decision was an unreasonable application of, and contrary to, established Supreme Court law and an unreasonable determination of the facts.

176.     In saying that it saw "no *Brady* issue" with the challenged material being disclosed "no later than during jury selection," the Appellate Division appeared to be applying state law on the

disclosure of *Rosario* material[28] pursuant to CPL § 240, which must occur before opening statements.[29] This was not the applicable law.

177.    *Brady* material requires disclosure at a time that the defendant can make "effective use" of it. *U.S. v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). As argued extensively *supra* at ¶ 138, *Brady* is supposed to ensure that a defendant can investigate the facts and evidence against him, *see Leka,* 257 F.3d at 103, thus the eleventh hour disclosure of the material in this case was patently insufficient. Counsel had no opportunity to make any meaningful use of the undisclosed information.[30]

178.    There was no justifiable reason under *Brady* for DD5 33 and DD5 39 to have been withheld until two days before the suppression hearing, contained in a resubmission of all the case DD5s. The information in those reports, which included Ramroop's expansive description of "Leon," the person police were purportedly looking for, as Jamaican and Indian was pointedly not applicable to Mr. Jimenez. V4-44. This information was especially important given the concerning "confrontation" of Ramroop and Blaylock by police that led to the conclusion that Blaylock's "Leon" was a person that Ramroop knew as "Ricky." *See* DD5 34 (Confrontation of Esco Blaylock and Sharon Ramroop) (V4-47). Moreover, Blaylock's concession in DD5 39 that he was "never in the theater" when the shooting happened undercut both his general veracity as a witness, and his purported credibility on the identity of the shooter. V4-45. Both of these documents could have been effectively used at the *Wade* hearing to argue for the suppression of Blaylock's identification.

179.    In another example, the notes contained information that witness Robert Kane had viewed photos on October 12, 1989—*after* the police had considered and apparently rejected Mr. Jimenez

---

[28] Under *People v. Rosario*, 9 N.Y.2d 286 (1961), the prosecutor is required to produce any written or recorded statement the witness made before the State's opening statement.

[29] CPL § 240 is being replaced by a new discovery law, effective January 1, 2020.

[30] Stradford, with all the resources of the NYPD, claimed to need five years to make sense of the 1989 investigation, thus, how could a sole practitioner, tied up with *voir dire*, hope to do anything substantive with this information.

as a suspect and turned their investigation elsewhere—but was unable to make an identification. *See* Picture File Search Report, Robert Cane, July 10, 1989 (V4-48); Detective's Notes from 1989 (V4-49).

180.    If Kane was shown a photo of Mr. Jimenez, and failed to identify him, this would have been critical information for the *Wade* hearing and at trial. If Kane was not shown a photo of Mr. Jimenez, this would have supported the argument that Mr. Jimenez had been discounted as a suspect early in the investigation. The Kane identification procedure was especially important because a few days after the shooting, he gave a very specific description of the shooter, describing him as a 6' black man with cropped hair and thin blond streaks along the side of his head. *See* DD5 32 (Interview of Robert Kane) (V4-50).

181.    As Mr. Jimenez argued in the CPL § 440.10 litigation, the belatedly disclosed *Brady* information undercut the very heart of the prosecution's case and should have been given to the defense months before it was disclosed. *See Leka*, 257 F.3d at 100, 102 (" the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use" . . . "a disclosure made on the eve of trial (or after trial has begun) may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage"). The Appellate Division's decision otherwise was an unreasonable application of *Brady* law.

      **b.    Undisclosed Ballistics Evidence**

182.    Before trial, the prosecution disclosed evidence of one .45 calibre discharged shell, one lead bullet and a .38 calibre revolver, which contained one discharged shell and three live rounds. *See* Forensic Report and Vouchers and Ballistics Report (V4-70). At trial, the prosecution contended

that the discharged shell and the lead bullet were from the man identified by O'Brien and Blaylock as Mr. Jimenez.

183.     In response to a Freedom of Information Law ("FOIL") request to the NYPD, Mr. Jimenez obtained a ballistics report that was not disclosed and which indicated that additional ballistics evidence was collected in the Worrell case. The undisclosed evidence consisted of two additional .45 calibre discharged shells, at least one of which was fired from a gun other than the one that fired the .45 calibre shell previously disclosed to the defense. *See* V4-50. The report obtained under FOIL also indicated that were two additional vouchers relating to this evidence, namely, D682923 and D682988. *Id.* Those vouchers were not provided to the defense.

184.     The prosecution's failure to disclose this additional ballistics evidence was a *Brady* violation. Unquestionably, evidence indicating that a third gun was involved was material under *Brady*, as it contradicted the testimonies of O'Brien and Blaylock. It also would have been support for a "friendly fire" theory, which would have been consistent with the information from Det. Carbone that O'Brien had been considered a suspect in Worrell's death.

185.     In the CPL § 440.10 litigation, the prosecution contested that the additional shells were related to the case – and gave a hearsay interpretation of where the shells could have come from. *See* V2-G2. Mr. Jimenez spoke to his own expert who disagreed with that interpretation.[31] V2-J. The CPL § 440.10 court did not address this claim.

