SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX: PART 86
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

               Plaintiff,

          -against-

RICARDO JIMENEZ,

               Defendant.
-----------------------------------------------------------------------X
Present: The Honorable Robert E. Torres

**DECISION AND ORDER**
Indict. # 3825/2006

      Pursuant to an order of the Appellate Division, 1st Department, a hearing was held before this Court to determine the sole issue of whether "the prosecution knew O'Brien[1] had been given a specific quid pro quo for his testimony" against the defendant; and, whether the prosecutor committed a *Brady* violation in failing to disclose such agreement, if one existed (*People v. Jimenez*, 142 AD3d 149 [1st Dept. 2016]).

      The People were represented by ADA Noah Chamoy and ADA Terry Gottlieb.[2] The defendant was represented by Anastasia Heeger, Esq. and Rosemary Herbert, Esq. Testimony was taken from Detective Wendell Stradford, ADA Lisa Mattaway, and Andrew O'Brien.[3]

---

[1] Mr. O'Brien was, and still is, in the federal witness protection program. While being questioned by federal authorities as part of his cooperation agreement, he informed a federal agent about a murder in a Bronx movie theater in 1989.

[2] The Post-Hearing Memorandum of Law was submitted by ADA Nancy Killian and ADA Noah Chamoy on behalf of the People.

[3] The parties to this hearing stipulated on the record that the witnesses for this hearing would be utilized by both the defense and the People. They also stipulated to the order it in which they would examine the witnesses.

Findings of Fact

Detective Wendell Stradford[4] ("Det. Stradford") testified first on behalf of the People regarding the defendant's allegation that Det. Stradford was aware of an agreement between ADA Lisa Mattaway and Andrew O'Brien. Det. Stradford testified that he met with and spoke to Andrew O'Brien several times during his investigation into a cold case murder at the Whitestone theater in Bronx County is 1989. Det. Stradford denied ever entering into any *quid pro quo* agreement with Mr. O'Brien regarding his potential testimony against Mr. Jimenez, the defendant. When further questioned by defense counsel as to his role as a conduit between ADA Lisa Mattaway and Mr. O'Brien, Det. Stradford testified (1) that the only thing O'Brien could ever hope for was a reduction in his sentence; (2) that the issue of any *quid pro quo* agreement on behalf of Mr. O'Brien was never discussed with ADA Mattaway; (3) there was never any discussion regarding any agreement in exchange for O'Brien's testimony; and, (4) when asked by the federal prosecutor handling O'Brien's federal cooperation obligation[5] to write a letter on behalf of Mr. O'Brien for his testimony, Det. Stradford stated that he disregarded the request and had no further contact or communication with any of the parties.

ADA Lisa Mattaway testified that she was the prosecuting attorney in this case. She testified that she notified defense counsel Patrick Bruno, Mr. Jimenez's trial attorney, prior to the trial and in writing, of O'Brien and his request to write a letter that he can have put in his file

---

[4] Det. Stradford was assigned to the NYPD Cold Case Squad from 1993 to 2016. In 2001, upon being assigned to this case, he began investigating the present case. Det. Stradford testified at the *Jimenez* trial.

[5] Mr. O'Brien was required to cooperate with *any* criminal matters he had knowledge of as part of his cooperation agreement with the federal prosecutor.

2

stating that he testified.[6] When further questioned regarding her relationship with Mr. O'Brien, she stated that she met with O'Brien on one occasion at a correctional facility prior to the trial and then only met with him again on the day of his testimony at trial. She had no further contact with Mr. O'Brien. She did affirmatively testify that she had no other agreement or gave no further promise to Mr. O'Brien other than the promise to write a letter on his behalf. When questioned regarding Mr. O'Brien's quest to seek leniency from the federal judge on his federal matter ADA Mattaway responded that the only relief she was aware Mr. O'Brien was seeking was the letter from her office.[9]

Mr. Andrew O'Brien testified that Det. Stradford made no promises to him; that AUSA Novak made no promises[10] to him and that ADA Mattaway made no other promises to him other than to write a letter on his behalf. (See Hearing Transcript, July 21, 2017, pages 39-40).

Following the testimony of Mr. O'Brien, the parties rested and requested to file written arguments. After a full review of testimony, hearing exhibits and post hearing submissions, I find that the People accurately disclosed that they would write a letter to be placed in O'Brien's federal file stating that he had testified for the Bronx District Attorney's office in its case of *People v. Jimenez*.

All three witnesses testified credibly about their roles as investigator of the murder, the prosecutor of the murder, and a witness to the murder. Further, the credible testimony clearly

---

[6] Court Exhibit 1: Memorandum prepared by ADA Mattaway to Patrick Bruno, dated June 8, 2007.

[9] ADA Mattaway testified that she did not know what a Federal Rule 35 was nor what actions would be taken on Mr. O'Brien's behalf at the federal level.

[10] Mr. O'Brien testified on cross examination that he did have a disagreement with AUSA Novak regarding the Federal Rule 35 motion because AUSA Novak strongly disfavored a second Federal Rule 35 motion.

establishes there was no *quid pro quo* agreement. I find no evidence of any agreement of any kind other than what the parties disclosed at trial and testified to before this Court at the hearing. There is no evidence before this Court to support the defendant's contention that there was any other agreement made between ADA Mattaway and Andrew O'Brien. I also find no evidence to support that there was any relationship between Det. Stradford and Mr. O'Brien or Det. Stradford and ADA Mattaway concerning any other agreement.

Therefore, the Court finds there was no *quid pro quo* agreement between the Bronx prosecutor's office and Mr. O'Brien and/or the federal prosecutor. The Court further finds no *Brady* violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor.

This constitutes the opinion, ruling, and order of the Court.

Dated: June 29, 2018
   Bronx, New York

Hon. Robert E. Torres, J.S.C.

Hon. Robert E. Torres, JSC

4

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF BRONX: CRIMINAL TERM: PART 86
--------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                              :   INDICTMENT NO.
                                   3825-2006
        -against-               :

                              :   440 Hearing
RICARDO JIMENEZ,

                              :
                Defendant.
--------------------------------------------X

                            265 East 161st Street
                            Bronx, New York 10451
                            May 5, 2017


B E F O R E:  HON. ROBERT E. TORRES
               Justice of the Supreme Court


A P P E A R A N C E S:

         DARCEL D. CLARK, ESQ.
         DISTRICT ATTORNEY OF BRONX COUNTY
         BY:  NOAH CHAMOY, ESQ.
             TERRY GOTTLIEB, ESQ.
             Assistant District Attorney

         OFFICE OF THE APPELLATE DEFENDER
         ATTORNEYS FOR DEFENDANT
         11 Park Place, Suite 1601
         New York, New York 10007
         BY: ANASTASIA HEEGER, ESQ.
            ROSEMARY HERBERT, ESQ.
            JENNIFER LAMBERT, Paralegal


                            VANESSA MOORE
                            Senior Court Reporter

1      (Whereupon, the following takes place on the

2   record, in open court, in the presence of the Court, the

3   assistant district attorneys, both defense counsel, and the

4   defendant:)

5      THE CLERK: Come to order. Part 86 is now in

6   session. The Honorable Robert E. Torres presiding. Judge,

7   the first case up on the calendar today will be number one.

8   This is indictment 3825 of 2006, Ricardo Jimenez. This

9   matter is scheduled for a hearing. Defendant is produced

10   but not before the Court at this time. Counsel, would you

11   please state your appearances for the record?

12      MR. CHAMOY: Your Honor, ADA Noah Chamoy, Bronx

13   District Attorney's Office.

14      MS. GOTTLIEB: Terry Gottlieb for the Bronx

15   District Attorney's Office.

16      MS. HEEGER: Anastasia Heeger, H-E-E-G-E-R, from

17   the Office of the Appellate Defender.

18      MS. HERBERT: And Rosemary Herbert,

19   H-E-R-B-E-R-T, Office of the Appellate Defender for the

20   defendant.

21      MS. HEEGER: And your Honor, this is our

22   paralegal. Is it okay if she sits up here with us at

23   counsel's table?

24      THE COURT: I assume the People have no

25   objection.

Proceedings

1      MS. GOTTLIEB:  No, Judge.

2      MS. LAMBERT:  My name is Jennifer Lambert,

3 L-A-M-B-E-R-T.

4      THE COURT:  Okay.  Thank you.  Good morning, all.

5 Is there anything we need to address before we bring the

6 defendant out?

7      MS. HERBERT:  Your Honor, we would be requesting

8 copies of the transcripts provided to us at no cost.

9 Mr. Jimenez is indigent and we are assigned counsel.

10      THE COURT:  I'll grant that request.

11      MS. HERBERT:  Thank you.

12      THE COURT:  Anything else.  No?  Okay.  Bring him

13 out.

14      (Whereupon, there is a break in the proceeding at

15 this time.)

16      A COURT OFFICER:  Coming out.

17      THE CLERK:  Come to order.  Judge, this is

18 recalling number one on the calendar, Ricardo Jimenez.  Let

19 the record reflect defendant is now present before the

20 Court.

21      THE COURT:  Good morning, again.  Are there any

22 issues you need to address before we begin?  Does either

23 side wish to make a preliminary statement?

24      MR. CHAMOY:  Briefly, your Honor.

25      THE COURT:  They get to go first.

Proceedings

1    MS. HEEGER:  No, your Honor.

2    THE COURT:  Okay.

3    MS. HEEGER:  We're prepared.

4    MR. CHAMOY:  Briefly your Honor, I just wanted to

5    confirm that the scope of this hearing is specified in the

6    Appellate Division decision and that is limited to question

7    of whether or not the prosecutor knew that O'Brien, that is

8    Andrew O'Brien, had been given a specific quid pro quo for

9    his testimony.  And that's the issue that's presented in

10   the Appellate Division order.

11   MS. HEEGER:  Your Honor, if I could respond.  The

12   scope of the hearing is that this matter's been remanded

13   for a hearing of whether the People committed a violation

14   pursuant to Brady v. Maryland by not disclosing the terms

15   of an agreement to assist for defense's production for

16   Andrew O'Brien's testimony.  So your Honor, we'd say that

17   the scope of the hearing is looking at any kind of

18   understanding or arrangement that Mr. O'Brien had with the

19   People.

20   THE COURT:  Quoting from the decision itself

21   People v. Jimenez, 142 A.D.3d 149, and I believe it would

22   be page --

23   MR. CHAMOY:  162, your Honor.

24   THE COURT:  162.  Thank you.  Quoting in part,

25   defendant to establish at a hearing that the prosecutor

1    knew that O'Brien had been given a specific quid pro quo

2    for his testimony. That's the scope of the hearing. I

3    know the very last paragraph of the decision can be

4    interpreted to say something different but that's the heart

5    of the decision. So that's the scope. It goes on to say

6    basically set forth based on that what would happen or what

7    the conclusion can be drawn, but that's the basic scope.

8    Anything else we need to address at this time?

9         MR. CHAMOY: Just your Honor, we have an

10   arrangement that we will be calling the witnesses as direct

11   and then the defense will be -- the defendant's attorneys

12   will be cross-examining them.

13         MS. HEEGER: Yes, your Honor. That's correct.

14         THE COURT: Okay. You may call your first

15   witness.

16         MS. GOTTLIEB: Your Honor, at this time the

17   People call Detective Wendell Stradford to the stand.

18         A COURT OFFICER: Witness entering. Just remain

19   standing. Raise your right hand. Place your left hand on

20   the Bible.

21         THE CLERK: Do you solemnly swear or affirm that

22   the testimony you give to this court shall be the truth,

23   the whole truth, and nothing but the truth so help you God

24   or do you so affirm?

25         THE WITNESS: I do.

1          THE CLERK:  Thank you very much.  Please be

2     seated.

3          A COURT OFFICER:  Please state your name and

4     spell your name for the record.

5          THE WITNESS:  Detective Wendell Stradford,

6     S-T-R-A-D-F-O-R-D, Wendell, W-E-N-D-E-L-L.

7          A COURT OFFICER:  Command and shield?

8          THE WITNESS:  Police Commissioner's office,

9     shield number 3420.

10          THE COURT:  Good morning, detective.

11          THE WITNESS:  Good morning, sir.

12          THE COURT:  You may proceed.

13          MS. GOTTLIEB:  Thank you, your Honor.

14  DIRECT EXAMINATION

15  BY MS. GOTTLIEB:

16     Q.   Detective Stradford, how long have you been employed

17  by the New York City Police Department?

18     A.   Thirty-three years.

19     Q.   And detective, what was your -- what was your

20  assignment prior -- where are you assigned presently?

21     A.   I'm in the Police Commissioner security detail now.

22     Q.   And how long have you been at the Commissioner's

23  office?

24     A.   Since September 2016.

25     Q.   And prior to September 2016, where were you assigned?

1          A.    The cold case squad.

2          Q.    And could you explain to the Court what the cold case

3     squad would do?

4          A.    The cold case squad investigates homicides that have

5     occurred where there is a perpetrator known or an unknown

6     perpetrator and no arrest has been made.

7          Q.    And when were you first assigned to the cold case

8     squad?

9          A.    In 1993.

10         Q.    And so how long were you in the cold case squad in

11    total?

12         A.    Since 93 to 2016, about 23 years.

13         Q.    And detective, did there come a time when you were

14    assigned to investigate the case involving the defendant Ricardo

15    Jimenez?

16         A.    Yes.

17         Q.    And when were you first assigned that case?

18         A.    I believe it was September 2001.  Not sure of the

19    month, but it was 2001.

20         Q.    And detective, did you testify at a trial in 2000 --

21    in that case?

22         A.    I'm sorry?

23         Q.    Did you testify in the trial against Ricardo Jimenez?

24         A.    Yes.

25         Q.    And was that trial held in June of 2007?

1      A.   Yes.

2      Q.   And detective, as part of your assignment to

3   investigate the case, were you -- did you become aware of an

4   individual by the name of, I think you at that time were calling

5   him A.O.?

6      A.   Yes.

7      Q.   And who is that individual?

8      A.   Andrew O'Brien.

9      Q.   And to your knowledge, did Andrew O'Brien testify at

10  the trial against Ricardo Jimenez?

11     A.   Yes, he did.

12     Q.   Detective, did you make any promises to Andrew O'Brien

13  for his testimony in the trial against Ricardo Jimenez?

14     A.   No.

15     Q.   Did you at some point after the trial have a

16  conversation with the AUSA regarding a letter?

17     A.   Yes.

18     Q.   Could you tell the Court what that conversation was?

19     A.   The U.S. Attorney at the time was a Mr. Novak.  He

20  contacted me in regards to if I was going to write a letter for

21  Mr. O'Brien.

22     Q.   Prior to being contacted -- and this was after the

23  trial had occurred.  Is that correct?

24     A.   Yes.

25     Q.   Prior to the -- during the trial or before the trial

1    before Mr. O'Brien testified, did you ever have any conversation

2    with AUSA Novak about a letter?

3          A.    No.

4          Q.    So, after the trial, you had a conversation with AUSA

5    Novak?

6          A.    Yes.

7          Q.    And that was the first time any conversation about a

8    letter from you came up.  Is that correct?

9          A.    Yes.

10         Q.    And what, if anything, did you tell AUSA O'Brien -- I

11   mean Novak?

12         A.    I'd have to check with my supervisor.

13         Q.    And did you, in fact, check with your supervisor?

14         A.    Yes, I did.

15         Q.    And after checking with your supervisor, what if

16   anything did you do?

17         A.    I was told not to do it and I didn't.

18         Q.    And prior to -- did you ever have any conversation

19   with Andrew O'Brien about you writing the letter?

20         A.    No.

21         Q.    Either before or after the trial?

22         A.    No.

23         Q.    Did you ever tell Assistant District Attorney Mattaway

24   that you had a conversation with Andrew O'Brien about a letter?

25         A.    No, I didn't.

1          MR. CHAMOY:  No further questions.

2          THE COURT:  You may inquire.

3          MS. HERBERT:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MS. HERBERT:

6          Q.   Good morning, detective.

7          A.   Good morning.

8          Q.   Now, when you were with the cold case squad in, I

9    think approximately 1999, you were in the special projects unit?

10         A.   Yes.

11         Q.   And that unit worked closely with federal law

12   enforcement, correct?

13         A.   Yes.

14         Q.   Specifically the FBI.  Is that correct?

15         A.   FBI, ATF, Secret Service.

16         Q.   DEA?

17         A.   All of the federal law enforcement agencies, yes.

18         Q.   And in connection with your -- when Mr. O'Brien's name

19   was brought to your attention, that was done in conjunction with

20   the DEA, correct?

21         A.   No.  I don't remember it that way.

22         Q.   You received information relating to Mr. O'Brien from

23   the DEA at some point early in this investigation?

24         A.   I don't remember if it was the DEA.

25         Q.   Oh.  You testified at trial in this case that you

1    received information -- or actually at the pretrial suppression

2    hearings in this case that you received information from the

3    DEA. Do you recall that testimony?

4        A.    No, I don't.

5        Q.    Would you like to review the testimony?

6        A.    Yes, ma'am.

7              MS. HERBERT:    I direct the witness to page 31 of

8        the hearing testimony -- no. I'm sorry. I think that's

9        the trial testimony. Excuse me. May I approach the

10       witness, your Honor?

11             THE COURT:    Just so I'm clear, is this the trial

12       testimony or the hearing testimony?

13             MS. HERBERT:    This is the hearing testimony.

14             THE COURT:    Could you direct me to the page and

15       line reference to that?

16             MS. HERBERT:    Yes.    Directing the witness's

17       attention to, I guess it would be, top of page 31 which

18       it's an answer that begins on a prior page starting at line

19       21.

20       Q.    Does that refresh your recollection?

21       A.    Yes.

22       Q.    And in fact, in this case, you did receive information

23    from the Drug Enforcement Agency known as the DEA?

24       A.    Yes.

25       Q.    And you also received information from the FBI?

1    A.    I don't recall that.  Just please recollect my memory,

2    please.

3    Q.    Again, directing -- well, directing the witness's

4    attention to page 320 of the trial testimony, which is tab --

5    and I direct the witness's attention to lines 18 through 21 on

6    page 320 of his trial testimony.

7    A.    How far do you want me to go?

8    Q.    Just it's the answer that begins at line 18 on page

9    320 and goes to line 21.

10           MS. GOTTLIEB:  Judge, I'm going to object.  It

11        doesn't talk about anything as to Mr. O'Brien and when they

12        got the information.

13           THE COURT:  Can I see it, please?

14           MS. HERBERT:  No, you're right.  No.  You're

15        correct.  I'm mistaken on that one.

16    Q.    But in connection with this case, there was a special

17    agent from the FBI that was assigned to work with you on this

18    case, correct?

19    A.    Ma'am, I don't recall that.  No.

20    Q.    Agent Diego Redondo?

21    A.    Oh, Diego, but he wasn't assigned with us on this

22    case.

23           MS. HERBERT:  May I have that binder?

24    Q.    In connection with your request to review -- to

25    interview Andrew O'Brien in 2001, that request was made by Agent

1   Redondo, correct?

2       A.   It could have been.

3       Q.   Would it refresh your recollection to review the

4   request form that Agent Redondo prepared?

5       A.   Not if he prepared it, no.

6       Q.   Well, it relates to your investigation, your request

7   for an interview.  You would not have reviewed that?

8            MS. GOTTLIEB:  Judge, I'm going to object.  I'm

9       not sure what this has to do with the scope of this

10      hearing.

11           THE COURT:  Sustained.

12           MS. HERBERT:  Your Honor, we're establishing the

13      background prior to the initial contact between this

14      witness and Mr. O'Brien.

15           MS. GOTTLIEB:  And again, I --

16           THE COURT:  Background as to what?  The fact that

17      there was interaction between this detective and federal

18      agencies or agents is a given.  So, I don't understand what

19      you're trying to establish as a background.

20           MS. HERBERT:  Well, one moment, your Honor.

21      Well, an issue in the case is the status of the

22      investigation whether there was involvement from federal

23      law enforcement in the investigation.

24           THE COURT:  That's not initially before me.

25      Whether any conversations or agreements reached is an issue

1    before me.

2              MS. HERBERT:  That's certainly correct.

3              THE COURT:  And whether the D.A. knew about it or

4    not, but asking about -- the line of questioning you're

5    going down doesn't take us there.

6              MS. HEEGER:  Your Honor, if I may.  One of the

7    issues is what the prosecutor's office would have been

8    aware of and one of the issues involves what the federal

9    end of this was doing with Mr. O'Brien and what the

10   prosecutor's office could or should have been aware of what

11   the feds were doing.

12             So, that was an issue in this case and the People

13   have taken a position on this issue that they were -- that

14   their office was not aware of what the federal authorities

15   were doing or the FBI was doing and that there was no

16   evidence of a joint investigation.  That's been a position

17   of their office.  We're trying to establish that there

18   actually is evidence of a joint investigation.

19             THE COURT:  Okay.  First off, for clarity in the

20   record and all fairness and this goes for both sides, you

21   have multiple attorneys at each table.  I want the

22   arguments restricted to just one person speaking.

23             MS. HEEGER:  Understood, your Honor.

24             THE COURT:  That goes for both sides.  Again, the

25   fact that -- well, withdrawn.  Are you trying to find out

1    whether a federal agency was actively involved in the

2    investigation of this incident and your client? Is that

3    what you're trying to find out?

4              MS. HERBERT: Yes. That's part of it, yes.

5              THE COURT: So why don't you ask that question?

6              MS. HERBERT: Okay. Very well.

7    Q.   Detective Stradford, was there FBI involvement in the

8    investigation? I'm referring specifically now to the initial

9    stages where Mr. O'Brien was brought to the cold case squad's

10   attention.

