SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX: PART 23
-----------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                    Plaintiff,

                                        **DECISION AND ORDER**
          -against-                     Ind # 3825/2006

RICARDO JIMENEZ,

                    Defendant.
-----------------------------------------------------------X
Present: The Honorable Robert A. Sackett

          Defendant, Ricardo Jimenez, by his attorneys, Matthew L. Mazur[1], Esq., and Anastasia

Heeger, Esq., of the Office of the Appellate Defender (OAD), move this Court pursuant to

Criminal Procedure Law (CPL) § 440.10 (1)(g) and (h) to vacate the judgment of conviction by

jury verdict rendered against him on August 16, 2007, upon the ground that it was obtained in

violation of his rights under the 5th, 6th and 14th Amendment to the United States Constitution and

under Article 1, Section 6 of the New York Constitution, the right to due process and effective

assistance of counsel (hereinafter constitutional rights).

          The People, by assistant district attorney Noah J. Chamoy (hereinafter ADA Chamoy),

and Joseph N. Ferdenzi (hereinafter ADA Ferdenzi) oppose defendant' motion. By affirmation

in opposition[2] incorrectly dated January 14, 2012, (should be 2013), the People argue that

---

[1]Matthew Mazur, Esq., who was a staff attorney at the Office of the Appellate Defender
(OAD), filed the initial Notice of Motion to Vacate on behalf of the defendant on or about
September 23, 2011. The defendant is now represented by Anastasia Heeger, Esq., of the OAD.

[2]Over the course of the past two years the defendant filed, *inter alia*, the instant 440
motion to vacate and legal memorandum with extensive exhibits, three supplemental
affirmations in support of the motion to vacate (two of which also included extensive exhibits),
and several legal letters to the Court. The People responded by filing three affirmations in
opposition and responses to the legal letters (over 1600 pages in submissions by both parties).

defendant's motion should be denied.  They argue that his claim of actual innocence is baseless[3];

that the arguments defendant raises in this CPL § 440.10 motion are essentially the same

arguments and claims the defendant raised in his appeal (*People v. Jimenez*, 71 AD3d 483

[2010]); that any new claims constitute additional impeachment evidence at most and thus do not

constitute newly discovered evidence and fall far from casting doubt on his guilt; that defendant's

*Brady* and related claims regarded information that was either not in the People's possession,

never existed or had no relevance to this case; that the defendant had a meaningful opportunity to

utilize and did utilize *Brady* information disclosed prior to trial; and, any inadvertent failure to

disclose information that should have been disclosed was not material as there was no reasonable

possibility and/or reasonable probability that the outcome of the case would have been different.

The People also argue that any additional information regarding additional New York State and

out of state convictions of two specific witnesses for the People (Kevin Morrisey and Anthony

O'Brien) would have been cumulative since those witnesses had been thoroughly impeached by

defendant's trial counsel, Patrick L. Bruno, Esq.  Finally, the People argue that the defendant

received the effective assistance of trial counsel and that each of the arguments that defendant

now claims counsel should have raised were in fact raised, rejected by the trial court and/or the

Appellate Division, and that those which were not raised would, in any event, have been rejected.

### The Batman Shooting

On the evening of July 2, 1989, Sean Worrell, Andrew Christopher O'Brien (O'Brien),

Dean Anthony Beckford and another individual by the name of Patchy were inside a crowded

Bronx Movie theater (Whitestone Theater) awaiting the showing of the "Batman Returns" movie

RJ-000002

(Batman movie)[4].  According to several witnesses, prior to the start of the movie, Mr. Worrell and his companions became involved in an argument with a man (subsequently identified as the shooter and the defendant) accompanied by a young woman, near the concession stand over who had been on the popcorn line first.  During the argument, the shooter stated that he was going to get his gun and thereafter, was seen leaving the movie theater.  Mr. Worrell and his companions then went into the Batman theater and took their seats.  As the movie was about to begin, the shooter returned, entered the crowded Batman theater, and approached Mr. Worrell and his companions.  Words were exchanged between the parties, weapons were drawn and shots were fired.  Two bullets struck Mr. Worrell (one to the back of his head and the other to his left shoulder).  The theater patrons ran off as the shots were fired.  The shooter and Mr. Worrell's companions[5] ran off in different directions after the gunfire.  Mr. Worrell died of the two gunshot wounds he received that early morning.

Pursuant to an immediate investigation of the murder, the police located and arrested Ricardo Jimenez.  He was released shortly thereafter when a young eyewitness to the argument and shooting failed to appear for a line up.  Following several leads and tips, the defendant was re-arrested by the NYPD Cold Case squad, seventeen years later.  On September 2, 2006, the defendant was indicted for the 1989 murder of Sean Worrell.

---

[4]Mr. Worrell and his companions were also accompanied by two women (the Littlejohn sisters) whose whereabouts were unknown to this Court and who were not interviewed by the police.

[5]Mr. Worrell's companions also ran off after the shooting as they were also carrying weapons and had outstanding warrants.

RJ-000003

### The Batman Shooting Trial

On June 20, 2007, the defendant's trial for the murder of Sean Worrell began[6]. Throughout the three week trial, the jury heard testimony from approximately twelve prosecution witnesses. Two of the prosecution witnesses - unknown to each other - were eyewitnesses to the entire incident at the Whitestone theater and gave similar accounts of the events as they unfolded, including the argument on the popcorn line and thereafter, the actual shooting. They both identified the defendant as the shooter. A third prosecution witness, testified that the defendant admitted to him that he shot the victim inside the theater and that the victim shot at him first. The defendant did not testify and did not present any witnesses. On July 13, 2007, the defendant was convicted of the single count of murder in the 2nd degree.

Following his conviction, the defendant filed a CPL §330.30(2) motion to set aside the verdict alleging improper conduct of one or more jurors. The trial court found no ground constituting a legal basis upon which to grant the defendant's motion and denied his motion without a hearing (*People v. Jimenez*, 16 Misc.3d 1127[A]). On August 16, 2007, the defendant was sentenced to 22 years to life.

### The Appeal

On January 19, 2009, the defendant filed a direct appeal to the First Department in a 117 page brief arguing, *inter alia*, (1) the trial verdict was against the weight of the evidence; (2) the court erred for refusing to charge a justification defense; (3) the prosecutor engaged in a pattern of misconduct; (4) the 17 year delay violated defendant's due process and speedy trial right; and (5) the sentence was excessive.

---

[6]Seventeen years after the Batman shooting.

4

On March 10, 2010, the First Department unanimously affirmed the judgement of conviction and rejected all of the defendant's arguments finding that the verdict was not against the weight of the evidence; that there was no basis to disturb the jury's determination concerning credibility; that two witnesses - one of whom was acquainted with the defendant[7] - and the other (the decedent's friend and companion) who was with the decedent at the theater on the night of the shooting - gave similar accounts of the incident; that "defendant's confession to the informant[8] contained significant details confirming the informant's credibility"; that the court properly refused to charge justification[9]; that defendant did not preserve his challenge to the prosecutor's summation; and, rejected the defendant's claim of excessive pre-indictment delay (*People v. Jimenez*, 71 AD3d 483 [2010]).

On June 30, 2010, the Honorable Carmen Beauchamp Ciparick denied the defendant's application for leave to appeal[10] to the Court of Appeals (15 NY3d 752 [2010]).

The defendant now seeks to vacate his conviction pursuant to CPL § 440.10 (1)(g) and (h), upon the ground that it was obtained in violation of his rights under the 5th, 6th and 14th Amendment to the United States Constitution; and, Article 1, Section 6 of the New York Constitution, right to due process and effective assistance of counsel (hereinafter constitutional rights). Defendant argues that his conviction should be set aside on the grounds that the

---

[7] Esco Blaylock

[8] Kevin Morrissey

[9] "We conclude that no reasonable view of the evidence supported justification defense" and "In any event, any error to charge justification was harmless." (*Jimenez*, 71 AD3d 483, 484)

[10] The defendant raised a wrongful conviction argument in his appeal to the Court of Appeals.

5

prosecution suppressed evidence favorable to him in violation of *Brady v. Maryland* (373 U.S. 83 [1963]); that there is newly discovered evidence that could not have been produced by the defendant at trial that creates a probability of a verdict in favor of the defendant; and, that the defendant was denied his right to effective assistance of counsel based on his trial counsel's failure to conduct an adequate investigation. Defendant argues that these specific issues undermine the integrity of his conviction and require that he be granted a new trial. Finally, the defendant argues that he is actually innocent of the crime ("actual innocence")[11].

### Initial Police Investigation of the Batman Shooting

#### Esco Blaylock-1989

Pursuant to an immediate investigation of the "Batman shooting", the police received information about the shooter and the events that occurred prior to the shooting. Several patrons and employees witnessed the argument between the decedent, his companions and the shooter. Esco Blaylock, a then fifteen year old employee of the theater, who was working the concession stand that evening, spoke to the police that early morning. He stated that (1) he saw the argument between the parties on the popcorn line; (2) that after his shift ended that evening he went inside of the "Batman" theater to watch the movie; (3) he witnessed the shooter, who he identified as the same person who had the argument with Mr. Worrell and his companions, enter the Batman theater, approach Mr. Worrell and his companions, pull out a weapon and shoot at Mr. Worrell and his companions and then run away; and, (4) that he recognized the shooter as "Leon", a

---

[11] Because most of the defendant's arguments in this CPL § 440.10 motion were raised by him in his appeal and were rejected, this Court will mainly address the issues that pertain to the defendant's claims of alleged *Brady* violations, newly discovered evidence and the denial of the effective assistance of his trial counsel.

6

person he knew from the neighborhood and who he saw regularly. He described Leon physically ("light skinned", "appeared to be black", "flat top haircut" with a "gold cap on his teeth") and intimately (drop out from the neighborhood, drove a Maxima, could portray himself as Jamaican, sold drugs, got into fights and he knew Leon's girlfriend).

One week after the shooting, on July 11, 1989, Mr. Blaylock went to the 48th precinct and was shown several photographs. Mr. Blaylock selected the defendant's photograph and identified him as the shooter. He again stated that he knew the defendant.

### Sharon Ramroop-1989

Mr. Blaylock identified the defendant's girlfriend as Sharon Ramroop, an "Indian" girl about 5'-7" tall, thinly built, and with long black hair. He identified the grade school she attended and the street where she would meet the defendant (corner of Watson and Boynton Avenue). Based on the detailed information Mr. Blaylock provided to the investigating detectives regarding the defendant's girlfriend, the police located the home of Sharon Ramroop and spoke with her mother. After conducting a search for Ms. Ramroop[12], the police located and spoke with her. Ms. Ramroop acknowledged that she knew Mr. Blaylock as they had attended the same grade school. She also told the detectives that she knew "Leon", a male of Jamaican/West Indian descent, who drove a gold Maxima, was a flashy dresser, wore baggy pants and sported a flat top haircut. On July 11, 1989, Ms. Ramroop appeared at the 48[th] precinct. She selected a picture of Manuel Jimenez who she told the detectives, was the defendant's brother, and whose nick name was "Ricky"(later identified as Ricardo Jimenez).

---

[12]Ms. Ramroop was reported missing by her mother prior to the shooting. After researching missing persons reports, the police located the 15 year old Sharon Ramroop (a/k/a Sharon Bassant) as having been arrested for attempted murder on April 4, 1989.

RJ-000007

Christopher Cordero-1989

On the night of the Batman shooting, Christopher Cordero was working at the Whitestone theater. He stated that he witnessed the argument on the concession line with the guy who was killed in the Batman movie but he did not witness the shooting. He also stated that (1) he was nervous when he spoke to the police that evening; (2) he did not want to be involved; and, (3) that the manager of the theater had warned the employees not to talk with the police because he did not want them coming around.

Ricardo Jimenez-1989

On July 12, 1989, the police arrested the defendant - one day after Mr. Blaylock and Sharon Ramroop identified the defendant from photographs at the 48th precinct. However, because of their inability to locate Mr. Blaylock[13], the case against the defendant could not proceed. Consequently, the defendant was released shortly afterward.

### The Second Investigation of the Batman Shooting

In 1996, federal authorities were questioning a federal inmate who pled guilty to RICO charges on an unrelated criminal matter in Virginia. The inmate, Andrew O'Brien, received a 38[14] year sentence after pleading guilty to the federal racketeering charges, entering into a cooperation agreement with the federal authorities, and testifying against his co-defendants in a

---

[13]In 1989, Mr. Blaylock suddenly stopped cooperating with the police investigation. When the police finally located Mr. Blaylock -several years later - he stated that he stopped cooperating with the police because he was instructed by his employer at the Whitestone Theater not to speak with the police about the Batman shooting and because his mother became scared and told Mr. Blaylock that she did not want him cooperating with the police.

[14]Andrew O'Brien's sentence was reduced to 30 years following his cooperation with the federal authorities in the "Poison Clan" case.

8

federal racketeering case. Consequently, Mr. O'Brien was in the federal witness protection program. While being questioned by the federal authorities, he informed an FBI agent about a murder in a Bronx movie theater in 1989.

In 1998, pursuant to the terms of the cooperation agreement and the information Mr. O'Brien provided to the federal authorities regarding the murder in a Bronx movie theater, Mr. O'Brien was referred to the New York City Police Department's Cold Case Squad.

In 1999, Mr. O'Brien spoke with a member of the NYPD Cold Case Squad - Detective Wendell Stratford (Det. Stratford) - about a shooting in a Bronx movie theater in 1989. Det. Stratford then began conducting an investigation to determine whether the homicide occurred and what the facts of the murder were.

On January 16, 2001, Detective Stratford and FBI Special agent Diego R. Redondo[15], personally visited with Mr. O'Brien in an undisclosed location[16]. Mr. O'Brien then recounted the events leading to the Batman murder and what he saw.

Mr. O'Brien wrote out a statement, in detail, that, *inter alia*, he was one of the decedent's companions at the Whitestone theater on the night of the Batman shooting. Mr. O'Brien stated that he began the argument with the defendant on the popcorn line prior to the shooting inside the Batman theater and that he witnessed the defendant argue with and shoot Mr. Worrell. At the end of his interview that day, Mr. O'Brien was shown a photo array in which he positively

---

[15]The Regional Intelligence Squad in the NY Office of the FBI had opened a case in conjunction with the NYPD Cold Case Squad to assist with the investigation into the Batman shooting.

