

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:96CR66-08

ANDREW C. O'BRIEN

    Defendant.

### ORDER

For the reasons set forth on the sealed record on June 5, 1998, it is hereby ORDERED that the Government's Motion for Reduction of Sentence is GRANTED. Accordingly, the Judgment in a Criminal Case, entered on May 13, 1997 is amended to change the term of imprisonment from life to 360 months. In all other respects the Judgment in a Criminal Case, entered on May 13, 1997 shall continue in full force and effect.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.

_____
United States District Judge

Richmond, Virginia
Date: June 10, 1998

A TRUE COPY, TESTE
CLERK, U.S. DISTRICT COURT
BY: _____
DEPUTY CLERK



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:96cr66-08

ANDREW O'BRIEN

### ORDER

Having received a self-explanatory documents dated March 21, 2007 and before, it is hereby ORDERED that the documents be placed in the file and copies of the documents be sent to the prosecuting Assistant United States Attorney in this case.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.

_____
United States District Judge

Richmond, Virginia
Date: __APR - 9 2007__

Andrew O'Brien #33942-083
Case #3:96CR66-08
P.O. Box 444
Otisville, NY 10963

March 21, 2007



Honorable Judge Robert E. Payne
Eastern District Court
Richmond, VA 23219

Dear Judge Payne,

I wrote the preceding two letters a year ago. It has taken
me another year to build up the courage to send them to
you. I know you probably can't help me. I just wanted you
to know the kind of person that I am.  Although I am in
one of the worst predicaments a witness can be in, I still
strive to make something of my life. Just wanted you to
know. Take care, Sir.

Sincerely,

Andrew O'Brien

Andrew O'Brien
ID#33942-083
Case#3:96CR66-08
P.O. Box 444
Otisville, NY. 10963
3/20/06

Honorable Judge Robert E. Payne
Eastern District Court
Richmond. VA 23219

Dear Judge Payne:

The following letter was written under the premise that you can
help me. Mr. DeDes, one of the record coordinators here at
Otisville, advised me to write you. Due to the fact that I have
three sentences for three different jurisdiction, my file is
somewhat of an anomaly to those who must sift through it. On my
Federal judgement of commitment papers, it states that my
Federal sentence would run concurrent to my Virginia State
sentence. My New York State sentence, which I had begun to serve
in 1991 was never mentioned. So that automatically made the
sentence consecutive. Under 5G. 1 (c), the court could have
considered giving me credit for the years I spent in prison.
Approximately eight years. Mr. Dedes said I should ask you if
you would consider mentioning the New York sentence. which was
relevent conduct, in a new judgement of commitment. He also said
I would need to get the prosecutor. Mr. Novak, to agree. On the
other hand, Mr. Dedes is not a lawyer. and couldn't state for
sure whether it is legally possible. Again, thank you for your
time and patience.

Sincerely,

Andrew O'Brien

```
                              Andrew O'Brien
                              ID#33942-083
                              Case#3:96CR66-08
                              P.O. Box 444
                              Otisville, NY. 10963
                              3/20/06
```

Honorable Judge Robert E. Payne
Eastern District Court
600 E. Main St.
Richmond, VA 23219


Dear Judge Payne:

May this letter reach you in good health and sound mind. I know
your time is valuable, so excuse for intruding on your busy
schedule.


Your Honor, I've been thinking about writing this letter for
two years. I was always waiting for the right time or the right
frame of mind, hoping I could write something so eloquent and
heartfelt that you'd be moved to help him. Of course, I know
this is the illusion of a desperate man. A man doing
thirty-eight years in prison. Judge Payne, most of the time I
accept my fate, and deal with it by doing a number of positive
things; reading, writing, studying, teach others. But there are
time's when a gnawing sense of injustice eats at my soul.


Certainly I've done some very bad things. Things of which I
deserve to spend a good number of years in prison. However, when
I came before you there were a number of mitigating
circumstances which no one took into consideration. Judge Payne,
I spent several years in some of the worst prisons known to man.
Several horrendous years before you sentenced me to thirty more.
In those years I had begun to transform myself into the man I am
still trying to become. I stood up to the gangs in prison. I
took correspondence college courses. I aided deaf and blind
prisons. I did all these things, and still do, not because I
wanted to impress anybody, or I had to go before a parole board,
I did them because I wanted to become a good person. I wanted

to be someone my family could be proud of. I believe the thirty years you gave me was just, but not getting credit for the eight years I had to do for the state, which was possible under 5G.1(c), is what unsettles me. I earned those eight years with my blood, sweat, and tears. No disrespect, Judge Payne, but can you imagine if the years you toiled at Washingston and Lee didn't count, or wasn't accredited to you? You wouldn't be the distinguished Jurist you are today. Not to say that I could ever compare my scuffed up shoes to yours.

Your Honor, another thing that baffled me was that no one cared that I had already taken responsibility for my crimes in the State courts. My situation is somewhat inexplicable to my handlers. As a Federal witness, I am constantly asked by my case managers here in the prison, and those over in the Justice Department, "Why'd you get so much time? How many people did you kill? Why were you treated so severely? Did you lie?" I can't explain it. Probably because I had a lawyer at sentencing whom I'd known for only one hour. Or the prosecutor was mad at me. Or the Judge hated me (actually I don't think you did). Or the stars were aligned against me.

Judge Payne, I am in the Witness Protection Program. This place is a cornucopia of second chances. In fact, it was built for that purpose. Everyday I get to see people go home after they've served their short sentences. I've seen guys with two, three, four and more murders walk out of here. I stood here and watched a man involved in the first World Trade Center bombing go home. There are inmates here with terrorist ties here who I will watch walk out that door. Everyone here is happy. On the visit inmates and their familes joyously discuss their futures in the second phase of the Witness Program. While my family and I grimly pray for some type of unforseen miracle. Being here has been a psychological nightmare. It's like being on a derailed train, where everyone can jump off but me. I've seen almost every face in here change twice. I have fifteen years in, with twenty more

3

to do. These numbers are incomprehensible to the other witnesses. I thought I could never stomach going back into the sadistic penitentiary environment, but I am at the point of signing out of the Witness Program just so I can get away from this mirror of disparity.

Your Honor, when I came to prison I was twenty-three. My daughter was four years old. Now she's twenty and in college. In fact, we're both in college, which I take great pride in. It's hard for me to understand how I can own up to my crimes twice, spend years in cheerless cells, away from my family, working on my rehabilitation, but yet be given a harsher sentence then everyone I've met thus far. A government witness doing thirty-eight years. A man named Phillip Pierre was given immunity on my case. He waylaid and then shot a man in the head at close range, wedged the body into a trunk, and drove across two boroughs to dump it. The other day Phillip saw my mother in the street and asked her how I was doing? He hadn't spent one sleepless night in prison for his crime.

Judge Payne, I find it ironic that for the last few years I've been writing letters for inmates going before judges for resentencing. Twice Judges have alluded to the letters in their decision to grant time served. One letter was even excerpted in the newspaper. I was never afforded the opportunity to write you before my own resentencing. So every time I write, I imagine that I'm writing you.

Your Honor, I hope you haven't taken umbrage to anything I've said. My intentions was to show you my plight; though you may perceive it as my comeuppance. I've sent my certificates, grades, and letters of support, because I was never given the chance to send them in the past. I apologize for writing such a long letter and interfering with your hectic calender year. Thank you for listening. Take care.

Sincerely

Andrew O'Brien

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY:  CRIMINAL TERM:  PART T23
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

    -against-                    **AFFIRMATION**
                                    Indictment Number: 3825/06

RICARDO JIMINEZ,

Defendant.
-------------------------------------------------------------------X

       I, **LISA R. MATTAWAY**, an attorney admitted to practice before the Courts of this State,

affirm under penalty of perjury pursuant to CPLR Rule 2106 as follows:

       1.    I am an Assistant District Attorney ("ADA") in the Office of **ROBERT T.**

**JOHNSON**, District Attorney, Bronx County. I submit this affirmation in support of Respondent's

answer in opposition to defendant's motion to vacate his judgment of conviction pursuant to

Criminal Procedure Law ("CPL") § 440.10.

       2.    I have prepared this affirmation on personal knowledge, as well as upon information

and belief, based on a review of the information contained in the records of this matter maintained

by the Office of the District Attorney, Bronx County, and this Court, which I believe to be true and

accurate, as well as conversations with Detective Wendell Stradford of the New York City Police

Department Cold Case Squad.

