1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF BRONX: CRIMINAL TERM: PART 22

3   ------------------------------------x

4   PEOPLE OF THE STATE OF NEW YORK,        INDICTMENT NO.

5            - against -                    3825/06

6   RICARDO JIMINEZ,                        WADE HEARING

7                           Defendant.

8   ------------------------------------x

9                               851 Grand Concourse
                                Bronx, NY 10451
10                              June 15, 2007

11  B E F O R E:

12               HONORABLE MEGAN TALLMER, JSC

13  A P P E A R A N C E S:

14               FOR THE PEOPLE:

15               ROBERT  T. JOHNSON, ESQ.
                 District Attorney, Bronx County
16               198 E. 161st Street
                 Bronx, NY 10451
17               BY: LISA MATTAWAY, ESQ.
                 JOSEPH SHMULEWITZ, Intern
18

19               FOR THE DEFENDANT:
                 PATRICK L. BRUNO, ESQ.
20               99 Tulip Avenue

21               Floral Park, NY

22

23

24               RENÉE SCOTT, CSR, RPR
                 SENIOR COURT REPORTER
25

1              M O R N I N G      S E S S I O N

2              THE CLERK:  This is number two on the

3     calendar, People of the State of New York against

4     Ricardo Jiminez for a hearing.

5              Appearances please.

6              MS. MATTAWAY:  Lisa Mattaway from the

7     Office of the District Attorney.

8              THE COURT:  Hi, Miss Mattaway.

9              MR. BRUNO:  For the defendant, Patrick

10    L. Bruno, 99 Tulip Avenue, Floral Park.

11             THE COURT:  Okay.  This case was sent

12    to me for a Wade.  The detective had an auto

13    accident the other day but he's here today.  Is

14    that correct?

15             MS. MATTAWAY:  Yes.

16             THE COURT:  And what identifications

17    are the subject of this hearing?

18             MS. MATTAWAY:  There are two positive

19    photo arrays.  There was an additional photo

20    array that defense counsel is aware of through

21    discovery material where there was no

22    identification made, so it's not the subject of

23    the hearing but he has that in his materials.

24             There was also a confirmatory photo

25    array identification on what's commonly referred

PROCEEDINGS                                3

1    to as a PIMS machine.  Additionally --

2              THE COURT:  A single photo?

3              MS. MATTAWAY:  Well, I understand the

4    witness viewed these coming up one at a time on a

5    machine.  So that's --

6              THE COURT:  It wasn't that a single

7    photo was shown to him?

8              MS. MATTAWAY:  Right.  He picked out a

9    photo from a machine.

10             THE COURT:  That is a type of photo

11   array.  It's just coming up one --

12             MS. MATTAWAY:  Right.  One at a time

13   and that witness though also had familiarity with

14   the defendant and, therefore, there's a Rodriguez

15   Tass issue as to that witness.

16             THE COURT:  How do you want to do

17   this --

18             MS. MATTAWAY:  Detective --

19             THE COURT:  -- with different

20   witnesses?  We talking about two positive photo

21   arrays which you are characterizing as a

22   confirmatory --

23             MS. MATTAWAY:  Yes, and Detective

24   Stradford can handle all of this testimony.

25             THE COURT:  So are you asking for a

PROCEEDINGS                                    4

1    bifurcated hearing with respect to that one

2    witness?

3                    MS. MATTAWAY:  Yes, please.

4                    THE COURT:  Because a separate Wade

5    hearing with respect to the two other?

6                    MS. MATTAWAY:  Correct.

7                    THE COURT:  Do you have any problems

8    with that, counsel?

9                    MR. BRUNO:  Not at all.

10                    THE COURT:  Have you turned over all

11   prior statements by this witness, People?

12                    MS. MATTAWAY:  Yes.

13                    THE COURT:  Counsel, do you acknowledge

14   receipt of them?

15                    MR. BRUNO:  Yes, your Honor, I so

16   acknowledge.

17                    THE COURT:  Anything we should discuss

18   before the witness testifies?

19                    MS. MATTAWAY:  There was an additional

20   photo array identification procedure conducted

21   just this morning by a different detective that

22   was negative and I told defense counsel about

23   that.

24                    THE COURT:  All right.  Negative with

25   respect to one of these three witnesses or --

1          MS. MATTAWAY:  Totally different

2     person.

3          THE COURT:  Okay.

4          MS. MATTAWAY:  A new witness was turned

5     over by the district attorney's office, a

6     Detective Wall who showed that witness an array

7     which included the photo of the defendant as he

8     looked in 1989 and the witness was unable to make

9     an identification but the witness stated words to

10    the effect that he would be willing to come

11    testify at trial.  Perhaps if he saw him in

12    person, he would make be able to make an

13    identification in court but based on an array

14    containing a 1989 photo he was unable to make an

15    identification.

16          THE COURT:  Counsel, this is what you

17    characterize as a negative photo identification,

18    correct?

19          MS. MATTAWAY:  Yes.  For the record,

20    that witness who was shown the array this morning

21    is Mike Centeno and the other witness with the

22    negative array who under similar circumstances

23    when shown an array said I can't I.D. off a photo

24    maybe if I saw the person alive, that person's

25    name is Robert Kane.  Those are the two negative

1    identifications so to speak.

2              THE COURT:  Counsel, did you have

3    something?

4              MR. BRUNO:  I'm sorry, your Honor.

5              THE COURT:  Did you want to say

6    something?

7              MR. BRUNO:  No, thank you.

8              MS. MATTAWAY:  The people who are

9    positive, okay, witness number one is Esco.

10   Blaylock.  He was the witness who made the

11   identification at the precinct back in '89 and

12   also has Rodriguez information for this court or

13   Rodriguez knowledge.

14             THE COURT:  He has the PIMS ID?

15             MS. MATTAWAY:  Correct.

16             THE COURT:  Okay.

17             MS. MATTAWAY:  Second witness

18   Christopher Cordero.  Third witness --

19             THE COURT:  How spell that?

20             MS. MATTAWAY:  C-O-R-D-E-R-O.

21             THE COURT:  Okay.  Third.

22             MS. MATTAWAY:  Andrew O'Brien.  Common

23   spelling.

24             THE COURT:  All right.

25             MS. MATTAWAY:  That's it.

PROCEEDINGS                                    7

1              THE COURT:  Are we ready to have the

2       detective testify, counsel?

3              MS. MATTAWAY:  Yes, ma'am.

4              THE COURT:  Why don't you call him?

5              MS. MATTAWAY:  The People call

6       Detective Windel Stradford.

7              MS. MATTAWAY:  Let the record reflect

8       the presence of Joseph Shmulewitz.

9              THE COURT:  Good morning.

10              MS. MATTAWAY:  He's an intern with the

11       Bronx District Attorney's office.

12              (Witness approaches witness stand.)

13              COURT OFFICER:  Please raise your right

14       hand, Detective, please.

15        **D E T.   W I N D E L   P. S T R A D F O R D**,

16     a witness called on behalf of the People, having

17     first been duly sworn/affirm, took the stand and

18     testified as follows:

19              COURT OFFICER:  Have a seat.  In a loud

20       and clear voice, please state your name, spell

21       your last name, give us your shield number and

22       command for the record.

23              THE WITNESS:  Detective Windel P.

24       Stradford, S-T-R-A-D-F-O-R-D.  My shield is 3420.

25       I'm assigned to the Cold Case Homicide Squad.

1              THE COURT:  Good morning, Detective.

2              THE WITNESS:  Good morning.

3              MR. BRUNO:  May I address the court in

4      a colloquy matter before we start?  I do want to

5      request daily copy.  As your Honor knows, this is

6      a --

7              THE COURT:  Are you 18B counsel?

8              MR. BRUNO:  Yes, I am.

9              THE COURT:  Fine, no problem.

10             MR. BRUNO:  Thank you.

11             THE COURT:  Okay.  All right, People.

12  DIRECT EXAMINATION

13  BY MS. MATTAWAY:

14      Q.   Good morning, Detective.

15      A.   Good morning.

16      Q.   How long have you been a member of the New

17  York City Police Department?

18      A.   Two three-and-a-half years.

19      Q.   How long have you been a detective?

20      A.   About 19 years.

21      Q.   And what are your duties at the Cold Case

22  Squad?

23      A.   We are tasked with locating persons who are

24  involved in homicides either they have been identified

25  or they haven't been identified.  Also with

1   apprehending persons who are identified by the

2   detective squads where they haven't been able to

3   locate that person.

4        Q.   And how long have you been doing that?

5        A.   I've been in Cold Case since January '95.

6        Q.   Prior to that, what did you do for the NYPD?

7        A.   I was assigned to the robbery squad.  I was

8   in the police commissioner's investigation squad.  I

9   was in special investigations, warrant squad and

10  street crime.

11       Q.   Okay.  Have you had the occasion in your

12  career to put together photo arrays and have shown

13  them to witnesses?

14       A.   Yes.

15       Q.   Are you able to estimate for us about how

16  many such photo arrays that you've conducted in your

17  career?