---

[31] At OAD's request, James M. Gannalo, a former NYPD detective who worked in the Ballistics Unit in 1989, and now works as an independent firearms consultant, reviewed the worksheet. See V2-I (at ¶¶ 26-30). Mr. Gannalo said that a reasonable interpretation of the worksheet is that Item 4, identified as coming from the "scene," came from the Whitestone theater. Noting that the "Date Received" was more than a month after the crime, he said it was conceivable that the item had been found by a theater patron or maintenance person in the weeks after the shooting.

Mr. Gannalo also identified the initials "CH" as belonging to his former colleague Charlie Hopkins. He said that while Items 1 and 3 were compared, it did not appear that Item 4 was ever examined. Mr. Gannalo suggested that there may exist an "amended" report filed which would reflect further testing and comparison of Item 4.

186.    The Appellate Division rejected this claim, saying that the ballistics evidence was equivocal, and dismissed Mr. Jimenez's claim as "speculative." However, given that both sides had offered differing explanations, based on consultations with experts, as to what had happened, the Appellate Division should have ordered a hearing, rather than to simply credit the prosecution's explanation. Accordingly, this was an unreasonable determination of the facts, and is not deserving of deference. *Taylor*, 366 F.3d at 1001.

**D.    The State Courts' Analysis of the Cumulative *Brady* Errors in this Case Was Contrary To Established Supreme Court Law.**

187.    In addition to not considering all of the *Brady* claims, the CPL § 440.10 court also did not undertake a cumulative assessment of how the non-disclosures affected the case. *See* V2-A. The Appellate Division conceded that Mr. Jimenez's *Brady* claims should be analyzed collectively. *See Jimenez*, 142 A.D.3d at 161. However, the court did not actually undertake this analysis in reaching its conclusion that "the trial's outcome would have been the same had the material, viewed collectively, been produced." *Id.*

188.    The court specifically rejected Mr. Jimenez's argument that the Supreme Court's analysis in *Wearry v. Cain*, 136 S. Ct. at 1006 compelled a finding of prejudice in this case. The Appellate Division explained that *Wearry* presented the jury with a binary choice of crediting a witness' testimony over the defendant's alibi evidence, and where the undisclosed *Brady* evidence discredited the witness, the prejudice was clear. *Jimenez*, 142 A.D.3d at 160-61. In this case, the Appellate Division reasoned, "the People introduced three witnesses with no connection to each other, one of whom testified that defendant confessed to him, and there was no alibi evidence. Further, the *Brady* material that defendant complains was not disclosed did not, as in *Wearry*, directly challenge the People's theory." *Id.*

189.    With this analysis, the Appellate Division did not, as the Supreme Court requires, consider

whether the undisclosed evidence "undermined confidence in [Mr. Jimenez's] conviction." *Wearry*,

136 S. Ct. at  1006-07 ("Even if the jury—armed with all of this new evidence—*could* have voted to

convict Wearry, we have "no confidence that it *would* have done so." (quoting *Smith*, 565 U.S. at 75-

76)). Instead, the court did precisely what the Supreme Court had instructed should *not* be done: it

evaluated whether, even in light of the new evidence, it could still find enough evidence to convict.

*See  Kyles*, 514 U.S. at 434 (the "defendant need not demonstrate that after discounting the

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to

convict"). Worse, the court also engaged in burden shifting by failing to find prejudice, in part,

because Mr. Jimenez did not present an alibi defense 18 years after the crime. *Jimenez*, 142 A.D.3d at

160-61.

190.    As explained exhaustively *supra ,* the Supreme Court has unfailingly emphasized that

prejudice under *Brady* arises when, in light of the undisclosed material, the trial evidence is not

strong enough to sustain confidence in the verdict. This is such a case. This prosecution was based

*entirely* on witness credibility, and the suppressed evidence impeaching the witnesses was not

cumulative and unquestionably relevant. *See Agurs*, 427 U.S. at 112-13. And, in the case of the

undisclosed Detective Carbone note, the belatedly disclosed evidence was also exculpatory. Overall

and contrary to the Appellate Division's reasoning, this evidence "direct[ly] challenged the People's

theory" since the overwhelming amount of *undisclosed Brady* evidence in this case went directly to the

credibility of the two main witnesses. Accordingly, the Appellate Division's analysis was an

unreasonable determination of the law.

## II.	Mr. Jimenez's Constitutional Due Process Right to a Speedy Trial Was Violated.

191.	The shooting in this case occurred on July 3, 1989. H. 10. After the bizarre photo

identification procedure with Blaylock and Ramroop mentioned in ¶ 168 (and discussed *infra* at ¶¶

206-13), Mr. Jimenez was arrested, but quickly released and never indicted. In 1996, O'Brien–a

friend of Worrell–purportedly spoke to law enforcement about this case in the context of a federal

cooperation agreement. Still, Mr. Jimenez was not indicted. Then, in 1998 or 1999, O'Brien spoke

about the case again, this time to a detective in the Cold Case Squad at the New York Police

Department. Again, Mr. Jimenez was not indicted. Then, in September 2006–*17 years* after the

incident—Mr. Jimenez was finally indicted. This degree of delay was simply unconscionable, and

flies in the face of the government's constitutional speedy trial obligations. The delay resulted not

from the complexity of the case, but from police and prosecutorial inaction. The extent of the delay

was so egregious that it violated Mr. Jimenez's rights to due process and a fair trial.