11             MS. GOTTLIEB: I'm going to object. I'm not sure

12        what that question means.

13             THE COURT: Objection overruled. If the

14        detective feels he can answer it, he can answer.

15   A.   Can you repeat that, please?

16   Q.   I think so. At that initial stage in the

17   investigation, was there FBI involvement?

18             MS. GOTTLIEB: Again, that's a different

19        question.

20             THE COURT: The problem is the term involvement.

21        We know there was FBI involvement.

22             MS. HERBERT: Perhaps I could be more specific.

23             THE COURT: We know that there is some connection

24        to the PBA. The trial transcript will speak for itself. I

25        believe all of this came out at trial as to the series of

1       law enforcement agencies that were contacted with counsel's

2       knowledge that eventually ended up on the detective's desk.

3       So, you know, either rephrase your question or move on.

4              MS. HERBERT:  Very well.

5       Q.   With respect to the initial status of the

6   investigation, when you first contacted Mr. O'Brien, were you

7   working with an agent from the FBI or in conjunction with an

8   agent from the FBI?

9       A.   In special projects we work with federal law

10  enforcement, FBI, DEA, ATF, and any other acronym you can think

11  of.  They were assigned to our office to help us to pursue cases

12  that were being investigated to that end.  That's it.

13      Q.   And specifically with regard to this case, was Agent

14  Redondo assisting you with this case at that point?

15      A.   I would contact the FBI and other agencies to assist

16  me in procuring documents that I couldn't get myself, that I had

17  no access to.

18      Q.   And Agent Redondo in this case assisted you in making

19  contact setting up an interview with Mr. O'Brien?

20      A.   He did make Mr. O'Brien -- well, actually he made a

21  request through the U.S. Marshals Service for me.

22      Q.   And you provided him with information that was the

23  basis of that request?

24              MS. GOTTLIEB:  I'm going to object to the form of

25       that question.

1        THE COURT:  I'm not clear as to what you're

2   asking here.

3        MS. HERBERT:  I'm asking whether this witness

4   provided information to Agent Redondo who then used that

5   information making his request to the Marshal Service.

6        THE COURT:  Well, he told you that he made a

7   request or asked the agent to contact the U.S. Marshals on

8   his behalf.  So, we have that.

9        MS. HERBERT:  Correct, your Honor.  I'm asking if

10   he provided information regarding the basis for that

11   request.

12        THE COURT:  So are you asking did he just make a

13   request out of the clear blue or he gave a basis for his

14   request?

15        MS. HERBERT:  The latter.

16        THE COURT:  Is that what you're asking?

17        MS. HERBERT:  Yes.

18        THE COURT:  Detective, did you just tell him can

19   you make this request for me or did you give him a reason

20   why you're making a request?

21        THE WITNESS:  No.  Just a request from

22   Mr. O'Brien.

23        THE COURT:  Okay.  Next question.

24   Q.   In your career in particularly working with the cold

25   case squad, you've worked with cooperating witnesses from time

1    to time?

2        A.    Yes.

3        Q.    And some of those witnesses have had pending cases,

4    correct?

5        A.    Yes.

6        Q.    Some of those cases -- some of those witnesses, those

7    cooperating witnesses, actually had convictions?

8        A.    Yes.

9        Q.    And when working with a cooperating witness, it's

10   important obviously for you to vet the witness, to do your due

11   diligence with respect to the witness?

12                   MS. GOTTLIEB:  Objection.

13                   THE COURT:  I'll allow you some leeway.  As this

14        is, I'm using the word some.  You may answer the question.

15       Q.    With respect to a cooperating witness you vet the

16   witnesses, you do due diligence with respect to those witnesses?

17       A.    Yes.

18       Q.    And in your experience, cooperating witnesses

19   frequently expect something in return for their cooperation?

20                   MS. GOTTLIEB:  Objection.

21                   THE COURT:  Sustained.  The issue is not what

22        people generally expect.  The issue is what happened in

23        this case.

24                   MS. HERBERT:  Certainly, your Honor, but it goes

25        to this witness's state of mind as he's entering into this

1    interview and into this, what turned out to be a longterm

2    relationship with Andrew O'Brien.

3             THE COURT:  I'll still sustain the question.

4    Move on.

5    Q.    And how did you first learn that Mr. O'Brien had

6    information regarding this homicide?

7    A.    I don't really remember.

8    Q.    Did you speak to Mr. O'Brien directly?

9    A.    That wouldn't have been possible.

10   Q.    So, the information did not come to you in the form of

11   a phone call from Mr. O'Brien?

12             MS. GOTTLIEB:  Objection.

13             THE COURT:  Side bar.

14             (Whereupon, the following discussion takes place

15       on the record, at the sidebar, in the presence of the

16       Court, the assistant district attorneys, and both defense

17       counsel:)

18             THE COURT:  What's the basis for that question?

19             MS. HERBERT:  Your Honor, we're just -- we're

20   trying to establish -- I mean, we know that he's -- he

21   spoke to O'Brien.  We know that he began his relationship

22   and we're trying to find out how he first learned of

23   Mr. O'Brien.  It's a pretty fundamental question.

24             MR. CHAMOY:  Your Honor?

25             THE COURT:  Go ahead.

1          MR. CHAMOY:  If I may.  There are two problems

2     with that.  One, it's entirely irrelevant to this

3     proceeding, but two, he also describes his relationship in

4     his hearing and trial testimony going back and that

5     information is part of this record.

6          MS. HERBERT:  And it's something that we

7     anticipate exploring down the road.

8          THE COURT:  That's the problem I have.  You have

9     trial testimony as to how this scenario unfolded in terms

10    of the information getting to fundamentally you would say

11    police department.  And obviously a trial transcript speaks

12    for itself and I believe there is initial contact with a

13    prosecutor in Brooklyn, a detective, turned over to

14    somebody and then it gets to this detective.  We have that

15    in record.  I don't think there is a good faith basis to

16    ask that particular question.  I'm not necessarily

17    precluding or taking a position that you're precluded from

18    exploring what interactions he had with Mr. O'Brien, but

19    you know, we seem to be going around in circles where we

20    have a very long history of extensive records, multiple

21    layers in review of this case.  So, we really should be

22    narrowing and getting to the point.

23          MS. HERBERT:  Your Honor, one of the things that

24    is concerning in this case is there are long gaps in time,

25    information based on the trial record comes to the cold

1    case squad in -- it's first in 1998, but then in 1999 and

2    then no action's taken until 2001. Now, we just have no

3    information about what happened in that period and the

4    witness may tell us that nothing happened or he may --

5              THE COURT: Why don't you just ask him that?

6              MS. HERBERT: I do.

7              THE COURT: There's no basis to ask did he call

8    you. That's the bottom line. There's no basis for that

9    question based on the record that the Court is aware of.

10   So I'm not precluding you from exploring that area, but you

11   have to be more direct with your questions. We have to

12   move this along.

13             MS. HERBERT: Certainly, your Honor. Just with

14   regard to that, I mean, there is evidence in the record

15   that he called the cold case squad. That was his

16   testimony.

17             THE COURT: Why don't you just ask him that?

18             MS. HERBERT: Okay.

19             THE COURT: Why don't you just ask him did you

20   ever talk to him on the phone?

21             MS. HERBERT: That was my next question.

22             THE COURT: You know, we can eliminate -- there's

23   no jury here. We can eliminate, you know, the circle of

24   whatever. Let's just get to the point and move on.

25             MS. HERBERT: Okay.

1      THE COURT:  Okay?

2      MS. HERBERT:  Understood, your Honor.

3      THE COURT:  All right.  Thank you.

4      (Whereupon, the following takes place in open

5   court:)

6   Q.   Detective, in 19 --

7      THE COURT:  I'm sorry.  Just so the record is

8   clear, the objection is sustained.

9      MS. GOTTLIEB:  Thank you, Judge.

10      THE COURT:  Continue.

11   Q.   In 1999 when you were given information regarding

12   Mr. O'Brien, did you have further contact with Mr. O'Brien

13   before you interviewed him in 2001?

14   A.   Given information and further contact is not the same

15   thing.

16   Q.   I guess did you speak to -- in that time period, I'm

17   talking about between when you first learned the information and

18   when you met with him in 2001, did you speak with him on the

19   telephone?

20   A.   No.

21   Q.   Did you exchange correspondence with him?

22   A.   He wasn't allowed.

23   Q.   He wasn't allowed to correspond?

24   A.   No.  I had to -- no.  There was no correspondence on

25   the phone, not in the time frame that you're speaking of.

1    Q.   Okay.  And so, when you did go to -- and you knew at

2  this point that Mr. O'Brien was a federal prisoner?

3    A.   Yes.

4    Q.   That he was serving a federal sentence?

5    A.   Yes.

6    Q.   And you learned that information before you went to

7  visit him?

8    A.   Yes.

9    Q.   And, in fact, you learned that he was a protected

10  witness?

11    A.   Yes.

12    Q.   He was in the federal witness security program?

13    A.   He's in WITSEC, yes.

14    Q.   Which is why you had to go through this procedure with

15  Agent Redondo in order to meet with him?

16    A.   It was a shortcut, yes.

17    Q.   And before you -- before you met with Mr. O'Brien in

18  2001, you had reviewed the original case file from the 45th

19  Precinct, correct, just to bring yourself up to speed on the

20  case?

21           MS. GOTTLIEB:  Objection.

22           THE COURT:  I'll allow it.  You may answer.

23    A.   Yes.

24    Q.   And you learned from that file that Mr. Jimenez had

25  been a suspect in 1989?

1           MS. GOTTLIEB: Objection.

2           THE COURT: I'll allow that. You may answer.

3      A.   Yes.

4      Q.   And now, before you met with Mr. O'Brien in 2001, did

5 you have any information that he knew the shooter's name in the

6 incident that you were investigating?

7      A.   Well, to clarify your question, I don't remember if it

8 was 2001 that I met with Mr. O'Brien.

9      Q.   Would the report that was generated, or your DD-5,

10 refresh your recollection about the date?

11     A.   Yes.

12          MS. HERBERT: One moment. I'm providing the

13     witness with the DD-5 that he completed following his

14     interview with Mr. O'Brien.

15          THE WITNESS: Okay.

16     Q.   Does that refresh your recollection about the date of

17 the meeting?

18     A.   Yes.

19     Q.   And what was that date?

20     A.   January 16th.

21     Q.   Of?

22     A.   2001.

23     Q.   Okay. And so that was obviously a considerable period

24 of time after you initially received information through, I

25 believe it was, Detective Pfeiffer?

1          MS. GOTTLIEB: Objection.

2          THE COURT: I'll allow it. I think it's obvious,

3     but I'll allow it. You may answer.

4     A.   Considerable period of time for you or for me?

5     Q.   Well, I guess a period of time of almost two years?

6     A.   Yes. It was almost about that. Yes.

7     Q.   Thank you. Now, as part of your due diligence in this

8     case, you thoroughly reviewed the information that you received

9     from the DEA regarding Mr. O'Brien?

10         MS. GOTTLIEB: Objection.

11         THE COURT: Sustained.

12    Q.   And before meeting with Mr. O'Brien, did you review a

13    FBI 302, a report that was prepared dealing with Mr. O'Brien?

14         MS. GOTTLIEB: Objection.

15         THE COURT: Sustained. I don't see how this goes

16    to the issues before the Court.

17    Q.   What did you do prior to meeting with Andrew O'Brien

18    in order to vet him to determine background information about

19    whether he might be a reliable witness?

20    A.   I'm not really sure how to answer that question

21    because until you meet a person you can't determine whether

22    they're reliable or, you know, a good witness. I hadn't met him

23    before that time.

24    Q.   So, just if I understand your answer then, you had not

25    reviewed materials or done other vetting prior to meeting with

1    Mr. O'Brien?

2                    MS. GOTTLIEB:  Objection.

3                    MS. HERBERT:  Your Honor, I'm simply trying to

4        understand the witness's answer.

5                    THE COURT:  Detective, before you met with

6        Mr. O'Brien, you yourself, was he in federal custody?

7                    THE WITNESS:  Yes.

8                    THE COURT:  And you knew his status of federal

9        custody at that time?

10                   THE WITNESS:  Yes.

11                   THE COURT:  What, if anything else, did you know

12       about his background before you met with him?

13                   THE WITNESS:  His criminal history.

14                   THE COURT:  Move on.

15       Q.   Moving to the January 16, 2001 interview with

16   Mr. O'Brien, who besides you was at that meeting?

17       A.   Agent Redondo.

18       Q.   Anyone from the Marshals Service?

19       A.   Not that I recall, no.

20       Q.   Your recollection was just you, Agent Redondo,

21   and Mr. O'Brien?

22       A.   And whoever was -- probably someone from BOP, Bureau

23   of Prisons.

24       Q.   Do you recall who that individual was?

25       A.   No.

1    Q.    And approximately how long did this interview last?

2            MS. GOTTLIEB:  Objection.

3            THE COURT:  I'll allow it.  If he remembers.

4    A.    I don't recall.  I don't recall.

5    Q.    Was it short?  Did it last for two hours?

6            MS. GOTTLIEB:  Objection.

7            THE COURT:  He said he doesn't recall.  Do you

8    have any idea how long it was?

9            THE WITNESS:  No, sir.

10            THE COURT:  Move on.

11    Q.    And who -- how did the interview proceed?  Were you

12    asking questions of the witness?

13    A.    Yes.

14    Q.    And during that interview, did Mr. O'Brien tell you

15    why he had contacted the cold case squad several years prior?

16    A.    You say that and I don't know where that came from

17    about Mr. O'Brien contacting the cold case squad.  You're --

18    Q.    I can provide you -- with the Court's indulgence, I

19    can provide you with -- it's again -- directing your attention

20    to page 340 of the trial testimony which I believe is in the

21    binder if you still have it.  It's tab B, 340.

22    A.    Okay.

23    Q.    And throughout this there's a discussion of this

24    initial contact?

25    A.    What line?

1    Q.   Well, it's really the entire page.  It's at the bottom

2   of the page on line 24.  The question refers to a lady detective

3   Pfeiffer mentioned and then on the following page you agreed.

4   If you wanted to review that.

5            MS. GOTTLIEB:  Judge, I'm going object to this.

6       First of all, it doesn't talk about timeframe and it

7       doesn't really answer Detective Stradford's questions as

8       far as I can tell and I think the transcript speaks for

9       itself.

10           THE COURT:  Somebody show me what's being

11      referred to.

12           THE WITNESS:  Sir, you want this?

13           THE COURT:  Thank you.

14           MS. HERBERT:  And just for the Court's

15      information, this is also discussed at page 321 about the

16      trial testimony of Detective Stradford.

17           THE COURT:  Side bar.

18           (Whereupon, the following discussion takes place

19      on the record, at the sidebar, in the presence of the

20      Court, the assistant district attorneys, and both defense

21      counsel:)

22           THE COURT:  Read back the question to me, please.

23           (Whereupon, the last question was read back at

24      this time.)

25           THE COURT:  Can you just pull down exactly what

1    he said because I'm missing something?

2    MS. HERBERT: Okay. Beginning here there is --

3    there's a detective that worked in my office. This is the

4    witness testifying. She was sent to the Brooklyn office.

5    She mentioned to me that she entered into this discussion.

6    This was a person who had some information on a homicide in

7    the Bronx and then it goes down here and then there's a

8    further discussion. I don't know that the name is

9    mentioned there, but there's a further discussion which

10   appears on page, I believe it's, 340 through 341. It's

11   Detective Pfeiffer who's the female detective in cold case

12   that's mentioned.

13   THE COURT: Yeah, but I think your line of

14   questioning was suggesting that Mr. O'Brien contacted cold

15   case squad directly and that doesn't -- that doesn't

16   support that, what you're showing this detective.

17   MS. HERBERT: Mr. O'Brien also testified to that

18   fact at trial, that he contacted the cold case squad.

19   THE COURT: Okay. But you're asking this

20   detective -- you're asking your questions wrong, quite

21   honestly. You know, he says he doesn't recall. I believe

22   he doesn't recall. He doesn't know that Mr. O'Brien

23   contacted cold case directly. Okay? I believe that's what

24   he just said. You're asking him to look at something to

25   refresh his recollection that doesn't really go to that

1      issue. We're just talking about the information of a chain

2      of contacts. Okay? So, I'm going to sustain the objection

3      as to the way you're approaching the subject and we can

4      take it from there.

5              MS. HERBERT: Okay. Very well.

6              (Whereupon, the following takes place in open

7      court:)

8              THE COURT: The objection is sustained.

9      Q.    Detective, during your interview in 2001 with

10   Mr. O'Brien, did he discuss with you why he was speaking to you

11   about this homicide?

12     A.    I'm sure he did.

13     Q.    And what did he say about that?

14     A.    That was a friend of his that was murdered in the

15   Bronx.

16     Q.    Was that the only thing that he discussed with you as

17   to why he was coming forward?

18     A.    Yes.

19     Q.    Did he indicate to you when you were meeting with him

20   that he was interested in getting some time off of his federal

21   sentence?

22     A.    No.

23     Q.    He never mentioned that to you?

24     A.    Are we talking about January 16, 2001?

25     Q.    Absolutely.

1     A.   No.

2     Q.   When the interview with Mr. O'Brien concluded, did you

3 make any arrangements to speak with him further?

4     A.   Not then, no.

5     Q.   Did you at some point make arrangements to speak with

6 him further?

7     A.   Yes.

8     Q.   And when did that occur?

9     A.   I couldn't even tell you.

10    Q.   Did you provide him with your telephone number?

11    A.   Not allowed.

12    Q.   I'm sorry?

13    A.   Not allowed.

14    Q.   Not allowed.  What didn't allow you?

15    A.   The U.S. Marshals Service.

16    Q.   Did you make any other type of arrangements for him to

17 stay in touch with you going forward?

18    A.   Through the Marshal Service, yes.

19    Q.   And obviously at some point after that meeting, you

20 did have further contact with Mr. O'Brien.  Is that correct?

21    A.   Yes.

22    Q.   And, in fact, over the course of the years he called

23 you on a number of occasions?

24    A.   He called me, yes.

25    Q.   In your office presumably?

1     A.   Yes.

2     Q.   And was there any other form of contact or was it

3  exclusively by telephone?

4     A.   There were a couple of visits to the facility.  I

5  don't remember how many.  Other than that, it was by telephone.

6     Q.   And the visits to the facility that you're mentioning,

7  was that -- was that just you meeting with Mr. O'Brien or were

8  there other people involved in those visits?

9     A.   No.  It could have been my partner and someone else.

10     Q.   And who was your partner?

11     A.   Detective Thomas, Denise Thomas.

12     Q.   And at those meetings at the facility after 2001, did

13  Mr. O'Brien in any of those meetings indicate to you that he was

14  interested in reducing his sentence, his federal sentence?

15     A.   No.

16     Q.   That's something that never came up?

17     A.   No.

18     Q.   Did he ask you during those meetings for anything --

19  for anything at all, for you to provide him with anything?

20     A.   No.

21     Q.   And during the phone calls that you referred to, first

22  of all, approximately how many phone calls did you receive from

23  Mr. O'Brien after your interview?

24     A.   I don't know.

25     Q.   More than two?

1    A.    I don't know.  I don't know.

2    Q.    And what was discussed during those phone calls?

3    A.    I don't remember.

4    Q.    Presumably it was this case and his knowledge of this

5    case?

6             MS. GOTTLIEB:  Objection.

7             THE COURT:  I'll allow that question.  Overruled.

8    A.    A person at WITSEC is restricted from the types of

9    conversations they are allowed to have over the phone.  So we

10   would not have spoken about that in particular over the phone.

11   The phone calls are recorded.

12   Q.    Okay.

13   A.    He is not allowed to have certain types of

14   conversations with law enforcement over the phone.  That's why

15   we had to go visit him in the facility.

16   Q.    So when he called you, you would not be discussing

17   this case or presumably any other case?

18   A.    I don't remember what we talked about.

19   Q.    During any of those conversations, did he ever ask you

20   to do anything for him?

21   A.    No.

22   Q.    Did you keep any record of those telephone calls?

23   A.    No.

24   Q.    You didn't keep any logs or notes of the calls?

25   A.    No.

1       Q.   You prepared an affidavit in connection with these

2   proceedings, correct?

3       A.   I believe so, yes.

4       Q.   And in that affidavit, you indicated that in phone

5   calls that Mr. O'Brien made to you he wanted to provide

6   information on other homicides to you.  Is that accurate?

7       A.   Yes.

8       Q.   So, during those phone calls, he was in fact talking

9   about -- about other cases, other homicides?

10      A.   He wanted to provide in me allowing him to talk about

11  those two different things.  We couldn't talk about certain

12  things over the phone.  It had to be done in person.

13      Q.   And so, in those subsequent meetings that you had with

14  him, did you discuss these other matters that -- these other

15  homicides?

16      A.   Not that I recall.

17      Q.   So he did not provide information or testimony

18  regarding other homicides?

19              MS. GOTTLIEB:  Objection.

20              THE COURT:  Overruled.

21      A.   Not that I recall.

22      Q.   Following your meeting in January of 2001, did you

23  bring the information you had to the district attorney's office?

24      A.   Yes.

25      Q.   Do you recall when that happened?

1    A.    No.

2    Q.    Was it soon after that interview or was it a long time

3  after?

4    A.    I'm not sure.

5    Q.    Now, you testified at trial that that occurred

6  sometime in 2001?

7    A.    Yes.

8    Q.    And so that's when you would have gone to the district

9  attorney's office with the information about Mr. Jimenez's case?

10    A.    Yes.

11    Q.    Okay.  And was the -- did the district attorney's

12  office assign a prosecutor to the case and proceed with the case

13  in 2001?