[16]Presumably in a federal penitentiary as Mr. O'Brien was serving a thirty year federal sentence.

9

identified the defendant as the person he argued with on the popcorn line on the night of the

Batman shooting and as the person who shot and killed his friend, the decedent, Sean Worrell.

### Esco Blaylock 2006

Pursuant to the Cold Case investigation of the Batman shooting, Det. Stratford also

located the then thirty nine year old Esco Blaylock[17].

In April 2006, Det. Stratford met with Mr. Blaylock.  Mr. Blaylock spoke with Det.

Stratford who also showed him a photo array in which Mr. Blaylock, once again, positively

identified the defendant as the person he saw arguing with the decedent and his companions on

the night of the shooting and as the person he saw enter the Batman theater and shoot Sean

Worrell.  Mr. Blaylock also signed the back of photograph of the defendant.

### Christopher Cordero-2006

Pursuant to his investigation, on May 17, 2006, Det. Stratford located and met with

Christopher Cordero, who was working at the theater on the night of the shooting.  Mr. Cordero

also was shown a photo array in which he identified the defendant as the person he saw arguing

with the decedent and his companions prior to the Batman shooting.  However, although he

identified the defendant, Mr. Cordero stated that he did not want to be called as a witness at trial

because he feared for his safety[18].

---

[17]Mr. Blaylock had already identified the defendant as the shooter back in 1989 before he
stopped cooperating with the police.

[18]As Mr. Cordero could not be guaranteed by the police that he would not be harmed if he
cooperated, he did not wish to testify.

Ricardo Jimenez-2006

On August 31, 2006, Det. Stratford located and arrested the defendant, Ricardo Jimenez, for the 1989 murder of Sean Worrell. On September 6, 2006, the defendant was indicted on a single count of murder in the second degree (PL §125.25) for the 1989 Batman shooting.

Kevin Morrissey

While being held at Riker's Island, the defendant met an inmate by the name of Kevin Morrissey. Mr. Morrissey was facing several cases in Nassau County, Queens, and Brooklyn, all for check fraud, grand larceny and other related charges. During their discussions, the defendant admitted to Mr. Morrissey that he did shoot Sean Worrell; that he saw Sean Worrell fall to the floor; and that Sean Worrell shot at him first[19]. Based on these admissions, Mr. Morrissey contacted the federal authorities and asked that they contact the Bronx District Attorney's office regarding the Batman shooting[20].

### Newly Discovered Evidence

CPL § 440.10 (1)(g) permits a judge to vacate a trial conviction on the basis of new evidence discovered after entry of judgment if the new evidence "could not have been produced by the defendant at the trial even with due diligence," *and* "the evidence creates a probability that the verdict would have been more favorable if the evidence had been received at trial."

However, to qualify as newly discovered evidence and entitle a defendant to a new trial a

---

[19]Interestingly, the defendant argued that Mr. Morrissey's testimony regarding his alleged jailhouse confession about the shooting was fabricated. However, he also requested a jury charge for a justification defense based on the alleged jailhouse confession that he argued to the jury never happened.

[20]Kevin Morrissey was an informant for the federal authorities.

11

defendant must meet each of the six requirements set forth by the Court of Appeals in *People v Salemi* (309 NY 208, 216 [1955]). The evidence must be such that it (1) would probably change the result if a new trial were granted; (2) must have been discovered since the trial; (3) could not have been discovered before the defendant's trial by the exercise of due diligence; (4) must be material to the issue; (5) must not be cumulative; and (6) must not be merely impeachment evidence (citations omitted). Consequently, the defendant must establish each of the six requirements enunciated in *Salemi.*.

A review of the evidence complained of does not meet any of the criteria set forth above. With the exception of the "undisclosed" benefits allegedly provided to the two testifying eyewitnesses, the undisclosed material focuses exclusively on their prior criminal records (*see, People v. Hicks*, 6 NY3d 737 [2005]; *People v. Marino*, 99 AD3d 726 [2012]; *People v. Clark*, 110 AD3d 1341,1343 ("*the report did not constitute newly discovered evidence, as it merely attempted to impeach and contradict trial evidence*")[2013]). This Court does not believe that the undisclosed additional criminal records of the testifying witnesses would have produced a different result in the verdict as it would have merely provided additional impeachment fodder. Consequently, this portion of the defendant's argument is denied.

### Insufficiency of Trial Evidence

Additionally, the People correctly contend that the defendant's motion pursuant to CPL§ 440.10 to vacate the judgment of conviction on the ground that the trial evidence was insufficient to establish that he committed second degree murder must also be summarily denied. A court "must deny" a motion pursuant to CPL §440.10 when the ground or issue raised "was previously determined on the merits upon an appeal from the judgment" (CPL§ 440.10 [2] [a]). The

RJ-000012

defendant in this case, on direct appeal to the First Department, Appellate Division, contested the

sufficiency of the evidence, and the issue was decided against him (*see People v Jimenez*, 71

AD3d 483[2010]). The sole exception to mandatory summary denial under these circumstances

is if there has been a "retroactively effective change in the law controlling such issue" since the

time of the appellate determination (CPL 440.10 [2] [a]). As this exception does not apply to the

defendant's case, the instant CPL§ 440.10 to vacate the judgment on the ground that the trial

evidence was insufficient to establish that he committed second degree murder is summarily

denied.

### Actual Innocence

Under new legislation effective August 1, 2012, the New York State Legislature has

authorized, for the first time, post-conviction motions based on a defendant's actual innocence of

the crime for which he or she was convicted. *See* 2012 N.Y. Session Laws, ch. 19. The new

"actual innocence" claim created by the Legislature allows those convicted either by plea or by

trial to state a ground for relief based upon DNA evidence, whether previously known or not, that

would create a sufficient probability that the defendant is innocent." *Statutory Amendments to*

*Sec. 440.10 and 440.30 of the NY Criminal Procedure Law.* John Castellano on the Statutory

Amendments to Sec. 440.10 and 440.30 of the NY Criminal Procedure Law, March 19, 2013.

Although the new statutory amendments to CPL §§ 440.10 and 440.30 allow a defendant to file a

post judgment claim of actual innocence of the offense of which he/she was convicted of, the

defendant's case does not meet that criteria - namely: DNA testing.

And, while the Second Department has recently recognized a freestanding claim of actual

innocence as a ground for a defendant to challenge his conviction (*People v. Hamilton*, 2014 NY

13

Slip Op 238)["an actual innocence claim must be established by clear and convincing evidence"];
the grounds and issue raised by the defendant regarding the sufficiency of the evidence which
resulted in his conviction do not meet the clear and convincing standard set forth in *Hamilton*
that may allow a hearing on the merits.  Moreover, these grounds were also previously
determined on the merits upon an appeal from the judgement of conviction and were denied (see,
*People v. Jimenez, supra*;  see also *People v. DeGuglielmo*, 75 AD3d 206 [2d Dept. 2010]; CPL
§440.10[2][a]).

Additionally, the defendant recently submitted (January 22, 2014) an affidavit by an OAD
investigator that contains information which they believe supports the defendant's claim of actual
innocence.  The OAD investigator, Brandilyn Alexander, states in her affidavit (incorrectly
identified as an affirmation) that she conducted a telephone interview of an alleged eyewitness to
the Batman shooting.  Winjie Littlejohn, who was one of the two sisters who accompanied the
decedent and his companions that evening, is stated as saying that she had never seen the person
in the photograph (1989 mug shot of the defendant that was recently emailed to her by the OAD
investigator) and that the shooter was "brown" and "Jamaican."

The People responded and this Court agrees that the affidavit does not establish the
defendant's innocence nor, does this Court believe, that the information provided in this affidavit
deviate from the description provided by all of the eyewitnesses to the argument and the
shooting: that the shooter spoke with a Jamaican accent and had brown skin.  The defendant was
described by Esco Blaylock as a Hispanic man who acted like he could be Jamaican.  Moreover,
the statement in the affidavit "That Mr. Worrell was not the person in line who was initially
arguing with the Jamaican man" does little to clarify the scenario that evening and who the

14

shooter was and whether she actually witnessed the shooting.

This Court is in accordance with the People's position that the affidavit does nothing more to support defendant's actual innocence claim.

Consequently, the defendant's claim of actual innocence is also denied.

### Brady Disclosure

CPL § 440.10 (1)(f) provides that a judgment may be vacated if the People's conduct was improper or prejudicial.

Following the First Department's affirmance of the defendant's conviction, the Office of Appellate Defender[21] (OAD) filed the instant CPL § 440.10 motion seeking to vacate the defendant's conviction based on, *inter alia*, the post conviction discovery of a litany of alleged *Brady* material which the defendant argues, the People improperly withheld (suppressed evidence favorable to the defendant) before and during the defendant's trial and which prejudiced the defendant.

The defendant argues that ADA Mattaway's failure to fully disclose the entire criminal records, cooperation agreements and benefits received by three specific witnesses - Andrew O'Brien, Kevin Morrissey and Esco Blaylock - materially prejudiced the defendant and, had they been produced prior to his trial, would have altered the outcome of his trial. This Court believes otherwise.

The Due Process Clauses of the Federal Constitution and the New York State Constitutions both guarantee a criminal defendant the right to discover favorable evidence in the

---

[21]The OAD represented the defendant in his unsuccessful appeal before the First Department (*People v. Jimenez*, 71 AD3d 483[2010]).

RJ-000015

People's possession material to guilt or punishment (*see Brady v Maryland*, 373 US 83, 87-88[1963]; *People v Bryce*, 88 NY2d 124, 128 [1996]).

"Under the New York rule, if a general demand [for discovery] has been made, evidence will be deemed material if there is a reasonable probability that had it been disclosed to the defense, the result would have been different--i.e., a probability sufficient to undermine the court's confidence in the outcome of the trial (citations omitted). The rule applies regardless of the good or bad faith of the prosecutor, for its purpose is not to punish misconduct but to insure that the accused receives a fair trial (citations ommitted)" (*People v. Bryce*, supra, at 128). The law also requires that *Brady* material be produced whether or not the defendant requests any such evidence (*see Strickler v Greene*, 527 US 263, 280-281 [1999]).

In *Brady v Maryland* (supra), the United States Supreme Court held that due process requires prosecutors to disclose information in their possession or control that is both favorable and material to the defense (*see, People v Vilardi*, 76 NY2d 67, 73 [1990]; *People v Scott*, 88 NY2d 888, 890 [1996]). *Brady* also held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" (373 U.S. at 87; see also, *People v. Bryce*, 88 NY2d 124 [1996] ).

To establish a *Brady* violation a defendant must show that the "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued" because the evidence was material (*Strickler v Greene*, supra at 281-282[1999]; see *People v LaValle*, 3 NY3d 88, 109-110 [2004]; see also *People v Fuentes*, 12

16

NY3d 259, 263 [2009] "Impeachment evidence falls within the ambit of a prosecutor's *Brady*

obligation." citations omitted).

## Impeachment Evidence

In *People v. DeSimone* (23 Misc.3rd 402,414 [2008]), it was held that "Firmly rooted in

the concept of the constitutional guarantee of due process is the principle that 'the suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the  good faith or bad faith of

the prosecution (citations ommitted).

The dispute in this case is whether the additional criminal records of Andrew O'Brien and

Kevin Morrissey were "material" to the question of defendant's guilt.  The test of materiality is

whether "there is a reasonable probability that had it been disclosed to the defense, the result

would have been different--i.e., a probability sufficient to undermine the court's confidence in the

outcome of the trial" (*People v Bryce*, 88 NY2d 124, 128 [1996]).  This Court holds that in this

case it does not.  Considering that the prosecutor provided the defense with the names of the

testifying witnesses, their respective and extensive criminal records in her possession, and the

fact that three different witnesses testified directly against the defendant - identifying the

defendant - in open court -describing in detail his actions on the popcorn line and thereafter in the

movie theater, this Court does not believe that the verdict would have produced a different result

had the defense had access to whatever additional impeachment value he could have gleaned by

the additional undisclosed crimes committed by these witnesses.

Even in criminal law there is such a concept as overkill.  The additional crimes which

were not included in the information provided to the defense for Andrew O'Brien were just

17

impeachment fodder - an extension of his violent criminal history. As for Kevin Morrissey,

every one of the ten criminal convictions which were disclosed to the defense were crimes of

fraud, deceit and a complete disregard for truthfulness. The eight additional convictions which

the People mistakenly did not provide to the defense were just an extension of his deceitful,

criminal past - whether it was in the federal or state level. Moreover, the People's conceded

disclosure error does not appear to be willful, and, on the record before this Court, there is

nothing that screams that they committed the grossest kind of *Brady* violation--one that is

designed to conceal the truth about the case from the fact finder (see, *People v. Williams*, 7 NY3d

15[2006]-"not every significant misjudgment by the prosecution entitles the defendant to a

windfall.").

### Discovery concerning Andrew O'Brien

With regard to Andrew O'Brien, ADA Mattaway disclosed, *inter alia*, the following:

3/11/1988 - Conviction by plea of guilty - Criminal Possession of a Weapon, Kings County;

3/9/1989 - Conviction by plea - Cocaine Possession, Richmond. Virginia, Circuit Court;

5/10/1993- Found Guilty of Murder; use of a firearm in commission of a felony, Virginia Beach,

Virginia[22]; Mr. O'Brien was serving a 30 year sentence in federal prison in Virginia for an un-

related murder; Mr. O'Brien asked the prosecutor for a letter to be placed in his file folder stating

that he testified for the Bronx District Attorney; An FBI request to interview Andrew O'Brien, by

an FBI agent (SA Redondo) from the NY office accompanied by an NYPD Detective, dated

1/03/2001; Complaint follow up report dated 1/16/2001, by Det. Wendell Stratford, regarding the

---

[22] This murder was identified as one of the overt acts committed by the Poison Clan under the federal racketeering indictment.

18

January 16, 2001, interview with SA Redondo of Andrew O'Brien;  FBI (FD-302) Memo dated

January 17, 2001, which detailed Mr. O'Brien's anticipated testimony.