       3.    I have been an ADA in the Bronx County District Attorney's Office since 1989.  As

a prosecutor, I have tried approximately 50 cases, approximately 15 of which involved murder

charges.  At the time I was assigned this case, I had tried approximately 30 cases. This case was my

3rd or 4th murder trial and the most complicated, given that it was a "cold" case homicide.

       In 2006, I was assigned to prosecute the case of People v. Ricardo Jiminez (3825/2006), in

which defendant was charged with Murder in the Second Degree (Penal Law § 125.25 [1]), for the

shooting death of Sean Worrell in a crowded Bronx movie theater on the night of July 2-3, 1989.

4.     As early as five months prior to trial, in January of 2007 [jury selection started on June 20, 2007], I started providing defense counsel, Patrick Bruno, Esq., with voluminous discovery materials, which I continued to do through June 2007. Mr. Bruno signed a series of receipts, acknowledging my disclosure of, inter alia, the identification of defendant, crime scene photographs, arrest report and photograph, complaint report, Unusual Occurrence Report, Homicide Duty Memos, vouchers (D593588, D593589, D593590), "Property Clerk's voucher for 45 automatic gun and shell," Detective's Folder Index, multiple DD5s, autopsy report, crime scene report, DD5 reports recounting police interviews of Christopher Cordero, Gregory Jones, Robert Kane, Linda Salter, James Williams, Jerome Smith, Shawn Bond, Andrew O'Brien, and Esco Blaylock (all provided between January 28, 2007, and June 2007)

5.     In a letter dated June 8, 2007, I informed counsel that Andrew O'Brien and Kevin Morrissey would be testifying for the People. I noted that Mr. O'Brien was serving a 30-year sentence in federal prison for an unrelated murder and had asked me for a letter that "he can have put in his file stating that he testified for the Bronx District Attorney's Office" (see defendant's appendix, Exhibit Q [letter dated June 8, 2008]).

I also informed counsel that Mr. Morrissey was facing several cases in Nassau, Queens, and Brooklyn, all for check fraud and related charges. I indicated that Nassau and Brooklyn had "apparently" agreed to give Mr. Morrissey a sentence of one to three years in jail, but Queens had not offered the same and Mr. Morrissey had asked me to make a telephone call to Queens if he testified for the People in Bronx County (see defendant's appendix, Exhibit Q).

6.     I provided counsel with, inter alia, an FBI 302-Memo, dated January 1, 2001, which detailed Mr. O'Brien's anticipated testimony, and a request to interview Mr. O'Brien, dated January

2

3, 2001. Counsel acknowledged receipt of the document on June 26, 2007.

Pursuant to my disclosure obligations under CPL § 240.45, I also gave counsel a list of known "convictions and bad acts" for Mr. Morrissey, Mr. O'Brien, and Esco Blaylock. I disclosed that Mr. Morrissey had the following ten convictions: a 1994 grand larceny (Suffolk County), a 1997 forgery (Nassau County), a 1997 forgery (Suffolk County), a 1997 unauthorized use of a vehicle (Carmel Town Court), a 2000 petit larceny (Queens County), a 2001 petit larceny (New Rochelle City Court), a 2001 petit larceny (Putnam County), a 2004 attempted grand larceny (Queens County), a 2004 possession of a forged instrument (Nassau County), and a 2004 attempted grand larceny (Suffolk County). I also disclosed that Mr. Morrissey had the following three pending cases: charges in 2006 for grand larceny, possession of a forged instrument and related counts (Kings County); charges in 2006 for possession of forged instrument, grand larceny, and related counts (Nassau County); and charges in 2006 for grand larceny, possession of a forged instrument and related counts (Queens County) (see defendant's appendix, Exhibit R).

With respect to Mr. O'Brien, I disclosed that he had pled guilty in 1988 to third-degree criminal possession of a weapon (Kings County), and in 1989, he pled guilty to cocaine possession in (Richmond, Virginia, Circuit Court). I also reiterated that Mr. O'Brien had been "found guilty of murder, use of a firearm in commission of a felony [in] Virginia Beach, Virginia" (see defendant's appendix, Exhibit R). Counsel acknowledged receipt of the information regarding Mr. Morrissey and Mr. O'Brien on June 26, 2007.

I also disclosed additional materials to counsel, which were not documented with receipts.

7.      During my various conversations with Det. Stradford, I was informed that Mr. O'Brien had never been a suspect in this case. He informed me that the police were aware of Mr. O'Brien in 1989 and never considered him a suspect.

3

8.    At trial, in June 2007, Mr. O'Brien identified defendant, whom he had seen multiple times the night of the murder, as the shooter inside the theater. The jury also learned that defendant admitted to Mr. Morrissey that defendant had shot the deceased and saw him fall on the ground, though defendant had claimed to Mr. Morrissey that the victim had fired first. Moreover, Mr. Blaylock, an employee of the theater who knew defendant and saw him on a regular basis, unequivocally identified defendant as the man who had shot and killed Sean Worrell.

On July 13, 2007, the jury convicted defendant of Murder in the Second Degree (Penal Law § 125.25 [1]). On August 16, 2007, the Honorable Robert Torres sentenced him to an indeterminate term of imprisonment of from twenty-two years to life.

9.    On March 10, 2011, the Appellate Division, First Department, unanimously affirmed the judgment of conviction and rejected all of defendant's arguments, including his claim that he had been wrongfully convicted. See People v. Jiminez, 71 A.D.3d 483 (1st Dept. 2010).

On June 30, 2010, the Honorable Carmen Beauchamp Ciparick, Associate Judge of the New York Court of Appeals, denied defendant's application for leave to appeal to that Court. See People v. Jiminez, 15 N.Y.3d 752 (2010).

10.    I have seen defendant's Notice of Motion to Vacate Judgment pursuant to CPL §440.10, dated September 23, 2011, Defendant's Supplemental Affirmation in Support of Motion to Vacate Judgment, dated October 4, 2011, Defendant's Second Supplemental Affirmation in Support of Motion to Vacate Judgment, dated May 29, 2012, Defendant's Third Supplemental Affirmation in Support of Motion to Vacate Judgment, dated July 2, 2012, and Defendant's Memorandum of Law, dated July 24, 2012. I understand that defendant is claiming that he was wrongfully convicted. He is also claiming that, in violation of Brady v. Maryland, 373 U.S. 83 (1963), this Office allegedly failed to disclose that Mr. Morrissey had a history of mental illness and

4

of untruthfulness in judicial proceedings, had additional state convictions, had federal and out-of-state convictions, had a history of using false identities, and that I had told Mr. Morrissey I would help move his wife and child to a new location, and that my disclosure to defense counsel understated the benefits Mr. Morrissey had hoped to obtain by testifying against defendant. I also understand that defendant claims that, with regard Mr. O'Brien, this Office inaccurately disclosed the benefit provided to Mr. O'Brien in exchange for his testimony against defendant, and this Office failed to disclose a 1992 state conviction for third-degree criminal possession of a weapon with a sentence of three-and-one-half to seven years in prison, a 1997 federal RICO conviction for criminal activities, including murder, a conviction for possession of a firearm in Richmond, Virginia, a 1989 conviction for carrying a concealed weapon in Norfolk, Virginia, certain Rosario material, and the following impeachment and other materials contained in a federal transcript from a federal trial in which Mr. O'Brien had been a cooperating witness -- Mr. O'Brien was a key figure in the "Poison Clan," a criminal syndicate responsible for drug trafficking and murders; Dean Beckford, who was with Mr. O'Brien and the deceased at the movie theater, was the leader of the "Poison Clan;" Mr. O'Brien had been involved in the sale of Marijuana in Brooklyn; Mr. O'Brien violated probation when he shot two men on the street; Mr. O'Brien had been a drug user and sold crack/cocaine; and that around the time of the shooting in this case, others involved in the drug trade were trying to kill Mr. Beckford and his associates. I understand that defendant also believes that this Office failed to disclose ballistics evidence which appears to suggest that there was a third gun used on the night of the shooting, that he believes he received certain Brady material in an untimely manner, and that he believes I elicited false and misleading testimony from Mr. O'Brien, Mr. Morrissey and Mr. Blaylock. I understand that, lastly, defendant claims his trial attorney, Patrick L. Bruno, Esq., was ineffective for numerous reasons.

5

11.     I have reviewed the trial folders and my notes before preparing this affirmation. From my refreshed recollection, I recall the following. Although I was aware of Kevin Morrissey's self-reported history of drug use, to which he testified at trial, I was not aware that he had any history of mental illness, nor did he inform me of any. In fact, during my various interactions with him, Mr. Morrissey was very well spoken, intelligent, and exhibited no sign of mental illness.