18       A.   Over a hundred.

19       Q.   Okay.  And have you also had the situation

20  where you had a witness make a single photo

21  identification?

22       A.   Yes.

23       Q.   Okay.  And have you also conducted lineups

24  in your career?

25       A.   Yes.

1     Q.   All right.  And I would like to draw your

2  attention at this time to December 1999.  Did there

3  come a time when you were assigned to the case of

4  People against Ricardo Jiminez?

5     A.   Yes, sir.

6     Q.   And where were you assigned at that time?

7     A.   I was in the Cold Case Squad --

8     Q.   Okay.

9     A.   -- special projects.

10     Q.   All right.  Can you briefly tell us what

11  kind of case it was?

12     A.   It was a homicide that occurred in the

13  Whitestone Movie Theater in the Bronx.

14               THE COURT:  Whitestone what?

15               THE WITNESS:  Movie theater.

16               THE COURT:  Okay.

17               THE WITNESS:  In 1989.

18     Q.   Do you remember the date?

19     A.   I believe it was July 3rd.

20               THE COURT:  19 --

21               THE WITNESS:  -- 89.

22     Q.   And did you have information when you

23  inherited this cold case as to who the possible

24  eyewitnesses were?

25     A.   Not initially, no.

1      Q.    You started to investigate them?

2      A.    Yes.

3      Q.    Okay.  In terms of the identification

4  procedures that have already been conducted in the

5  case before you took it over, were you aware if any

6  identification procedures had already occurred?

7      A.    Yes.

8      Q.    Okay.  What identification procedures, if

9  any, were you aware that had occurred before you took

10  over the case?

11      A.    Detective Serrano.  I don't know who the

12  other Detective was that was with him.  I believe it

13  was done in the Four Eight Precinct in the catch unit

14  with one of the persons involved that was at the movie

15  theater that night.

16      Q.    What was that eyewitness' name?

17      A.    Esco Blaylock.

18            THE COURT:  What is the name?  I'm

19      sorry.

20            THE WITNESS:  Esco Blaylock.

21            THE COURT:  Okay.

22      Q.    Now, did you know who Detective Serrano was?

23      A.    He was assigned to the 45 Precinct.

24      Q.    But in terms of this case, what was his

25  importance of the case?

1    A.    He was the case detective.

2    Q.    All right.  By the time you got it in '99,

3  do you know if he was still working?

4    A.    No, he's retired.

5    Q.    Okay.  And this Esco Blaylock, did you have

6  occasion to meet with him subsequently?

7    A.    Yes.

8    Q.    All right.  Did Esco Blaylock prior to

9  making the identification on this PIMS machine --

10              THE COURT:  I thought he didn't make

11         it.  Wasn't this the negative?

12              MS. MATTAWAY:  No, ma'am.

13              THE COURT:  Oh, I'm sorry.  I'm sorry,

14         People.

15    Q.    Let me go back then.  In fact --

16              THE COURT:  He learned the PIMS

17         identification that had been done by Detective

18         Serrano with Blaylock?

19              MS. MATTAWAY:  Yes.

20              THE COURT:  Okay.  And that was when?

21    Q.    What was the date of the identification?

22    A.    I don't remember the exact date.  I would

23  have to look to see.

24    Q.    Do you need something to refresh your

25  recollection?

1      A.   Yes.

2      Q.   Okay.

3      A.   July 11, 1989.

4      Q.   All right.  And did you refer to a specific

5  piece of paper to get that information?

6      A.   Detective Serrano's DD5.

7      Q.   Can you tell us the number so the defense

8  counsel knows which one we're talking about?

9                 MR. BRUNO:  Thirty-five.

10                 MS. MATTAWAY:  You know it?

11                 MR. BRUNO:  Yes.

12                 THE COURT:  Do you have it, counsel?

13      A.   It was DD5 number 35.

14      Q.   Okay.  And what does it say about the

15  identification back then in '89?

16      A.   That Mr. Blaylock and another person were

17  present at the catch unit at 2030 hours to view photos

18  at the catch unit.

19      Q.   And can you briefly explain what the PIMS

20  identification procedure would be?

21      A.   I can't tell you exactly what the one in the

22  Four Eight is like because I've never used that one.

23      Q.   Okay.

24      A.   But basically what it is it's a machine

25  where they can get the photos.  They just go through a

1  series of photos that's where a description of a

2  person is given and they can more or less put in

3  parameters to have those photos shown if it's male

4  black or a male Hispanic, you know, the hair,

5  different things like that.  If they have a name, they

6  can do it by a name search.  If they have another

7  descriptor of that person, they could put that in

8  there.  Also with that person's photo in the machine,

9  it will come up at some point and then the individuals

10 that are brought there tell the detective whether this

11 is the person or not.

12      Q.   Okay.

13           THE COURT:  This is on the computer.

14      They are done by a computer?

15           THE WITNESS:  I've never been in that

16      catch unit.  Some are on a computer.  Some are on

17      I think it's the slide machines.

18      Q.   Okay.  In any event, Detective, is there an

19 indication from Detective Serrano why it was Esco

20 Blaylock who was viewing these photographs?

21      A.   Esco Blaylock had indicated to Detective

22 Serrano that he knew who the shooter was from the

23 Whitestone Movie Theater.

24      Q.   What was the basis of his knowledge?

25      A.   He knew the person from the neighborhood.

DET. STRADFORD - PEOPLE - DIRECT                15

1   He told Detective Serrano that the person who had done
2   the shooting he knew him as Leon and that's how he was
3   introduced to him as and he went on to tell the
4   detective how he knew him.  I guess the Detective
5   asked him.  He told him.
6                MR. BRUNO:  Your Honor, I know there's
7        flexibility on hearsay at the hearing but there
8        might have been flexibility for Detective Serrano
9        to quote that, not for this man to quote it from
10       a file.
11               THE COURT:  No.  I think, counsel,
12       you're allowed even two layers or even more
13       layers of hearsay at the suppression hearing.
14       That's my understanding of the law.
15               MR. BRUNO:  And also noting there was
16       talk about a file that is at that point 10 or 12
17       or 13 years old.
18               THE COURT:  Well, that's an argument
19       that really goes to the weight but it's
20       admissible, counsel.  Go ahead.  You were saying
21       Mr. Leon.
22       A.   I'm sorry.  He knew him.  He was introduced
23   to him as Leon by a friend of his I believe his name
24   is John but he had given certain descriptions about
25   this person Leon as far as his gold tooth, how he wore

DET. STRADFORD - PEOPLE  - DIRECT                16

1   his hair.  The fact that he drove --

2                    THE COURT:  Gold tooth, hair, yes.

3                    THE WITNESS:  Gold tooth.

4        Q.    Tell me about the tooth?

5        A.    There was a removable tooth, a gold cap,

6   front, the one you could take out of your mouth and

7   put in.

8        Q.    And had the witness seen him take the tooth

9   out?

10       A.    He indicated yes.  He knew the fact that

11  Leon drove a Maxima and that he also had a white car.

12  He knew what street he lived on Boynton Avenue.

13                   THE COURT:  Boynton.

14                   THE WITNESS:  Boynton, yes, ma'am.

15       A.    I don't remember the address that he gave

16  without looking at it.  He also knew a girl by the

17  name of Sharon who indicated that Leon used to go out

18  with.  And that person was also present at the catch

19  unit: Sharon.

20                    He knew enough things about Leon from

21  the neighborhood.  He had observed him fights.  He

22  knew that he put on Jamaican accents when he wanted to

23  when he was speaking to people and the fact that he

24  indicated that Leon sold drugs.

25       Q.    And let me fast forward right now to a

DET. STRADFORD - PEOPLE - DIRECT                    17

1   future time in 2006.  Did you talk to Esco Blaylock a

2   date since that and you reconfirmed all this

3   information?

4        A.   Yes.

5        Q.   Okay.

6                  MR. BRUNO:  Objection to the leading.

7                  THE COURT:  Overruled.

8        Q.   Now, let me go back to 1989 for a minute,

9   okay?  You said that this took place in the catch

10  unit?

11       A.   Catch, yes.

12       Q.   Okay.  And there was a female named Sharon

13  present?

14       A.   Yes.

15       Q.   All right.  Is there any indication from

16  Detective Serrano's folder that she made any kind of

17  photographic identification?

18       A.   I believe so, yes.

19       Q.   Okay.

20       A.   I have to refer to it to know for sure.

21       Q.   You need to refresh your recollection?

22                  THE COURT:  Is there something to which

23       you can direct his attention?

24                  MS. MATTAWAY:  Yes, DD5 35.

25                  THE WITNESS:  Yes.

1      Q.   Tell us about Sharon's identification if

2  any?

3      A.   She was shown photos along with -- I don't

4  believe they were together.  It's not done that way.

5                  MR. BRUNO:  Objection, your Honor.

6                  THE COURT:  You mean it's not the

7       custom to do it that way?  Is that what you're

8       saying?

9                  THE WITNESS:  Correct.

10                 THE COURT:  You don't know what

11      happened in this particular case?