192.	Before Mr. Jimenez proceeded to trial, he filed a motion *pro se* to dismiss the indictment,

asserting that he was deprived of his constitutional right to a speedy trial. *See* Ricardo Jimenez *pro se*

*Singer* motion (V4-52). This motion was summarily rejected, despite the fact that the prosecution

never responded to the motion.

193.	On direct appeal, Mr. Jimenez argued that the excessive pre-indictment delay in this case

violated his federal constitutional rights to due process and a speedy trial and mandated reversal of

the conviction and dismissal of the indictment. *See* V-6A (102-11). In the alternative, Mr. Jimenez

requested that, because the prosecution never responded to his speedy trial motion, a hearing should

be ordered to further develop the record with respect to this issue. *Id.*

194.    The Appellate Division rejected Mr. Jimenez's claim of excessive pre-indictment delay, without explanation, and further concluded that any "procedural error" in the court's determination of his motion was "harmless." 71 A.D.3d at 484.

195.    This decision was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was an unreasonable determination of the facts.

196.    The Supreme Court has instructed that a speedy trial is guaranteed to the accused by the Sixth and Fourteenth Amendments to the Constitution. *See Barker v. Wingo*, 407 U.S. 514, 515-16 (1972). Courts considering constitutional speedy trial claims must utilize a balancing test to assess whether a particular defendant has been deprived of this right. *See Doggett v. United States*, 505 U.S. 647, 652 (1992) ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay (citing *Barker*, 407 U.S. 514 at 530-32 (further explaining that factors to be considered in a constitutional speedy trial claim are: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." )). It was contrary to this well-established Supreme Court case law for the lower to court to have refused to apply the appropriate balancing test, and for the Appellate Division to have sanctioned this inaction by concluding that, as a matter of law, the delay was not unconstitutional.

197.    In his *pro se* motion to dismiss on the basis of excessive pre-indictment delay, Mr. Jimenez pointed out that that the shooting had happened nearly 18 years before his upcoming trial. V4-44. This delay alone was presumptively prejudicial. *See U.S. v. Black*, 918 F.3d 243, 254-55 (2019) (noting that the Supreme Court has found that a post-accusation delay approaching one year may be considered presumptively prejudicial, and that a delay of over five years was "extraordinary")(citing

*Doggett*, 505 U.S. at 652 n.1 and quoting *Barker*, 407 U.S. at 533)).  Mr. Jimenez also explained that he had been arrested after the incident and released, and that, even though he had purportedly been identified in 2001 (the O'Brien identification), the government "never showed any interest, nor followed up on any aspect of this case." *Id.* Mr. Jimenez argued that, throughout this time, his whereabouts were known to prosecutors. *Id.* He also contended that, given this lengthy delay, he was hindered from preparing and mounting a defense. *Id.* Mr. Jimenez demanded that the prosecution show "good cause" for the delay. *See Doggett*, 505 U.S. at 655 ("we generally have to recognize that excessive delay *presumptively compromises the reliability of a trial* in ways that neither party can prove or, for that matter, identify")(emphasis added). Certainly then Mr. Jimenez's motion should have, at the very least, triggered a further inquiry. There was no basis upon which the court could summarily deny Mr. Jimenez's motion.

198.     Likewise, there was no record basis upon which the Appellate Division could affirm the summary denial of Mr. Jimenez's motion, making its decision also an unreasonable determination of the facts. *See Taylor*, 366 F.3d at 1001. Indeed, the Appellate Division failed to require any inquiry into the protracted period of pre-indictment delay in this case and instead relied on two Court of Appeals cases, *People v. Decker*, 13 N.Y.3d 12, 14 (2009) and *People v. Lesiuk*, 81 N.Y.2d 485, 490 (1993), which found no due process violations from pre-indictment delays of 15 and 17 years, to find as a matter of law that the delay in this case was not unconstitutional. However, in *Decker* and *Lesiuk,* the prosecution in each case came forward with justifications for the delay. Without having required an inquiry into the operative facts, it was unreasonable for the Appellate Division to have summarily concluded that the extraordinary pre-indictment delay in this case was constitutional.

### III. Mr. Jimenez' Sixth Amendment Right to Effective Assistance of Counsel Was Violated.

199. A petitioner asserting a claim of ineffective assistance of counsel must show that his attorney's performance fell below "an objective standard of reasonableness," and prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). Prejudice is established where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Hinton v. Alabama*, ___U.S.___, 134 S.Ct. 1081, 1089 (2014) (prejudice exists where there is a reasonable probability that new evidence would lead the jury to have a reasonable doubt about defendant's guilt). A "reasonable probability" is a lesser standard than by a preponderance of the evidence. *Strickland*, 466 U.S. at 694 ("[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

### A. As an Alternative Ground, Counsel Was Ineffective For Failing to Renew Mr. Jimenez's Move to Dismiss the Indictment on Constitutional Speedy Trial Grounds.