14    A.    Initially, no.  There was no -- there was no D.A.

15  assigned because I was away.  I was sick, and then 9/11

16  occurred.

17    Q.    And did the district attorney's office inform you as

18  to why they were not assigning a D.A. at that point?

19            MS. GOTTLIEB:  Objection.

20            THE COURT:  Sustained.

21    Q.    But now at some point the case was assigned to

22  Assistant District Attorney Lisa Mattaway.  Is that correct?

23    A.    Yes.

24    Q.    And approximately when did that happen?

25    A.    I don't remember.

1    Q.    Was it in 2001?

2    A.    I don't remember.

3    Q.    And then after the case was assigned to ADA Mattaway,

4  did Mr. O'Brien -- was he still calling you at that point?

5    A.    I'm sorry?

6    Q.    After the case was assigned to Ms. Mattaway, did

7  Mr. O'Brien still call you?  Was he still calling you at that

8  point in time?

9    A.    It's possible.  I'm not sure.

10   Q.    And did he continue -- after the case was assigned to

11  ADA Mattaway, did he continue to indicate to you that he wanted

12  to provide information about other homicides?

13            MS. GOTTLIEB:  Objection.

14            THE COURT:  I'll allow it.  You may answer.

15   A.    He might have.  Yes.

16   Q.    And did you act as an intermediary and a go-between

17  between ADA Mattaway and Mr. O'Brien?

18            MS. GOTTLIEB:  Objection to the form of the

19        question.

20            THE COURT:  As to the phraseology of that

21        question, sustained.

22   Q.    Well after the case was assigned to ADA Mattaway, did

23  you meet subsequently with Mr. O'Brien?

24   A.    Yes.

25   Q.    Was ADA Mattaway present at those meetings -- well,

1    first of all, was there more than one meeting?  Excuse me.

2         A.    She was present at one.  I don't remember if there was

3    more than one.  She was present at one.  Yes.

4         Q.    Would it be fair to say that you had additional

5    contact with Mr. O'Brien where ADA Mattaway was not present

6    during that period of time?

7         A.    Maybe one other time.

8         Q.    And did you convey any information to Mr. O'Brien from

9    ADA Mattaway?

10        A.    No.

11        Q.    And did Mr. O'Brien ever ask you to convey information

12   to ADA Mattaway?

13        A.    No.

14        Q.    Did Mr. O'Brien ever tell you shortly prior to the

15   beginning of the trial in this case that he was ready to go?

16        A.    Is that a quote?

17             MS. GOTTLIEB:  I'm going to object.

18        Q.    It is a quote.

19        A.    Attributed to me?

20        Q.    I can show you.

21             MS. HERBERT:  Court's indulgence for a moment.

22             THE COURT:  Well, the witness asked for

23        clarification.

24             MS. HERBERT:  I'm seeking the clarification, your

25        Honor.

1          MS. GOTTLIEB:  Judge, I'd ask what we're showing

2     the witness.

3          MS. HERBERT:  They're emails that were provided

4     to us from the district attorney's office.

5          THE COURT:  Show it to counsel so they know what

6     you're referring to.

7          MS. GOTTLIEB:  Again, I'm going to object because

8     it's not what the email says, that I'm ready to go.

9     It's -- she's misphrasing it.

10          THE COURT:  Let me see it, please.

11          MS. HERBERT:  I can certainly --

12          MS. GOTTLIEB:  I'm not sure.

13          MS. HERBERT:  Rephrase the language, your Honor?

14          THE COURT:  Rephrase it, please.

15          MS. GOTTLIEB:  Objection for rephrase the

16     question.

17          MS. HERBERT:  One moment, please.

18     Q.   Did Mr. O'Brien call you shortly before the beginning

19     of trial in this case and tell you that he was, quote, on board

20     and ready?

21     A.   I don't remember.

22     Q.   If I can ask you to take a look at the highlighted

23     portion of that document.

24     A.   This is a message from Lisa Mattaway.  My name's not

25     mentioned other than the fact that she got a call from me today.

1    Q.   I'm specifically asking if that refreshes your

2 recollection as to any conversation you may have had between

3 with Mr. O'Brien that you relayed to ADA Mattaway?

4         MS. GOTTLIEB:  Judge, I'm mostly objecting

5    because she's trying to quote somebody and that's not even

6    a quote.  I think this whole line of questioning is

7    misleading and not what that document even talks about.

8    It's not a quote from anybody.

9         THE COURT:  To the extent that the inference

10   that's a direct quote of what Mr. O'Brien may or may not

11   have said, the objection's sustained.  Can I see this

12   letter for a second, please?  And for clarity of the

13   record, we have been referring to an email from Lisa

14   Mattaway to a David Novak dated June 13, 2007.  Next

15   question.

16   Q.   Now, you indicated you met with Mr. O'Brien again in

17 2006.  Is that correct?

18   A.   I didn't indicate that.  You didn't ask me that.

19        THE COURT:  He didn't indicate that at this

20   proceeding.

21   Q.   It is correct, is it not, that you met with Andrew

22 O'Brien in 2006 along with ADA Lisa Mattaway?

23   A.   If that's when it was, yes.

24   Q.   And that occurred at a correctional facility in New

25 York State where Mr. O'Brien was, correct?

1      A.   Yes.

2      Q.   And who else was present at that meeting besides

3  yourself, Mr. O'Brien, and Ms. Mattaway?

4      A.   Probably personnel from BOP and Detective Thomas.

5      Q.   And that's your partner Detective Thomas?

6      A.   Yes.

7      Q.   And at that meeting, was the possibility of

8  Mr. O'Brien testifying discussed?

9      A.   I'm sure it was.  Yes.

10     Q.   And who brought up that topic?

11     A.   The district attorney.

12     Q.   And did Mr. O'Brien indicate at that meeting that he

13  would -- that he wanted something in exchange for testifying?

14     A.   No.

15     Q.   Did the subject of Ms. Mattaway writing a letter for

16  Mr. O'Brien come up at that meeting?

17     A.   No.

18     Q.   It was not discussed at all?

19     A.   No.

20     Q.   And Mr. O'Brien never asked you to write a letter at

21  that meeting?

22     A.   No.

23     Q.   Now, in connection with having Mr. O'Brien produced to

24  testify at trial in this case, you worked with a federal

25  prosecutor in Virginia, that's AUSA David Novak?

1      A.    That's not really correct though, but Mr. Novak was

2   the U.S. Attorney in Virginia, yes.

3      Q.    And you had some contact with him in connection with

4   this case and with the production of Mr. O'Brien?

5      A.    The U.S. Marshals are responsible for producing the

6   defendant -- the witness.

7      Q.    But as the AUSA responsible for Mr. O'Brien, did you

8   have to work through Mr. Novak to get to the U.S. Marshals

9   office?

10      A.    I had to speak to Mr. Novak to get permission to speak

11   with Mr. O'Brien.

12      Q.    And do you recall approximately when those -- that

13   conversation occurred?

14      A.    No, ma'am.

15      Q.    And was there one conversation or more than one

16   conversation between you and detective, I'm sorry, AUSA Novak?

17      A.    It was more than one.

18      Q.    Several conversations?

19      A.    It was more than one.

20      Q.    And during those conversations with AUSA Novak, did

21   the subject of your writing a letter on Mr. O'Brien's behalf

22   come up?

23                MS. GOTTLIEB:   Judge, I'm going to object to the

24         form of the question for a time frame.

25                MS. HERBERT:   This question is directed at the

1     period of time prior to trial.

2                 MS. GOTTLIEB:  Can we rephrase the question,

3         Judge?

4                 MS. HERBERT:  I'm happy to rephrase.

5                 THE COURT:  Prior to the trial, did you ever talk

6         to Mr. Novak about you writing a letter on behalf of

7         Mr. O'Brien?

8                 THE WITNESS:  No, sir.

9                 THE COURT:  Next question.

10    Q.    The conversation that you described on direct whereby

11    AUSA Novak contacted you after the trial to ask you about

12    writing a letter, do you recall your testimony on direct?

13    A.    That I said that he contacted me?

14    Q.    That you discussed with him.  I'm not sure who

15    contacted who, but you discussed with him?

16    A.    I don't understand your question.

17    Q.    You testified on direct examination that Mr. Novak,

18    AUSA Novak, contacted you after the trial about writing a letter

19    for Mr. O'Brien?

20                MS. GOTTLIEB:  Objection.  That's not his

21        testimony.

22                THE COURT:  The testimony is that there was a

23        conversation between this witness and the assistant U.S.

24        district attorney about a letter.

25                MS. HERBERT:  I can certainly explore.

1      Q.   With regard to that conversation that you testified to

2  on direct, did you contact Mr. Novak or did Mr. Novak contact

3  you?

4      A.   I don't recall.

5      Q.   Was this an in-person conversation or telephone

6  conversation?

7      A.   Mr. Novak's in Virginia.  I was here in New York.  So

8  it had to be telephonically.

9      Q.   And during that conversation, Mr. Novak asked if you

10  would write a letter on behalf of Mr. O'Brien?

11          MS. GOTTLIEB:  Objection to the form of the

12      question.

13          THE COURT:  Overruled.

14      A.   Could you --

15      Q.   Certainly.  During that conversation, Mr. Novak asked

16  if you were going to write a letter on Mr. O'Brien's behalf?

17      A.   If I was going to write a letter, yes.

18      Q.   He asked you that question?

19      A.   Yes.

20      Q.   And you indicated that you would need to speak to a

21  supervisor?

22      A.   I don't recall if I indicated that to him, but I had

23  to speak to a supervisor.  I couldn't just do it.

24      Q.   Now, the letter that was the subject of this

25  conversation, did Mr. Novak explain or did you ask what sort of

1  a letter that was?

2        A.   No.

3        Q.   What did you think he was referring to?

4        A.   I'm aware of what type of letter.

5        Q.   Well, can you share that with me?

6        A.   It's a letter about Mr. O'Brien's, you know, his

7  testimony and cooperation.

8        Q.   And in that conversation, did Mr. Novak explain what

9  he expected that letter might be used for?

10       A.   Yes.

11       Q.   And what was that?

12       A.   It's called a 5K.  I guess something to do with his

13  sentence or whatever.  I'm not sure.

14       Q.   So, your understanding based on that conversation with

15  Mr. Novak was that the letter referred to would be used in

16  connection with a sentence reduction or something relating to

17  reducing Mr. O'Brien's sentence?

18             MS. GOTTLIEB:  Objection.

19       A.   No.

20             THE COURT:  Overruled.

21       Q.   No that was not discussed or that was not --

22       A.   No.

23       Q.   Well, what did Mr. Novak tell you about what purpose

24  the letter might be used for?

25       A.   I didn't ask.  It's just assumed.

1      Q.   And when you -- and so what did you tell Mr. Novak

2   during that conversation with regard to the letter?

3      A.   I'm sure I had to speak to my supervisor.

4      Q.   And what did you -- what did you tell Mr. Novak after

5   you spoke to your supervisor?

6      A.   I didn't.

7      Q.   You never got back to Mr. Novak at all?

8      A.   No.

9      Q.   Did you speak to ADA Mattaway about this request after

10  your conversation with Mr. Novak?

11     A.   No.

12            MS. HERBERT:  Just a moment, your Honor.  Nothing

13         further, your Honor.

14            THE COURT:  Anything further?

15            MS. GOTTLIEB:  Just one moment, Judge.  Nothing

16         further, Judge.

17            THE COURT:  You may step down.  Thank you.  Have

18         a good day.

19            THE WITNESS:  Thank you.  You too, sir.

20            THE COURT:  Counsel, want to step up?

21            (Whereupon, a bench conference was held off the

22         record.)

23            MS. GOTTLIEB:  I'm just going to mark these.

24            (Whereupon, People's Exhibit 1 and 2 are into

25         Evidence.)

1    MS. GOTTLIEB: Your Honor, at this time the

2    People call ADA Lisa Mattaway to the stand.

3    A COURT OFFICER: Witness entering. Remain

4    standing. Raise your right hand. Face the clerk.

5    THE CLERK: Do you solemnly swear or affirm that

6    the testimony you give to this court shall be the truth,

7    the whole truth, and nothing but the truth so help you God

8    or do you so affirm?

9    THE WITNESS: I do.

10    THE CLERK: Thank you very much. Please be

11    seated.

12    A COURT OFFICER: Please state your name and

13    spell your name for the record.

14    THE WITNESS: Lisa Mattaway, M-A-T-T-A-W-A-Y.

15    A COURT OFFICER: And your employer?

16    THE WITNESS: Bronx County District Attorney.

17    A COURT OFFICER: Thank you.

18    THE COURT: Good afternoon.

19    THE WITNESS: Good afternoon.

20    MS. GOTTLIEB: May I inquire, your Honor?

21    THE COURT: You may inquire.

22    MS. GOTTLIEB: Thank you, your Honor.

23  DIRECT EXAMINATION

24  BY MS. GOTTLIEB:

25    Q.   Ms. Mattaway, how long have you been employed by the

1  Bronx District Attorney's office?

2      A.    About 28 years.

3      Q.    And directing your attention to June 2007, were you

4  employed by the Bronx District Attorney's office?

5      A.    Yes.

6      Q.    And what unit were you in at that time?

7      A.    Trial division.

8      Q.    And as part of your assignments in 2007, were you

9  assigned to try -- or prior to that, were you assigned to

10  investigate the -- or prosecute the defendant Ricardo Jimenez?

11      A.    Yes.

12      Q.    And did you actually present the case to the grand

13  jury?

14      A.    I did.

15      Q.    And in June of 2007, did you actually try that case?

16      A.    I did.

17      Q.    And was one of the witnesses that you used during that

18  trial an individual by the name of Andrew O'Brien?

19      A.    Yes.

20      Q.    And prior to putting Andrew O'Brien on the stand, did

21  you make any deals or arrangements with Andrew O'Brien or

22  promises in conjunction with his testimony?

23      A.    No.  I didn't make a deal.

24      Q.    Did you promise to Mr. O'Brien anything?

25      A.    He asked for a letter after he testified and then I

1  wrote a letter.

2      Q.   And prior to Mr. O'Brien testifying at trial, did you

3  tell him you would write a letter?

4      A.   I think so.  I don't remember.

5      Q.   And prior -- and in conjunction with that promise, in

6  June, on June 8, 2007, did you send a letter or your memo to his

7  defense attorney Pat Bruno?

8      A.   Yes.

9      Q.   And in that email, I'm sorry, in that memo or letter

10  did you explain to Mr. Bruno that you would write a letter?

11      A.   Yes.

12      Q.   And I'm going to ask you to --

13          MS. GOTTLIEB:  Your Honor, prior to the witness

14      being called, there was a stipulation by both parties that

15      People's number one would be moved into evidence without

16      objection.  At this time, I'd ask the witness to look at

17      what has been moved into evidence as People's 1.

18          THE COURT:  Ms. Heeger?

19          MS. HEEGER:  That's correct, your Honor.

20          THE COURT:  People's 1 in evidence.

21          THE WITNESS:  Yes.

22      Q.   And is that the memo or letter you sent to Mr. Bruno?

23      A.   Yes.

24      Q.   And in that memo did you explain to Mr. Bruno, the

25  entire extent of the promise for the witness Andrew O'Brien?

1    A.    Yes, I did.

2    Q.    And I'm going to direct your attention to June --

3 October 16, 2007. Did you, in fact, write a letter on behalf of

4 Andrew O'Brien?

5    A.    Yes.

6    Q.    And I'm going to ask you to look at what's been moved

7 into evidence with consent of counsel as People's number two in

8 evidence.

9            THE COURT:    Is that correct?

10           MS. HEEGER:    Yes, your Honor.

11           MS. GOTTLIEB:    Judge, just for the record, the

12       court reporter wrote ID but it's actually in evidence.

13           THE COURT:    Okay. We can correct that.

14   Q.    Ms. Mattaway, I'm going to ask you to look at People's

15 number two in evidence. Do you recognize that?

16   A.    Yes.

17   Q.    And what do you recognize that to be?

18   A.    This is a copy of the letter that I wrote after the

19 trial.

20   Q.    And who's that letter addressed to?

21   A.    David Novak.

22   Q.    And was that letter the full extent of the promises

23 that you had or the full extent of the promise that you had with

24 Mr. O'Brien?

25   A.    Yes.

1    Q.    When you told Mr. O'Brien that you'd write a letter,

2    did you tell him any particular language you would use?

3    A.    No.

4    Q.    Did you show him a copy of that letter prior to him

5    testifying?

6    A.    No.

7    Q.    And did you make him any promises what the effect of

8    that letter would be?

9    A.    No.

10    Q.    Did you have any assurances from AUSA Novak about what

11    the effect of that letter would be?

12    A.    No.

13    Q.    Did you in any way indicate to Mr. O'Brien that you

14    would be able to get him or the promise that -- or the fix had

15    been in for a reduction in sentence?

16    A.    No.

17                MS. GOTTLIEB:    No further questions.

18                THE COURT:    You may inquire.

19                MS. HEEGER:    Thank you, your Honor.

20    CROSS-EXAMINATION

21    BY MS. HEEGER:

22    Q.    Ms. Mattaway, my name is Anastasia Heeger and I'm one

23    of Mr. Jimenez's attorneys.    Thank you for being here this

24    morning.    When did you first learn that Andrew O'Brien was a

25    potential witness in the Worrell homicide?

1     A.    August of 2006.

2     Q.    And before trial, you met once with Mr. O'Brien?

3     A.    Yes.

4     Q.    And that was in August 2006, about 10, 11 months

5 before the trial, correct?

6     A.    Yes, off the top of my head.  I'm not counting how

7 many months between August and June, but that's fine.

8     Q.    And was this the only time you met with him in person

9 prior to the trial?

10    A.    Yes.

11    Q.    Now, before this meeting in August 2006, did you ever

12 communicate directly with Mr. O'Brien?

13    A.    No.

14    Q.    Did you ever communicate with Mr. O'Brien through a

15 third party?

16    A.    No.

17    Q.    And actually, did you ever speak with Mr. O'Brien on

18 the telephone?

19    A.    No.

20    Q.    And did Mr. O'Brien ever write to you?

21    A.    No.

22    Q.    Did you ever write to Mr. O'Brien?

23    A.    No.

24    Q.    Did he ever email you through the Bureau of Prison's

25 email system?

1    A.   No.

2    Q.   And have you ever communicated with Mr. O'Brien's

3  family?

4    A.   No.

5    Q.   With his sister?

6    A.   No.

7    Q.   Or his daughter?

8    A.   No.

9    Q.   Did you ever communicate with a lawyer for

10  Mr. O'Brien?

11   A.   No.

12   Q.   A lawyer named James Nachman?

13   A.   No.

14   Q.   And before -- strike that.  Back to your meeting in

15  August 2006, you went to the federal facility where Mr. O'Brien

16  was incarcerated, correct?

17   A.   I don't remember if it was a federal facility.  I went

18  to a jail.

19   Q.   And who set up this meeting?

20   A.   Detective Stradford.

21   Q.   And Mr. O'Brien is in the witness security program,

22  correct?

23   A.   Yes.

24   Q.   So there's special procedures for setting up meetings

25  with him?

1     A.   I don't know.  I assume so.

2     Q.   And at this meeting, how many people were in the room?

3     A.   I don't remember.

4     Q.   Was Detective Stradford there?

5     A.   Yes.

6     Q.   Did Mr. O'Brien have an attorney there?

7     A.   No, not that I remember.  I think Stradford had a

8  partner.

9     Q.   Okay.  And was there a Bureau of Prisons or prison

10  counselor there?

11     A.   No, not that I remember.

12     Q.   Was anyone from WITSEC there?

13     A.   I have no idea.

14     Q.   And an FBI agent?

15     A.   I don't remember any of that.

16     Q.   And about how long was this meeting in August of 2006?

17     A.   I don't remember.

18     Q.   And did you have any notes of the conversation?

19     A.   No.

20     Q.   And is it your practice not to take notes during a

21  witness interview?

22            MS. GOTTLIEB:  Objection.

23            THE COURT:  I'll allow it.  You may answer.

24     A.   It's not my practice.

25     Q.   Why didn't you here?

1      A.   I'm sorry?

2      Q.   Why didn't you take notes of this meeting?

3      A.   It's not my practice.

4            THE COURT:  Sustained.

5      Q.   In this meeting in August 2006, is this when you

6  learned that Mr. O'Brien had been writing to a federal judge

7  seeking leniency?

8      A.   I don't recall I've ever.

9            MS. GOTTLIEB:  Objection.

10           THE COURT:  Sustained.  Assuming facts not in

11    evidence before this tribunal.

12      Q.   Okay.  Did Mr. O'Brien mention to you that he was

13  writing letters to a judge seeking leniency?

14      A.   I don't recall.  No.  I don't think so.  No.

15      Q.   Were you aware?

16      A.   No.

17      Q.   Of any such arrangement -- or strike that.  Were you

18  aware that Mr. O'Brien was writing letters to a federal judge

19  before the trial?

20      A.   No.

21      Q.   Well, you did write that in an email to an AUSA before

22  trial that you were aware that Mr. O'Brien was writing letters

23  seeking leniency.  Do you recall writing that?

24      A.   You're asking about August 2006?

25      Q.   No.  I'm asking about before trial.

1      A.   Well then that's a different question.

2      Q.   Okay.  Well, before trial, were you aware that

3  Mr. O'Brien had been writing letters to a federal judge seeking

4  leniency?

5      A.   I don't remember.

6      Q.   Would looking at an email that you wrote to Mr. Novak

7  refresh your memory?

8      A.   Possibly.

9              MS. HEEGER:  Your Honor, I want that marked as

10         Defense A, please, and actually -- this should be in

11         evidence.  We received this from the People and it's part

12         of the filings in this case.