### Alleged Brady Violation regarding Andrew O'Brien

The People concede that they failed to disclose certain materials regarding Andrew

O'Brien which were in the custody and control of the United States Attorney's Office in

Richmond, Virginia and which were sent to ADA Mattaway by an AUSA David Novak (EDVA)

two weeks prior to the beginning of the defendant's trial.  The alleged discovery materials which

the People concede they did not turn over to the defense included:

(1) Transcripts of Mr. O'Brien's testimony against the Poison Clan members in the federal

racketeering case of *USA v. Beckford, et al.*;and,

(2) letters written by Mr. O'Brien to the federal judge overseeing the federal racketeering case of

*USA v. Beckford, et al.*.

On June 4, 2007, having just returned from vacation ADA Mattaway began to prepare for

the start of the defendant's trial.  On this date, she contacted AUSA Novak in Virginia and

requested his help in, *inter alia*, producing Mr. O'Brien from federal prison[23], as well as

providing her with any cooperation agreements regarding Mr. O'Brien, any favorable treatment

he may have received as a result of his cooperation, copies of any letters written by O'Brien to

the federal judge requesting leniency.  In an email dated June 8, 2007, AUSA Novak notified

ADA Mattaway that she would be receiving a packet of materials for Mr. O'Brien and that she

should be receiving them by early next week.  Prior to the beginning of the hearings, ADA

---

[23]Because Mr. O'Brien was in the federal witness protection program all local law
enforcement access had to be specifically approved by the federal government.

19

Mattaway received three to four boxes of materials sent by AUSA Novak in response to her request. Included in these boxes were, *inter alia*, the requested materials including the transcripts of Mr. O'Brien's testimony in the 1996 federal racketeering Poison Clan case (*USA v. Beckford*) in the Eastern District of Virginia, the cooperation agreement and several letters written by Mr. O'Brien to the federal judge in the Poison Clan case requesting leniency. ADA Mattaway, however, concedes that she must have inadvertently overlooked the material regarding the transcripts of Mr. O'Brien's testimony as she was performing numerous tasks in preparation for the beginning of the defendant's hearings and trial (June 15, 2007). ADA Mattaway argues that any information that should have been disclosed to the defendant but was not, was purely based on her mistake, but was not in any way, intentional.

The defendant argues that the suppression of the federal transcripts of Mr. O'Brien's 1996 testimony against other members of the "Poison Clan gang" in an unrelated federal racketeering prosecution arising out of the state of Virginia undermines the credibility of the testimony given by Mr. O'Brien in the 1989 Batman shooting in the Bronx. He argues that these transcripts deprived the defense of utilizing valuable information regarding Mr. O'Brien's actions while he was a member of the Poison Clan gang and, consequently was injurious to their defense. However, this argument is misplaced.

"As a general rule, evidence is relevant if it tends to prove the existence or non-existence of a material fact, i.e., a fact directly at issue in the case. Relevant evidence, however, is not necessarily admissible. A court may, in its discretion, exclude relevant evidence if its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury (*see, People v Davis*, 43 NY2d 17, 27 [1977]; *see*

RJ-000020

*also, People v Scarola,* 71 NY2d 769, 777[1988]).  Evidence "of merely slight, remote or

conjectural significance" will ordinarily be insufficiently probative to outweigh these

countervailing risks [citations omitted] (*see, People v Primo,* 96 NY2d 351, 356-357 [2001]; *see*

*also, People v Ventimiglia,* 52 NY2d 350, 359 [1981] "Efforts to quantify the degree of

probativeness necessary for admission establish that the evidence must be of more than 'slight

value.' " [citations omitted]).

        The defendant argues however, that it is the additional benefit of being provided the out

of state and federal convictions that could have led to the discovery of other impeachment

testimony (Poison Clan trial transcript) and/or persons who may have contradicted the testifying

witnesses' version of events the night of the shooting (*inter alia* Sharon Ramroop and the

Littlejohn sisters).  However, this argument is also misplaced.  "The *Brady* doctrine requires

prosecutors to turn over material exculpatory to defendants (citation ommitted).  *Brady* does not,

however, require prosecutors to supply a defendant with evidence when the defendant knew of,

or should reasonably have known of, the evidence and its exculpatory nature." (*see, United States*

*v LeRoy,* 687 F2d 610, 618 [2d Cir]).

        There were numerous indicators in the discovery material provided to the defense prior to

the trial that revealed information pertaining to the persons defendant alleges could have

provided exculpatory material in his defense - information regarding Sharon Ramroop, the

Littlejohn sisters and Mr. O'Brien's criminal  involvement with the federal authorities and his

federal conviction.  Defense counsel had sufficient opportunity to investigate the information

which was available in the very documents ADA Mattaway provided to him several weeks

before their anticipated testimony against the defendant.  Moreover, the defendant was placed at

21

the scene of the shooting as having been in the company of a tall, dark, slender woman with long

black hair and jewelry - a description similarly close in detail to that of the then Sharon Ramroop

- the woman who was identified as having been with the defendant at the movie theater on the

night of the shooting[24]. As for the Littlejohn sisters, their information was unknown to the

prosecutors as well.  Additionally, the police who conducted the initial investigation into the

Batman shooting did not seek out the Littlejohn sisters for further information - presumably

because they had an eyewitnesses to the entire event that preceded the shooting and the shooting

itself (Esco Blaylock) and because Sharon Ramroop identified the defendant as "Ricky".  The

second investigation conducted by the NYPD Cold Case squad mirrored that of the first-only this

time they had a second eyewitness to the entire event -Andrew O'Brien.  Consequently, there was

no need to look for any other witnesses and, more than likely, that is why the People had little or

no information in their file on Ms. Ramroop or the Littlejohn sisters.

The transcripts of Mr. O'Brien's testimony in the Poison Clan case regarded his

involvement with and crimes he committed as a Poison Clan member and what he witnessed and

heard other Poison Clan members do and say - issues that were germane to the federal

racketeering and conspiracy case arising out of Virginia - issues that were collateral to the

defendant's case and provided solely additional impeachment material of the testifying witness

(see, People v. Schultz, 4 NY3d 521 [2005]; see also, People v. Gamble,18 NY3d 386, 399

[2012] "That the People introduced evidence establishing defendant's motive for the shootings

does not, as the Appellate Division observed, "open the door to generalized, speculative evidence

---

[24]Clearly she was a witness the defendant would have actively searched for if she was
able to support or provide exculpatory information in his defense.

of possible motives by unidentifiable persons" [citations omitted]).

In addition to the federal materials not disclosed by the People, the defendant argues that the People also did not disclose a 1992 state conviction for Criminal Possession of a Weapon where Mr. O'Brien was sentenced to 3 and ½ years to 7 years in prison; and, a 1989 misdemeanor conviction for brandishing a weapon in Richmond, Virginia. These convictions, ADA Mattaway concedes, were also not disclosed to the defense but she argues that it was solely because of the confusing nature of the rap sheets that she did not disclose the 1992 state conviction for 3rd degree criminal possession of a weapon where the rap sheet presented separate dockets, a dismissal for one of those dockets and other confusing information which did not affirmatively include the word "convicted". With regard to the non-disclosure of his 1989 misdemeanor conviction for brandishing a weapon in Virginia, she argues again that this was inadvertent, that any non-disclosure was unintentional and was solely because of her limited time to cull through the voluminous materials she received from AUSA Novak less than one week prior to the beginning of hearings and trial.

"A prosecutor's inadvertent or negligent failure to disclose exculpatory material in his control ( *Giglio v United States*, 405 US 150, 153-154 [1972]; *Brady v Maryland*, 373 US 83, 87[1963]; *People v Savvides*, 1 NY2d 554, 556[1956]), has long been seen as conflicting with "considerations of elemental fairness … and … professional responsibility" (*People v Simmons*, 36 NY2d 126, 131 [1975]), which may deny the defendant due process when the non-disclosure of even unrequested exculpatory evidence is "highly material" to the defense [*supra*, at 132] (*People v. Martin*, 240 AD2d 5, 6[1998]). As the transcript of Mr. O'Brien's testimony in the Poison Clan case contains admissions to certain crimes and observations of crimes by Mr.

23

O'Brien and members of the Poison Clan in the late 1980's and early 1990s, that information can hardly be considered as highly material to the defense as whatever information may have been utilized by the defendant from this transcript solely constitutes additional impeachment evidence. More importantly, defense counsel thoroughly impeached Mr. O'Brien with the extensive criminal history provided to him by ADA Mattaway-as well as the impeachment evidence regarding Mr. O'Brien's cooperation agreement with the federal authorities and his agreement with ADA Mattaway. When the proffered proof only tends to impeach or discredit prior testimony, it is within the court's discretion to deny the motion (see, e.g., *People v Suarez*, 98 AD2d 678, 679[1983]; *People v Williams*, 35 AD2d 1023, 1024[1970] "Since the proferred (sic) proof only tends to impeach or discredit the prior testimony and is cumulative, defendant's motion was properly denied."; See also, *People v. Mateo*, 2 NY3d 383,410 [2004] and *People v. Bleakley*, 69 NY2d 490, 495 [1987] "Great deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor.")

Additionally, this Court does not believe that the prosecutor's inadvertent failure to reveal the other two state convictions arising out of New York and Virginia was intentional, nor would it have altered the outcome of the defendant's trial nor deny him due process as that information also constitutes impeachment evidence. "[W]here the impeachment information has no bearing on defendant's guilt or innocence, such as where the prosecution witness' misconduct is completely unrelated to the trial at which he is testifying and the witness's testimony is not crucial to the prosecution's case, its non-disclosure does not constitute a *Brady* violation [citations omitted] (*People v Fernandez*, 249 AD2d 3, 6[1998]).

Consequently, the motion to vacate the defendant's conviction based on the ground that

24

the prosecutor withheld exculpatory material in the form of the transcript of Andrew O'Brien's testimony in the Poison Clan case and the state convictions is also denied. Since the alleged "exculpatory" material was in the nature of impeachment evidence, it is within this Court's discretion to deny this portion of instant motion to vacate the defendant's conviction.

### Discovery for Kevin Morrissey

ADA Mattaway disclosed the following ten convictions regarding Kevin Morrissey:

10/17/1994-Grand Larceny, Suffolk County Supreme Court;  7/1/1997-Convicted on plea- Forgery, Nassau County Court; 5/1/1997-Convicted on plea of guilty -Forgery 3rd Degree, Suffolk County Supreme Court; 8/11/1997-Convicted on plea of guilty-Unauthorized Use of a Vehicle, Carmen Town Court; 10/19/2000- Convicted on plea of guilty-Petit Larceny, Queens County Criminal Court; 12/20/2001- Convicted on plea of guilty-Petit Larceny, New Rochelle City Court; 8/29/2001-Convicted on plea of guilty-Petit Larceny, Putnam County Court; 2/4/2004 - Attempted Grand Larceny, Queens County Supreme Court; 3/9/2004 - Convicted on plea of guilty-Poss of a Forged Instrument, Nassau County Court; and, 2/26/2004 – Attempted Grand Larceny, Suffolk County Supreme Court.

With regard to Mr. Morrissey's three pending (open) cases, ADA Mattaway more specifically stated that his three pending cases were: 12/13/2006 - Grand Larceny, 3rd Degree, Grand Larceny, 4th Degree, Possession of a Forged Instrument, 3rd Degree, Forgery 3rd Degree, Petit Larceny, Supreme Court, Kings County; 12/28/2006 -  Possession of a Forged Instrument, 2nd , Grand Larceny, 3rd - Nassau County Court; and 12/19/2006 - Attempted Grand Larceny, 3rd Degree, Possession of a Forged Instrument, 2nd Degree, Criminal Possession of Stolen Property, 3rd Degree, Attempted Grand Larceny, 3rd Degree, Scheme to Defraud, 1st Degree; and Criminal

RJ-000025

Impersonation, 2nd - Queens County Criminal Court.

### Alleged Brady Violations regarding Kevin Morrissey

The defendant argues that the prosecution failed to disclose the following additional convictions for Mr. Morrissey as well as evidence of his mental illness. The additional convictions include eight additional New York state convictions (February 1990, Nassau County [fraudulent disposition of mortgaged property]; April 1990, Westchester County [Petit Larceny]; April 1991, Queens County [Harrassment 1]; July 1991 [Issuing a Bad Check]; July 1997, Nassau [Forgery 3rd]); July 1997, Nassau [Criminal Possession of a Forged Instrument]; and, July 2001, Queens, [Criminal Possession of Stolen Property]), two federal convictions in New York (USA v. Morrissey [CR-92-1257 EDNY]; USA v. Morrissey [00-CR-485-01-CR510 EDNY]) and out of state convictions in New Jersey, Pennsylvania and Connecticut. The defendant argues that had ADA Mattaway disclosed these other convictions, his defense counsel, Patrick Bruno, "could have discovered additional evidence of Mr. Morrissey's mental illness."

However, this Court believes and holds that the quantity of the impeachment evidence - a relatively minor point considering that Mr. O'Brien and Mr. Morrissey were thoroughly impeached on the *Rosario* and *Brady* material provided to defense counsel - that divulged their respective unsavory criminal pasts, apparently did not dissuade the jury to doubt the basic accuracy of their respective testimonies and convict the defendant for the murder of Sean Worrell. Considering that Mr. Morrissey's criminal past reflected that his crimes were basically crimes of dishonesty, deceit and fraud and Mr. O'Brien's criminal history were crimes of violence, drug dealing and murder, there is a strong probability that the evidence provided by their testimony against the defendant would not have been altered by the additional impeachment

26

value (if any) of their respective propensities for dishonesty, deceit and fraud and crimes of violence, drug use[25], drug dealing and murder.  Moreover, this is not the case where there was a single and questionable eyewitness who testified about the shooting.  The primary evidence at trial establishing the defendant's identity as the murderer were the eyewitness testimonies and the testimony of Mr. Morrissey regarding the defendant's confession to shooting Sean Worrell. Setting aside the damning fact that Andrew O'Brien stood face to face arguing with the defendant on the popcorn line, and shortly thereafter was standing next to the victim when he saw the defendant shoot Sean Worrell at point blank range, there was another *unconnected* eyewitness to the argument on the popcorn line who also testified that he witnessed the defendant enter the Batman theater, walk up to the decedent and his associates and thereafter shoot the decedent - a then 15 year old Esco Blaylock.