I did not understate the benefits Mr. Morrissey had hoped to obtain by testifying in this case. As noted, prior to trial, I informed trial counsel that Mr. Morrissey had several open cases in Nassau, Queens, and Brooklyn, all for check fraud and related charges. I also indicated that Nassau and Brooklyn had "apparently" agreed to give Mr. Morrissey a sentence of one to three years in jail, but Queens had not offered the same and Mr. Morrissey had asked me to make a telephone call to Queens if he testified. I made no promises that I would obtain a more favorable plea for Mr. Morrissey on any of his cases. In fact, it is not my practice to ever make such promises. I simply told Mr. Morrissey that I would contact the specific offices and inform them that he had cooperated and testified truthfully under oath.

After trial, on July 23, 2007, I was contacted by Jeffrey Groder, Esq., who represented Mr. Morrissey on his Nassau County case. Mr. Groder asked me to contact Nassau ADA Kylie Higgins to advise her regarding the nature and extent of Mr. Morrissey's cooperation. I called and spoke with ADA Higgins, who confirmed that Nassau had wanted to offer Mr. Morrissey a plea with a sentence of one-and-one-half to three years. I then informed ADA Higgins that Mr. Morrissey had testified in this case but I made no specific request on Mr. Morrissey's behalf. Subsequently, I was contacted by Mr. Groder who requested that I write a letter to the Nassau County District Attorney's Office regarding Mr. Morrissey's cooperation. I wrote the requested letter on October 23, 2007, and, just as I had done in my telephone conversation with ADA Higgins, I made no specific request on Mr.

6

Morrissey's behalf but only noted the extent of his cooperation. Mr. Groder had informed me that he had hoped to use my letter to obtain further leniency, namely a misdemeanor plea for Mr. Morrissey, but I was not part of any such negotiation either before or after trial.[1]

On July 25, 2007 (after the trial), I was contacted by Andrew Worgan, Esq., who represented Mr. Morrissey on his Queens County Case. Mr. Worgan asked me to contact Queens ADA Allison Wright to advise her regarding the nature and extent of Mr. Morrissey's cooperation. That same day, I called and spoke with ADA Wright who confirmed that Queens prosecutors were not willing to offer Mr. Morrissey a lesser sentence.

On review of the trial folders in preparing this response, I discovered that they contain two documents (the first one, entitled "Additional Inquiry Response," is a request for information based on an FBI database; the second one is from the U.S. Marshals Service) indicating possible federal criminal history for Mr. Morrissey. I had not seen those documents and was not personally aware of Mr. Morrissey's federal criminal history before or during the trial. The "Additional Inquiry

---

[1]  A review of Mr. Morrissey's criminal history indicates that, on August 2, 2007, he pled guilty to second-degree attempted possession of a forged instrument (Penal Law § 170.25) in Nassau County and received a sentence of one-and-one-half to three years.

On December 12, 2007, Mr. Morrissey pled guilty to third-degree grand larceny in Queens County and was sentenced to a term of from two to four years imprisonment.

In January 2008, almost a year after Mr. Morrissey had testified, he entered into a cooperation agreement with the Bronx County District Attorney's Office and Kings County District Attorney's Office for his testimony in an unrelated Bronx murder case. People v. Felipe Arroyo (Indictment Number 4502/2006). I was not involved in the Arroyo prosecution. According to the agreement, Mr. Morrissey had agreed to plea guilty, in Kings County, to third-degree grand larceny and that his sentence of three-and-one-half to seven years, which was to run concurrently with his other cases, would be adjourned during the pendency of the agreement. After Mr. Morrissey's testimony in Arroyo, however, the Bronx District Attorney's Office would inform prosecutors in Brooklyn of Mr. Morrissey's cooperation in the unrelated murder case and recommend that Mr. Morrissey receive a lesser sentence of two to four years incarceration or the "Willard Program," a substance abuse treatment program, to run concurrently with his sentences in Queens, Nassau, and Suffolk Counties.

7

Response," dated April 20, 2007 (two months before Mr. Morrissey's testimony), indicates that it was requested by and sent to Det. Stradford and contains his user name as the requestor. I do not have a password of my own to run the federal criminal history of my witnesses. Instead, I rely on colleagues or case detectives to do so for me. Similarly, the fax cover on the document from the U.S. Marshals Service indicates that it was faxed directly to Det. Stradford at the Cold Case Squad. As noted, I had not seen those documents prior to Mr. Morrissey's testimony. I believe that Det. Stradford obtained the documents in anticipation of a May 22, 2007, meeting with Mr. Morrissey, but I was never given them directly. I did not discuss any federal history with Mr. Morrissey at that meeting. In preparing this response, I had a conversation with Det. Stradford. He informed me that, as was his practice, he would have provided all documents to this Office prior to trial.[2]

As noted, I had disclosed ten convictions and three pending cases against Mr. Morrissey. However, I have since reviewed the folders and discovered that the copy of Mr. Morrissey's rap sheet that I had relied upon and highlighted only contained 28 of the 38 pages that I should have had. The missing pages are the last ten pages of the complete rap sheet, and the rap sheet itself contains no signifier that the it continued past page 28. It contained the following older convictions of Mr. Morrissey, which were not disclosed: Petit Larceny (Penal Law § 155.25), a class A misdemeanor, on August 11, 1989 (Cortlandt Town Court, Westchester County); Fraudulent Disposition of Mortgaged Property (Penal Law § 185.10), a class A Misdemeanor, on February 22, 1990 (Nassau District Court); Issuing a Bad Check With Knowledge of Insufficient Funds (Penal Law § 190.05), a Class B Misdemeanor, on March 12, 1991 (Yorktown Town Court, Westchester County); Issuing a Bad Check (Penal Law § 190.05), a Class B Misdemeanor, on March 8, 1991 (New Rochelle City

---

[2]My disclosure forms indicate that I disclosed documents from Det. Stradford's folders before and after April 20, 2007.

8

Court, Westchester County). Also, although I had disclosed that Mr. Morrissey was convicted of one count of Forgery in 1997 (Nassau County), a more careful reading of Mr. Morrissey's rap sheet indicates that he pled guilty to two counts of forgery and one count of fifth-degree criminal possession of stolen property , all class A Misdemeanors. In the rap sheet, I found no July 2001 conviction from Queens County.  Rather, that conviction occurred on October 19, 2000, and was disclosed.

I also reviewed the CRIMS reports provided by defendant. It indicates that the October 19, 2000, conviction that I had disclosed was "finished" on July 2001, but not that it was a separate conviction. Indeed, the docket number on the conviction that I had disclosed for October 19, 2000, is the same as the one on the CRIMS report provided by defendant. (see defendant's appendix, Exhibit FFF). I have found no April 2005 conviction in Nassau County in the rap sheet, nor is there an April 1991 Harassment conviction. Indeed, the CRIMS report provided by defendant notes that this conviction was sealed pursuant to CPL §160.55 (see defendant's appendix, Exhibit FFF), which explains why it does not appear on the rap sheet. The rap sheet for Mr. Morrissey also mentions no convictions in New Jersey and Pennsylvania.  Although the "federal history" portion of the rap sheet that I had prior to trial mentions that Mr. Morrissey was arrested in Greenwich, Connecticut, for forgery related offenses on February 17, 1999, it notes that the disposition was "pending" and had no final resolution. That portion of the rap sheet also mentions federal history in Darien, Connecticut, and mentions that there was a "DISP DATE" of March 24, 1992. The nature of the disposition, however, is unclear because it only mentions "F NOLLE" and "F 1YR." Furthermore, although Mr. Morrissey testified that he had a Bergen County, New Jersey case pending, I was not aware of it and it is not mentioned in the rap sheet I had.

The rap sheet that I had reviewed prior to trial contained the following aliases for Mr.

9

Morrissey: Andres Benitez, Ken Morrisey, Kevin Sanchez, Kevin Moreland, Kevin Moore, and James Morrisey. It also indicates that Mr. Morrissey had provided approximately twelve addresses, three different social security numbers, and two dates of birth. I considered Mr. Morrissey's aliases, different addresses, dates of birth, and social security numbers as information he used as part of his forgery related crimes, but not as information that he had provided in an attempt to evade prosecution, and, as such, I did not disclose them.