12                 THE WITNESS:  No.

13                 THE COURT:  Overruled.

14     A.   She picked out a photo of Manual Jiminez,

15  who is Mr. Jiminez's brother and she explained to the

16  detectives that he is the brother of the person that's

17  known as Leon and then they went on to identify

18  Ricardo Jiminez.

19     Q.   Tell me about that.

20     A.   I'm not sure how they did it but there's an

21  indication that when they got to Ricardo Jiminez Esco

22  Blaylock identified him as the person who he knew as

23  Leon from the movie theater.

24     Q.   This person Sharon?

25     A.   Yes.

1        Q.    Who you just told us actual picked out a

2   photo of the defendant's brother?

3        A.    Yes.

4        Q.    But identified him as the brother.  Did she

5   ever pick out a photo of the shooter?

6        A.    Yes.

7        Q.    Okay.  Did she say that she knew him as Leon

8   or some other name?

9        A.    She knew him as Ricky.

10       Q.    Is there an indication however that both

11  Mr. Blaylock and Sharon had picked out the same photo?

12       A.    Yes.

13              THE COURT:  Now, People, Sharon, as I

14         understand it, is not the subject of this

15         hearing?

16              MS. MATTAWAY:  No.

17              MR. BRUNO:  I would object to any

18         testimony concerning Sharon.

19              THE COURT:  Is it relevant?

20              MS. MATTAWAY:  No.  It's just in the

21         interest of fair disclosure that Tass and the

22         identification procedure done in 1989 on the same

23         date as -- the same time as Esco Blaylock.  Both

24         of these witnesses apparently.-

25              THE COURT:  Okay.  That's the only

1    purpose for which withdraw eliciting it, People?

2              MS. MATTAWAY:  Yes.

3              THE COURT:  I'm going to allow it then.

4              MS. MATTAWAY:  Okay, thank you.

5    Q.   All right.  You got the case in 1999,

6    correct, Detective?

7    A.   Yes.

8    Q.   All right.  At this time, I like to direct

9    your attention to January 16, 2001.  Did you conduct

10   an identification procedure, you personally conduct an

11   identification procedure in this case?

12   A.   Yes.

13   Q.   Tell us about that?

14   A.   I was at the correctional facility in New

15   York State with a person that we know as AO, initial

16   A, initial O.

17   Q.   Okay.

18   A.   Who had information on the shooting at the

19   Whitestone Movie Theater.

20   Q.   Without telling us the subject of this

21   information, tell us about the identification

22   procedure?

23   A.   AO was shown photographic profile display

24   and he picked out Mr. Jiminez as the person who he

25   observed shoot the victim at the movie theater.

DET. STRADFORD - PEOPLE  - DIRECT                21

1      Q.    By the way, for the record, can you put the

2 victim's name on the record so we know?

3      A.    I'm sorry Sean Worrell, W-O-R-R-E-L-L.

4      Q.    Detective, do you have the original photo

5 array that you showed on January 16th, 2001 here with

6 you in court today?

7      A.    Yes.

8      Q.    Can you please produce it?

9              THE COURT:  The People is AO, the

10         person who you previously identified as Andrew

11         O'Brien?

12             MS. MATTAWAY:  Yes, ma'am.  I'd like to

13         have this marked as People's 1 please.

14             THE COURT:  Counsel, you're not going

15         to object to its admission, are you?

16             MR. BRUNO:  Of the photos?

17             THE COURT:  Yes.

18             MR. BRUNO:  May I see it first?

19             THE COURT:  Sure.

20             MR. BRUNO:  I have no objection to it

21         being received in evidence.

22             MS. MATTAWAY:  I offer it into

23         evidence.

24             (People's Exhibit 1, photo array  was

25             marked and received into evidence.)

1                    COURT OFFICER:  So marked People's 1 in

2      evidence --

3                    MS. MATTAWAY:  Thank you show it to the

4      witness.

5      Q.   Detective Stradford, that is the actual

6  array that you showed Andrew O'Brien?

7      A.   Yes.

8      Q.   And which photograph was the defendant?

9      A.   Number two.

10      Q.   And which photograph did Mr. O'Brien

11  identify?

12      A.   I'm sorry.

13      Q.   Which photograph did Mr. O'Brien pick out?

14      A.   Number two.

15      Q.   And you had him sign that array?

16      A.   He initialed it, yes.

17      Q.   He initialed it, okay.

18                    THE COURT:  Can I see it please.  Thank

19      you.

20      Q.   Now, I'd like to turn your attention to

21  April 19, 2006.  Did you conduct an identification

22  procedure in connection with this case on that date?

23      A.   Yes.

24      Q.   Tell us about that.  Do you have that

25  original array with you?

DET. STRADFORD - PEOPLE  - DIRECT          23

1       A.    Yes.   I would have to look to see because I

2    don't remember who it was.

3       Q.    Okay.

4                   THE COURT:  Do you have ti, Detective?

5                   THE WITNESS:  Yes, ma'am.

6       Q.    Okay.   I'd like to have that marked as

7    People's 2.

8                   THE COURT:  Let's show it to counsel to

9       see if he'll consent to its admission.

10                   MR. BRUNO:  No objection.

11                   THE COURT:  It comes in as People's 2

12       in evidence.   Let's mark it.

13                   (People's Exhibit 2, photo array, was

14           marked and received into evidence.)

15                   COURT OFFICER:  So marked People's 2 in

16       evidence.

17       Q.    Please tell us the circumstances of showing

18    this photo array?

19       A.    I was with -- I had met Esco Blaylock on

20    that date in Manhattan myself and another detective

21    and I told him what we were there for and I provided

22    him with the photo display.   I asked him if he

23    recognized anyone there and he told me that he did and

24    I asked him which one it was.   He told me number two.

25    And I asked him where did he recognize him from and he

DET. STRADFORD - PEOPLE - DIRECT                24

1  told me that was the guy that he knew as Leon that had

2  shot the person in the movie theater back in July 3rd,

3  '89.

4      Q.   Okay.  Additionally, did you also show him a

5  single photo on this date?

6      A.   Yes.

7      Q.   Do you have that photo?

8      A.   Yes.

9           MS. MATTAWAY:  I'd like to have that

10     marked as People's 3.

11          MR. BRUNO:  With no objection.

12          THE COURT:  All right.  People's 3 in

13     evidence.

14          (People's Exhibit 3, photo array, was

15        marked and received into evidence.)

16          COURT OFFICER:  So marked People's 3 in

17     evidence.

18     Q.   Detective Stradford, can you tell us why you

19  had him identify a single photo as well as a photo

20  array on April 19, 2006.

21     A.   I actually didn't have him identify the

22  single photo.  We did the photo array first and just

23  as a procedure I asked him to sign the individual

24  photo to show that he had identified the photo

25  array --

1        Q.    Okay.

2        A.    -- the same day.

3        Q.    Now, is the photo array that you showed Esco

4   Blaylock the same or similar to the same photo array

5   that you had shown Mr. O'Brien in 2001?

6        A.    It's in the same format but there are

7   different people in the photo array.

8        Q.    Okay.

9        A.    The only common person in the photo array is

10  Mr. Jiminez.

11       Q.    Okay.  You put both photo arrays together?

12       A.    Yes.

13       Q.    And when you also met with Mr. Blaylock on

14  April 2000 -- April 19, 2006, did you also have a

15  conversation with him as to his basis of knowledge for

16  how he knew Leon the person who was picked out in the

17  photo array?

18       A.    Yes, sir.

19       Q.    And what did he tell you in 2006?

20       A.    That he had known him from the neighborhood,

21  where apparently Mr. Blaylock lived in the area where

22  Mr. Jiminez lived.  He had explained to me that he was

23  introduced to him by a common friend that he thought

24  that at one time that they were both seeing the same

25  girl but it turned out not to be that.

1                        THE COURT:  Who is they, he and his

2            friend.

3                        THE WITNESS:  Mr. Blaylock and

4            Mr. Jiminez.

5            A.    But it turned out not to be.  And he

6    explained to me, you know, that, you know, he knew

7    what kind of car he had and, you know, that he had

8    dropped out of school.  I didn't ask him if knew he

9    dropped out of school.

10           Q.    He knew the defendant?

11           A.    I'm sorry.  He knew Mr. Jiminez had dropped

12   out of school.  I didn't ask him how he knew and, you

13   know, just moved on.  He just said he hadn't seen him

14   in a while but he knew that, you know, he said he's a

15   big tough guy.  He's always in Monroe.  I think it's

16   Monroe Houses, been in fights and stuff.

17           Q.    Did he indicate how many times he had seen

18   him fight?

19           A.    I don't recall.

20           Q.    Okay.  Did he indicate to you how often he

21   used to Mr. Jiminez back then?

22           A.    Every week.

23                        THE COURT:  Every week?

24                        THE WITNESS:  Yes.

25           Q.    And over what period of years is this?

1      A.    During the time of before the shooting he

2   saw him quite regularly in the neighborhood and then

3   maybe sometime afterwards in the '90 he didn't.   I

4   asked him if he seen him, you know, since then and he

5   told me no.

6      Q.    Okay.  And let me direct your attention to

7   May 17, 2006.  Did you conduct a photographic

8   identification procedure on that date?