200. As argued above, Mr. Jimenez's constitutional due process and speedy trial rights were violated. To the extent that counsel failed to adequately raise this issue with the trial court, he was ineffective. Seventeen years elapsed between the Worrell shooting and the return of an indictment, and eight years elapsed after O'Brien purportedly first contacted the NYPD regarding the incident. However, Mr. Jimenez's court-appointed counsel, Patrick Bruno, did not move to dismiss the indictment on constitutional speedy trial or due process grounds. After his attorney failed to act, on April 14, 2007, Mr. Jimenez filed a *pro se* motion to dismiss based on pre-indictment delay. *See* Ricardo Jimenez *pro se Singer* motion (V4-52). Eleven days later, defense counsel perfunctorily joined the *pro se* motion, but made *no legal arguments at all, and cited no facts about the police investigation*, even

though he had, at that point, received most of the police reports, which provided substantial evidence of the problems with the investigation.

201.     The *pro se* motion was ignored by the prosecution and the court. Defense counsel failed to demand that the prosecution respond or request that a hearing be held, and, on May 21, 2007, simply asked for a ruling. After a cursory review of Mr. Jimenez's *pro se* papers, Justice William Mogulescu denied the motion. *See* Transcript of May 21, 2007 (V4-53).

202.     Less than a month later, at the conclusion of the *Wade* hearing, defense counsel raised the issue of pre-indictment delay with the hearing judge, Justice Meghan Tallmer, but was told that any motion to reopen the issue would need to be addressed to Justice Mogulescu. H. 55-57. Although defense counsel argued to the Justice Tallmer that his client was "prejudiced by the very passage of time," H. 55, he never moved before Justice Mogulescu to reopen the motion to dismiss based on pre-indictment delay; instead, he simply let the issue drop.

203.     As explained in the previous section, on direct appeal, Mr. Jimenez asserted that the extent of the pre-indictment delay was "so egregious that it violated Mr. Jiminez's rights to due process and a fair trial." *See* Direct Appeal Brief (V6-A), at 102-03. He further contended that "due process and speedy trial guarantees mandate dismissal of the indictment" under the federal constitution. *Id.* at 110-11.

204.     The Appellate Division summarily ruled that it had "considered and rejected defendant's claim of excessive preindictment delay." *Jiminez*, 71 A.D.3d at 484, adding that "[a]ny procedural error in the manner in which the court determined the motion" was harmless. *Id.*

205.     After Mr. Jimenez's conviction was affirmed, defense counsel told appellate counsel that he failed to take any further action on Mr. Jimenez's speedy trial motion because he did not believe it would be successful. *See* 2d Supp. (V2-D ¶ 9). In his CPL § 440.10 motion, Mr. Jimenez alleged,

*inter alia,* that he was deprived of the effective assistance of counsel by his attorney's failure to file a motion to dismiss the indictment on constitutional speedy trial and due process grounds.

**B.      Counsel Was Ineffective for Failing to Strike Detective Stradford's Testimony at the *Wade* Hearing as Baseless Conjecture.**

206.    On June 15, 2007, a *Wade/Rodriguez* hearing was held before Justice Tallmer to address, *inter alia*, the anticipated in-court identification by Esco Blaylock. Detective Stradford, the only witness at the hearing, was ostensibly called, in part, to testify about an extremely unorthodox identification procedure conducted in 1989 with then 14-year-old Blaylock and another teenager named Sharon Ramroop, who was not a witness to the shooting.

207.    The only evidence of what led up to this interview was paperwork from 1989, including two DD5s that were withheld, as discussed *infra* at ¶¶ 170-71, until a couple of days before the hearing.

208.    According to police reports, in 1989, Blaylock said the shooter was a man named "Leon" who had stripes dyed into his hair and dated a girl he knew as "Sharon." *See* DD5 9 (Interview of Esco Blaylock) (V4-54); DD5 18 (Interview of Esco Blaylock) (V4-55). The police spent several days unsuccessfully trying to confirm Blaylock's information, but they did manage to identify "Sharon" as Sharon Ramroop, who had been arrested earlier that year for her alleged participation in a botched robbery. *See* DD5 22 (Efforts to Identify Leon) (V4-56); DD5 26 (Efforts to Identify Leon and Sharon Ramroop)(V4-57); DD5 28 (Meeting with Esco Blaylock) (V4-58); DD5 33 (Identification of Sharon Ramroop) (V4-44). On July 10, 1989, Ramroop told police she knew *a* man named Leon, who was Jamaican and Indian but that she had not seen him for several months. V4-44.