13             THE COURT:  Is this going into evidence?

14             MS. GOTTLIEB:  No objection, Judge.

15             THE COURT:  Defendant's A in evidence.

16             (Whereupon, Defendant's Exhibit A is marked into

17         Evidence.)

18     Q.   So, I direct you to the second page of the email.  It

19  is, I believe, the fourth paragraph down.  The third or the

20  fourth paragraphs kind of run into each other, but it's the

21  fourth paragraph down.

22     A.   Right.

23     Q.   The first --

24             THE COURT:  For the purposes of the record, can

25         we have the date of the email and who it was from and to

1    who?

2              MS. HEEGER:  These are emails between Lisa

3    Mattaway and AUSA David Novak.  There are four emails in

4    this exhibit dated between June, let's see, 4th, 2007 and

5    June 8, 2007.

6              THE COURT:  Thank you.

7    Q.    Does that refresh your memory as to whether you were

8    aware prior to trial that Mr. O'Brien was writing letters to a

9    federal judge seeking leniency?

10    A.    Yes.

11    Q.    So were you --

12              MS. GOTTLIEB:  Just so the record was clear, that

13    would be the June 4th email --

14              MS. HEEGER:  Thank you, counsel.

15              MS. GOTTLIEB:  -- on the list.

16    Q.    So to be clear, prior to trial you were aware that

17    Mr. O'Brien had been writing letters to a federal judge seeking

18    leniency?

19    A.    At that time, yes.

20    Q.    Thank you.  In the August 2006 meeting, did

21    Mr. O'Brien ask you to write a letter stating that he had -- if

22    in the event that he testified did he -- strike that.  In the

23    August 2006 meeting, did Mr. O'Brien ask that in exchange for

24    his testimony you would write a letter for him stating that he

25    testified for the Bronx District Attorney?

1      A.   I don't remember the exact words.

2      Q.   Did he ask you to write a letter in the 2006 meeting?

3      A.   I don't remember.

4      Q.   Did he ask for anything in the 2006 meeting?

5      A.   I don't remember.

6      Q.   When did you agree to write the letter that you spoke

7   about on direct?

8      A.   I don't remember.

9      Q.   But it was prior to trial?

10      A.   Yes.

11      Q.   And the understanding was that the letter was going to

12   be for his file, correct?

13      A.   Right.

14      Q.   And you agreed to write it.  Would you agree that a

15   letter from a prosecutor would be a valuable --

16            MS. GOTTLIEB:  Objection.  I'm going to object to

17       the form of the question.  There's a question with no

18       answer and then we go on to would you agree.

19            MS. HEEGER:  Okay.

20            THE COURT:  Okay.  Why don't you start from the

21       beginning?

22      Q.   Sure.  You agreed to write the letter for the file,

23   correct?

24      A.   Yes.

25      Q.   Would you agree that a letter from a prosecutor can be

1    a valuable inducement for a witness to testify?

2              MS. GOTTLIEB:  Objection.

3              THE COURT:  Sustained as to the form of the

4       question.

5       Q.   When you agreed to write the letter for the file, what

6    was your understanding of what the file was?

7       A.   I don't have any understanding.

8       Q.   Well, did you know who the letter was going to be

9    addressed to?

10      A.   No.

11      Q.   Did you ask who it was going to be addressed to?

12      A.   No.  I'm not sure what you're talking about.

13      Q.   When Mr. O'Brien asked for a letter for his file and

14   you agreed to write the letter, what was your understanding of

15   what the file was?

16      A.   I don't have any understanding.

17      Q.   And I'm asking you, did you know who the letter was

18   going to be addressed to?

19      A.   No.

20      Q.   Did you ask who the letter was going to be addressed

21   to?

22      A.   No.

23      Q.   Did you ask what it was going to be used for?

24      A.   No.

25      Q.   Did you care what it was going to be used for?

1      A.   No.

2                MS. GOTTLIEB: Objection.

3                THE COURT: Overruled.

4      Q.   Well, did Mr. O'Brien have unlimited authorization to

5  use this letter for any purpose that he wished?

6                MS. GOTTLIEB: Objection.

7                THE COURT: Rephrase the question.

8      Q.   In giving the letter to Mr. O'Brien, could he have

9  used the letter for, say, a clemency petition?

10               MS. GOTTLIEB: Objection.

11               THE COURT: Overruled.

12               MS. HEEGER: Well, your Honor, I'm trying to get

13          a sense of when ADA Mattaway agreed to give the letter were

14          there any restrictions on what he would use this letter

15          for.  Was it just a blank check?

16               MS. GOTTLIEB: Objection.

17               THE COURT: Okay.  See, this is the problem you

18          have.  Could he -- how is she supposed to know how to

19          answer that question?

20               MS. HEEGER: Your Honor, I'm not --

21               THE COURT: Anything is possible.  I understand

22          what you're trying to get.  I'm just so -- I'm not really

23          restricting what you're trying to get at, it's just that

24          the phraseology, it could mean almost anything.  That we

25          cannot have.

1             MS. HEEGER: Understood, your Honor.

2       Q.   When you agreed to write the letter, did you put any

3   restrictions on what the letter could be used for?

4             MS. GOTTLIEB: Objection.

5             THE COURT: Overruled.

6       A.   It wasn't a thank you letter to Mr. O'Brien. So your

7   question about restrictions and things, I didn't write this

8   letter to Mr. O'Brien.

9       Q.   I understand that. It was for the file, correct?

10      A.   The letter was to the AUSA.

11      Q.   So, when you agreed to write the letter, the

12  understanding was that the letter was to the AUSA? Did I

13  understand that correctly?

14      A.   No. That's not the understanding. There's no

15  understanding.

16      Q.   On direct you spoke about the June 8, 2007 memorandum

17  that you wrote to Mr. Bruno?

18      A.   Right.

19      Q.   And you said that you wrote a letter to the file?

20      A.   I wrote a letter in response to the request by AUSA

21  David Novak post trial confirming that Mr. O'Brien testified for

22  me. That's what I wrote.

23      Q.   Are you talking about in June -- on June 8, 2007 which

24  is the subject of People's Exhibit 1?

25      A.   Right.

1  Q.  The disclosure to defense counsel --

2  A.  Right.

3  Q.  -- discusses a letter to be written to the file?

4  A.  It says has asked for a letter to be prepared by the

5  undersigned. That's me.

6  Q.  Correct.

7  A.  That he can put in his file or have put in his file.

8  Q.  Okay. And I am asking that when that disclosure was

9  made.

10  A.  Right.

11  Q.  Was the understanding that the letter was going to be

12  written to the AUSA?

13  A.  I don't remember. I don't know. I don't remember.

14  Q.  Okay. Thank you.

15  A.  I think so.

16  Q.  Thank you. Now, when you discussed writing the letter

17  with Mr. O'Brien, you were aware that Mr. O'Brien had already

18  received a sentence reduction in his case, correct?

19  A.  No. That's two parts to your question too. I have no

20  recollection of discussing with Mr. O'Brien anything about a

21  letter.

22  Q.  I'm sorry. Could you repeat that?

23  A.  I have no recollection of discussing with Mr. O'Brien

24  anything about a letter. My recollection is and my focus was

25  his trial testimony. Still is.

1    Q.    So, on June 8, 2007 when you wrote that memo to
2    defense counsel.
3    A.    Right.
4    Q.    Talking about writing a letter to the file.
5    A.    Right.
6    Q.    When did you agree to write the letter to the file?
7    A.    Probably back in August of '06, but I don't remember.
8    Q.    Ms. Mattaway, do you recall writing an affirmation in
9    connection with this case?
10    A.    Yes.
11         MS. HEEGER:    Your Honor, I'd like to ask that
12    this be marked as Defendant's B and also admitted into
13    evidence as part of one of the filings in this case.
14         THE COURT:    Any objections?
15         MS. GOTTLIEB:    No objection, Judge.
16         THE COURT:    Defendant's B in evidence.
17         (Whereupon, Defendant's Exhibit B is marked into
18    Evidence.)
19    Q.    Now, Ms. Mattaway, on page 14, the third line down,
20    you wrote that according to your notes O'Brien had already
21    received leniency from the federal government in the form of a
22    sentence reduction and he only wanted a letter from me.
23    A.    That's what I wrote.
24    Q.    So, when you agreed to write the letter, you were
25    aware that he had already received a sentence reduction?

1    A.    That's what it says.

2    Q.    Thank you. And Ms. Mattaway, when you mentioned that

3  a reference according to your notes, what notes are you

4  referring to?

5    A.    Probably my diary.

6    Q.    And how did you learn that O'Brien had already

7  received a sentence reduction?

8    A.    I don't know. I don't remember.

9    Q.    Did you learn it in a conversation with AUSA Novak?

10    A.    I don't remember.

11    Q.    Did Detective Stradford tell you?

12    A.    I don't remember.

13    Q.    Now, you testified earlier that you had joined the

14  Bronx D.A.'s office about 28 years ago. That's about 1989,

15  right?

16    A.    Actually it's 29 years. I started in '88.

17    Q.    And so by 2007, you had been in the office for about

18  18 years, correct?

19    A.    I guess.

20    Q.    Okay. Pretty experienced.

21    A.    At the time.

22    Q.    And as part of your job as an experienced prosecutor,

23  you interacted with federal prosecutors, correct?

24    A.    No.

25    Q.    You had no interaction with federal prosecutors at

1  that point?

2      A.   I think this is my first time ever.

3      Q.   Okay.  So prior to trial, you were aware that

4  Mr. O'Brien had resolved the case that he was serving time on

5  about ten years prior to that, correct?

6      A.   No.  I don't know anything about his other case.  I

7  don't remember.

8      Q.   But you were aware that he had a sentence reduction in

9  the case?

10      A.   Well, that's what it says on the affirmation.

11      Q.   Well, you were aware he was in federal custody,

12  correct?

13      A.   Yes.

14      Q.   Okay.  So you were aware he had a federal conviction?

15      A.   I don't -- like I guess -- I don't know if he had

16  anything open.  I don't know.  I don't think so.

17      Q.   Well, I asked were you aware that he had a federal

18  conviction?

19      A.   Right, but you're saying that that's the only thing he

20  had.  I don't know what else, if anything, he had.

21      Q.   No.  I'm just asking about the case that he was

22  serving time on.

23      A.   Okay.

24      Q.   And so you were aware he had a federal conviction?

25  You were aware that he -- and you were aware he had a sentence

1    reduction in that case, correct?

2         A.   Yes.

3              MS. GOTTLIEB:  Objection.  Time frame.

4              MS. HEEGER:  Prior to trial.

5              THE COURT:  She's answered it.  Move on.

6         Q.   And you were also aware prior to trial that he was

7    writing letters seeking leniency, correct?

8         A.   Yes, at some point.

9         Q.   So, as an experienced prosecutor, you would need to do

10   some due diligence into this witness, correct?

11        A.   I don't know what you mean.  I have no idea what you

12   mean.

13        Q.   Well, you knew he was seeking leniency?

14        A.   You've asked me that.

15        Q.   Okay.  And were you going to inquire into the basis

16   for this?

17              MS. GOTTLIEB:  Objection.

18              THE COURT:  Sustained.

19              MS. HEEGER:  Okay.  I can move on.

20        Q.   On June 4, 2007 you emailed AUSA David Novak in the

21   District of Virginia, correct?

22        A.   Yes.

23              THE COURT:  All right.  I assume you have a lot

24        more to go.

25              MS. HEEGER:  I do, your Honor.

1          THE COURT: All right. We're going to break at

2    this time. It's almost ten to one.

3          MS. HEEGER: Okay.

4          THE COURT: We'll pick this up after lunch. You

5    may step down.

6          THE WITNESS: Thank you.

7              *       *       *       *       *

8    A  F  T  E  R  N  O  O  N   S  E  S  S  I  O  N

9          (Whereupon, the witness resumes the stand.)

10         THE CLERK: Come to order. Judge, this is

11   recalling number one on the calendar, indictment 3825 of

12   2006, Ricardo Jimenez. This is a hearing continued. ADA

13   Mattaway, I remind you, you remain under oath.

14         THE COURT: Before we begin, is there anything

15   either side needs to address for the record?

16         MS. HEEGER: No, your Honor.

17         THE COURT: Okay. You may proceed.

18         MS. HEEGER: Thank you, your Honor.

19   Q.   ADA Mattaway, I believe my last question was that on

20   June 4, 2007 you emailed AUSA David Novak, correct?

21   A.   Yes.

22   Q.   And this was about three weeks before Mr. Jimenez's

23   trial?

24   A.   Right.

25   Q.   And you asked Mr. Novak for any cooperation agreements

1  that he had made with Mr. O'Brien, yes?

2      A.    I asked for any cooperation agreements he has made,

3  not necessarily with the AUSA.

4      Q.    Were you asked for any cooperation agreements he made

5  in exchange for O'Brien's testimony in the federal case?

6      A.    For his testimony with the federal government.  I

7  don't know what else he had with the federal government, if

8  anything.

9      Q.    And you asked for any information regarding favorable

10  treatment O'Brien may have received in exchange for cooperation?

11      A.    That's right.

12      Q.    And you asked that if any of the letters mentioned the

13  possibility that he may testify in your case you wanted those

14  letters too?

15      A.    Right.

16      Q.    Now, Andrew O'Brien wasn't the first cooperator you

17  worked with?

18      A.    He might have been.

19      Q.    Well, you would agree that a critical part of being a

20  prosecutor is to vet your potential witnesses?

21              MS. GOTTLIEB:  Objection.

22              THE COURT:  Sustained.  Next question.

23      Q.    Well, you were trying to find out about his deal with

24  the federal government?

25      A.    No.

1    Q.   Well, you recognize that there was a possibility that

2  O'Brien would mention his testimony for you in his letters to

3  the federal judge?

4    A.   Whatever it said in the email.  It's in evidence.

5  Defense A.

6    Q.   Well, is it fair to say that you recognize that Andrew

7  O'Brien might have cited his cooperation in your case --

8              MS. GOTTLIEB:  Objection.

9              THE COURT:  Finish your question, please.

10    Q.   You recognize that Andrew O'Brien might have cited his

11  cooperation in your case as support for his efforts to get a

12  sentence reduction?

13              MS. GOTTLIEB:  Objection.

14              THE COURT:  At what point in time?

15              MS. HEEGER:  When this email was written.

16              THE COURT:  Overruled.

17    A.   He hadn't testified yet.  I didn't consider him

18  cooperating.

19    Q.   Well, you made a pretty specific request of the ADA.

20    A.   Right.

21    Q.   And you asked if any of these letters requesting

22  leniency mentioned your case?

23    A.   Right.  It would be potential cooperation.  He hasn't

24  done it yet.

25    Q.   Well --

1      A.    When I sent this email.

2      Q.    Correct. But you would be -- but you were asking if

3 he was mentioning to the federal judge in his efforts to get

4 leniency that he was cooperating with you?

5      A.    Again, about to cooperate. I don't know if he would

6 mention a future potential for testimony.

7      Q.    Okay. But at the time you wrote this email.

8      A.    Right.

9      Q.    You were aware that there was a possibility that

10 O'Brien might be mentioning his potential cooperation with you

11 to the federal judge?

12      A.    Yeah. Anything's possible. Yes.

13      Q.    So, the --

14      A.    It's a possibility.

15      Q.    So, the time you write in the email you know you're

16 writing a letter, correct?

17      A.    A letter?

18      Q.    That you had promised O'Brien a letter for his file?

19      A.    At the time I'm writing the email to AUSA Novak?

20      Q.    Correct, on June 4, 2007.

21      A.    It doesn't mention anything about that.

22      Q.    Well, I'm asking your recollection. At the time that

23 you wrote this email to him.

24      A.    Right.

25      Q.    Had you agreed to write the letter for O'Brien?

1      A.    I don't remember.

2      Q.    Well, you mention the letter in your June 8, 2007

3  memorandum to Patrick Bruno four days later?

4      A.    That's right.

5      Q.    So did the agreement to write the letter come before

6  the O'Brien -- I mean, strike that.  Before the email to Novak

7  or after the email to Novak?

8      A.    I don't know.

9      Q.    But you are aware that O'Brien is seeking further

10  sentencing leniency?

11      A.    When?

12      Q.    When you write the email.

13      A.    I don't -- I don't know.  I don't know.  What did I

14  write?  I don't -- I don't know.  I wrote this at 4:06.  I don't

15  know when I was aware he was seeking further leniency.  I don't

16  know when.

17      Q.    Well, my question was when you wrote to AUSA Novak in

18  this email, I am aware that O'Brien has written numerous letters

19  to the judge in this case requesting leniency.

20      A.    Right.  I don't know where I got that information

21  from.

22      Q.    Okay.  I'm just confirming that you were aware he was

23  seeking leniency when you wrote the email.

24      A.    Yeah.  I mean, if it's in the email, but I don't know

25  when.

1     Q.    Thank you.  Now, prior to sending that email, you had

2  a telephone conversation with Mr. Novak?

3     A.    I think so.  I don't remember.

4     Q.    You refer to it in the first?

5     A.    Right.  I don't have any independent recollection.

6     Q.    And other than this call that you reference in the

7  email, did you have any additional telephone calls with

8  Mr. Novak prior to this?

9     A.    I don't recall.

10    Q.    And a few days after you sent the June 4th email, AUSA

11  Novak sent you the materials you requested, correct?

12    A.    That's what he said in his email.

13    Q.    And this material was received on or about June 13th,

14  correct?

15    A.    I don't know when my office received it.

16    Q.    Okay.  Would an email help to refresh your

17  recollection?

18    A.    Possibly.  I don't know.

19              MS. HEEGER:  I'd ask that that be marked as --

20              THE COURT:  I believe C.

21              MS. HEEGER:  -- Defendant's C, please.  And

22        again, we would ask that this be admitted into evidence as

23        part of the materials, separate files by the People in this

24        case.

25              THE COURT:  Any objection?

1        MS. GOTTLIEB:  Separate?  No problem, Judge.

2        THE COURT:  Can I see it, please?  Are you

3    referring to a specific email here?  The bottom one or the

4    middle one?

5        MS. HEEGER:  It's actually the middle one.

6        THE COURT:  All right.  Defendant's C in

7    evidence, a two-page document containing a number of email

8    correspondence at this point in time, specific reference

9    being made to the second one which would be an email from

10   Ms. Mattaway to Mr. Novak dated 2/13/2007.  Is that

11   correct?

12       MS. HEEGER:  Correct, your Honor.

13       THE COURT:  Okay.

14       (Whereupon, Defendant's Exhibit C is marked into

15   Evidence.)

16       THE WITNESS:  Okay.

17   Q.   So, these materials were received by your office on or

18   about June 13, 2007?

19   A.   I wrote got the packet.  It must be that.  I assume

20   that's what it is.

21   Q.   And in the package of materials that AUSA Novak sent

22   you, this included letters that O'Brien had written to the judge

23   in 2006 and 2007?

24   A.   I have no independent recollection of what was in

25   anything.

1        MS. HEEGER: Your Honor, I'd ask this be marked

2     as Defendant's D, and I have a copy for the Court also.

3     And I request that this be admitted into evidence as a

4     document received from the district attorney.

5            THE COURT: Any objection?

6            MS. GOTTLIEB: No objection.

7            THE COURT: Defendant's D in evidence, two-page

8     letter dated June 8, 2007 from Mr. Novak addressed to

9     Ms. Mattaway. Mark it, please.

10           (Whereupon, Defendant's Exhibit D is marked into

11    Evidence.)

12    Q.   So, my last question was, the packet that he sent you

13 included letters from Mr. O'Brien to the federal judge from 2006

14 and 2007?

15    A.   That's what the letter from AUSA Novak says but I have

16 no independent recollection.

17    Q.   Okay. And it also included his 1997 plea agreement?

18    A.   I don't know the date of his plea agreement.

19    Q.   Okay. It included the 1998 order reducing his

20 sentence?

21    A.   It says that in the letter from Novak.

22    Q.   Okay. And it included the 32-page FBI 302 detailing

23 the information that he gave to investigators?

24    A.   That's what his letter says.

25    Q.   And did you look at any of this material?

1      A.   I don't remember.

2      Q.   In your affirmation you stated that you did not look

3 at the material because you were busy after having returned from

4 vacation.

5      A.   Probably.  That's right.

6      Q.   And none of this material was turned over to the

7 defense?

8      A.   I can't say that.  I disagree with that.  Pat Bruno

9 cross-examined the defendant on material that was specifically

10 in this.  I just don't have any notes as to when it got to him,

11 unfortunately.

12      Q.   In your affirmation, you stated that you had

13 inadvertently neglected to look at and disclose the documents

14 that the AUSA sent you?

15      A.   That's what it says.

16      Q.   So you did not disclose the documents?

17      A.   Again, I don't remember what I did or didn't do.

18      Q.   Did you know whether it was this affirmation?

19           THE COURT:  As to clarity, you're referring to

20     what's now Defendant's B in evidence.

21           MS. HEEGER:  Correct, your Honor.  Defendant's B

22     in evidence.  I'm referring to page 12 of Ms. Mattaway's

23     affirmation, six lines from the bottom.

24      A.   I said I must have inadvertently neglected to look at

25 and disclose the documents.  Yes, that's what I wrote in there.

1    Q.   Okay.  So you neglected to disclose the documents to

2   defense counsel?

3              MS. GOTTLIEB:  Objection.

4    A.   That's not what it says.  It says I have no

5   independent recollection of what I did with these materials.

6    Q.   Where --

7    A.   I still don't.

8    Q.   When you wrote I must have inadvertently neglected to

9   look at and disclose the documents that the AUSA had given me.