It is however, the record before this Court that strongly indicates that not only was there probable cause to arrest defendant but the fact that three different witnesses - *each with different backgrounds and criminal histories, unconnected to each other* - provided two mirrored eyewitness accounts of the shooting (who coincidentally both identified the defendant as the shooter), and the third unconnected witness (whether or not he was in general a reliable witness), provided the accounts of the shooting as told to him by the defendant - were all largely consistent and evidently taken by the jury as true.  The jury made their credibility determinations despite the witnesses' backgrounds and found the defendant guilty. (see *People v. Mateo*, supra; and, *People v. Bleakley*, 69 NY2d 490, 495[1987]).  Consequently, I find that there was no "reasonable

---

[25]Defense counsel cross examined Andrew O'Brien about his prior drug use and history of involvement with drugs and Kevin Morrissey testified in open court as to his self reported history of drug use.

27

probability" that disclosure of the additional criminal records of Andrew O'Brien and Kevin

Morrissey would have changed the outcome of the defendant's trial.

### Kevin Morrissey's History of Drug Use and Mental Illness

The defendant's argues that the prosecutor also withheld evidence of Mr. Morrissey's

drug use and a history of mental illness[26]. In her affirmation, ADA Mattaway states that she met

with Mr. Morrissey on several occasions and not once did she ever have cause to think that Mr.

Morrissey was mentally infirm nor that he may have had a history of mental illness as he also did

not inform her of any history of mental illness. ADA Mattaway affirms that "during her various

interactions with him, Mr. Morrissey was very well spoken, intelligent and exhibited no sign of

mental illness."

### Prosecutorial Misconduct

"Mere conclusory allegations of prosecutorial misconduct are alone insufficient to require

a trial court to conduct an evidentiary hearing for the purpose of resolving those accusations"

(*People v. Brown*, 56 NY2d 242, 246 [1982]).  To raise a triable issue some *actual evidence* of

knowledge on the part of the prosecution that Detective Stratford, Andrew O'Brien and Kevin

Morrissey's testimony was false must be submitted to the court.  Other than highlighting the

discrepancies in their respective testimonies (which I might add can be found in almost any re-

examination of trial testimony and written statements) this does not rise to the level of a scenario

---

[26] While there were several references throughout the documents relating to Mr.
Morrissey that allude to some form of questioning of his mental capacity, there is nothing in the
record that affirmatively states that Kevin Morrissey was diagnosed with a mental condition
sufficient to warrant a hearing to determine his capacity or to overturn the jury's verdict.
Additionally, in one of the references to Mr. Morrissey's alleged mental infirmity, the federal
judge presiding over one of his cases stated that he believes Mr. Morrissey was just malingering
in an effort to minimize his culpability in a case involving fraud.

RJ-000028

where this Court must conduct an evidentiary hearing to determine and or explore these discrepancies. As no triable issue was raised there is no abuse of discretion in denying the motion to vacate on this ground without an evidentiary hearing (see *People v Ford*, 46 NY2d 1021; *People v Session*, 34 NY2d 254). To hold otherwise and require a hearing to investigate every speculative and unsupported allegation of prosecutorial impropriety would unquestionably impose an undue burden upon our judicial system and the People of the State of New York.

### Cooperation Benefits for Andrew O'Brien and Kevin Morrissey

The defendant argues that the People misrepresented the benefits that Andrew O'Brien and Kevin Morrissey would receive for cooperating against the defendant beyond what was contained in the discovery the People provided through their *Rosario* obligation.

A review of the record show that at least five months prior to the start of the defendant's trial ADA Mattaway started providing defense counsel with voluminous discovery materials, which she continued to do so up to and throughout the defendant's trial.

Prior to the start of the defendant's trial[27] and pursuant to her disclosure obligation under CPL §240.45[28], Assistant District Attorney Lisa Mattaway (ADA Mattaway), provided the defendant's attorney with numerous discovery and Brady material. Included in this material was a memorandum from her office dated June 8, 2007, and directed to the attention of Patrick Bruno, Esq.. This memo specifically refers to two persons she would call as witnesses in her

---

[27]In their Affirmation in Opposition, the People state that "As early as five months prior to trial, in January of 2007, the prosecutor started providing defense counsel, Patrick Bruno, Esq., with voluminous discovery materials, which she continued to do until June."

[28]Pursuant to the Court of Appeals' case in *People v. Rosario* (9 NY2d 286 [1968]), codified under CPL § 240.45, the People are required to provide defense counsel with all pre-trial statements of prosecution witnesses.

RJ-000029

direct case against the defendant and who were incarcerated.  The two witnesses were Andrew

O'Brien and Kevin Morrissey.  She also provided defense counsel with similar information as it

pertained to another eyewitness she intended to call against the defendant - Esco Blaylock.

The memorandum disclosed that Andrew O'Brien was currently serving a 30 year

sentence in federal prison for an unrelated murder and that he specifically asked that ADA

Mattaway prepare a "letter" that he could have put in his file stating that he testified for the

Bronx District Attorney's Office.

With regard to Kevin Morrissey, the memorandum disclosed that he was currently facing

several cases in Nassau, Queens and Kings County for check fraud and related charges.  ADA

Mattaway disclosed that "Nassau County and Brooklyn apparently have agreed to give him a

sentence of 1-3 years in jail but Queens has not.  Mr. Morrissey has asked for a phone call to be

made to Queens (District Attorney) if he testifies for the Bronx District Attorney's Office in this

case."

### The Federal Cooperation Agreement of Andrew O'Brien

In 1997, Mr. Andrew O'Brien entered into a cooperation agreement with the United

States Attorney for the Eastern District of Virginia (Helen Fahey) and Assistant United States

Attorney (AUSA) David Novak.  Mr. O'Brien entered into this agreement before testifying

against his co-defendants on an unrelated federal racketeering indictment[29] regarding his

association with a notorious drug gang called the "Poison Clan[30]".  The sum and substance of the

---

[29]United States of America v. Dean Beckford,et al., Cr.3-96-CR66, Eastern District of
Virginia, Richmond Division- a 23 count racketeering indictment.

[30]The Poison Clan was a notorious drug gang involved in interstate drug dealing
(Virginia, New York, Maryland, Pennsylvania, New Jersey), murder and related criminal

terms of the cooperation agreement with the Virginia federal authorities included that the defendant "cooperate *fully and truthfully* with the United States and provide all information known to the defendant regarding *any* criminal activity." A review of the record also shows that it was only after his cooperation in the "Poison Clan" case that Mr. O'Brien received a reduction on his federal sentence. On the basis of this federal cooperation agreement, Mr. O'Brien spoke to the federal authorities in 1997 about the 1989 Batman shooting in the Bronx. Pursuant to this information, the federal authorities notified the New York City Police Department about this murder and the Batman shooting case was resurrected. The NYPD Cold Case Squad began their re-investigation into the homicide of Sean Worrell. Approximately 10 years later, in 2007, the defendant was convicted for the Batman shooting based, in large part, upon the information Andrew O'Brien provided to the federal authorities.

The defendant argues that the People inaccurately disclosed the benefit that Mr. O'Brien would receive from the federal prosecutors in Virginia in that the People did not disclose that federal prosecutors would move for Mr. O'Brien's sentence to be reduced "on the basis of his testimony against Ricardo Jimenez". However, the People accurately disclosed the benefit they would provide to Mr. O'Brien in exchange for his testimony against the defendant - that they would write a letter to be placed in his file stating that he testified for the Bronx District Attorney's office.

In her affirmation ADA Mattaway affirms that (1) she had no knowledge that the letter she would write on Mr. O'Brien's behalf - *post conviction* - would be used in a Rule 35 federal motion (a motion which she affirms she was totally unfamiliar with) four months after the

---

activities.

defendant's conviction, to request a reduction of his federal sentence; (2) she did not know nor did she ever discuss with AUSA Novak that this letter would be used for such a motion on Mr. O'Brien's behalf; and, (3) according to her notes, Mr. O'Brien had already received leniency from the federal government in the form of a sentence reduction and had only wanted a letter from her.  Contrary to defendant's claim, ADA Mattaway was never in control of Mr. O'Brien's federal file let alone in what the federal authorities (AUSA Novak) would do with the letter she wrote in support of Mr. O'Brien's testimony (see, *People v. Kronberg, et al.*, 243 AD2d 132, 154 [1998] "mere access to statements not in the People's control or possession does not trigger an obligation to produce under *Rosario*").  The file was in the custody and control of the federal authorities in Virginia.  Mr. O'Brien's cooperation agreement was with the US Attorney's office in Virginia.  The materials ADA Mattaway did have were the materials that AUSA Novak sent to her upon her request.  Not only is there no evidence of a joint investigation between the People and the federal authorities in Virginia (see, *People v. Leo* 249 AD2d 251, 252 [1998], *People v Santorelli*, 95 NY2d 412[2000]), there was no joint investigation, nor "extensive cooperation between the investigative agencies [where] the entire effort was marked by [a] spirit of cooperation"(*United States v Antone*, 603 F2d 566, 569-570 [1979]), nor was there a collaboration between the Bronx District attorney's office and the US Attorney's office in Virginia regarding either Mr. O'Brien or the defendant.  This Court would be hard pressed to hold that whatever actions transpired outside of the realm of the People's agreement between ADA Mattaway and Andrew O'Brien, created a material obligation on the People to account for AUSA Novak's actions on Mr. O'Brien's behalf post conviction.  Consequently, the motion to vacate the defendant's conviction on the ground that the People materially misrepresented the

32

benefits her office provided to Mr. O'Brien is also denied.

## The People's Agreement with Kevin Morrissey

ADA Mattaway also disclosed the benefit to be provided to Kevin Morrissey from her office in exchange for his testimony against the defendant -to place a call to the Queen's County Assistant District Attorney prosecuting the case against Kevin Morrissey in the hopes of getting the ADA to comply[31] with the offers given to Mr. Morrissey by the Nassau County District Attorney's Office and the King's County District Attorney's office (1-1/2 to 3 years) on two similar yet unrelated cases. The defendant argues that ADA Mattaway did not completely disclose the benefits her office was providing to Mr. Morrissey in the form of providing new housing for Mr. Morrissey's wife and child. This argument however, is also misplaced. Shortly after Mr. Morrissey testified against the defendant in this case ADA Mattaway communicated with Mr. Morrissey's attorney in his Nassau County case, his Kings County case and his Queens County case - the three cases she disclosed to the defense prior to the start of the defendant's trial - pursuant to the terms of her agreement with Mr. Morrissey. Several weeks later, ADA Mattaway was contacted by NYPD detectives who informed her that the defendant had or was attempting to put a "hit" on her and Detective Stratford[32]. On September 4, 2007, ADA Mattaway wrote to the Warden at Riker's Island informing him of the death threats by the defendant and she also requested protection for Mr. Morrissey who was still incarcerated in Riker's while the defendant was awaiting his transfer to a state facility. On September 18, 2007,

---

[31]Queens ADA was offering 2 to 4 years.

[32] After learning of the death threats ADA Mattaway was assigned a detective to accompany her to her car and provide protection for several weeks.

RJ-000033

ADA Mattaway was contacted by Mr. Morrissey's wife. Mr. Morrissey's called to ask if ADA Mattaway could make arrangements to move her and her child because she lived in the same neighborhood where the defendant and his family resided and she was afraid for her safety. It was only after this communication from Mrs. Morrissey that ADA Mattaway attempted to provide some relocation assistance for her. This Court believes that ADA Mattaway's actions in attempting to provide assistance to Mrs. Morrissey - several weeks following the defendant's conviction was borne solely out of the allegations (credible enough to provide safety and security for ADA Mattaway for several weeks following the death threats) of the death threats which were, again, outside of the realm of her agreement with Mr. Morrissey and was never contemplated by any of the parties. Consequently, the motion to vacate the defendant's conviction on the ground that the People materially misrepresented the benefits her office provided to Mr. Morrissey is also denied.

Additionally, this Court believes that even if the additional information complained of regarding Mr. O'Brien and Mr. Morrissey been known and provided to the defense pursuant to the People's *Brady* obligation, the outcome of the defendant's trial would not have produced a different verdict. Contrary to the defendant's contentions, the eyewitnesses' testimony and the testimony of Kevin Morrissey were not incredible or unworthy of belief despite their criminal histories and backgrounds.

As the prosecutor clearly met her *Brady* obligation with regard to disclosure of the complete agreements made between her office and O'Brien and Morrissey for their testimony against the defendant, this Court finds no *Brady* violation under this issue.

34

### The People's Rosario Delay

Defendant's claim of substantial prejudice stemming from the People's delays in disclosure of various *Rosario* documents is not supported by the record (*see, People v Ranghelle*, 69 NY2d 56, 63[1986]; *People v Iglesias*, 184 AD2d 432 [1992], *lv denied* 80 NY2d 930).

### Ineffective Assistance of Counsel

The right to the effective assistance of counsel is guaranteed by both the Federal and New York State Constitutions (see, US Const, 6th Amend; NY Const, art I, § 6). Under the federal constitution, a defendant is entitled to representation that satisfies "an objective standard of reasonableness" (*Strickland v Washington*, 466 US 668, 669,[1984]).

Under *Strickland*, a defendant claiming ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). Under the New York State constitution, to prevail on a claim that a defendant was denied effective assistance of counsel, the defendant must demonstrate that his attorney failed to "provide meaningful representation...[and] must [also] demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (*People v Caban*, 5 NY3d 143, 152 [2005][internal quotations and citations omitted]).

The state standard is considered "somewhat more favorable to defendants," focusing on "the fairness of the process as a whole rather than its particular impact on the outcome of the case" (*People v Benevento*, 91 NY2d 708, 714[1998]; *People v Georgiou*, 38 AD3d 155, 161[2007]). Moreover, the State standard of meaningful representation does not require a defendant to fully satisfy the prejudice test of *Strickland*. Our State's prejudice component

RJ-000035

focuses on the fairness of the process as a whole, rather than its particular impact on the outcome of the case (*id*. at 155-156 [internal quotations and citations omitted]).  Counsel's representation is "viewed in totality" (*People v Turner*, 5 NY3d 476, 480 [2005]).