I had not agreed to relocate Mr. Morrissey's family at any time before or during the trial. Rather, after the conviction, on August 10, 2007 (the jury returned a verdict on July 13, 2007), I was informed by NYPD detectives and detectives from this Office that defendant had or was attempting to put a "hit" on Det. Stradford and me. On September 4, 2007, I wrote a letter to Captain Bolden of Rikers Island, informing him of defendant's death threats and urging him to do his best to protect Mr. Morrissey, who had testified against defendant. After learning of these death threats, my Office assigned a detective to accompany me to my car and to insure my safety for several weeks. The Office also gave me a cellular telephone that they could easily track in case I was in danger. Moreover, my local precinct dispatched a police car to patrol my house for several nights and the precinct also gave me a direct number to call in case I was in danger.

On September 7, 2007, a detective from this Office met with Mr. Morrissey on Rikers Island to discuss defendant's death threats. On September 18, 2007, Mr. Morrissey's wife contacted me asking if I could make arrangements to move her and her child. Mr. Morrissey's wife explained that she was afraid for her safety because she lived in the same neighborhood as defendant's wife and family. I spoke with a representative in the Crimes Victim Assistance Unit (CVAU) of this Office. The CVAU representative informed me that since Mr. Morrissey's wife was in Section 8 Housing, the only arrangement that could be made would be for her to move to another Section 8 apartment,

10

Morrissey: Andres Benitez, Ken Morrissey, Kevin Sanchez, Kevin Moreland, Kevin Moore, and James Morrisey. It also indicates that Mr. Morrissey had provided approximately twelve addresses, three different social security numbers, and two dates of birth. I considered Mr. Morrissey's aliases, different addresses, dates of birth, and social security numbers as information he used as part of his forgery related crimes, but not as information that he had provided in an attempt to evade prosecution, and, as such, I did not disclose them.

I had not agreed to relocate Mr. Morrissey's family at any time before or during the trial. Rather, after the conviction, on August 10, 2007 (the jury returned a verdict on July 13, 2007), I was informed by NYPD detectives and detectives from this Office that defendant had or was attempting to put a "hit" on Det. Stradford and me. On September 4, 2007, I wrote a letter to Captain Bolden of Rikers Island, informing him of defendant's death threats and urging him to do his best to protect Mr. Morrissey, who had testified against defendant. After learning of these death threats, my Office assigned a detective to accompany me to my car and to insure my safety for several weeks. The Office also gave me a cellular telephone that they could easily track in case I was in danger. Moreover, my local precinct dispatched a police car to patrol my house for several nights and the precinct also gave me a direct number to call in case I was in danger.

On September 7, 2007, a detective from this Office met with Mr. Morrissey on Rikers Island to discuss defendant's death threats. On September 18, 2007, Mr. Morrissey's wife contacted me asking if I could make arrangements to move her and her child. Mr. Morrissey's wife explained that she was afraid for her safety because she lived in the same neighborhood as defendant's wife and family. I spoke with a representative in the Crimes Victim Assistance Unit (CVAU) of this Office. The CVAU representative informed me that since Mr. Morrissey's wife was in Section 8 Housing, the only arrangement that could be made would be for her to move to another Section 8 apartment,

10

i.e., she could only get the same accommodation (namely, same size) but not better. I did not follow up to see if Mr. Morrissey's wife had been relocated. In short, I never offered or promised to relocate Mr. Morrissey's wife either before or during the trial because, as noted, that attempt to relocate was prompted after the trial when defendant's death threats were discovered.

Subsequently, Mr. Morrissey wrote me a letter stating that he was "appalled" to learn that Det. Stradford and I were the subject of threats from defendant. Mr. Morrissey urged me to take the threats seriously and informed me that his wife and child lived only blocks away from defendant's wife and family. Mr. Morrissey asked me to relocate his family and stated, "I know you said you would move them [Morrissey's wife and child] it won't be the Taj Mahal please . . just get them safe in the meantime while this blows over" (see defendant's Appendix, Exhibit Y).

Again, I never agreed to relocate Mr. Morrissey's wife either before or during the trial and, besides the one telephone call, I never spoke with Mr. Morrissey's wife.

12.     Regarding Andrew O'Brien, I had limited access to him because he was in the federal witness protection program and all local law enforcement access had to be specifically approved by the federal government. I only met with Mr. O'Brien once prior to the trial. As noted, I disclosed that Mr. O'Brien was serving a 30-year sentence in federal prison for an unrelated murder in Virginia and he had asked me for a letter stating that he testified for this Office. I also disclosed, and Mr. O'Brien admitted at trial, that on March 11, 1988, he pled guilty to felony possession of a weapon and, on March 9, 1989, he was convicted of cocaine possession in Virginia.

A review of the trial folders revealed transcripts from a federal trial in which Mr. O'Brien had testified that had not been disclosed to defense counsel. On June 4, 2007, I e-mailed Assistant United States Attorney (AUSA) David Novak in the Eastern District of Virginia, requesting, inter alia, help in producing Mr. O'Brien from federal prison. I requested "any cooperation agreements

11

[Mr. O'Brien] ha[d] made in exchange for his testimony with the federal government and any information regarding favorable treatment he may have received in exchange for his cooperation, including his placement in the witness protection program." I informed AUSA Novak that I was aware that Mr. O'Brien had written numerous letters to the federal judge requesting leniency and if any of those letters mention the possibility he may testify "here in Bronx Supreme Court," I "imagine I will need copies of those letters too." In an e-mail dated Friday, June 8, 2007, AUSA Novak informed me that he had mailed me a "packet of materials for [Mr.] O'Brien" and I should expect them "early next week." There is no indication when the transcripts and other materials were delivered to this Office.

Nevertheless, the trial folders contain the federal transcripts and indictment, as well as a cover letter from AUSA Novak dated June 8, 2007, indicating that he had sent me, inter alia, Mr. O'Brien's letters to the federal judge, Mr. O'Brien's Grand Jury testimony, the indictment (which had been made public), Mr. O'Brien's plea agreement, and transcripts of Mr. O'Brien's testimony in U.S. v. Dean Beckford. I must have received them. However, given that I had only recently returned from a vacation on June 4, 2007, the three to four total boxes of materials I had to work with on this case,  and the numerous tasks I was performing in preparing for this cold-case homicide from 1989 (which began with hearings on June 15, 2007), including producing the witnesses, I must have inadvertently neglected to look at and disclose of the documents that the AUSA had sent me, but I have no independent recollection of what I did with these materials.

In preparing this response, I reviewed Mr. O'Brien's rap sheet, which I had prior to his testimony, and it shows that any non-disclosure was based on the confusing nature of the rap sheet. For instance, I inadvertently did not disclose Mr. O'Brien's 1992 state conviction of third-degree criminal possession of a weapon, where he was sentenced to three-and-one-half to seven years in

12

prison. The rap sheet indicates, under "Arrest/Arraignment Charges," that Mr. O'Brien had two separate dockets in 1991, 1074/1991 and 1075/1991 (under 1075, he was charged with assault with intent to cause serious physical injury and related charges and, under 1074, he was charged with, inter alia, third-degree criminal possession of a weapon). The "Disposition" section indicates that docket 1075 was dismissed. The same section also indicates that a bench warrant had been issued under docket 1074 but notes that "disposition [was] pending" on that docket. Then, all the way at the bottom of the sheet, in the "Disposition and Related Data" section, it notes "Downstate Corr Fac-Admission" and indicates that the inmate was "committed" on 04/21/1992" and was "Admitted for" third-degree criminal possession of a weapon. Since the above-mentioned sections never indicated that Mr. O'Brien had been "convicted," while the other sections of the rap sheet specifically used the term, I mistakenly overlooked Mr. O'Brien's conviction for third-degree criminal possession of a weapon. Similarly, I inadvertently did not disclose a misdemeanor conviction from March 9, 1989, for brandishing a weapon in Richmond, Virginia. Finally, although Mr. O'Brien's rap sheet, which I had reviewed prior to trial, contains a February 19, 1990, arrest for carrying a concealed weapon in Norfolk, Virginia, it indicates that no "DISPOSITION WAS RECEIVED."