9      A.    Yes.

10     Q.    Please tell us about that?

11     A.    I was with a gentleman by the name of

12  Christopher Cordero.

13     Q.    Okay.

14     A.    Mr. Cordero was also a person that worked in

15  the movie theater that night.  I believe he was a

16  concession stand worker he had spoken to the detective

17  prior in 1989 regarding this and he gave them a

18  statement that he knew who the shooter was of Sean

19  Worrell.

20                I met Mr. Cordero on Metropolitan

21  Avenue that was in the street. He was nervous and he

22  wouldn't allow us to come into his house, so he --

23  once he knew who we were we met him in the street, he

24  got into the car with myself, Detective Thomas and

25  Detective Santiago.  I asked him to relate to me what

1  had happened in the movie theater.

2      Q.   I'm only asking you about the identification

3  procedure at this time, Detective.

4      A.   Okay.

5      Q.   Okay.

6      A.   He -- I asked him would he view a photo

7  display if he recognized anyone in there would he tell

8  me, that he told me that he would.  I presented him

9  with the photo display and he picked out -- he picked

10 out Mr. Jiminez.  I just don't recall what position he

11 was in at that time.

12     Q.   Do you have that original photo array that

13 you showed Mr. Cordero on May 17, 2006 here with you

14 in court today?

15     A.   Yes.

16     Q.   Please produce it.

17          THE COURT:  Do you want to show it to

18      counsel?

19          MS. MATTAWAY:  I'd like to have that

20      marked as People's 4.

21          MR. BRUNO:  I have no objection, your

22      Honor.

23          THE COURT:  Then it is People's 4 in

24      evidence.

25          (People's Exhibit 4, photo array, was

1          marked and received into evidence.)

2                    COURT OFFICER:  So marked People's 4 in

3      evidence.

4       Q.   Can you tell us, Detective, which photograph

5  Mr. Jiminez was in People's 4?

6       A.   Number two.

7       Q.   What is that?  Is that the photograph

8  Mr. Cordero identified?

9       A.   Yes.

10      Q.   Okay.  Did you conduct any other

11  identification procedure in this case?

12      A.   No.

13      Q.   Was there another identification procedure

14  conducted with a brother officer or sister officer in

15  this case?

16      A.   Yes.

17      Q.   Okay.  And did that result in a positive

18  identification?

19      A.   No.

20      Q.   And, for the record, which witness did that

21  pertain to?

22      A.   Robert Kane.

23                    MS. MATTAWAY:  Thank you.  I have

24      nothing further for this witness.

25                    (Continued on the next page ...)

1                        THE COURT:  Cross.

2                        MR. BRUNO:  I'll ask for one moment.

3                        THE COURT:  Sure.

4                        (Short Pause.)

5      CROSS-EXAMINATION

6      BY MR. BRUNO:

7               Q.    Good morning, Detective.

8               A.    Good morning.

9               Q.    Now, you indicated that you were assigned

10     this case I believe it was July of 1999; is that

11     correct?

12              A.    I didn't say July, I said '99, some time in

13     '99.

14              Q.    Forgive me.  That's right, you said you

15     were assigned December of '99?

16              A.    Right.

17              Q.    The incident was 7/3/99.  Forgive me.  You

18     were assigned December of '99.

19              I'm not sure how it works, was there any

20     particular reason why you were first assigned in '99?

21              A.    The way it works in our unit, we get

22     communications from the Mayor, the police

23     commissioner, chief of detectives to our e-mail

24     address.  People write letters, they send it directly

25     to our unit or we get communications from other law

1    enforcement agencies regarding cases which were not

2    solved or needed to investigated.  This was that type

3    of case.  It was information given to us from the DEA,

4    Drug Enforcement Agency, and we followed -- I followed

5    up on it.

6         Q.   So, in other words, the case lay dormant

7    from July '89 to December of 1999, correct?

8         A.   I don't know what the detectives in the 45

9    Precinct were doing.  I can only tell you what I did

10   in '99.

11        Q.   Well, except that with reference to a

12   number of questions, you said that you reviewed or

13   made reference to DD5s from prior detectives, correct?

14        A.   Yes.

15        Q.   So can we safely assume, you're a veteran

16   of 23 some odd years, can I assume you totally

17   reviewed the folder?

18        A.   Yes.

19        Q.   And am I correct that basically nothing

20   further occurred in terms of police investigation

21   shall we say after 1990?

22        A.   I couldn't tell you that.  I know the last

23   DD5 is dated -- is Number 40.  If there was anything

24   else done -- initially there's papers in the folder

25   that could be dated.  I didn't pay attention to the

1    date, but I do know that the last DD5 was Number 40,

2    and I'm not aware of what the date is on there.

3         Q.   Sir, again no hard feelings, you sound very

4    evasive.

5                    MS. MATTAWAY:  I object.

6                    THE COURT:  Sustained.

7         Q.   You implied that you pretty much thoroughly

8    reviewed the folder when you're actually assigned as a

9    cold case manager?

10        A.   Yes.

11        Q.   Have you done that, totally review?  Are

12   you now stating that the last activity shown looking

13   at police paperwork would be DD5 Number 40?

14        A.   The last DD5 is Number 40.  I can only

15   attest to what is in DD5 Number 40.

16        Q.   Okay.

17        A.   I can't tell you if any other detectives

18   have touched that folder before, after forty or before

19   I got it.

20        Q.   Okay.  Let's do it that way.  DD5 Number

21   40, reflects what date of police activity?

22        A.   July 17th, 1989.

23        Q.   Okay.  So the last bit of police activity

24   reflected on the last DD5 is some 14 days after the

25   murder, correct?

1          A.    Yes.

2          Q.    Now, consistent with how you testified, is

3     it fair to say that there is no -- until you get

4     involved, no further police paperwork reflecting

5     activity after 7/17/89?

6                         MS. MATTAWAY:  I object.

7                         THE COURT:  If he knows.

8                         Is there anything else in the

9          paperwork?

10                        THE WITNESS:  Not in this folder, no.

11         Q.    Okay.  That's where I'm going.  If there

12    were other police activity, would it not have to be an

13    addendum to that folder?

14         A.    No.

15         Q.    No?

16         A.    No.

17         Q.    Okay.  If there were other police activity

18    which resulted in a companion folder, would that not

19    be forwarded to the cold case squad?

20         A.    Only if I knew about it.  Only if they knew

21    the case had been transferred to me.  I understand

22    what you're asking me.  Only if they knew if the case

23    had been transferred.

24         Q.    Sir, this was a senseless murder over a bag

25    of popcorn.

1                    MS. MATTAWAY:  Objection.

2                    THE COURT:  Sustained as to the

3          characterization.

4          Q.   This was a murder?

5          A.   Yes.

6          Q.   A young man in the bloom of his life was

7     killed, correct?

8                    MS. MATTAWAY:  I object.

9                    THE COURT:  I'll allow that.

10         Q.   Correct?

11         A.   Someone was murdered, yes.

12         Q.   And, parenthetically, at the time, it got

13    an awful lot of press coverage; am I correct?

14         A.   Yes.

15         Q.   Are you now conveying to us, the Court, the

16    D.A., that if there were some companion folder on a

17    case that was forwarded to the cold case squad, they

18    wouldn't think of forwarding it unless you -- what do

19    you do, send a memo to the thirty-some-thousand cops

20    in the City and say, hello, I've been assigned, send

21    me a paper; is that what happens?

22         A.   No, we don't.

23         Q.   I'm sorry.  I'm being facetious, but you

24    kind of elicit it.

25                  As a cold case detective, do not the powers that

1      be in the police department forward you whatever

2      materials were gathered during the investigation?

3              A.   Only if requested.

4              Q.   You're telling us that -- by the way, this

5      was initially -- this was a murder in the 45 Precinct,

6      correct?

7              A.   Yes.

8              Q.   So just to make one hypothetical question

9      and I'll go on, if in 1992 a detective in the 45

10     uncovered a potential witness and interviewed him or

11     her, that would not be reflected in materials

12     forwarded to you?

13             A.   If the detective like you said did that,

14     that detective would find out where that case folder

15     is.   If the detective knows that it's a homicide or an

16     incident that occurred in a particular precinct, that

17     is the precinct in which he will contact.   No, he will

18     not contact the cold case squad, he will contact the

19     precinct of concern.   The detectives in the precinct

20     of concern will either say, no, we don't have the

21     folder any more and they will notify that detective

22     where the folder has gone.

23             Q.   But that wasn't the question.   In my

24     hypothetical -- this murder occurred in '89.   In my

25     hypothetical, for whatever reason a detective in the

1       45, the precinct that has the case, meets some random

2       witness who has a tip.  They do an interview, they now

3       have located another potential witness.

4              Would not that 1992 detective's work either be

5       placed in the same folder or would not the companion

6       folder then be referenced to that folder?

7              A.   If that happened in 1992 in the 45 Precinct

8       and it was the detective from the 45, it would have

9       been placed in the folder that's in the 45 Precinct.

10             Q.   Okay.

11                  THE COURT:  Which is not the same as

12             the folder you're referring to?