209.    On July 11, 1989, at around 12:45 p.m., Ramroop, who was not at the theater the night of the shooting, was shown photos but was unable to make an identification. *See* Picture File Search Report, Sharon Ramroop, July 11, 1989 (V4-59). Later that day, Ramroop and Blaylock were "confronted" by police and then "exchanged information relative to the description originally

furnished by various witnesses." *See* DD5 34 (Confrontation of Esco Blaylock and Sharon Ramroop) (V4-47). After this exchange, the police report says, "[i]t now appears that Esco Blaylock knows the perpetrator as Leon, and Sharon Ramroop knows the perpetrator as Ricky." *See id.*

210.    Blaylock and Ramroop were taken by the police to the Bronx CATCH unit. *See* DD5 35 (Identification of "Leon") (V4-60). The two teenagers were shown photos and Ramroop picked out a picture of Manuel Jimenez, Mr. Jimenez's brother, and told police that "his brother was Ricky, the person being sought." *See id.* After "[a] search of the files," a photograph of Mr. Jimenez was retrieved and shown to Blaylock, who identified Mr. Jimenez as the Worrell shooter, a person he knew as "Leon." *Id.*

211.    There was no explanation on the DD5s, or any other paperwork, of what the police told Ramroop, who was not a witness to, nor involved with the Worrell shooting, about the suspect, or even what exactly led Ramroop to give police a name.

212.    At the suppression hearing, although Stradford had nothing to do with this baffling identification procedure, he speculated at length about his *interpretations* of DD5s written by Detective Michael Serrano, 18 years earlier. Indeed, when asked to describe the 1989 procedure, Stratford admitted that he "d[id]n't know what happened in this particular case," and that he was "not sure how they did it." H. 18. Moreover, the photo or photos that Blaylock and Ramroop selected in 1989 were not introduced at the hearing.

213.    Nonetheless, despite Stradford's speculative testimony and the lack of any evidence as to exactly how the 1989 photo identification procedures were conducted, defense counsel did not move to strike the account, and to demand that a witness with *actual knowledge* of the 1989 identification procedures be called. Defense counsel did not even demand that the prosecution produce the photo that Blaylock purportedly selected in 1989.

214.    When asked by OAD why he failed to take such actions, defense counsel could not recall a

reason. *See* V2-D (at ¶ 27). He also said that he did not believe that calling Blaylock as a witness at

the hearing would have "accomplished anything." V2-D (at ¶ 28).

215.    In the CPL § 440.10 motion, Mr. Jimenez asserted that his attorney provided ineffective

assistance of counsel at the *Wade* hearing for failing to take the actions described in ¶¶ 212-13.

**C.    Counsel Was Ineffective for Failing to Call Two Witnesses Who Would Have Provided Identification Testimony Exculpatory of Mr. Jimenez, and For Failing to Cross-Examine O'Brien with His Written Statement.**

216.    Included in the DD5s from 1989 were reports on interviews with two witnesses who

provided information exculpatory of Mr. Jimenez.

### a.    Linda Salter

217.    Linda Slater, a 35-year-old concessions stand worker, had served the shooter. *See* DD5 14

(Interview of James Williams) (V4-61). Salter described to police the two men who had argued at the

stand, and was shown a photograph of Mr. Jimenez. *See* DD5 40 (Interview of Linda Salter) (V4-62).

Salter said she had seen Mr. Jimenez on other occasions, but that he was not one of the men who

had argued on the night of July 3. *Id.*

218.    When asked why he had not called Salter to testify, defense counsel said he believed he was

unable to locate her before trial, and was able to allude to her information through the questioning

of another detective. *See* V2-D (at § 103).

219.    However, OAD interviewed Salter and she confirmed that she witnessed the dispute at the

concessions stand, that it involved black men, and did not include Mr. Jimenez. *See* Affidavit of

Linda Salter, dated Oct. 27, 2011 (V4-63). She said she would have testified as such if called by the

defense. *Id.*

### b.   Gregory Jones

220.   A second witness, Gregory Jones, the chief of security at the theater, described the shooter in 1989 as a black male. *See* DD5 6 (Interview of Gregory Jones) (V4-64); DD5 15 (Interview of Gregory Jones) (V4-65). Defense counsel could not recall making any efforts to locate Jones. *See* V4-D (at § 104).

221.   When interviewed by OAD in 2012, Jones said he was outside the theater when he learned that shots were fired inside Theater One. He and another security guard, Harold Hazely, went to the rear of the theater. Jones said he saw a black man, all in white, 5' 8" to 5' 10" tall, with a dark complexion and a slim face running out of the theater. Jones noticed this man because he had a gun in his hand. The man got into a small car. *See* Affidavit of Gregory Jones, dated Feb. 9, 2012 (V4-66).

222.   Jones said he had never been contacted by a defense attorney. V4-66. He said he would have been willing to testify as to what he saw the evening of the shooting. *Id.*

### c.   Andrew O'Brien's Inconsistent Written Account

223.   As described *supra* at footnote 19, O'Brien wrote out a statement after meeting with Stradford in 2001 that was drastically different from his trial account insofar as the location of himself, Worrell and the shooter. *See* V4-20. Specifically, O'Brien said that he and "Patchee"[32] were standing at the top of the left aisle of the theater, (in the back), while the shooter stood at the top of the right aisle facing them. O'Brien said that out of "the corner" of his eye, he saw Worrell moving towards the shooter, and then heard shots ring out. *Id.* At trial, O'Brien said he and Patchee were in the same aisle as the man with the gun and that Worrell was coming up behind them. T. 203.

---

[32] "Patchee" was a man named Earl, who was part of the Poison Clan group.