10   A.   Right because that was the allegation that I didn't do

11  it, but I remember Mr. Bruno cross-examining the witness about

12  materials that were in there.  So, I don't know how else he

13  would have gotten them if I didn't turn it over.

14   Q.   Well, if you didn't look at them, how did you turn

15  them over?

16              MS. GOTTLIEB:  Objection.

17   A.   I had -- I don't know.

18              THE COURT:  Sustained.

19   A.   I don't know.

20   Q.   I'm trying to understand what you meant when you wrote

21  I must have inadvertently neglected to look at and disclose the

22  documents.

23   A.   Correct.  I know what you're asking.  I had a second

24  seat.  I don't remember.  I'm telling you I don't remember

25  myself personally doing it, but I don't have a memory of it.

1    Q.   But when you wrote this affirmation --

2    A.   Right.

3    Q.   -- doesn't this affirmation say that you neglected to

4    look at and to disclose them?

5              MS. GOTTLIEB:  Objection, Judge.  I think the

6         affirmation speaks for itself and it specifically says what

7         it says.

8              THE COURT:  Sustained.

9              MS. GOTTLIEB:  You can't change the words.

10             THE COURT:  Sustained.

11             MS. GOTTLIEB:  Thank you.

12   Q.   Ms. Mattaway, you turned over a number of detailed

13   discovery receipts in this case?

14   A.   I don't remember.  I'm sure I did.

15             MS. HEEGER:  I'd like this marked as Defense E.

16             MS. GOTTLIEB:  Judge, I'm going to object to

17        this.  This was all argued before the Appellate Division.

18        This argument was specifically rejected.  This is not the

19        basis of this hearing.  What was turned over and what

20        wasn't turned over was litigated and decided by the

21        Appellate Division.  The Appellate Division then went on to

22        limit this hearing to a very narrow area and this isn't

23        part of it.

24             THE COURT:  Do you wish to respond?

25             MS. HEEGER:  Your Honor, this is a critical part

1    of this. What I'm trying to ascertain from the witness is

2    A, whether the materials were looked at and whether they

3    were turned over because as was stated here there's been

4    the suggestion that no Brady violation occurred because

5    this material may have been turned over to defense counsel

6    and I'm trying to explore this allegation that they may

7    have been turned over to defense counsel.

8         THE COURT: Well, it appears to me that if you

9    refer to the decision of the Appellate Division as cited

10   before, I believe it's page 160, beginning of what's known

11   as 14, we'll call it 14. The Appellate Division did not

12   take that position. Quoting that first line, we agree with

13   the motion course that none of these materials having been

14   made available before the trial had a reasonable

15   possibility of changing the -- well, then it goes on, but I

16   believe that's what the objection is fundamentally based

17   on. It seems kind of clear that they -- that's not the

18   position or roughly it is. I mean, if you have an

19   additional offer of proof, I'll listen, but just keep in

20   mind I'm not in a position to overrule the Appellate

21   Division.

22        MS. HEEGER: Your Honor, may I approach?

23        THE COURT: Sure.

24        (Whereupon, the following discussion takes place

25   on the record, at the sidebar, in the presence of the

1    Court, the assistant district attorneys, and both defense

2    counsel:)

3             MS. HEEGER:  Your Honor, our position is that the

4    materials that were in this envelope gave the necessary

5    context and information to understand the value of the

6    letter; that he was seeking a sentence reduction, the

7    mechanism by which he could receive a sentence reduction.

8    Those are critical to understanding the value of the

9    letter.  If the letter had been turned over to defense

10   counsel, we could have explored this.  So when Andrew

11   O'Brien testified to receiving the letter, he could have

12   asked him about the letters that he had been writing

13   seeking leniency.  He could have asked him after already

14   receiving a sentence reduction.  He could have been aware

15   that Mr. O'Brien was in a jurisdiction and was under a plea

16   agreement where he had gotten a certified sentence

17   reduction before.  So, exploring what was in this package

18   and whether or not it was A, what the prosecutor looked at

19   and B, whether or not it was turned over to defense counsel

20   is critical.  And the People have said in response that, as

21   Ms. Mattaway did just now that those materials may have

22   been turned over to defense counsel so no Brady violation

23   lies because maybe he had the material.  It seems that

24   actually he did not have the material.

25             MR. CHAMOY:  Well, I do have to say something to

1     correct what was just represented because I handled the

2     appeal. The People's position was always that the only one

3     that we disputed was the matter of the plea agreement and

4     otherwise there was no record evidence that we could

5     support that would state that the other materials that were

6     in the packet had been turned over, but the facts that

7     Patrick Bruno had placed on the record in terms of his

8     cross-examination suggested an intimate knowledge of facts

9     that were potentially elicited from the underlying

10     cooperation slash pre-agreement. That was the only one

11     that was disputed.

12     MS. HEEGER: Your Honor, I don't think that's a

13     fair characterization of the cross-examination.

14     Mr. O'Brien was barely questioned at all about his plea

15     agreement with the feds.

16     MR. CHAMOY: Well, we're not here to debate

17     what's in the cross-exam. We're here to discuss what was

18     and what wasn't disputed when you're trying to go into

19     every document and go into a lengthy examination when it's

20     not at issue to this hearing.

21     THE COURT: This document is in evidence. It

22     will be weighed. However this area, your argument, is

23     fundamentally asking me to overrule the Appellate Division

24     and as much as, I'll probably pay for this statement, as

25     much as I would like to do that on occasion, I refrain from

1  that. So, it is in evidence and I think some of this is

2  more appropriate perhaps for your argument than it is for

3  just going over the stuff and just denying it when I

4  believe the Appellate Division already ruled on this.

5  Their ruling in sending this matter for a hearing has

6  extremely narrow parameters. That's not to undermine the

7  complexity of the issue within those parameters, but I

8  still have those parameters.

9       MS. HEEGER: Your Honor, may I respond?

10      THE COURT: Sure.

11      MS. HEEGER: The first thing I wanted to note is

12  it is correct that the Appellate Division denied our claims

13  involving some of the items that were in the packet. For

14  example, one of the Brady claims that was asserted was that

15  the 302 not being disclosed deprived defense counsel of

16  questioning him on that. That is not why I'm asking this.

17  I am asking about the materials that go to his plea

18  agreement, to things that go to the matter of sentencing,

19  Brady and sentence reduction. I do not believe that that

20  was covered by the Appellate Division's decision on that

21  and is a part of this hearing because --

22      THE COURT: I don't mean to cut you off, but I

23  think I made it clear. I'm not reading the Appellate

24  decision with a broad brush. Okay? I think they made a

25  very direct statement as to why they were sending him back.

1    Okay?  And I'm going to hold you to it in those parameters.

2             MS. HEEGER:  Understood, your Honor.  May I make

3    one other remark about the scope of the hearing?  Your

4    Honor, when -- I think as we noted at the beginning of the

5    proceedings that the Appellate Division did give some

6    rather disrate instructions in its opinion.  As you are

7    aware, we filed a motion to reargue and one of the reasons

8    that we did is we anticipated that there might be some

9    confusion about the scope of the hearing here and in the

10   response to the motion to reargue, the People represented

11   that there was no confusion because and particularly cited

12   the case People v. Novoa as saying understandably that

13   would be the standard that this court reviews.  Now, the

14   standard in People v. Novoa is that there -- if there's any

15   kind of understanding between the parties and I think that

16   that is what we need to be looking at here.  If there's any

17   understanding between the parties and I have a --

18             MR. CHAMOY:  But none of your questions go to

19   that issue.  Not one of the questions.

20             THE COURT:  You're not going to under an

21   understanding between the parties, and so I'm clear I made

22   a reference that what you're disputing lies in a decision.

23   They don't seem to line up exactly.  Okay?  You cannot read

24   those independently of each other.  You have to read the

25   decision as a whole and the underlying reasoning for the

1    ruling. Okay? And that's where the strict parameters come

2    in. It's not that there's two really different statements

3    in there. If you look at them separately they don't

4    exactly line up, but that's not the way we have to read it.

5    We have to read it as an entire decision, an entire line of

6    reasoning and what led to this conclusion. You are

7    correct. The understanding between the parties is an

8    issue. This line of questioning and getting into this is

9    not taking us there. And again, some of this, how you want

10   to relate it to this, is more appropriate for argument than

11   it is for examination.

12             MS. HEEGER: Thank you, your Honor.

13             (Whereupon, the following takes place in open

14   court:)

15             THE COURT: For the record, the objection's

16   sustained. Next question.

17             MS. HEEGER: Okay.

18   Q.    I want to move on to the June 8th memorandum which is

19   in evidence as People's Exhibit 1.

20   A.    Right.

21   Q.    And on June 8, 2006, you wrote the memorandum to

22   Patrick Bruno.

23   A.    Right.

24   Q.    And in this memo you noted that Mr. O'Brien had asked

25   for a letter to be prepared by the undersigned to be put in his

1    file.

2        A.   Right.

3        Q.   And you wrote this letter to fulfill your Brady/Giglio

4    obligations?

5        A.   I don't know if Giglio was a case back then, but Brady

6    was.

7        Q.   And in this memorandum, did you mention that

8    Mr. O'Brien had been writing letters to the federal prosecutor?

9            MS. GOTTLIEB:   Objection.   I think it speaks for

10            itself, Judge.

11            THE COURT:   Sustained.

12       Q.   Why did you not put the information about Mr. O'Brien

13   seeking leniency in this memorandum?

14       A.   He wasn't seeking it from me.

15       Q.   But he was seeking it from the federal judge?

16       A.   Look, the only thing he wanted from me was a letter

17   after he testified and that's what he got.

18       Q.   But you were aware that he was seeking leniency in his

19   case, correct?

20       A.   That was in the June 4th --

21            MS. GOTTLIEB:   Objection.

22       A.   I guess.   In his -- but I don't know again what he was

23   doing with the federal government.

24            THE COURT:   If there's an objection, you

25            shouldn't be talking.

1          THE WITNESS:  I'm sorry, Judge.

2          THE COURT:  Only as to the actual phraseology to

3     your question, I'm going to sustain the objection.  I'm not

4     sustaining it as to the heart of what you're trying to get

5     to.

6          Q.   Okay.  Why did you not tell the defense that

7     Mr. O'Brien was seeking leniency?

8          A.   Again, I don't know or don't remember what the extent

9     of what he wanted federally was.  What's in this memo dated June

10    8th is what it says, what he wants from me.

11         Q.   But I'm asking you why you did not include that

12    Mr. O'Brien was seeking leniency from the federal judge?

13         A.   I didn't include it in this memo.  That doesn't mean

14    it wasn't disclosed.

15         Q.   Do you have any memory of disclosing that information?

16         A.   No, not independently.  It's been ten years.

17         Q.   Do you agree that the defense should have been

18    informed of that information?

19              MS. GOTTLIEB:  Objection.

20              THE COURT:  Sustained.

21         Q.   Ms. Mattaway, as a prosecutor you've had training on

22    Brady and Giglio, correct?

23         A.   Like throughout my whole career?  Yeah.

24         Q.   Correct.  And would you agree that impeachment

25    evidence that undermines a witness's credibility needs to be

1  disclosed?

2          MS. GOTTLIEB: Objection.

3          THE COURT: Sustained. Whether a Brady violation

4  or not in this case is for the Court to determine based on

5  the evidence presented to the Court, not the opinion of any

6  particular witness or party.

7          MS. HEEGER: Your Honor, if I may. Ms. Mattaway

8  has asserted in her affirmation that she made the

9  appropriate disclosures in the June 8, 2006 memorandum and

10  what I'm trying to ascertain is her understanding of what

11  Brady and Giglio requires.

12          THE COURT: But it's not based on her. It's

13  based on what really happened.

14          MS. HEEGER: Well, it goes to her decision-making

15  in what she's decided to disclose and to not disclose.

16          THE COURT: It's not based on her

17  decision-making. It's based on what knowledge she had, if

18  any, based on whether there was an agreement, the

19  parameters of that agreement, what she was aware of, and

20  how that impacted on your client, not based on what her

21  thinking was or understanding. If she thought she did

22  something totally correct but the record is still it

23  wasn't, there's still a Brady violation.

24          MS. HEEGER: Correct, your Honor.

25          THE COURT: So, her opinion doesn't matter in

1     this. Meaning no disrespect to the witness.

2         Q.   So Mr. Novak contacted you again on October 1, 2007?

3         A.   I don't remember the exact date, but I'm sure it's in

4     the material somewhere here.

5         Q.   You address it in your affirmation.

6         A.   Yes. Page 14. I see it.

7         Q.   And did he call you or did he email you?

8         A.   I don't think he emailed me. I think if he emailed me

9     it would have been -- you know, you would have had it.

10        Q.   And he asked you about Mr. O'Brien's cooperation in

11    this case?

12        A.   I don't remember what he asked me specifically.

13        Q.   In your affirmation you said that on October 1st AUSA

14    Novak contacted me regarding Mr. O'Brien's cooperation?

15        A.   Right.

16        Q.   And then four days later he asked you to write a

17    letter about this cooperation?

18        A.   Right.

19        Q.   And did you ask what the letter was for?

20              MS. GOTTLIEB: Objection.

21              THE COURT: I'll allow that question.

22        A.   No.

23        Q.   But you understood that this was the letter that

24    Mr. O'Brien had earlier requested?

25              MS. GOTTLIEB: Objection.

1          MS. HEEGER:  Your Honor, this goes --

2          THE COURT:  -- as to the form of the question.

3          MS. HEEGER:  -- to the heart of the hearing.

4          THE COURT:  As to the form of the question.

5      Q.   The letter that Mr. Novak requested of you.

6      A.   Right.

7      Q.   Was the letter that Mr. O'Brien had asked you to write

8  for him, correct?

9      A.   Right.  But again, I don't know that the request came

10  from Mr. O'Brien himself.  You keep saying that he asked me.

11     Q.   Okay.  So, where did you -- where did the request for

12  the letter come from?

13     A.   I think it came from Novak.

14     Q.   So I understand your testimony.

15     A.   Okay.

16     Q.   The request for a letter.

17     A.   Right.

18     Q.   Came from Novak?

19     A.   I don't remember.  That's my point.

20     Q.   But, okay.  How about the request for a letter came

21  prior to June 8, 2007?

22          MS. GOTTLIEB:  Judge, I'm going to object to this

23      line of questioning.

24          MS. HEEGER:  Your Honor, this is the heart of the

25      hearing.

1      THE COURT:  I understand that, but the way you're

2  asking a question and we keep jumping around dates is

3  creating an unclear record.  That's my problem.  I want the

4  record to be very clear.  So, correct me if I'm wrong.

5  You've already testified that sometime before the trial.

6      THE WITNESS:  Yes.

7      THE COURT:  You had a conversation with

8  Mr. O'Brien.  He just asked you to write a letter for him.

9  Is that fair and accurate?

10      THE WITNESS:  Now I'm not sure if he asked me or

11  if it was Novak.

12      THE COURT:  Okay.  But somebody talked to you

13  about doing a letter before the trial?

14      THE WITNESS:  On June 4th.

15      THE COURT:  Okay.  And then --

16      THE WITNESS:  Because I -- I'm sorry, Judge.

17      THE COURT:  And then after the trial.

18      THE WITNESS:  Right.

19      THE COURT:  You were contacted with regards to

20  the letter?

21      THE WITNESS:  Right.

22      THE COURT:  Was that the same letter or a

23  different letter?

24      THE WITNESS:  No.  The same letter.

25      THE COURT:  Okay.  And who was the person that

1    contacted you after the trial?

2                THE WITNESS: Novak.

3                THE COURT: Okay. Proceed.

4    Q.  And 11 days after your conversation with Mr. Novak,

5    you wrote the letter for Mr. O'Brien?

6    A.  I don't know if it's 11 days, but.

7                MS. HEEGER: Okay. I believe the letter is

8    People's 2.

9                THE COURT: The point being after you had that

10   conversation you wrote the letter, correct? Correct?

11               THE WITNESS: Right. Yes.

12               THE COURT: Next question.

13               MS. GOTTLIEB: Letter's dated October 16th for

14   the record.

15               THE WITNESS: My letter's dated October 16th. I

16   don't know if that's 11 days.

17               THE COURT: It's in evidence. It speaks for

18   itself.

19   Q.  And Andrew O'Brien called you that morning of October

20   16th?

21   A.  I have no recollection of that.

22   Q.  Page two of the letter, would that refresh your

23   recollection?

24   A.  Okay. That's what it says.

25   Q.  And he was calling to check up on his letter, correct?

1    MS. GOTTLIEB: Objection.

2    THE COURT: I'll allow that question.

3    A.   Whatever I wrote is what happened.

4    Q.   And Mr. O'Brien called you directly?

5    A.   I don't know if he called the main number and got

6  transferred to me.

7    Q.   Is that the first time he called you?

8    A.   Yes. I don't recall ever speaking with him.

9    Q.   Do you remember any of the subject of your

10  conversation?

11   A.   No.  Well, whatever it says I wrote in the letter.

12   Q.   He expressed he wanted to work for you as a jailhouse

13  informant?

14        MS. GOTTLIEB: Objection.

15        MR. CHAMOY: Objection.

16        MS. GOTTLIEB: Now we're talking about the

17   letter.  Judge, I think the letter speaks for itself and

18   I'd ask her not to paraphrase it.  If she wants to quote

19   the letter, quote the letter.

20        THE COURT: Sustained, as to that.  It's

21   sustained.  Move on.

22   Q.   So, you wrote that just this morning Mr. O'Brien

23  telephoned me from jail to tell me he had chatted up another

24  inmate who has some information on two old Bronx homicide cases.

25  Did you write that?

1    A.    That's what I wrote.

2    Q.    Okay. And in this letter, you also urged AUSA Novak

3 to give him whatever consideration he could in his position,

4 correct?

5    A.    Whatever I wrote, that's --

6              MS. GOTTLIEB: Paragraph, please.

7              MS. HEEGER: The second paragraph on the second

8        page of the letter, the first line.

9    Q.    You wrote I urge you to give Mr. O'Brien whatever

10 consideration you can in your position.

11    A.    Right.

12    Q.    So you were advocating for Mr. O'Brien?

13              MS. GOTTLIEB: Objection.

14              THE COURT: I'll allow that question.

15    A.    I wrote a letter.

16    Q.    Well, this was more than just a general advisement

17 that he had testified for you?

18    A.    I consider advocating on your feet in court like

19 you're doing. I wrote a letter. What Mr. Novak did with it, I

20 don't know.

21    Q.    So you wrote the letter on October 16, 2007 and then

22 AUSA Novak emailed you on November 26, 2000 asking about the

23 letter?

24    A.    Yes.

25    Q.    And he said that he hasn't yet received it from you?

1      A.   Right.

2      Q.   And that he wanted to make a decision by Christmas as

3  to whether to give Mr. O'Brien a sentence reduction?

4      A.   That's what it says in his communication.

5      Q.   Did you respond you didn't know what he was talking

6  about?

7      A.   My response, I believe, is in the record some place.

8  I think I sent a letter saying here it is.

9      Q.   Because you understood that this was for a sentence

10  reduction?

11          MS. GOTTLIEB:  Objection.

12     A.   No, I did not.

13          THE COURT:  Well, she's answered it already.

14     Q.   What was your understanding of your Brady/Giglio

15  obligations at this point?

16          MS. GOTTLIEB:  Objection.

17          THE COURT:  Sustained.

18     Q.   Well, you had represented to this court and defense

19  counsel that you were writing a letter for a file and now the

20  letter you know is now for sentence reduction?

21          MS. GOTTLIEB:  Objection.

22     A.   I do not know that.  I did not know that.

23          THE COURT:  Stop.  Objection to that last

24  question's sustained.  Next question.

25     Q.   So I understand your testimony, did you believe that

1  you had an obligation to tell the defense the purpose of the

2  letter?

3              MS. GOTTLIEB:  Objection.

4              THE COURT:  Sustained.

5      Q.   Did you understand that when you sent your letter off

6  that you did not understand what the letter was to be used for?

7              MS. GOTTLIEB:  Objection.

8              THE COURT:  I'll allow that question.

9      A.   I was asked for a letter about Mr. O'Brien's

10 cooperation and that's what I sent, detailing what the

11 cooperation was.

12     Q.   Did you have an obligation to ask what it was to be

13 used for?

14             MS. GOTTLIEB:  Objection.

15             THE COURT:  Sustained.

16     Q.   Mr. O'Brien testified about this letter briefly at

17 trial, correct?

18             THE COURT:  Sustained as to the form of the

19       question.

20             MS. HEEGER:  Your Honor, I'd like to give the

21       witness the trial transcript excerpts.

22             MS. GOTTLIEB:  Judge, I'm going to object to

23       this.

24             THE COURT:  Well, I'll see where she's going.

25       Sustained, my own objection to that question the use of the

1    word briefly.

2        Q.    Mr. O'Brien testified about this letter at trial,

3    correct?

4        A.    No.

5        Q.    Can you please turn to 224 in the trial testimony,

6    please?  I believe it's under tab A.

7        A.    I am looking at 224.

8              MS. GOTTLIEB:  Line, please.

9        Q.    Correct?  Starting at line four.  Andrew O'Brien, 224.

10       A.    Okay.  I don't see anything that says the word letter

11   anywhere.

12       Q.    Question, what is your understanding of what if

13   anything I can or will do for you in exchange for you testifying

14   here today for us?  Answer, well my understanding is that you'll

15   just tell the federal prosecutors that I cooperated with y'all

16   and that's it.  Question, are you a sentenced prisoner?  Answer,

17   yes.  Question, and you said you have 18 years to go?  Answer,

18   yes.

19       A.    Okay.  There's nothing about a letter in there.

20   Telling is not a letter.

21       Q.    Okay, but you writing the letter was telling the

22   federal prosecutors that you cooperated, correct?