In *People v. Baldi* (54 NY2d 137, 147 [1981]), the Court of Appeals stated that "our most critical concern in reviewing claims of ineffective counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis.  It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy (see *People v. Droz*, 39 NY2d 457 [1976] " . . *what constitutes effective assistance is not and cannot be fixed with precision, but varies according to the particular circumstances of each case*").  A convicted defendant, with the benefit of hindsight, often can point out where he or she thinks trial counsel went awry.  "But trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness (*People v. Rivera*, 71 NY2d 705, 708 [1988]).  So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met (see *People v Jackson*, 52 NY2d 1027[1981]; *People v Aiken*, 45 NY2d 394[1978], *supra*; cf. *People v Bell*, 48 NY2d 933[1979]; *People v Droz, supra*).  A defense attorney fails to provide meaningful representation when counsel's performance falls below an objective standard of reasonableness and deprives the defendant of a fair trial (*see People v Turner*, 5 NY3d 476, 485 [2005]; *People v Hobot*, 84 NY2d 1021, 1022 [1995]).

Defendant argues that his counsel was ineffective for a myriad of reasons and concludes that these numerous instances establish defense counsel's ineffectiveness.  His argument focuses

36

primarily on three areas of defense counsel's alleged ineffectiveness - (1) motion practice; (2) handling of both defense and prosecution witnesses; and, (3) failure to pursue a line of argument in summation and failure to pursue a mistrial argument. More specifically defendant argues that his trial counsel was ineffective for (a) failure to file a motion to dismiss the indictment based on the 17 year unexplained pre-indictment delay; (b) defense counsel's representation at the Wade hearing was deficient and prejudiced the defendant; (c) counsel was ineffective for failing to call an expert on eyewitness identification; (d) counsel was ineffective for failing to confront Andrew O'Brien and Esco Blaylock with their prior inconsistent statements; (e) counsel was ineffective in the handling of both defense and prosecution witnesses. When considered in context, all except (d) and (e) involve tactical decisions concerning a difficult defense.

Pre-Indictment Delay

This Court believes that many reasons can account for a lawyer's failure to file a pre-trial motion. "An attorney might, for example, be motivated by strategy or by a reasonable conclusion, based on the facts known at the time, that there is no colorable basis for a hearing" (*People v. Rivera*, 71 NY2d 705 [1998]). That appears to be the scenario in this case.

There is no statute of limitations for the crime of murder. The fact that this crime occurred seventeen years prior to the crime is of no consequence whatsoever. As long as the People prosecuted the case once the police completed their investigation into this murder and presented the People with their findings and sufficient evidence to charge the defendant with the crime then there is no excessive pre-trial delay in prosecuting this cold case murder. Had the People withheld the prosecution of the defendant for seventeen years after the completion of the Batman shooting investigation by the police then there would be an actual basis to charge the

37

People with failure to prosecute.[33]  But that is not the case.  This case was resurrected from the dead in 1997 after Andrew O'Brien cooperated with the federal authorities in Virginia pursuant to his cooperation agreement following the Poison Clan prosecution in the Eastern District of Virginia- a case totally unrelated to the Batman Shooting.

Without anything more from the defendant, his allegation that his trial counsel was ineffective for failing to file a motion to dismiss based on 17 years of unexplained delay is baseless.  "To prevail on a claim of ineffective assistance of counsel, it is incumbent on defendant to demonstrate the absence of strategic or other legitimate explanations for counsel's failure to request a particular hearing.  Absent such a showing, it will be presumed that counsel acted in a competent manner and exercised professional judgment in not pursuing a hearing" (*People v. Rivera*, 71 NY2d 705 [1998]; see also, *People v. Mauro*, 48 NY2d 892 [1979] "no basis for reversal of conviction found in defendant's contention that he was denied the effective assistance of counsel in consequence of his attorney's failure to make a pre-trial motion to suppress his five statements and his delay in making a motion for mistrial; *People v. Caban*, 5 NY3d 143 [2005]").  Moreover, the Appellate Division, First Department, found no lack of due process for the 17 year delay in prosecuting the defendant (see *People v. Jimenez*, supra.)

Wade Hearing

With regard to trial counsel's alleged deficient and prejudicial representation at the *Wade* hearing, the defendant raises several issues.  The first "failing to object to the hearsay statements of Detective Stratford" is meritless.  First of all, this is not what the record reveals.  The record

---

[33]But see, *People v. Ayyash*, Ind.No. 2777/07 (Sup. Ct. Bx. Co. 2012) dismissing a murder case after 19 years of pre-indictment delay.

38

reveals that defense counsel did make an objection to this testimony however, it was overruled by the hearing judge. Secondly, It is well established that hearsay evidence is admissible to establish *any material fact* at a suppression hearing (*People v. Terry*, 224 AD2d 202,203 [1996]). As to defendant's argument that counsel was ineffective for failing to move to strike Detective Stratford's testimony as baseless conjecture, defendant provides no legal support for this argument.

The defendant also claims that counsel was ineffective because he failed to call two persons to testify at the *Wade* hearing- Esco Blaylock (eyewitness to the shooting and the shooter), and Sharon Ramroop (one of the defendant's girlfriends). However, the defendant has not demonstrated the absence of strategic or other legitimate explanations for defense counsel's decision not to call either of these persons as his witnesses at the hearing. Esco Blaylock is one of the People's main eyewitnesses to the event. Every aspect of his proposed testimony related to his familiarity with the defendant from his neighborhood and his witnessing the argument on the popcorn line and the shooting inside the movie theater. An experienced attorney such as defense counsel would have been hard pressed to call him as their witness in their defense at the Wade hearing for a myriad of reasons. As for Sharon Ramroop, the record reveals that she did not witness the shooting and provided no material benefit to the People. Moreover, Sharon Ramroop was the defendant's girlfriend. Clearly there was a reason to call her *if* she would have been able to provide some sort of defense or alibi or material testimony relevant to the defendant's case. "Just as an attorney whose client offers a weak alibi defense may choose as a matter of strategy to adopt another tack (see *People v Ford*, 46 NY2d 1021[1979])", a review of the record supports this Court's belief that defense counsel purposely chose not to call his client's girlfriend at the

39

*Wade* hearing.  Absent such a showing, it is presumed that counsel acted in a competent manner and exercised professional judgment in not calling either of these persons as defense witnesses.

Expert Testimony

Defendant's argument that counsel was ineffective for failure to call an expert on eyewitness identification is also misplaced.  The defendant himself acknowledged that defense counsel was aware of expert testimony on eyewitness identification but recognized the weakness of any such testimony regarding Andrew O'Brien's identification of the defendant.  This was a reasonable assessment of the lack of value that expert eyewitness identification testimony would have provided to the defendant considering the significant interaction Mr. O'Brien had with the defendant the night of the shooting starting with the defendant on the popcorn line and then inside the movie theater before he saw the defendant shoot his friend, Sean Worrell, at point blank range and only inches away from him.  In this case however, there was another eyewitness to the entire incident - from the argument on the popcorn line to the shooting in the theater - Esco Blaylock, the witness who was familiar with the defendant from his neighborhood (see *People v. Pacheco*, 38 AD3d 686-688 [2007]-where trial court denied the defendant's application to present expert testimony because one of the two eyewitnesses to the event was acquainted with the defendant; and see, *People v. Caban*, 5 NY3d 143, 152 -"there can be no denial of effective assistance of counsel arising from counsel's failure to make a motion or argument that has little of no chance of success.").

Andrew O'Brien, Esco Blaylock and the handling of both Defense and Prosecution Witnesses

The defendant further argues that his attorney was also ineffective for failing to confront Andrew O'Brien and Esco Blaylock with their prior inconsistent statements and he was

40

ineffective in the handling of both defense and prosecution witnesses. This Court is unpersuaded by this argument *ab initio*. A review of the record before this Court is sufficiently demonstrative of the manner in which Mr. Bruno aggressively cross examined these eyewitnesses, thoroughly impeaching Andrew O'Brien on each and every aspect of the disclosed criminal record, cooperation agreement, murder, his association with the "Poison Clan" case in Virginia, his eyewitness account of the Batman shooting and every aspect of his credibility which Mr. Bruno continued in his closing arguments to the jury.

The arguments raised by defendant focus mainly on minor inconsistencies in Esco Blaylock's testimony regarding the manner in which the then 15 year old Esco Blaylock was no longer employed by the Whitestone theater shortly after the Batman shooting, his "familiarity" with the defendant prior to the shooting and his cooperation and reason for lack of cooperation with the police after the shooting. Defense counsel cross examined Mr. Blaylock about his position at the theater, his age back then and the reason why he was no longer employed by the theater after the shooting - insinuating that Mr. Blaylock was untruthful about why he stopped working at the Whitestone and why he stopped cooperating with the police. Defense counsel buttressed his cross examination by attacking Mr. Blaylock's credibility in his closing arguments to the jury.

Upon reviewing a claim of ineffective assistance of counsel, this Court must reverse the defendant's conviction if "the cumulative effect of defense counsel's actions deprived defendant of meaningful representation," even though each error, taken individually, might not warrant reversal (*People v Oathout*, 21 NY3d 127, 132 [2013] [internal quotation marks and citation omitted]; see, *People v Oliveras*, __NY__, 2013 NY Slip Op 4040 at *6; see also, *Baldi*, 54

41

NY2d at 146)  Under the New York State Constitution, that guarantee entitles the defendant to

"meaningful representation").  When addressing claims of ineffective assistance of trial counsel,

the Court of Appeals concluded, in *People v. Baldi* (54 NY2d 137 [1981]), that a "'meaningful

representation' criterion comports with both the Sixth Amendment and our own state

constitutional sensibilities.  More importantly is that we have retained *Baldi* in preference to the

federal (*Strickland v Washington*, 466 US 668 [1984]) standard in evaluating claims of

ineffective assistance of trial counsel (*People v. Stutz*, 2 NY3d 279 [2004]).

In *People v. Benevento*, supra, the Court of Appeals appropriately summed up this

standard which is this Court's perception of defense counsel's handling of the instant trial:

"In applying this standard, counsel's efforts should not be second-guessed with the

clarity of hindsight to determine how the defense might have been more effective

(*see, People v Satterfield,* 66 NY2d 796, 799).  The Constitution guarantees the

accused a fair trial, not necessarily a perfect one (*see, People v Flores,* 84 NY2d

184, 187; *People v Ford,* 86 NY2d 397, 404 ["The phrase 'meaningful

representation' does not mean 'perfect representation' "]; *People v Aiken,* 45 NY2d

394, 398 ["representation ... need not be errorless"]; *People v Modica,* 64 NY2d

828, 829 ["the test being 'reasonable competence', not perfect representation"]).

That a defendant was convicted may have little to do with counsel's performance,

and courts are properly skeptical when "disappointed prisoners try their former

lawyers on charges of incompetent representation" (*People v Brown,* 7 NY2d

359, 361); *Benevento* supra at 712.

42

This Court does not find that the myriad of instances of alleged ineffectiveness by defense counsel establish that the defendant was denied "meaningful representation" by his trial attorney (see *People v. Turner*, 5 NY3d 476, 481 [2005] "Two of our decisions have rejected ineffective assistance claims despite significant mistakes by defense counsel (*People v Hobot*, 84 NY2d 1021 [1995]; *People v Flores*, 84 NY2d 184 [1994]). Those cases hold, and we reaffirm today, that such errors as overlooking a useful piece of evidence (*Hobot*), or failing to take maximum advantage of a *Rosario* violation (*Flores*), do not in themselves render counsel constitutionally ineffective where his or her overall performance is adequate.). Their was strong eyewitness evidence that the defendant shot Sean Worrell in a well lit and crowded movie theater. This evidence was supported by, *inter alia*, medical and ballistics reports, expert testimony, police reports and good detective work. This Court holds that the New York State constitutional standard for the effective assistance of counsel was ultimately met by defense counsel and the defendant was not denied the effective assistance of counsel.

Consequently, as defendant's arguments do not raise any material issue of fact that requires this Court to conduct an evidentiary hearing and for all the reasons stated above the defendant's motion to vacate his conviction is denied in its entirety. This constitutes the decision and order of this Court.

Dated: Bronx, New York
March 4, 2014

Hon. Robert A. Sackett, J.S.C.

Papers considered: Defendant's Notice of Motion to Vacate and Affirmation including exhibits (September 23, 2011); Defendant's Supplemental Affirmation in Support of Motion to Vacate

43

Judgment including exhibits (October 4, 2011); Defendant's Second Supplemental Affirmation in Support of Motion to Vacate (May 29, 2012); Defendant's Third Supplemental Affirmation in Support of Motion to Vacate (July 2, 2012); Defendant's Memorandum of Law in Support of Defendant's Motion to Vacate (July 24, 2012); Defendant's Reply Memorandum of Law in Support of Defendant's Motion to Vacate (June 20, 2013); Defendant's Supplemental Reply Affirmation in Support of Motion to Vacate (October 17, 2013); OAD legal correspondence dated August 1, 2013; August 16, 2013; October 2, 2013, October 10, 2013; legal correspondence by OAD dated January 22, 2014.

Plaintiff (People of the State of New York by ADA Noah J. Chamoy) Affirmation in Opposition with memorandum of law and exhibits (January 14, 2013); legal correspondence (October 22, 2012); legal correspondence dated April 25, 2013 with exhibits; legal correspondence dated July 16, 2013; People's Supplemental affirmation in Opposition dated July 30, 2013 with attachments; legal correspondence by the People (July 30, 2013); legal correspondence by the People (October 4, 2013); legal correspondence by the People (February 27, 2014); Defendant's court file including felony Complaint, record of court action and court file jacket.