I accurately disclosed the benefit provided to Andrew O'Brien in exchange for his testimony. As noted, I informed counsel that Mr. O'Brien was serving a thirty-year sentence in federal prison for an unrelated murder and had asked me for a letter that "he can have put in his file stating that he testified for the Bronx District Attorney's Office" (see defendant's appendix, Exhibit Q). I never made any specific promises or guarantees to Mr. O'Brien, and, in fact, it is never my practice to do so. Prior to reviewing defendant's current motion with the assigned ADAs from the Appeals Bureau, I had no knowledge of federal Rule 35 and I did not know Mr. O'Brien was testifying with the hope or understanding that a Rule 35 motion would be filed on his behalf. There certainly was no

13

agreement between Mr. O'Brien, then-AUSA Novak, and myself that, in exchange for Mr. O'Brien's testimony, Mr. Novak would file a Rule 35 motion for a reduction in Mr. O'Brien's sentence. According to my notes, Mr. O'Brien already had received leniency from the federal government in the form of a sentence reduction and he only wanted a letter from me. In fact, I was informed that, as part of his cooperation agreement with the federal government, Mr. O'Brien was already required to cooperate with all law enforcement, including state and local prosecutions like this one.

On October 1, 2007, months after the trial had ended, AUSA Novak contacted me regarding Mr. O'Brien's cooperation in this case. On October 5, 2007, AUSA Novak requested a letter regarding O'Brien's cooperation. AUSA Novak did not request that I mention anything in particular in the letter and he had no involvement in determining its content. I also did not know and we did not discuss that AUSA Novak would use the letter to file a Rule 35 motion. I wrote a letter, dated October 16, 2007, explaining Mr. O'Brien's cooperation and the value of his testimony in this case. Although I asked that AUSA Novak give Mr. O'Brien whatever consideration he could, based on Mr. O'Brien's brave testimony in this case, I never made any specific request on his behalf.

13.     As noted, I disclosed vouchers, D593588, D593589, D593590 and "Property Clerk's voucher for 45 automatic gun and shell." I never had and still do not have any vouchers numbered D682988 and D682923. Similarly, I never had the "Ballistics Unit Case Worksheet" and the first time I saw that document was is in defendant's appendix (defendant's appendix, Exhibit TT).

14.     Prior to trial, I spoke with Daryl Bonelli (with his attorney present, since Mr. Bonelli was incarcerated at the time). Mr. Bonelli informed me that he was at the theater with his roommate Jerome Smith on the day of the shooting, and that both Smith and he "hit the floor" when the shooting started. As such, they did not see anything.

15.     I have no recollection of, and no notes in my diary concerning Det. Stradford

14

informing me of his attempts to locate and speak with Maria Padilla, who was noted in the 1989 investigation as defendant's girlfriend and one of his supposed alibi witnesses. However, I believe he must have discussed his attempt with me. If Det. Stradford had informed me that Ms. Padilla now lived out-of-state, wanted nothing to do with this case, and would not travel to New York to testify, I would have relied on his representation and not attempted to force her cooperation, particularly in this case where I believed that defendant would be presenting a justification defense.

16.     I did not elicit any false and misleading testimony from Andrew O'Brien, Kevin Morrissey, and Esco Blaylock. Moreover, I have never found any indication that Det. Stradford testified falsely at the hearing regarding the use of the PIMS machine in 1989.

17.     Any information that should have been disclosed, but was not, was inadvertent and purely based on my mistake, but was not, in any way, intentional.

Dated: January 10, 2012
         Bronx, New York

                                        LISA R. MATTAWAY, ESQ.
                                        Assistant District Attorney

15

## STIPULATION

If called to testify, David J. Novak, United States Magistrate Judge for the United States District Court for the Eastern District of Virginia, would state as follows:

- In 2007, Mr. Novak was an Assistant United States Attorney with the Eastern District of Virginia.

- Mr. Novak had previously handled the prosecution of *United States v. Dean Beckford, et al.,* at which Andrew O'Brien testified as a cooperating witness.

- For his cooperation in that case, Mr. O'Brien received a Federal Rule of Criminal Procedure Rule 35(b) reduction in his sentence from a life term to thirty years, the "standard cut" for a cooperating witness convicted of murder in the Eastern District of Virginia.

- Mr. Novak was in contact with Mr. O'Brien after Mr. O'Brien cooperated in his federal case.  Mr. O'Brien was "hopeful" that he would receive a further "cut" or "cuts." Mr. O'Brien asked Mr. Novak if there was anything he could do to get one. He wanted to help himself "in any possible way." He did not specifically mention this case in their discussions. Mr. Novak must have informed Mr. O'Brien at some point that second Rule 35 reductions are "strongly disfavored," but that he could not say a reduction would "never" happen.

- Mr. Novak was the "driving force" against providing "second cuts" in his Office.

- To obtain a second Rule 35 reduction on behalf of a witness, Mr. Novak would have to agree, then get consent from a supervisor in his Office, and then get court approval, which was never guaranteed. Thus, no one could promise Mr. O'Brien a further reduction.

- As an AUSA in the Eastern District, Mr. Novak was a sponsor for Mr. O'Brien's entry into the United States Witness Security Program (WITSEC). Mr. O'Brien's entry into WITSEC meant permission was required to contact him. Mr. Novak did not know WITSEC prison policies otherwise.

- Pursuant to his cooperation agreement, Mr. O'Brien was required to cooperate with all law enforcement, including state and federal prosecutions. The failure to cooperate would constitute a "breach" of his agreement.  He did not recall this requirement to be a factor in this case and recalled that Mr. O'Brien wanted to cooperate in this case.

- Mr. Novak's "surmise" was that Mr. O'Brien wanted to testify to get a time cut. He did not believe Mr. O'Brien was cooperating to be a "good citizen."

- Mr. Novak specifically recalled receiving an initial phone call from Bronx Assistant District Attorney Lisa Mattaway requesting the production of Mr. O'Brien as a witness in her case. It "stunned" and "jumped out" at Mr. Novak that she made this request to produce Mr. O'Brien, a witness in WITSEC, for a trial to start the following week. Mr. Novak thought that she "had no idea how WITSEC works" and that her "ducks [were] not lined up."

- Mr. Novak recalled asking ADA Mattaway to email him if she needed anything else.  Mr. Novak believed he received a request for Brady material from Ms. Mattaway on a Monday. He accumulated the paperwork on Mr. O'Brien and mailed it to her that Thursday for discovery analysis. It was a "big deal" for Mr. Novak to get the O'Brien documents together on short notice.

- Mr. Novak does not recall whether he discussed a letter with Ms. Mattaway before trial. He is "pretty sure" he told her that second Rule 35 motions or second sentence reductions are "disfavored," and told Ms. Mattaway, "Don't promise him anything," or "You can't promise him anything." His recollection is based on a prior experience he had where someone had made a promise to a cooperating witness of a sentencing reduction, the witness did not get the promised reduction, and a "contract" was put out on Mr. Novak's life.

- Mr. Novak believes that, in October, Ms. Mattaway contacted him about the result of the trial and wanted to do something for Mr. O'Brien. Mr. Novak believed he told Ms. Mattaway a further reduction was disfavored, but could not say "for sure." His reaction was, "send me a letter."

- Ms. Mattaway sent Mr. Novak a "pretty strong" letter, detailing Mr. O'Brien's cooperation, the results of trial, and seeking consideration. At the time of receipt, Mr. Novak was not sure whether he was going to ask for a reduction on behalf of Mr. O'Brien. He "did not know" what he "would do," and did not "know [Ms.] Mattaway from a hole in the wall."

- Ms. Mattaway was the "initiator" of the letter.  There was "no one else it could have been." Mr. Novak decided to support what Ms. Mattaway did.  The second motion was "driven by her, not me." He had two or three calls with Ms. Mattaway; one call was right before she wrote the letter.

- Ms. Mattaway's letter resulted in Mr. Novak filing the second Rule 35 reduction motion on Mr. O'Brien's behalf. Mr. O'Brien's sentence was reduced by five years, which was not a "big" reduction.

S - 4

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY Part **M30**

**RECEIVED**

MAY 1 1 2007

SUPREME COURT CLERK'S OFFICE
BRONX COUNTY

-------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

AFFIRMATION IN OPPOSITION

- against -

INDICTMENT NO. **3825/2006**

**RICARDO JIMENEZ,**

Defendant.

-------------------------------------------------------X

**LISA RENÉE MATTAWAY**, under penalty of perjury and pursuant to Rule 2106 of the CPLR, hereby affirms and states:

That I am an Assistant District Attorney in the Office of Robert T. Johnson, District Attorney of Bronx County and am submitting this affirmation in response to defendant's motion. I base this affirmation on information and belief founded upon the records maintained in this matter by this Court and my Office, which I believe to be true and accurate.