13                  THE WITNESS:  No, it would have been

14             this folder.

15                  THE COURT:  So it is the same?

16                  THE WITNESS:  Yes.

17                  THE COURT:  That's the folder you

18             received from the 45?

19                  THE WITNESS:  Yes.

20                  THE COURT:  Okay.

21             Q.   So in responding to my series of questions,

22      with all due respect, your responses still leave a

23      loose end, I believe.

24             When you say that, no, if there were any

25      companion folders I would only get it if I requested

1    it, does that mean if some work were done -- in this

2    scenario, if some work were done beyond the 45th

3    Precinct, is that what you're saying in essence?

4              A.   That I knew about, yes.

5              Q.   Whether you knew or not?

6              A.   If I knew about it, I can make a request

7    for it.  If I don't know about it, I can't request it.

8              Q.   And then that possibly useful information

9    just falls by the wayside?

10                  MS. MATTAWAY:   I object to this

11             "possible's".

12                  THE COURT:   Sustained.

13                  MR. BRUNO:   May we approach, your

14             Honor.

15                  THE COURT:   Sure.

16                  (Whereupon, there is a discussion held

17             off the record, at the side bar, among the

18             Court, Mr. Bruno and Assistant District Attorney

19             Mattaway.)

20                  THE COURT:   Let me see if I can cover

21             this.

22                  Detective, are you personally aware of

23             any other material relevant to this case that's

24             not included in that folder that you have?

25                  THE WITNESS:   From this 1989 folder,

1              the only other information that is not from New

2         York City Police Department is from the Drug

3         Enforcement Agency and the FBI.

4                   THE COURT:  Other than that, you're

5              not personally aware of any other information

6              relevant to this case that's not already in that

7              folder?

8                   THE WITNESS:  No.

9                   THE COURT:  Okay.

10             Q.   Sir, to further clarify, let me pursue one

11        other hypothetical.  I went through the hypothetical

12        involving a detective in the 45th Precinct.

13        Hypothetical detective.  What I think your answers

14        raise now are the following:  What if -- for the sake

15        of argument, a detective in the 49 over on Pelham

16        Parkway comes across a potential witness.  Do you know

17        back in '89, I witnessed this murder and it pertains

18        to this murder case.  That 49th Precinct Detective

19        Squad man, would he now forward his materials to this

20        45th Precinct folder before us or would the 49th

21        Precinct detective create a companion folder?

22             A.   He would notify the 45 Precinct detectives

23        and let them know what he had.  He had to do some

24        paperwork on that, information he had, and it would

25        get forwarded to the 45 Precinct.  He would not start

1     a folder on it.

2            Q.   And then the 45th Precinct detective who

3     got that memo from the 49 man ended up creating a DD5

4     and that would end up in the same folder that's before

5     us, correct?

6            A.   He wouldn't do a DD5.

7            Q.   Whatever he would do.

8            A.   He wouldn't do a DD5.  He would take the

9     information got from the 49 detective and add it to

10    the folder.

11           Q.   So that ultimately this additional work

12    that was done on referral by a 45th Precinct detective

13    would end up in the same folder that's before us?

14           A.   You said from the 49.

15                THE COURT:  You did.

16           Q.   I'm sorry, the information forwarded by the

17    49 man would then result in the 45th Precinct

18    detective following up, correct?

19           A.   All depending what the information is.  It

20    might not be worth following up.

21                MS. MATTAWAY:  I object.  It's beyond

22           the scope.

23                THE COURT:  We're getting way way

24           beyond where we're supposed to be in the

25           hearing, counsel, as we discussed.

1          Q.    If you're as evasive at the trial, you'll

2      impress the jury.

3                     THE COURT:  Come on.

4          Q.    Am I correct -- really, we're going round

5      and round in the 14 minutes.  The bottom line becomes

6      any work that was done in this case by a New York City

7      cop or detective is in the folder before us; am I

8      correct?

9                     MS. MATTAWAY:  I object.

10                     THE COURT:  Sustained.

11                     MS. MATTAWAY:  Beyond the scope of the

12          hearing.

13                     THE COURT:  That's not what he said.

14          Q.    Is that the distinction you're trying to

15      make, there may have been work done by Feds and DEA;

16      is that correct?

17                     MS. MATTAWAY:  Objection.

18                     THE COURT:  Sustained.

19          Q.    You did say that a moment ago, didn't you?

20                     MS. MATTAWAY:  I object.

21                     THE COURT:  Counsel, you've exhausted

22          this line of inquiry.  We'll make a record of

23          our bench conference.

24                     MR. BRUNO:  Fine.

25          Q.    Was there work -- did you say a moment ago

1      there was some kind of investigative work or reporting

2      done by federal agents?

3                          MS. MATTAWAY:  I object.

4                          MR. BRUNO:  He testified to that.

5                          THE COURT:  I'll allow it.

6      A.    Yes.

7      Q.    Okay.  What was the nature of that?

8                          MS. MATTAWAY:  I object.

9                          THE COURT:  Beyond the scope of the

10             hearing, counsel.

11                    Again, if you're going to be making an

12             application to delve into the issues you

13             discussed, you'll have to make it.  It's not

14             relevant to the Wade Hearing.

15     Q.    Did you say there was work or some kind of

16     information forwarded by DEA?

17                         MS. MATTAWAY:  Objection.

18                         THE COURT:  I sustained the objection.

19             Don't reask the question.  Let's move on.

20     Q.    Did you say that you were led, I believe it

21     was, to witness O'Brien -- withdrawn.

22             Did you say that you received this cold case

23     assignment as a result -- I don't know, of some letter

24     or referral by DEA?

25             A.    Yes.

1        Q.    In very brief summary, what was the nature

2    of that letter or referral?

3                    MS. MATTAWAY:  I object.

4                    THE COURT:  Sustained.

5        Q.    What led you --

6                    THE COURT:  Counsel, don't just reask

7        the question.

8                    MR. BRUNO:  I'm not.

9        Q.    What led you to make contact with the

10    witness, Mr. O'Brien?

11                    MS. MATTAWAY:  I object.

12                    THE COURT:  Counsel, this is again

13        beyond the scope of the Wade.  This is not a

14        Gethers, it's not a Mapp, it's not a Dunaway,

15        just a Wade.

16        Q.    What led you to revisit the witness Esco

17    Blaylock?  What led you to revisit Esco Blaylock?

18                    MS. MATTAWAY:  I object.

19                    THE COURT:  Sustained.  Counsel, the

20        only issue in this case is the suggestiveness of

21        the identification, that's it.

22        Q.    Now, you indicated that as reflected in the

23    initial 45th Precinct folder, that Mr. Blaylock did a

24    photo identification back in 1989, based upon a PIMS

25    identification; am I correct?

1          A.    Yes.

2          Q.    Am I correct PIMS is some kind of

3     computerized -- it's a machine as opposed to a book,

4     correct?

5          A.    Yes.

6          Q.    And that one electronically flips through

7     basically mug shots on this PIMS machine; am I

8     correct?

9          A.    That's how -- yes.

10         Q.    Am I correct that the PIMS machine system

11    was not in use by the police department in 1989?

12         A.    I was not available or aware of what went

13    on in the 48, as I indicated before.  I told you I

14    didn't know, I've never been before so I couldn't

15    answer how it worked.

16         Q.    Now, I'm saying as a general -- withdrawn.

17         Didn't you testify that back in 1989, that these

18    two witnesses, Sharon as well as Esco -- these two

19    witnesses went to the 48 to view the PIMS machine; am

20    I correct?

21         A.    They went to the CATCH Unit to view PIMS,

22    yes.

23              MR. BRUNO:  Would your Honor take

24         judicial notice this man testified on direct

25         they went to view the PIMS.

1                        THE COURT:   I think he acknowledged.

2        He just acknowledged that, counsel.

3                        MR. BRUNO:   No, he said CATCH Unit.

4                        THE COURT:   CATCH Unit of the 48

5        Precinct is that what you meant?

6                        THE WITNESS:   Yes.

7            Q.   Did you testify on direct that not only

8        Esco Blaylock, but Sharon went to the 48th Precinct

9        and viewed the PIMS machine?

10           A.   I believe that's what I said, yes.

11           Q.   Yes.   Am I correct that the PIMS machine

12       was not in use by the NYPD in the summer of 1989?

13           A.   I don't know when it came into existence.

14           Q.   Sir, wouldn't it have to exist if you

15       believed they viewed it?

16                       MS. MATTAWAY:   I'll object.

17                       THE COURT:   I'll allow that.

18           A.   I don't know.   You asked me if it was in

19       effect.   I told you I don't know when it came in.

20           Q.   All right.   You said that you never had to

21       utilize the PIMS in the 48 Precinct, correct?

22           A.   Yes.

23           Q.   You've utilized PIMS?

24           A.   Yes.

25           Q.   When did you first utilize PIMS as best you

1    recollect?

2          A.    When I was in the robbery squad.

3          Q.    How far back?

4          A.    1989, 1990, '91, '92.

5          Q.    So you're testifying you've used PIMS as

6    far back as '89?