Counsel did not, however, cross-examine O'Brien on this discrepancy and, when asked why, could not recall a reason. *See* V2-D (at ¶ 98).

**D. The State Courts' Decisions Were Contrary to, and Involved an Unreasonable Application of, Clearly Established Federal law as Determined by the Supreme Court of the United States, and Were an Unreasonable Determination of the Facts.**

224. On appeal from the CPL § 440.10 court's denial of Mr. Jimenez's claims of ineffective assistance of counsel, the Appellate Division affirmed the lower court's ruling that counsel was effective, holding:

> [W]e find that defendant received effective assistance under the state and federal standards. . . . Defendant has not shown that any of counsel's alleged deficiencies fell below an objective standard of reasonableness, or that, viewed individually or collectively, they deprived him of a fair trial or affected the outcome of the case. This is no reason to believe that any of the additional pretrial and trial measures that he claims should have been taken by counsel had any reasonable hope of success.

*Jimenez*, 142 A.D.3d at 163-64.

225. Both courts' decisions were "contrary to, and involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), and were an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2).

### i. Failure to Challenge Excessive Pre-Indictment Delay

226. As the Unites States Supreme Court has recognized, the failure to file a meritorious pre-trial motion can constitute ineffective assistance of counsel. *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (finding counsel's performance to be deficient, where counsel failed to file a pre-trial motion to suppress evidence from defendant's home and remanding for a determination of prejudice); *Lynn v. Bliden*, 443 F.3d 238, 249 (2d Cir. 2006) (recognizing ineffective assistance of counsel claim for failing to request a *Wade* hearing where there was a "highly viable" *Wade* argument).

227.    The CPL § 440.10 found counsel's inaction excusable on a finding that there was a reasonable delay between 1989 and 1997 because "[t]his case was resurrected from the dead in 1997" by Andrew O'Brien. V2-A (at 38). Not only, as discussed above, is this not the case, even if it was, it does not explain why the prosecution waited nearly another decade after O'Brien purportedly gave information on the shooting to charge Mr. Jimenez. The CPL § 440.10 court also fashioned its own legal test for constitutional speedy trial claims, contending that Mr. Jimenez had no claim lest he prove that "the People withheld the prosecution of the defendant for seventeen years after the completion of the Batman shooting investigation by the police." *Id.* at 37. This is not the inquiry required by *Barker*, 407 U.S. 514 at 515-16.

228.    Likewise, the Appellate Division's conclusion that a *Singer* motion[33] would not be successful was an unreasonable determination of the facts and the law. Again, as argued *supra* at ¶¶ 190-97, to establish a due process violation based on excessive pre-indictment delay, a defendant must show both that he was prejudiced by the delay and that the government's reasons for the delay were improper. *United States v. Marion,* 404 U.S. 307, 324 (1971) ("Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense."). Here, counsel was confronted with an unexplained period of 17 years of pre-indictment delay and the record showed that there were substantial, multi-year delays at every step of the investigation. The police knew where Mr. Jimenez was during this time. Blaylock was continuously available to authorities had they wished to speak with him. O'Brien said he first contacted the NYPD in 1998 or 1999, but he was not interviewed for another *two* to *three years*. Even then, when O'Brien purportedly

---

[33] In *People v. Singer*, 44 N.Y.2d 241, 254-55 (1978), the New York Court of Appeals held that, where commencement of an action has been delayed for a lengthy period, without good cause, the defendant may be entitled to a dismissal, and that the People have the burden of establishing good cause for the delay. The court also held that because "[p]reindictment delay is governed by the due process clause ... [a dismissal of the indictment] requires a showing of actual prejudice...." *Id.* at 252. Claims of due process violations based on unreasonable delay are analyzed under the five factors set forth in *People v. Taranovich*, 37 N.Y.2d 442 (1975).

identified Mr. Jimenez's photograph in an array in January of 2001, the police waited another *four* to *five years* before re-interviewing witnesses identified in the original 1989 investigation and, finally, presenting the matter to a grand jury in 2006. In other words, the exact same information that was available and known to law enforcement in 2006 was known to them in 2001, and arguably, 1989.

229.    At no point has the prosecution offered any explanation for the glacial pace at which it proceeded in this case and there is nothing to suggest that the delay was the result of anything other than inattention. The prosecution was never held to its burden of establishing good cause for the delay.

230.    While Mr. Jimenez took it upon himself to file a speedy trial motion to dismiss, his attorney should have further argued to the court that the prosecution be held to its burden, and—when directed to reopen the issue with Justice Mogulescu—who had summarily denied Mr. Jimenez's motion, counsel should have renewed Mr. Jimenez's arguments. H. 55-57. Yet, although defense counsel argued to Justice Tallmer that his client was "prejudiced by the very passage of time," H. 55, he never moved before Justice Mogulescu to reopen the motion to dismiss based on pre-indictment delay; instead, he simply let the issue drop.