23       A.    It was memorializing what I told him, him meaning

24   Novak.

25       Q.    When Mr. O'Brien then testified that he had 18 years

1    to go and was a sentenced prisoner, didn't that lead the jury to
2    infer that this letter wasn't going to be used for his sentence?
3              MS. GOTTLIEB:  Objection.
4         A.   There's no letter.
5              THE COURT:  Sustained.
6         Q.   Well, that your advocacy --
7              MS. GOTTLIEB:  Objection.
8              THE COURT:  Sustained.
9         Q.   Well, did you believe you had any obligation to alert
10   the defense that Mr. O'Brien's testimony had been highly
11   misleading?
12             MS. GOTTLIEB:  Objection.
13             THE COURT:  Sustained.
14        Q.   In Mr. Novak's November 26th email to you, he asked
15   you to check with your homicide detective and determine whether
16   he still intends to write a letter?
17        A.   I don't have that in front of me.
18             MS. HEEGER:  This is Defendant's F, please.  I'd
19        also request that --
20             MS. GOTTLIEB:  I think it's already in.  Is it?
21        Yes.  I think it is.
22             THE COURT:  Can I see it?  So we have an
23        agreement that it is not in yet?
24             MS. GOTTLIEB:  Yes, Judge.  I think she only read
25        from it.

1           THE COURT: Defendant's E accepted as evidence.

2    So, set it's accepted as evidence, but I assume you're

3    making an application.

4           MS. HEEGER: Yes. Yes.

5           MS. GOTTLIEB: No objection.

6           THE COURT: Let me see it again. Defendant's E

7    is a two-page document, again, listing a number of emails;

8    first one on page one from Ms. Mattaway to a Chamoy,

9    C-H-A-M-O-Y, dated October 3, 2013. Never mind. That's a

10    mistake. That's the top to you guys, I guess. I

11    apologize. First email is from Mr. Novak to Ms. Mattaway

12    dated November 26, 2007. Sorry about that.

13           (Whereupon, Defendant's Exhibit E is marked into

14    Evidence.)

15    A.   What's the question?

16           MS. HEEGER: Could you read the last question

17    back?

18           (Whereupon, the last question was read back.)

19    A.   He did. That's what his email to me said.

20    Q.   Okay. And did you do as he requested?

21    A.   I have no recollection.

22    Q.   Ms. Mattaway, can you look at what's marked as

23  People's 2? It's the June 8, 2007 memo to Patrick Bruno.

24    A.   Yes.

25    Q.   And under the paragraph number one about Andrew

1    O'Brien, it says currently jailed in federal custody for murder

2    unrelated and serving 30 years, has asked for a letter to be

3    prepared by the undersigned that he can have put in his file

4    stating that he testified for the Bronx District Attorney's

5    office. So, Mr. O'Brien did ask you for the letter?

6        A.    Again, I don't know that he did. I can't remember if

7    it came from him or someone else. I would think if he did it I

8    would have written he has asked for a letter. I didn't put

9    that.

10       Q.    But back in 2007 when you wrote this, your memory

11   would have been better than now?

12       A.    I can't say now what my memory would have been.

13            MS. HEEGER: Your Honor, if I may have a moment

14   please. Nothing further, your Honor. Thank you.

15            THE COURT: Anything further?

16            MS. GOTTLIEB: No, Judge.

17            THE COURT: You may step down. Thank you.

18            THE WITNESS: Thank you.

19            THE COURT: Counsel, you want to step up?

20            (Whereupon, there is a discussion held off the

21       record, at the bench, among the Court, the assistant

22       district attorneys, and both defense counsel.)

23            THE COURT: Anything for the record before we

24   adjourn?

25            MS. HERBERT: Your Honor, I believe we had

1   discussed an adjourn date of June 2nd.

2           THE COURT:  Correct.

3           MS. HERBERT:  At which time we will hope to have

4   Mr. O'Brien and either some arrangement with respect to

5   Judge Novak or further action will be taken.  We would ask

6   the Court to set an interim date, a control date so that

7   Mr. Jimenez might remain at Downstate Correctional Facility

8   in the interim and be returned to Wende Correctional

9   Facility where he came from for today's proceedings or

10  prior to today's proceedings.

11          THE COURT:  Do the People wish to be heard?

12          MR. CHAMOY:  No, your Honor.

13          THE COURT:  Okay.  I appreciate the request on

14  behalf of your client.  Quite honestly, it's highly

15  unlikely that would work.  It may end up being more of an

16  issue for your client the way state corrections operates

17  these days, so I'm going to deny that application.  We will

18  have to do another order to produce.  And again, my current

19  experience with working with these things, even when you

20  put cases on for two days they won't have him sent back.

21          MS. HERBERT:  If the Court could at least mark

22  his card not satisfied.

23          THE COURT:  I'll mark the order not satisfied.

24  I'll put it on for a June date.  I will request that we do

25  a second or additional order of protection as a safeguard.

1    Obviously, you know, you'll be in touch with my chambers if
2    things change between now and June 2nd. We can work out a
3    change for a date. And it's my understanding that both
4    sides are going to be exchanging information and working on
5    the scheduling potentially with Mr. O'Brien and Judge
6    Novak. Is that a fair and accurate summation of our
7    conversation?
8              MS. HERBERT: That's correct, Your Honor.
9              MS. GOTTLIEB: Yes, Judge. My only concern is
10   with producing the defendant, if the 19th works and he's
11   down here that's one thing, but it seems to me that it's
12   going to be difficult for us to produce him. I assume the
13   People are going to be producing because now he's in
14   transit and we're going to need ten days.
15             THE COURT: We're adjourning to the second, June
16   2nd.
17             MS. GOTTLIEB: Right, but I can't do an order to
18   produce him today from upstate if he's not even there yet
19   is my point. So, if your plan works, then he's going to be
20   at Downstate. If the plan doesn't work, I can't produce
21   him before the 19th. So I'm going to need ten days from
22   the 19th, working days at a minimum, to produce him and I
23   don't know if that's actually ten days. It can't be. Am I
24   correct, Ed?
25             THE CLERK: The order's not going to hold him

1    whether you mark it satisfied or not.

2         MS. GOTTLIEB: I mean, we'll know if he gets sent

3    out. We'll know in a very short period of time whether he

4    gets sent up. But if he gets sent up somewhere between the

5    17th and the 21st is when we run into problems. I

6    shouldn't worry then. Just produce him from upstate.

7         THE CLERK: I know what you're saying, but I

8    don't know where state corrections is going to keep him.

9    It's entirely up to them.

10        MS. GOTTLIEB: I just don't want him in transit

11   in the period that we need to locate him.

12        THE COURT: We'll leave it on for June 2nd.

13   We'll mark it unsatisfied. They'll make a decision whether

14   to hold him or not within the next couple of days. And if

15   that's the case, assuming they send him back upstate

16   sometime next week, we'll have just about ten days between

17   then and June 2nd.

18        MS. GOTTLIEB: Okay.

19        THE COURT: Unless you want to push it out a week

20   and play it safe to June 9th.

21        MS. GOTTLIEB: You know, because then we're going

22   to run into the same problem on the 19th. It will be too

23   many days. Just leave it the way it is and we'll see how

24   it goes.

25        THE COURT: Again, ideally we'll have all this

1 | together for June 2nd. I'll oversee, and if we don't have
2 | it together by June 2nd or a very sure day certain for all
3 | of this, it is going to get a lot more complicated.

4 |     MS. HERBERT: Well, we can certainly monitor
5 | Mr. Jimenez's location and advise the district attorney's
6 | office accordingly.

7 |     THE COURT: Yes. I think chambers, whoever,
8 | contact my chambers and we'll make every effort to make any
9 | phone call we can to resolve whatever the situation is.
10 | Anything else for the record?

11 |     MS. GOTTLIEB: No.

12 |     MS. HERBERT: No.

13 |     THE COURT: Please mark the order unsatisfied
14 | June 2nd.

15 |     A COURT OFFICER: Order not satisfied, June 2nd.

16 |     THE COURT: Thank you.

17 |     (Whereupon, the case is adjourned to Friday, June
18 | 2, 2017.)

19 |     *   *   *   *

20 |     Certified to be a true and accurate transcript of
21 | the stenographic minutes taken within.

22 |

23 |

24 |     VANESSA MOORE,
    Senior Court Reporter

25 |

1  SUPREME COURT OF THE STATE OF NEW YORK
   BRONX COUNTY : CRIMINAL TERM : PART 86
2  -------------------------------------------x
   PEOPLE OF THE STATE OF NEW YORK
3
            -against-
4                                      Indictment No.
   RICARDO JIMENEZ                     03825/2006
5

6                    Defendant
   -------------------------------------------x
7                         Bronx Hall of Justice
                          265 East 161st Street
8                         Bronx, New York  10451

9                         Date: July 21, 2017

10 B E F O R E:

11            HON. ROBERT TORRES,
                 Supreme Court Justice
12
   A P P E A R A N C E S:
13
        ROBERT T. JOHNSON, ESQ.
14      District Attorney, Bronx County
        198 East 161st Street
15      Bronx, New York  10451
        BY: TERRY GOTTLIEB, ESQ.,
16          Assistant District Attorney
                 -and-
17          NOAH J. CHAMOY, ESQ.,
            Assistant District Attorney
18

19      OFFICE OF THE APPELLATE DEFENDER
        Attorneys for the Defendant
20      11 Park Place, Suite 1601
        New York, New York  10007
21      BY:  ANASTASIA HEEGER, ESQ.,
             Senior Staff Attorney
22               -and-
             ROSEMARY HERBERT, ESQ.,
23           Supervising Attorney

24
                          Peter M. Kent
25                        Senior Court Reporter

1          THE CLERK:  On the record.

2          Calling Number 1 on the Part 86 Calendar in the

3     matter of the People of the State of New York against

4     Ricardo Jimenez.

5          Counsels, state your appearances.

6          MS. HEEGER:  Anastasia Heeger, H-e-e-g-e-r, from

7     the Office of the Appellate Defender, for the defendant,

8     Ricardo Jimenez.

9          MS. HERBERT:  Rosemary Herbert, H-e-r-b-e-r-t,

10    also from the Office of the Appellate Defender.

11         MR. CHAMOY:  Assistant District Attorney Noah

12    Chamoy, for the People.

13         MS. GOTTLIEB:  Terry Gottlieb, from the Bronx

14    District Attorney's Office.

15         THE COURT:  Good morning everyone.

16         MS. HERBERT:  Good morning.

17         MS. GOTTLIEB:  Hi, Judge.

18         MS. HEEGER:  Good morning.

19         THE COURT:  I believe there is going to be an

20    application.  As for this purpose, you are waiving your

21    client's presence in the courtroom, is that correct?

22         MS. HEEGER:  Yes, Your Honor.

23         THE COURT:  You may proceed.

24         MR. CHAMOY:  Your Honor, the People move to close

25    the courtroom for this proceeding regarding this witness.

1    Mr. O'Brien is in Federal witness security, and for

2    post-conviction proceedings there is no Federal

3    Constitutional right or State right to have open proceedings

4    in a post-conviction hearing.  Basically, while he did

5    testify in open court for trial, there was no compelling

6    interest or indeed interest at all in preventing, in

7    preventing, um, an open courtroom from being -- excuse me,

8    from taking place, or as in this case since trial there has

9    since been circumstances that I would consider even

10   compelling under the Federal standard that make it so a

11   closed courtroom is appropriate.

12            Specifically, I will point Your Honor's attention

13   to the affidavit of Wendell Stratford, sworn under oath and

14   provided to this Court previously with the original motion

15   papers that after the trial he was contacted by the

16   Intelligence Division of Rikers Island Jail informing him of

17   credible information from an informant, its own

18   investigation that this defendant had put out a hit on the

19   trial prosecutor and him.  That the defendant knew the type

20   of car he drove, his license plate, and where he parked it.

21   And that the Office of the District Attorney and police took

22   measures to ensure the safety of the trial prosecutor.

23            There is -- likewise in paragraph 15 of his

24   affidavit -- there is likewise a similar affidavit from Lisa

25   Mattaway describing the same thing.  No -- paragraph 11

1    appears -- excuse me, no, paragraph 12 of her affidavit.

2    This information was not known obviously at the trial.  This

3    all came to fruition afterwards.  This was a verified threat

4    placed on not just a witness, but in fact the homicide

5    detective and the prosecutor, is more than sufficient reason

6    to close the courtroom to the public in this case.

7         MS. HERBERT:  Your Honor, we would oppose that

8    request in that, well, we would ask that Mr. Jimenez' family

9    be allowed to remain in the courtroom.

10         A ruling to close the courtroom and exclude the

11    family would be far broader than is necessary to effectuate

12    any interest the witness may have in protecting his

13    identity.  The fact that the witness was or testified in

14    open court and family members were present during the

15    original trial proceedings certainly I think eliminates the

16    notion that revealing or disclosing his physical person in

17    these proceedings would in any way add to his security.

18         He is currently, as we understand it, in prison in

19    an undisclosed location, so nobody quite frankly in the

20    courtroom would have any ability to in any way endanger his

21    safety.

22         And I would also note that the allegations that

23    are referred to by Mr. Chamoy have nothing to do with the

24    witness' appearance and testifying in open court at the

25    trial proceedings.

1     Under those circumstances, I don't think that the

2    heavy burden and these strong preferences for open

3    proceedings can be overcome at least as it relates to the

4    exclusion of Mr. Jimenez' family members.

5     THE COURT: Any response?

6     MR. CHAMOY: The only response I have is that

7    while they cite to the standard for pre-trial and trial

8    proceedings, the fact is that I scoured Federal, State and

9    dually all out of state jurisdictions and could find no

10   constitutional case that stated that an open courtroom was

11   required in a post-conviction hearing. To the contrary, it

12   appears that the Federal Courts are unanimous that many of

13   the rights that the defendant has can be forfeited without

14   constitutional concern, including his own presence, which in

15   New York is solely by Statute.

16    MS. HERBERT: Your Honor, if I might respond?

17    There is also -- I am not aware of any, any

18   decision that holds that proceedings of this sort that a

19   right does not apply. There may not have been specifically

20   extended, but to say the reverse is not necessarily true,

21   and I think particularly given the allegations in the

22   subject of this hearing which deal with the, deal with the,

23   um, withholding of critical information by the prosecutor's

24   office with allegations to that effect, that the fact that

25   this courtroom remain open is of particular importance.

1        THE COURT:  Obviously there are compelling factors

2    to be weighed, and as it is normally the case, I am going to

3    not close the courtroom, per se.  However, I am going to

4    restrict any movement in and out of the courtroom.  So you

5    are in the courtroom now, you will not be allowed in and out

6    of the courtroom.  Be it someone's in the courtroom now,

7    they leave, they will not be allowed back in, and from this

8    moment on nobody else will be allowed into the courtroom.

9        The record should reflect at this point in time,

10   besides the attorneys for both sides, a paralegal we already

11   mentioned on the record is here for the hearing, and an

12   intern from the defense side, I believe it's two family

13   members, everyone else in the courtroom are court personnel

14   or my own -- one of my staff.  So we will post an officer at

15   the door.  Nobody comes in and nobody goes out.  If they do,

16   they cannot come back in.

17        Anything else for me to address?

18        The People's exception to that ruling will be

19   noted for the record.

20        MR. CHAMOY:  Thank you, Your Honor.

21        THE COURT:  Anything else we need to address

22   before we proceed?

23        MS. HEEGER:  Your Honor, I mentioned earlier today

24   the June 6th letter that I had sent to the Court and sent to

25   the People.  I don't know if you want to discuss that now.

1     We can certainly do it later.

2              MR. CHAMOY:  Your Honor, it is unrelated to this

3     witness' testimony.

4              THE COURT:  Let's get the witness on the stand,

5     take care of that.  We can address all other matters at a

6     later time.

7              MS. HEEGER:  Thank you, Your Honor.

8              THE COURT:  Anything beyond that?

9              MR. CHAMOY:  No, Your Honor.

10             MS. HEEGER:  No, Your Honor.

11             THE COURT:  I should note that my ruling of the

12    closing of the courtroom takes into account that the

13    testimony at the trial the courtroom was not closed.

14             (Brief pause.)

15             THE CLERK:  Recalling in the matter of the People

16    of the State of New York against Ricardo Jimenez.

17             Let the record reflect that the defendant is now

18    in the courtroom.

19             THE COURT:  Ready to proceed?

20             MS. GOTTLIEB:  Yes, Your Honor.  The People are

21    ready to proceed.

22             We call our first witness, Andrew O'Brien to the

23    stand.

24             COURT OFFICER:  Witness entering.

25             (Whereupon, the witness, Andrew O'Brien, entered

1    the courtroom and took the stand.)

2            COURT OFFICER:  Remain standing.  Please raise

3    your right hand.

4            THE CLERK:  Do you swear or affirm that the

5    testimony you will give will be the truth, the whole truth,

6    and nothing but the truth so help you God?

7            THE WITNESS:  I do.

8            COURT OFFICER:  State your full name for the

9    record, spelling your last name.

10           THE WITNESS:  Andrew O'Brien.  O-'-B-r-i-e-n.

11           THE COURT:  Good morning.

12           THE WITNESS:  Good morning.

13           THE COURT:  You want to proceed?

14           MS. GOTTLIEB:  Thank you.

15   DIRECT EXAMINATION

16   BY GOTTLIEB:

17       Q.   Mr. O'Brien, I am going to ask you to speak up nice and

18   loud.

19           Do you remember a -- I am going to take you back to

20   around June 2007 -- did you testify in a case entitled the People

21   State of New York versus Ricardo Jimenez?

22       A.   Yes.

23       Q.   And when you testified in that case, did you testify

24   truthfully?

25       A.   Yes.

1      Q.   And prior to testifying in that case, did you meet with

2  an ADA by the name of Lisa Mattaway?

3      A.   Yes.

4      Q.   And prior to testifying for ADA Mattaway, did you

5  discuss what, if anything, she would do for you if you testified?

6      A.   Yes.

7      Q.   Did you testify at trial about what Lisa Mattaway said

8  she would do for you?

9      A.   Yes.

10     Q.   And when you testified at trial, did you testify

11  truthfully about that issue?

12     A.   Yes.

13     Q.   And when you testified at trial, was it your

14  understanding -- and I will quote from the transcript -- Page 24

15  to 25 -- it was your understanding that -- you're speaking to

16  Ms. Mattaway -- just tell the Federal prosecutor that I

17  cooperated with you and that's it?

18     A.   Yes.

19     Q.   Is that what you testified to?

20     A.   Yes.

21     Q.   Was that the full extent of what Lisa Mattaway told you

22  she would do for you?

23     A.   Yes.

24     Q.   And did she make any other promises to you?

25     A.   No.

1     Q.   Did AUSA David Novak make any promises to you if you

2     testified for ADA Mattaway?

3     A.   No.

4     Q.   Did Detective Wendell Stratford make any promises to

5     you if you testified for ADA Mattaway in the case of the People

6     versus Ricardo Jimenez?

7     A.   No.

8     Q.   So the full extent of your promise from Lisa Mattaway

9     was for your -- that you testified at trial in June 2007?

10    A.   Yes.

11               MS. GOTTLIEB:  No further questions.

12               THE COURT:  You may inquire.

13    CROSS EXAMINATION

14    BY MS. HEEGER:

15    Q.   Mr. O'Brien, you had occasion to speak with the

16    prosecutor this morning?

17    A.   Yes.

18    Q.   And what was the subject of your conversation?

19    A.   She asked me about the past situation with the ADA.

20    She asked me if she promised me anything and I told her no.

21    Q.   What were you told about the purpose of today's

22    proceedings?

23               MS. GOTTLIEB:  Objection.

24    Q.   What is your understanding of the purpose of today's

25    proceeding?

1      A.    Well, my understanding was that, um, I guess he got an

2  appeal, and that's what the issue was.

3      Q.    And prior to today, has anyone from the DA's Office

4  spoken to you about today's proceeding?

5      A.    No.

6      Q.    Now, in 1997 you signed a plea agreement with the Feds,

7  correct?

8      A.    Yes.

9      Q.    Under this agreement you pled to a single RICO charge?

10     A.    Yes.

11     Q.    You were sentenced to life in prison?

12     A.    Yes.

13     Q.    And you agreed to cooperate with FBI investigators?

14     A.    Yes.

15     Q.    And to testify against fellow members of the Poison

16  Clan?

17     A.    Yes.

18     Q.    And when you testified, you testified with the hope

19  that your sentence would be cut?

20          MS. GOTTLIEB:  I am going to object to the form of

21      the question.

22          THE COURT:  As to the form of the question, I

23      sustain the objection.

24     Q.    You testified about this plea agreement at

25  Mr. Beckford's trial, correct?

1      A.   Yes.

2            MS. GOTTLIEB:  Objection.

3            To which trial?

4      Q.   The Poison Clan trial?

5      A.   Yes.

6      Q.   Yes.  And at that trial did you testify that you hoped

7  that the Federal prosecutor would make a motion to reduce your

8  sentence?

9      A.   Yes, I think so.  I don't know, it's been a long time.

10      Q.   Would looking at the transcript of that proceeding

11  refresh your recollection?

12      A.   I guess, yeah.

13            MS. GOTTLIEB:  Judge, I am going to object to this

14          line of questioning.  I am not sure what that trial has to

15          do with this trial.

16            THE COURT:  Yes.  I am not sure where you are

17          going with this line of questioning.

18            MS. HEEGER:  Your Honor, if we can approach, I

19          would be happy to explain it.