44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX – PART __
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,   :
                                                :

                                                :     NOTICE OF MOTION
            -against-                     :     TO VACATE
                                                :     JUDGMENT
                                                :
RICARDO JIMINEZ,                  :     Ind. 3825/06
                                              :
            Defendant.             :
-------------------------------------------------------------------x

       PLEASE TAKE NOTICE that upon the attached affirmation of Matthew L.
Mazur, Esq., and its attached exhibits, the undersigned will move this Court, on
November 14, 2011, or as soon thereafter as counsel may be heard, for an order pursuant
to N.Y. Criminal Procedure Law § 440.10(1)(g) & (h) (McKinney 2005):

     (1)     Setting aside the judgment in this case on the ground that it was obtained in
           violation of the defendant's rights, under the Fifth, Sixth and Fourteenth
           Amendments to the U.S. Constitution and Article I, § 6 of the New York
           Constitution, to due process and effective assistance of counsel;

     (2)     Granting, if necessary, a hearing to develop any unresolved factual disputes
           pertaining to this motion pursuant to N.Y. Criminal Procedure Law
           § 440.30(5); and

     (3)     Granting any other relief that the Court deems just and proper.

       PLEASE TAKE FURTHER NOTICE that pursuant to N.Y. Civil Practice Law &
Rules § 2214(b), answering papers, if any, shall be served at least seven days before the
return date herein.

Dated:      New York, New York
          September 23, 2011
                          Respectfully submitted,

                          RICHARD M. GREENBERG, ESQ.
                          Attorney for Defendant

ROSEMARY HERBERT, ESQ.
Supervising Attorney

by:     MATTHEW L. MAZUR, ESQ.
        Staff Attorney
        mmazur@appellatedefender.org

OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY  10007
(212) 402-4100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX – PART __
-------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK, :

                                      :

            -against-           :

                                        :

RICARDO JIMINEZ,                 :

                                        :

          Defendant.          :
-------------------------------------------------------------x

                                   AFFIRMATION
                                   IN SUPPORT OF
                                   MOTION TO
                                   VACATE JUDGMENT

                                   Ind. 3825/06

           MATTHEW L. MAZUR, ESQ., an attorney duly admitted to practice in the

State of New York, does hereby affirm under penalty of perjury that the following

is true:

           1.     I am a staff attorney at the Office of the Appellate Defender, which

was assigned by the Appellate Division, First Department, to represent Ricardo

Jiminez on his appeal in the above-captioned case.  See Order of Appointment,

12/11/07 (App. Ex. A).

           2.     On August 16, 2007, Ricardo Jiminez was convicted, after a jury trial,

of one count of murder in the second degree, N.Y. Penal Law § 125.25(1)

(McKinney 2004).  Mr. Jiminez was sentenced to a term of imprisonment of

twenty-two years to life.

3. On March 11, 2010, the Appellate Division affirmed Mr. Jiminez's conviction. See People v. Jiminez, 71 A.D.3d 483 (1st Dep't 2010), lv. denied, 15 N.Y.3d 752 (2010). Mr. Jiminez remains incarcerated pursuant to this judgment.

4. Ricardo Jimenez's case has all the hallmarks of a wrongful conviction. The initial identification of Mr. Jiminez was made under circumstances commonly understood to lead to error. Mr. Jiminez did not match the description of the perpetrator, the main eyewitness relied upon by the prosecution not only changed his story but admittedly lied to the police, and his trial testimony was inconsistent with the physical evidence. The prosecution also relied on two informants with extensive criminal histories – one of whom was once named as a suspect in the shooting – with extraordinary incentive to provide false testimony against Mr. Jiminez. And Mr. Jimenez was not prosecuted until 17 years after the crime, severely limiting his ability to mount an effective defense.

5. I make this affirmation in support of Ricardo Jiminez's motion to vacate his judgment of conviction, pursuant to Criminal Procedure Law §§ 440.10(1)(g) & (h) (McKinney 2005), on the grounds that the prosecution suppressed evidence favorable to Mr. Jiminez in violation of Brady v. Maryland, 373 U.S. 83 (1963), that there is newly discovered evidence that could not have been produced by Mr. Jiminez at the trial that creates a probability of a verdict

more favorable to the defense, and that Mr. Jiminez was denied his right to effective assistance of counsel at his trial.  See U.S. Const. amends. V, VI, XIV; N.Y. Const. art. I, § 6.  Where the foundations of the prosecution's case were already shaky, the failure to disclose evidence favorable to the defense in violation of Brady v. Maryland, and trial counsel's failure to conduct an adequate investigation undermine the integrity of Mr. Jiminez's conviction and require that he be granted a new trial.

6.     All statements of fact in this affirmation are made upon information and belief, based on a review of the record on appeal; a review of records produced by the Bronx County District Attorney's Office; a review of court files in other jurisdictions; a review of the files of Mr. Jiminez's trial counsel, Patrick Bruno; communications with Mr. Bruno; and communications with Mr. Jiminez.

7.     Mr. Jiminez reserves the right to supplement this motion upon the discovery of additional evidence that supports his legal claims.

## THE "BATMAN" SHOOTING

8.     The conviction in this case stems from a shootout at the Whitestone Cinema, at 2505 Bruckner Blvd., at about 12:45 a.m., on July 3, 1989, during the opening credits of the "Batman" movie, which had just been released that summer.

9.    The decedent, Sean Worrell, was at the movies with several friends, including Dean Anthony Beckford and Andrew Christopher O'Brien, and a man known as "Patchy," who were members of a violent drug distribution ring known as the "Poison Clan." At least three members of Worrell's group, including Worrell, were armed with guns.

10.    According to witnesses, prior to the start of the movie, Worrell became involved in an argument with another man on the popcorn line over who had been in the line first. During the course of this argument, the second man told Worrell he would go outside and get his gun. The man then walked out of the building and into the parking lot. Worrell and his friends went inside the theater and took their seats.

11.    As the movie was starting, the man who had argued with Worrell on the popcorn line entered the back of the darkened theater. Upon seeing each other, Worrell and the other man resumed their argument. At some point, both men pulled out guns and started shooting.

12.    When the lights came on in the theater, Worrell was found collapsed in the aisle, with gunshot wounds to his head and upper back, and a .38 caliber revolver in his hand. The man who had argued with Worrell on the popcorn line had fled the theater, as had all of Worrell's friends.

4

## THE INITIAL POLICE INVESTIGATION

13.    Within hours of the shooting, police had interviewed seven witnesses and had obtained a detailed description of the man who had argued with Worrell on the popcorn line.  The suspect was described as a Black male, 5'10" to 6'0" tall, with a "flat top" haircut with red streaks running along the sides.  The man was wearing a white shirt and white shorts, and he had at least one gold tooth cap.  See Complaint Report, 7/3/89 (App. Ex. B).

14.    A number of the movie theater employees had seen the suspect. However, only one of them, Esco Blaylock, told the police that he had seen both the argument on the popcorn line and the shooting itself and that he knew the man who shot Worrell as "Leon."  Blaylock told detectives that he had been introduced to Leon two years earlier by a friend named Johnny Gomez and had attended elementary school with Leon's girlfriend, "Sharon."  See Complaint Follow-Up #18, 7/3/89 (App. Ex. C).

15.    Early in the investigation, police also learned that Worrell had been a the movies with several friends.  By July 6, 1989, detectives had interviewed Dixie Ann Worrell, a cousin of the decedent, over the telephone.  Ms. Worrell told the police that her cousin Sean had left her home on July 2, 1989, at about 6:00 p.m., in the company of two friends, "Andy" and "Patchy."  They were supposed to go

5

to the Whitestone Cinema to see Batman, but they never returned. The following afternoon, Ms. Worrell received a call from Andy, asking if Sean had come home. Andy told Ms. Worrell that Sean had been in an argument at the theater and that he, Andy, had been shot. Ms. Worrell said that Andy called again the following day to ask if Sean had come home, and left a beeper number. See Complaint Follow-Up #25 (App. Ex. D).

16.     In the week following the Batman shooting, the police focused on trying to identify "Leon." On July 10, 1989, the police located and interviewed Sharon Ramroop, who had been identified by Blaylock as Leon's girlfriend. Ramroop confirmed that she knew Blaylock and also a person named Leon, whom she described as a man of "Jamaican and Indian [e]xtraction." According to Ramroop, Leon was about 5'10" tall, with a "flat top" haircut, and he drove a gold Nissan Maxima. See Complaint Follow-Up #33, 7/10/89 (App. Ex. E).

17.     The following day, having failed to identify Leon, detectives brought Blaylock and Ramroop together at the police station. During this meeting, Blaylock and Ramroop "exchanged information." Ramroop then told police that the person Blaylock knew as Leon was known to her as "Ricky." See Complaint Follow-Up #34, 7/11/89 (App. Ex. F).

6

18.     During their meeting with the police, Blaylock and Ramroop also viewed photographs of potential suspects.  When Ramroop saw a photograph of Manuel Jiminez, she told police that he was Ricky's brother.  The police subsequently showed Ramroop and Blaylock a photograph of Ricardo Jiminez, which Ramroop identified as "Ricky" and Blaylock identified as "Leon."  See Complaint Follow-Up #35, 7/11/89 (App. Ex. G).

19.     Within a day of their meeting with Blaylock and Ramroop, the police arrested Ricardo Jiminez and brought him to the police precinct.  However, the police were unable to locate Blaylock, and in the absence of a lineup identification, no charges were brought against Mr. Jiminez in connection with the Batman shooting.  See Complaint Follow-Up #37, 7/13/89 (App. Ex. H).

20.     On July 17, 1989, police conducted another interview with Blaylock, only to find that his account of the shooting and description of the perpetrator had completely changed.  Whereas Blaylock had previously said that he had witnessed the shooting inside the theater, he now said that he had been outside playing video games.  He said that he had heard about the shooting from an usher.  Although Blaylock maintained that he had witnessed the argument at the popcorn stand, he gave a totally different description of the shooter.  Blaylock now described the person who argued with Worrell as a Hispanic male, 6'2" tall, 170 pounds, with a

thin build and a light complexion.  He said the man had "kinky black hair," curly

on the top and shaved over the ears, with gold stripes on the sides, and there was

no mention of the name "Leon."  See Complaint Follow-Up #39, 7/17/89 (App.

Ex. I).

21.    The same day Blaylock changed his story, detectives interviewed

another movie theater employee, Linda Salters, at her home.  Salters had seen the

argument at the concession stand, and had even served one of the men.  She said

both of the men had Jamaican accents and "flat-top haircuts."  When the police

showed Salters a photograph of Ricardo Jiminez, she said that "she had seen [Mr.

Jiminez] on other occasions but he was not one of the males which had the

argument at the concession stand."  See Complaint Follow-Up #40, 7/17/89 (App.

Ex. J) (emphasis added).

22.    At that point, the initial investigation of the Batman shooting was

effectively at a standstill.

ANDREW O'BRIEN, A FEDERAL COOPERATING WITNESS,
PROVIDES INFORMATION ABOUT THE BATMAN CASE

23.    In 1990, the year after the Batman shooting, Andrew Christopher

O'Brien was imprisoned in Virginia for the murder of Wesley Stewart, on October

22, 1990, in Virginia Beach, Virginia.  On May 10, 1993, O'Brien pleaded guilty

8

to first degree murder and was sentenced to 25 years in prison, with 10 years suspended, in Virginia state court. See Court records, Commonwealth v. O'Brien, Case No. CR90-2812 (Va. Cir. Ct.) (App. Ex. K).

24.    On June 7, 1996, O'Brien was charged in a federal indictment, in Richmond, Virginia, with racketeering and conspiracy to distribute crack and powder cocaine as part of a continuing criminal enterprise. It was alleged that O'Brien was a member of an organization known as the "Poison Clan," led by Dean Anthony Beckford, which had engaged in a pattern of racketeering activity, including multiple murders, from New York to Virginia. See Indictment, USA v. Beckford et al., 96-cr-00066 (E.D. Va.) (App. Ex. L).

25.    O'Brien – facing life in prison and having already pleaded guilty to the murder of Wesley Stewart, one of the overt acts charged in the indictment – entered into a cooperation agreement with the United States Attorney's Office in Richmond. Pursuant to this agreement, O'Brien pleaded guilty to racketeering conspiracy and was sentenced to life in prison. However, after testifying against Dean Beckford in federal court, O'Brien's federal sentence was reduced to 30 years, concurrent with the sentence imposed by the Virginia state court. See Government's Second Mot. Reduction Sentence, USA v. Andrew Christopher O'Brien, No. 96-cr-00066 (App. Ex. M).

9

26.     The first time O'Brien disclosed to law enforcement that he had been involved in the Batman shooting was during his cooperation with federal authorities in Richmond.

27.     According to a handwritten note that was disclosed to Mr. Jiminez's trial counsel, as late as March 1996, Detective Dave Carbone, in Brooklyn, who was investigating a string of murders from New York to Virginia, had reported that the perpetrator of the Batman shooting was "Andy O'Brien - Virginia." Carbone was also planning to charge O'Brien with "other homicides." See Note from "George" to Sgt. Larkin, 3/18/96 (App. Ex. N).  However, once O'Brien had entered a cooperation agreement with federal authorities, it appears that any plans to charge O'Brien with the Batman shooting or any other homicide were abandoned.

28.     By 2001, the Regional Intelligence Squad in the New York Office of the Federal Bureau of Investigation (FBI) had also opened a case, "in conjunction with the NYPD Cold Case Homicide Squad," to assist with the investigation of the Batman shooting.  To that end, on January 3, 2001, Special Agent Diego R. Redondo contacted the FBI's Investigative Services Division to set up an interview with O'Brien, who was in the federal witness protection program.  See Request for Interview of Andrew C. O'Brien, 1/3/01 (App. Ex. O).

29.     On January 16, 2001, Special Agent Redondo and Detective Wendell Stradford, from the New York City Police Department, interviewed O'Brien at an undisclosed location.  During the interview, O'Brien said that he had been at the Whitestone Cinema with "Patchie," Dean Beckford and Sean Worrell, along with two girls, Maureen Littlejohn and her sister "Winjie" on the night that Worrell was killed.  See FBI Form 302 at 1 (App. Ex. P).

30.     O'Brien told Special Agent Redondo and Detective Stradford that he was next to Worrell during the argument in the popcorn line.  O'Brien said that he joined the argument when the unknown man referred to Worrell as "boy."  After the man went outside, O'Brien and Worrell went into the theater, along with Beckford, "Patchie," and the two girls.  They sat towards the front of the theater, on the left side.  Id. at 2.