### MOTION FOR INSPECTION OF THE GRAND JURY MINUTES
### AND DISMISSAL OR REDUCTION OF THE INDICTMENT,
### AND RELEASE OF GRAND JURY MINUTES

The People consent to the Court's IN CAMERA review of the Grand Jury minutes. We contend that inspection will reveal that the evidence presented to the Grand Jury amply supports each and every element of the crimes charged under Indictment number **3825/2006.** The People also maintain that the Grand Jury was properly instructed on the law, that a quorum of Grand Jury members who heard all the evidence participated in the vote, and that the integrity of the proceedings was unimpaired. For these reasons, the People oppose defendant's motion to dismiss or reduce the charges pending against him under Indictment number **3825/2006.**

The People oppose defendant's request for release of the Grand Jury minutes. The proceedings of the Grand Jury are secret and defendant puts forth no reason why that secrecy should be abrogated. See: CPL Section 190.25 Subdivision 4. This is a relatively straightforward case and the Court can, without the help of defense counsel, determine the sufficiency of the evidence presented the Grand Jury and the propriety of its proceedings.

The People deny all allegations to the contrary and oppose disclosure of the Grand Jury minutes to the defendant. The issues raised in defendant's motion are straightforward, and release of the minutes to defendant is not necessary to their resolution. C.P.L. §210.30(3).

Accordingly, the People respectfully request that defendant's motion to dismiss and/or reduce the charges be denied, and that the integrity of the secret Grand Jury proceedings be maintained by the Court's refusal to release the Grand Jury minutes to defendant.

## MOTION TO SUPPRESS IDENTIFICATION

The People oppose defendant's motion to suppress the identifications made by the eyewitnesses to law enforcement personnel and deny the factual allegations set forth by defense. The People do, however, consent to a pre-trial Wade hearing to be conducted immediately prior to trial.

## MOTION FOR BRADY MATERIAL

The People are aware of their continuing obligations under Brady v. Maryland, and will continue to comply.

## MOTION FOR SANDOVAL HEARING

The People consent to a pre-trial Sandoval hearing, but suggest it be conducted by the Trial Court immediately prior to jury selection.

## MOTION FOR DEFENDANT'S RIGHT
## TO FILE FURTHER MOTIONS

The People oppose the filing of additional motions by defendant. The People are aware that the granting of additional motions and relief is within the sole discretion of the Court.

**WHEREFORE**, the People of the State of New York respectfully request that the defendants's motion be denied in all above and for what further relief which this Court deems just and proper.

Dated: May 10, 2007
       Bronx, New York

Respectfully submitted,

**LISA  RENÉE MATTAWAY**
Assistant District Attorney
Trial Bureau B52

----------------------------------------------------------------------X

**THE PEOPLE OF THE STATE OF NEW YORK**

  - against -

                                  <u>INDICTMENT NO. **3825/2006**</u>

**RICARDO JIMENEZ,**
      Defendant.

----------------------------------------------------------------------X

STATE OF NEW YORK  )

                      ) ss.:

COUNTY OF BRONX   )

     I, GRAZIA LOSPOT., being duly sworn, say:
I am a _Secretary_ in the Office of the Bronx County District
Attorney.

     On **Thursday, May 10, 2007**, I served a true copy of the annexed AFFIRMATION
IN OPPOSITION on **Elias Martinez, Esq.** by enclosing same in a securely sealed post-
paid wrapper addressed as follows:

                              **Patrick L. Bruno, Esq.**
                              **Bruno & Ventura**
                              **99 Tulip Avenue**
                              **Floral Park, New York 11001**

     I deposited same in the post office box regularly maintained by the United States
Government located at 198 East 161 Street, Bronx, New York, 10451 addressed to above
named attorney at the above address, that being the address last papers served by said
attorney in the within proceedings.

Sworn to before me this
**10th** day of **May**, 2007.

                               Notary Public

                 BERYL M WRIGHT
            COMMISSIONER OF DEEDS
          CITY OF NEW YORK-NO 3-6696
        CERTIFICATE FILED IN BRONX COUNTY
       COMMISSION EXPIRES AUG. 1, 2007

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF VIRGINIA

 3                  RICHMOND DIVISION

 4                  Pages 11 + Cert.

 5

 6   UNITED STATES OF AMERICA

 7            V.

 8   JOHN DOE

 9

10      GRAND JURY 95-3

11

12      TESTIMONY OF ANDREW CHRISTOPHER O'BRIEN

13      Before a full quorum of the Grand Jury

14      On April 3, 1996

15

16

17

18

19   Assistant U.S. Attorney:  Andrew G. McBride

20

21

22              Reporter:  Diane Gaynier

23

24

25
```

95 APR 17 AM 10: 35

RECEIVED
U.S. ATTORNEY
EASTERN DIST. OF VA
RICHMOND DIVISION

ACCU-BETA ... Inc.  (804) 550-0981

GJ-42

```
 1                    MR. MCBRIDE:  Come forward, sir, and

 2  please take the oath.  Raise your right hand and face

 3  the foreperson of the grand jury if you would.

 4

 5  ANDREW CHRISTOPHER O'BRIEN, AFTER FIRST BEING DULY

 6  SWORN, WAS CALLED AND EXAMINED BY MR. MCBRIDE:

 7

 8          Q       Mr. O'Brien, will you please take a

 9  seat over there, just relax, sit down, get comfortable

10  and please tell the ladies and gentlemen of the grand

11  jury your full name in a loud, clear voice, sir.

12          A       Andrew Christopher O'Brien.

13          Q       How old are you, sir?

14          A       28.

15          Q       Can you read and write English?

16          A       Yes.

17          Q       Did you attend high school?

18          A       Yes.

19          Q       Where did you attend high school,

20  sir?

21          A       Tilden High School.

22          Q       Tilden High School.  Is that in

23  Brooklyn, New York?

24          A       Yes.

25          Q       Are you from Brooklyn, New York?
```

ACCU-BETA ... Inc.  (804) 550-0981

1          A       Yes.

2          Q       You're aware that this is a federal

3   grand jury investigating narcotics activity in

4   Richmond and Virginia Beach?  You know that?

5          A       I'm now finding out.

6          Q       Okay.  You've been interviewed in

7   the past or attempted to be interviewed by some

8   agents, FBI agents and Virginia State Police agents

9   regarding drug activity in Virginia Beach; is that

10   true, sir?

11          A       Not that I remember it.

12          Q       Special Agent Riley of the Virginia

13   State Police?

14          A       He didn't ask me nothing about no

15   drugs.

16          Q       I'm telling you now--

17          A       As far as I recall it.

18          Q       I'm telling you now that this is a

19   federal grand jury investigating narcotics violations

20   and violent crimes in connection with narcotics

21   trafficking in Virginia Beach and in Richmond.  Do you

22   understand that?

23          A       Yeah, I understand.

24          Q       You've been placed under oath by the

25   foreperson of the grand jury and you understand that?

ACCU-BETA ... Inc.  (804) 550-0981

```
 1          A      Yes.

 2          Q      You understand if you give any false

 3   answer or you omit any truthful answers to questions

 4   that I might ask you, sir, or any member of the grand

 5   jury might ask you, you could be subject to a charge

 6   of perjury as the foreperson told you?

 7          A      Yes.

 8          Q      You also understand you have certain

 9   rights and privileges as a citizen in front of the

10   grand jury.  The grand jury is entitled to the

11   evidence of every citizen, but you do have a

12   Fifth Amendment right not to say anything that could

13   incriminate yourself.  Do you understand that?

14          A      Yes.

15          Q      You have the right if you wish to

16   consult with an attorney about your testimony.  An

17   attorney cannot be present in the grand jury room, but

18   an attorney could be outside the room and you could

19   consult with an attorney if you wish.  Do you

20   understand that, sir?

21          A      Yes.

22          Q      Do you have any questions about your

23   rights or about the purpose of the grand jury?

24          A      No.

25          Q      So you understand those rights as
```

ACCU-BETA ... Inc.  (804) 550-0981

```
 1    I've enumerated them?

 2              A       I understand.

 3              Q       Now, you indicated that you went to

 4    Tilden High School.

 5              A       Yes.

 6              Q       In Brooklyn, New York?

 7              A       Yes.

 8              Q       Did you grow up in Brooklyn?

 9              A       Yes.

10              Q       Were you born in Brooklyn, born and

11    raised?