7          A.    I can remember that, yes.

8          Q.    And what precinct was that robbery unit?

9          A.    When I was in the robbery squad, assigned

10   the 40th street in patrol, 48th, between Eighth and

11   Ninth Avenue in Manhattan.

12         Q.    In any event, you relied upon -- to refresh

13   your recollection, you relied upon what had been DD5

14   Number 35 back in '89, correct?

15         A.    Yes.

16         Q.    And if you wish to refresh your

17   recollection again, am I correct there is no reference

18   whatsoever to the witnesses Esco and Sharon viewing

19   photos in the PIMS unit, in the PIMS machine; am I

20   correct?

21         A.    Your question, sir?

22         Q.    Am I correct there is no reference to the

23   two witnesses, Esco and Sharon, viewing photos on a

24   PIMS machine?

25         A.    Yes.

1          Q.   There is no reference.  Am I correct --

2                    THE COURT:  Is that correct,

3          Detective, there's no reference to the PIMS?

4                    THE WITNESS:  No ma'am.  Yes, that's

5          correct.

6          Q.   Am I correct there is reference to the two

7          of them viewing photos?

8          A.   A file.

9                    THE COURT:  A file?

10                   THE WITNESS:  Yes.

11         Q.   No, am I correct both Esco and Sharon

12         viewed files?

13         A.   It says a file.

14                   MR. BRUNO:  Your Honor, I would now

15         ask that this document be marked as Defendant's

16         Exhibit A for identification.

17                   THE COURT:  People, do you have any

18         objection to this coming in?

19                   MS. MATTAWAY:  No.

20                   THE COURT:  Let's put it in evidence.

21                   (Whereupon, the item previously

22         referred to is received and marked Defendant's

23         Exhibit Number A in evidence.)

24                   THE COURT:  This is DD5 35.

25         Q.   Sir, I now ask you to take what's been

1    marked Exhibit A and start reading the second

2    paragraph of the body of it, you know, of the report

3    section.  It starts with "both".  Would you mind

4    reading it out loud.

5            A.   You need me to?

6            Q.   That's what I asked.

7                 THE COURT:  It's in evidence.  Why

8            don't I read it.

9                 MR. BRUNO:  That would be great, I ask

10           that your Honor read the second and third

11           paragraphs.

12                THE COURT:  Both Esco and Sharon

13           viewed photos.  Sharon Ramproot identified a

14           photo as that of Manuel Jiminez, indicating that

15           his brother is Ricky, the person being sought.

16           A search of the file produced a photograph of

17           Ricardo Jiminez, M/H DOB 3/30/68.  NYSIS

18           5522945Z.  Mr. Esco Blaylock, identified the

19           photo of Ricardo Jiminez as the shooter of the

20           case and the person known to him as Leon.

21           Sharon Ramproot stated she knew this individual

22           as Ricky.

23                MR. BRUNO:  Thank you so much.

24           Q.   So, sir, having reviewed that item that's

25    now in evidence, am I correct that it's first noted

1    that the two parties viewed photos; am I correct?

2          A.   Yes.

3          Q.   No reference to PIMS.  Am I further correct

4    that once the woman Sharon identifies a photo of

5    Manuel, a file is then pulled, a file that pertains to

6    Ricardo Jiminez?

7          A.   It doesn't say a file was pulled, counsel.

8          Q.   Okay.  A search of the file produced a -- a

9    search of the files produced a photograph of Ricardo

10   Jiminez, correct?  Correct?

11         A.   Yes.

12         Q.   And as a result of that, going on this

13   report, apparently Esco then identifies a single photo

14   that had come from the file; am I correct?

15         A.   He identified Ricardo Jiminez.

16         Q.   From the context of the report which you're

17   relying upon, it would seem that Esco Blaylock

18   identifies a single photo of Ricardo Jiminez; am I

19   correct?

20         A.   I can only go by what's said there.

21         Q.   That's exactly the point.

22         A.   It doesn't say single photo, it says he

23   identified a photo of him.  I don't know how many

24   photos were there.  It says files, counselor.

25         Q.   Right.  A search of the files produced a

1    photograph, single, of Ricardo Jiminez.

2        A.    It indicates to me they showed several

3    photos and then they found his.

4        Q.    All right.  You know what it's in evidence,

5    your interpretation doesn't matter.  Thank you.

6        Now, you say that you -- in -- withdrawn.

7        Going somewhat chronologically, your next

8    activity after meeting with Blaylock in January 2001,

9    you go to a New York State jail to interview Mr.

10   O'Brien, correct?

11       A.    I went to a correctional facility in New

12   York State.

13       Q.    Fine.  You went to a New York -- I see.

14   He's in federal custody.  You went to a federal jail

15   in New York State and you interviewed Mr. O'Brien,

16   correct?

17       A.    That's not what I said, sir.

18       Q.    What did you say?

19       A.    I said I went to a correctional facility in

20   the State of New York.

21       Q.    Okay.  And you interviewed Mr. O'Brien?

22       A.    Correct.

23       Q.    Okay.  Have you any hesitance to say

24   whether it's state or federal facility?

25                  MS. MATTAWAY:  I object.

1                    THE COURT:  Overruled.

2          A.    Yes.

3          Q.    You have hesitancy?

4                    THE COURT:  Yes, you do have some

5          hesitation?

6                    THE WITNESS:  Yes.

7                    THE COURT:  Okay.

8          Q.    As a result, Mr. O'Brien is shown a photo

9    array and he picks out a photograph of Mr. Jiminez,

10   correct?

11         A.    Yes.

12         Q.    Now, was there any other activity -- as a

13   detective, any other activity by you between meeting

14   with Mr. Blaylock and then meeting with Mr. O'Brien

15   some time later?

16                   MS. MATTAWAY:  Objection.

17                   THE COURT:  Sustained.

18         Q.    In other words, the first -- the first

19   break you got in this case was the meeting with Mr.

20   O'Brien; am I correct?

21                   MS. MATTAWAY:  Objection.

22                   THE COURT:  Sustained.

23         Q.    Now, when you meet with Mr. Blaylock, that

24   was April of '06.  You say he first identified Mr.

25   Jiminez from the photo array that's in evidence,

 1    correct?

 2              A.    Yes.

 3              Q.    And then afterwards you showed him that

 4    frontal and profile photograph of Mr. Jiminez; am I

 5    correct?

 6              A.    Yes.

 7              Q.    What was your reasoning in showing it?

 8              A.    Just for identification purposes, for him

 9    to --

10              Q.    For him?

11              A.    You want me to answer?

12              Q.    Yes, of course.

13              A.    For him to sign to show he had been with me

14    on that date.  That is just for my file.

15              Q.    But am I correct he had already signed the

16    photo array?

17              A.    The photo array is for court.

18              Q.    If that were the case, why didn't you do

19    the same thing with O'Brien?

20              A.    There was no need to.

21              Q.    Why?

22              A.    Mr. O'Brien -- there was no need to.

23              Q.    Okay.  If that were the case, why didn't

24    you do the same thing with Christopher Cordero?

25              A.    No need to.

1          Q.    But there was a need to with Esco

2     Blaylock?

3          A.    Yes.

4          Q.    What was the reason?

5          A.    For my file.

6          Q.    Well, again, you didn't want a signed

7     single photograph for your file from O'Brien or from

8     Cordero?

9          A.    I didn't need it.

10         Q.    Why?

11         A.    I needed it for the file, that's all I can

12    say.

13         Q.    What made this distinction?

14         A.    Mr. Blaylock.

15         Q.    What was the reason?

16         A.    Mr. Blaylock's demeanor concerned -- as far

17    as Mr. Cordero and Mr. O'Brien.

18         Q.    Meaning what, Mr. Blaylock was more

19    hesitant?

20         A.    It was a personal decision.

21         Q.    I'm sorry?

22         A.    It was a personal decision.

23         Q.    On your part?

24         A.    On my part, yes.

25         Q.    Okay.  Now, also on April 19th of '06, your

1   meeting -- withdrawn.

2        As a result of your meeting with Mr. Blaylock on

3   April 19th of '06, you prepared a report, another DD5;

4   am I correct?

5        A.   Yes.

6        Q.   Am I correct, amongst other things you

7   noted that he acknowledged he had lied back in '89; is

8   that correct?

9        A.   Yes.

10        Q.   What did he lie about?

11              MS. MATTAWAY:  Objection.

12              THE COURT:  Sustained.  Beyond the

13        scope, counsel.

14        Q.   In any event, you've indicated today at

15   this hearing that although he was in error, Mr.

16   Blaylock thought that he had a girl friend in common

17   with the defendant back in '89; is that correct?

18        A.   Yes.

19        Q.   No need to even say it, but do you know who

20   that girl was?  Was a name given?

21        A.   No.

22        Q.   Okay.  And am I correct that as a result of

23   your investigation, you've concluded that at the time

24   of the incident, Esco Blaylock was some 15 years of

25   age?

1              MS. MATTAWAY:  I object.

2              THE COURT:  This is beyond the scope.

3         Sustained.

4         Q.    Am I correct that as a result of your --

5    withdrawn.