231.    There was no justification for this inaction. Any competent attorney would have filed a fully-supported motion that demanded the prosecution justify such a protracted period of inaction, and fully expanded on the prejudice suffered by his client. This is especially true since, under the five factor analysis set forth in *People v. Taranovich*, 37 N.Y.2d 442 (1975)[34] for claims of constitutional due process violations based on unreasonable delay, a fully supported *Singer* motion in this case should have been granted. In fact, in a case involving a comparable period of pre-indictment delay in

---

[34] The *Taranovich* factors are: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay. 37 N.Y.2d at 442.

another Bronx county "Cold Case" murder prosecution, counsel successfully moved to dismiss based on a violation of the constitutional right to a speedy trial. S*ee People v. Ayyash,* Ind. No. Ind. No. 2777/07 (Sup. Ct. Bx. Co 2012) (murder indictment dismissed for 19 year delay) (V4-61)**.** And, given the remedy for excessive pre-indictment delay, namely, dismissal of the indictment with prejudice, there can be no strategic justification for counsel's failure. Under these circumstances, counsel was not entitled to the presumption that his failure to act was "for tactical reasons rather than through sheer neglect." *Yarbrough v. Gentry*, 540 U.S. 1, 8 (2003). The state courts' conclusion otherwise were an unreasonable determinations of law and fact.

ii.     **Failure to Move to Strike Stradford's Testimony at the *Wade* Hearing**

232.     Similarly, the courts also unreasonably rejected Mr. Jimenez's claim that his counsel was ineffective for failing to move to strike Stradford's testimony at the *Wade* hearing.[35] As explained by the Supreme Court in *U.S. v. Wade*, 388 U.S. 218, 228-29 (1967), the reason for scrutinizing identification procedures before trial is to ensure that identifications that were improperly influenced by police suggestion are not put before the jury. *Id.(quoting* Wall, EYE-WITNESS IDENTIFICATION IN CRIMINAL CASES 26 ("The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.")).

233.     There was every reason to be concerned about improper police influence in the bizarre identification procedure conducted with Ramroop and Blaylock. The police came up empty-handed when they went out looking for Blaylock's "Leon." *See* V4-48, V4-49.  And, although Blaylock contended that "Leon" dated Ramroop, yet there was never any evidence that Mr. Jimenez was

---

[35] The CPL § 440.10 court rejected this claim on the reasoning that hearsay evidence is admissible under New York law in a suppression hearing. V2-A (at 38-39). However, that is not the claim Mr. Jimenez made. He argued that counsel was ineffective for failing to move to strike the testimony as rank speculation, and to argue that the prosecution had not met its burden of proof. The Appellate Division did not specifically discuss this claim.

involved with Ramroop. To the contrary, when the police found Ramroop, she told police that the man she knew as "Leon" was Jamaican and Indian—certainly not Mr. Jimenez. V4-51.

234.    But the circumstances turned even stranger. Ramroop was brought in to view photographs—a perplexing move since she was not even at the theater the night of the shooting. And, after being unable to pick anyone out, Ramroop was put in a room with Blaylock and the teenagers then "exchanged information relative to the description originally furnished by various witnesses," and, after this exchange, "[i]t now appears that Esco Blaylock knows the perpetrator as Leon, and Sharon Ramroop knows the perpetrator as Ricky." V4-47, V4-60.

235.    It is entirely unclear what happened in that room. There was no memorialization of the information "exchanged," or what Ramroop was told about the suspect, or anything about what led her to give information. It was never even revealed what photographs the two teenagers had viewed, or what triggered the purported connection that Esco's "Leon" was Ramroop's "Ricky," or even how Ramroop purportedly knew "Ricky." And certainly Stradford had no idea what happened in that room. He was simply reading off of some very brief, cryptic DD5s and speculating as to what happened. This rank speculation was insufficient as a matter of law for the prosecution to meet their burden to prove, by clear and convincing evidence, that the procedure was not suggestive. There was simply no basis to conclude that, under the "totality of the circumstances," the identification was reliable. *See Sexton v. Beaudreaux*, __ U.S. __, 138 S.Ct. 2555, 255-60 (2018) (*citing Neil v. Biggers*, 409 U.S. 188, 196 (1972)).

236.    This cannot be deemed effective representation. Counsel had no explanation for his failure to move to strike Stradford's testimony; clearly the result of his failure to make a reasonable investigation of the case. *Strickland*, 466 U.S. at 691. Moreover, counsel's "apparent willingness to

accept the government's version of the facts at least calls into question the adequacy of his representation." *U.S. v. Matos*, 905 F.2d 30, 33-34 (2d Cir. 1990).

237.    Counsel's inaction was not reasonable "considering all of the circumstances." *Strickland*, 466 U.S. at 189. Stradford's testimony was patently insufficient to establish that the photo array procedure was untainted by police suggestiveness. Had counsel move to strike this testimony, the prosecution would not have been able to meet its burden at the *Wade* hearing and Blaylock's identification would have been suppressed.[36] Likewise, had the defense demanded that Blaylock be called, he would have testified as he did at trial and admitted that he did not personally associate with "Leon" and had merely been told by others who he was. T. 499.[37] This would not have been enough to stablish sufficient familiarity with Mr. Jimenez to make an admissible identification. *See People v. Rodriguez*, 79 N.Y.2d 445, 450-51 (1992).