20            THE COURT:  Approach.  On the record.

21            (Whereupon, a side-bar conference was held by the

22          Court and counsels, on the record as follows:)

23            MS. HEEGER:  Your Honor, Mr. O'Brien's 1997 plea

24          agreement and his understanding of how the agreement took to

25          cooperate and what that results in is directly relevant to

1    his understanding of the agreement of -- we are trying to

2    connect the understanding of what happened at Mr. Jimenez'

3    trial.

4              THE COURT: How are you trying to connect them?

5              MS. HEEGER: Well, I'd like the opportunity to

6    explore this, what was, what was said in the agreement and

7    what he, what his understanding of what cooperation means

8    and how this all works.

9              And the People said this business about a promise.

10   I am trying to elicit his understanding of how these

11   promises worked the first time around, which I think is

12   directly relevant to how they understood the promises to

13   work in this proceeding. I don't have a lot of questions on

14   it, but I'd like to explore this.

15             MS. GOTTLIEB: Judge, if she wants to find out

16   what his cooperation agreement was, just ask what the

17   cooperation agreement was. I am not sure if we need to go

18   into are you trying to impeach him with prior testimony.

19   I'm not sure where you are going with the prior trial

20   testimony.

21             I think that the problem --

22             MS. HEEGER: I am trying to elicit the exact

23   nature of what the promise was the first time around.

24             MS. GOTTLIEB: Is there an agreement? Do we have

25   a copy of the agreement?

1          MS. HEEGER: Well, there is that, but then he was

2     specifically asked at Mr. Beckford's trial, which is the

3     Poison Clan trial, of how -- what he understood that

4     agreement to mean, which is not in the agreement.

5          MS. GOTTLIEB: Well, his testimony would not be in

6     there.  I am not sure how that's relevant to how, you

7     know --

8          MS. HEEGER: The agreement, the agreement says we

9     can do it through the agreement.  That's fine.  I mean we

10    can do it through the agreement.

11         THE COURT: Well, you can try to elicit what his

12    understanding of the agreement was.

13         Why don't you just ask him that?  Why are we going

14    over testimony?

15         MS. HEEGER: Well, he said he didn't obviously

16    know, that's why I was trying to go from that approach.

17         THE COURT: Well, maybe you should rephrase the

18    question and ask him what was his understanding.  Ask him

19    directly.

20         MS. HEEGER: That's fine.

21         We'll proceed that way.

22         THE COURT: I don't -- are you trying to get to

23    his understanding?  Um -- just get there.

24         MS. HEEGER: Okay, fair enough.

25         (Whereupon, the parties returned to their

1            respective places in the courtroom.)

2                      THE COURT:  The objection is being sustained.

3                      Rephrase your question.

4        Q.   Mr. O'Brien, in your plea agreement the Government did

5    not promise that they would file a Rule 35 motion, did they?

6        A.   No.

7        Q.   No.

8             They said that it was up to their discretion, correct?

9        A.   Yes.

10       Q.   And they could not guarantee that Judge Payne would

11   grant it, correct?

12       A.   Yes.

13       Q.   But when you testified in the Poison Clan trial, you

14   hoped that they would?

15       A.   Yes.

16       Q.   Now, also as a result of your cooperation, you were put

17   in the WITSEC Program?

18       A.   Yes.

19       Q.   And under this program are your communications heavily

20   monitored?

21                      MS. GOTTLIEB:  Objection.

22                      THE COURT:  Sustained.

23       Q.   Are your calls recorded?

24                      MS. GOTTLIEB:  Objection.

25                      THE COURT:  Sustained.

1    Q.   Are your letters logged?

2          MS. GOTTLIEB:  I am not sure what this has to do

3    with this.

4          THE COURT:  Sustained.

5          The parameters of the program even now is not an

6    issue to this court.

7          Move on.

8    Q.   What year was your sentence?

9    A.   What year?  Um, I think it is 199 --

10          MS. GOTTLIEB:  Objection to the form of the

11    question.  I'm not sure what she's talking about, the

12    original agreement?

13          THE COURT:  No -- yes, for clarity of the record.

14          MS. HEEGER:  Correct.

15          THE COURT:  I may be wrong, there is more than one

16    circumstance you're addressing?

17          MS. HEEGER:  That is correct, Your Honor.

18    Q.   What year was your life sentence reduced to 30 years?

19    A.   I think it was 1998.

20    Q.   And that year you started talking to an NYPD detective

21  about this case?

22    A.   Yes, I think it was a year after.

23    Q.   And you reached out to offer assistance, is that

24  correct?

25    A.   Yes.

1    Q.   And you first spoke to a Detective Pfeiffer?

2    A.   Yes.

3    Q.   Then a Detective Stratford followed up?

4    A.   Yes.

5    Q.   How did you first come into contact with Mr. Stratford?

6    A.   Um, I think Ms. Pfeiffer relayed him -- me to him or

7  whatever.

8    Q.   Did he call you?

9    A.   Um, I think I called him.

10   Q.   And you eventually met Mr. Stratford in 2001?

11   A.   Yes.

12   Q.   About how many times had you spoken on the phone prior

13  to that?

14   A.   Um, good amount of times.

15   Q.   Could you give us an estimate?

16   A.   Ten, fifteen.

17   Q.   And that's before you met him the first time?

18   A.   Um, yes, I would say so.

19   Q.   And what were the subject of your conversations?

20            MS. GOTTLIEB:  Objection.

21            THE COURT:  As to the following question,

22       sustained.

23   Q.   Were you talking about this case -- Mr. Jimenez' case?

24   A.   Eventually, yes.

25   Q.   What else were you talking about?

1              MS. GOTTLIEB:  Objection.

2              THE COURT:  Sustained as to the form of the

3     question.

4        Q.   You met with Detective Stratford and an FBI agent in

5     2001?

6        A.   Yes.

7        Q.   And was this the only time you met with Detective

8     Stratford?

9        A.   No, I think, I, I think I seen him two times after

10    that.

11             THE COURT:  You said after that?

12             THE WITNESS:   After, after the, um, um, after I

13        seen him then I think I seen him a total three times.

14             THE COURT:  Thank you.

15       Q.   And during these meetings, did you discuss the length

16    of your sentence?

17       A.   Yes.

18       Q.   And did you discuss your hopes of getting a time cut?

19       A.   Yes.

20       Q.   And did you discuss what it is you would be looking for

21    if you wanted to cooperate?

22       A.   Say -- what do you mean by that, as far as what?

23       Q.   Well, what you would want if you cooperated?

24             MS. GOTTLIEB:  Objection.

25             THE COURT:  I will allow that question.

1      A.   What I would want?

2      Q.   Yes?

3      A.   I would want -- only things I could hope for is a

4 reduction in my sentence.

5      Q.   And you discussed this with Detective Stratford?

6      A.   To a certain extent.

7      Q.   Could you explain?

8      A.   Well, I probably, um, I probably, um, complained to him

9 about my sentence, you know, you know, my situation.  He's not in

10 a position to help me -- do anything for me -- so he really could

11 not tell me that he could do anything for me.

12      Q.   Did he say he would relay that information to the

13 prosecutor?

14      A.   Um, I don't remember him saying that, you know.

15      Q.   And did Detective Stratford or -- did he ever relay

16 information to the prosecutor from you?

17           MS. GOTTLIEB:  Objection to the form of the

18      question.

19           THE COURT:  Sustained.

20           MS. GOTTLIEB:  I am not sure what she is talking

21      about, "the prosecutor."

22           THE COURT:  Sustained.  Sustained.

23           MS. GOTTLIEB:  Thank you.

24      Q.   During the time period that you were speaking to

25 Detective Stratford about their case, did you ever give him

1    information or messages to relay to the prosecutor on your

2    behalf?

3                    MS. GOTTLIEB:  Judge, again, I am going to object

4         to the form of the question.  We have two prosecutors, the

5         Federal prosecutor and the State prosecutor, I'm not sure

6         who we are talking about.

7                    MS. HEEGER:  We are talking about the State

8         prosecutor, ADA Mattaway.

9         A.    Did he relay?  Um, he could have.  I don't know what he

10   did -- if he did that or not.

11        Q.    Did you ask him to?

12        A.    Um, I could have.

13        Q.    And could you have asked him to ever relay information

14   to Mr. Novak?

15        A.    Him personally?  Um, I don't think so.

16        Q.    But you kept in touch with Mr. Novak over the years?

17        A.    Yes.

18        Q.    You would negotiate your plea with him?

19        A.    Yes.  In the past, yes.

20        Q.    Yes.

21              He signed your plea agreement?

22        A.    Yes.

23        Q.    And he was your, he was your sponsor for the Witness

24   Protection Program?

25        A.    Yes.

1    Q.   He was your sponsor?

2    A.   (No response.)

3    Q.   It's fair to say over the years you had asked Mr. Novak

4    if there was anything you could do to reduce your sentence?

5         MS. GOTTLIEB:  Objection to the form of the

6    question.

7         THE COURT:  I will allow it.

8         Move on.

9    A.   Yes.

10   Q.   You were hopeful that something could be done?

11   A.   Yes.

12   Q.   And if something was done, you knew that it would have

13   to be through a Rule 35 motion?

14   A.   Yes.

15   Q.   And Mr. Novak left the door open for that?

16        MS. GOTTLIEB:  Objection.

17        THE COURT:  Sustained.

18   Q.   Mr. Novak said he would consider that?

19        MS. GOTTLIEB:  Objection.

20        THE COURT:  I will allow that question --

21        MR. CHAMOY:  Your Honor, if we could get a time

22   frame we are discussing.

23        THE COURT:  -- on the grounds.

24   Q.   Well, let's start with, since your sentencing, since

25   you were in -- in your discussions with Mr. Novak, did he tell

1    you that he would consider a Rule 35?

2              MS. GOTTLIEB:  Objection, Judge.

3              THE COURT:  Again, this is the problem, we already

4         know that there was some consideration and some involvement,

5         that's not the issue before this court.  So I am allowing

6         you some leeway just for the purposes of having some

7         foundation on the record, but we already know some of this

8         stuff.  It's not the issue before this court.

9              MS. HEEGER:  Your Honor, respectfully, I am not

10        sure I understand.

11             THE COURT:  That's my ruling day one of this

12        hearing, again, as the Court of Appeals specified what the

13        issue is.  So we are going far-afield.  Again, I am giving

14        you some leeway, but let's get to the point.

15             MS. HEEGER:  Okay, Your Honor, respectfully -- I

16        respectfully disagree, this is exactly the point.

17             THE COURT:  Okay, you have your record that you

18        disagree, you also have my ruling.  And again, for the third

19        time, I am giving you some leeway, but that's just some

20        leeway.  Get to the heart of the issue before this court.

21        Move on.

22             MS. HERBERT:  Your Honor, if we could just have

23        one moment?

24             (Brief pause.)

25             MS. HEEGER:  Okay.

1       Q.  After you had already received an initial Rule 35

2   sentence reduction, did Mr. Novak say that he would consider a

3   second one?

4       A.  At some point, yes.

5       Q.  Now, after you met with Detective Stratford, you wrote

6   a letter?

7       A.  I wrote a few letters.  So --

8       Q.  And if I showed you a copy of the letter, would that

9   refresh your recollection?

10      A.  Yeah.

11          (Brief pause.)

12          MS. HEEGER:  Your Honor, I'd like this marked as

13   Defendant's Exhibit F as in "Frank," please, for

14   identification.

15          THE COURT:  Defendant's F for identification.

16          MS. GOTTLIEB:  I have no objection to it being

17   moved into evidence.

18          THE COURT:  As evidence.

19          (Whereupon, Defendant's Exhibit F was marked in

20   evidence.)

21          COURT OFFICER:  Defendant's F so marked in

22   evidence.

23          MS. HEEGER:  For the record, this is a five page

24   handwritten letter addressed to whom it may concern.

25          THE WITNESS:  Yeah.  Yes.

1    Q.   And is this your letter?

2    A.   Yes.  This is my handwriting, yep.

3    Q.   And what is the subject of that letter?

4    A.   The subject is me explaining everything that took

5    place.

6    Q.   And when did you write that letter?

7    A.   Um, on the date it says 1/16/01.

8    Q.   And who is that letter meant to be sent to?

9    A.   Um, I can't remember exactly who it was suppose to be

10   meant for, but I think at one time Detective Stratford wanted me

11   to document, write down anything that I was, that I remember from

12   the case.  I don't remember who I sent this to though.

13   Q.   So was there a purpose beyond memorializing the

14   conversation?

15   A.   Not that I can recall.

16   Q.   Did you ever send it to anyone?

17   A.   I believe this letter was written when he told me he

18   wanted me to write down everything that I remember.  I don't

19   think this letter was specifically to go to anybody as far as my,

20   um, I think it was just -- I don't know if he gave it to the DA

21   or whoever, but that's what I remember writing.

22   Q.   Is that letter complete?

23            MS. GOTTLIEB:  Objection --

24   A.   Is it complete?

25            MS. GOTTLIEB:  -- to the form of the question.

1          Complete as to the letter or as to the facts?

2          Q.   Is there more to the letter?

3          A.   I don't know.

4          Q.   It's not signed.

5               Did you sign the letter?

6          A.   I don't remember.

7          Q.   Okay.   Now, Ms. Mattaway came to see you in 2006?

8          A.   I believe so.

9          Q.   And she came with Detective Stratford?

10         A.   Yes.

11         Q.   And did you tell her about your very long sentence?

12         A.   Could have, yes.

13         Q.   And did you tell her that you had cooperated before and

14   got a sentence reduction?

15         A.   I don't remember if I told her that or not.

16         Q.   And -- but you told her you wanted to cooperate on her

17   case?

18         A.   I said I was willing, yes.

19         Q.   And you told her that you wanted her to tell the

20   Federal prosecutors that you had cooperated?

21         A.   Yes.

22         Q.   And you told her that you were hoping this, this

23   cooperation -- ADA Mattaway -- that you hoped this cooperation

24   would lead to a time out?

25         A.   I don't recall saying that to her in particular.  I

1    can't say that I did, I can't say that I didn't.

2        Q.    And specifically you wanted her to write a letter about

3    your cooperation?

4        A.    Yes.

5        Q.    And you wanted her to write this letter for Mr. Novak?

6        A.    Yes.

7        Q.    And Mr. Novak is the, is the person, is the person who

8    was going to keep an open mind about --

9            MS. GOTTLIEB:  Objection.

10           THE COURT:  Sustained as to the phraseology in

11       that question.

12       Q.    Mr. Novak is the person who would have to file the

13   Rule 35?

14       A.    Yes.

15       Q.    And you were hoping that Mr. Novak would consider your

16   assistance in this case as being the basis for a Rule 35?

17       A.    Yes.

18       Q.    Now, in March 2006 you wrote a couple of letters to

19   Judge Payne, correct?

20       A.    Yes.

21           MS. HEEGER:  I'd ask to have this marked as

22       Defendant's G.

23           Is there any objection to putting this into

24       evidence?

25           MS. GOTTLIEB:  No objection to it going into

1          evidence.

2                    THE COURT:  In evidence as Defendant's G.

3                    (Whereupon, Defendant's Exhibit G was marked in

4          evidence.)

5                    COURT OFFICER:  Defendant's Exhibit G so marked in

6          evidence.

7          Q.   Now, Mr. O'Brien, are these the materials that you

8    mailed to Judge Payne?

9          A.   Yes.

10         Q.   And this package of materials, it includes one letter

11   dated March 21, 2007?

12         A.   Yes.

13         Q.   And then there are two letters dated March 20, 2006?

14         A.   Yes.

15         Q.   And then you have some letters of support and

16   certificates attached to that, is that correct?

17         A.   Yes.

18         Q.   I want to talk about the March 2006 letters first.  The

19   first letter that -- the one page letter.

20         A.   Which one?

21         Q.   The one, the one page letter from March 20, 2006.

22         A.   All right.

23         Q.   Now, in this letter you are asking the judge to do

24   something or to consider doing something?

25         A.   Are you saying the first letter or --

1   Q.   Correct.  First.  March 20, 2006.

2   A.   This is not from me.  This is a letter from somebody

3   else.  This is a letter of support.  Are you talking about the

4   other one?

5   Q.   Just to be clear, the letter addressed to Judge Payne

6   signed by you.

7   A.   Okay.

8   Q.   That's dated March 20, 2006 and it starts --

9   A.   2006?  This is 2007.

10  Q.   It's the second page.

11  A.   Okay.

12  Q.   Correct?

13  A.   I got it.

14  Q.   Okay.  And you were asking the judge to consider doing

15  something?

16  A.   Yes.

17  Q.   And what were you asking him to do?

18  A.   Um, I was asking him to run my New York State sentence

19  concurrent.

20  Q.   And that was the New York State sentence you had gotten

21  for the weapons conviction in the Rudy McKay incident?

22  A.   Yes.

23  Q.   And the violation of probation?

24  A.   Yep.

25  Q.   And you wanted him to do a new judgment and commitment?

1     A.   Yes.

2     Q.   And to mention that sentence so it would run concurrent

3  with everything else?

4     A.   Yes.

5     Q.   Now, you knew that the judge just could not do that out

6  of thin air, correct?

7     A.   Well, under the law, sometimes if they -- if it's --

8  sometimes if it's done out of -- they didn't know if the judge

9  wanted to run it concurrent or consecutive because he never, he

10  never said anything about it.  So you could have the sentence,

11  the order of judgment corrected under the clerical error if it

12  was done by omission.

13     Q.   But it was not a clerical error?

14     A.   We don't know.

15         THE COURT:  He answered.

16         Next question.

17     Q.   But there needs to be a motion, correct?

18     A.   Yeah.

19         MS. GOTTLIEB:  Objection.

20         THE COURT:  I am a little confused.  Where are we

21  going with all of this?

22         MS. HEEGER:  I promise to have a destination.

23         THE COURT:  Well, I will give you a little bit

24  more leeway, but very little.

25         MS. HEEGER:  Okay.

1      THE COURT:  Let's move on.

2      Q.   You noted that in your letter you wrote that the

3    prosecutor, Mr. Novak, would have to agree?

4      A.   If it says in the letter I guess I said it.

5      THE COURT:  Well, the letter is now in evidence,

6    it speaks for itself.

7      MS. HEEGER:  Right.

8      THE COURT:  Move on.

9      Q.   Because a motion would have to be before the Court --

10   you knew that a motion would have to be before the Court to

11   change your sentence?

12      MS. GOTTLIEB:  Objection, Judge.

13      It says -- it's the fourth line down -- says I

14      would need to get Prosecutor Novak to agree.  It doesn't say

15      anything about him needing to know there was a motion or

16      anything of that -- I think the letter speaks for itself.

17      THE COURT:  Sustained.

18      Move on.

19      Q.   How did you believe that the Court would change your

20   sentence?

21      A.   Well, this letter could be taken as a motion if you are

22   a Pro Se litigant and you don't know the law.  You could write a

23   letter, the judge -- the court recognizes it as a Pro Se motion,

24   and if it could be done he will do it.  That's why I mentioned

25   the 5g1 because it's a statute that they use to give people

1    credit for time they did on their State sentence in the Federal

2    Court.

3         Q.   But Rule 35 is the mechanism to change a sentence?

4              MS. GOTTLIEB:  Objection.

5              THE COURT:  Don't answer.

6              Move on.

7         Q.   Let's talk about the second letter.

8         A.   The second letter?

9         Q.   The next letter that you wrote that's also dated March

10   20, 2006.  And in this letter, at the third paragraph on the page

11   you wrote, when I came before you there were a number of

12   mitigating circumstances which no one took into consideration.

13        A.   Yes.

14        Q.   And when you talked about going, you were talking about

15   the first Rule 35 motion?

16        A.   Yes.

17        Q.   And in this letter is it fair to say you were

18   contending that you had too much time?

19        A.   Yes.

20        Q.   And that it was unfair?

21        A.   Yes.

22        Q.   And that you had had the harshest sentence of anybody

23   you had ever met?

24        A.   Yes.

25        Q.   On the, on the third page, the second paragraph from

1        the bottom, you wrote that you had been writing letters for

2        inmates going before judges for resentencings.

3            A.    Yes.

4            Q.    So you have assisted other people with Rule 35's?

5            A.    No, it wasn't Rule 35, these were letters when people

6        are going to get sentenced they would write a letter to the judge

7        asking them to, even though you committed bad crimes, but you

8        asking him for leniency.

9            Q.    So sentencing is not recent --

10               MS. GOTTLIEB:  Objection.

11               THE COURT:  I don't know where all this is going

12           with regards to the issue before this court.

13               MS. HEEGER:  Your Honor, if could finish my line

14           of questioning, I will get there.

15               THE COURT:  You said that a few minutes ago.

16           Seems like we are going farther astray.

17               This individual, this witness has knowledge of how

18           the sentencing structure during or resentencing in the

19           Federal statute works.  It's not relevant to the issue

20           before this court.

21               MS. HEEGER:  Your Honor, I --

22               THE COURT:  So move on.

23           Q.    You sent these --

24               MS. HEEGER:  Strike that.

25           Q.    You wrote those letters in 2006 but you did not send

1      them, correct?

2      A.   Which ones? This letter here?

3      Q.   Yes.

4      A.   Um, yeah.

5      Q.   You held onto them for a year?

6      A.   Yes.

7      Q.   Why?

8           MS. GOTTLIEB: Objection.

9           THE COURT: Sustained.

10     Q.   When did you mail the letters?

11     A.   Um, I believe it is 2007.

12     Q.   Why did you wait a year to mail the letters?

13          MS. GOTTLIEB: Objection.

14          THE COURT: Sustained.

15          MS. HEEGER: Your Honor, may I ask the basis of

16    the objection?

17          MS. GOTTLIEB: Irrelevant to the hearing.

18          THE COURT: Move on.

19          MS. HEEGER: Your Honor, I believe that these are

20    relevant to the hearing given the date that they were

21    mailed.