31.     According to O'Brien, the man from the popcorn line then entered the theater and threatened O'Brien by saying something like, "when the movie is done, it's me and you."  Id.  O'Brien and "Patchie" then got up and followed the man up the aisle to the exit doors.  The man remarked that O'Brien "looked like he had a gun," before displaying his own dark, automatic weapon.  O'Brien said that "Patchie" also pulled out a gun.  Id.

11

32.     O'Brien said that Worrell approached the group, seemingly unaware that guns had been drawn, and the man with the automatic weapon started firing. Worrell was hit, and O'Brien and "Patchie" dove for cover.  Worrell was armed, O'Brien said, but he was not sure if he had fired his gun.  O'Brien was grazed by a bullet on his left side.  Id.

33.     O'Brien said that he and "Patchie" chased the shooter out of the theater, but they stopped when they saw two security guards.  O'Brien, "Patchie," and Beckford then fled, rather than wait for the police, since both "Patchie" and Beckford had outstanding warrants.[1]  They left the two girls at the theater.  Id.

34.     At the conclusion of the interview, Special Agent Redondo and Detective Stradford showed O'Brien a photo array.  After viewing the array, more than ten years after the Batman shooting, O'Brien identified Ricardo Jiminez as the person who had shot Worrell.  Id. at 3.

## THE PROSECUTION OF RICARDO JIMINEZ

35.     On September 6, 2006, more than five years after he was identified by O'Brien and more than 17 years after the shooting itself, Ricardo Jiminez was

---

[1]O'Brien had previously testified in the Beckford trial that he also had an outstanding probation warrant during the summer of 1989.

indicted on a single count of murder in the second degree, N.Y. Penal Law

§ 125.25(1), in connection with the Batman shooting.

36.     The principal witnesses at Mr. Jiminez's trial were Andrew O'Brien

and Esco Blaylock, as well as a jailhouse informant, Kevin Morrissey, who Mr.

Jiminez first encountered while he was detained at Rikers Island.  Although

several other witnesses from the movie theater testified at the trial, none of them

identified Mr. Jiminez as the shooter.  Moreover, a number of the witnesses had

described the shooter as a black male, with a medium or dark complexion, whereas

Mr. Jiminez is a light-skinned Hispanic.  See, e.g., T. 150, 408-414, 420.[2]

37.     Esco Blaylock testified that he was 15 years old and working as a

popcorn popper at the Whitestone Cinema at the time of the shooting.  T. 493.

That night, Blaylock said, he saw a man he knew "from around the way" named

Leon get into an argument with a Jamaican man in the popcorn line.  T. 496-98.

According to Blaylock, Leon started to mock the other man's Jamaican accent, and

the argument continued until Leon said, "hey you know, I'm gonna get mine."  T.

500.  As Leon walked away, the Jamaican man said, "get what you're gonna get."

T. 500.

---

[2]For convenience, the trial transcript will be cited "T. ___."  The transcript, which was
provided to Mr. Jiminez by the Appellate Division in connection with his appeal will be provided
upon request.

38.     When his shift ended, at midnight, Blaylock decided to go into the theater showing Batman. T. 503. Blaylock stood at the back of the theater on the left. T. 504. According to Blaylock, he saw Leon enter the theater on the other side and sit down in the back row of the theater. T. 506, 509. At some point, Blaylock said, Leon stood up and yelled, "you're the one with the smart mouth." T. 510, 515. The man Leon had argued with in the popcorn line stood up and moved towards the aisle, stepping over people as he did so. T. 513, 515. Leon also made his way to the aisle. T. 515.

39.     At the time of the actual shooting, Blaylock said, "no-one else was in the aisle." T. 515. He said he saw Leon pull out a gun and fire twice at the man who was moving towards him. T. 510, 516, 519. Contrary to his 1989 statements to the police, Blaylock said that he never saw the victim holding a gun. T. 547.

40.     Blaylock testified that Mr. Jiminez was the person he knew as Leon. T. 527.

41.     Although Blaylock said he had stopped talking to the police in 1989 because he had been instructed by the management of the theater and his parents not to cooperate, T. 530, Blaylock denied that he had ever told the police that he was not in the theater or that he had seen the decedent with a gun in his hand. T.

14

551. Blaylock also denied telling Detective Stradford that he had ever lied to the police in 1989.  T. 560.[3]

42.    Andrew O'Brien testified that he was serving a 30-year federal sentence for his participation in a racketeering enterprise that resulted in a person's death.  T. 179, 220.  He also said he had been convicted of criminal possession of a weapon in 1988 and possession of cocaine in 1989.  T. 227. O'Brien explained that he was testifying pursuant to a cooperation agreement with federal authorities, and it was his understanding that the Assistant District Attorney in Mr. Jiminez's case would inform federal prosecutors of his cooperation.  T. 224-25.

43.    On the night of the shooting, O'Brien said, he was at the movies with Worrell, Dean Beckford, and Earl, who was known as "Patchy."  T. 180-81. According to O'Brien, all four of them went to the theater armed with guns, but he, O'Brien, had left his gun in the car.  T. 182-83.  While he and Worrell were waiting in line for popcorn, O'Brien said, a man approached "aggressively" and asked if they were on line.  T. 191.  An argument ensued, during which the other

---

[3]Detective Stradford testified that, in April 2006, Blaylock had told him that he had lied to the police back in 1989 because his mother did not want him involved in the investigation.  T. 357, 365.

man said he was going to get his gun. T. 194. O'Brien said he was not concerned about the man, since all of his friends had guns. T. 194.

44.    After O'Brien and his friends went into the movie and sat down, one of them noticed that the man from the popcorn line had entered the theater. T. 197-99. The man approached and said to O'Brien, "When the movie is over, it's me and you," before walking away. T. 200. According to O'Brien, "Patchy" got up and started following the man up the aisle, and he, O'Brien, followed, overtaking "Patchy." T. 201. When they got close to the exit, the man turned around and pulled out his gun saying, "Yo, what's up? You got a gun?" T. 201.

45.    O'Brien said he told "Patchy" that the man had a gun, and just as "Patchy" reached for his gun, the man started shooting. T. 202, 207. O'Brien ducked, and he was grazed. T. 202. Worrell was in the aisle, but O'Brien did not see what he was doing. T. 210.

46.    When the shooting stopped, O'Brien chased the man out of the theater. T. 211. At some point, Dean Beckford followed and told him that Worrell was dead. T. 211.

47.    In court, now 18 years after the incident, O'Brien identified Mr. Jiminez as the shooter. T. 217.

48.     O'Brien said he first told law enforcement that he had witnessed the shooting in 1996, while he was being questioned by federal agents.  T. 221. O'Brien was later introduced to members of the cold case squad and the Assistant District Attorney.  T. 222-23.

49.     O'Brien denied any knowledge that he was once a suspect in the Batman shooting.  T. 237.

50.     Kevin Morrissey, the jailhouse informant, was a career criminal with five pending cases involving forgery and grand larceny.  T. 27.  He met Mr. Jiminez in jail in September 2006.  T. 28.

51.     Morrissey said he told Jiminez that he was a paralegal and agreed to perform legal research for him.  T. 30.  However, according to Morrissey, he never looked at any of the paperwork relating to Mr. Jiminez's case.  T. 56.

52.     Morrissey claimed that Mr. Jiminez told him that he had been in an argument with a Jamaican man at a movie theater.  T. 32.  Morrissey said that Mr. Jiminez told him that the man had made a move towards his waist and, believing the man to be armed, Mr. Jiminez went out to his car to get his gun.  T. 32.

53.     According to Morrissey, Mr. Jiminez said he later spotted the man "in the lower row of the movie theater" and said, "Hey you."  T. 32.  Morrissey

17

claimed that Mr. Jimenez told him that the other man turned and shot at him, at

which point Mr. Jiminez shot back and ran out of the theater.  T. 32, 37.

54.     On cross-examination, Morrissey said he had already reached plea

agreements in three of his pending cases for the minimum term of 1½ to 3 years,

but a prosecutor in Queens County was "holding out" for more time.  T. 46-47.

Morrissey said he hoped that his cooperation in this case would help him convince

the Queens prosecutor to agree to the minimum as well.  T. 46-47.  Morrissey also

acknowledged that he had prior convictions for grand larceny in 1994, forgery in

1997, a stolen vehicle in 1997, petit larceny in 2000, petit larceny in 2001,

attempted grand larceny in 2004 and possession of a forged instrument in 2004.  T.

47.  By way of explanation for this criminal conduct, Morrissey claimed that he

had a "drug problem."  T. 50.

55.     Morrissey had first contacted a federal marshal about Mr. Jiminez and

the Batman shooting and asked him to get the information to the "proper

authorities."  T. 58.

56.     Notably, while Blaylock, O'Brien and Morrissey each described the

shooter as facing Worrell at the time of the shooting, the medical evidence

revealed that Worrell had been shot from behind.  Specifically, according to Dr.

Susan Ely, of the Office of the Chief Medical Examiner, Worrell was first shot in

the "back of the upper arm or shoulder regions just about near the back of the armpit." T. 607. The second gunshot entered "on the back of the left upper side of the head and it exits . . . on the right forehead region." T. 617. Worrell also suffered abrasions to his face that were consistent with falling forwards onto his face after being shot. T. 617. This evidence strongly suggested that Worrell may have been killed by one of his own friends.

57.    The ballistics evidence also suggested that Worrell, and perhaps one of his friends, had fired towards the back of the theater. There was a single .45 caliber automatic shell casing on the right side of the auditorium. T. 83, 85. However, the .38 caliber revolver recovered from Worrell's hand also contained a .38 caliber discharged shell and several unfired rounds. T. 84, 94-95. In addition, a lead bullet was found towards the back of the theater, T. 83, and an off-duty correction officer who worked security at the theater had seen a bullet hole on the rear wall of the theater, about nine or ten feet off the ground, T. 448.

58.    Finally, the lead detective from the 1989 investigation testified that Linda Salter, the movie theater employee who said she had seen the argument at the concession stand and was familiar with Mr. Jiminez, had informed him that Mr. Jiminez was not one of the men involved in the argument. T. 413.

\*   \*   \*

19

59.   After deliberating for five days and requesting numerous read-backs, the jury found Ricardo Jiminez guilty of second degree murder for the shooting of Sean Worrell.  T. 866.

60.   At his sentencing, Mr. Jiminez maintained his innocence.  He was sentenced to an indeterminate prison term of 22 years to life.

## NEWLY DISCOVERED EVIDENCE
## WITH RESPECT TO O'BRIEN AND MORRISSEY

61.   In late 2010, the Office of the Appellate Defender (OAD), which represented Mr. Jiminez on his direct appeal, received a federal grant to support its Reinvestigation Project.  In April 2011, Mr. Jiminez's case was selected for reinvestigation as a possible wrongful conviction.

62.   Over the past five months, basic investigation has uncovered new evidence that seriously undermines the credibility of the testimony given by Andrew O'Brien and Kevin Morrissey at Mr. Jiminez's trial.  The investigation is ongoing.  At this stage, however, it is already clear that (a) the prosecution failed to disclose information about O'Brien and Morrissey that was both material and favorable to the defense, (b) this newly discovered evidence creates a probability that the verdict would have been more favorable to Mr. Jiminez, and (c) that

defense counsel should have uncovered this information through investigation of these two critical prosecution witnesses.

63.  Kevin Morrissey.  On June 8, 2007, the prosecution disclosed that it intended to call Morrissey as a witness.  The disclosure stated that Morrissey was "currently facing several cases in Nassau, Queens, and Brooklyn, all for check fraud and related charges.  Nassau and Brooklyn apparently have agreed to give him a sentence of 1-3 years in jail, but Queens has not.  Mr. Morrissey has asked for a phone call to be made to Queens if he testifies for the Bronx District Attorney's Office."  See Mem. from ADA Lisa Mattaway to Patrick Bruno, 6/8/07 (App. Ex. Q).  On the morning of trial, the prosecution disclosed that Morrissey had three pending cases, in Brooklyn, Nassau and Queens, as well as ten prior convictions in various state courts.  See CPL § 240.45 Disclosures (App. Ex. R).[4]

64.  The disclosures relating to Morrissey, however, omitted significant impeachment material.  First, in addition to Morrissey's state convictions, counsel has learned that he has at least three convictions, and numerous violations of supervised release, in federal court.  In 1993, Morrissey was convicted of fraud and conspiracy, and sentenced to 26 months in prison, in the United States District

---

[4]During his testimony, Morrissey also revealed that he had a fourth pending case in Suffolk County, as well as a fifth pending case in New Jersey.  T. 49-50.

Court for the Eastern District of New York.  See USA v. Morrissey, Dkt. No. 92-cr-01257 (E.D.N.Y.) (App. Ex. S).  Morrissey's supervised release was subsequently revoked in this case.  Id.  In 2002, in a case involving crimes committed in both the Eastern and Southern Districts of New York, Morrissey was convicted of forging money orders and uttering forged and counterfeit securities.  See USA v. Morrissey, Dkt. Nos. 00-cr-00485 & 01-cr-00510 (E.D.N.Y.) (App. Ex. T).  Again, following his release from prison, Morrissey violated his supervised release.  These federal felony convictions involving acts of dishonesty and deceit were never disclosed to the defense.

65.    Second, according to court records in both federal court and in Queens, Morrissey has a history, not only of substance abuse, but of serious mental illness.  In both federal cases, the docket entries reveal that Morrissey requested evaluations to determine his fitness to stand trial.  Moreover, in the Queens case that was pending at the time of Mr. Jiminez's trial and as to which Morrissey had requested assistance from the Bronx District Attorney's Office, Morrissey was again examined for competency to stand trial based on his past psychiatric problems.  See Court Jacket, People v. Morrissey, Ind. 3287-06 (Queens) (App. Ex. U).  The public court file in Queens also contains a document, dated six months before Mr. Jiminez's trial, stating that Morrissey has

22

"Schizophrenia, Undifferentiated Type," and had been prescribed Zyprexa, an anti-psychotic. <u>See</u> After Care Letter, 1/8/07 (App. Ex. V). The prosecution never disclosed to Mr. Jiminez that Morrissey has serious psychiatric problems.