12              A       No.

13              Q       Where were you born, sir?

14              A       England.

15              Q       London, England?

16              A       Yes.

17              Q       When did you come to the United

18    States?

19              A       Sometime in '68.

20              Q       1968?

21              A       Yeah.

22              Q       What's your birthday?

23              A       12/10/67.

24              Q       12/10/67.  So you were one year old?

25              A       Yes.
```

ACCU-BETA ... Inc.  (804) 550-0981

```
 1          Q        Did you come with your mom, or your
 2  dad, or both?
 3          A        Both.
 4          Q        What is your full name, sir?
 5          A        Andrew Christopher O'Brien?
 6          Q        Your mom's name is?
 7          A        Doreen O'Brien.
 8          Q        And your dad?
 9          A        Frank O'Brien.
10          Q        They settled in Brooklyn, New York
11  upon their arrival from England?
12          A        Eventually.
13          Q        What was your address in Brooklyn?
14          A        ████████████
15          Q        ██████████████████?
16          A        Yes.
17          Q        How far is Tilden High School from
18  your house in Troy Avenue?
19          A        About ten or fifteen blocks.
20          Q        Did you walk to school or take the
21  subway?
22          A        Sometimes bus, sometimes walk.
23          Q        When did you leave Brooklyn,
24  New York?  How old were you when you left?
25          A        How old was I when I left?
```

ACCU-BETA ... Inc.  (804) 550-0981

```
 1          Q       Yeah.  How much school did you

 2   finish at Tilden?  Did you graduate from Tilden High?

 3          A       No, I went to 11th grade.

 4          Q       11th grade.  Then you quit school at

 5   that point?

 6          A       Yeah.

 7          Q       Did you move out as well?

 8          A       No.

 9          Q       So you continued to live at

10   853 Troy Avenue after that?

11          A       Yeah.

12          Q       When did you leave home and come to

13   Virginia?  When did you leave home?  When did you

14   leave Troy Avenue?

15          A       Sometime in '87.

16          Q       '87?

17          A       '88.

18          Q       Where did you go?  Did you go to

19   Virginia Beach directly?

20          A       No.  No.

21          Q       Where did you go?  Do you recall

22   where you went first?  Was it in Virginia?

23          A       No, it was in Brooklyn still.

24          Q       Still in Brooklyn.  So you lived

25   away from your parents still in Brooklyn?
```

RJ-001950

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you recall what that address was? |
| 3 | A | No. |
| 4 | Q | When did you move down to the |

5  Virginia Beach area?

| | | |
|---|---|---|
| 6 | A | I choose not to answer that |

7  question.

| | | |
|---|---|---|
| 8 | Q | You choose not to answer that |

9  question?

| | | |
|---|---|---|
| 10 | A | Yeah. |
| 11 | Q | All right, well, let me ask you |

12  this:  Did you know a fellow named Dean Beckford from

13  Brooklyn?

| | | |
|---|---|---|
| 14 | A | Yes.  Yes. |
| 15 | Q | Let me show you a photograph that's |

16  been marked as Grand Jury Exhibit WT-8.  I'll ask you

17  if you recognize that individual.

| | | |
|---|---|---|
| 18 | A | Yes. |
| 19 | Q | Who is that person? |
| 20 | A | It looks like Mr. Beckford. |
| 21 | Q | What's his first name? |
| 22 | A | Dean, you said. |
| 23 | Q | Do you know him by that name? |
| 24 | A | Yes. |
| 25 | Q | So who is the person pictured in |

ACCU-BETA ... Inc.  (804) 550-0981

```
 1   that photograph, in WT-8?

 2          A       Like I said, it looks like

 3   Mr. Beckford.

 4          Q       It looks like Dean Beckford?

 5          A       Yeah.

 6          Q       When did you first meet

 7   Mr. Beckford, Mr. Dean Beckford?

 8          A       Years ago.

 9          Q       In Brooklyn?

10          A       Yes.

11          Q       Do you know him by any other names?

12          A       Not that I recall.

13          Q       Is it your testimony, sir, you never

14   heard anybody refer to him by any other name?

15          A       Not that I can recall.

16          Q       Did you ever hear anybody call him

17   Smiles or Smilely?

18          A       I'm not answering that question.

19          Q       You refuse to answer that question?

20          A       Yes.

21          Q       Okay.  How about a fellow named

22   Devon Beckford, did you know him, sir, in Brooklyn?

23          A       Yes.

24          Q       Let me show you what's been marked

25   as Grand Jury Exhibit WT-6 and ask you if recognize
```

ACCU-BETA ... Inc.   (804) 550-0981

```
 1   that individual.  Do you recognize that person, sir?

 2          A       I'm not answering that question

 3   either.

 4          Q       You're not going to answer that

 5   question?

 6          A       No.

 7          Q       Okay.  Now, I think we were to the

 8   point where you said you refused to answer

 9   essentially.  You're not telling--

10          A       I'm pleading the Fifth.  I'm

11   pleading the Fifth on that.

12          Q       On this particular question?

13          A       On that one and the majority of

14   them.

15          Q       On the majority of them?

16          A       On the rest of the questions.

17          Q       All the rest of the questions

18   without me asking them?

19          A       Yes.

20          Q       I would like to move if we could to

21   the murder in Virginia Beach.  Are you going to plead

22   the Fifth on that as well?

23          A       Yes.

24          Q       It's your intention to not answer

25   any further questions no matter what they are--
```

ACCU-BETA ... Inc.  (804) 550-0981

```
 1            A       Yes.

 2            Q       --from me or any member of the grand

 3     jury?

 4            A       Yes.

 5            Q       You base that refusal upon your

 6     Fifth Amendment privilege not to incriminate yourself?

 7            A       Yes.

 8            Q       Okay.  We have nothing further to

 9     discuss then and you'll be excused at this time.

10                    (CONCLUDED AT 1:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ACCU-BETA ... Inc.   (804) 550-0981

1    CERTIFICATE OF REPORTER:

2

3

4

5

6

7            I, Diane Gaynier, certify I reported and

8    transcribed the foregoing, which is complete and

9    accurate, to the best of my ability.

10            I am not related to nor employed by any

11    counsel, party, or witness, and have no interest in

12    this matter.

13            Given under my hand this 13th day of April,

14    1996.

15

16                              _____

                               Diane Gaynier, Court Reporter
17

18

19

20

21

22

23

24

25


ACCU-BETA ... Inc.   (804) 550-0981



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Virginia*

---

Chuck Rosenberg
United States Attorney

*Main Street Centre*
*600 E. Main Street, Suite 1800*
*Richmond, Virginia 23219 -2447*

June 8, 2007

Lisa Mattaway
Senior Trial Assistant District Attorney
Bronx County District Attorney's Office
198 E. 161st Street
8th Floor
Bronx, New York 10451

   Re: <u>Andrew O'Brien</u>

Dear ADA Mattaway:

   Please find enclosed the following materials pertaining to Andrew O'Brien for your determination as to whether they are discoverable in your prosecution of Ricardo Jimenez:

  1. Mr. O'Brien's letters dated March 21, 2007 and March 20, 2006, to U.S. District Judge Robert E. Payne and related documents;

  2. The grand jury testimony of Mr. O'Brien on April 3, 1996;[1]

  3. The indictment charging Mr. O'Brien and his co-defendants;

  4. FBI-302 (redacted) dated February 14, 1997, regarding the interview of Mr. O'Brien;

  5. Plea Agreement and Statement of Facts for Mr. O'Brien;

  6. Order dated June 10, 1998, reducing Mr. O'Brien's sentence;

  7. Trial transcript from *United States v. Dean Beckford, et al.*, criminal case no. 3:99CR66, with the testimony of Mr. O'Brien;

---

  [1] This transcript was previously disclosed as part of the discovery process during the prosecution of Mr. O'Brien and his conspirators, so the secrecy requirements of Fed. R. Crim. P. 6 no longer apply.

8.     Letter dated September 22, 1998, to the New York Parole Board; and,

9.     The Court docket sheet for Mr. O'Brien's case.

I note that, although the Plea Agreement and Statement of Facts are marked as being under seal, they have since been unsealed, so there is no limitation on your production of these documents.

If you have any questions, please contact me at (804) 819-5485.