6              MR. BRUNO:  You're right, not the

7         scope.

8              I have nothing further, but I do ask

9         that this witness be available in this building

10        today.  I have a further motion at the end of

11        this hearing.

12             THE COURT:  Well, counsel, I don't

13        know why that motion would probably be directed

14        to me.  If it has to do with the Wade, let's do

15        it now.  I'll ask him to step out briefly, but

16        I'll not keep him around if it has to do with

17        something you need to apply to Judge Mogulescu

18        for.  Do you want him to step out.

19             (Whereupon, the witness exits the

20        courtroom.)

21             (Continuing on next page.)

22

23

24

25

PROCEEDINGS                              55

1              THE COURT:  Let's make the record if I

2    could paraphrase our bench conference that was

3    not transcribed.  First, I asked counsel if he

4    would like to explore the line of questions

5    because of his concern about possible missing

6    Brady, Rosario, Ventimiglia material.  He said no

7    that he was pursuing it because it would have a

8    bearing on constitutional speedy trial issues.

9              In terms of what information was known

10   to the police and what accounted for the delay in

11   the arrest of his client and I indicated that

12   Judge Mogulescu had already denied the

13   constitutional speedy trial motion, that if he

14   wanted to have Judge Mogulescu reconsider that

15   and possibly order an evidentiary hearing with

16   respect to that he would have to go back and seek

17   that with Judge Mogulescu but that the scope of

18   this hearing was limited to the suggestiveness of

19   the identification.  Is that an accurate

20   paraphrase of our conversation, counsel?

21             MR. BRUNO:  Yes, your Honor.  That is a

22   fair summary.

23             THE COURT:  People?

24             MS. MATTAWAY:  Yes.

25             THE COURT:  So what is it, counsel, you

1       would want him to be here for today?

2                   MR. BRUNO:  Well, based upon the

3       position you've taken, your Honor, respectfully

4       based upon your position, I would think at the

5       end of the Wade Hearing, I would then have to go

6       make an application to Judge Mogulescu to

7       reconsider his decision on the constitutional

8       speedy trial issue in that unavoidably this

9       hearing and my very very recent receipt of

10      unredacted discovery raises new issues that my

11      client was prejudiced by the very passage of

12      time.

13                  THE COURT:  Counsel, you know that that

14      application has to be made in writing.  The

15      People have to have the opportunity to respond.

16      I can't imagine that Judge Mogulescu is going to

17      instantly render a decision on it.  So there's no

18      need to have this or any point in having the

19      detective hang around today.  There's not going

20      to be an evidentiary hearing.

21                  MR. BRUNO:  That's understood, okay.

22                  THE COURT:  You have nothing for him,

23      counsel?

24                  MR. BRUNO:  Nothing further with this

25      detective.  Although -- well, your Honor, yes.  I

1        would respectfully ask that you allow me to

2        explore the areas I was trying to explore in that

3        there really is no other forum at which I could

4        ascertain whether or not the police acted or

5        failed to act in such a way that my client was

6        prejudiced by the very passage of time.

7                    THE COURT:  I'm not going to do that,

8        counsel.  You can get these minutes.  You can

9        make your application to Judge Mogulescu but the

10       People we're not in a position to respond to

11       that.  That's not within the scope of the

12       hearings that was sent to me, counsel.  So I'm

13       not going to allow that.  But if you have nothing

14       else, People, did you want to redirect him on

15       anything?

16                    MS. MATTAWAY:  Yes.

17                    THE COURT:  Let's get him back in for

18       redirect.

19                    (Witness resumes witness stand.)

20                    THE COURT:  All right.  You're still

21       under oath, Detective.

22                    Go ahead, People.

23                    MS. MATTAWAY:  Thank you.

24  REDIRECT EXAMINATION

25  BY MS. MATTAWAY:

1    Q.    Detective Stradford, I just want to briefly

2  revisit that issue regarding DD5 35 where you

3  interpreted what had happened with Mr. Blaylock and

4  Sharon as them viewing on a PIMS machine?

5    A.    Yes.

6    Q.    Okay.  Are you able to explain for the court

7  why it says that you chose to testify and say they

8  viewed the photos on a PIMS machine?

9    A.    I assumed it was on a PIMS machine.

10    Q.    And what words in the indictment DD5 35

11  which is in evidence that is Exhibit A that led you to

12  draw that conclusion?

13    A.    The sentence that says search of the files

14  produced a photograph of Ricardo Jiminez.

15    Q.    And in terms of your experience and

16  knowledge as a detective whose done this personally,

17  is a review of the photographs on a PIMS machine a

18  search of the files?

19    A.    Yes.

20    Q.    Okay.  Regarding the photo array that you

21  showed to Mr. O'Brien in 2001, did you ever suggest to

22  him which photo to pick out?

23    A.    No.

24    Q.    Regarding the photo array shown so

25  Mr. Blaylock in 2006, did you ever suggest to him

1   which photo to pick out?

2        A.   No.

3        Q.   Regarding the photo array shown to

4   Mr. Christopher Cordero also in 2006, did you ever

5   suggest to him which photo you should pick out?

6        A.   No.

7        Q.   Okay.  When you put the three photo arrays

8   together that are the subject of this hearing that you

9   showed to Mr. O'Brien, Mr. Blaylock and Mr. Cordero,

10  where did you get the other photographs in addition to

11  the photograph of Mr. Jiminez from 1989?

12       A.   Mr. Jiminez' photos I received from BCI,

13  from a photographic unit at police headquarters.  The

14  other photos Cold Case Squad maintains photos.  We

15  have a photo file in our office and I, you know,

16  scattered the file to get the photos.

17       Q.   Is there anything about the filler photos

18  that you used for these arrays when you made them to

19  show the three witnesses I just mentioned, anything

20  specific to this case that you were looking for?

21       A.   I don't understand your question.

22       Q.   The filler photos that you put in the arrays

23  that you showed to Mr. O'Brien, Mr. Blaylock and

24  Mr. Cordero, respectively were you looking for

25  anything specific when you chose the filler photos to

1   go around the photograph of Mr. Jiminez?

2       A.    Similar likeness to Mr. Jiminez, his

3   appearance, his hair, facial hair, hair in his head as

4   best I could.

5       Q.    And also so the record is clear on this

6   issue, was the photograph that you used of Mr. Jiminez

7   in all three photographs the same photograph?

8       A.    Yes.

9       Q.    And was that photograph a photograph of the

10  way Mr. Jiminez appeared in 1989 or a way that

11  Mr. Jiminez appeared in some other year?

12      A.    It's the photograph that I used, the

13  photograph of Mr. Jiminez from 1989.  I don't know

14  what he looked like at the time but that's the

15  photograph that it's from 1989.

16              MS. MATTAWAY:  I thank you.  I have

17      nothing further.

18              THE COURT:  Any recross?

19              MR. BRUNO:  Yes.

20  RECROSS EXAMINATION

21  BY MR. BRUNO:

22      Q.    You were asked about the so-called filler

23  photographs for each of the photo arrays, am I

24  correct, that all the fillers you used were male

25  Hispanics of about the age 20, give or take?

DET. STRADFORD - PEOPLE - RECROSS            61

1    A.   I'm not certain of their ethnic background.

2  I only picked photographs of people of similar

3  appearance.

4    Q.   Well, am I correct that you're looking in

5  the general course of this choosing this kind of work

6  who you're looking for fillers to go into the

7  categories, one of which would be male and Hispanic,

8  am I correct?

9    A.   Male, he doesn't have to be a Hispanic to be

10 a filler.  There are dark skinned Hispanics that could

11 pass as an African American.

12   Q.   I see.  And in this particular occasion,

13 were any of the fillers African American?

14               MS. MATTAWAY:  I object.

15               THE COURT:  Sustained.  They speak for

16     themselves, counsel.

17               MR. BRUNO:  Thank you.

18   Q.   Now, also you were asked further questions

19 about this DD35 which is now Defense Exhibit A.  You

20 said that in reading the phrase "a search of the

21 file," you assumed that was a PIMS search, am I

22 correct?

23   A.   Correct.

24   Q.   Now, you said you used a PIMS machine now

25 many times although not necessarily in the Four Eight

1  Precinct, correct?

2       A.   Never in the Four Eight.

3       Q.   I understand that.  But when you used the

4  PIMS machine and a DD5, were any kind of police

5  paperwork results you referred to that as the witness

6  viewing photos or did you say the witness viewed the

7  PIMS machine or the PIMS photos?

8                 MS. MATTAWAY:  I object.

9                 THE COURT:  Overruled.

10      A.   Are you asking me is that what I do for the

11  defendants?

12      Q.   What did you do?

13      A.   It all depends.  Sometimes.

14      Q.   On what?

15      A.   Right.  You want me to answer?

16                 THE COURT:  All right.  Sustained.

17      Q.   It all depends on what?

18                 THE COURT:  Counsel, stop revisiting.

19      Counsel, I'm sustaining the objection.  You only

20      need to know what his knowledge was of what was

21      done in this case.