### iii.    Failure to Call Linda Salter and Gregory Jones to Testify

238.    While acknowledging Mr. Jimenez's claim that his attorney was ineffective for failing to call "certain witnesses," the Appellate Division did not specifically address it, finding only that the measure did not have "any reasonable hope of success." This conclusion is, again, an unreasonable application of the relevant law, and an unreasonable determination fact.[38]

---

[36] And, as explained immediately below, the prosecution likely would not have been able to establish an independent source for Blaylock's second photo array procedure or in-court identification.

[37] Also, as part of the CPL § 440.10 litigation, a private investigator working for appellate counsel interviewed Blaylock in 2006. Blaylock reiterated that he did not know "Leon" personally, and said, in 2006, he had been shown multiple photo arrays in which the person he ultimately identified was in each array. Blaylock compared the process to the game, "Where's Waldo?" *See* Affidavit of Nelson J. Lassalle, dated Apr. 23, 2012 (V4-68). When asked by OAD's investigator to describe "Leon," the man he believed responsible for the shooting, Blaylock did not immediately answer and instead responded that he had to think. *See id.* Appellate counsel also spoke to Ramroop several times. In repeated interviews – one of which was conducted in her London home – Ramroop denied ever dating, or even knowing Mr. Jimenez. *See* V4-1; Affidavit of Rosa Greenbaum, dated May 14, 2012 (V4-69); Affirmation of Richard M. Greenberg and Statement of Sharon Ramroop, dated June 19, 2013 (V4-70).Ramroop also stated that she was not friends with Blaylock, but merely knew who he was. *Id.*

[38] The CPL § 440.10 court did not address this claim.

239.     Again, this case largely rested on the eyewitness identifications of O'Brien and Blaylock. Had counsel put on the testimonies of Salter—whose testimony was especially relevant since she was uncontestably familiar with Mr. Jimenez's appearance and had personally served the shooter—and Jones—who had a law enforcement background—he could have effectively argued to the jury that Mr. Jimenez had been misidentified. These were two witnesses who spoke to police in the immediate aftermath of the crime, stood by their accounts, and were willing to testify. There was certainly no reasonable basis in fact or the applicable Supreme Court case law for the Appellate Division to have concluded that there was "no reason" to believe that this evidence "had any reasonable hope of success."

### iv.     Failure to Cross-Examine O'Brien with His Written Account

240.     Neither the CPL § 440.10 court, nor the Appellate Division directly addressed counsel's failure to confront O'Brien with the fact that he had provided a very different account of the shooting in a detailed, five-page, handwritten letter, *see* V4-20, than he did at trial.  That letter describes an entirely different sequence of events from the account he provided at trial.  It would also have caused the jury to question his ability to recall the events he was describing.

241.     The CPL § 440.10 court's implicit rejection of this claim, based on a finding that O'Brien had been impeached on, *inter alia*, "each and every aspect" of his "disclosed criminal record," cooperation agreement, and eyewitness account of the "Batman shooting," was an unreasonable determination of the facts. That was, as discussed above, clearly not the case.

242.     Moreover, the Appellate Division's general conclusion that specific impeachment of O'Brien on his account of the shooting would not "have affected the outcome of the case," was unreasonable. Impeachment with this divergent account would, at the very least, have significantly undermined O'Brien's credibility. And certainly, had the other aspects of O'Brien's credibility been

challenged with the undisclosed *Brady* evidence, the jury would have every reason to have rejected his identification of Mr. Jimenez.

## **REQUEST FOR RELIEF**

For all of the above reasons, Mr. Jimenez requests that this Court provide the following relief:

A.    That this Court grant the Petition, vacate the conviction, and order a new trial;

B.    In the alternative, that an evidentiary hearing be conducted on all claims involving disputed issues of material fact, and that Mr. Jimenez be granted such discovery as is necessary for a full and fair resolution of any claims contained in this Petition;

C.    That this Court grant other such further relief as is just and necessary.

Respectfully submitted:


_____S/_____

ANASTASIA HEEGER, ESQ.
AH-9640
The Office of the Appellate Defender
11 Park Place, Suite 1601
New York, NY   10007
aheeger@oadnyc.org
212-402-4100

April 23, 2019

## VERIFICATION

ANASTASIA HEEGER, ESQ., an attorney duly admitted to practice in the State of New York, hereby affirms under penalties of perjury:

I am an attorney for the Petitioner, RICARDO JIMENEZ, in this habeas corpus proceeding, and I have read the foregoing petition. As to matters within my personal knowledge, I allege that such matters stated therein are true. As to other matters stated therein, I allege on information and belief that they are true. Such information and belief is based on my examination of court records and transcripts pertaining to this case.

Dated:      New York, New York
            April 23, 2019


__S/_____
ANASTASIA HEEGER

I declare under penalty of perjury that the facts contained in the foregoing Amended Petition for a Writ of *Habeas Corpus* are true and correct.

Ricardo Jiminez, aka Ricardo Jimenez
07A4969
Petitioner

DATED:     Fallsburg, New York
           April 15, 2019

Sworn to me this 15th day of April 2019

NOTARY PUBLIC

**CHRISTOPHER E BARRETO**
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01BA6382056
Qualified in Orange County
My Commission Expires October 15, 2022