22          THE COURT: Side-bar. On the record.

23          (Whereupon, a conference was held at side-bar by

24    the Court and counsels, on the record as follows:)

25          THE COURT: You wish to respond?

1          MS. GOTTLIEB: Your Honor, when the defendant

2     writes letters to the judge and -- I mean he could write

3     them every week, every day. I went to law school doing

4     Pro Se prisoner complaints for a Federal magistrate, that

5     doesn't mean the prosecution on the Federal level or the

6     State level made promises to this defendant, which is the

7     issue Detective Stratford made. He knows how the system

8     works. He knows how to file a Pro Se prisoner complaint,

9     and Federal prisoners do it on a daily basis. I don't think

10    it is relevant to the hearing and he waited a week or a day

11    or a year or that he filed these letters, it's really what

12    the promises were.

13          MS. HEEGER: Your Honor, this hearing is not

14    restrained about promises. The decision from the Appellate

15    Division is about whether or not there were quid pro quos,

16    whether or not there were understandings here. What I am

17    getting at is the understanding in my previous line of

18    questioning was what was Mr. O'Brien's understanding with

19    Mr. Novak, which is why I was asking those questions. And

20    the understanding of Mr. Novak is that Mr. Novak would

21    consider a Rule 35 motion, that's part of it. The other

22    part of it is why I am asking this now is that he wrote

23    these letters, and I wanted to explore why he did not send

24    them in 2006, but instead waited until after he had spoken

25    to the ADA, after he had an understanding from her that he

1       would write a letter, a letter that in his mind is now

2       connecting with his, with Mr. Novak's willingness to

3       consider this.  And he, he sent these at a time -- I'd like

4       to demonstrate or have the opportunity to when he believed

5       that Judge Payne would have an opportunity to consider his

6       sentences again, and that is what is to be considered on the

7       Rule 35 motion.

8              THE COURT:  Well, his belief is not core to this

9       issue.  Whether he believes something or not it is not core

10      to this issue.  When they were mailed.  You have that on the

11      record also and in evidence and part of the record, okay?

12      His belief is not the core issue that's before this court.

13      I have given you a lot of leeway to go in big circles and

14      you are going in circles.

15             So, to the extent that his beliefs or his

16      reasoning for that not sending the letter until later on, I

17      am stopping you here with that question.  I am not

18      necessarily closing the door to the whole -- to your

19      hearing, but you are going in circles and you are trying to

20      create something here because of this that means this

21      happened, and that's not what the law requires.

22             So we'll go back and continue.

23             MS. HEEGER:  Your Honor, may I?  I'm sorry.  I do

24      want to make an objection here clear.

25             THE COURT:  You already made your objection and it

1       is already clear.  You have your record.  I made my ruling.

2       Go back and ask your questions.

3                    (Whereupon, the parties returned to their

4       respective places in the courtroom.)

5                    MS. HEEGER:  And if I may just have a moment?

6                    (Brief pause.)

7       Q.    When you sent those letters to Judge Payne, you

8  expected the Rule 35 motion might be filed?

9       A.    No.

10                   MS. GOTTLIEB:  Objection.

11                   THE COURT:  No.

12      Q.    But --

13                   THE COURT:  He's answered.  He's answered.

14      Q.    But by March 2007 you had a discussion with ADA

15  Mattaway?

16                   MS. GOTTLIEB:  Objection.

17      A.    I don't remember the date.

18                   THE COURT:  Overruled.

19      Q.    You met with ADA Mattaway in December 2006, correct?

20      A.    '06, right.

21      Q.    You had made an agreement with her to testify in

22  exchange for a letter to Mr. Novak?

23      A.    Yes.

24      Q.    And you sent your materials to Judge Payne after you

25  had made that agreement?

1      A.   Well, I know I sent the letter, I don't know about --

2   are you talking about the rest of this stuff?

3      Q.   Correct.

4      A.   I don't think --

5      Q.   Correct.

6      A.   -- I don't think I sent -- I think I sent this stuff

7   before Rule 35. This stuff here.

8      Q.   Well, yes, but --

9      A.   I'm talking about when I was going for a Rule 35

10  Hearing, this is when I sent the packet, this is not when I sent

11  the letter by itself.

12     Q.   Well, the first letter on the first page there, that's

13  dated March 21, 2007?

14     A.   Yes.

15     Q.   You wrote to Judge Payne -- I wrote the preceding two

16  letters --

17             MS. HEEGER: Strike that.

18     Q.   -- I wrote the preceding two letters a year ago. You

19  wrote that, correct?

20     A.   Yes.

21     Q.   So you sent all of those materials, all the letters and

22  materials up there you sent to Judge Payne?

23     A.   Yeah, but I don't think I sent this letter here the

24  same time I sent the other stuff the way I remember it because

25  when I -- if you look at the paragraph of this, of this letter,

1    says I -- you know -- you can't, can't help me.  So I was not

2    going up to him for a Rule 35, I was just writing how I felt to

3    the judge.

4         Q.   Okay, but you were, you were expecting one would be

5    filed in the future?

6              MS. GOTTLIEB:  Objection.

7         A.   I don't know if I was expecting.  I might have hoped

8    for one.

9              THE COURT:  Overruled.

10             MS. HEEGER:  One moment, Your Honor.

11             (Brief pause.)

12             MS. HEEGER:  Your Honor, nothing further.

13             THE COURT:  Okay.  Ms. Gottlieb?

14   RE-DIRECT EXAMINATION

15   BY MS. GOTTLIEB:

16        Q.   You spoke to ADA Mattaway in 2006, correct?

17        A.   Yes, I believe so.

18        Q.   But you actually entered into an agreement with her and

19   testified where she would give you a letter in June 2007, isn't

20   that correct, right before trial?

21        A.   I believe so.  You know, I am fuzzy on the dates,

22   but --

23        Q.   When you went, you met with Ms. Mattaway right before

24   trial, correct?

25        A.   Yes.

1          MS. HERBERT:  Objection.

2          Leading.

3          THE COURT:  Sustained.

4     Q.   You met with Ms. Mattaway for the first time -- when

5     did you first meet with Ms. Mattaway?

6     A.   I think when the first time I met her is when she came

7     up to see me with Detective Stratford.

8     Q.   You testified on cross examination that was 2006,

9     correct?

10    A.   I believe so, yes.

11    Q.   And you didn't meet with her again until the trial in

12    June 2007?

13    A.   Only that -- I think I seen her that morning.

14    Q.   The morning before the trial in 2007?

15    A.   Yes.

16    Q.   And so did you have any conversation with her between

17    2006 when you met her with Detective Stratford until you met her

18    again right before the trial in 2007?

19    A.   I don't believe so.

20    Q.   So -- but you mailed these letters in March 2007,

21    correct?

22    A.   Yes.  Yes.

23    Q.   Other than writing a letter, did Ms. Mattaway promise

24    you anything, anything besides writing a letter?

25    A.   No, that's it.

1          Q.   Any change in sentences, any letters to the judge,

2    anything besides that one letter that she wrote to the --

3          A.   No.

4          Q.   You had hopes that your testimony would help you in

5    some way, correct?

6          A.   Yes.

7          Q.   But there were actually no promises from Novak,

8    Stratford or Mattaway other than the letter?

9          A.   Yes.

10         Q.   I mean other than for the letter from Lisa Mattaway,

11   that was the only promise made?

12         A.   Yes.

13         Q.   You said you had conversations with AUSA Novak?

14         A.   Yes.

15         Q.   Okay.  Did you also in any of those conversations

16   indicate that second reductions are greatly disfavored and

17   unlikely?

18         A.   We had, we had disagreements about -- I don't know if

19   he said it in those terms, but --

20         Q.   Did he make it clear that Rule 35 second reductions are

21   really hard to come by?

22         A.   I don't remember him saying that exact thing.

23              MS. GOTTLIEB:  No further questions.

24

25

1  RE-CROSS EXAMINATION

2  BY MS. HEEGER:

3      Q.   When you were brought down for Mr. Jimenez' trial, was

4  it the morning of your testimony or the morning before then?

5      A.   The morning of the testimony.

6      Q.   And, just to be clear, you had a letter of agreement

7  with ADA Mattaway prior to that day, didn't you?

8      A.   A letter of agreement --

9           THE COURT:  Rephrase the question.

10          MS. HEEGER:  Yes.

11     Q.   The agreement with Ms. Mattaway was that she would

12  write you a letter --

13     A.   Yes.

14     Q.   -- was prior to you being brought down for trial?

15     A.   Um, I'm not sure if it was before or after or on that

16  day.

17     Q.   Was that negotiated in your in person meeting with her

18  in the summer of 2006?

19     A.   I don't know.  Like I said, it is when I, either when I

20  seen her when she came to see me or the day of the trial, I don't

21  remember which day it was.

22     Q.   But it was done in person?

23     A.   Yes.

24     Q.   And you just testified that about your discussions with

25  Mr. Novak about second Rule 35 --

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | -- and he told you that they were not common? |
| 3 | A. | Excuse me? Oh, yes. I don't recall that, him saying |
| 4 | it's not common. | |
| 5 | Q. | He didn't tell you that he would not do one? |
| 6 | A. | He didn't say he would not, and didn't say he would. |
| 7 | Q. | He said never say never? |
| 8 | A. | I guess. |
| 9 | Q. | So that was open to you? |
| 10 | | MS. GOTTLIEB: Objection. |
| 11 | | THE COURT: Overruled. |
| 12 | | You may answer that. |
| 13 | A. | I mean it was better than no. |
| 14 | Q. | And you testified that ADA Mattaway did not promise you |
| 15 | that you would get a Rule 35? | |
| 16 | A. | Yes. |
| 17 | Q. | She didn't promise you you'd get a sentence reduction? |
| 18 | A. | Yes. |
| 19 | Q. | Did -- Mr. Novak didn't promise you a Rule 35? |
| 20 | A. | Yes. |
| 21 | Q. | Or did he promise you a then reduction? |
| 22 | A. | Yes. |
| 23 | Q. | But back the first time around you testified no one |
| 24 | promised you a Rule 35, did they? | |
| 25 | A. | No. |

1     Q.   And no one promised you a sentence reduction, did they,

2  in 1997, did they?

3     A.   No.

4     Q.   Because they could not, right?

5     A.   Yeah, they could not.

6     Q.   It's up to the judge, right?

7     A.   Yes.

8     Q.   But you testified anyway?

9     A.   Yes.  Yeah.

10     Q.   Because it was of value to you that potentially you

11  would get a sentence reduction?

12             MS. GOTTLIEB:  Objection.

13     A.   Yes.

14            THE COURT:  I will allow that.

15     Q.   And when you testified against Mr. Jimenez, you had no

16  promises, correct?

17     A.   Yes.

18     Q.   But you were getting a letter?

19     A.   Yes.

20     Q.   And Mr. Novak was going to consider a Rule 35?

21             MS. GOTTLIEB:  Objection.

22           THE COURT:  As to that.  Sustained.

23     Q.   You believed that Mr. Novak would consider a Rule 35?

24             MS. GOTTLIEB:  Objection.

25           THE COURT:  Sustained.

1          MS. HEEGER:  Your Honor, that goes to his state of

2     mind.

3          THE COURT:  It is not necessary to assist him with

4     the testimony he's already given you.

5          You can try rephrasing it.

6     Q.   You were hopeful you would get a Rule 35 motion?

7     A.   Yes.

8     Q.   And that hope was of value to you?

9     A.   Well, hope is of value to everybody, right?

10     Q.   So the hope that you would get that Rule 35 was worth

11     your testimony against Mr. Jimenez?

12          MS. GOTTLIEB:  Objection.

13          THE COURT:  The way that question is phrased, I am

14     going to sustain it.

15     Q.   That Mr. Novak would consider filing a Rule 35 based

16     upon your cooperation in this case was one of your motivations

17     for testifying?

18          MS. GOTTLIEB:  Objection.

19          THE COURT:  Was it your hope that Mr. Novak would

20     consider filing the Rule 35 motion?

21          THE WITNESS:  Yes.

22          THE COURT:  Move on.  Move on.

23          MS. HEEGER:  All right.  Nothing further.

24          THE COURT:  Anything further?

25

1     RE-DIRECT EXAMINATION

2     BY MS. GOTTLIEB:

3         Q.   Prior, did you ever tell, before you testified at the

4     Jimenez trial, did you tell AUSA Novak that you were seeking a

5     letter from ADA Mattaway?

6         A.   I don't remember telling him that.

7         Q.   And why did you testify in the Jimenez case?

8         A.   Well, one is that, one is that, you know, at the time I

9     was cooperating with the Federal Government and I told them about

10     the incident, so they wanted to, you know -- I have to tell them

11     everything I knew. Once I cooperated, I had to tell them

12     everything I knew, everything I saw, everything I was involved

13     with. That was one. And also I kind of felt guilty because

14     that -- I felt that it was my -- I kind of caused the argument

15     partially and it got my friend killed.

16         Q.   And you were also hoping for a letter?

17         A.   For the letter, yes.

18         Q.   For the letter?

19         A.   Yes.

20             MS. GOTTLIEB: No further questions.

21             THE COURT: Anything further?

22     RE-CROSS EXAMINATION

23     BY MS. HEEGER:

24         Q.   Mr. O'Brien, at Mr. Jimenez's trial you testified about

25     your cooperation. You were motivated to cooperate -- that you

1   testified that you were motivated to cooperate because of the

2   agreement with the Feds?

3       A.   Yes.

4       Q.   And you also testified about feeling guilty about

5   Shaka's death?

6       A.   Yes.

7       Q.   But didn't you testify that you were expecting ADA

8   Mattaway to tell Mr. Novak that you cooperated?

9       A.   Yes.

10      Q.   But you did not testify and tell the jury that you

11  hoped that Mr. Novak would file a Rule 35, did you?

12      A.   Um, I don't, I don't, I don't recall that in that way.

13  You know, they asked me, they asked me -- I think they asked me

14  was I getting anything, and the only thing I said I knew is

15  that -- the only thing I know is that the ADA or whatever the DA

16  was going to, going to let the prosecutor know of my cooperation

17  in this case.

18      Q.   But you left out the part in the hopes that the

19  prosecutor will file a Rule 35?

20              MS. GOTTLIEB:  Objection.

21              THE COURT:  Sustained.

22      Q.   You didn't tell the jury that you were hoping for a

23  Rule 35?

24              MS. GOTTLIEB:  Objection.

25              THE COURT:  Sustained.

1          MS. HEEGER:  All right.  Nothing further,

2     Your Honor.

3          THE COURT:  Anything further?

4          MS. GOTTLIEB:  Nothing further.

5          MR. CHAMOY:  Nothing.

6          THE COURT:  You may step down.  Thank you.

7          (Whereupon, the witness, Andrew O'Brien, stepped

8     down from the stand and exited the courtroom.)

9          (Brief pause.)

10          THE COURT:  Anything further at this time?

11          MR. CHAMOY:  Nothing on behalf of the People,

12     Your Honor.

13          MS. HEEGER:  Not regarding Mr. O'Brien.

14          THE COURT:  All right.  You wanted to discuss

15     July 11th at this time?

16          MS. HEEGER:  Yes, Your Honor.

17          MR. CHAMOY:  Go ahead.

18          THE COURT:  Do you have a copy we can mark for the

19     purposes of the record?

20          MS. HEEGER:  I do not have a copy.

21          THE COURT:  Do you have a copy?  Do you have --

22     we'll make a copy.

23          MS. HEEGER:  Yes, I have mine.

24          THE COURT:  We'll make a copy for the purposes of

25     the record.

1          MR. CHAMOY:  Also, Your Honor, on the record, we

2     were working out a stipulation regarding David Novak.  I

3     have some proposed stipulations that the defense is looking

4     over.

5          THE COURT:  That will be finalized?

6          MR. CHAMOY:  Within a week.

7          MS. HEEGER:  Within a week.

8          THE COURT:  After that, we'll assume there will be

9     no more testimony or documents submitted to the Court.

10          MS. HEEGER:  I guess that depends upon this

11     application here.

12          THE COURT:  There is some markings on it.  Are you

13     okay with that for a court exhibit?

14          MS. HEEGER:  Yes.

15          THE COURT:  I just want to make sure.

16          (Whereupon, Defendant's Exhibit H was marked in

17     evidence.)

18          COURT OFFICER:  Defendant's Exhibit H is marked in

19     evidence.

20          MS. HEEGER:  Your Honor, I served the People and

21     the Court on June 6th -- I'm sorry, June 20th with a letter

22     renewing the objections to the Court's scope ruling at the

23     last hearing and our objection is really two fold:  One is

24     that the plea agreement, the 1997 plea agreement and the

25     letters that Mr. O'Brien sent to Judge Payne in 2007 that

1      were provided to the People by AUSA Novak, are not beyond

2      the scope of the hearing, and we want to, you know,

3      reiterate our objection to the finding that they were not

4      within the scope. And I understand the opinion from the

5      Appellate Division because I think it's important to

6      distinguish those two documents were not included in the

7      Appellate Division's discussion about other documents in

8      which it found that there was no Brady violation there.

9      These two documents go to the subject of this hearing. They

10     go to a quid pro quo between Andrew O'Brien and that Andrew

11     O'Brien had for his testimony. And we would ask the Court

12     to reconsider its scope decision in that these documents are

13     part of this hearing, and now as part of that is the issue

14     of whether or not they were turned over, which at least

15     insofar as the plea agreement, the People are contesting.

16     And I think that Your Honor is going to need to make a

17     finding of fact as to whether or not those documents were

18     turned over. So that is why we think that there needs to be

19     more cross examination and exploration of that issue,

20     because I think the Court is going to need to determine

21     that.

22              That's one of the basis. The other has to do with

23     the elicitation by ADA Mattaway from Mr. O'Brien that he was

24     a sentenced prisoner with 18 years to go. We also believe

25     those were facts that the Appellate Division mentioned in

1    its opinion as evidence that could go to a Brady violation

2    or prosecutorial misconduct, and that's part of this

3    hearing.

4         MR. CHAMOY:  May I, Your Honor?

5         THE COURT:  Yes, you may.

6         MR. CHAMOY:  Briefly as to the latter, as to the

7    issue of him being a sentenced prisoner with 18 years to go.

8    I don't recall if there was any limitations by this Court in

9    the scope of the cross examination regarding Ms. Mattaway on

10   the question of whether or not that testimony was elicited

11   or otherwise discussed or what it meant.  I don't recall

12   that being an issue.  I do recall Ms. Mattaway stated she

13   didn't have an independent recollection of whether or not

14   the plea agreement had been turned over, which is basically

15   what they want to cross examine her on.  And the problem

16   there is the record then has to speak for itself.

17   Basically, the only other person who was available to

18   testify is no longer, and that would be Patrick Bruno.

19   Unfortunately, he died during the pendency of this

20   litigation.

21        MS. HEEGER:  Your Honor, I would, I would mention

22   Mr. Bruno did sign an affirmation that was part of the 440

23   practice in this case which he did address that specific

24   issue.

25        THE COURT:  I am reserving a ruling on this.

1          MS. HEEGER:  Your Honor, I do have Mr. Bruno's

2     affirmation.  Is that something the Court would want to

3     review, his affirmation?

4          THE COURT:  I will take a copy of it.  I remember

5     reviewing it at some point in time.

6          MS. HEEGER:  Okay.

7          THE COURT:  But now I don't remember in what

8     context.  You have a copy?  That will make my life easier.

9     I appreciate that.

10          MS. HEEGER:  Okay.

11          THE COURT:  This is a copy I can hold on to?

12          MS. HEEGER:  Yes.

13          THE COURT:  Thank you.

14          Okay.  Off the record.  Just step up briefly.

15          (Whereupon, a conference was held at the bench by

16     the Court and counsels, off the record.)

17          THE COURT:  Go back on the record.

18          Pursuant to our bench conference, we will be

19     proceeding as follows:  My chambers will be in contact with

20     all parties sometime mid to late August to set up a

21     telephone conference in early September, at which point the

22     parties will be advised as to my ruling with regards to

23     these two outstanding matters.

24          My understanding is that the stipulation will be

25     filed with the Court once it is agreed upon.  And in that

1    telephone conference we will further discuss timetables as

2    to how we proceed.  And at this point both sides are

3    requesting to file their final arguments in writing.

4         Is that a fair and accurate representation of our

5    bench conference?

6         MS. HEEGER:  Yes, Judge.

7         MR. CHAMOY:  Yes.

8         THE COURT:  Is there anything that we discussed at

9    the bench conference that I left out or either side wishes

10    to enhance?

11         MS. HEEGER:  No.

12         MR. CHAMOY:  No.

13         THE COURT:  Okay.  All right, in that case, you

14    will be hearing from my chambers again mid to late August.

15         MS. HEEGER:  Thank you, Judge.

16         THE COURT:  Thank you all.  Have a good day.

17         Oh, I am going to ask you to submit all your

18    exhibits now, whatever exhibits, you have to submit them now

19    so that we'll have them readily available.

20         One more thing, everyone please, just for the

21    purposes of controlling and keeping track of it in the court

22    system, everybody's okay with me just putting it down as a

23    September 29th date?

24         MS. HEEGER:  Yes.

25         THE COURT:  All right.  Again, we can revisit that

1          on our telephone conference, but this way we have a control

2          date and in the system it is being tracked.

3                         MR. CHAMOY:   Yes, Judge.

4                         THE COURT:   Everybody okay with that?

5                         MS. HEEGER:   Yes, sir.

6                         THE COURT:   Thank you.

7                                    * * *

8

9          REPORTER'S CERTIFICATION:
                I hereby certify that the foregoing
10    is a true and accurate transcript of the
       proceedings held in the above matter.
11

12         Peter M. Kent
            Senior Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25