66. Third, the prosecution's disclosure significantly understated the benefits Morrissey hoped to obtain by testifying against Mr. Jiminez. Specifically, contrary to Morrissey's testimony and the representations by the prosecutor prior to Mr. Jiminez's trial, the prosecutors in Brooklyn and Nassau counties had <u>not</u> agreed trial that Morrissey should be sentenced to a term of 1-3 years. Thus, following Morrissey's testimony, his attorney in the Nassau County case asked the prosecutor in the Bronx to inform the Nassau County prosecutor of Morrissey's assistance. <u>See</u> Letter from Jeffrey Groder to ADA Lisa Mattaway, 11/5/07 (App. Ex. W). Then, in early 2008, Morrissey entered into a cooperation agreement with prosecutors in Brooklyn and the Bronx, which makes clear that he was facing 3½ to 7 years in Brooklyn but could be sentenced to a "Willard" sentence if he cooperated in a second Bronx case. <u>See</u> Mem. of Agreement, 1/7/08 (App. Ex. X).[5] Finally, in a letter to the prosecutor that was apparently written after Mr. Jiminez's trial, Morrissey notes that the prosecutor had told him that she would

---

[5] <u>See</u> N.Y. Crim. Proc. Law § 410.91 (authorizing sentence of parole supervision as an alternative to incarceration).

23

"move" his wife and child to a new location.  See Letter from Kevin Morrissey to ADA Lisa Mattaway (App. Ex. Y).  These benefits to Morrissey – far beyond a single telephone call to a prosecutor in Queens – were not disclosed to Mr. Jiminez.

67.   Andrew O'Brien.  The prosecution disclosed that O'Brien was serving a federal sentence of 30 years for a murder and, in exchange for his cooperation, had asked for a letter stating that he had testified for the Bronx District Attorney's Office.  See Mem. from ADA Lisa Mattaway.  It was disclosed at the beginning of trial that O'Brien had convictions for criminal possession of a weapon in the third degree in 1988, possession of cocaine in 1989, in addition to the murder in Virginia Beach.  See CPL § 240.45 Disclosures.

68.   As with Morrissey, however, the disclosures about O'Brien omitted significant information that was favorable to Mr. Jiminez.  First, the prosecution failed to disclose that O'Brien was a key figure in the "Poison Clan," a violent criminal syndicate responsible for drug trafficking and murders from Brooklyn to Virginia.  Nor was it disclosed that Dean Beckford, who was with O'Brien and the decedent at the movie theater, was the leader of the "Poison Clan."  See Indictment, USA v. Beckford et al.

24

69.    Second, as detailed in O'Brien's 1997 testimony at Beckford's trial, O'Brien had been convicted of crimes and had committed numerous other bad acts that were not disclosed to Mr. Jiminez.  According to O'Brien, he became involved in the sale of marijuana as early as 1982 or 1983, in Brooklyn.  See Transcript of Testimony of Andrew O'Brien, USA v. Dean Beckford et al., 6/24/97 at 3619-20 (hereinafter "Tr.") (App. Ex. Z).[6]  In 1988, he was convicted of criminal possession of a weapon, as disclosed to Mr. Jiminez, but he violated his probation when he shot two men on the street.  Id. at 3622.  O'Brien then went on the run from probation, but he continued selling drugs in downtown Brooklyn.  Id. at 3623.  O'Brien was finally arrested in 1991, after he shot another man in the leg for calling his girlfriend a "bitch."  Id. at 3732.  He was convicted in 1992, after a trial, of criminal possession of a weapon in the third degree, for which he was sentenced to 3½ to 7 years in prison.  See CRIMS Report, Ind. 265-91 (Kings) (App. Ex. AA).  This additional conviction for criminal possession of a weapon was not disclosed to Mr. Jiminez.[7]

---

[6]The transcript of O'Brien's testimony was mailed to undersigned counsel by the clerk's office of the federal district court in Richmond, Virginia.

[7]In the Beckford trial, O'Brien also recounted that he had been arrested in Richmond, Virginia, with a gun and confessed to the police that it was his, Tr. at 3678, but the result of this arrest is unknown.

70.     Third, O'Brien admitted during his testimony at the <u>Beckford</u> trial, in
1997, that, in addition to selling crack cocaine in the late 1980s, he had also been a
drug user.  Tr. at 3625-26, 3730-31.  The prosecution failed to disclose O'Brien's
drug use – a fact that would have cast doubt on the reliability of his account of the
shooting and his identification of Jiminez ten years later – to the defense.

71.     Fourth, in the course of his testimony at the <u>Beckford</u> trial, O'Brien
revealed that, around the time of the Batman shooting, others involved in the drug
trade were actively trying to kill Dean Beckford and his associates.  Earlier in
1989, O'Brien had traveled to Richmond, Virginia, at the request of Beckford, to
kill a potential government witness named Delroy Smith.  <u>Id.</u> at 3646.  After
failing to find Smith, O'Brien returned to Brooklyn, where he sold drugs for
"Patchy."  <u>Id.</u> at 3650.[8]  Around that time, Beckford told O'Brien that he had
witnessed Phillip Pierre kill a rival drug dealer named George Chang in early
1989.  <u>Id.</u> at 3654.  At a subsequent meeting at Nagasaki's Restaurant, in Queens,
Beckford instructed the other members of the Poison Clan, including O'Brien, that
Pierre and his associates had to be killed.  <u>Id.</u> at 3659.  At Beckford's trial,
O'Brien testified that he knew in 1989 that Pierre and others wanted to kill

---

[8]During that time, Beckford told O'Brien that he and another man had shot Sherman
Ambrose and Delroy Smith, in Richmond, Virginia.  <u>Id.</u> at 3650-51.

26

Beckford. Id. at 3753-55. In other words, just months before the Batman

shooting, Beckford's gang was killing others involved in the drug trade, and was

in turn being targeted by those who wanted to kill them.

72.     Finally, O'Brien's cooperation with the Bronx District Attorney's

Office against Mr. Jiminez formed the basis for yet another request by the United

States Attorney's Office in Richmond to reduce his federal sentence. The letter

provided by the Assistant District Attorney detailing O'Brien's cooperation states

that his testimony was "crucial to the People's case" and that O'Brien had already

telephoned from the jail saying that he had "chatted up another inmate who has

some information on two (2) cold Bronx homicide cases." See Letter from ADA

Lisa Mattaway to AUSA David Novak, 10/16/07, Exhibit A to Government's

Second Mot. Reduction Sentence.

## MOTION TO VACATE THE JUDGMENT

73.     Ricardo Jiminez was denied due process of law when the prosecution

suppressed material impeachment information about two critical witnesses at Mr.

Jiminez's trial. See U.S. Const. amend. V, XIV; N.Y. Const. art. I, § 6; Brady v.

Maryland, 373 U.S. 83 (1963).

74.     In a pretrial motion, Mr. Jiminez specifically requested copies of all

prior convictions of prosecution witnesses, including the actual criminal

complaints, and further asked that the names and identifying information of those witnesses be provided at least three weeks in advance of trial in order to allow for independent investigation.  See Aff. Patrick L. Bruno, 2/8/07, at ¶ 15.  The prosecution responded, "The People are aware of their continuing obligations under Brady v. Maryland and will continue to comply."  See Aff. ADA Lisa Mattaway, 5/10/07, at 2.  However, as detailed above, the prosecution's disclosures omitted significant impeachment material pertaining to two critical prosecution witnesses.

75.    The Brady material in this case was known, if not to the individual Assistant District Attorney, to the members of law enforcement involved in the investigation of Mr. Jiminez's case.  See Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).  In particular, federal law enforcement officials were instrumental in securing the cooperation of both Morrissey and O'Brien and were surely aware of the information that could be found in their public federal court files.  The prosecutor had a duty to disclose impeachment material known to all members of the prosecution team.

76.    Even in the absence of a Brady violation, moreover, the impeachment material pertaining to Morrissey and O'Brien constitutes newly discovered evidence that requires reversal of Mr. Jiminez's conviction.  Had this information

28

– consisting of prior criminal convictions and other bad acts, additional benefits promised in exchange for testimony against Mr. Jiminez, and Morrissey's serious psychiatric problems – been presented to the jury, which in any event deliberated over a period of five days, there is more than a reasonable probability that Mr. Jiminez would not have been convicted.  See N.Y. Crim. Proc. Law § 440.10(g).

77.     Finally, although Mr. Jiminez's trial counsel, Patrick Bruno, was not even informed of the identity of the prosecution's cooperating witnesses until the eve of trial, counsel's failure to conduct even basic investigation, such as reviewing the witnesses's public court files, was ineffective under both the federal and state constitutions.  See U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; Strickland v. Washington, 466 U.S. 668 (1984); People v. Benevento, 91 N.Y.2d 708, 674 N.Y.S.2d 629 (1998).[9]

WHEREFORE, for all the above reasons, Ricardo Jiminez's motion to vacate his conviction should be granted.  Alternatively, the court should hold an evidentiary hearing to resolve any factual dispute necessary to a determination of the question.

---

[9]Based upon communications with Mr. Bruno and a review of his case file, it does not appear that Mr. Bruno undertook any investigation of either Morrissey or O'Brien.  However, counsel has not yet obtained an affirmation from Mr. Bruno regarding the scope of his investigation and therefore reserves the right to supplement this motion.

Dated:     New York, New York
             September 23, 2011

MATTHEW L. MAZUR, ESQ.

30

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX – PART ____
------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK, :
           Respondent,            :       AFFIRMATION OF
                                   :       SERVICE
            v.                :       BY MAIL
                                   :
RICARDO JIMINEZ,                :
           Defendant.          :       Ind. No. 3825/06
                                   :
------------------------------------------------------------x

      MATTHEW L. MAZUR, ESQ., an attorney duly admitted to practice in the

State of New York, hereby affirms the following under penalties of perjury:

      1.  I am associated with the Office of the Appellate Defender, which has

been assigned to represent the defendant in the above-captioned case.

      2.  On September 23, 2011, my office served a notice of motion and

supporting affirmation by mail on the attorney for the respondent, The People of

the State of New York, Bronx County District Attorney's Office, 198 E. 161st St.,

Bronx, New York 10451.


Dated:  New York, New York
          September 23, 2011

                                   _____
                                   MATTHEW L. MAZUR

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX – PART __
-------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK, :
                                                            :
                                                            :       SUPPLEMENTAL
             -against-                                      :       AFFIRMATION
                                                            :       IN SUPPORT OF
                                                            :       MOTION TO
RICARDO JIMENEZ,                                            :       VACATE JUDGMENT
                                                            :       Ind. No. 3825/06
             Defendant.                                     :
-------------------------------------------------------------x

      MATTHEW L. MAZUR, ESQ., an attorney duly admitted to practice in the

State of New York, does hereby affirm under penalty of perjury that the following

is true:

      1.    I am a staff attorney at the Office of the Appellate Defender and, on

September 23, 2011, I filed an Affirmation in Support of Motion to Vacate

Conviction on behalf of Ricardo Jimenez.

      2.    As set forth in ¶¶ 61-77 of that Affirmation, Mr. Jimenez was denied

due process when material impeachment information about two prosecution

witnesses, Andrew O'Brien and Kevin Morrissey, was suppressed by the

prosecution, that newly discovered evidence that creates a probability of a verdict

more favorable to Mr. Jimenez, and that Mr. Jimenez was denied effective

1



assistance of counsel at his trial.  See U.S. Const. amends. V, VI & XIV; N.Y. Const. Art I, § 6.

3.   In that motion, undersigned counsel reserved the right to supplement the motion and to provide an affirmation from trial counsel confirming the allegations contained in the motion.  See Aff. Mot. Vacate Judgment ¶¶ 7, 77 n.9. Counsel has obtained an affirmation from Patrick L. Bruno, Esq., Mr. Jimenez's trial counsel.  That affirmation is attached as Exhibit A.

4.   In his affirmation, Mr. Bruno confirmed that the prosecution failed to fully disclose the prior convictions and bad acts of prosecution witnesses Kevin Morrissey and Andrew O'Brien, as well as the benefits promised to and received by these witnesses in exchange for their testimony against Mr. Jimenez.  The prosecution also failed to disclose to the defense information indicating that Kevin Morrissey suffered from serious mental illness, which was reflected in court records.

5.   In his affirmation, Mr. Bruno also confirmed that he failed to investigate these two witnesses, to determine whether they had convictions or bad acts in addition to those disclosed to the defense by the prosecution on June 20, 2007, see Exhibit R, Appendix of Exhibits to Motion to Vacated Judgment, and whether the witnesses were promised or received any benefits in addition to those

2

disclosed by the prosecution in is memorandum of June 8, 2007, <u>see</u> Exhibit Q,

Appendix of Exhibits to Motion to Vacated Judgment.  Rather, Mr. Bruno stated

that he relied solely on the disclosures made by the prosecution.

WHEREFORE, for the above reasons, as well as the reasons set forth in my

initial affirmation, this Court should grant Ricardo Jimenez's motion to vacate his

judgment of conviction.  Alternatively, this Court should hold an evidentiary

hearing to resolve any factual dispute necessary to the determination of the

motion.


Dated:      New York, New York
            October 4, 2011


                              MATTHEW L. MAZUR, ESQ.


3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX – PART ____
------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK, :
              Respondent,            :    AFFIRMATION OF
                                      :    SERVICE
              v.                   :    BY MAIL
                                        :
RICARDO JIMENEZ,                :
              Defendant.           :    Ind. No. 3825/06
                                        :
------------------------------------------------------------x

      MATTHEW L. MAZUR, ESQ., an attorney duly admitted to practice in the

State of New York, hereby affirms the following under penalties of perjury:

      1.  I am associated with the Office of the Appellate Defender, which has

been assigned to represent the defendant in the above-captioned case.

      2.  On October 4, 2011, I served by mail a supplemental affirmation on the

attorney for the respondent, The People of the State of New York, Bronx County

District Attorney's Office, 198 E. 161st St., Bronx, New York 10451, to the

attention of ADA Rither Alabre.


Dated:  New York, New York
         October 4, 2011

                                     _____
                                     MATTHEW L. MAZUR