Sincerely,

Chuck Rosenberg
United States Attorney

By:

David J. Novak
Assistant United States Attorney
Senior Litigation Counsel

-2-

3/18/96

Sgt. Larkin

Det Dave Carbone | From
(718) 963-5370    E-Team
Brklyn North Homicide has been
investigating numerous Homicides
from N.Y. to Virginia. He
has information on one of our
Homicides from 1989    # 11
7/3/89 0040
61 5948
Victim: Sean Victor Worrell
Killed: Whitestone Cinema

Perps name Andy O'Brien -Virginia
He is going to charge him with
other Homicides. And one of
them is ours. He will
send us his paperwork

RJ-000266

(12/31/1995)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                                      Date:  01/03/2001

To:  Investigative Services Division        Attn: AIU/WSP
                                            Room 4944
                                            Lisa Ripper

Richmond                          Attn:  SA Tom O'Donnell

From:  New York
            Regional Intelligence Squad
            Contact:  SA Diego R. Redondo, (212) 384-3148

Approved By:  Shafer David C

Drafted By:  Redondo Diego R:drr

Case ID #: ▓▓▓▓▓▓▓▓▓▓▓▓▓    (Pending)
           ▓▓▓▓▓▓▓▓▓▓▓▓     (Pending)

Title:  ANDREW CHRISTOPHER O'BRIEN;
        WITNESS SECURITY PROGRAM;
        RICHMOND OFFICE

Synopsis:  Request for interview of ANDREW C. O'BRIEN by an agent
from the New York Office accompanied by a New York City Police
Department (NYPD) detective.

Details:  As part of its responsibilities, the Regional
Intelligence Squad of the New York Office assists local
authorities with the investigation of cold case homicides which
occurred in their jurisdiction.  In this context, a case was
opened, in conjunction with the NYPD Cold Case Homicide Squad -
Special Projects, regarding the murder of SEAN WORRELL.

        WORRELL's homicide occurred on 07/17/1989 at the
WHITESTONE MOVIE THEATER, 2505 BRUCKNER BOULEVARD, BRONX, NY.
During the course of this investigation, it was determined that
O'BRIEN possessed first hand knowledge of the homicide.
Specifically, he witnessed the murder being committed by RICARDO
JIMINEZ.  O'BRIEN is currently incarcerate and a participant in
the U.S. Marshal Service Witness Security Program, (USMS/WSP).

        O'BRIEN was sponsored for USMS/WSP by AUSA David Novak,
Easter District of Virginia, and FBI's Richmond Office.  Novak
has been contacted, and made aware of the desire to interview
O'BRIEN, and had no objection to this.

        It is requested that arrangements be made for O'BRIEN
to be made available for an interview at his current place of
incarceration, to be conducted by SA Diego R. Redondo and
Detective Wendell Stradford, NYPD.  The preferred date for the
interview is Tuesday, January 16, 2001.  An alternate date of

To:    Investigative Services Division   From:   New York
Re:    289A-RH-48028, 01/03/2001

January 17, 2001 would also be acceptable.

2

RJ-000268

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription     01/17/01

         The following investigation was conducted by SA Diego
R. Redondo and Det. Wendell Stradford, NYPD.

         ANDREW CHRISTOPHER O'BRIEN, DOB 12/10/1967, SSAN 059-
64-4396, was interviewed at an undisclosed location.  After being
advised of the identities of the interviewing agents, as well as
the nature of the interview, O'BRIEN provided the following
information.

         In the summer of 1989, O'BRIEN went to the WHITESTONE
THEATER in the Bronx, NY to see the movie Batman.  Accompanying
O'BRIEN were "PATCHIE" and two girls, PATCHIE's girlfriend
MAUREEN LITTLEJOHN and her sister "WINJIE."  DEAN BECKFORD, aka
"SMILES," and SEAN WORRELL, aka "SHAKA," met them at the theater
after arriving in another vehicle as did EARL LNU.  O'BRIEN could
not recall exactly what vehicles he and WORRELL were using at the
time, but thought it was a white rental car.  O'BRIEN was not
sure what vehicle the friends who met them at the movie were
using either.  Possibly, it was Ford Escort or black Nissan
Stanza that they had gotten from or that belonged to MERVIN
BENJAMIN.  O'BRIEN and his friends used to get rental vehicles
from an UNSUB male in Richmond, VA.

         At that time, O'BRIEN had a sort of box top or flat top
haircut, and was wearing jeans, a white t-shirt, white sneakers,
a blue spring jacket, and glasses.  WORRELL was also probably
wearing jeans, a T-shirt, and sneakers, but O'BRIEN was not sure.
O'BRIEN described WORRELL as short, chubby, dark-skinned and
might have had a gold tooth.

         O'BRIEN was in line at the concession stand with
WORRELL to buy some popcorn.  An UNSUB male approached them and
referred to WORRELL as "boy" when asking if he and O'BRIEN were
in line.  O'BRIEN took offense to the use of the term "boy" and
got in an argument with UNSUB.  At this point, UNSUB went
outside, and O'BRIEN noticed at this time that there was a girl
with him.  During this incident, BECKFORD, PATCHIE and the girls
were off to the side and not involved in the conversation.

| | | | |
|---|---|---|---|
| Investigation on | 01/16/01 | at | Undisclosed Location |
| File # | 281F-NY-NEW | Date dictated | n/a |
| by | Diego R. Redondo | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

281F-NY-NEW

Continuation of FD-302 of ___Andrew Christopher O'Brien_____ , On _01/16/01____ , Page ___2___

O'BRIEN and WORRELL purchased items at the stand, and then went
into the movie theater where the lights were still on. O'BRIEN
described the theater as being divided by two aisles and having
blue carpeting with some type of pattern in it. The seats in the
theater also were covered with fabric. There was a big screen in
the theater. O'Brien was shown crime scene photographs of the
theater, and immediately recognized it. He was also shown a
photograph of WORRELL taken at the scene and recognized him right
away as well.

        O'BRIEN and his friends sat towards the front left (as
facing the screen of the theater) having gone down the left of
the two aisles within the theater. When in their seats, UNSUB,
now wearing a jacket, approached O'BRIEN and said something along
the lines of "when the movie is done, it's me and you." O'BRIEN
and PATCHIE went up to follow UNSUB, and were in between the two
sets of double doors leading into the theater area, when UNSUB
commented that O'BRIEN looked like he had a gun, at which point
UNSUB pulled out a gun of his own. O'BRIEN advised that the gun
appeared to be a dark, automatic weapon. PATCHIE then pulled out
his own gun.

        WORRELL then started to approach the group, seemingly
unaware that guns had been drawn. It was at this point that
UNSUB began firing, and WORRELL was hit. PATCHIE and O'BRIEN
dove for cover, in spite of which O'BRIEN advised he was grazed
by a bullet. O'BRIEN showed scars that he indicated were a
result of this on both his left arm, and left abdominal area.
After the shooting, UNSUB was attempting to go out of a side exit
of the theater. O'BRIEN and PATCHIE ran up to confront UNSUB,
but saw individuals whom they assumed to be theater guards, one
of which had a gun, approaching, so they backed off. O'BRIEN was
not sure if WORRELL had fired off any rounds, but he stated
WORRELL was armed with a .357 loaded with .38 long bullets.

        O'BRIEN was not armed at this time, but PATCHIE and
BECKFORD both had outstanding warrants, so they ran out of the
theater rather than stay around waiting for the police to arrive.
O'BRIEN believed that BECKFORD had turned over WORRELL's body
prior to leaving to look at him, and told the others in the group

FD-302a (Rev. 10-6-95)

281F-NY-NEW

Continuation of FD-302 of ___Andrew Christopher O'Brien_____ , On _01/16/01_____ , Page ___3___

that he was dead.  O'BRIEN is not sure how LITTLEJOHN and WINJIE
got home, but it was by other means.  O'BRIEN advised it was
possible the sisters had seen UNSUB leave.  O'BRIEN believed the
warrant on BECKFORD was for jumping bail in Virginia.

        O'BRIEN described UNSUB as male, slim build, taller
than O'BRIEN, squarish hair cut - but not a boxtop like
O'BRIEN's.  UNSUB may have been wearing light colored clothing,
i.e., beige or brown, and might have had a part in his hair.
O'BRIEN was shown a photographic array, and identified photograph
#2 (RICARDO JIMINEZ, DOB 03/30/1968), as the individual with whom
he had the confrontation, and who subsequently shot WORRELL.

        O'BRIEN described the female with JIMINEZ at the
theater as being slim and pretty with a lot of hair.  She was
wearing big earrings, and may have been wearing some chains and
bracelets.  O'BRIEN felt that she was likely Puerto Rican or a
light skinned black.  O'BRIEN was shown a photograph of a female
and he advised she looked like the girl he had just described,
and who had been with JIMINEZ at the theater the night of the
shooting.

        PATCHIE and O'BRIEN lived near Hook Creek Road in
Queens around the corner from Green Acres Mall.  LITTLEJOHN lived