22                 MR. BRUNO:  I have nothing further.

23                 MS. MATTAWAY:  Nothing further.  Thank

24      you.

25                 THE COURT:  Thank you, Detective.  You

1     are excused.  People rest?

2                 MS. MATTAWAY:  People rest.

3                 THE COURT:  Defense call any witness or

4     any evidence?

5                 MR. BRUNO:  No witness.

6                 THE COURT:  You want to rest on the

7     record?  You want to argue this case?

8                 MR. BRUNO:  I like to argue it.

9                 THE COURT:  Excuse me.

10                MR. BRUNO:  I like to argue briefly.

11                THE COURT:  You can step out.

12                (Witness steps complies.)

13                THE COURT:  All right.  Counsel, go

14    ahead.

15                MR. BRUNO:  With reference to all three

16    photo arrays, although for some reason it was not

17    acknowledged, I think your Honor has to note that

18    they all are male Latinos or Hispanics.

19                For a Wade hearing, it is noteworthy in

20    evaluating the detective's demeanor and

21    credibility for whatever reason, he's extremely

22    an obstructionist.  I maintain less than candid

23    and credibility is a key issue at such a hearing.

24                In any event, your Honor, I believe

25    that at least for with reference to

PROCEEDINGS                    64

1      Mr. Blaylock's identification, this Exhibit A DD5

2      number 35 is most important.  Again, we have the

3      detective evaded. We have the detective required

4      an extensive length of time and questioning.

5      What it comes down to is that clearly the female

6      Sharon looked at photos and in effect her job was

7      done when she identified Manual, my client's

8      brother.

9               I think it's clear from this document

10     in spite of the officer's lack of candor, it's

11     clear from this document in evidence that the

12     police then pulled a single photo of my client

13     and showed it to Mr. Blaylock that I believe it

14     was per se prejudicial and suggestive.

15               In addition, your Honor, I was

16     precluded for whatever reason from pursuing it

17     but one major point of believability that the

18     witness Blaylock tried to convey was that my

19     client, and he shared a thought, said they had a

20     common girlfriend.

21               At one point, the tremendous

22     discrepancy in their age is quite significant

23     either my client, if that were true, either my

24     client was a pervert or Blaylock was dating women

25     some six or seven years older than he at the age

PROCEEDINGS                             65

1     of 14 or 15 when that is a tremendous difference.

2                I have nothing further.   The rest of

3     this I would have to rely upon the record.

4                THE COURT:   Okay.   All right.   The

5     defendant in this case is charged with a murder

6     and related charges.   He moved to suppress any

7     potential in-court identifications as the product

8     of improperly suggestive photo identifications by

9     three witnesses.   A Wade Hearing was held with

10    respect to two of those witnesses Christopher

11    Cordero and Andrew O'Brien and a bifurcated

12    Rodriguez/Wade was held with respect to the third

13    witness as Esco Blaylock.   Detective Stradford

14    testified on behalf of the People.

15                I find defense offered no witnesses or

16    evidence.   I find Detective Stradford to be

17    entirely credible.   I make the following findings

18    of fact and conclusions of law.

19                Detective Stradford is a 23-year

20    veteran of the NYPD, nineteen of those years as a

21    detectives.   In 1995, he was assigned to the Cold

22    Case Squad.   Prior to that, he had been involved

23    in the robbery squad.   Police officer -- excuse

24    me -- police commissioner investigations and

25    special investigations.   He has prepared over 100

1    photo arrays and has also shown single photos to

2    witnesses.

3             In December of 1999, the detective who

4    was then assigned to the Cold Case part was

5    assigned the case of a shooting that had occurred

6    on July 3, 1989 of a young man in the Whitestone

7    Movie theater leading to the man's death.

8             In response to certain new information

9    received from the DEA, that case was referred to

10   the Cold Case file assigned to Detective

11   Stradford, who reviewed the entire file that had

12   been forwarded by the precinct.

13            That file indicated that the initial

14   detective assigned to the case was a retired

15   Detective Serrano.  The filed further indicated

16   that on July 11 of 1989, that Serrano had met

17   with two allege witnesses, that being

18   Mr. Blaylock and also a Sharon Ranroop.

19            After being shown pictures, Miss

20   Ranroop identified a picture of Manual Jiminez

21   and told Detective Serrano that that person was

22   the brother of the shooter who she knew as Ricky.

23            A subsequent search of the files

24   produced a photograph of defendant of Ricardo

25   Jiminez.  That picture was then shown to

1       Mr. Blaylock, who identified Ricardo Jiminez as

2       the shooter.

3                   Mr. Blaylock explained to Detective

4       Serrano that he knew the shooter, he had seen the

5       defendant from the neighborhood.  He knew him as

6       Leon.  They had been introduced by a mutual

7       friend.  He described this Leon as having a

8       removal of a gold tooth that he drove a Maxima,

9       that he also had a white car, that he lived on

10      Boynton Avenue, that at some point Mr. Blaylock

11      thought that they were dating the same girl but

12      learned that he was wrong.  He had seen defendant

13      in many fights.  He knew that the defendant used

14      a Jamaican accent at times and that he sold

15      drugs.

16                  He also indicated that this Leon had

17      dropped out of school, that he lived in the

18      Monroe Houses, that he before the shooting he had

19      seen him regularly at least every week but have

20      not seen him since then in the '90.

21                  On January 16th, 2001, Detective

22      Stradford went to New York State Correctional

23      Facility to interview Andrew O'Brien.  He showed

24      Andrew O'Brien a photo array that's been received

25      into evidence as People's Exhibit 1.  Mr. O'Brien

1    identified the defendant as the shooter.  He was

2    not told by the detective which photograph to

3    pick out.  On April 9, a photo array also shown

4    to Mr. Blaylock --

5              MS. MATTAWAY:  April 19.

6              THE COURT:  April 19th of '06, another

7    photo array was shown to Mr. Blaylock who also

8    picked out defendant as the shooter as Leon.

9              Following that identification from the

10   photo array, Mr. Blaylock was also shown a single

11   photo received into evidence as People's 3 which

12   he signed.

13             On May 17, of 2006, the detective

14   interviewed Christopher Cordero, who had worked

15   in the concession stand of the theater, said he

16   had knew the shooter, the decedent, and he met

17   with Christopher Cordero on the street.  Cordero

18   was shown a photo array.  No suggestion was made

19   as to Cordero as to who to pick out and he also

20   picked out the defendant.  No suggestion was made

21   to Blaylock either at the time that he made his

22   identification.

23             With respect to the three photo arrays

24   that had been admitted into evidence, the only

25   person who shows up in all three is the defendant

1    but with respect to all three, all six of the

2    photographs displayed individuals with similar

3    age, facial type, complexion, facial features,

4    facial hair, hair style.  They are all

5    essentially the same background.  There's no

6    distinctive clothing, certainly no clothing that

7    had any relationship to any descriptions given in

8    this case that would make anybody focus upon the

9    defendant.  He's wearing a black colored shirt as

10   are several of the subjects.

11            The Court concludes that, well, first

12   with respect to the Rodriguez, that Rodriguez,

13   regardless of whether Mr. Blaylock was shown a

14   single photograph after Sharon Ramroop had led

15   the police to defendant's picture or whether he

16   was shown an array of photographs on a machine or

17   otherwise that the witness had sufficient

18   familiarity with the defendant.

19            To preclude any possibility of any

20   improper suggestiveness effecting his

21   identification, he was able to identify the

22   defendant by his nickname, explained the nature

23   and number of this context, knew very personal

24   information about the defendant including this

25   removable gold tooth.  That would only be known

1    to somebody who had been in close contact with

2    the defendant.

3            In any event, the Court would find that

4    even if the single photo identification to

5    Mr. Blaylock had in any way suggest that the

6    passage of over ten years between that

7    identification and the subsequent identification

8    would at that point make any suggestion I think

9    is moot because the passage of ten years being

10   shown a new photo array that the witness could

11   not possibly had been effected by any

12   suggestiveness that may have occurred back in

13   1989.  Although the Court does not believe that

14   there was any suggestiveness involved in the

15   first identification.

16           With respect to Christopher Cordero and

17   Andrew O'Brien, the Court finds that these photo

18   arrays were non-suggestive in how they were made

19   up, how they were shown to the witness, what

20   comments were made to the witness.

21           And the Court therefore concludes

22   there's nothing in the prior identifications by

23   any of these witnesses that constituted improper

24   police conduct such that any of their in-court

25   identification should be suppressed on

PROCEEDINGS                    71

1     constitutional grounds.  The People's photo

2     arrays themselves don't come in under their

3     direct case, correct?

4               MS. MATTAWAY:  Correct, sadly.

5               THE COURT:  All right.  That

6     constitutes the decision and order of this court.

7               * * * * * * * * * * *

8          C E R T I F I C A T I O N

9

10              I, RENÉE SCOTT, do hereby certify that

11    the within proceedings are a true and accurate

12    transcript of the original stenographic record.

13

14        _____

          RENÉE SCOTT, CSR, RPR

15        SENIOR COURT REPORTER

16

17

18

19

20

21

22

23

24

25