1    SUPREME COURT OF THE STATE OF NEW YORK

2    BRONX COUNTY :   CRIMINAL TERM :   PART 1

3    -------------------------------------------

4    THE PEOPLE OF THE STATE OF NEW YORK,

5             -against-                    IND. NO.
                                           3825/2006
6    RICARDO JIMENEZ,

7                    Defendant(s)          Trial

8    -------------------------------------------

9                              June 28, 2007

10                             851 Grand Concourse
                               Bronx, New York 10451
11

     B E F O R E:
12
              THE HONORABLE ROBERT TORRES,
13
                              JUSTICE.
14

     A P P E A R A N C E S:
15
              ROBERT T. JOHNSON, ESQ.
16            District Attorney, Bronx County
              BY:  LISA MATTAWAY, ESQ.,
17               DEBRA GUARNIERI, ESQ.
                 Assistant District Attorneys
18

19            PATRICK BRUNO, ESQ.
              BRIAN WILSON, ESQ.
20            Attorneys for the Defendant

21
     Also Present:  MR. JOSEPH SHMULEWITZ, Intern
22

23                             Catherine Mercorella,
                               Senior Court Reporter
24

25

1               THE COURT CLERK:  Case on trial.  People

2          of the State of New York versus Ricardo Jimenez.

3               MS. MATTAWAY:  Your Honor, may I approach

4          with counsel before we start anything, please?

5               THE COURT:  Step up.

6               (An off-the-record discussion was

7                 held at the bench.)

8               (Whereupon, a recess was taken.)

9               THE COURT:  Counsel, let's step in the

10         back off the record.

11              (An off-the-record discussion was

12                held in the robing room.)

13              THE COURT:  On the record.  Early this

14         morning the court clerk received a phone call from

15         what would be juror number eight, Ms. Rios,

16         indicating that Ms. Rios' mother was ill; she would

17         be taking her mother to the doctor.

18              Approximately about 10 o'clock, I talked

19         to Ms. Rios directly who indicated to me that her

20         mother has Parkinson's, has diabetes.  Her mother had

21         some type of an episode last night, and they were

22         both up all night.  She would be taking her mother to

23         the doctor.

24              She indicated to me that when her mother

25         has had incidents like this in the past, it has taken

1        her mother several days at minimum to get back to her

2        so-called normal self, and Ms. Rios was the primary

3        caretaker of her mother.  She indicated without a

4        shadow of a doubt there would be no way she thought

5        she would be able to come in today at all and was

6        doubtful about tomorrow.

7                    I will listen to counsel.

8                    MS. MATTAWAY:  Your Honor, I'm well aware

9        that it's the defendant's choice to substitute a

10       sworn juror with an alternate.  The People, though,

11       submit that the juror probably should be replaced at

12       this point with alternate number one.

13                    MR. BRUNO:  Your Honor, you were kind

14       enough to advise us of this background information

15       off the record.  I have had the opportunity to speak

16       at length with my client.  He agrees, I believe, with

17       my position that realistically to wait for juror

18       number eight could risk delaying this trial three,

19       four, five days.  Also, for situations like this, we

20       select alternates.

21                    Having said that, my client and I agree we

22       will remove the present juror number eight and

23       substitute the alternate.

24                    THE COURT:  Okay.  Thank you.

25                    There is another issue.  There was an

1    application made by defense concerning a new review

2    of the Grand Jury presentation in light of certain

3    items that came up in discovery specifically

4    concerning an issue of justification.  The record

5    should reflect that I have read the Grand Jury

6    minutes.  The defense team was kind enough to give me

7    the specific items of discovery that they were

8    referring to this morning.  I went through those.

9                For the record, I am dealing with this

10    issue.  I am accepting it as an application de novo

11    as opposed to an application for a reconsideration of

12    the original motion.  I think this is a totally new

13    issue that came up.  It is my position that

14    procedurally I can accept and deal with it as an

15    application de novo and I am not required by the

16    procedural laws or rules and regulations to refer it

17    back to the motion court.

18                Under the particular facts and

19    circumstances of this case and my review of both the

20    Grand Jury minutes and the relevant items of

21    discovery, it is my position that there was no legal

22    mandate or requirement to submit a justification

23    charge to the Grand Jury or submit any of those

24    items.

25                There is an exception to that, and the

1    record will reflect that.

2                MR. BRUNO:  I appreciate you noting my

3    exception.  Also, under the circumstances, I would

4    respectfully request that you direct the D.A. to give

5    me the Grand Jury minutes or the portion of the

6    minutes which incorporate the D.A.'s charge to the

7    Grand Jury.

8                I know normally that's not required.  In

9    view of the issue I've raised, in view of your

10   decision, I believe an exception should be made.  You

11   should direct the People to provide me a copy of the

12   charge, also the minutes of any witness who referred

13   to the victim having a handgun.

14                THE COURT:  And your application for the

15   charge itself is based on what theory?

16                MR. BRUNO:  Well, your Honor,

17   realistically, should my client be convicted, I

18   believe that this issue -- of course, no disrespect

19   to you -- I believe this issue would unavoidably be a

20   serious appellate issue.  I would want to know in

21   advance, because from our end of it, this is still a

22   secret.  I don't know whether any witness made

23   reference to the victim having a gun, and I don't

24   know whether -- I assume from your decision that

25   there was no charge of justification.

1              THE COURT:  Correct.

2              MR. BRUNO:  Again, I'm not making a new

3       application.  I don't believe it's appropriate, but

4       my reasoning now is that if it wasn't elicited at the

5       Grand Jury that the victim and potentially his

6       friends pulled loaded guns, that might have been an

7       error from the onset of this case before I was

8       involved and before your Honor was involved.  For

9       that reason, I would like to have available a copy of

10      the subject minutes.

11             THE COURT:  Do the People wish to be

12      heard?

13             MS. MATTAWAY:  Yes.

14             Your Honor, the People oppose defense

15      counsel's application.  He's not entitled to the

16      charge.

17             With regard to the propriety of whether or

18      not self-defense should have been charged in the

19      Grand Jury, the People appreciate this Court's

20      ruling.  I certainly concur with the ruling.  I would

21      cite People versus Workman, 277 A.D.2d 1029; People

22      versus Harris, 98 N.Y.2d 452; People versus Samuels,

23      12 A.D.3d 695.

24             I would remind defense counsel that the

25      People are under no obligation to present Brady

1   material to the Grand Jury because I assume his

2   theory is that the fact that the victim had a gun,

3   assuming the victim had a gun, is Brady.  The People

4   do not have an obligation to present this testimony

5   to the Grand Jury and, moreover, defense counsel is

6   now in possession of the Grand Jury testimony of all

7   the witnesses who testified before the Grand Jury,

8   and there is no mention by any witness who testified

9   before the Grand Jury of the deceased having a gun in

10  his hand.  Therefore, the charge that was read to the

11  Grand Jury was appropriate at the time the case was

12  presented to the Grand Jury.

13          MR. BRUNO:  If I may make one further

14  comment, your Honor.

15          THE COURT:  Yes.

16          MR. BRUNO:  The only point I want to make

17  to clarify the record, although I made this point

18  yesterday, I believe the D.A. is out of line when she

19  qualified it saying, "if the victim had a gun."  I

20  reiterate what I said yesterday.  We have to give

21  some credit to the following:  An off-duty city

22  policeman and his then fiancee were sitting a few

23  seats from the victim.  The victim, in fact, rushes

24  past the off-duty cop sort of angering him, "Who is

25  this nut pushing past me?"

1           The victim pushes past the cop to get to

2     the aisle to confront the shooter, and after this

3     tragedy ends, the off-duty cop literally takes a

4     loaded .38 Special, to be exact, which was stolen, by

5     the way, from a Pennsylvania state trooper a week or

6     two earlier, the cop takes this stolen gun from the

7     dead hand of the victim.  I just wanted that clear.

8     Oh, and it's eventually vouchered.

9           THE COURT:  At this point in time, your

10    application for the actual charge to the Grand Jury

11    is being denied.

12          MR. BRUNO:  Thank you, sir.

13          THE COURT:  I think that takes care of all

14    our housekeeping matters.  At this point, we'll take

15    a ten-minute recess.

16          MS. MATTAWAY:  Thank you.

17          (Whereupon, a recess was taken.)

18          (Whereupon, the unsworn jurors enter the

19    courtroom.)

20          THE COURT CLERK:  Are the jurors

21    satisfactory to the People?

22          MS. MATTAWAY:  Yes, they are.

23          THE COURT CLERK:  To the defense?

24          MR. BRUNO:  Yes, sir.

25          THE COURT CLERK:  Jurors, please raise

1   your right hands.

2            Do you solemnly swear that you will try

3   the case of the People of the State of New York

4   versus Ricardo Jimenez in a just and impartial manner

5   and to render a verdict according to the law and

6   evidence, so help you God?

7            THE JURORS:  Yes.

8            THE COURT CLERK:  Just stay there one

9   second.

10            THE COURT:  Counsel, step up, please.

11            (An off-the-record discussion was

12        held at the bench.)

13            (Whereupon, the sworn jurors enter the

14   courtroom.)

15            THE COURT CLERK:  Case on trial continued.

16   All sworn jurors are present.

17            THE COURT:  Good morning.

18            THE JURORS:  Good morning.

19            THE COURT:  You may be wondering about Ms.

20   Rios who was originally juror number eight.  One of

21   her relatives became ill and she will not be

22   available to sit as a juror through the trial.

23   That's why we made the substitution.  With any amount

24   of luck, from this point on, we won't have too many

25   more disruptions in the trial.

1        The trial actually began with the

2   selection of the jury, yourselves.  What will happen

3   next is that we'll have what's known as opening

4   statements.  The prosecution is required by law to

5   make an opening statement to the jury.  It gives you

6   a preview or outline of the evidence they intend to

7   produce during the course of the trial.

8        After they have made their opening,

9   defense may, if he wishes, make an opening statement

10  also.  I remind you that there is no requirement that

11  the defendant do anything during the course of this

12  trial.  He has that presumption of innocence, and

13  that's still with him at this very moment, as we

14  discussed during the jury selection.  However, if he

15  does choose to make an opening statement, again, it

16  will be more or less a preview of what they

17  anticipate happening during the trial.  What counsel

18  for either side says during an opening statement is

19  not evidence.

20       After the opening statements, the People

21  will present their case.  Again, as we discussed

22  during the jury selection, evidence comes in

23  primarily by way of oral testimony.  The prosecution

24  will call witnesses to the witness' stand and ask a

25  series of questions.  That is known as direct

1    examination.  When the prosecution has concluded

2    asking their questions, defense will have an

3    opportunity to ask questions.  That is known as

4    cross-examination.  There may be additional rounds of

5    questioning.  That will be referred to as redirect

6    and recross.

7              Once the People have called all the

8    witnesses they intend to call and presented all the

9    documents they wish to put into evidence, their case

10   will be over.  At that point, if the defense wishes,

11   they will either rest or they may also put on a case.

12   Again, they are not required to prove anything or put

13   on a case of any nature.  However, if they do decide

14   to put on a case and call witnesses, we will repeat

15   the same process but in reverse.  Defense counsel

16   will ask questions.  That will be his direct.  The

17   prosecution will have an opportunity to ask

18   questions.  That will be their cross-examination.

19             After the conclusion of all the witnesses

20   and evidence in the case, each side will be afforded

21   an opportunity to make closing arguments known as

22   summations.  Summations will be followed by my

23   charging you on the law.  After I have charged you on

24   the law, you will then retire to the jury room and

25   commence your deliberations.

1    Evidence in the case, the only evidence in

2    the case comes from the witnesses and whatever

3    documents that are admitted into evidence.  Questions

4    in and of themselves are not evidence.  It is the

5    question together with the answer that constitutes

6    the evidence; and where a question is asked and the

7    answer negates that question, you cannot assume that

8    the question has any factual basis.  For instance, if

9    a witness is asked do they own an automobile and the

10   witness says no, you should not assume that they

11   really do own an automobile simply because the

12   question was asked.  It is the question together with

13   the answer that constitutes the evidence.

14   During the course of the trial, either

15   side may object to a particular question or an answer

16   or both taking a position that that question and/or

17   answer is impermissible as a matter of law in this

18   particular case.  If I rule or if I say "strike it,"

19   that means I made a legal determination that the

20   question and/or the answer is legally impermissible

21   according to the rules of evidence, and that is no

22   longer part of the evidence or part of the record.

23   There are times where I'll say "strike

24   it."  I'll say "sustained, strike it."  Whether I say

25   the words "strike it" or not, if I sustain an

1    objection, that question and/or the answer is no

2    longer part of the evidence.  If I rule, if I say

3    "overruled," that means I made a legal determination

4    that the question and/or the answer is permissible

5    under our rules of evidence in this case.

6           Do not hold against either side the mere

7    fact that they make objections.  That is their job.

8    You should also not draw any inferences from my

9    rulings.  In fact, you should draw no inferences from

10   anything I may say or do during the course of this

11   trial.  I have no opinion in this case.

12          In that regard, you have noticed that at

13   times I have a computer sitting on the bench here.

14   You should draw no inferences from my use or nonuse

15   of the computer.  I'll be using the computer and I

16   may be doing something that's not related in the

17   courtroom at that time.  The only promise I make to

18   you is that at no time am I playing games on the

19   computer.

20          As we discussed, the jury is the sole and

21   exclusive judge of the facts of the case.  It will be

22   your job to evaluate the credibility of the evidence.

23   I have no golden rule to give you to tell you whether

24   a particular witness is truthful or not truthful,

25   whether the testimony they are giving you is truthful

1    or not truthful, whether it's colored, mistaken or

2    outrightly false.

3              As we discussed during the voir dire, we

4    ask that you bring to this process the same mechanism

5    you use in your everyday life to evaluate people.

6    There is one rule I can give you at this time.  If

7    you find that any witness has testified falsely about

8    a material fact, you are at liberty to disregard that

9    witness' testimony entirely or you may disregard so

10   much of the testimony as you believe to be false and

11   accept so much of the testimony as you believe to be

12   truthfully given.

13             You bring to this process the common sense

14   you use in your everyday life.  I encourage you to

15   listen to the testimony carefully, observe the

16   witnesses, observe their manner in testifying, their

17   demeanor as an aid in helping you make your

18   determinations.

19             I am directing you not to draw any

20   conclusions until you have heard all of the evidence.

21   Keep an open mind.  I encourage you to be on time.

22   You are charged not to discuss this case among

23   yourselves or anyone else.  Obviously, at the

24   appropriate time at the end of the trial I will be

25   directing you to discuss it at that point so you

1    could deliberate, but until that point you are not to

2    discuss the case among yourselves.

3                    There may be some media coverage of this

4    case.  If for any reason you happen to see an article

5    about this case or some newscast of it, regardless of

6    where it is or the nature of it, you are to disregard

7    it completely or not to watch the newscast or read

8    the article of it.  Again, your oath is to make your

9    determination based solely on what you see and hear

10   here in this courtroom.

11                   Do not visit the location of the incident.

12   You are not allowed during the duration of this trial

13   to accept any benefit whatsoever in return for giving

14   information about the trial.  If anyone attempts to

15   offer you anything to get information about the

16   trial, you are to report that immediately to court

17   personnel.  If anyone attempts to improperly

18   influence your determination as a juror on this case

19   or approach you with any type of offer regarding this

20   case during the duration of your service as a juror,

21   you are, one, not allowed to do that and you are to

22   report that to court personnel immediately.

23                   I do not allow jurors to take notes.  It

24   tends to be distracting to your fellow jurors.  We do

25   have an official record.  You see the young lady

1    taking down every word that's been said, and at the

2    end of the case I will give you instructions as to

3    how you could make use of that official record if you

4    need something read back to you or you need to

5    clarify something.

6            As you've already been told, probably

7    several times at this point, the lawyers on this case

8    are generally friendly, outgoing people, but the

9    lawyers and myself are prohibited from having any

10   interaction with you at all during the course of this

11   trial.  So, if you happen to bump into any of us in

12   the hallways of this building or on the street, in

13   Pathmark, no matter where it may be, and we act like

14   we don't recognize you and just walk past you, we are

15   not being rude, we are just doing what we are

16   required to do under the law.

17           Again, do not formulate any opinions or

18   conclusions about this case until you have heard all

19   of the evidence and I have charged you on the law.

20           Are there any smokers in this group?  As

21   you are aware, you're not allowed to smoke anyplace

22   in the building, so, to the best of your ability, I

23   encourage you to attend to your smoking needs before

24   or after or on the luncheon break.

25           At any time during the course of this

1        trial, if any juror wishes to change your seat where

2        you're sitting in the box, please do not do so

3        without letting court personnel know.  At this point,

4        these are the seats you should take every time you

5        come into the courtroom.  If you want to change your

6        seat for whatever reason, just let court personnel

7        know that before you do it.

8                Also, at any time during the trial if you

9        need to take a break for whatever reason or you think

10        it's too cold or too hot in here or you're having

11        trouble hearing us, just kind of like raise your

12        hand, call somebody's attention or throw something at

13        me, and we will accommodate you.

14                We will now proceed with opening

15        statements.

16                MS. MATTAWAY:  Thank you.

17                Good morning, ladies and gentlemen.

18                THE JURORS:  Good morning.

19                MS. MATTAWAY:  It was 1989.  A first-class

20        stamp was 25 cents, the Cosby show was number one and

21        Driving Miss Daisy won the Oscar for best picture,

22        but the blockbuster of the summer of '89 was Batman.

23        It grossed $250 million in the end, and it was the

24        movie everybody wanted to see and that included

25        Ricardo Jimenez and Sean Worrell.

1    They were both there at the Whitestone

2    Cinema on July 3, 1989.  Batman was premiering and

3    the theater was packed.  Neither of them came alone.

4    They were with other people.  However, as so many of

5    us do before you go into the movie, first you have to

6    buy the snacks, and to do that they went to the

7    popcorn line.

8    What do we remember after 18 years?  Why

9    would any of us remember 1989?  Really good things

10   and really bad things.  When you buy popcorn, you're

11   served by concession workers, and some of them will

12   take the stand at this trial and they will talk to

13   you about what they remember, about the fight at the

14   popcorn line, but I anticipate my evidence will show

15   that there was an argument in the popcorn line and it

16   was between Ricardo Jimenez and Sean Worrell and

17   other people.

18   How did it begin?  How did it end?  Who

19   started it?  What about what the witnesses say will

20   be important for you?  What may be not so important?

21   The witnesses will tell you about the argument in the

22   popcorn line.  Unfortunately, Sean Worrell cannot

23   because he's dead, and Ricardo Jimenez killed him.

24   But back to the argument in the popcorn

25   line.  How did it end?  Ricardo Jimenez, who was

1    angry enough, uttered words to the effect of "I'm

2    going to go get my gun," and Sean Worrell, how does

3    he respond, unfortunately for him?  "Go get your

4    gun."  And without a care in the world seemingly,

5    Sean Worrell took his popcorn and took his drink and

6    went in to see Batman.

7             And this is where it gets interesting,

8    because my evidence will show that Mr. Jimenez,

9    having uttered the threat, does not let it drop, does

10   not just take his seat in Batman.  No.  He goes to

11   the car, and he gets the gun and he comes back into

12   the Whitestone Cinema and he goes right to Theater 1

13   and he hunts down Sean Worrell, the guy he had the

14   fight with in the popcorn line.  You'll hear that.

15            Now, it was over in three shots.  Ricardo

16   Jimenez, my evidence will show you, took the first

17   one, pop, and he gets Sean Worrell in the back.

18   Actually, it goes through the arm, ends up in the

19   chest puncturing a lung.  You'll hear evidence to

20   that effect from my medical examiner who did the

21   autopsy or, excuse me, who will interpret the autopsy

22   report on Sean Worrell.

23            So, again, first bullet enters the back of

24   the victim.  Second shot -- did Sean Worrell get a

25   gun?  Yes, he did.  You'll hear about it.  Second

1     shot from Sean Worrell, I anticipate my evidence will

2     show, and it's ten feet up in the air, hurts no one.

3     Third shot from Ricardo Jimenez in the back, the back

4     of Sean Worrell's head, exits through the forehead.

5     Sean Worrell drops dead and it's over.

6          You will hear that Ricardo Jimenez fled

7     the theater, and there was pandemonium pretty much.

8     Ricardo Jimenez was apprehended at that time, a short

9     time thereafter the shooting.  He was apprehended,

10    but you'll hear that the detectives had witnesses who

11    were understandably scared, did not want to

12    cooperate, and with no one to identify the shooter

13    and willing to come down and view a line-up, Mr.

14    Jimenez is let go.

15         However, you will hear that some 17 years

16    later, Mr. Jimenez is apprehended.  How does that

17    happen?  You will hear that the Cold Case Squad from

18    N.Y.P.D. picked up the file in about 2000, reexamined

19    the file, went out to re-interview witnesses.

20         Some people clearly remembered what

21    happened in the Whitestone Cinema on July 3, 1989.

22    Some were fuzzy.  Some don't remember it at all, but

23    at least one person who remembered it was a teenager

24    at the time and he is now a grown man and he will

25    take the stand and he'll talk to you about what he

1      remembers about that shooting, but he'll tell you he

2      saw Ricardo Jimenez kill Sean Worrell in the theater.

3      What he saw with the eyes of a 15 year old he never

4      forgot and now as a grown man, he'll talk to you.

5              He also talked to the Grand Jury, and

6      that's why we are here, because the Grand Jury issued

7      an indictment and, as the judge told you, it's just

8      an accusation, but that's why we are here.  I will

9      read from it now.  It states:  "Supreme Court of the

10     State of New York, County of Bronx.  The People of

11     the State of New York against Ricardo Jimenez.

12     Murder in the Second Degree.  The Grand Jury of the

13     County of the Bronx by this indictment accuses the

14     defendant, Ricardo Jimenez, of the crime of Murder in

15     the Second Degree committed as follows:  The

16     defendant, Ricardo Jimenez, on or about July 3, 1989

17     in the County of the Bronx with intent to cause the

18     death of a person did cause the death of Sean Worrell

19     by shooting him in the head and chest with a loaded

20     pistol."  And it is dated September 6, 2006.

21             That's why we're here, because that

22     witness testified before the Grand Jury, and he's

23     going to testify before you at this trial.  He is

24     accused of murder.  The Grand Jury returned this

25     indictment.  That's why we're here.

1               How am I possibly going to prove that?  I

2       can and I will because it's not just the witness who

3       testified before the Grand Jury who will testify at

4       this trial, it's other people who saw things, who

5       were there, even witnesses who weren't there but have

6       something to add.

7               As I told you in jury selection, some of

8       my witnesses have criminal records.  You know that

9       going in.  I ask you to keep an open mind, wait until

10      the witness testifies, don't judge the book by the

11      cover, wait until they talk to you about what they

12      remember, what they know, what they add to the story

13      and then make your decision about whether or not you

14      think you can believe these people and what they're

15      telling you, but there will be a number of witnesses

16      who will testify as well as police witnesses, and, as

17      I told you, there will be a doctor, a medical

18      examiner who testifies.

19              I believe that after you have heard all of

20      the People's witnesses that you will come to the

21      conclusion that Ricardo Jimenez did kill Sean Worrell

22      on July 3, 1989, and you will find him guilty.

23              Thank you.

24              THE COURT:  Thank you.

25              Does defense wish to make an opening

1  statement?

2            MR. BRUNO: Yes, I will, your Honor.

3            May it please your Honor, ladies and

4  gentlemen of the jury, opening statement, a blank

5  pad.

6            His Honor told you my opening is optional

7  and half the time I don't open. I listen to the

8  D.A., and I mentally scratch my head and I say, well,

9  gee, should I open, and I chose to today because, you

10  see, based upon her opening 18 years after a murder,

11  let's throw in the towel. He's guilty. Take him

12  out. Hang him. But, it ain't that simple.

13            See, I have met none of these witnesses,

14  quite sincerely. I have my stack of papers, police

15  reports, whatever investigation my people could do.

16  I have a paper case right now. I have a flavor of

17  what I think she's going to present. Right now she

18  knows more than I. What I think I have here -- let

19  me start out being the bad guy. All right?

20            I have a Sean Worrell, a young man who

21  died young, yes, over a bucket of popcorn. It's

22  ridiculous. We have a Sean Worrell who went to the

23  opening night of Batman ready for trouble because

24  you'll hear not only did he have a piece in his

25  waistband, but at least one of his buddies did. So I

1      don't deny that he was shot.  I don't deny that there

2      was a showdown out of the old west, but you'll see I

3      deny that it was Ricardo Jimenez.

4              Let me whet your appetite.  These people,

5      whether 18 years ago or today, describe a man very

6      unlike Ricardo Jimenez, a man of a different race,

7      with a different accent.  Try that on for size.  And

8      she, the prosecutor, makes reference to, well, some

9      witnesses may have a criminal record and, yes, quite

10     candidly, I've dealt with many a witness and many a

11     client with a criminal record.  They could be telling

12     the truth.  I'll put that on the table up front, but

13     that's also not that simple.

14             One of her star witnesses is selling his

15     soul to get out of doing 30 years in federal prison

16     for murder as a result of drug trafficking.  That's

17     one of her star witnesses who all of a sudden, yeah,

18     he was 16, years later decides, well, I could solve

19     that Batman murder.  I was there that night.  Yeah,

20     he's one of the guys with the victim.  I was there

21     that night.  Yeah, now I recall who it was.

22             Yeah, to save their souls, to try to cut

23     their sentences in half, you'll see all of a sudden

24     they recollect that it's Ricardo Jimenez.  That's

25     what we are dealing with.

1                    Again, I'm done right now.  She knows a

2        lot more than I right now, but I'll question the

3        witnesses and God help me, I'll bring out the truth.

4                    Thanks for your attention.

5                    THE COURT:  Thank you.

6                    You may call your first witness.

7                    MS. MATTAWAY:  May I see if the witness is

8        in the hall, your Honor?

9                    THE COURT:  Go right ahead.

10                   MS. MATTAWAY:  Thank you.

11                   (Brief pause in the proceedings.)

12                   MS. MATTAWAY:  The People call Kevin

13       Morrissey.

14                   (Brief pause in the proceedings.)

15                   THE COURT:  Step up a minute.

16                   (An off-the-record discussion was

17              held at the bench.)

18                   THE COURT:  Ladies and gentlemen, we are

19       going to ask you to excuse us for a moment.  We have

20       a technical glitch.  It should be no more than two

21       minutes.

22                   (Whereupon, the jury exits the courtroom.)

23                   (An off-the-record discussion was held at

24       the bench.)

25                   (Continued on the next page.)

1              (Whereupon, the witness enters the

2        courtroom and takes the witness stand.)

3   K E V I N   M O R R I S S E Y, having been called as a

4        witness by and on behalf of the People, having

5        been first duly sworn by the Clerk of the Court,

6        testified as follows:

7              THE COURT:  You can bring the jury

8        back.

9              (Whereupon, the jury enters the

10       courtroom.)

11             THE COURT CLERK:  Case on trial

12       continues.  All sworn jurors are present.

13             THE COURT:  Ladies and gentlemen, Mr.

14       Morrissey has already been sworn in.  You may

15       inquire.

16             MS. MATTAWAY:  Thank you.

17  DIRECT EXAMINATION

18  BY MS. MATTAWAY:

19       Q.   Good morning sir.

20       A.   Good morning.

21       Q.   Please state your name for the jury.

22       A.   Kevin Morrissey.

23       Q.   Oh, you gotta (sic) speak up.

24       A.   Kevin Morrissey.

25       Q.   I would like you to project your voice all

1    the way back here.

2         A.    Kevin Morrissey.

3         Q.    Okay.  Are you currently incarcerated?

4         A.    Yes, I am.

5         Q.    For what crime or crimes are you currently

6    incarcerated?

7         A.    Counterfeit certified checks to purchase

8    automobiles.

9         Q.    Okay.  Approximately how many pending cases

10   do you have?

11        A.    Five.

12        Q.    And where are they pending?  Can you speak

13   in the microphone, sir?

14        A.    Certainly.  Queens, Nassau County, Suffolk

15   County, Brooklyn, and Bergan County, New Jersey.

16        Q.    Are any of your pending cases for crimes of

17   violence?

18        A.    No.

19        Q.    And what are the nature of your pending

20   cases?

21        A.    The purchase of automobiles and counterfeit

22   certified checks from a financial institution and

23   those cars are re-sold after I purchased them.

24        Q.    All of them?

25        A.    All of them.

1        Q.    Okay.  Why are you here today?

2        A.    To give testimony in reference to the case

3    before the jury.

4        Q.    All right.  Are you aware of the incident?

5        A.    I'm aware of what the defendant told me

6    about the incident.

7        Q.    All right.  Were you there when this

8    incident happened in 1989?

9        A.    No.

10             MR. BRUNO:  Objection, not a fact in

11       evidence.

12             THE COURT:  Overruled.

13       Q.    When did you first meet the defendant?

14       A.    It was at the prison on the barge up in the

15   Bronx back, I guess, September of 2006.

16       Q.    All right.  Do you know the defendant's

17   name?

18       A.    Ricky Jimenez.

19       Q.    Do you see him here in the courtroom?

20       A.    Yes, I do.

21       Q.    Please point to him and indicate an --

22       A.    Right over there.

23       Q.    Over there?

24       A.    Yes.

25       Q.    What is he wearing?

```
 1        A.    Tan shirt, tan slacks, black sneakers.

 2                  MS. MATTAWAY:  The record should

 3        reflect the witness has indicated the defendant.

 4                  THE COURT:  Indicating the defendant.

 5        Q.    What were the circumstances of your first

 6   meeting with Mr. Jimenez?

 7        A.    I asked the correction officer for a razor

 8   and they told me to come back.  And I wanted to get

 9   the razor before I get into the shower and I went into

10   the shower without the razor and he was kind enough to

11   give his ID and bring me the razor into the shower.

12        Q.    And then what happened?

13        A.    I told him thank you and that, basically, I

14   had a certificate in paralegal studies.  I'm pretty

15   good looking up cases.  If he needs help with

16   anything, looking up anything, I'm available.

17        Q.    And what did he say to that?

18        A.    Okay.  I don't recall verbatim what he said

19   but, okay, that's good.  And that was basically it.

20   And I was in the shower and I had no clothes on so I

21   was trying to cut the conversation short.

22        Q.    Okay.  Did you have another conversation

23   subsequent to the initial conversation about the

24   razor?

25        A.    Many conversations.
```

1        Q.      Many conversations?

2        A.      Many conversations.

3        Q.      About how many conversations have you had

4   with Mr. Jimenez since that day he gave you a razor?

5        A.      Maybe about twenty.

6        Q.      And where did they take place?

7        A.      In the unit that we're housed on on the

8   boat on the Vernon C. Baynes Correction Center.

9        Q.      Can you try to talk into the microphone,

10  sir?

11       A.      Yeah, I'm sorry.

12       Q.      And in which facility is this?

13       A.      It's the barge in the East River in the

14  Bronx in the Hunts Point section.

15       Q.      Is that part of Rikers Island?

16       A.      No, it's not.

17       Q.      It's separate from Rikers Island?

18       A.      It's separate from Rikers Island.

19       Q.      And tell us about the next conversation.

20       A.      The very next conversation in reference to

21  the case that's pending?

22       Q.      Yes.

23       A.      Basically I was going to go to the law

24  library and look up some cases for him in reference to

25  the case that's pending before the Court.

 1      Q.    What did he tell you about his case?

 2      A.    It's an old case.  It happened, you know,

 3  late eighties.  It was at a movie theater up in the

 4  Bronx.  I believe he said he was arrested in August on

 5  it.

 6      Q.    August when?

 7      A.    Two thousand six, and he said that there

 8  was several new witnesses on the case and he just

 9  didn't know where they came from.  He was very

10  surprised he got arrested on the case.

11      Q.    All right.  And, why did he want your help?

12      A.    I don't know exactly why.  I mean, I can't,

13  you know, get into his head but I believe he was

14  scared of the charges and he had no bail, and he did a

15  lot of jail time before.

16              MR. BRUNO:  Objection, your Honor.

17              THE COURT:  Sustained.  Strike it.

18  Jury is to disregard that comment.

19              Next question.

20              MS. MATTAWAY:  Yes.

21      Q.    What did you say to him when he asked you

22  for help?

23      A.    I said I would help him and, you know, I

24  would go down to the law library with him and, you

25  know, pull cases that were in reference to the case

1    that, you know, he was arrested on.

2         Q.    And did you discuss the facts of his case

3    with him?

4         A.    Yes, I did.

5         Q.    What did he tell you?

6         A.    Basically he was at a movie theater in the

7    Bronx and he got into an argument with this Jamaican

8    kid, and he thought the kid had a gun.  And the

9    argument escalated and the kid was making motions

10   toward his waist.  And he ran out to his car.

11        Q.    Who went out to whose car?

12        A.    Mr. Jimenez went out to his car.  He had a

13   gun in his car.  He came back into the movie theater,

14   he spotted the kid in the lower row in the movie

15   theater.  He said, "Hey you", the kid turned around,

16   shot at him.  He shot back at the kid, hit the kid,

17   ran out to his vehicle, took off and went back home.

18        Q.    And where did he say he went after that?

19        A.    I think it was the Soundview Projects where

20   he lived, his aunt's house.

21        Q.    Did he tell you where he got the gun from

22   initially?

23        A.    No.

24        Q.    And did he tell you what the words were in

25   the popcorn line?

1        A.      No.   I believe it was just over the last

2   bag of popcorn.

3        Q.      How did he know he was Jamaican?

4        A.      I don't know that.

5        Q.      And how did he know which theater to go to?

6        A.      I don't know that either.

7        Q.      Where did he say he went when he went to

8   the projects?

9        A.      To his aunt's house.

10       Q.      Did he say why he went there?

11       A.      Because he was scared and that he told his

12  aunt what happened and his aunt was going to say he

13  was home sleeping at the time.

14       Q.      And did he tell you what he did with the

15  gun?

16       A.      He said he was running an operation out of

17  Clifton, New Jersey.

18                    MR. BRUNO:   Objection, your Honor.

19                    THE COURT:   Sustained.   Strike it.

20                    Next question.

21       Q.      What did he physically do with the gun?

22       A.      Gave it to his brother.

23       Q.      Mr. Jimenez gave it to his brother?

24       A.      Right.

25       Q.      And did he indicate to you if he was

 1   arrested?

 2        A.    Yes, he did.  He said about five days later

 3   he was arrested on the case and they never did a resin

 4   test for powder burns.  He was in custody for about

 5   five hours.  He described the detective.  And he said

 6   that he believed that the witness's mother wouldn't

 7   let the son testify and one of his crew members got to

 8   the witness so he couldn't be that witness.

 9        Q.    He couldn't --

10        A.    He didn't think it was that witness who was

11   the witness now on this particular time that he was

12   arrested.

13        Q.    In 2006?

14        A.    Right.

15        Q.    Okay.  This witness back from 1989, you

16   said something about the witness's mother?

17        A.    Right.  The witness's mother wouldn't let

18   her son testify and he was released after he was

19   arrested.

20        Q.    And Mr. Jimenez told you this?

21        A.    Yes.

22        Q.    And he said something about his crew?

23        A.    He said one of his crew members got to the

24   witness and they scared him.

25                  MR. BRUNO:  Objection, your Honor.

1              THE COURT:  Sustained as to

2       characterization.  Strike it.  Ask the question

3       again.

4       Q.    Okay.  He believed that --

5              MR. BRUNO:  Objection as to his belief.

6              THE COURT:  Sustained.  Wait for the

7       question.

8              MS. MATTAWAY:  Yes.

9       Q.    What did Mr. Jimenez told you he did, if

10      anything, with respect to this witness from 1989?

11      A.    Well, he didn't do anything.

12             THE COURT:  Next question.

13      Q.    He didn't do anything?

14      A.    Right.

15      Q.    Did he tell you he was aware of something

16      happening?

17             MR. BRUNO:  Objection, your Honor.

18             THE COURT:  Let her finish the

19      question.

20      Q.    Did he tell you he was aware of something

21      happening to a witness in 1989?

22      A.    Yes.

23             MR. BRUNO:  Objection.

24             THE COURT:  Sustained.  Strike it from

25      the record.  Next question.

1          Q.     Did Mr. Jimenez told you that he personally

2     spoke to a witness from 1989?

3          A.     No.

4          Q.     Did Mr. Jimenez tell you why he believed he

5     was let go in 1989?

6          A.     Yes.

7          Q.     Okay.  And what is it that he told you

8     about why he believed the witness was let go?

9                    MR. BRUNO:  Objection, your Honor.

10                   THE COURT:  Sustained, asked and

11          answered.  Move on.

12                   MS. MATTAWAY:  Fine.

13         Q.     Did Mr. Jimenez talk to you about his

14    identification procedure back from 1989?

15         A.     I don't remember that, no.

16         Q.     Did Mr. Jimenez talk to you about what he

17    was wearing at the time or how he looked back then?

18         A.     Yes.

19         Q.     What did he tell you?

20         A.     He had two tattoos at the time, one on his

21    neck, one on his right hand.  He had on a tee-shirt,

22    black shorts, black sneakers.

23         Q.     And did he talk to you at all about his

24    race versus the victim's race?  About his race?

25         A.     (No verbal response.)

1       Q.      Do you remember that?

2       A.      I don't recall.

3       Q.      Now, did Mr. Jimenez tell you what it was

4   that he yelled to the kid in the theater when he came

5   back in?

6       A.      "Hey you."

7       Q.      And what did the kid do in response to

8   that?

9       A.      He fired a shot at Mr. Jimenez.

10      Q.      And then what happened?

11      A.      Mr. Jimenez fired a shot at him and the kid

12  went down.

13      Q.      This is what he told -- Mr. Jimenez told

14  you?

15      A.      Right.

16      Q.      Now, did he ask you anything specific in

17  terms of your paralegal certificate ability to do with

18  regard to those facts?

19      A.      Not to those facts, no.  We were looking

20  into a due process issue, you know, with the time

21  lapse, you know, that went between the time of the

22  incident and now that he's been arrested.

23      Q.      Okay.  Did you and he talk?  In other

24  words, of the shots and who fired first?

25      A.      He said the kid he had the beef with fired

1    first at him and he returned fire.

2          Q.    Did he tell you how many times he fired?

3          A.    No.  But I believe it was once, he said he

4    fired, the kid went down so he didn't say specifically

5    one time.  He said he fired, the kid went down, and he

6    fled the theater.

7          Q.    Did he tell you which part of the body he

8    hit the kid in?

9          A.    No, I don't think so, no.

10         Q.    You met with him about twenty times?

11         A.    Right.

12         Q.    What were the context of these meetings?

13         A.    About the case, about, you know, prior

14   incarcerations, about neighborhood, you know, the jail

15   system, the justice system, you know, things like

16   that, normal things in jail, basic stuff.

17         Q.    Okay.  Now, when he described to you how he

18   shot once and the kid went down on the first shot, did

19   you have any reaction to that when you heard that?

20                    MR. BRUNO:  Objection as to his

21        reaction.

22                    THE COURT:  Sustained.

23         Q.    Did you have any conversation about the kid

24   at all?

25         A.    Well, I said something else.

 1                        MR. BRUNO:  Objection.  I'm going to

 2          sustain.

 3                        Next question.

 4     Q.     Did he say he knew this kid?

 5     A.     No, I don't recall him saying he knew the

 6     kid.

 7     Q.     Did he say anything about his feelings

 8     about doing this?

 9     A.     I believe it was about the case in general,

10     where he said "Just some Jamaican."

11                        MR. BRUNO:  Objection, your Honor.

12                        THE COURT:  I'm going to sustain that

13          as not responsive to your question.

14     Q.     Did he talk to you about his feelings about

15     firing the shot?

16                        MR. BRUNO:  Objection, your Honor.

17                        THE COURT:  I'll allow the question.

18                        MR. BRUNO:  May we approach --

19          withdrawn -- assuming he's admonished to give a

20          simple yes or no at this point, most

21          respectfully.

22                        THE COURT:  Correct.  Did he talk to

23          you, yes or no?

24                        THE WITNESS:  Yes.

25     Q.     And what did he say?

 1                    MR. BRUNO:  Objection.  May we approach

 2          for an offer of proof?

 3                    THE COURT:  Yes.  Step up on the

 4          record.  Excuse us a moment.

 5                    (Whereupon, the following takes place

 6          in the robing room amongst the Court and both

 7          counsel, outside the presence of the witness and

 8          the sworn jury.)

 9                    MR. BRUNO:  May I be heard?

10                    THE COURT:  Go ahead.

11                    MR. BRUNO:  Relying upon Discovery

12          which is the only thing I can rely upon, I think

13          what the D.A. is trying to elicit as the answer

14          is that Mr. Jimenez, in response to that last

15          question says to the effect of, it didn't mean

16          anything to me, it was only a freaking Jamaican.

17          My point is this.  The witness, the DA may

18          argue --

19                    Well, is that what you're eliciting?

20                    MS. MATTAWAY:  Yes.

21                    MR. BRUNO:  The DA may argue, arguing

22          as a lawyer that, well, if that's what the man

23          said, that's what the man said.  On the other

24          hand, I have to maintain there has to be some

25          balance here.  She would be eliciting that answer

1          solely to interject a racial hostile issue into

2          the testimony, noting parenthetically, quite

3          candidly, that at least one juror has the outward

4          appearance of a Jamaican-born person.  Under the

5          circumstances, I don't think the DA should be

6          allowed to pursue that subject any further.

7                    THE COURT:  Go ahead.

8                    MS. MATTAWAY:  I would be willing then,

9          if that's Counsel's argument, to rephrase the

10         question and ask the witness, without any

11         reference to the race of the victim, did he say

12         anything about the victim.  In other words, if

13         his answer is, the kid didn't mean a thing, as

14         opposed to, the Jamaican kid didn't mean a thing,

15         but it is what he said.

16                    MR. BRUNO:  May I respond?

17                    THE COURT:  Ahum.

18                    MR. BRUNO:  Of course you're the Judge,

19         but I'm responding as follows.  I'm asking the DA

20         be totally precluded.  But if you're going to

21         adopt her protocol, I ask that she actually lead

22         the witness and phrase the question that way, is

23         it correct that he said that kid didn't mean a

24         thing.

25                    THE COURT:  I agree with defense

 1          counsel.  I think if you want to get this in,

 2          I'll allow the leading very precisely without any

 3          reference directly or indirectly to any racial

 4          background or element whatsoever.  So I'll allow

 5          you to lead on that one question with instruction

 6          to your witness that he answer in a yes or no,

 7          and then I assume we're moving on.

 8                   MS. MATTAWAY:  May I refresh his

 9          recollection so I can pinpoint him and say, have

10          him read it, refresh the line, and then say

11          without reference to the race.

12                   THE COURT:  No, I'm telling you there's

13          no need to refresh his recollection.  He hasn't

14          indicated he can't remember.  I'm telling you you

15          can ask him if what he told you was, I forget the

16          exact terminology, was just a kid or whatever he

17          said, without any reference whatsoever to any

18          racial issue.  You can ask him, did he tell you

19          whatever that one line is, I apologize, I

20          haven't --

21                   MR. BRUNO:  That kid didn't mean

22          anything.

23                   THE COURT:  You can ask him that direct

24          question, either answer yes or no.  You'll get

25          your answer and then you'll move on.

1                    MS. MATTAWAY:  Right.

2                    MR. BRUNO:  Thank you, sir.

3                    MS. MATTAWAY:  Thank you.

4                    (Whereupon, the following takes place

5          in Open Court, in the presence of the defendant,

6          defense counsels, the Court, the assistant

7          district attorneys and sworn jurors, alternates

8          and witness.)

9                    THE COURT:  You may ask your next

10         question.

11         Q.    Mr. Morrissey, I am going to address my

12    questions to something very specific.

13         Now, did you and Mr. Jimenez have a conversation

14    about what the kid meant to him?  That is a yes or no.

15         A.    Yes.

16         Q.    Okay.  Without any reference to race, what

17    did he tell you?

18                    THE COURT:  Sustained.  That is not the

19         question I told you to ask.  Now ask the question

20         I told you.

21         Q.    What did he tell you?

22                    THE COURT:  Sustained.

23         Q.    About --

24                    THE COURT:  Sustained.

25                    MS. MATTAWAY:  One moment please.

1                        (Whereupon, there was a short pause in

2           the proceedings.)

3           Q.    Mr. Morrissey, did Mr. Jimenez tell you

4    that the kid didn't mean anything to him?

5           A.    Yes.

6                 MS. MATTAWAY:  Nothing further.

7                 THE COURT:  You may inquire.

8                 MR. BRUNO:  Shall I proceed?  Your

9    Honor, may I use the podium?

10                THE COURT:  Yes.

11   CROSS EXAMINATION

12   BY MR. BRUNO:

13          Q.    Good afternoon Mr. Morrissey.

14          A.    Good afternoon.

15          Q.    Let me start here.  You indicated here

16   that, in effect, your criminal history revolves around

17   forged or, you know, not regular certified checks

18   which are then used to purchase cars, correct?

19          A.    Correct.

20          Q.    And then the profit is then, the purchased

21   cars are then sold?

22          A.    Correct.

23          Q.    Are you related to the Morrissey family who

24   are involved in auto sales in Nassau and Suffolk

25   County?

1       A.      Yes, I am.

2       Q.      There is Morrissey Pontiac?

3       A.      GMSC.

4       Q.      They're very involved in the auto family?

5       A.      That was my dad.  He passed away in '98.

6       Q.      Well, that part I'm sorry.

7       Well then, in effect, did you run the business?

8   In other words, when your dad was out of the business

9   -- withdrawn.

10      What I'm asking is your criminal activity,

11  forgive the approach, your criminal activity revolved

12  around illegally getting cars?

13      A.      Yes.

14      Q.      With forged checks?

15      A.      Yes.

16      Q.      Was that done in the course of your family

17  business, or in effect, you are on your own with your

18  enterprise?

19      A.      I was on my own with my enterprise.

20      Q.      And, in fact, your family still has the

21  successful GM dealerships on Long Island, correct?

22      A.      Correct.

23      Q.      Now, you indicated you're in jail for five

24  pending cases.  You're in jail for five pending cases

25  all of which are basically the same MO, the same

```
 1   genre, correct?

 2        A.    Correct.

 3        Q.    You get phony bank checks, buy cars, resell

 4   them?

 5        A.    Right.

 6        Q.    And you have such cases pending it appears

 7   -- withdrawn.  All of these arrests we're discussing

 8   now occurred 2006, correct?

 9        A.    Correct.

10        Q.    And you have cases of this nature pending

11   in Bergan County, New Jersey?

12        A.    Correct.

13        Q.    And then Brooklyn, Queens, Nassau and

14   Suffolk, correct?

15        A.    Correct.

16        Q.    And am I correct that one of your

17   motivations for testifying here and not implying

18   corruption on the DA's part, by the way, one of your

19   motivations, by the way, is you want Ms. Mattaway as

20   an agent for the Bronx D.A.'s Office to intercede with

21   these other counties D.A. to give you a break?

22        A.    One county, Queens.

23        Q.    And, in fact, my understanding is that, in

24   layman's terms, you already have a deal where you can

25   get one to three years in Brooklyn and Nassau; am I
```

1    correct?

2         A.    One and a half to three, Brooklyn, Nassau,

3    and Suffolk.

4         Q.    Okay.  And Queens is holding out.  Queens

5    wants more time?

6         A.    Yes, sir.

7         Q.    Because Queens doesn't feel they're part of

8    New York City?

9         A.    Exactly.

10        Q.    They want to be the tough borough?

11        A.    Exactly.

12        Q.    Touch of levity.  Forgive me.

13        Having said that, and again with all due respect,

14   but, you've been doing these scams now for about

15   thirteen years; am I correct?

16        A.    Correct.

17        Q.    And I'll go through it quickly.  But back

18   in October of 94 you have a Grand Larceny which was

19   adjudicated in Suffolk County Supreme Court, correct?

20        A.    Correct.

21        Q.    And then in July of 97 you take a forgery

22   rap in Nassau County, correct?

23        A.    Correct.

24        Q.    And then in May of 97 you have a forgery

25   conviction in Suffolk?

1        A.      Correct.

2        Q.      And then in August of 97 you have, in

3    effect, a stolen car conviction in Carmel, New York?

4        A.      Rent-a-car.

5        Q.      Up in Putnam?

6        A.      Lake Carmel.

7        Q.      You travel a lot?

8        A.      Family's all over.

9        Q.      You got a lot of cars to go around in?

10        A.      Quite a few.

11        Q.      Lets move on.

12              October 2000 you got plea of guilty for petit

13    larceny in Queens?

14        A.      Correct.

15        Q.      And then December of 01 you got a petit

16    larceny in New Rochelle?

17        A.      Correct.

18        Q.      And then you got Westchester?

19        A.      Yes, a lot of relatives in Westchester.

20        Q.      Ma-ron.(phonetics)

21              Then August of 01 you got a petit larceny in

22    Putnam?

23        A.      Correct.

24        Q.      You went back to Putnam?

25        A.      Lake Carmel.

1      Q.      Then February of 04 you got an attempted

2   grand larceny in Queens?

3      A.      Correct.

4      Q.      Was that for a hot car, stolen car?

5      A.      Car with a purchase, yes.

6      Q.      Then March of 04 you got a plea of guilty,

7   possession of forged instrument, phony check?

8      A.      Phony check.

9      Q.      That was Nassau?

10     A.      Nassau.

11     Q.      Then February of 04 you got an attempted

12  grand larceny in Nassau?

13     A.      Phony check.

14     Q.      And then you stay -- withdrawn.

15     So then you didn't get caught with your phony

16  checks for two years?

17     A.      I was in jail, that's why.

18     Q.      Oh, so now you got these five, so you're

19  out of jail short time.  You've got five raps now

20  pending in --

21     A.      Four different jurisdictions.

22     Q.      And, again, being a very direct man, you've

23  garnered a living now for at least the past thirteen

24  years being a professional con man, correct?

25     A.      I guess you could surmise that, yes.

1        Q.      I mean fooling and conniving?

2        A.      I have worked in between.

3        Q.      Oh, I'm sure, but fooling and conniving?

4        A.      I wouldn't take a check from you, I mean.

5        Q.      Right.  I wouldn't accept a check from you.

6        A.      Absolutely not.

7        Q.      And without sounding a little too

8    philosophical, you chose this path in spite of the

9    fact that you are the heir to a very very very

10   successful car people on Long Island?

11       A.      I'm -- You know, I got a drug problem and

12   the family kept their distance from me as the problem

13   escalated.  I would admit that.

14       Q.      Again, not playing God.  It's a court of

15   law, In God We Trust, but I say, again, you chose this

16   path in spite of the fact that you would've been the

17   third generation involved with Morrissey General

18   Motors products?

19       A.      Right.

20       Q.      I'll leave you alone now about your

21   background.  About the case at hand, am I correct, and

22   again, not saying it's improper, am I correct that

23   you, while in jail, from time to time, time to time

24   can make friends, get favors, and maybe even make a

25   few dollars by acting in the nature of a legal

1    adviser; is that correct?

2         A.    Not making a few dollars, no, but I can

3    make friends, yes.

4         Q.    Well, about the dollars.  Am I correct that

5    if you do extensive research work for a fellow inmate,

6    the family members of the inmate may make deposits in

7    your commissary as a thank you?

8         A.    That's never happened to me but that's the

9    norm.  It's never happened to me all the time I'm in

10   jail.

11        Q.    Quite candidly, as part of providing

12   services to Mr. Jimenez, did not his wife, Margie,

13   make two different deposits in your commissary

14   account, and not implying you committed a crime?

15        A.    No.

16        Q.    She didn't put in first twenty and then

17   fifteen dollars?

18        A.    No, sir.

19        Q.    Okay, leave that as it may.

20        Am I correct, and it's said politely, you are

21   more intelligent, more book smart than most of the

22   population at the barge; am I correct?

23        A.    I'd like to think so.

24        Q.    Well, that makes you, that's why you have

25   these extra services you can offer; am I correct?

1      A.    It gives me something to do and, you know,

2   if I could help, I could help.

3      Q.    Meaning you are what people in the jails

4   commonly call a jailhouse lawyer; am I correct?

5      A.    It could be characterized.

6      Q.    Like in the Cagney movies, you could give

7   legal advice, do legal research; am I correct?

8      A.    I guess, yeah.

9      Q.    And if not money, you might get an extra

10   sandwich, you might get protection if someone wants to

11   hit you?

12      A.    I have never had that problem but, you

13   know, a candy bar, a phone call.

14      Q.    Now, if it's not disputed, you did provide,

15   whatever term, legal counsel for Mr. Jimenez.  As part

16   of preparing for this legal counsel, you might ask to

17   review whatever legal papers he had?

18      A.    Personally, I make a policy not to.

19      Q.    Why is that?  Withdrawn.

20      Are you telling us that you provide these

21   services, for example, in this case, you were pursuing

22   what we commonly call a speedy trial issue?

23      A.    Well, due process issue in order, if there

24   was sufficient evidence to arrest him eighteen years

25   ago, why arrest him now.

1        Q.    Pretty good.  What we call constitutional

2   speedy trial; is that correct?

3        A.    I guess you could --

4        Q.    As opposed to what the procedural law

5   provides for?

6        A.    Correct.

7        Q.    And you were --

8        Well, you were retained for that purpose in jail,

9   correct?

10       A.    No, I wasn't.

11       Q.    In Mr. Jimenez's case?

12       A.    No.

13              MS. MATTAWAY:  Objection.

14       Q.    You counseled him in that regard?

15              THE COURT:  Overruled.

16       A.    I spoke with him in reference to the case

17   and that was it.  I wasn't retained.  I wasn't paid.

18   I wasn't compensated, if that's what you mean.

19       Q.    I abandon that.  You denied that Margie

20   gave you money?

21       A.    That is correct.

22       Q.    I moved on.  I moved on.  That's okay.

23       But having -- something was said that maybe I

24   elevated you too much.  I get retained.  You do

25   whatever.

1          Did you engage in providing research or legal

2     services for Jimenez?

3          A.     I did research, yes.

4          Q.     And as a preface before you sat down to do

5     your work, you did not review what we commonly call

6     Discovery?

7          A.     No, it was all oral admissions in reference

8     to this case.

9          Q.     You didn't review documents provided either

10    by my offices or documents forwarded by me from the

11    D.A.?

12         A.     No.  I thought he had an Irish attorney.

13         Q.     I'm sorry.

14         A.     I thought he had an Irish attorney.  He

15    mentioned the attorney's name.  I don't --

16         Q.     That's interesting.  So you thought having

17    heard my name -- Were you confused by the fact that my

18    last name sounds Italian and my first name, Patrick,

19    sounds Irish?

20         A.     Yes.

21         Q.     My late father was Paswale.  We will put

22    you at ease.  We have solved that mystery.

23         A.     Okay.

24         Q.     You provided, whatever you want to call it,

25    legal research or document research, you know, for a

1    speedy trial research without ever looking at

2    Discovery?

3         A.    I don't believe at that point in time he

4    had any Discovery to look at.  I never looked at any

5    documents or materials.

6         Q.    That's interesting.  Let me ask you.  You

7    said you believed I was Irish, correct?

8         A.    Correct.

9         Q.    What did you base that on?

10        A.    When he told me who his attorney was.

11        Q.    Did you ever see him carting around his

12   package of Discovery with my firm name "Bruno and

13   Ventura" on it?

14        A.    No.  I didn't notice that.

15

16              (Continue on the next page.)

17

18

19

20

21

22

23

24

25

1        Q.    And you didn't notice him carting around in

2    that a number of letters which were signed and typed

3    Patrick Bruno?  You didn't observe that, right?

4        A.    No.  It was early on.

5        Q.    And since I'm almost done since you never saw

6    his discovery I'll ask you sort of hypothetical.

7        A.    Okay.

8        Q.    All this stuff you're reporting today a

9    Jamaican got killed, that's in the discovery, isn't it

10   sir hypothetically?

11       A.    I can't answer hypothetically because I

12   didn't look at the discovery.

13       Q.    And it was a fight over popcorn that would be

14   referred to in the discovery?

15       A.    I don't know.  I didn't look at that time.

16   I'm going by oral admissions that were made by him.

17   That's it.

18       Q.    And the fact that the press had a ball with

19   this calling it the "Batman" murder, that would be a

20   looney toon to the discovery?

21       A.    I didn't look at the discovery.

22       Q.    You're the jail house lawyer that doesn't

23   look for any background reserve, correct?

24       A.    I thought Rosario material gets handed right

25   before trial.  I didn't know discovery gets -- I

1    thought it was like Federal Court.  It's 3500 material.

2    You get it right before trial.  I had just come in off

3    the street.  I was on vacation in New Jersey and, you

4    know, this was something new to me.  I believe he just

5    had gotten arrested too because we were transferred to

6    Riker's Island after that.

7         Q.   By the way, who is Federal Marshal Craig

8    Michael Cane?

9         A.   It's a U.S. marshall that I'm acquainted

10   with.

11        Q.   Acquainted in what way?

12        A.   He arrested me several times before.

13        Q.   Are you related in any way?

14        A.   No.

15        Q.   Is it common practice to communicate with a

16   U.S. Federal Marshal by his first name Dear Craig?

17        A.   No.  I wouldn't call it common practice, but

18   I've had dealings with Marshal Cane before and I know

19   him to be honest and, you know, diligent so I figured I

20   would get the information to him and he would get it to

21   the proper persons.

22        Q.   Am I correct, did you first get involved in

23   this case meaning you're gonna be a witness against

24   Ricardo Jimenez, you first get involved here by writing

25   a warm personal letter Dear Craig, correct?

Morrissey-People-Cross                    58

1       A.   Correct.

2       Q.   In that letter you outline maybe you could

3  help out what had been a big press case years ago; is

4  that correct?

5       A.   I didn't say a press case.  I remember the

6  contents of the letter.  I said I'd like you to be

7  there if anyone wants to speak to me about it.  I wrote

8  that letter ten months ago and I didn't hear anything

9  until about a month ago and I was surprised.

10       Q.   And you were surprised that the DA wasn't

11  ready for trial until a month ago?

12                MS. MATTAWAY:  Objection.

13                THE COURT:  Sustained.

14       Q.   Am I correct the communication I'm referring

15  to and you're agreeing, you basically tell Craig can

16  you hook me up with the Bronx DA, I could provide

17  information, correct?

18       A.   I said in substance in the letter this is the

19  information I have.  Please get it to the proper

20  authorities and if you need me I'd -- if they need to

21  talk to me, I'd like you to be there.

22       Q.   And you didn't send that letter in the

23  context of being a boyscott.  You sent it hoping to use

24  it as leverage in your case; am I correct?

25       A.   Yeah, sure.

Morrissey-People-Cross                    59

1         Q.   Now, by your own admission and I'm not

2    rubbing it in, you've been in jail off and on over the

3    last past decade?

4         A.   Yes.

5         Q.   Am I safe to assume you've acted as counsel

6    or jail house lawyer on many occasions?

7         A.   A few.

8         Q.   It's your testimony you've never reviewed

9    legal documents in preparing to assist the other

10   inmates?

11                  MS. MATTAWAY:  Objection.

12        A.   Never.

13                  THE COURT:  Overruled.

14        Q.   In fact, you said early on you make it your

15   policy not to.  Why is that?

16        A.   Because after you are released from jail you

17   could be subpoenaed to come in and give testimony at a

18   later date.  And if I didn't review the documents, I

19   can't be questioned about them.  I could just be

20   questioned about what the conversation was with the

21   person that I had the conversation with.

22        Q.   You're saying you could be subpoenaed for

23   having read documents?

24        A.   As a witness against the person and then it

25   gets a little bit muddy if you reviewed 3500 material

Morrissey-People-Cross                      60

1   or you reviewed anything that was court documents.

2   They could say that the information might have been

3   derived from that way.

4        Q.   So with all due respect, you're now giving us

5   double talk?

6        A.   No.

7                  MS. MATTAWAY:   Objection.

8        A.   I'm just trying to explain myself.

9                  THE COURT:   Sustained.   Next question.

10       Q.   You've come across fairly astute at least

11  with a workmen's knowledge of what goes on in a

12  courtroom, okay?

13       A.   Okay.

14       Q.   You're telling us that if you read in Mr.

15  Smith's court documents that the sky was blue that day

16  the day of the shooting, you could walk into court and

17  quote that I once read the sky was blue, that would be

18  blatant hearsay?

19                 MS. MATTAWAY:   I object right there.

20       A.   I don't understand.

21       Q.   Sir, you fully understand.

22                 THE COURT:   Next question.

23       A.   No.   I don't fully understand.   It's based on

24  oral admissions made.   I didn't review any particulars.

25       Q.   By the way, have you cut deals before?

Morrissey-People-Cross                    61

1       A.   Yes.

2       Q.   How many times?

3       A.   Twice.

4       Q.   So this is your third time or your second?

5       A.   Third time and there is no deal to cut.  I

6    didn't sign any proffer.  I didn't sign anything.  A

7    phone call may be made.  That was it.  And they were

8    quite clear on that.

9       Q.   So you're hear testifying hoping to get

10   Queens to join in your plea bargain is the bottom line?

11      A.   I would hope Queens would adjudicate the case

12   the same as the other boroughs, but Queens is very

13   tough and I don't have a good lawyer like you.

14      Q.   Thank you.  I hope you're sincere.

15      A.   I am.

16      Q.   I won't give you my card.  It will be a

17   conflict.  Excuse me one minute, sir.

18                  (Brief pause)

19      Q.   In this letter to the Federal Marshal Craig,

20   am I correct that you ask that he contact a particular

21   Bronx ADA, a Ms. Villa?

22      A.   Right.

23      Q.   Where did you get that from?

24      A.   Your client.

25      Q.   He told you that the ADA on his case was a

Morrissey-People-Cross                    62

1    Ms. Villa?

2         A.   I asked him because part of my practice when

3    I do research on cases, I go get the attorney's

4    digest.

5         Q.   Yes.

6         A.   And it gives the date that the attorney was

7    admitted to the bar, what percentage they came in in

8    their class, how long they been there.

9         I wanted to see that if there was a DA Bureau

10   Chief, how long they been there.  That's it.

11        Q.   Have you since come to realize that Ms.

12   Mattaway has been the personal DA since the date of the

13   arrest?

14        A.   I guess so.  Nobody told me otherwise.

15        Q.   By any chance -- can't be.  By any chance--

16   can't be.

17        You didn't come across the name and Villa

18   while reading the discovery from 1989, that can't be?

19        A.   Absolutely not.

20        Q.   I thought so.  Thank you so much?

21        A.   I didn't even have it.

22        Q.   Thank you so much, sir.  Best of luck in

23   Queens.

24        A.   Thanks.

25                  THE COURT:  Anything further.

1              MS. MATTAWAY:  May I redirect?

2    REDIRECT EXAMINATION

3    BY MS. MATTAWAY:

4        Q.   Mr. Morrissey, you said something like, maybe

5    I misheard you, something like you were at the seaside

6    or you were -- what was that?

7        A.   Well, the last two weeks of August I was in

8    Seaside Heights New Jersey and I came back, I believe

9    it was right before Labor Day because I heard the

10   weather was gonna be a wash out.  Labor day and we had

11   just gotten a new apartment in Guttenberg New Jersey

12   and it needed to be painted, so we came back early.

13   And I got arrested September 6th, so I guess that's

14   probably two days after Labor Day.

15       Q.   And at the time you were arrested you were

16   arrested in New Jersey or New York?

17       A.   Queens.

18       Q.   In Queens?

19       A.   Right.

20       Q.   On or about August 31, 2006, were you even in

21   New York State?

22       A.   No, I was in Jersey, Seaside Heights.

23       Q.   And were you reading the newspapers, the New

24   York papers at that time?

25       A.   No, I was reading the Toms River paper

Morrissey - People - Redirect          64

1    because I was looking to buy a car with another bad

2    certified check down there.

3         Q.   You remember that?

4         A.   Yes.  I wanted to pay for the vacation.

5         Q.   Did you know anything about the arrest of

6    someone for the 1989 "Batman" homicide over Labor Day

7    weekend, 2006?

8              MR. BRUNO:  Objection.  Beyond the scope

9         of cross, your Honor.

10             THE COURT:  Sustained.

11        Q.   Did you know anything from the press about

12   Mr. Jimenez's arrest?

13             MR. BRUNO:  Objection, beyond the

14        scope.

15             THE COURT:  Sustained.

16        Q.   Did you read any newspaper articles?

17        A.   No.

18        Q.   From New York at that time?

19        A.   No.

20             MR. BRUNO:  Objection, beyond the

21        scope.

22             THE COURT:  He's answered it.  Next

23        question.

24        Q.   Did Mr. Jimenez show you any newspaper

25   articles in connection with his case?

Morrissey - People - Redirect          65

1      A.   No.  Ms. Mattaway, I answered this no he

2  didn't.

3      Q.   So he didn't show you anything written?

4      A.   No.

5      Q.   Did he tell you how he knows or how he

6  thought the ADA handling his case was someone named and

7  Villa?

8              MR. BRUNO:  A fact not in evidence, your

9      Honor.

10             THE COURT:  Sustained.

11     Q.   Did he mention to you Anna Villa?

12     A.   Yes.

13             MR. BRUNO:  Fact not in evidence, your

14     Honor.

15             THE COURT:  Overruled.  The answer was

16     yes.  Next question.

17     A.   The answer was yes.

18     Q.   Is that the person you were looking up?

19     A.   I looked it up, but I couldn't find her.

20     Q.   He gave you this name?

21     A.   Right.

22     Q.   And he told you this is a DA?

23     A.   Right.

24     Q.   What did he say to you?  Who did he believe

25  she was?

Morrissey - People - Redirect          66

1      A.    The DA handling his case.

2      Q.    Where did he get that information?

3              MR. BRUNO:   Objection, your Honor.

4              THE COURT:   Sustained.

5      Q.    Did you ever read any newspaper article at

6   all since even August of 2006 about this case?

7      A.    No.

8              MR. BRUNO:   Objection, your Honor, not

9      elicited on cross.

10             THE COURT:   Strike it.   Next question.

11     Q.    Right.   How many times have I met with

12  you?

13     A.    Twice.

14     Q.    And what made you first decide to reach out

15  to Craig?

16     A.    Based on the oral admissions, you know, I

17  felt it was the right thing to do and I wrote this

18  letter ten months ago.   I didn't hear anything until

19  about a month ago.

20     Q.    You were arrested September 6th, correct?

21     A.    Right.

22     Q.    How long after you were arrested did you meet

23  Mr. Jimenez and get handed the razor?

24     A.    About three days afterwards I would say

25  approximately.

Morrissey - People - Redirect          67

1          Q.   And how many conversations into your

2     relationship was it before you wrote the letter?

3          A.   It was when he was moved to Rikers Island and

4     he asked me to call his wife to say that he was moved

5     and he gotta go to the box for some kind of fight or

6     something like that.

7                    MR. BRUNO:  Objection, your Honor.

8                    THE COURT:  Sustained as to that last

9          answer.  Strike it for the record.

10         Q.   Do you recall approximately when the last

11    time you had contact with Mr. Jimenez was?

12         A.   End of September, early October.

13         Q.   Okay.  Between September 6th, 2006, when you

14    were arrested and the end of September when you last

15    ever had contact with him, how many times did you meet

16    with him?

17         A.   I saw him every day on the unit, you know,

18    constantly until he went to the barber shop to go to

19    work.

20         Q.   And was there anything specific about what he

21    was saying, at one point you felt you needed to write

22    this letter?

23                    MR. BRUNO:  Objection, your Honor.

24                    THE COURT:  I'll allow that question.

25         A.   Yeah, when he made reference to the kid that

Morrissey - People - Redirect          68

1    it didn't matter.

2         Q.   Why did that cause you to write this letter?

3              MR. BRUNO:  Objection, beyond the scope

4         of cross, your Honor.

5              THE COURT:  Sustained.

6         Q.   Did Craig respond to you?

7         A.   I responded to my attorney and said that he

8    got the stuff that I sent him to Brooklyn.  I guess

9    it's their policy to give it to the U.S. Marshal

10   service in Brooklyn when something comes into Central

11   Islip and we didn't hear anything back and then they

12   send it back to him and he resubmitted I believe.

13             THE COURT:  I'm striking his entire

14        response except for the portion that relates to

15        the answer to be yes.

16             Next question.

17        Q.   What name, if you remember, did Mr. Jimenez

18   give you was his Irish attorney's name?

19        A.   You know, I'm not really sure, but it sounded

20   Irish.  It could have been Pat.  It could have been

21   Brian.  It sounded Irish.

22        Q.   Okay.  Now, you said something about it was

23   your policy to not look at documents because you could

24   be subpoenaed?

25        A.   Right.  I could be subpoenaed at a later

Morrissey - People - Redirect          69

1    date.

2                    MR. BRUNO:  Objection.

3                    THE COURT:  The answer is yes.  Next

4        question.

5        Q.   That's what you said?

6        A.   Yes.

7        Q.   How do you know this?

8        A.   Because I've been arrested many times and

9    I've been through the federal system, you know, where

10   the rule of law is tantamount.

11                   MR. BRUNO:  Objection.  All irrelevant.

12                   THE COURT:  Sustained.  Strike it.  Next

13       question.

14       Q.   Were you subpoenaed to be here today?

15       A.   No.

16       Q.   Are you hear voluntarily?

17       A.   Voluntarily.

18       Q.   What is 3500 material?

19                   MR. BRUNO:  Objection, your Honor.

20       Totally irrelevant.

21                   THE COURT:  Sustained.  For the purpose

22       of the jury that reference refers to a legal

23       matter not your concern.  It has nothing to do

24       with the facts of this case.

25       Q.   You said that you previously cut deals, that

Morrissey - People - Redirect          70

1    was your words, twice before?

2         A.   I cooperated on two prior cases, yes.

3         Q.   Have you ever testified in Supreme Court in

4    consideration for your testimony?

5         A.   Never.

6         Q.   This is the first time?

7         A.   Yes.

8         Q.   Okay.  And what is the limit, or what is the

9    understanding of what if anything I will do for you in

10   exchange for you testifying?

11                   MR. BRUNO:  Asked and answered.  A

12             strong letter to Queens.

13                   THE COURT:  Overruled.

14        A.   I don't believe I said that.

15                   MR. BRUNO:  I paraphrased.

16                   THE COURT:  You don't get to make

17             comments or ask questions.  You get to listen to

18             the question and answer it directly.

19                   THE WITNESS:  Okay.

20                   THE COURT:  I overruled the objection.

21             Why don't you repeat your question.

22        Q.   Okay.  What do you understand I might do for

23   you in exchange for testifying here today by what you

24   know?

25        A.   Verbatim for my truthful testimony you'd make

Morrissey - People - Redirect          71

1    a phone call and that was it.

2        Q.   And what do you hope the outcome of my phone

3    call will be?

4        A.   That the adjudication will be the same as the

5    other counties from one and a half to three.

6        Q.   Did I make you any promises about how

7    successful that call can be?

8        A.   No.

9                MS. MATTAWAY:  Nothing further.

10               MR. BRUNO:  May I.

11               THE COURT:  Go ahead.

12   RECROSS EXAMINATION

13   BY MR. BRUNO:

14       Q.   Did you not on cross examination when I

15   questioned you indicate in substance that you whatever

16   term, you cut a deal in hopes of helping to reduce your

17   own sentence?

18       A.   Yes.

19       Q.   And am I correct that on redirect meaning

20   when Ms. Mattaway gets up now you have a heart and you

21   were moved to come here because quote that kid didn't

22   matter; is that correct?

23       A.   That's why I wrote the letter.

24       Q.   So in other words, going to the next logical

25   step if I'm correct, Ms. Mattaway said I want you to

Morrissey - People - Redirect          72

1   testify but I won't help in the Queens case, you would

2   have been here today, right?

3        A.   I would have been here either way.

4        Q.   You said you're here voluntarily today.

5   That's kind of a tricky approach meaning you're here

6   today, you wanted to testify to get a benefit, correct?

7        A.   I hoped to get a benefit.

8        Q.   But on the other hand the word voluntarily

9   bothers me.  You were escorted in here by two

10  detectives employed by the DA's office in handcuffs and

11  legcuffs, right?

12       A.   Yes.

13       Q.   You're quasi voluntary.  Your mind was

14  voluntary, your body wasn't.

15                 MS. MATTAWAY:  Objection.

16                 THE COURT:  Sustained.

17       Q.   On these prior two occasions when you quote

18  unquote cooperated, you didn't testify, correct?

19       A.   Correct.

20       Q.   Now, I wasn't there but --  Am I correct you

21  didn't testify because the person heard you were

22  squealing so they copped out and pled guilty?

23       A.   No, the person was caught on tape with marked

24  money with two hundred pounds of marijuana being

25  exchanged number one.  The second case was America's

Morrissey - People - Redirect          73

1   Most Wanted guy.  I got no benefit for that, but he got

2   caught.

3          Q.   So they didn't need you?

4          A.   Probably not.

5          Q.   Admittedly putting an altar boy spin on it,

6   Jimenez is the first one that called you out, tell your

7   story, you don't bother me, correct?

8                    MS. MATTAWAY:  I object.

9                    THE COURT:  Sustained.

10                   MR. BRUNO:  Nothing further.

11                   THE COURT:  Anything further?

12                   MS. MATTAWAY:  Yeah, I did.

13  REDIRECT EXAMINATION

14  BY MS. MATTAWAY:

15         Q.   Mr. Morrissey, you said that you would be

16  here even if you weren't getting anything for your

17  testimony this morning, but are you if you get nothing,

18  are you in any different position than if you didn't

19  testify?

20         A.   Position is the same.  The offer is still the

21  same whether I testify or don't testify.  I don't

22  believe Queens even knows about this.

23                   MS. MATTAWAY:  Okay.  I have nothing

24        further.

25                   MR. BRUNO:  May I?

Morrissey - People - Redirect          74

1              THE COURT:  Yes.

2        Q.    You tell me there is no difference what offer

3    is on the table right now in Queens two to six, three

4    to nine?

5        A.    Three and a half to seven.

6        Q.    That's not a difference though?

7        A.    It's gonna be that's the offer right now.

8    They don't even know about this.

9        Q.    In other words, if this works out, you'll be

10   out very soon on time served.  If it doesn't work out

11   you're stuck in two and a half years more?

12       A.    Right.

13       Q.    You're a practical man.  That's no

14   difference.  You'll do it standing on your head.

15              MS. MATTAWAY:  Objection.

16              THE COURT:  Sustained.  Do not answer

17       that question.  Anything further?

18              MS. MATTAWAY:  No sir.  Thank you.

19       Thank you.

20              THE COURT:  We're gonna break for lunch

21       now.  I want to remind you there was a reference

22       to the words truthful, whether any testimony or

23       any evidence is credible or not credible, truthful

24       or not truthful is a determination for the jury

25       and only the jury should make.  No one else.

Morrissey -People-Recross            75

1           Return to this courtroom.  It's a little
2      after 1.  I apologize.  Return to this courtroom
3      at 2:20.  Do not discuss the case among
4      yourselves.
5           Do not allow anyone to discuss the case with
6      you.  Keep an open mind.  Enjoy your lunch.  I'll
7      see you back here at 2:20.
8                (Whereupon, a luncheon recess is taken)
9  AFTERNOON SESSION
10               THE COURT CLERK:  Case on trial
11     continues.  People of the State of New York
12     against Jimenez.
13               THE COURT:  Anything I need to address
14     before we proceed?  Bring the jury out.
15               (Jurors enter)
16               THE COURT CLERK:  Jurors are present and
17     properly seated.
18               THE COURT:  Good afternoon.  I hope you
19     all have a good lunch.  Now, proceed.  You may
20     call your next witness.
21               MS. MATTAWAY:  Thank you.  The People
22     call Detective Victoria Burton.
23  DETECTIVE, VICTORIA BURTON, a witness called on behalf
24     of the People of the State of New York, is duly
25     sworn and testifies as follows:

Morrissey -People-Recross                76

1          COURT OFFICER:  Give your first and last

2     name.  Spell your last name, your shield number,

3     and command.

4          THE WITNESS:  Victoria Burton

5     B-U-R-T-O-N, shield 667, Crime Scene Unit.

6          THE COURT:  Good afternoon.

7          THE WITNESS:  Hello.

8          THE COURT:  You may inquire.

9          MS. MATTAWAY:  Thank you.

10   DIRECT EXAMINATION

11   BY MS. MATTAWAY:

12        Q.   Good afternoon, Detective.

13        A.   Good afternoon.

14        Q.   How long have you been a member of the New

15   York City Police Department?

16        A.   For 16 and a half years.

17        Q.   And what is your present assignment?

18        A.   I am a detective in the crime scene unit.

19        Q.   How long have you been doing that?

20        A.   For 13 years.

21        Q.   What are your duties as a detective in the

22   crime scene unit?

23        A.   As a detective in the crime scene unit, I

24   respond to the scenes of all homicides, all felonious

25   assaults, where the victim is so seriously injured that

Det. Burton - People - Direct       77

1    they are likely to die.  All department of

2    investigations, that's a job where police officer is

3    involved and any other crime where members of the crime

4    scene unit expertise may aid a detective in a precinct.

5         Q.    What did you do prior to joining the Crime

6    Scene Unit?

7         A.    I was on patrol in the 112th Precinct.

8         Q.    Now, regarding your duties in the Crime Scene

9    Unit, what does a Crime Scene Unit detective do when

10   she responds to a homicide scene?

11        A.    When we respond to any crime scene we search

12   for evidence.  When that evidence is found it's

13   collected.  We record the evidence that is found and

14   identifying mark is put on that evidence so it could

15   later be identified in court and we record the scene by

16   means of photography and notes and also a sketch and we

17   also package evidence.

18        Q.    Okay.  When were you notified to come testify

19   here for trial today?

20        A.    I believe it was yesterday.

21        Q.    And are you familiar with the case that

22   you're testifying about?

23        A.    Only because I looked at the notes.

24        Q.    All right.  Do you know the dates of the

25   incident that you're testifying about today?

Det. Burton - People - Direct        78

1      A.    Yes.

2      Q.    What date was it?

3      A.    July 3, 1989.

4      Q.    Were you the crime scene unit, Detective,

5  assigned to this case on July 3, 1989?

6      A.    No.

7      Q.    Do you know who that detective was?

8      A.    Detective Goodwin and Detective Honeyman.

9      Q.    Where, if you know, are Detective Goodwin and

10  Detective Honeyman now?

11      A.    They've both retired.

12      Q.    Okay.  Is it part of your duties as a present

13  member of the crime scene unit to interpret the crime

14  scene unit reports of retired detectives and testify

15  about them?

16      A.    Yes.

17      Q.    Have you done that before?

18      A.    Yes.

19      Q.    Okay.  Have you brought with you to court

20  today a copy of the original 1989 crime scene unit

21  report that relates to this incident?

22      A.    Yes, I have.

23      Q.    Okay.  And can you tell us based on your

24  reading of the report what did Detective Goodwin and

25  Honeyman do on July 3rd, 1989 in connection with this

Det. Burton - People - Direct         79

1    case?

2         A.    Okay.   Detective Goodwin and Honeyman

3    responded to the scene.   They took photographs of the

4    scene.   They also recovered evidence, ballistic's

5    evidence which would be firearms and anything related

6    to firearms and they did a sketch of the scene.

7         Q.    Do you have in your crime scene report a note

8    as to what time they got to the scene on July 3rd,

9    1989?

10        A.    They responded at 1:05 in the morning.

11        Q.    And where exactly did they respond to?

12        A.    May I refer to the notes?

13              THE COURT:   You may refresh your

14        recollection.

15        A.    They responded to the Whitestone movie

16   theater at 2505 Bruckner Boulevard.

17        Q.    You said something about a sketch.   Do you

18   have the sketch with you that the crime scene

19   detectives made on July 3rd, 1989?

20        A.    Yes, I do.

21        Q.    Did you also get a chance to take a look at

22   the photographs that were taken in 1989?

23        A.    Yes.

24        Q.    Okay.   What can you tell us about the

25   photographs that were taken?

Det. Burton - People - Direct      80

1    A.   The photographs were views of the movie

2   theater.   There were thirteen photographs taken, but

3   five photographs were able to be sent to you because

4   there was a camera malfunction.   So there were five

5   photographs of the movie theater.

6              MS. MATTAWAY:   Okay.   At this time I'd

7         like to have these documents or these items marked

8         as People's 1A through E.

9              (Whereupon, four documents are marked as

10        People's 1a through 1d for identification by the

11        reporter)

12             COURT OFFICER:   People's 1A through E

13        marked for identification.

14             MS. MATTAWAY:   Please show them to the

15        witness.

16    Q.   Detective Burton, please take a look at

17   People's 1A through D.   Do you know what they are?

18    A.   Yes.

19    Q.   What are they?

20    A.   These are the photographs that Detective

21   Goodwin took of the scene at 2505 Bruckner.

22    Q.   How do you know that what you're holding in

23   court as People's 1A through E are the photographs

24   taken back on July 3, 1989?

25    A.   On the rear of the photograph is the sticker

Det. Burton - People - Direct       81

1    and we still use the same sticker with the exception

2    it's now a different color that we use to document our

3    photographs in our units.

4                    MS. MATTAWAY:  I offer them as People's

5         1A through E.

6                    THE COURT:  Show them to counsel.

7                    MS. MATTAWAY:  One moment please.  I

8         apologize.  This is E.

9                    MR. BRUNO:  I guess for a moment.  I'm

10        sorry.

11                    Can we approach, your Honor.

12                    THE COURT:  Step up.

13                    (Whereupon, a discussion is held off the

14        record between the court and all counsel)

15

16

17

18

19

20

21

22

23

24

25

1           MR. BRUNO:  Your Honor, at this time I

2      have no objection to photographs which are currently

3      labelled 1-A through D inclusive.

4           THE COURT:  People's 1-A through D will be

5      in evidence.  Mark it, please.

6           (Whereupon, People's Exhibit Numbers

7      1-A through 1-D, photographs, were received in

8      evidence and marked.)

9           THE COURT OFFICER:  1-A through D marked

10      in evidence.

11           THE COURT:  Members of the jury, what the

12      witness identified, the photographs, she only

13      identified A through D.  We haven't dealt with the

14      other photographs at this time.

15           You may ask the next question.

16           MS. MATTAWAY:  Yes.

17      Q.    Can you please tell us what evidence, if any,

18  was noted as recovered or observed by the Crime Scene Unit

19  detectives on July 3, 1989?

20      A.    Yes.  Detective Goodman recovered and noted a

21  discharged shell, a lead bullet, a firearm and four --

22  excuse me -- three cartridges and an additional discharged

23  shell.

24      Q.    Are the locations of any of these items of

25  evidence noted on the Crime Scene Unit report?

cm/d Det. Burton - for People - Direct

1          A.    Yes.  One of the discharged shells was
2    recovered on the right side of the theater 16 rows down,
3    and one lead bullet was recovered on the left side of the
4    theater four rows down.
5          Q.    Is a location of recovery noted for any other
6    items of evidence?
7          A.    No.
8          Q.    Okay.
9                Now, again, drawing your attention back to
10   People's 1-A through D which are now in evidence, do you
11   still have those?
12         A.    Yes.
13         Q.    Can you please tell them what Detective Goodwin
14   noted they represented?
15         A.    Yes.
16         Q.    And please tell us which item refers to what
17   you're talking about.
18         A.    Item 1-C is a photograph, a view from the
19   entrance towards hall entrance number 2.
20               People's Exhibit 1-D is a photograph view from
21   the entrance towards hall entrance 1.
22               Exhibit 1-A is a photograph view from rear
23   towards front showing deceased.
24               Exhibit 1-B is a photograph, a view from front
25   towards rear showing deceased.

cm/d Det. Burton - for People - Direct

1    Q.    Okay.  Now, back to the gun and ballistics

2    evidence for a moment, please.

3              Did the Crime Scene detective note if he

4    received any evidence from anyone else from the police

5    force?

6    A.    Yes.

7    Q.    What is it that was noted?

8    A.    He noted that he recovered the firearm and the

9    ballistic items from inside of the firearm which were three

10   cartridges and discharged shell were recovered by an

11   off-duty member of the service, Police Officer Velazquez.

12   Q.    Okay.  Have you had training and experience in

13   ballistics and firearms?

14   A.    A limited amount, yes.

15   Q.    Okay.  Are you able to tell us what a shell

16   casing is, what a cartridge is?  Can you explain that to us

17   based on what was found by the Crime Scene detectives?

18   A.    Yes.

19   Q.    Okay.

20   A.    When people look at a bullet, they see one

21   whole piece.  It is one piece as a bullet, but it needs to

22   be thought of as two separate pieces.  You have a

23   discharged shell; and sitting on top and inside of the

24   discharged shell, you have the actual projectile which is

25   known as the bullet.

1            So when a trigger is pulled and it sets the

2    explosion into motion where you're going to fire this

3    ballistic item, the projectile leaves the firearm through

4    the muzzle and it goes on to its intended target, and the

5    discharged shell actually stays in the vicinity of the

6    shooter.

7            So, this is a revolver; it stays in the

8    cylinder.  And for an automatic firearm and a

9    semiautomatic, it ejects out of the gun, but it stays in

10   the vicinity of the shooter.

11       Q.    Okay.

12            So, can you again then now address your

13   knowledge towards what was recovered and tell us what

14   pieces of a bullet or what was recovered now that we know

15   what it is?

16       A.    Okay.  One discharged shell, .45 caliber

17   automatic Winchester brand center fire discharged shell was

18   recovered on the right side of the theater 16 rows down.

19   One lead bullet was recovered on the left side of the

20   theater four rows down.  One firearm was recovered, and

21   inside of that firearm was three cartridges and one

22   discharged shell.

23       Q.    What is a cartridge?

24       A.    A cartridge is the actual -- the whole bullet,

25   the projectile and the discharged shell together.

1       Q.      Those cartridges that were in the gun, do you

2   have any indication whether or not they could work or they

3   had been used?  Can you tell from this?

4       A.      Not from this report.

5       Q.      Okay.

6       A.      No.

7       Q.      All right.  I would like to address your

8   attention to the second page of the Crime Scene Unit

9   report.

10          Did Detective Goodwin indicate anything about

11  the deceased's condition or appearance?

12      A.      Yes.  He indicated that the deceased had a

13  bullet wound to the head, the front of the head.

14      Q.      Okay.  And was there anything about the

15  deceased's clothing noted?

16      A.      Yes.  He notes he was wearing white shorts, a

17  shirt and sneakers.

18      Q.      And, finally, directing your attention to the

19  last page of the Crime Scene Unit report, are you able to

20  tell us what that is?

21      A.      This is a sketch of the interior of the theater

22  where he depicts the center rows and the aisles on both

23  sides of the center rows and the left rows and the right

24  rows and also where the screen would be, and he also notes

25  that the sketch is not to scale.

1          Q.    At this time I ask you if you can remove the

2     final page from your crime scene report, and I offer that

3     as People's 2.

4                    THE COURT:  Show it to counsel.

5                    MR. BRUNO:  If it please the Court, I have

6           reviewed that document.  I have no objection to its

7           receipt directly in evidence.

8                    THE COURT:  This will be People's 2 in

9           evidence.

10                   (Whereupon, People's Exhibit Number

11          2, final page of Crime Scene Unit report, was

12          received in evidence and marked.)

13                   MS. MATTAWAY:  Thank you.  Nothing

14          further.

15                   MR. BRUNO:  May I proceed?

16                   THE COURT:  You may inquire.

17    CROSS-EXAMINATION

18    BY MR. BRUNO:

19          Q.    Good afternoon, Detective.

20          A.    Hello.

21          Q.    Let me just ask you for a little more

22    information about the ballistics evidence that was

23    recovered.  Okay?

24                 You've given us some decent outline about a

25    cartridge or a round.  Am I correct the word "round" can be

1  used interchangeably?

2          A.    Not really.  It's not really accurate.

3          Q.    All right.

4                So, the cartridge, I'm sorry to belabor it, the

5   cartridge, for example, would be the entire item that one

6   would buy in the gun store to then use in the gun?

7          A.    Correct.

8          Q.    And this cartridge would consist of a metal --

9   one moment, please -- would include a metal shell which is

10  sometimes a silver color, sometimes a gold color, correct?

11         A.    Correct.

12         Q.    So, it would include the shell.  At the back of

13  the shell would be like the firing cap.  It looks like a

14  little, shiny circle, correct?

15         A.    Primer.

16         Q.    And then at the front of the shell, of course

17  forced in at the factory, what is more properly called the

18  bullet?

19         A.    Correct.

20         Q.    Now, with reference to bullets, meaning the

21  projectile that is forced out of the gun when it's fired,

22  with reference to bullets, am I correct that a revolver,

23  amongst others, can properly use a lead bullet?

24         A.    Yes, it can.

25         Q.    And, again, because it's a fine point, meaning

cm/d Det. Burton - for People - Cross

1    a lead bullet within further covering, correct?

2          A.    Yes, that's correct.

3          Q.    And, of course, as another option for a

4    revolver, the bullets then may be jacketed or may not be

5    jacketed, correct?

6          A.    Correct.

7          Q.    And I'll get back to that.

8                With reference to automatic or semiautomatic,

9    am I correct that the cartridge would have the same

10   components?

11         A.    Correct.

12         Q.    Shell, bullet, primer; correct?

13         A.    Yes.

14         Q.    However, am I correct that but for rare

15   exceptions, in a semiautomatic handgun the bullet would

16   have a jacket?

17         A.    You would have to speak to a ballistics expert.

18   I can only speak of in my experience.

19         Q.    Well, on direct you indicated that you had some

20   working knowledge of ballistics; am I correct?

21         A.    I said limited.

22         Q.    Limited, okay.

23               Let me approach it this way:  Am I correct that

24   early on in your career the authorized weapon, the weapon

25   you would have carried at least on duty, would have been a

1     revolver?

2          A.    That's correct.

3          Q.    That was the classic policeman's gun.  You had

4     the cylinder, correct?

5          A.    Correct.

6          Q.    And the cylinder was that round item you saw

7     like projecting from the side of the gun with generally six

8     holes for six rounds, correct?

9          A.    Yes.

10         Q.    And then in recent years the police department

11    transferred or, forgive me, converted to carrying a 9

12    millimeter semiautomatic weapon; is that correct?

13         A.    Yes.

14         Q.    Now, am I correct that back when you carried

15    your service revolver, it would have been a .38 Special,

16    correct?

17         A.    Yes.

18         Q.    Back when you carried your .38 Special, the

19    authorized round was a cartridge with a lead bullet, am I

20    correct?

21         A.    Yes.

22         Q.    Am I correct that now that you carry a 9

23    millimeter semiautomatic, you must use jacketed rounds; am

24    I correct?

25         A.    Yes.

1        Q.    And for the jury's edification, am I correct

2    that the reference to the jacket is that you could modify

3    it, the head of the bullet, over the head is still another

4    thick layer of generally brass or copper; am I correct?

5        A.    Generally, yes.

6        Q.    And am I correct that the reason that it's

7    required to have a jacketed round in a semiautomatic is to

8    avoid jamming or clogging; am I correct?

9        A.    No.  Actually, the copper jacketing gives

10    rigidity to the lead because the lead is very soft.

11        Q.    That's correct.  I skipped a step.  Thank you.

12        Am I correct that as part of the function of

13    firing a semiautomatic handgun, the slide slides back,

14    pushes a round into place and it's then fired; am I

15    correct?

16        A.    Yes.

17        Q.    Am I correct that during the process of firing,

18    great heat is generated?

19        A.    Correct.

20        Q.    Am I correct that because of the great heat

21    that's generated, but for the copper or brass jacket, the

22    lead would actually get soft to a point of not melting but

23    would get soft enough that it could jam the slide and

24    prohibit the proper firing of the firearm?

25              MS. MATTAWAY:  I object.

1                    THE COURT:  Overruled.

2                    If she knows, she can answer.

3         Q.    Am I correct?

4         A.    You would have to check with a ballistics

5    expert.  I don't know.

6         Q.    Having the limited background you just gave us,

7    am I correct that the .45 caliber automatic shell that was

8    found would have probably been ejected from a .45 automatic

9    handgun?

10        A.    Not necessarily.

11        Q.    Okay.

12                   Am I correct this would have been fired from

13   some weapon that could accommodate .45 caliber automatic

14   rounds?

15        A.    That's correct.

16        Q.    And for the jury's edification, for example,

17   the legendary Thompson submachine gun fired .45 caliber

18   semiautomatic rounds; am I correct?

19                   MS. MATTAWAY:  Objection.

20                   THE COURT:  If she knows, she can answer.

21        A.    I don't know.

22        Q.    You don't know.  Okay.

23                   In any event, moving on to Item 2, the lead

24   bullet that was recovered from the left side of the

25   theater, would it not be quite likely or you're a little

1    sketchy on that, the lead bullet that's recovered, is it

2    not -- you pick a word -- correct me in case -- quite

3    likely that it was not fired from a semiautomatic --

4                   MS. MATTAWAY:  I object.

5         Q.    -- because of the lack of a jacket?

6                   THE COURT:  Can I hear the question again?

7         Q.    Item number 2 is a lead bullet recovered from

8    the left side of the theater.  Hearing that it's a lead

9    bullet, is it not now quite likely -- and you could modify

10   that word "quite likely" -- that that round, that bullet,

11   did not come from a semiautomatic weapon?

12                  THE COURT:  Objection overruled.

13                  If she knows, she can answer.

14        A.    Can you repeat it again, please?

15        Q.    Item number 2 that's recovered and noted is a

16   lead bullet recovered from the left side of the theater?

17        A.    Right.

18        Q.    Is it not most likely that that lead bullet was

19   not fired from a semiautomatic gun because of the lack of a

20   jacket?

21        A.    That is not a true statement.

22        Q.    Why is it not?  Tell me.

23        A.    It's not a true statement because a lot of

24   times the copper jacketing will separate from the bullet

25   and they are not near each other.

1      Q.    You weren't there, but during the search of the

2   premises by Officers Goodwin and Honeyman, was a separated

3   copper jacket recovered?

4      A.    There is no indication of one.

5      Q.    Thank you.

6            Now, with reference to the third item, the

7   third item recovered is a Smith and Wesson four-inch barrel

8   .38 Special revolver; is that correct?

9      A.    Yes.

10      Q.    Am I correct that within that revolver as

11   recovered would have been the following:  One .38 Special

12   round with a lead bullet, as it were; is that correct?

13      A.    Yes.

14      Q.    Then there was another lead semi-wadcutter

15   bullet -- withdrawn.

16            There is another round, meaning unfired, with a

17   lead semi-wadcutter bullet; is that correct?

18      A.    Yes.

19      Q.    Again, for the jury's edification, am I correct

20   that a semi-wadcutter is a flat-nosed bullet as opposed to

21   a round-nosed bullet?

22      A.    Yes.

23      Q.    Now, the third round recovered in that revolver

24   is another .38 Special semi-wadcutter round or cartridge,

25   meaning unfired?

1          A.    Yes.

2          Q.    So, there are three unfired rounds in that .38

3    Special?

4          A.    Correct.

5          Q.    One round nose, two flat nose in layman's

6    terms, correct?

7          A.    Correct.

8          Q.    Now, the fourth item found in that .38 Special

9    is a .38 Special discharged shell; am I correct?

10         A.    Yes.

11         Q.    So that would be an indication that at some

12   point a round was fired from that gun and the bullet

13   discharged, correct?

14         A.    No.  It just means there is a discharged shell

15   in the firearm.  It doesn't mean it was fired.

16         Q.    All right.

17               Now, not saying or implying that everyone would

18   have the same level of maintenance and concern as a police

19   officer, but am I correct that you would not leave a

20   discharged shell in your gun?  You would reload?

21               MS. MATTAWAY:  I object.

22               THE COURT:  Sustained.

23         Q.    What is your practice?  Would you be walking

24   around with a discharged shell in your weapon?

25               MS. MATTAWAY:  I object.

1            THE COURT:  Sustained.

2        Q.   Am I correct that it was further noted that

3   there was evidence of discharge in all six chambers; am I

4   correct?

5        A.   Yes.

6        Q.   Although you cannot say with any certainty nor

7   can I ask you nor can I phrase it as a question of

8   certainty, would not one logical conclusion be that Item

9   Number 2, the left bullet, would have been discharged from

10  the discharged shell in the .38 Special?

11            MS. MATTAWAY:  I object.

12            THE COURT:  Sustained.

13       Q.   All right.  Let's take it even more basically.

14            Am I correct that one of the -- the last listed

15  item that's in the recovered .38 Special is, in layman's

16  terms, an empty shell?

17       A.   Correct.

18       Q.   Meaning a shell lacking a bullet?

19       A.   Correct.

20       Q.   It says "discharged," so that would also imply

21  that the primer had been utilized; is that correct?

22       A.   Yes.

23       Q.   By the way, when the primer is utilized, you

24  see a dent in it?

25       A.   Yes.

1        Q.    The dent is caused by the firing pin?

2        A.    Yes.

3        Q.    Now, we have a discharged shell that had been

4    struck by a firing pin in Item 4, and in Item 2 we have a

5    lead bullet that was fired from something, correct?

6        A.    That's correct.

7        Q.    Would it not be one logical possibility that

8    the recovered lead bullet could have been discharged from

9    that discharged .38 Special shell?

10            MS. MATTAWAY:  I object.

11            THE COURT:  Sustained.

12       Q.    Now, finally -- withdrawn.

13            Finally, there is at least circumstantial

14   indication, I won't say evidence, circumstantial indication

15   that present in that theater that day -- well, withdrawn.

16            There is actual evidence that present in that

17   theater that day was a .38 Special revolver loaded with at

18   least three live rounds, correct?

19       A.    That's correct.

20       Q.    And there probably was present some other

21   weapon that could have discharged a .45 caliber shell?

22       A.    No, that's not a fair statement.

23       Q.    I see where you're going.

24            In other words, someone may have come to the

25   theater and dropped an empty .45 caliber shell on the

1      floor?

2              A.    It's possible.

3              Q.    I see.

4                    Ma'am, I mean no disrespect, but just go over

5      the testimony in your head, direct and cross.  Is it not a

6      fair statement that you were just a sufficient enough

7      ballistics expert to satisfy the A.D.A., but you just ran

8      short on my key points?  Is that a fair statement?

9                    MS. MATTAWAY:  I object.

10                   THE COURT:  Sustained.

11             Q.    Again, when you carried a .38 Special early in

12     your career, you had lead bullets, no jacket, correct?

13             A.    Actually, it did have a jacket.  It didn't have

14     a copper jacket.  It had Nyclad coating, so it wasn't just

15     a lead bullet.

16             Q.    A coating?

17             A.    Right.

18             Q.    Is not the coating there to avoid spraying,

19     meaning less chance of ricocheting and hitting citizens by

20     a police officer?

21             A.    In a .38?

22             Q.    .38 Special.

23             A.    I don't know.

24             Q.    You don't know.  See, just short.  Just short.

25                   THE COURT:  Sustained.

1              MS. MATTAWAY:  I object.

2        Q.    You carry a 9 millimeter Glock?

3        A.    Yes.

4        Q.    Am I correct in your 9 millimeter Glock which

5   is now the authorized weapon you do have a jacketed round;

6   am I correct?

7              MS. MATTAWAY:  I object.

8              THE COURT:  Overruled.  You can answer.

9        Q.    Don't say you don't know.

10       A.    I'm not.  I'm going to answer.

11       Q.    Please do.

12       A.    Yes, it does have a copper jacketing.

13             MR. BRUNO:  Thanks so much.  Nothing

14       further.

15             THE COURT:  Anything further?

16             MS. MATTAWAY:  Yes.  I have a brief

17       redirect.

18   REDIRECT EXAMINATION

19   BY MS. MATTAWAY:

20       Q.    Detective Burton, with respect to defense

21   counsel's question to you about the note by Detective

22   Goodwin in the report that there was evidence of discharge

23   present in all chambers, do you have any note as to when

24   those rounds were discharged that put the evidence in the

25   chambers?

1      A.    No.

2      Q.    Are you able to tell us if the three unfired

3  rounds that were found in the gun, I mean could they leave

4  discharge?

5      A.    Just by being in the firearm?

6      Q.    Right.

7      A.    No.

8      Q.    Okay.

9            Is there any way, if you know, how to tell how

10  long ago or how far before in time a round was fired in

11  order to have evidence of discharge present?

12      A.    No.

13            MS. MATTAWAY:  Nothing further.

14  RECROSS-EXAMINATION

15  BY MR. BRUNO:

16      Q.    Incidentally, now that you have testified, the

17  .38 Special ends up being recovered by an off-duty cop who

18  was a patron of the theater; am I correct?

19            MS. MATTAWAY:  Objection.

20            THE COURT:  Overruled.

21            You can answer that, if you know.

22      A.    Yes.

23      Q.    You, of course, have no indication from where

24  it's recovered?

25      A.    Not in Detective Goodwin's notes, no.

cm/d Det. Burton - for People - Recross

1        Q.    Have you any personnel knowledge?

2        A.    No.

3                    MR. BRUNO:  Thank you.

4                    MS. MATTAWAY:  Nothing further.

5                    THE COURT:  You may step down.  Thank you,

6        Detective.  Have a good day.

7                    THE WITNESS:  Thank you.

8                    (Whereupon, the witness was excused.)

9                    THE COURT:  You may call your next

10       witness.

11                   MS. MATTAWAY:  The People call Mike

12       Centeno.

13                   THE COURT OFFICER:  Raise your right hand,

14       left hand on the Bible, face that gentleman over

15       there.

16                   THE COURT CLERK:  Do you solemnly swear

17       the evidence you give to this court and jury will be

18       the truth, the whole truth and nothing but the truth,

19       so help you God?

20                   THE WITNESS:  Yes, I do.

21                   THE COURT OFFICER:  Have a seat.  Please

22       give your first and last name, spell your last name

23       and the county you reside in.

24                   THE WITNESS:  My name is Mike Centeno,

25       C-E-N-T-E-N-O, and I live in Middlesex County, New

cm/d Mike Centeno - for People - Direct

1           Jersey.

2                       THE COURT:  Good afternoon.  You may

3           inquire.

4                       MS. MATTAWAY:  Thank you.

5     M I K E    C E N T E N O, resident of Middlesex County, New

6           Jersey, having been first duly sworn, testified as

7           follows:

8     DIRECT EXAMINATION

9     BY MS. MATTAWAY:

10          Q.    Good afternoon, Mr. Centeno.

11          A.    Good afternoon.

12          Q.    I'm going to stand back here, and I hope that I

13    can hear you from back here.  Please keep your voice up.

14    Okay?

15          A.    Yes.

16          Q.    Speak into the microphone.

17                How old are you, sir?

18          A.    Forty-four.

19          Q.    I would like to direct your attention to July

20    3, 1989.

21                How old were you back then, about?

22          A.    Early twenties.

23          Q.    Okay.  And do you recall if you were working

24    back then?

25          A.    Yes, I was.

cm/d Mike Centeno - for People - Direct

1      Q.    And what was your job back then?

2      A.    My part-time job or my regular job?

3      Q.    Did you have two jobs?

4      A.    Yes, I did.

5      Q.    Tell us what you did.

6      A.    I worked for Prudential Securities at the time,

7   a brokerage firm on Wall Street.

8      Q.    Was that your full-time job?

9      A.    That was my full-time job.

10     Q.    And what was your part-time job?

11     A.    I was moonlighting as a security guard at the

12   movie theater.

13     Q.    Which movie theater?

14     A.    Whitestone Cinemas in the Bronx.

15     Q.    What were your duties as a part-time security

16   guard at the Whitestone Cinemas?

17     A.    I would stand guard by the ticket booth.  We

18   would make sure that if any guys got rowdy, we would break

19   it up, patrol the theaters, make sure no one is sneaking in

20   through the back doors, that type of stuff.

21     Q.    How many security guards were on duty at that

22   time?

23     A.    I believe about eight or ten.  I'm not sure,

24   about ten.

25     Q.    Were the security guards at the Whitestone

1    theater armed at that time?

2         A.    Yes.   There were eight armed and two unarmed

3    security guards, me being one of the unarmed security

4    guards.

5         Q.    And did you have any kind of uniform or

6    something you wore?

7         A.    Yeah.   We wore gray slacks, blue Blazer and a

8    security guard pin.

9         Q.    Apart from the weapon -- you were one of the

10   unarmed ones?

11        A.    Yes, I was.

12        Q.    Apart from the weapon, what other equipment, if

13   any, did you have?

14        A.    We had a pair of handcuffs and that was it.   We

15   didn't have anything.   That was it.

16        Q.    Do you recall if you had any radios?

17        A.    Oh, I'm sorry.   Yes, we had the walkie-talkies.

18        Q.    And did you have a specific area of the theater

19   you were supposed to patrol or anything like that?

20        A.    That night I was assigned to the ticket booth

21   in the front.

22        Q.    Is there a reason why you were assigned to the

23   ticket booth in the front?

24        A.    No reason.   I was the rookie, so they always

25   put us at the ticket booths in the front to make sure

1    nobody is skipping on line and there is no hassles, the

2    clerks aren't given any hassles, anybody screaming or

3    cursing and that type of stuff at them.

4         Q.    And you say this booth was in the front?

5         A.    Yeah, to the right.  When you walked into the

6    theater, it was immediately to the left when you walked in

7    of the front doors.

8         Q.    Immediately to the left of the front doors?

9         A.    Right.  You walked in and the ticket booth was

10   to the left.

11        Q.    Are you able to tell us, if you remember, where

12   the concession stand was in relation to where the ticket

13   booth was?

14        A.    The concession stand was right in the middle of

15   the lobby.  I mean, you walked in and the concession stand

16   was like 30 feet in and took up a good part of the lobby.

17        Q.    And then can you tell us what lay ahead of you

18   beyond the concession stand if you were to walk into the

19   Whitestone Cinemas?

20        A.    There were theaters right behind the concession

21   stands.

22        Q.    How many theaters?  Do you remember?

23        A.    It should be two.  I believe it was Theaters 5

24   and 6.  Yeah.

25        Q.    Do you remember which theater was to which

cm/d Mike Centeno - for People - Direct

1   direction?

2         A.     5 was to the left when you walked in; 6 was to

3   the right when you walked in of the concession stand.

4         Q.     And how many theaters in all?

5         A.     I want to say ten or, I believe, twelve

6   theaters, I believe.

7         Q.     All right.  I'm sorry.  What?

8         A.     Ten or twelve.

9         Q.     Are you able to tell us, if you remember, where

10  Theater 1 was?

11        A.     Yes.  Theater 1 was, you walked into the front,

12  you went past the concession stand to the left all the way

13  down the corridor, at the end of the corridor.  It was one

14  of the big theaters.

15                    (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1          Q.    When you say big, what do you mean?

2          A.    Well, it sat over two hundred fifty people.

3    It had three sets of rows of seats in it.

4          Q.    Do you remember what movie was playing in

5    Theater One on July 3, 1989?

6          A.    Batman premiered just came out that week.

7          Q.    Okay.  One moment please.

8                    MS. MATTAWAY:  I would like to have

9              this item marked People's A through D.

10                   (Whereupon, the court reporter marks

11                People's Exhibit numbers 3A through 3D for

12                identification, as directed by the Court.)

13         Q.    Mr. Centeno, can you look at what's been

14   marked as People's 3A through D.  Do you recognize

15   what's in those photos?

16         A.    Yeah, the movie theater, the concession

17   stand, the front doors, a door to one of the movie

18   theaters and the corridor leading to Theater One.

19         Q.    And is the way the photos appear here in

20   court today a fair and accurate representation of the

21   way the area around the concession stand and the

22   hallway to the Theater One and the entrance look like?

23         A.    Yes, very much.

24                   MS. MATTAWAY:  I offer it as People's A

25             through D.

1          THE COURT:  Show it to counsel.

2          MR. BRUNO:  May I voir dire?

3          THE COURT:  Go right ahead.

4   VOIR DIRE EXAMINATION

5   BY MR. BRUNO:

6        Q.    Mr. Centeno, you told us that these

7   pictures basically depict the layout of the theater?

8        A.    Correct.

9        Q.    Or major parts of it?

10       A.    The concession stand, the movie theater,

11  the corridor leading to theaters one through five and

12  the front doors.

13       Q.    My question is in terms of decor and so

14  forth?

15       A.    Yes.

16       Q.    The only difference from 89 would be

17  carpeting, painting?

18       A.    Yeah, I'm looking at overall set up of the

19  theater, nothing's changed.

20       Q.    So, in other words, the physical layout is

21  the same.  They may have re-decorated a few times?

22       A.    They might of.  I don't remember the carpet

23  on the floor 18 years ago.

24       Q.    Have you been there in recent history, when

25  you say that's the layout of the theater?

1          A.     No, I have not.

2          Q.     So then you're basically saying that this

3     looks like the theater layout as best you recollect it

4     back in 89?

5          A.     Spot on.  Pretty much, yeah, same set up.

6          Q.     So the set up is the same.  You do

7     acknowledge that the decor is changed?

8          A.     It could've.  I'm not, I can't be a hundred

9     percent sure.  The colors look the same.  The carpet,

10    I don't know if it's the same from 18 years ago.

11    Pretty much it's still the same dingy theater.  It was

12    18 years ago when I was there.

13         Q.     I was there when it was a drive-in.  I'm

14    very old.  All right.  All right.

15         Is it the bottom line that you're saying this is

16    the interior of the theater because, you know, you're

17    here for a case that involves that theater?

18         A.     No, this is the theater.  This is where I

19    worked for six months.

20         Q.     So the decor is changed probably five or

21    six times since you left there?

22                   MS. MATTAWAY:  I object.

23                   MR. BRUNO:  I have no objection, your

24         Honor, but I think the record speaks for itself.

25         No objection.

1           THE COURT:  People's 3A through D in

2      evidence.

3                (Whereupon, the court reporter marks

4           People's Exhibit number 3A through 3D, as

5           directed by the Court.)

6                MS. MATTAWAY:  May I ask the court

7      officer if we can bring the easel over near the

8      witness.

9                COURT OFFICER:  Where the jury can see

10     it?

11               MS. MATTAWAY:  Yes, please.

12     Q.    All right.  Now, let me address my question

13     back to that point in time when you say you were at

14     the front ticket booth on this date?

15     A.    Yes.

16     Q.    Okay.  Do you remember what time you

17     started your shift that night?

18     A.    About say seven o'clock.

19     Q.    In the evening?

20     A.    Yes, because I would get home from work and

21     then go to the second job.

22     Q.    So was this, would it be fair to say it's

23     technically July 2nd because it's before midnight?

24     A.    Yes.

25     Q.    So around July 2nd, 7 p.m. you started?

 1          A.     Yeah, right.

 2          Q.     And let me take you now to sometime close

 3     to midnight.  Did anything happen at the theater that

 4     night?

 5          A.     I observed an argument from afar, from

 6     where I was standing by the ticket booth.

 7          Q.     Tell us about that.

 8          A.     There was two gentlemen, don't know why

 9     they were arguing but they were at the concession

10     stand.  I just figured the other security guards were

11     there.  They would handle it.

12          Q.     Were you and the other security guards in

13     the vicinity of the concession stand?

14          A.     They were on the other side of the

15     concession stand because that's usually where we stand

16     when they're not on duty patrolling.

17          Q.     Can I ask you if you can approach People's

18     3A through D and show us what you mean when you say

19     they were on the other side, if you can?

20          A.     They would be behind this concession stand

21     right directly behind, against the wall.

22          Q.     Which photograph is that, sir?

23          A.     This is People's B.

24                 THE COURT:  Indicating to the extreme

25          right-hand side of that photograph.

1              MS. MATTAWAY:  All right.

2         Q.    And, what, if anything do you remember

3    about the people who were in the argument?

4         A.    There was two gentlemen, a gentleman and a

5    girl from what I saw, from where I was stationed.

6         Q.    Okay.  Are you saying it's two gentlemen

7    versus a gentlemen and a girl or something else?

8         A.    Well, I saw one gentleman, black gentleman,

9    a little heavy-set chubby cheeks.  I got a diagonal

10   look at him from where I was standing.

11        Q.    What was he wearing?

12        A.    White shorts; his shirt was opened.

13        Q.    What color shirt?

14        A.    I believe it was white.

15        Q.    Okay.

16        A.    He had a white tee-shirt under.

17        Q.    Who was this man with?

18        A.    He was with another gentleman, a friend of

19   his.

20        Q.    What did he look like?

21              MR. BRUNO:  Objection to a friend.

22              THE COURT:  Sustained.  He was with

23        another gentleman.  Move on.

24        A.    He was with another gentleman.  And the

25   other gentleman was a little smaller, slim, skinny.

1          Q.      Okay.  Are you able to tell us, if you

2    could tell, his race?

3          A.      They were black.

4          Q.      Both black?

5          A.      Yes.

6          Q.      Were they arguing with each other or with

7    someone else?

8          A.      No, they were arguing with another

9    gentleman.

10          Q.      Tell me about that other gentleman.

11          A.      He was taller.  He was much taller, about,

12    I would say at that time six feet.  He was in, he was

13    in his young early twenties.  He was slim.  He wasn't

14    big.  And he was with a girl.

15          Q.      Did you know what she looked like?

16          A.      Ah, no, because I actually got the back

17    view of it and I didn't pay too much mind when the

18    argument broke out, it didn't break out into anything.

19    It just went, I heard it from afar.

20          Q.      Did you see anybody making any gestures or

21    anything like that?

22          A.      The black gentleman had his hand, you know,

23    raised like he was talking, arguing with.

24          Q.      You'd mentioned at least two black people.

25    Who?

1          A.    The gentleman who was shot.

2          Q.    Okay.

3          A.    I mean him.

4          Q.    Can you later see this guy and he appeared

5    to be shot?

6          A.    Yeah.

7          Q.    Okay.  Now, in relation to the two or three

8    men you've previously described, which one was he?

9          A.    The gentleman who was shot?

10         Q.    Yes.

11         A.    He was the chubby one, black, chubby

12   cheeks.

13         Q.    In the white shorts and the white shirt?

14         A.    Yeah.

15         Q.    So, tell us again what gestures, if any, he

16   was making?

17         A.    With his hands, he was getting loud and he

18   would gesture with his hand.

19         Q.    Who was he doing this to?

20         A.    To the other tall gentleman across from him

21   that was with the young lady.

22         Q.    And what was that gentleman, if anything,

23   doing back?

24         A.    Well, they were arguing.  They were both

25   almost not in each other's faces but they were close

1   enough.

2       Q.     Did that other taller man use his hand as

3   well?

4       A.     Yes, they were gesturing to each other.

5       Q.     You're making a motion like you're pointing

6   with a gun.

7       A.     Not with a gun.

8              MR. BRUNO:  Objection.

9              THE COURT:  Overruled.

10      A.     Not like a gun.

11      Q.     Did you just make a motion in open court

12  like putting your index finger out?

13      A.     Yeah, they were putting their hands in each

14  other's faces, not directly, but from where they were

15  standing two or three feet apart.  They were arguing

16  and gesturing with their hands.

17      Q.     Did you hear any part of the conversation?

18      A.     No.  The theater is kind of loud because

19  the ticket booths were still open and I didn't pay it

20  any mind because the other security guards were

21  already there trying to calm the situation down.

22      Q.     Was the female getting involved?

23      A.     She was adding her two cents in too.

24              MR. BRUNO:  Objection, your Honor.  If

25      he couldn't hear, what two cents?

1                    THE COURT:  Sustained.

2          Q.    What was she doing that you could see?

3          A.    Well, from behind you could see she was

4    talking and grabbing her boyfriend and they were

5    having an argument.

6          Q.    She was having an argument with the

7    boyfriend?

8          A.    No, she was going back at the two guys that

9    were across from her.

10         Q.    What, if anything, was the slim friend

11   doing with the man in white with the chubby cheeks?

12         A.    They were trying to separate, not separate,

13   break themselves up as far as not to get involved, not

14   to --

15                    MR. BRUNO:  Objection, your Honor.  He

16         said he couldn't hear a thing.

17                    THE COURT:  I'll allow that answer.

18                    Next question.

19         Q.    What did you see them do, if anything?

20         A.    They were having an argument.

21         Q.    What made you draw the conclusion, sir,

22   that someone was trying to break themselves apart, you

23   just said that?

24         A.    Right.  They were trying to break

25   themselves up from getting into a fight.

 1                    MR. BRUNO:  Objection, your Honor.

 2                    THE COURT:  Sustained as to getting

 3        into a fight.

 4        Q.     What did you see?  What movements, if any,

 5   motions that you could see that made you draw this

 6   conclusion that someone was trying to squash this

 7   fight?

 8        A.     They were backing away from each other.

 9   They were at the concession stand and everybody there

10   was trying to, you know, break it up.

11                    MR. BRUNO:  Objection as to his

12        conclusion.

13                    THE COURT:  Sustained as to his

14        conclusion.

15        Q.     From what you could see, was anybody

16   pulling them apart from each other?

17        A.     The girlfriend was holding onto her

18   boyfriend and the young kid was pulling back his

19   friend.

20        Q.     All right.  Did anyone else, from what you

21   could see, have his hand on either of the two main

22   arguing people?

23                    MR. BRUNO:  Objection as to "main".

24                    THE COURT:  Sustained.

25        Q.     All right.  Were you able to see, if any

1    one of these four people you've now talked about

2    appeared to be the most involved with each other?

3                     MR. BRUNO:  Oh, objection.

4                     THE COURT:  Sustained.

5                     MS. MATTAWAY:  Okay.

6                     THE COURT:  Sir, you saw what appeared

7         to you to be four individuals engaged in an

8         argument, correct?

9                     THE WITNESS:  Correct.

10                    THE COURT:  Two guys on one side, a guy

11        and girl on the other side?

12                    THE WITNESS:  Correct.

13                    THE COURT:  It also appeared to you in

14        the midst of this argument with everything you

15        said there was hand movement?

16                    THE WITNESS:  Yes, there were.

17                    THE COURT:  And you also saw two people

18        trying to pull two others apart or separate them,

19        cause distance between the two of them?

20                    THE WITNESS:  Correct.

21                    THE COURT:  Next question.

22    Q.    What happened next?

23    A.    Security was on the scene.  They separate,

24   they kind of calmed the situation down.

25    Q.    What did they do?

1          A.     They got in between both guys and they

2    tried to talked them, listen, it's not worth it --

3    they just got them to separate and go their ways.

4          Q.     Did you know who these security guards

5    were?

6          A.     If I remember correctly, it was Jonesy

7    (Jone-zee) and I don't remember the other guy's name.

8    I mean, it's been so long.

9          Q.     One is Jonesy (Jone-zee)?

10         A.     I know him as Jonesy (Jone-zee).  His name

11   is Greg Jones.

12         Q.     Did you at any time leave your place by the

13   front ticket booth and go assist them?

14         A.     No.

15         Q.     Did you at any time change your position

16   from where you were by the ticket booth?

17         A.     Yes, after the ticket booth closed.  The

18   ticket booth closes after the theater is sold out.  I

19   walked the ticket booth girl with her register back to

20   the main office and I take her position behind the

21   concession stand by Theater Five, just to view

22   everything coming in and to the sides.

23         Q.     All right.  Before we get to that point,

24   let me bring you back to this point where the security

25   guards appear to be trying to break up these two

1    groups, right?

2         A.    Correct.

3         Q.    How does that end?  What do you see?

4         A.    I see the taller gentleman, he leaves the

5    theater.

6         Q.    What do you mean by that?

7         A.    He vacates the premises.  He walks out the

8    front door.

9         Q.    And where does the female go?

10        A.    I can't tell you.  I was paying mind to

11   what I had to do on my station but I saw that he went

12   out the front door.

13        Q.    Did he do anything else besides turn around

14   and go?

15        A.    Well, they kept still cursing and yelling.

16             MR. BRUNO:  Objection.  Couldn't hear a

17        thing.

18             THE COURT:  Overruled.

19             You say he walked out of the theater?

20             THE WITNESS:  Yes.  And he was saying,

21        he was saying his parting shots at the guy and

22        the security.

23             MR. BRUNO:  Objection to "parting

24        shots".

25             THE COURT:  Overruled.

1                    THE WITNESS:  Okay.

2                    THE COURT:  Next question.

3          Q.    What is it you remember hearing, if

4    anything?

5          A.    He had said, yelled out he was going to go

6    get his gun.

7          Q.    Okay.  Is where you are at the ticket booth

8    anywhere in the vicinity of this man as he's leaving?

9          A.    Yeah, because I'm in the middle, as you

10   walk in there is a rope that lines up all the folks

11   for the ticket booth.  I'm in the middle of the rope

12   and the ticket booth and the entrance doors.

13         Q.    Okay.  Taking a look at photograph B, 3B

14   that's in evidence, all right.  What door is depicted

15   in that photo?

16         A.    The front door of the theater.

17         Q.    Okay.  Is that the same front door you saw

18   this guy go?

19         A.    That is correct.

20         Q.    All right.  When you saw him go, at what

21   point, if you see that spot anywhere in that photo,

22   did he say he was going to go get his gun?

23         A.    Right in between the concession stand and

24   the door.

25         Q.    Okay.

1        A.     As he's walking out.

2        Q.     All right.  And in terms of distance, using

3   this courtroom or something, can you tell us about how

4   far away you are from this guy?

5        A.     If that wall is the concession stand, that

6   gentleman is standing right about here and the front

7   door is that wall.

8        Q.     Is the width of the courtroom approximately

9   the same as the length?

10       A.     It's a little wider.

11       Q.     From the concession stand to the front

12   glass entrance of the Whitestone Cinema?

13       A.     Yeah, I mean, I would say about the end of

14   this testimony booth here.

15       Q.     Sorry, sir.

16       A.     I was just using the walls as an example

17   but if you want exact distance, I would say from the

18   wall to about here approximately.

19               THE COURT:  That's how far away he was

20          from you when you heard him say that?

21               THE WITNESS:  No, that's the concession

22          stand and these are the front doors.

23               THE COURT:  For the purposes of the

24          record, indicating approximately 22 to 24 feet.

25       Q.     The person with the chubby cheeks and

1    dressed in white who he had been earlier arguing with,

2    where was that guy at the time he's saying this?

3                    THE COURT:  Who's saying what?

4         Q.    The man who said "I'm going to go get my

5    gun," where was the other guy?

6         A.    The other guy was about over here on this

7    side of the concession stand with security.

8         Q.    Security was still around?

9         A.    Yeah, they were still in the front.  That's

10   where we're always stationed in front of the

11   concession stand in the front of the theater.

12        Q.    What, if anything, was that guy saying in

13   response or anything like that?

14        A.    Again, they were just going at each other

15   with words.  To one guy he made the comment and he

16   walked out the theater, the taller gentleman.

17        Q.    And the other guy who's dressed in white

18   with the chubby cheeks, what did he do?

19        A.    I don't know.  By that time security had

20   calmed the issue.  They had him to the side.  I went

21   back to my duties.  I believe he went to go see his

22   movie.

23                    MR. BRUNO:  Objection to what he

24        believes.

25                    THE COURT:  Sustained as to what he

1          believes.

2                Q.    Did you see in which direction he walked?

3                A.    No, I can't remember if he walked in the

4     front of the concession stand to Theater One or he

5     walked around it, I don't know.

6                Q.    Did you see anything in his hand?

7                A.    I'm not, I don't remember.  I don't know if

8     he had stuff they were purchasing at the concession

9     stand in his hand or if he left it on the counter.

10               Q.    Do you recall what happened to the other

11    man, the slim man?

12               A.    He walked out the theater.  Oh, the friend

13    of the chubby?

14               Q.    Right.  The friend of the chubby cheek man,

15    not the man who walked out the theater.

16               A.    No.

17               Q.    When is the last time you recall seeing

18    him?

19               A.    The slim guy?  I recall seeing him after

20    everything was, after the incident happened.

21               Q.    Okay.  And I apologize if I asked you this

22    question already.  Did you see what happened to the

23    female?

24               A.    No, I do not.  I didn't pay any --

25               Q.    Did you watch the man who said "I'm going

1   to go get my gun" as he left the theater?

2        A.    Yes, he walked out the front door.

3        Q.    How past out the front door were you able

4   to see him before you lost sight of him?

5        A.    I'd say as soon as he went through the

6   front door because I'm standing on the side of that,

7   so I don't see him.  I saw him as he walked out.  I

8   don't know if he went to the right, to the left, or --

9        Q.    Did you have any conversation about what

10  had just happened with Jonesy (Jone-zee) or anyone

11  else?

12       A.    Yeah, we're all talking about, Oh, the guy

13  said he was going to go get his gun and the other guy

14  said, yeah.  It was what we heard because the people

15  at the concession stand told us what they were arguing

16  about.

17       Q.    Did anybody from the security staff, if you

18  know, go out to the parking lot or the front of the

19  theater to follow this guy who made the threat?

20       A.    No.

21       Q.    Is there a reason why?

22            MR. BRUNO:  Objection, he can't speak

23       for security.

24            THE COURT:  Sustained.

25       Q.    Did you have a boss at that time?

1          A.      Yeah, Jonesy (Jone-zee) was the boss.

2          Q.      Okay.  And did Jonesy (Jone-zee) tell you

3     to do anything with regard to this incident?

4          A.      He just said "Keep an eye out," you know,

5     on the theater, to see if the guy comes back.

6          Q.      And what, if anything did you do?

7          A.      Well, I took a position by, again, behind

8     the concession stand by Theater Five and we just, from

9     an eye, watched the theater, the front doors, the

10    side.  And we had walked around when needed into the

11    theaters just to make sure everything is okay.

12         Q.      All right.  Did you -- withdrawn.

13    At what point did you do that part of your

14    testimony where you said you walked the girl with the

15    box?

16         A.      That's after the ticket booth closed

17    because it was a live show, they closed it up.

18         Q.      Right.

19         A.      We walked her back to the office and then I

20    came back out and took my position near Jonesy

21    (Jone-zee) and the rest of the guys that were standing

22    out there.

23         Q.      How soon after you had seen the man leaving

24    out the front door did the ticket booth close?

25         A.      I'd say fifteen, twenty minutes if --

1  approximately, again it's eighteen years ago.

2      Q.    I know.  Where did you go when you walked

3  this girl someplace?

4      A.    I came back to the concession stand to take

5  my post along Jonesy (Jone-zee) and the rest of the

6  guys.

7      Q.    No, I'm saying you walked the woman

8  someplace?

9      A.    Yes, I walked her to the office.

10      Q.    So there came a time you walked, left the

11  front of the theater area that's depicted in B?

12      A.    Yes, because the ticket booth was closed.

13  There was no more tickets being sold for any shows.

14      Q.    And where, can you see any of the places

15  where you walked with her in any of those photos?

16      A.    This is the corridor but the office is up

17  more.

18      Q.    Okay.  Photograph 3D?

19      A.    Yeah, D, because when you walk in the

20  offices are to the left of the concession stand.

21      Q.    And in one of those doors there is an

22  office?

23      A.    Yes.

24      Q.    And that's where you were with her?

25      A.    That's where I walked her too.

1        Q.      You didn't go in?

2        A.      No.

3        Q.      How long did that take you?

4        A.      Three minutes to walk from the ticket booth

5    to the office.

6        Q.      Then what happened?

7        A.      Then I went and took a position with Jonesy

8    (Jone-zee) and the rest of the guys that were behind

9    the concession stand alongside the theaters.

10       Q.      How long were you standing there before

11   something happened?

12       A.      I'd say about forty minutes.

13       Q.      Then what happened?

14       A.      We heard, I heard something that sounded

15   like M-80s going off, pop, pop, pop.  And a lady comes

16   running down the corridor saying that there's

17   gunshots, gunshots.  And then we get something over,

18   there was security guards in the theater already who's

19   checking the doors, making sure nobody is sneaking in.

20   And we got the call over the radio, code ten, code

21   ten, Theater One.

22       Q.      What is that?

23       A.      Security guard in need of assistance.  And

24   we all start, you know, we get the call, we start

25   running.  I run past.  I'm running to my right.  The

1   lady is like in a hurry, walk past me, and I'm running

2   to the theater.

3        Q.    Do you see the place you went in any of

4   those photos?

5        A.    Yeah, in pictures C and D.

6        Q.    Okay.

7        A.    Or D is the main picture, that's the

8   corridor I was running down.

9        Q.    Correct.  And what does C show?

10       A.    C shows the two theaters that Batman was

11  playing in One; and Theater Two, whatever was playing

12  there.

13       Q.    Okay.  And is the hall empty or what?

14       A.    The hall is pretty much empty because the

15  one lady, she is already by Theater Three or Four when

16  I pass her.

17       Q.    Okay.  And what, where do you go when

18  you're running?

19       A.    I'm running toward Theater One.

20       Q.    And what happens next?

21       A.    I'm running, and a gentleman about six one,

22  tall, light-skin like myself or how you want to put

23  it, he comes out of the theater, he comes out of these

24  doors because he swings around and he's holding a gun,

25  black gun with, you know, you know, a brown handle.

1    And he comes out like he has the gun still up in the

2    air.  I see that, and of course I'm no hero so I jump

3    in the corridor of Theater Two.  I'm sorry, they don't

4    pay me enough to chase guys with guns.

5         Okay, but I see him.  He comes, he's coming out

6    of Theater One and I'm running toward him and there is

7    a couple of security guards behind me and we all did

8    the same thing.  We duck in the hallways of the

9    theater.

10        Q.    Did you have any conversation with this

11   guy?

12        A.    With the guy with the gun?

13        Q.    Yeah.

14        A.    No, I did not.

15        Q.    Okay.  And you say it was still in his

16   hand?

17        A.    It was still in his hand.

18        Q.    You've made a gesture here in court as

19   you're holding a gun.  Can you do that again?

20        A.    He had the gun up here as he came out of

21   the theater, as he saw I wanted no part, I went into

22   Theater Two, he was putting the gun down and putting

23   it in his waistband.

24        Q.    Can you stand up and demonstrate what you

25   saw this guy do?

1    A.    Okay.  He's coming out running this way and

2    we see, we're about ten feet from each other, if that

3    much.  He sees I run into Theater Two and he's putting

4    the gun in his waistband, in his band in his shorts.

5    He's wearing shorts.

6    Q.    All right.

7    A.    And then he runs out the side doors which

8    are not here.

9    Q.    Okay.

10    A.    But he runs out, I said a green fire exit

11    doors that are positioned right in front of Theater

12    One.

13                   MS. MATTAWAY:  The record should

14         reflect the witness stood up in open court and

15         made a gesture as if he was holding a gun in his

16         right hand and across his body tucked the gun in

17         his waistband?

18    A.    He was holding a gun.

19    Q.    When he came out of Theater One?

20    A.    Yes, he was.

21    Q.    Did anyone else come out of Theater One at

22    the same time he did?

23    A.    No.  He's the only one that flew past out

24    of Theater One when the commotion had, the shots had

25    stopped.

1          Q.     Are you able to tell us about how high up
2      in the air he had this gun?

3          A.     I would say he had it about shoulder high.

4                 MS. MATTAWAY:    The record should

5          reflect the witness has stood up in open court,

6          held out his arms in front of him.

7          A.     Shoulder high, yeah, but when he saw that
8      we were all ducking for cover ourselves --

9                 MR. BRUNO:   Objection as to conclusion

10         what he saw or didn't see.

11                THE COURT:   Sustained.

12         A.     He put the gun away when we all ducked for
13     cover.

14

15                (Continue on the following page.)

16

17

18

19

20

21

22

23

24

25

Centeno-People-Direct                133

1          MS. MATTAWAY:  Okay.  One moment please,
2     your Honor.
3          Okay.  At this time I ask that the witness
4     take a look at People's 4A through D.
5          THE COURT:  I think we have to mark it
6     first.
7          MS. MATTAWAY:  Yes, please.  I like to
8     have them marked for identification.
9          THE COURT:  May I see them for a second?
10         (Whereupon, four exhibits are marked by
11    the reporter as People's 4a through 4d)
12         COURT OFFICER:  So marked, People's 4A
13    through D.
14         (Handing)
15    Q.   Do you know what those are, sir?
16    A.   Yeah.  These are pictures of the fire exits.
17    Pictures of the theater, one the stairs leading from
18    the fire exit and the actual door of the fire exit.
19    Q.   Are they fair and accurate representations of
20    where the same door to theater one and the fire exit
21    doors were back in 1989?
22    A.   Yes.
23    Q.   The layout is the same?
24    A.   Exactly.  Aside from the carpeting, the
25    layout is the same.

Centeno-People-Direct                    134

1      Q.    How about the green doors?  Are they still

2   green?

3      A.    No, they are red now.

4      Q.    But is it the same location?

5      A.    Same location.

6      Q.    Okay.

7            MS. MATTAWAY:  I offer them as People's

8      4A through D.

9            THE COURT:  Show them to counsel.

10           MR. BRUNO:  May I see them?

11           (Handing)

12           MR. BRUNO:  May I voir dire, sir?

13           THE COURT:  Go right ahead.

14     Q.    You covered the issue about the decor.

15     A.    Okay.

16     Q.    We covered that.  The decor has changed.

17     A.    Okay.

18     Q.    You know what's puzzling me?  How do you know

19   it's theater one?  Don't the fire doors look the same?

20     A.    No.  The fire doors on that side was right in

21   between theater one and theater two.

22     Q.    If there is a fire on the other side of the

23   theater?  You just die?

24     A.    There are exit doors on that side, but I know

25   where these exit doors are at.

Centeno-People-Direct                    135

1        Q.   And again, similar to before the last batch

2   of pictures, aren't you saying that it looks like

3   theater one because that's the subject of this case?

4        A.   That is theater one.

5        Q.   If I'm wrong, I'm wrong.

6        A.   You're wrong.  That's theater one.

7        Q.   What indication do you have that these doors

8   are the doors that are in the vicinity of theater one

9   as opposed to two, three, four, five, that's all I'm

10  asking?

11       A.   Those are the only exit doors on that side of

12  the corridor.

13       Q.   But that's the point.  What if the photograph

14  were taken of the other side?

15       A.   It's not because you could see from the signs

16  it's theater one, theater two.

17       Q.   How?  Is there a sign?

18       A.   Up top.

19       Q.   There is a one there?

20       A.   No, that's just --

21       Q.   I see emergency lights.  You see numbers?

22            MS. MATTAWAY:  Your Honor, I object at

23       this point.

24            THE COURT:  Sustained.

25       A.   Trust me.  That's theater one.

Centeno-People-Direct                136

1                    MR. BRUNO:   I don't trust you.

2                    THE COURT:   Sustained.

3                    MR. BRUNO:   I don't trust you.

4                    THE COURT:   Sustained Mr. Bruno.   Are

5        you done?   Any objection?

6                    MR. BRUNO:   Again no objection.   Subject

7        to what -- the records obviously speaks for

8        itself.

9                    THE COURT:   People's 4A through D in

10       evidence.

11                   COURT OFFICER:   So marked.   People's 4A

12       through D in evidence.

13       Q.   I'm sorry.   Okay.   Okay.   Can you just please

14   tell us sir briefly what 4A through D are?   I apologize

15   that I don't have them mounted on the board at this

16   time.

17       A.   4A are the stairs that are directly outside

18   those exit doors by theater one and two.

19       Q.   Where do those stairs go to?

20       A.   They lead you to the parking lot.   B is one

21   of the actual exit doors being opened.

22       Q.   Where does that lead to if you go through

23   that doorway?

24       A.   Through the stairs.

25       Q.   Is that what was depicted in the first photo?

Centeno-People-Direct                    137

1        A.    Yes.

2        Q.    Okay.  Please continue.

3        A.    4C is the actual picture of the doors and

4    theater one in the corner.

5        Q.    Can you tell us how 4C relates to 3D, sir?

6        A.    It's the corridor.  3C is the actual door to

7    get into the theater.  From when you walk in there two

8    entrances one to the left one to the right.

9        Q.    Correct?

10       A.    This picture is to the right, the entrance to

11   the right.

12       Q.    Okay.

13       A.    And you have to walk here.  There is that

14   door is to the left.

15       Q.    Which photograph are you pointing to now in

16   open court, sir?

17       A.    4C.  4C has a picture of the doors that are

18   to the left.

19       Q.    And where is theater one in relation to 4C,

20   sir, 4C that you're holding in your hands?

21       A.    Where is -- that is theater one.

22       Q.    Can you please show us -- I apologize.

23   Please put the photos down.  With your free hand can

24   you point to where theater one is?

25       A.    Theater one is right here.

Centeno-People-Direct                    138

1      Q.   All right.

2           MS. MATTAWAY:  I'd ask that the witness

3      be given this black magic marker.

4      Q.   Can you make -- write number one right on it

5   so we could see please.

6      A.   That's theater one.

7      Q.   All right.  Regarding the red doors to the

8   left of that photograph, okay, what did you see on July

9   3rd, 1989, regarding those doors?

10     A.   I saw the gentleman come out of the theater,

11  run and go out these side exit doors.

12     Q.   Those doors?

13     A.   These doors right here.  Yes, to the left.

14     Q.   And photographs 4A and B which we just

15  covered, are those fair and accurate representations of

16  what happens if you push through one of those doors

17  where you go through?

18     A.   Yes.  You go to the left -- to the right to

19  the stairs.  You go down, leads you to the parking lot.

20     Q.   Finally, could you show us what 4D was, sir,

21  the last photo that you have in your batch there?

22          THE COURT:  You have it on top.

23     A.   4D is the actual door to the right of the

24  theater.

25     Q.   Which theater?

Centeno-People-Direct                139

1      A.    Theater one.

2      Q.    Okay.  Using that black marker again could

3  you please write number one so we could see.

4      A.    That's the right hand entrance to theater

5  one.

6      Q.    When you encountered this man, do any of the

7  photos that you have with you show the approximate spot

8  where you encountered him?

9      A.    Yes.

10      Q.    Which photo if any?

11      A.    4C.

12      Q.    4C?

13      A.    Yeah.

14      Q.    Okay.  Can you flip it and show us first

15  where you saw the man?

16      A.    Right about here.

17      Q.    That's where you saw him with the gun?

18      A.    Yes, as he swung around he ran out and he was

19  running towards me with the gun shoulder high and I'm

20  running down the opposite direction from him and I duck

21  into theater two.

22      Q.    Okay.  Are you able to draw a stick figure

23  right on there for the approximate spot where you saw

24  the man right on 4C, please?

25                THE COURT:  Make a C where you think you

Centeno-People-Direct                    140

1        saw him.

2                    MS. MATTAWAY:  Or an X.  All right.

3        Q.   Now, you said that you ran in the opposite

4   direction, sir?

5        A.   I was running opposite him.  I was coming

6   towards him.

7        Q.   Initially?

8        A.   Initially I was running towards him.

9        Q.   How far did you get before you turned around

10  and went back to theater two or towards theater two?

11       A.   I didn't turn around.  I was actually at

12  theater two when I saw him come out, just getting there

13  and he was running towards me.

14       Q.   Right.

15       A.   He had the gun and I dipped right into the

16  cubby of theater two.  I didn't stop.  I went right to

17  the side and ducked into theater two.

18       Q.   At this time I'd like to have this photo

19  marked as People's 5 please.

20                    (Whereupon, a photograph is marked as

21            People's 5 for I.D. by the reporter)

22                    COURT OFFICER:  So marked.

23       Q.   Okay.  Please look at that photo.  Do you

24  know what that is?  What does that show?

25       A.   That's the actual corridor going the other

1  way now.  This is at theater one and it's showing you

2  all the theaters one through ten or twelve.

3        Q.   Is that a fair and accurate representation of

4  the layout of the Whitestone Cinema showing the wrong

5  corridor from the other direction?

6        A.   Yes, it is.

7                  MS. MATTAWAY:  I offer it as People's 5.

8                  THE COURT:  Show it to counsel.

9                  MR. BRUNO:  May I voir dire?

10                 THE COURT:  Go right ahead.

11  VOIR DIRE EXAMINATION

12  BY MR. BRUNO:

13        Q.   So again I assume but for the decor that this

14  is what the place looked back in '89; is that your

15  testimony?

16        A.   That's the place back in '89, yes.

17        Q.   And the way this is laid out, would you be

18  saying in effect theater one would be behind the camera

19  guy in this picture?

20        A.   Theater one you could see a slight shot of it

21  on your thumb.  That's the theater one, right.  That's

22  theater one right there.

23        Q.   In so many words if one were taking this

24  picture, one would be standing parallel with the other

25  one?

Centeno-People-Direct                    142

1       A.    That's correct.

2       Q.    And again what indication do you have that

3  that's theater one in that theater in '89?  What

4  indications do you have from this?

5       A.    I know the layout of the theater.  I worked

6  there for six months.

7       Q.    I got you.  There is a sign in front of you

8  that says theater one, so it says two, three, four.

9       A.    There you go.

10       Q.    We agree.  Although how do you know it's the

11  Whitestone theater?

12                 MS. MATTAWAY:  I object.

13       Q.    You been to the Raceway Cinema in Westbury?

14                 MS. MATTAWAY:  I object.

15                 THE COURT:  Sustained.

16       Q.    Have you ever been there?

17                 MS. MATTAWAY:  I object.

18                 THE COURT:  Sustained.

19       A.    No, I haven't.

20                 THE COURT:  Don't answer it.  Next

21       question.

22                 MR. BRUNO:  I'll ask you on cross.

23       Don't worry.  No objection, your Honor.

24                 (Whereupon, People's 5 for

25       identification is now marked into evidence as

Centeno-People-Direct            143

1        People's 5)

2                  COURT OFFICER:  People's 5 received in

3        evidence.

4        Q.   Mr. Centeno, please take a look at that

5   photographer, sir.

6                  Do you see the approximate spot on that photo

7   where you ducked into theater two?

8        A.   Yes.

9        Q.   Can you use that black marker that I gave you

10  previously and just indicate where you went into

11  theater two and where theater one was in relation to

12  where you were?

13                  (witness complies)

14       Q.   Oh.  This is on People's 5, yeah.

15       A.   That's X, one is theater one.

16       Q.   Correct?

17       A.   X two is theater two.

18       Q.   And to the right of photograph that's

19  People's 5, are those the same exit doors you've been

20  talking about?

21       A.   Yes, they are.

22                  MS. MATTAWAY:  Final photo.  I'd like to

23       have this one marked as People's 6.

24                  (Whereupon, a photo is marked as

25       People's 6 for identification by the reporter)

Centeno-People-Direct          144

1                COURT OFFICER:  So marked.

2        Q.   Please take a look at People's 6.  Do you

3    know what that is?

4        A.   Yeah, a picture of the concession stand, a

5    side shot and it's -- yeah.  A side shot of the

6    concession stand and the corridor leading to the

7    theaters.

8        Q.   And is that a fair and accurate

9    representation of the way the concession stand back of

10   it and then the entrance where the theater looked back

11   on July 3, 1989?

12       A.   Yes.

13               MS. MATTAWAY:  I offer it as People's 6.

14               THE COURT:  Show it to counsel.

15               (Handing)

16               MR. BRUNO:  You've been to the Roosevelt

17   Field Cinema in Mineola?

18               MS. MATTAWAY:  Objection.

19               THE COURT:  Sustained.

20               MR. BRUNO:  I have no objection.

21               THE COURT:  People's 6 in evidence.

22               (Whereupon, People's 6 for ID is now

23   marked People's 6 in evidence by the reporter)

24               COURT OFFICER:  People's 6 now marked in

25   evidence.

Centeno-People-Direct          145

1              MS. MATTAWAY:  I have nothing further.

2        Thank you.

3    CROSS EXAMINATION

4    BY MR. BRUNO:

5              MR. BRUNO:  May I proceed.

6              THE COURT:  Does anybody in the jury

7        need to take a break or stretch a leg?

8              Everybody is okay.

9              THE JUROR:  Rest room.

10             THE COURT:  We'll take like a five

11       minute break.  You go and stretch your legs.

12             (Whereupon, a brief recess is taken)

13             THE COURT CLERK:  Case on trial

14       continues.  All parties are present and properly

15       seated.

16             THE COURT:  You may inquire.

17             MR. BRUNO:  Thank you, sir.

18   CROSS EXAMINATION

19   BY MR. BRUNO:

20       Q.   Good afternoon Mr. Centeno.

21       A.   Good afternoon.

22       Q.   Am I correct that back in '89 when you were

23   employed at the theater, you were 26 years old?

24       A.   Yes.

25       Q.   And you said your primary job at that time

Centeno-People-Cross                146

1    was at Production Security?

2         A.   Correct.

3         Q.   What was your job at Production Security?

4         A.   I was supervisor in the operations

5    department.

6         Q.   What does that mean?  What did you do?

7         A.   Meaning I took care of rich people's money.

8         Q.   And what is your current job, not saying

9    which company?

10        A.   I'm an investment banker.

11        Q.   Now, you indicated early on -- withdrawn.

12   You're describing an occurrence back in '89, so when I

13   say early on, I'm talking about that evening.  You

14   describe early on in this scenario that in affect

15   you're in the lobby at the ticket booth; am I correct?

16        A.   Stationed at the ticket booth.

17        Q.   And you indicate that although you have

18   difficulty hearing because there is a lot going on, you

19   could observe?

20        A.   Yes.

21        Q.   And you indicated in summary -- I won't go

22   through all of it, that you observed what looks like an

23   argument?

24        A.   Correct.

25        Q.   And it looks like an argument on one hand

Centeno-People-Cross                147

1    involving two black guys, or like one set of friends so
2    to speak and then the other team as it were is a taller
3    slimmer man with a girl, correct?
4         A.    Correct.
5         Q.    Now, the DA never asked you what was the
6    apparent race or ethnicity of the taller slimmer guy.
7         A.    I assumed he was my complexion.  I assumed he
8    was Black.  Light-skinned Black person.
9         Q.    I see.  Are you telling us you're Black?
10        A.    No, I'm Spanish.  But from afar I assumed I
11   thought he was Black.
12        Q.    Well, now, it was towards the end of your
13   testimony you even -- you stated referring to what
14   would be the slender guy with the girl, you stated you
15   know, light-skinned, like me.  So I don't understand if
16   the man has complexion like you and you acknowledge
17   you're Latino, or whatever term you want to use?
18        A.    Yes.
19        Q.    Light-skinned like me and you acknowledge
20   you're a Latino, but then you told us the tall slim guy
21   has your complexion, so therefore I assume he's Black.
22   I'm confused.
23             MS. MATTAWAY:  I object to defense
24        counsel's confusion.
25        Q.    Can you explain?

Centeno-People-Cross                    148

1              THE COURT:   I won't comment on defense

2      counsel confusion, but watch your phraseology.

3              Do you understand the question?

4              THE WITNESS:   Does he want me to answer

5      why I think the guy was Black?

6      Q.   Yeah.

7      A.   I just took it for granted Black guys were

8      arguing at the concession stand.

9      Q.   In other words, using the scenario that

10     night, if a Latino had taken umbrage, had taken offense

11     of these two Black guys, there would be no argument?

12             MS. MATTAWAY:   Objection.

13             THE COURT:   Sustained.

14     Q.   I'm not gonna debate with you.   Okay.   Fine.

15     That's your reasoning, okay.   Fine.

16             Let me ask you this, in preparing to testify

17     today I assumed you conferred with the DA.   It's not

18     improper, correct?

19     A.   Yes, we spoke.

20     Q.   Did she show you any reports or statements

21     involving you from back in '89?

22     A.   Yeah, she did.

23     Q.   She did.   And in fact, in '89 at 7:10 in the

24     morning -- in other words, in affect there was all this

25     raucous at the theater, some of you folks stayed around

Centeno-People-Cross                    149

1    and cops interviewed you?

2         A.   When you say seven in the morning.

3         Q.   Forget the hour.  You stayed being

4    interviewed by cops?

5         A.   Yes.

6         Q.   And you were interviewed by the lead

7    detective, Detective Serrano?

8         A.   I don't remember the detective's name.  I

9    know it was a detective.

10        Q.   Okay.  And do you recall reporting -- you

11   don't know the name to Mr. Detective, that the person

12   you saw you mean the apparent shooter was a male Black

13   in his twenties?

14        A.   Yeah.

15        Q.   Correct?

16        A.   Yeah.

17        Q.   And a male Black in his twenties with dark

18   complexion, correct?

19        A.   Okay.  Yeah.

20        Q.   Not okay.  Is that what you said?

21        A.   I assumed the guy was Black.

22        Q.   No, no, no sir.  Being interviewed by a

23   detective at some time that morning meaning within

24   hours of the shooting?

25                  MS. MATTAWAY:  I object.

Centeno-People-Cross                150

1              THE COURT:  Overruled.

2        Q.    You reported to the detective that the person

3    involved was a male Black in his twenties, dark

4    complexion, correct?

5        A.    Yes.  If that's what my statement I made to

6    the detective, then back 18 years ago yes I said that.

7        Q.    And in fact, keeping it brief trying to be a

8    bit considerate here, the first part of your testimony

9    today in so many words you're in the vicinity of the

10   lobby able to observe the apparent argument, correct?

11       A.    Correct.

12       Q.    And you're in the vicinity of the lobby able

13   to then see the apparent shooter leaving?

14       A.    Not in the vicinity of the lobby.  I was

15   running towards the theater and the shooter.

16       Q.    I'm sorry.  I'm confused now.  I'm saying--

17   withdrawn.

18             You know what, we'll keep it simple then.

19   All right.  You testified you observed an apparent

20   argument at the concession stand?

21       A.    Correct.

22       Q.    You testified that you see -- you see the

23   respective friends trying to pull them away, meaning

24   the friends of the chubby Black guy is trying to back

25   him off the female friend of the other guy, dark, light

Centeno-People-Cross                    151

1    black Latino?  The girlfriend of the other guy is

2    trying to pull him away from the raucous, correct?

3         A.    Correct.

4         Q.    And you observed that.  You then, whatever it

5    is, moments later whatever, you were then close enough

6    to now observe and hear the slimmer guy saying in

7    essence I'm going for my gun and he does leave the

8    premises, correct?

9         A.    Correct.

10        Q.    You observed that.  So your testimony today

11   is that you at least observed and to an extent hear

12   what constitutes let's call it the original argument,

13   correct?

14        A.    Correct.

15        Q.    Let's harken back now to your interview by

16   the detective whom you can't place at some time in the

17   morning.

18             Did you not report to him that you were on

19   duty at the time of the shooting and were in the lobby

20   when you heard three pops?

21        A.    That's correct, behind the concession stand.

22   That's the lobby.

23        Q.    No, no, no, no.  What I'm saying is in

24   summary then -- if need be you could refresh your

25   memory.

Centeno-People-Cross                152

1     A.    Okay.

2     Q.    Didn't you in essence -- you were there as a

3    security guard.  It was a crazy night with a shooting.

4    Did you not in essence report to the lead detective

5    that your first involvement is after the shooting.  You

6    weren't involved in the lobby at all.  Is that not

7    correct, sir?

8                    MS. MATTAWAY:  I object to involved.

9                    THE COURT:  Overruled.  You may answer.

10    A.    When you mean involved in the lobby as far as

11    standing with the other security guards.

12    Q.    I'll rephrase it.  I'll rephrase it.  I try

13    to save time and it's more confusing.  You're on duty

14    as a security guard.  What you're telling us in essence

15    if I'm wrong this is important, correct me.

16                You're saying that in essence that the

17    argument in the lobby apparently resulted in the

18    shooting in theater one.  Is that a fair summary to

19    save a lot of time?

20    A.    Correct.

21    Q.    And am I correct as a security guard knowing

22    at the end of the night that a murder resulted if you

23    had observed the argument that led to the shooting,

24    you'd have certainly reported that as a human and as a

25    security guard; am I correct?

Centeno-People-Cross                153

1      A.    That's correct, but I wasn't --

2      Q.    I'm sorry.  Go ahead.  You wasn't what?

3      A.    I wasn't standing right there when they were

4   arguing, what they were saying to each other.

5      Q.    This I know.  But in other words, you saw fit

6   to report that today; am I correct?

7      A.    Yes.

8      Q.    And 18 years ago within hours of the shooting

9   as a security guard on duty would you not have reported

10   that to the investigating cop that I saw what led to

11   this?

12      A.    It wasn't asked.  They didn't ask me about

13   that.

14      Q.    You're telling us that the detective -- you

15   know what -- withdrawn.

16           Is it not a fact that you told this detective

17   that you see -- well let's back up.

18           "At the time of the shooting I was in the

19   lobby.  I heard three pops.  I thought they were

20   M-80's."

21      A.    That's correct.

22      Q.    A lady came out of the "Batman" movie and

23   told me there was a shootout inside; is that correct?

24      A.    She didn't tell me.  She ran past me.  As I

25   was running --

Centeno-People-Cross                  154

1        Q.   So she yelled it out and she fled?

2        A.   Right, because we heard the pops over the

3    radio.   There was a security guard in the theater.

4                 MS. MATTAWAY:  Objection.  The witness

5        is trying to answer.

6                 THE COURT:  Sustained.

7        Q.   And did you further report that as you

8    approached the front of theater one you see that male

9    black 5'11" slim face, dark complexion, exiting tucking

10   a firearm in his waistband?

11       A.   Not in front of theater one.  I wasn't in

12   front of theater one when I encountered the gentleman.

13       Q.   Okay.  You then took cover in the entranceway

14   doorway, correct?

15       A.   Theater two.

16       Q.   And did you leave off reporting to the

17   detective that this was the first time I had seen this

18   male?

19                 MS. MATTAWAY:  I object.  Leave off.

20       What is that?

21                 THE COURT:  Rephrase that question.

22       Q.   Okay.  Did you advise the detective this was

23   the first time I had seen this male?

24       A.   I don't remember.

25       Q.   Okay.  Let me ask you this and then I'll move

Centeno-People-Cross                    155

1    on.   If I tell you that Detective Serrano will testify
2    here at a later time will any of your testimony change
3    today?
4         A.   No.
5         Q.   So you're telling this jury that in affect
6    you're on board, you're involved, you're observing from
7    when the argument erupts; am I correct?
8                   MS. MATTAWAY:   I object.   I object.
9         Q.   Is that correct?
10                  THE COURT:   Sustained.
11        Q.   All right.   All your testimony this morning
12   was true you're telling us?
13        A.   Yes.
14        Q.   Okay.   And it may sound obvious, is it fair
15   to say that your memory would have been more vivid
16   within hours of the shooting in '89 as opposed to today
17   just about eighteen years later?
18        A.   That's fair to say, yes.
19        Q.   Fresher in '89, right?
20        A.   Yes.
21        Q.   And is it fair to say that as a 26 year old
22   grown man getting paid to be a security guard, you
23   would have reported whatever facts entered into this
24   incident that you observed?
25        A.   I can't say that I did and I can't say that I

1    didn't.

2         Q.    Was that not part -- would that not make

3    sense that that was part of your job?

4         A.    Yeah, but the questions that were asked to me

5    was when we were at the theater what did I observe when

6    I was running towards theater one.

7         Q.    I see.

8         A.    That's what I answered to.  They never asked

9    me about what took place, the argument, all that stuff

10   because I was by the ticket booth.

11        Q.    So, for example, if the guy who shot the guy

12   had orange hair, you wouldn't volunteer that unless the

13   detective said did somebody involved have orange hair?

14             MS. MATTAWAY:  Objection.

15             THE COURT:  Sustained.

16        Q.    You have to be asked about something --

17        A.    They didn't ask me.  I didn't say it.

18        Q.    Okay.  I'll move on.  You said that at some

19   point Jonesy was present in that lobby during or in the

20   aftermath of the argument; is that correct?

21        A.    That's correct.

22        Q.    Now, the man you're calling Jonesy, that was

23   Craig Jones whatever title he's the chief of security

24   at that time, correct?

25        A.    He was the most senior guy.

Centeno-People-Cross                157

1    Q.   He was the head security?

2    A.   Correct.

3    Q.   And he was an armed guard, correct?

4    A.   Yes.

5    Q.   And in fact he was a moonlighting correction

6    officer?

7    A.   They all were.

8    Q.   Am I correct at that time of the -- ten guys

9    on duty, eight were armed security and two were

10   unarmed?

11   A.   Correct.

12   Q.   And Jones is one of the armed guys.  He has

13   his correction's gun on him, right?

14   A.   That's correct.

15   Q.   Now, you indicated that you had heard -- you

16   said early on you couldn't hear, but then you heard the

17   part about I'm going for my gun, correct, in the lobby?

18   A.   Yes.

19   Q.   Now, am I correct, all of you security people

20   again at that time have radio to interact with each

21   other?

22   A.   Correct.

23   Q.   But you also said we're talking seconds, when

24   the man is allegedly trying to leave the theater saying

25   I'm going for my gun, other security guards were

Centeno-People-Cross                158

1   present, correct?

2        A.   Correct.

3        Q.   Were any of them armed?

4        A.   They all -- all but two.

5        Q.   The ones who are present to hear that?

6        A.   Yes, they are.

7        Q.   So there was an obvious argument.  One of the

8   parties to the argument is saying I'm going for my gun

9   and you're telling us none of the armed security people

10  either followed him or kept an eye for his return; is

11  that correct?

12       A.   That's correct.

13                 (Continued on the next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          Q.    That's correct.
2                Well, again, this is not said facetiously, why
3    in God's name were they armed, in case somebody stole
4    popcorn?
5                     MS. MATTAWAY:  Objection.
6                     THE COURT:  Sustained.
7          Q.    But, legally, in other words, these guys are
8    all carrying pieces.  Why are they carrying them?
9                     THE COURT:  Sustained.  Sustained.
10         A.    Because --
11                    THE COURT:  Don't answer.
12                    Move on.
13         Q.    You even said, and I'm quoting, "We were all
14   talking about the guy going for his gun," correct?
15         A.    Yeah.
16         Q.    And there were eight armed security guys on
17   duty?
18         A.    That's correct.
19         Q.    All moonlighting C.O.s?
20         A.    That's correct.
21         Q.    And nobody said, "Let's keep an eye on this
22   guy"?
23                    MS. MATTAWAY:  Objection.
24                    THE COURT:  Overruled.
25                    You may answer that.

cm/g Mike Centeno - for People - Cross

1       Q.      Nobody?

2       A.      No.   Jonesy was keeping an eye at the front

3   door, but the guy came back inside to get back into the

4   theater.

5       Q.      You evaded him?

6       A.      Okay, yes.

7       Q.      With ten guards, many of whom were armed, now

8   the guy is going for a gun, nobody consistently kept an eye

9   on him?

10      A.      Correct.

11      Q.      Also, you tell us now -- we are getting ahead

12  in time -- as this person is exiting the theater, he's

13  holding the gun straight out at shoulder length, correct?

14      A.      Correct.

15      Q.      Again, do you recall being interviewed by the

16  detective in the early hours following this?

17      A.      Yeah.

18      Q.      And do you recall advising him that "I saw him

19  tucking a black firearm under his belt as he went out the

20  back door"?

21      A.      Tucking it in his pants, not under his belt.

22      Q.      All right.

23              So, on that point also the detective made an

24  error; is that correct?

25      A.      He tucked it in his waistband.

1        Q.    Okay.

2              So, in other words, now we are going to dispute

3        whether or not the guy had a belt on; is that correct?

4        A.    I'm not disputing anything.

5        Q.    So, in any event, you believed that your

6        statement was correct then or now?

7                   MS. MATTAWAY:  I object.

8        A.    Correct then and correct now.

9                   THE COURT:  Sustained.  Don't say

10              anything.

11                   Next question.

12       Q.    I see.

13              Well, you even indicated, and it was a good

14       comical moment, you said, "I'm no hero."  My point is, if

15       the person came out of the theater pointing the gun at your

16       eye level, you wouldn't have noted that to the detective?

17       A.    I probably noted it.  He didn't put it down.  I

18       said, "We came out -- he came out of the theater, had the

19       gun eye level."

20       Q.    And the cop overlooked noting that, in other

21       words?

22                   THE COURT:  Sustained as to that

23              commentary.  Move on.

24       Q.    Talking like two regular guys, what sounds more

25       scary --

1              MS. MATTAWAY:  I object.

2         Q.    -- the man is tucking the gun in his waistband

3    or pointing it at shoulder height?  What is more

4    intimidating?

5              THE COURT:  Sustained.

6         Q.    By the way, what happened to you 18 years ago

7    that you couldn't be a witness then?

8              MS. MATTAWAY:  Objection.

9              THE COURT:  Sustained.

10        Q.    Like, where did they find you 18 years later?

11             MS. MATTAWAY:  Objection.

12             THE COURT:  Sustained.

13        Q.    You were out there somewhere.

14             By the way, I apologize if I had some fun with

15   you with reference to those pictures.

16        A.    It's all well and good.

17        Q.    And in your personal and/or social life, have

18   you gone to a number of theaters?

19             MS. MATTAWAY:  I object.

20             THE COURT:  Sustained.

21        Q.    Do you go to the movies?

22             MS. MATTAWAY:  I object.

23             THE COURT:  Sustained.

24        Q.    Let me ask you this:  The corridors and the

25   counters and so on depicted in these photographs that are

1    now in evidence, but for knowing the subject of this case,

2    are those scenes any different from a dozen other theaters

3    you have been in?

4              MS. MATTAWAY:  I object.

5              THE COURT:  Sustained.

6         Q.    You know, I wasn't being a comedian when I

7    asked you about those two theaters I'm familiar with.

8              MS. MATTAWAY:  I object.

9              THE COURT:  Is that a question?

10        Q.    By the way, the person you saw leaving either

11   with the gun at shoulder length or tucked in his waistband,

12   be that as it may, did you observe that he was wearing a

13   cap at the time, a white cap?

14        A.    I can't remember.  All I remember is he came, I

15   saw the gun, he tucked it, I ducked.  It happened in less

16   than three seconds.

17        Q.    And then finally, just to revisit a point, you

18   said the person you see with the gun, the person involved

19   in the argument where the girlfriend is next to him, that

20   guy, you said that guy on one hand was light complected

21   like you; is that correct?  That was your statement; is

22   that correct?

23        A.    Yes, the guy with the girl.

24        Q.    And you acknowledged, not in an offensive,

25   racial way, you're a Latino or Hispanic, correct?

cm/g Mike Centeno - for People - Cross

1        A.    Yes.

2        Q.    Yet you acknowledge, you did report to the

3   detective that morning in '89 that it was a male black with

4   a dark complexion; is that correct?

5        A.    I don't remember saying "dark," but to me, I

6   assumed -- I thought he was a black guy because I'm also

7   being mistaken for being black.  People look at me, they

8   say, oh, no.  I'm Latino.

9        Q.    So back in '89 that was your reasoning, the guy

10  was similar complexion to me, so I'll call him black

11  knowing that I'm Latino; that's your reasoning, just so I

12  understand?

13       A.    Pretty much at that time 18 years ago, the

14  early hours of the morning they asked me that question, it

15  was a black guy.

16       Q.    You realize your role here is what they call a

17  witness?  You realize that, right?

18       A.    That's correct.

19       Q.    You realize the measure of a witness is called

20  credibility, believability?

21       A.    That's correct.

22                 MS. MATTAWAY:  I object.

23                 THE COURT:  Sustained.

24       Q.    All this ethnic, racial stuff ain't too

25  credible, sir?

1                    MS. MATTAWAY:  I object.

2                    THE COURT:  Sustained.

3                    I advise counsel to watch your commentary.

4          Q.    Maybe we'll call you back after Centeno --

5     Serrano testifies.

6                    MS. MATTAWAY:  I object to whatever that

7          is.

8                    MR. BRUNO:  Good day.  Thanks.

9                    THE COURT:  Anything further from the

10         People?

11                   MS. MATTAWAY:  May I have brief redirect?

12                   THE COURT:  Go ahead.

13    REDIRECT EXAMINATION

14    BY MS. MATTAWAY:

15         Q.    Mr. Serrano, did you have --

16         A.    Mr. Centeno.

17         Q.    I'm sorry.  Mr. Centeno.  I apologize.  He just

18    said Serrano.

19                   Did you have any training from the Whitestone

20    Cinema people on how to respond to situations --

21         A.    No.

22         Q.    -- such as this?

23         A.    No.

24         Q.    Okay.

25                   And prior to having this job, had you ever

1    acted in a security guard mode?

2        A.   No.

3        Q.   And did you have any training on how to report

4    things to law enforcement?

5        A.   No.

6        Q.   Do you remember how long you spoke to Detective

7    Serrano back in July 3, 1989?

8        A.   Fifteen, 20 minutes at the most, I think, back

9    then.  It was late.  It was in the wee hours of the

10   morning, and they were just looking to take our statements

11   and get us out of there.

12       Q.   All right.

13            Had you ever seen that man who pointed the gun

14   at you before?

15       A.   No.

16       Q.   And have you seen him since?

17       A.   No.

18       Q.   And were there other people around when you

19   were talking to Detective Serrano?

20       A.   Yeah, there were a lot of witnesses that they

21   were taking statements from from the theater and other

22   security guards.

23       Q.   Okay.

24            The pops that you heard that you said sounded

25   like M80s.  Remember you said that?

1     A.     Yes.

2     Q.     Can you recall what the pacing was of the pops?

3     A.     It was like seconds apart, pop, pop, pop.

4     Q.     Were either or any two out of the three close

5  in succession to each other, the first two or the last two,

6  or were they equal?

7                MR. BRUNO:  Objection.  Beyond the scope

8        of cross.

9                THE COURT:  Sustained.

10               MS. MATTAWAY:  Nothing further.

11               MR. BRUNO:  May I proceed?

12               THE COURT:  Go ahead.

13  RECROSS-EXAMINATION

14  BY MR. BRUNO:

15     Q.     The D.A. just asked you if back in '89 you had

16  any guard training at the theater; is that correct?

17     A.     Correct.

18     Q.     Can I safely assume they didn't just hire you,

19  give you the gray slacks and the blue blazer and say,

20  "You're a guard"?

21     A.     You said it.  I didn't.

22     Q.     What's your answer?

23     A.     Yes, they handed me -- they needed somebody.

24  They handed me a gray blazer -- a blue blazer, gray slacks,

25  and said, "This is what you are going to do."

1          Q.    And also, I'm not sure what it means, but you

2    weren't in a guard mode.  What did that mean, by the way?

3    What does that mean?

4                    MS. MATTAWAY:  Objection.

5          Q.    What's guard mode?

6                    THE COURT:  Sustained.

7          Q.    What's guard mode?

8                    THE COURT:  Sustained.

9          Q.    Do you know?

10         A.    No.  Do you?

11                   THE COURT:  Sustained.

12         Q.    In any event, putting aside the lack of

13   training, putting aside the fact you weren't in a guard

14   mode, as a 26-year-old guy and now as a 44-year-old guy, do

15   you need any kind of specialized training to know what's

16   important in describing the participants in an apparent

17   murder?

18                   MS. MATTAWAY:  Objection.

19                   THE COURT:  Sustained.

20         Q.    Do you?

21                   THE COURT:  Sustained.

22         Q.    If I slug somebody right now in this courtroom,

23   aren't you going to report that it was a guy my age, my

24   complexion in a tan suit?

25                   THE COURT:  Sustained.  Beyond the scope

cm/g Mike Centeno - for People - Recross

1      of redirect.

2      Q.    You need special training for all this, sir?

3                  THE COURT:  Sustained.

4                  MR. BRUNO:  Nothing further.

5                  THE COURT:  Anything further?

6                  MS. MATTAWAY:  No, sir.

7                  THE COURT:  You may step down.  Thank you.

8                  THE WITNESS:  Thank you, your Honor.

9                  (Whereupon, the witness was excused.)

10                 THE COURT:  Ladies and gentlemen, we are

11     going to break for the day.  Again, I remind you do

12     not discuss the case among yourselves.  Do not allow

13     anyone to discuss the case with you.  Do not visit

14     the location.  Keep an open mind.  I'll see you back

15     here at 10 o'clock tomorrow morning.  Enjoy the rest

16     of your day.

17                 (Whereupon, the jury exits the courtroom.)

18                 MR. BRUNO:  May I be heard, your Honor?

19                 THE COURT:  Go ahead.

20                 MR. BRUNO:  Your Honor, putting it very

21     directly, this is the first of, I'm sure, many

22     witnesses who is outright lying about his statements

23     on the night of this incident 18 years ago.  For that

24     reason, I must call Detective Serrano, the lead

25     detective, and possibly others.

1    My application is the following:  The D.A.

2    has assured me off the record that she will produce

3    Detective Serrano.  I am now asking you to direct her

4    that if she's not going to produce him, she must tell

5    me in good faith because I must produce him and,

6    again, I'm sorry to put it so bluntly, but this is

7    the first of I'm sure many witnesses who will

8    outright lie.

9    I'm not tipping my hand in saying a

10   pivotal issue here is practically every witness says

11   it's a black man.  This witness fortunately made an

12   ass of himself, first acknowledging the comparison to

13   himself and then trying to wheedle into the fact that

14   that could be a black person.  I don't follow his

15   reasoning, but I'm going into that to make the point.

16   I now ask you to make such a direction to the People.

17   THE COURT:  Ms. Mattaway.

18   MS. MATTAWAY:  Your Honor, this is only

19   the first day of trial, but I have to say that I'm

20   really disturbed by some of the language Mr. Bruno

21   uses to come out from the starting gate, calling one

22   of my first witnesses liars.  His demonstration in

23   open court in front of these jurors berating my

24   witness, screaming at him, essentially saying, I

25   don't trust you, I don't trust you on the record,

1    words like, "All this ethnic, racial stuff ain't too

2    credible, maybe we'll call you back at another

3    trial," I just find these comments outrageous.

4            I ask at this time that the Court admonish

5    Mr. Bruno and please direct him not to make these

6    comments again in front of the jury on the record,

7    these, again, outrageous comments.  It really should

8    not have a place in a courtroom.  I really have to

9    hold myself back at the time he makes the comments

10   because I don't want to get into it with him in front

11   of this jury because they shouldn't have been made in

12   the first place, and I certainly don't want to add

13   fuel to the fire, but, I mean, the record speaks for

14   itself.

15           To jab a finger in open court at a witness

16   and say, "I don't trust you.  I don't trust you" --

17           MR. BRUNO:  He said, "Trust me."

18           MS. MATTAWAY:  -- it's irrelevant.

19           THE COURT:  One at a time.

20           MS. MATTAWAY:  What Mr. Bruno thinks, how

21   he feels, his feelings of the witness' credibility,

22   he'll be free to argue all of that on summation, but

23   I really feel that he attacked my first civilian

24   witness.  I'm really very disturbed by the racial

25   comments that he made and this comment about calling

1    you back at another trial, it really doesn't have a

2    place here in this courtroom, and I really would like

3    the Court to do something about it at this time.

4              MR. BRUNO:  May I respond, your Honor?

5              THE COURT:  No.  I need you to respond to

6    his application, and then I'll deal with your

7    application.

8              MS. MATTAWAY:  His application?

9              THE COURT:  Let's deal with one issue at a

10    time.

11             MS. MATTAWAY:  Okay.

12             THE COURT:  Detective Serrano.

13             MS. MATTAWAY:  I have reached out to the

14    man.  I have had contact with the man.  He said that

15    he would come down.  He's 75 years old.  I am trying

16    to work out the logistics with him.  I have reached

17    out to him and told him we would like him down here

18    to testify and if he doesn't come down for me, that

19    Mr. Bruno wants him, but I have made contact with the

20    man.  I have told him to come down.  I don't have a

21    date yet.  He said maybe next week.  I know we are

22    not meeting the 3rd or 4th.

23             THE COURT:  Ms. Mattaway, please reach out

24    to him again and get a definite date.

25             MS. MATTAWAY:  Okay.

1          THE COURT:  Now, Mr. Bruno, do you wish to

2     respond to the People's application?

3          MR. BRUNO:  Your Honor, I don't want this

4     to get to the level of sandbox; however, the gauntlet

5     has been dropped.  The D.A. engaged in personal

6     attacks.  I'll respond in a limited way.

7          Most notably two minutes into this man's

8     testimony, the D.A. elicits the racial and ethnic

9     makeup of all the parties involved except the

10     shooter.  Why?  Because she knew that this man back

11     in '89 said he was a male black, dark complexion.

12     She actively evaded the most blatant conflict in this

13     man's testimony.

14          Also, your Honor, I'll state as an officer

15     of the court and, of course, this witness denied

16     everything, that's why I need Serrano, but in this

17     man's interview with Detective Serrano, the lead

18     detective, he first involves himself in this incident

19     as the apparent shooter is fleeing the theater.  He's

20     never in the lobby.

21          Furthermore, for example, he puts himself

22     in the presence of his boss, Jonesy, which is Greg

23     Jones, the armed C.O.  Relying upon your discovery,

24     Serrano's investigation, Jones is never in the

25     theater.  He is assigned a patrol car patrolling the

1     parking lot.

2            So, yes, I'm the first to acknowledge I

3     use stronger than usual language in discussing this

4     witness because he made so many blatant, boldface

5     lies and the D.A., to an extent, facilitated it.  To

6     prep a man to purposely evade the ethnic, racial

7     makeup of the alleged defendant because she knew it

8     would be a blatant lie, that's outrageous.

9            THE COURT:  Okay.  Contradictions

10    notwithstanding, commentaries have no place during

11    the questioning of a witness.  Commentaries have no

12    place in front of a jury.  To some extent, that rule

13    applies to openings and closings, depending on what

14    the comment is.  The commentaries have to come to a

15    stop.  What I'm going to classify as bickering with

16    witnesses, be it lightheartedly, has to come to a

17    stop.

18           I, as I always do, try to give both sides

19    some leeway, but don't misinterpret my quiet

20    demeanor; and the more this thing goes on that we

21    think we can ask a question any way we want at any

22    time we want and make a comment any way we want and

23    we can try to slip things in any way we want, the

24    more it goes on, the more restrictive I'm going to be

25    and I have no qualms about being restrictive for the

1     jury, and if the jury reacts to it and any party

2     suffers from it, my attitude is you brought it on

3     yourself.

4             We've got to bring all this under control

5     with the comments, with the way the questions are

6     asked.  Like I said, I believe in giving people some

7     leeway, but I will crack down across the board.

8             It appears that my comments are being

9     directed at Mr. Bruno.  So we are clear, my comments

10    apply to everybody in front of me in the courtroom.

11    One of my primary missions is to make sure everybody

12    gets treated the same and there is a fair trial.

13    Hopefully, I will not have to address this issue ever

14    again.

15            That being said, I assume there is nothing

16    else, I'll see everybody back here 10 o'clock

17    tomorrow morning.

18                 MS. MATTAWAY:  Thank you.

19                 MR. BRUNO:  Have a good evening, sir.

20                 (Whereupon, the trial is adjourned to June

21    29, 2007.)

22

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK

2   BRONX COUNTY :  CRIMINAL TERM :  PART 1

3   ------------------------------------------

4   THE PEOPLE OF THE STATE OF NEW YORK,

5                    -against-                    IND. NO.
                                                  3825/2006
6   RICARDO JIMENEZ,

7                         Defendant(s)            Trial

8   ------------------------------------------

9                              June 29, 2007

10                             851 Grand Concourse
                               Bronx, New York 10451
11
    B E F O R E:
12
            THE HONORABLE ROBERT TORRES,
13
                              JUSTICE.
14
    A P P E A R A N C E S:
15
            ROBERT T. JOHNSON, ESQ.
16          District Attorney, Bronx County
            BY:  LISA MATTAWAY, ESQ.,
17               DEBRA GUARNIERI, ESQ.
                 Assistant District Attorneys
18
19          PATRICK BRUNO, ESQ.
            BRIAN WILSON, ESQ.
20          Attorneys for the Defendant

21
    Also Present:  MR. JOSEPH SHMULEWITZ, Intern
22
23                            Catherine Mercorella,
                              Senior Court Reporter
24
25

1               (Whereupon, People's Exhibit Numbers

2       7-A through 7-E, photos on poster board, were

3       received in evidence and marked.)

4               (Whereupon, People's Exhibit Numbers

5       8-A through 8-F, photos on poster board, were

6       received in evidence and marked.)

7               THE COURT OFFICER:  Place your left hand

8       on the Bible, raise your right hand and face the

9       clerk.

10              THE COURT CLERK:  Do you solemnly swear

11      the evidence you give to the court and jury will be

12      the truth, the whole truth and nothing but the truth,

13      so help you God?

14              THE WITNESS:  Yes.

15              THE COURT OFFICER:  Please state your

16      first and last name.

17              THE WITNESS:  Andrew O'Brien.

18              MS. MATTAWAY:  Judge, can I talk to him?

19              THE COURT:  Yes.

20              (Discussion off the record between the

21      D.A. and the witness.)

22              THE COURT:  Ready?  Jury, please.

23              THE COURT OFFICER:  Jury entering.

24              (Whereupon, the jury enters the

25      courtroom.)

 1                    THE COURT CLERK:  Case on trial continued.

 2        All sworn jurors are present.

 3                    THE COURT:  Good morning, jurors.

 4                    THE JURORS:  Good morning.

 5                    THE COURT:  The witness on the stand,

 6        Mr. O'Brien has already been sworn in.

 7                    You may proceed.

 8                    MS. MATTAWAY:  Thank you.

 9   A N D R E W   O ' B R I E N, having first been duly sworn,

10        testified as follows:

11   DIRECT EXAMINATION

12   BY MS. MATTAWAY:

13        Q.    Good morning, Mr. O'Brien.

14        A.    Good morning.

15        Q.    I'm going to stand back here, and I'm going to

16   ask you to please keep your voice up and talk into the

17   microphone so we can all hear what you have to say.  Okay?

18   Thank you.

19                    How old are you, sir?

20        A.    Thirty-nine.

21        Q.    Are you presently incarcerated?

22        A.    Yes.

23                    MR. BRUNO:  I'm sorry to interrupt.  The

24        witness was never identified in front of the jury.

25                    THE COURT:  I think I just said

1          Mr. O'Brien.

2                    MR. BRUNO:  Correct.  Can we hear his

3          first name, most respectfully?

4                    THE COURT:  Why don't you give your full

5          name for the jury.

6                    THE WITNESS:  Andrew O'Brien.

7                    THE COURT:  You can move that microphone

8          over a little more.

9                    MR. BRUNO:  Sorry to interrupt.

10                   MS. MATTAWAY:  It's okay.  Sure.

11         Q.    For what crime, sir, are you presently

12    incarcerated?

13         A.    Murder.

14         Q.    Okay.  Can you tell us the date it was

15    committed?

16         A.    October.

17         Q.    Approximately, the year?

18         A.    October 1990.

19         Q.    '90?

20         A.    No, no -- yeah, '90, '90.

21         Q.    And how long are you facing?

22         A.    Eighteen more years.

23         Q.    Okay.

24               Did you know somebody named Sean Worrell?

25         A.    Yes.

cm/a Andrew O'Brien - for People - Direct

1    Q.    How did you know him?

2    A.    We grew up in the neighborhood together.

3    Q.    Did you know him by any kind of nickname?

4    A.    Shaka.

5    Q.    And I would like to direct your attention at

6    this time to July 3, 1989.

7          Did something happen on that date?

8    A.    Yes.

9    Q.    Okay.  What happened on that date?

10   A.    Well, that date me, Shaka and a couple of other

11   guys, we went to the Bronx movie theater, the Whitestone

12   movie theater in the Bronx and we got into an argument with

13   a guy and he ended up getting killed.

14   Q.    Who ended up getting killed?

15   A.    Shaka.

16   Q.    What movie were you going to see?

17   A.    Batman.

18   Q.    Do you remember about what time you got to the

19   movie theater on July 3, 1989 or was it still July 2?

20   A.    It was -- it had to be probably around 10:30,

21   11:00 or something.

22   Q.    Do you remember what show you were going to

23   see?

24   A.    As far as what?  What you mean?

25   Q.    What time?

1        A.    Was it the last show or something?

2        Q.    Yes.

3        A.    I don't know what time the movie theater

4 closed, but it probably was the last show.

5        Q.    All right.

6            And who were you with that evening?

7        A.    I was with Shaka and Dean.  You want the last

8 name, too?

9        Q.    Sure.

10       A.    Dean Beckford and another guy named Earl.  I

11 don't know his last name.

12       Q.    Did Dean Beckford have any kind of nickname?

13       A.    Smiles.

14       Q.    And did Earl have a nickname?

15       A.    Patchy.

16       Q.    What was your relationship to Patchy?

17       A.    We was friends.

18       Q.    And what was your relationship to Smiles?

19       A.    Same thing, we was friends.

20       Q.    Were you equally friends with Shaka, Smiles and

21 Patchy at that time?

22       A.    Well, me and Smiles and Patchy was a little bit

23 more closer, but, you know, we was basically the same.

24       Q.    When did you meet Shaka?

25       A.    I knew him from when he was a kid, you know.

1  Like, I don't know, he probably was about 13, 14 or
2  something.
3      Q.    That evening when you went to the movie
4  theater, did any of the four of you have weapons?
5      A.    Yes.
6      Q.    Who had weapons that evening?
7      A.    Shaka had a weapon, Dean had a weapon and
8  Patchy had a weapon.
9      Q.    Did you have one?
10     A.    I had one, too, yes.
11     Q.    So you all did?
12     A.    Yes.
13     Q.    All four?
14     A.    Yes, but not in the movie theater, but we had
15  guns in the car.
16     Q.    Okay.  Can you tell us why you brought your
17  guns in a car to a movie?
18     A.    Well, at the time, you know, we was running the
19  streets.  We was into selling drugs and different things,
20  so we just always carried a gun.
21     Q.    Was Shaka running with you, too?
22     A.    Yes.
23     Q.    Okay.  When you went into the movie theater,
24  though, after parking the car, did anyone, if you know,
25  take their guns with them?

1        A.    Well, as far as I knew, everybody took their

2   gun with them except me.

3        Q.    Okay.  Yours was in the car?

4        A.    Right.

5        Q.    Why didn't you take yours?

6        A.    Well, because that day was windy and I had a

7   T-shirt on and I knew that sometimes they have undercover

8   cops in the movie theater, and when I got out of the car,

9   it was kind of windy and I said I could see the bulge in my

10   waist and I said, yo, these guys got guns.  I don't need my

11   gun.  I'll be all right.  We all right.  So, I left it in

12   the car.

13        Q.    Do you remember what Shaka was wearing that

14   evening?

15        A.    What he was wearing?

16        Q.    Yes.

17        A.    Not particularly, probably a short set or

18   something.

19        Q.    Do you remember what he looked like?

20        A.    Shaka?

21        Q.    Yes.  Describe him for us.

22        A.    He was short, stocky, dark skinned.  That's it

23   really.

24        Q.    And tell us about Patchy; what did he look

25   like?

cm/a Andrew O'Brien - for People - Direct

1       A.    Patchy was a little bit taller than Shaka, dark

2  skinned.  He had like a short afro.  That's about it.

3       Q.    And tell us what Smiles looked like.

4       A.    Smiles was a little bit taller than both of

5  them.  He wore glasses and kept his hair at that time like

6  in a box top.

7       Q.    Okay.

8       A.    Or flat top, whatever.

9       Q.    What did you look like back then?

10      A.    I was -- I guess I looked younger.  I had a

11  little facial hair.  My hair was like, you know, square,

12  like, you know, flat top or whatever.  I wore glasses.

13      Q.    Have you always worn glasses?

14      A.    No, not always.

15      Q.    When did you start wearing glasses?

16      A.    About '89.

17      Q.    About then?

18      A.    Yes.

19      Q.    All right.

20            How tall are you, sir?

21      A.    Five seven and a half.

22      Q.    About how much do you weigh?

23      A.    Right now 165.

24      Q.    Do you remember about what you weighed back

25  then in '89?

1      A.    Probably -- I was probably 170, a little bit
2    more heavier, you know.
3      Q.    Okay.  And in terms of your height to Shaka's
4    height, what would be the difference?
5      A.    I would say I was slightly taller than him.
6      Q.    And I forgot if you have given me that, if I
7    asked you the question, what Smiles was wearing.
8      A.    At the time I think he was wearing like jeans
9    and a jacket or something.
10      Q.    Do you remember what Patchy wore?
11      A.    Probably jeans and a T-shirt and a jacket, like
12    a spring -- you know, something you wear in the summertime
13    when it's a little windy.
14      Q.    Did you see what Shaka did with his gun?
15      A.    When he got out of the car?
16      Q.    Yes.
17      A.    No, but I presume that he had it in his waist.
18      Q.    If you don't know, you can say.
19      A.    No, I don't know what he did with it.
20      Q.    Okay.  Do you even know that he took his gun
21    with him?
22      A.    No.
23                  MR. BRUNO:  Objection.  Asked and
24          answered.
25                  THE COURT:  Overruled.

1              Next question.

2     Q.    Did you see if Patchy took his gun with him?

3              MR. BRUNO:  Objection.  Asked and

4     answered.

5              THE COURT:  Overruled.

6              MR. BRUNO:  May we approach, your Honor,

7     with the reporter?

8              THE COURT:  Step up.

9              Excuse us a moment.

10             (Whereupon, the following takes place in

11    camera, on the record, in the presence of the court

12    and counsel; the defendant is not present:)

13             MR. BRUNO:  Your Honor, not making a

14    personal attack, but I want to try to nip this in the

15    bud.  A lot of this occurred yesterday, and I was

16    pretty quiet about it.

17             What the D.A. does and has done is when

18    her witnesses give an answer that she doesn't want to

19    hear, thinks hurts her case, she asks it again three

20    minutes later.  With all due respect to your Honor,

21    I'm sure you do recollect one of the earlier

22    questions and answers, sort of like preparation for

23    going into the theater, this witness made it clear

24    that all four men arrived with weapons; that when

25    they exited the vehicle, the three others kept their

cm/a Andrew O'Brien - for People - Direct

1    guns because they have proper clothing on.  This man

2    left his gun in the car because he had on a thin

3    T-shirt and it was windy and, again, you know, I

4    don't want it to be personal, but the D.A. is

5    cognizant that these guys went there that night

6    loaded for bear, and she's not going to hide it.

7                In addition, she is going to end up

8    embarrassing herself like she did yesterday with that

9    last witness because I have all the reports on this

10   guy.  This guy tells us in the reports who had guns

11   and what kind of guns.  They were packing heavy, a

12   .357 and a 9 millimeter, so I don't know why she's

13   doing this, and it shouldn't be allowed.

14                MS. MATTAWAY:  I believe it's fair inquiry

15   of this witness.

16                MR. BRUNO:  Asking 12 times?

17                THE COURT:  To the extent that there may

18   be some effort to clarify, I'm going to allow these

19   questions.  I assume that you have a question now

20   about whoever is next, Patchy, and then I assume we

21   are moving on.

22                MS. MATTAWAY:  Of course.  But what I am

23   just trying to get out from this witness is at what

24   point does he know that they have guns.  Is it as

25   they are getting out of the car?  Is a conscious

1      decision made?  He has said why he doesn't have his

2      gun, but I don't know.  Perhaps the first time he

3      sees that they brought guns with them was in the

4      theater.

5            THE COURT:  To the extent that you're

6      clarifying that they kept their guns, I'm going to

7      allow it.  If you intend to go beyond that, I'm going

8      to shut you down.  Okay?  I acknowledge that the way

9      he answered the first question you may want to

10      clarify to make sure.

11            MS. MATTAWAY:  How does he know that they

12      have guns?

13            THE COURT:  That they did keep their guns,

14      but, you know, if you go beyond that and keep asking

15      questions about these guns, I'm going to stop it.  I

16      think it's information you already have on the record

17      and we need to move on.

18            MS. MATTAWAY:  Okay.

19            (Whereupon, the following takes place

20      in open, on the record, in the presence of the

21      court, counsel, defendant and jury:)

22            MR. BRUNO:  Your Honor, may I have a

23      recess so the reporter can transcribe what occurred

24      thus far?  You're making it as though this needs

25      clarification.  The man made it crystal clear.  All

cm/a Andrew O'Brien - for People - Direct

1      four exited the car with guns.  Three retained it on

2      their person.  The fourth one abandoned it in the car

3      because of a thin T-shirt.  I'm sure you recall that.

4                    With all due respect, how are you

5      tolerating this?

6                    THE COURT:  Based on your application now

7      and your excellent recall of what the testimony is,

8      you don't need it transcribed.

9                    Let's go back.

10                   (Whereupon, the following takes place

11     in open, on the record, in the presence of the

12     court, counsel, defendant and jury:)

13                   THE COURT:  You may continue.

14                   MS. MATTAWAY:  May I have the last

15     question read back, please?

16                   (Whereupon, the requested portion was

17     read by the reporter.)

18                   MR. BRUNO:  I renew my objection.  Asked

19     and answered.

20                   THE COURT:  My ruling stands.  You may

21     answer that question.

22     A.    No, I don't know if he took it or not, but I

23     presume -- I thought that he did.

24                   THE COURT:  If you don't know, that's your

25     answer.

1                    Next question.

2          Q.    Did you see Smiles take his gun?

3          A.    No.

4          Q.    Once the four of you got out of the car, where

5     did you go?

6          A.    Well, we wasn't in the same car.

7          Q.    Oh.

8          A.    We was in two different cars.

9          Q.    Who did you go with?

10         A.    I was with Patchy and Shaka was with Smiles.

11         Q.    Did both cars arrive at the theater at

12    approximately the same time?

13         A.    No.  Smiles and Shaka came first, got there

14    first.

15         Q.    And about how long after they arrived did you

16    arrive in your car?

17         A.    We got there, we got there probably about 15

18    minutes later, 20 minutes.

19         Q.    Did you meet up with them?

20         A.    Yes.

21         Q.    How did that happen?

22         A.    Well, we went into the lobby and we seen them

23    standing there.

24         Q.    And then what happened?

25         A.    Well, we was waiting for the movie to start and

1       it was like a long line on the concession stand, so I said,

2       I was saying, "Yo, who's gonna get the popcorn" and

3       whatever, whatever.  So nobody -- everybody just didn't

4       want to go.  I said, "Yo, Shaka, let's go over and get the

5       popcorn, man."

6               So, we went over there and we are waiting on

7       line for the popcorn and I'm talking to him about different

8       things, you know, B.S.'ing and whatever, and that's when

9       the individual approached us.

10      Q.    And then what happened?

11      A.    And he like -- I'm on the line, so Shaka is

12      standing next to me.  So he said, "Yo, you on the line,

13      man?" like that, and like real, real aggressively.  So,

14      Shaka looked up and was like, "No, no, no, I'm not on the

15      line."  So he was like looking and I'm like, "Yo, what's

16      this guy's problem, man?"

17              So, me and the guy started arguing.

18      Q.    And what was your argument about?

19      A.    Just the fact that the way he came up and I'm

20      like, "Yo, what's up, man?"

21              He's like, "Yo, what's up?" boom, boom, boom,

22      and we just started arguing.  That was it.

23      Q.    Prior to this argument, did you have any

24      conversation with Patchy, Smiles or Shaka about who had

25      guns?

1          THE COURT:  Sustained.

2     Q.   When this man came up, where were Smiles and

3  Patchy?

4     A.   They was like standing -- they like in the

5  background.  They standing somewhere on the side.  They are

6  not close to us because it was just me and him standing

7  there.  Me and Shaka was the only one standing on the line.

8  They are like just waiting for us standing.  You know, if I

9  could remember the movie theater correctly, it's like, you

10 know, they got like a game, they had like video games over

11 there, something off to the side.  I don't know.

12               MS. MATTAWAY:  At this time I would like

13          to show the witness People's 3-A through D.

14     Q.   Take a look at that exhibit, Sir.

15               Do any of the photos in that exhibit look

16 familiar?

17     A.   Yeah.  Yes, they do.

18     Q.   Okay.  Which ones do you recognize?

19     A.   Um, I recognize all of them.

20     Q.   What do you recognize --

21     A.   I mean, I can't recognize them as the specific

22 movie theater, but that's how most movie theaters look.  I

23 don't know if that's what you're asking me.

24     Q.   I'm asking if any of the photos look or depict

25 anything that you remember from this movie theater from

cm/a Andrew O'Brien - for People - Direct

1    July 3, 1989.

2           A.    Yeah.   Well, I remember the concession stand.

3    The rug looks familiar.   You know, it all looks familiar.

4                 MS. MATTAWAY:   You could take it back.

5           Q.    And how far up on the concession stand line

6    were you when the argument began?

7           A.    I'd say we was pretty close to it because we

8    been standing there for a little while, so we was moving up

9    in line and everything, so.

10          Q.    And what words were said?

11          A.    He was like, he came and he said, "Yo, what's

12   up, man?  You on the line, man?" like, you know, real

13   aggressive, and Shaka, like he looked at him and he's like,

14   "No, no, I'm not on the line," but the guy was like looking

15   and I'm like, "Yo, what's his problem, man?"

16                And then me and him was looking at each other.

17   He's like, "What's up?"  And I'm like, "What's up, man?"

18   And we started arguing.

19          Q.    What you said was you started arguing.  What

20   did you argue about?

21          A.    It was basically, "What the F you looking at?"

22   "Yo, what's up?" boom, boom, boom.  It wasn't really about

23   nothing.

24          Q.    What do you mean by "boom, boom, boom"?

25          A.    Well, you know, we started tossing around, "Yo,

1   what's up, man?"  boom, boom.  "Yo, what the F you want to
2   do?"

3               I remember us yelling.  I don't know the exact
4   words, but I remember us yelling and arguing, you know, and
5   when -- before he walked off, that's when I said, "Yo" --
6   excuse my language -- I said, "Yo, you pussy, man."

7               He's like, "What?" boom, boom.  And he turned,
8   he said, "Yo, man.  All right, I'm gonna get my gun."  And
9   I was like, "Yo, go ahead.  Go ahead." boom, boom, because
10  I'm mad now and I'm thinking, all right, you know, we all
11  right in here, boom, boom, boom.  So, and he walked out.
12  That's when he walked out of the movie theater.

13      Q.    What do you mean when you keep saying, "boom,
14  boom"?

15      A.    Well, I'm trying to add lib, you know, curses
16  in there.  I don't know, you know.  I don't know the
17  specific curses, you know, mother F'er or this, that, you
18  know, whatever it was.

19      Q.    You do remember calling him a pussy, though?

20      A.    Yes.

21      Q.    And what did you mean when you just said, "We
22  were all right"?

23      A.    Well, you know, I figured there is four of us.
24  There is only one guy, you know.  These guys, you know,
25  they strapped or whatever.  So, I mean, we should be all

cm/a Andrew O'Brien - for People - Direct

1    right, you know.

2         Q.    Did you notice if this man was with anybody?

3         A.    No, at the time I didn't notice he was with

4    anybody.

5         Q.    Okay.

6               What did the man look like?

7         A.    Well, he was like my complexion, a little bit

8    taller than me.  He was a little like slimish.  That's

9    basically it.

10        Q.    And after he said that he was going to go get

11   his gun, did you see where he went?

12        A.    Well, I know he went through the door.

13        Q.    Which door?

14        A.    Through the lobby door.

15        Q.    You're making a gesture with your finger.

16        A.    I'm looking at the --

17        Q.    At People's 3?

18        A.    Yeah, I'm looking.

19        Q.    Is there a specific photo on People's 3 that

20   you're pointing to?

21        A.    These doors right here.

22               THE COURT:  Indicating People's 3-B.

23        Q.    3-B?

24        A.    Yes.

25        Q.    The front doors of the theater?

1      A.    Yes.

2      Q.    Did you see him leave through the front?

3      A.    Yes.  He went through the doors.

4      Q.    Okay.  How far, if at all, past the front door

5   could you see him?

6      A.    Well, after he went out the front door, I

7   didn't see exactly where he went because like then we went,

8   we still bought the popcorn and everything.  We was like,

9   "Man, forget it," because Beckford and Patchy, they was

10   like, "Yo, forget that dude.  Forget all that."

11            So, I went and bought the popcorn and left.  I

12   didn't even know he was gonna come to the same movie

13   theater.  They was like, "Yo, forget that dude, man."

14      Q.    And which movie theater did you go to?  Do you

15   remember?

16      A.    We ended up going to the Batman movie.

17      Q.    And do you remember where the theater was?

18      A.    I don't know if I could say I remember where it

19   was.  I know we had to walk down a short hallway and then

20   we went through the doors.

21      Q.    Okay.  And when you got to the movie theater,

22   do you remember where you took a seat?

23      A.    Yes.

24      Q.    Where did you sit when you first got to the

25   theater?

1      A.     When we first got to the theater, we went all

2  the way down to the bottom, sat down like, I don't know,

3  four or five, about four or five rows from the movie

4  screen.

5      Q.     Who is "we"?

6      A.     Me, Patchy and Smiles and Shaka.

7      Q.     You all four sat together?

8      A.     Well, me and Shaka sat in two seats, and they

9  sat in the row -- I think it was the row behind us.

10     Q.     Is there any reason why you didn't sit in the

11  same row?

12     A.     Well, because, I mean, it's a big movie

13  theater, you know, and you just sat in different rows.

14  That's it.  You know, like they right behind us, so we can

15  still conversate or whatever, so.

16             MS. MATTAWAY:  Okay.  At this time I would

17         like to show the witness People's 7-A through E

18         already in evidence.

19             THE COURT:  Members of the jury, this

20         exhibit was premarked and admitted into evidence

21         before you came out.  This is in evidence.

22     Q.     Take a look at that exhibit board, sir.

23     A.     All right.

24     Q.     Are you able to see on this exhibit the seats

25  that you took with your friends on July 3, 1989?  Can you

1    see them in any of these photos?

2         A.    Well, it looks like it could be on this side,

3    but I have to see.  Is this the movie theater?  Is this the

4    movie screen right here?  Because we was sitting right

5    close to it.

6              THE COURT:  Pointing to 7-A.

7         Q.    I'll show you People's 8.  This is 8-A through

8    F already in evidence.

9              THE COURT:  Members of the jury, this

10             exhibit also was marked and admitted into evidence

11             prior to you coming into the courtroom.

12        A.    Somewhere, somewhere over here, if I'm not --

13   see, we are sitting on -- let me see.

14             THE COURT:  The record should reflect the

15             witness just pointed to 8-F.

16        A.    I think it's the right-hand side -- no, it's on

17   the left side.  We were sitting on the left side on the

18   small -- on these small -- you know, the section that's

19   smaller.

20        Q.    Yes.

21        A.    We were right up on the movie screen.

22             MS. MATTAWAY:  Okay.  I'm going to give

23             the witness a red pen.

24        Q.    Can you just indicate directly on any photo,

25   any photo you think is helpful, to demonstrate what you're

1    describing?  Just make an "X" where you think you remember

2    you were sitting.  If you can't remember, you can't

3    remember.

4         A.    I'm trying to remember if it was my right or my

5    left when I come in.  It was on the -- it was on the

6    left-hand side, so where you come down, I don't think you

7    have it in this picture.  I think it's on the other side.

8         Q.    Okay.  Would you like to see the other board?

9    Perhaps that would be helpful, People's 7.

10        A.    Yeah, yeah, we was sitting on the other side.

11        Q.    So, it's not shown in the photographs?

12        A.    I think it's on the other side, if I'm not

13   mistaken.

14        Q.    All right.

15              So, what happened after you were sitting in the

16   theater?

17        A.    So, we are sitting there and the lights are

18   still on and everything and peoples is coming into the

19   movie theater.  So when I -- when one of them looked,

20   either Patchy or Smiles looked up and seen, he said, "Yo, I

21   think that's that dude right there."  And he came in, and

22   he sat down somewhere at the top.  As soon as you come

23   through the doors on the other side, it's like there's a

24   row right there on the big side.  So, I like looked and I

25   like turned around and next thing you know like he went

1    back through the doors, right?  And we're sitting there.

2    He came down, came all the way down, and he said, "Yo, when

3    the movie is over, it's me and you" and he walked off.

4         Q.    He said that to who?

5         A.    To me.  See, his main problem was with me; it

6    wasn't really with Shaka.  His main problem was me because

7    I was the one that was giving him all the mouth.

8         Q.    Okay.  And was he alone when he came down?

9         A.    When he came down, yeah, he was alone when he

10   came down.

11        Q.    Did you recognize him when he came back in?

12        A.    Yeah, yeah.  I knew who he was.

13        Q.    Had anything changed about his appearance from

14   when you had first seen him out at the concession stand and

15   this time?

16        A.    No, not really.

17        Q.    Okay.  And when he said those words to you,

18   when it's over it's you and me or something?

19        A.    Yeah.

20        Q.    What, if anything, did you do or say in

21   response to that?

22        A.    I didn't say nothing to him at first, and he

23   walked off.  He walked off and Patchy was like, "Yo, what's

24   this dude trying to do?"

25              So then I looked at Shaka and I told him, I

1      said, "Damn, yo, I left my gun in the car."

2                    He said, "Yo, why did you do that?"

3                    I said, "Yo, because the bulge."

4                    He said, "Yo, this dude is bluffing."  And

5      that's when I got up, Patchy got up, and said, "Yo, what's

6      up with this guy?"  And he got up and started walking out,

7      and I followed behind him.

8          Q.    Patchy went first?

9          A.    Yes.

10         Q.    And then what happened?

11         A.    He like got up and he walked around, around the

12     aisle and went up this way, and I was walking, I'm walking

13     with him, but I like walked past him because I'm getting

14     kind of like hyper.

15         Q.    Past Patchy?

16         A.    Yeah.  So I walked past him, and it's like when

17     I got -- when I got close to the doors, I seen this homeboy

18     seen me coming, and he was like, "Yo, what's up?  You got a

19     gun?"  And that's when he pulled out, and I said, "Yo," I

20     said, "Yo, he got a gun.  He got a gun."

21         Q.    Who were you saying it to?

22         A.    I was saying it to Patchy, "Yo, he got a gun.

23     He got a gun."  Patchy is looking at me like, Why you

24     acting like that?  The way he looked at me, like, yo, he

25     thought I had a gun on me, too.  I didn't tell him.  I told

1    Shaka I didn't have my gun on me.

2           Q.    You did not tell Patchy you were not armed?

3           A.    I didn't tell Patchy I wasn't armed because I

4    was kind of like, you know, kind of embarrassed, you know,

5    he was like, Yo, what's the matter?  You scared to carry a

6    gun?

7                 So, anyway, when I say, "Yo, he got a gun, he

8    got a gun," and next thing you know the shooting just --

9    they started shooting.  He just started shooting, boom,

10   boom.  That's like when I ducked.  I felt I got hit or

11   grazed or whatever, and that was it.

12          Q.    At the time you first noticed this person pull

13   a gun out --

14          A.    Yeah.

15          Q.    -- how far away were you standing from him?

16          A.    Probably, probably like from a little just

17   slightly close where you are from where I'm at now.

18          Q.    From where maybe the brown chair is?

19          A.    Yes.

20                THE COURT:  Approximately 16 feet.

21                MS. MATTAWAY:  All right.

22          Q.    And where is Patchy?

23          A.    Patchy is like, he's like a little bit behind

24   me.  So when I run back, I like catch up to him.  I'm like,

25   "Yo, he got a gun."  He's basically standing just a little

1      bit close to me.

2             Q.    Where are you standing at this time?

3             A.    I'm standing in the aisle and I'm standing --

4      like Patchy is behind me.  I'm standing right here.

5             Q.    Were you in the same aisle as the man with the

6      gun?

7             A.    Yes.

8             Q.    And in terms of the screen and where the back

9      of the theater is, who was standing where?

10            A.    Well, Shaka -- I mean Patchy is standing like

11     close to me, and that's when Shaka was like walking up.  He

12     was coming up behind us.

13            Q.    Is the man with the gun in the aisle closer to

14     the back of the theater or the screen?

15            A.    No.  He's closer to the back of the theater.

16            Q.    All right.  And where are you?  Are you closer

17     to the back of the theater or closer to the screen?

18            A.    Well, compared to where he's at, I'm closer to

19     the back -- to the screen, but we are all up there.  Like,

20     you know, we're not down at the bottom of the movie

21     theater; we're on the top.

22            Q.    Had you left your seat to go towards the back;

23     is that what you're telling us?

24            A.    No.  I left my seat to go -- yeah.  You mean

25     the back?  You mean to exit, towards the exit?  Is that

1       what you're saying?

2           Q.    To the back of theater which would eventually

3       lead out to the concession stand as opposed to the screen.

4           A.    Yes.

5           Q.    That's what I'm trying to understand.

6           A.    Yes.

7           Q.    All right.

8                 In terms of which aisle, based on any of the

9       photos that have just been shown to you, are any of the

10      photos helpful in describing which aisle you're talking

11      about?

12          A.    Yes.  I think one of the aisles was the one

13      that we was in, but it wasn't the aisle that we were

14      sitting in.  The first time you asked me was it --

15          Q.    Okay.  It's a different aisle than the aisle

16      you had sat in; is that what you're telling us?

17          A.    Yes.

18                MS. MATTAWAY:  Can the witness be shown

19            both People's 7 and 8?

20                THE COURT OFFICER:  Together?

21                MS. MATTAWAY:  Yes, the two big boards.

22          Q.    Do you need either of those boards to describe

23      the aisle you're talking about this happening in?

24          A.    This aisle right here.

25          Q.    Which photo are you talking about?

cm/a Andrew O'Brien - for People - Direct

 1          A.   E.

 2                    THE COURT:  That would be 8-E.

 3                    MS. MATTAWAY:  8-E. Can we flip it?  All

 4          right.

 5          A.   This one right here.

 6          Q.   That's the aisle you're talking about?

 7          A.   Yes.

 8          Q.   Okay.  Using the red pen -- do still have it,

 9     the marker?

10          A.   I don't know what I did with it.

11                    THE COURT OFFICER:  I have it.

12          Q.   Can you please make an "X" for where you saw

13     the man with the gun standing in any photo that's relevant.

14          A.   Right here.  You said an "X"?

15          Q.   Yes.

16                    (The witness has complied.)

17          Q.   Which photo did you mark, sir?

18          A.   E.

19          Q.   You marked E, okay.

20                    And do you see the approximate spot where you

21     remember standing with Patchy in any of the photos?

22          A.   Damn.  Where the hell is that "X" at?  I can't

23     see.  I don't think this is very good.

24          Q.   Would you rather a heavier marker?  You want a

25     black magic marker?

1           THE COURT:  Black will not work.  Do you

2      have a light color?

3           MS. MATTAWAY:  I have orange and pink.

4           THE COURT:  That might work.

5      A.   A different color probably.

6      Q.   Okay.  Try pink.

7      A.   No, this is the same thing.

8           (The witness has complied.)

9           THE COURT:  Can you do me a favor?  Next

10      to that last "X" you marked, the last one, the one

11      you just did, sir, just put a little number "2" like

12      that.  We have two "X"s there.  We want to make sure

13      we know the difference.

14           (The witness has complied.)

15           THE COURT:  Thank you.

16      Q.   Are you able to, using the marker, write "A" --

17 and Patchy was Dean Beckford?

18      A.   No, that's Earl.

19      Q.   That was Earl?

20      A.   I don't know his last name.

21      Q.   Just make an "E" and an "A" for where the two

22 of you were, please.

23      A.   The first "X" you told me to mark where I was

24 at.

25      Q.   The first "X" is where the man with the gun is.

1      A.    The second "X" you wanted to know where I was
2   at?
3      Q.    Just put an "A" there, please.
4            (The witness has complied.)
5      Q.    Okay.  Did you move any closer to the man?
6      A.    Closer?
7      Q.    Yeah.
8      A.    No.
9      Q.    When you saw that he had the gun?
10     A.    No.  I tried to move away from him.
11     Q.    All right.
12           What did you do?
13     A.    I said, "Yo, he got a gun" and that's when I
14   like ran, because I'm trying, I'm trying to warn Patchy
15   'cause he's like a couple of steps behind.  I said, "Yo, he
16   got a gun" and Patchy went to reach in his waist for
17   whatever, and that's when all the shooting just happened,
18   started.
19     Q.    How was the man holding the gun?
20     A.    Like this.
21     Q.    Okay.  Can you actually stand up and do that,
22   please.
23           Straight out in front?
24     A.    Yes.
25           MS. MATTAWAY:  The record should reflect

1          the witness has stood up and held his arm out here in

2          open court and made a motion with his fist as if he's

3          holding a gun.

4      Q.    Did he say anything at that time?

5      A.    No.  All I know what he said, he said, when I

6   seen him with a gun, he said, "What's up?  You got a gun?"

7   Like he asked me if I had a gun.  Like, "Yo, what's up,

8   man?"  And that's when he pulled out the tool -- I mean the

9   gun, and that was it.

10     Q.    All right.

11          What else, if anything, was going on in the

12  theater at this time?

13     A.    What else?  What you mean?

14     Q.    Did anyone else -- was anybody saying anything

15  else or moving or anything?

16     A.    Well, it was so quick.  There was really not

17  too much to say.  I know Patchy was standing here and Shaka

18  was coming up.

19     Q.    How do you know Shaka was coming up behind you?

20     A.    Because I seen.  Like, I turned a little bit

21  and I seen, because I got to turn this way to turn to

22  Patchy.  I'm like, "Yo, he got a gun."  I'm trying to move

23  past him, because I know Patchy has a gun on him.  I'm

24  trying to get behind him.  So I'm looking at him like this,

25  and I seen Shaka coming up, you know.

cm/a Andrew O'Brien - for People - Direct

1          Q.     What was Shaka doing?

2          A.     When I seen him, he was just walking up, you

3     know.

4          Q.     Did you see where he had come from?

5          A.     Well, he was sitting next to me before I got

6     up, so he had to come from where we were sitting at.

7          Q.     How far behind you and Patchy was Shaka down

8     the aisle?

9          A.     Just a couple of feet.

10         Q.     Did he have anything in his hand at the time

11    you saw him?

12         A.     At the time I didn't see anything in his hand.

13         Q.     And did he say anything to you as he was coming

14    up?

15         A.     No.  When that happened, I seen him, and next

16    thing you know the shooting started, so I had to dive one

17    way and Patchy dived the other way and that's it, you know,

18    the shooting started.

19         Q.     All right.  Who shot first?

20         A.     Who shot first?  Well, I thought the guy shot

21    first.

22         Q.     The guy you talked about?

23         A.     Yeah.  I thought he shot first because when I

24    heard the shot, I know the last person I seen with a gun

25    was him.

cm/a Andrew O'Brien - for People - Direct

1          Q.    Right.

2          A.    So once I heard the shots, you know, I'm trying

3     to grab the floor.  I'm not worrying about who is -- you

4     know, I seen the guy pointing a gun.  Now bullets is

5     flying, you know, so I tried to hit the floor.

6          Q.    How many shots did you hear before you hit the

7     floor?

8          A.    Before I hit the floor -- well, from the first

9     shot, that's when I'm going for the floor, but, I mean,

10    it's hard to explain.  It's almost like you feel like

11    you're moving in slow motion, but while I'm going towards

12    the floor, you're hearing boom, boom, boom and I felt like,

13    like in between I felt like a burning sensation on my side

14    and my arm.  I'm thinking I got shot.  You know, I'm

15    thinking, you know, I'm shot.

16               So, by the time I hit the floor, it's like

17    people just running around screaming, you know, jumping

18    over you or whatever so.

19         Q.    And did you see what Shaka was doing?

20         A.    Did I see what he was doing?

21         Q.    Yes.

22         A.    I didn't see what he was doing.

23         Q.    Did you see what happened to him?

24         A.    But I looked back and seen, but what happened

25    was that when we got back up, Patchy started chasing after

cm/a Andrew O'Brien - for People - Direct

1    the guy, and I'm going with him.  So I seen, I seen him on

2    the floor, but I didn't think, I didn't think he was dead

3    or anything.  I just thought probably he dived on the floor

4    like everybody else.

5                So I jumped up, and we started chasing the guy

6    -- right? -- and we went into the hallway and, you know,

7    they had like people running around and everything, so like

8    they had security and everything coming at us.  So like the

9    guy slips through the exit and we trying to follow the guy.

10   You know what I'm saying?  Because now I know Patchy has a

11   gun on him, and he's trying to follow the guy and I'm going

12   behind him like, "Yo, let's get this guy," whatever,

13   whatever.

14               So, I'm running behind him, so we end up

15   outside with people spilling out and whatever, whatever,

16   and that's when Beckford came out -- Dean came out and told

17   us, "Yo, man," he said, "Yo, yo, man, I turned Shaka over,

18   man.  He's dead, man.  Let's get out of here."

19               And I'm like, "What?"

20               He said, "Yo, the homeboy's gone, man."  And

21   that was it.

22                    (Continued on the next page.)

23

24

25

Andrew O'Brien-People-Direct          212

1     Q.    Let me go back to the time in the theater
2   when the shooting happens.   Okay?
3     A.    Yes.
4     Q.    Did you see anyone else shoot besides the man
5   with the gun?
6                 THE COURT:   Sustained.   Not his
7         testimony.
8                 MS. MATTAWAY:   Okay.
9     Q.    Did you hear any sounds behind you?
10                THE COURT:   At what point in time?
11                MS. MATTAWAY:   At the time of the
12        shooting.
13                MR. BRUNO:   Objection to the form of the
14        question.
15                THE COURT:   Sustained.   Be a little bit
16        more specific.
17    Q.    Well, you said you heard boom, boom, boom,
18   correct?
19    A.    Yes.
20    Q.    In which direction did you hear the booms
21   coming from?
22                MR. BRUNO:   Objection, your Honor.
23                THE COURT:   If he could answer that
24        question, I'll let him answer it.
25    A.    What did you say?

Andrew O'Brien-People-Direct          213

1      Q.    In which direction did you hear the booms
2   coming from?
3      A.    Well, I thought that it was coming from in
4   front of me, you know.
5      Q.    And why did you think that?
6      A.    Because I seen him with the gun.  And I mean
7   who else is going to -- I'm saying to myself who is
8   going to be shooting.  He pulled out the gun.  Next
9   thing you know, I hear shooting.
10              MR. BRUNO:  Objection as to his
11        thoughts, your Honor.
12              THE COURT:  Strike the last part of the
13        answer.  The only part of that answer that stands
14        is he thought it was coming from in front of him.
15        Next question.
16      Q.    After which shot -- yeah, after which shot
17   did you feel the burning sensation?
18      A.    I believe it was at the second one.
19      Q.    The second one?
20      A.    Yes.
21      Q.    Are you able to describe for us how or in
22   what movement you felt the grazing or the burning
23   sensation?
24      A.    Well, I know like -- I like jumped out the
25   way and did like this and I just felt like something.

Andrew O'Brien-People-Direct          214

1        Q.   Can you stand up and show us on your own
2    body?
3        A.   When I went to dive I felt like something
4    just like like something just real hot just skim past
5    me through my sides and it hit my arm boom, boom, like
6    that.   That's when I, you know, then I fell.
7               THE COURT:  Indicating the left torso
8         toward the left bicep.
9        Q.   Did you feel the sensation on your torso and
10   your bicep at approximately the same time?
11       A.   Well, I felt it when it hit my side and then
12   a little bit later then, you know, like milliseconds, I
13   don't even know how to describe the time to anybody,
14   boom.  It happened so fast.  It hit my side first then
15   my arm later.
16       Q.   Did it feel like it was from one shot?
17               MR. BRUNO:  Objection, your Honor.
18               THE COURT:  Sustained.
19       Q.   Could you tell at the time you were shot
20   where Shaka was?
21       A.   Can I tell where he was at?
22       Q.   Yeah.
23               THE COURT:  Sustained to the form of the
24        question.
25               Do you know where he was at that time?

Andrew O'Brien-People-Direct          215

1        Q.    Do you know where he was?

2        A.    He was behind me.

3        Q.    How was your body positioned at the time you

4   were shot?

5        A.    Positioned?

6        Q.    Were you facing the man?  Were you turning?

7   Were you down?  What were you doing?

8        A.    I was facing him, but then, you know, when

9   you dive you just, it just happened so fast.

10       Q.    And on which side were you hit?

11       A.    On my left.

12       Q.    And at the time that you were down, did you

13   look to see your injuries at that time?

14       A.    Well, not really.  I just felt it and I was

15   like, like I was saying okay I'm shot, but I don't feel

16   that bad.  I could still move because that's when I had

17   to jump up and everything and I was running behind

18   Patchy and everything.  I said "man I can't be that bad

19   if I can -- I could still walk, you know."

20       Q.    The last time you saw Shaka, in what position

21   was he?

22       A.    He was on the floor behind me.

23       Q.    And was he face down or face up when you saw

24   him?

25       A.    It looked like he dove down, you know, like

Andrew O'Brien-People-Direct          216

1   had his head, his face facing the ground.

2        Q.   Face down.  And was the face, if you

3   remember, was it down in the aisle or in the seat area?

4        A.   To me it was in the aisle.

5        Q.   Was the face down pointing to the screen or

6   up pointing towards the back of the theater of the

7   aisle?

8        A.   Pointing towards the back.

9        Q.   And was anyone over Shaka or near him when

10  you saw him?

11       A.   No, over him, no.

12       Q.   Okay.  Or in close proximity to him?

13       A.   You have people jumping up and running so

14  they had people all over the place.

15       Q.   Were you able to see any type of fire or

16  muzzle flash from the man's gun?

17       A.   Yes, because it was coming forward.

18       Q.   And what color was it?

19            MR. BRUNO:  Objection, your Honor.

20            THE COURT:  Sustained.

21       Q.   How many flashes did you see?

22       A.   I saw before I dive, I saw one flash but then

23  when I dived like it was a flashing, but I didn't

24  really look at it because the movie was just -- lights

25  had just went out so you could see the flash probably

Andrew O'Brien-People-Direct          217

1    reflecting off the wall.  Whatever it was.  I don't

2    know.

3         Q.   Was the movie started?

4         A.   It was just starting, like I guess the

5    opening credits was on or whatever.

6         Q.   And one moment please.  Was there any pause

7    or can you tell us the time difference between the

8    shots?

9         A.   No.  There was like a quick succession, just

10   boom, boom, boom.  There was really no pause or nothing

11   like that.

12        Q.   Okay.  Do you see the man with the gun who

13   fired in the theater on July 3rd, 1989 here in the

14   courtroom today?

15        A.   Yes.

16        Q.   Can you point to him and tell us what he's

17   wearing today?

18        A.   Some type of stripped shirt and jeans.

19        Q.   Can you point to him please.

20             THE COURT:  Indicating the defendant.

21        Q.   Is that the same man who you called a pussy

22   back at the concession stand earlier that night?

23        A.   Yes, yes.

24        Q.   When was the last time you saw him?

25        A.   The last time I seen him personally?

Andrew O'Brien-People-Direct        218

1      Q.    Yeah.

2      A.    In the movie theater.

3      Q.    When you and Patchy ran out after --

4      A.    Yeah.

5      Q.    Did you see him where he went?

6      A.    I seen him going through the exit.

7      Q.    Through the doors?

8      A.    Yes.

9      Q.    Did you go through the door and catch up to

10   him or what?

11     A.    Well, what happened as soon as he went

12   through the door, security and everything came this way

13   and Patchy had to like dip his gun in real quick so we

14   started saying he went that way.  We started pointing

15   outside because we didn't want them -- he didn't want

16   them to bust him with the gun.  We said the guy went

17   that way.  They started chasing after him and we kind

18   of went behind him and went outside in the movie

19   theater.

20     Q.    One moment.  I'd like to show the witness

21   this Exhibit 4A through D.

22           Do you recognize any photos in that exhibit?

23   Do any of them approximately reflect anything you've

24   testified about, sir?

25     A.    Well, this looked like exit doors.  As soon

Andrew O'Brien-People-Direct          219

1  as you come out of the movie theater.

2      Q.    Which photo, sir?

3      A.    What is it, C?

4            THE COURT:   4C.

5      Q.    Okay.  Did you go through that exit door at

6  that time when you told the guards he went that way?

7      A.    We like waited a few minutes and then we went

8  out through the same exit.

9      Q.    Thank you.  You could take it back.  After

10 Smile spoke and he told you about Shaka, did you ever

11 go back into the theater to take a look at Shaka?

12     A.    No, no.

13     Q.    Where did you go?

14     A.    Well, we got in the car and we drove back to

15 Brooklyn.

16     Q.    Is Brooklyn where you had originally started

17 out that evening?

18     A.    Yes.

19     Q.    Did there come a time that you got a chance

20 to examine yourself and look to see if you were

21 injured?

22     A.    Yes.

23     Q.    Tell us about that?

24     A.    Well, while I was in the car, I said yeah man

25 I think I got glazed.  I had blood and everything.

Andrew O'Brien-People-Direct          220

1    Patchy was playing doctor touching it and he said, "do
2    you feel any pain here, there?"  I said "I don't think
3    there was any bullets."  It was just like a big piece
4    chunk of meat cut out right here.  So we drove back to
5    Brooklyn and we went to a friend's house and we told
6    him what happened and he got some -- he had some gauze
7    and some cheap tape and he taped it up and that was it.
8        Q.   Do you still have any scars on your body from
9    that incident?
10       A.   Yes.
11       Q.   Could you show us?
12               MR. BRUNO:  I would object at this time,
13           your Honor.
14               THE COURT:  Sustained.
15       Q.   After you were treated by this friend who
16   took care of your injuries, did you ever go to a
17   hospital for treatment?
18       A.   No.
19       Q.   Okay.  And did you, by the way, did you get a
20   chance to examine your arm?
21       A.   What you mean, the injury?
22       Q.   Yeah.
23       A.   Yeah.  Both of them.  I looked at both of
24   them.
25       Q.   And did you get any treatment for your arm?

Andrew O'Brien-People-Direct        221

1        A.    No.

2        Q.    Just the torso?

3        A.    Just the torso -- no, no, no.  They treated

4    it.  Me and my friends.  We treated ourselves.  We used

5    alcohol, whatever, gauze, taped it up.

6        Q.    What did your arm look like?

7        A.    Well --

8                   MR. BRUNO:  Objection.

9                   THE COURT:  Sustained.  This whole line

10        of questioning.  Not relevant to this trial.

11        Q.    Okay.  When, if you remember, was the first

12    time after this incident happened that you felt

13    compelled to tell somebody about it?

14                   MR. BRUNO:  Objection.

15                   THE COURT:  As to the phraseology of

16        that question, sustained.

17        Q.    Do you remember the first time you told

18    anyone in law enforcement about what happened?

19        A.    Yes.

20        Q.    And when was that approximately?

21        A.    That was in -- that was in -- I think it was

22    '96.

23        Q.    Okay.  And do you remember how you first

24    decided to tell somebody about this?  Did you write

25    them?  Did you call someone?  What happened?

Andrew O'Brien-People-Direct        222

1        A.   Well, I was being -- I was being questioned

2   by federal agents and they asked me, you know, of

3   certain things that I knew about and this was one of

4   them.

5        Q.   Is there any reason why you kept your silence

6   from '89 to '96?

7        A.   Well, yeah, there is a reason.  You know, one

8   of the reasons is that, you know, us living in the

9   street first of all you really didn't cooperate with

10  the police officers.  If anything, if you had a

11  problem, you handled it yourself.  You know, that was

12  one of them.  And second of all -- that was basically

13  it, you know.

14       Q.   After you first told someone in '96, when was

15  the first time you remember speaking with somebody?

16       A.   I told somebody in '96 and then I spoke to I

17  think I spoke to Ms. Pheifer the Cold Case Squad in

18  '98.

19       Q.   When you say the Cold Case Squad, do you mean

20  the New York City Police Department Cold Case Squad?

21       A.   Yes.

22       Q.   The first law enforcement person that you

23  spoke to in '96 though about three years earlier, was

24  that person from the NYPD?

25       A.   No, that person was from the FBI.

Andrew O'Brien-People-Direct          223

1        Q.    Okay.  You spoke to a Ms. Pheifer in the NYPD
2    Cold Case Squad?
3        A.    Yes.
4        Q.    Did you reach out to her or were you
5    contacted?
6        A.    Well, somebody referred her to me and they
7    gave me her number and I called her.
8        Q.    And you had a conversation with her?
9        A.    Yes.
10       Q.    And after you had a conversation with her in
11   '99, do you remember the first time you spoke to
12   someone in law enforcement about that?
13       A.    I think I said it was '98.
14       Q.    '98, I apologize.
15       A.    After that I think it was the same year or
16   the year after that I spoke to Detective Stradford.
17       Q.    All right.  And how many times since you
18   spoke to Detective Stradford, in approximately 1999,
19   since then have you spoken to Detective Stradford?
20       A.    How many times?  I spoke to him about -- I
21   don't know, ten times, fifteen times over the years.
22       Q.    Okay.  When was the first time that you
23   remember ever meeting me?
24       A.    I met you -- when was it?  What year is this,
25   2007?  I think it was 2006 or late 2005.

Andrew O'Brien-People-Direct          224

1      Q.    And after that meeting when was the next time

2   you saw me again?

3      A.    Today.

4      Q.    What is your understanding of what if

5   anything I can or will do for you in exchange for you

6   testifying here today for us?

7      A.    Well, my understanding is that you'll just

8   tell the Federal prosecutors that I cooperated with

9   ya'll and that's it.

10     Q.    Are you a sentenced prisoner?

11     A.    Yes.

12     Q.    And you said you have 18 years to go?

13     A.    Yes.

14     Q.    Are you presently doing this for anybody

15  else?

16     A.    Doing what?  What I'm doing here?

17     Q.    Yes.

18     A.    I'm basically doing it just because it's a

19  lot of different reasons.

20     Q.    Why are you doing this?

21     A.    Well, one is that I felt guilty because, you

22  know, I kind of like started the argument with the guy,

23  with the person.

24     Q.    At the popcorn line?

25     A.    I started an argument.  Basically I felt like

Andrew O'Brien-People-Direct        225

1   I got the guy killed.

2        Q.    Shaka?

3        A.    Yes.  I got Shaka killed and I never really

4   tried to help his family, you know.  And second is that

5   because I cooperated with the Federal Government and

6   they said that my agreement that I had to cooperate

7   with all law enforcement and everything else and so

8   that's the reason why I started talking to the New York

9   NYPD.

10        Q.    This was part of your original agreement?

11        A.    Yes.

12        Q.    On your Federal case?

13        A.    Yes.

14        Q.    You have to cooperate with any law

15   enforcement people, is that what you're telling us?

16        A.    Of crimes I may have been part of, or know

17   of, if I kept it to myself they could rip up my

18   agreement and everything else.

19        Q.    You currently have an agreement, but it's

20   with the Feds?

21        A.    Yes.

22        Q.    A full written thing that you signed?

23        A.    Yes.

24        Q.    Do I have any written thing with you?

25        A.    No.

Andrew O'Brien-People-Direct          226

1              MS. MATTAWAY:  At this time, I have
2      nothing further.
3              THE COURT:  You may inquire.
4  CROSS EXAMINATION
5  BY MR. BRUNO:
6      Q.    Good afternoon Mr. O'Brien.
7      A.    Good afternoon.
8      Q.    Now, you are currently in the process of
9  serving a 30 year prison term in the Federal system; am
10  I correct?
11      A.    Yes.
12      Q.    In fact, you were escorted here today by two
13  federal agents; am I correct?
14      A.    Yes.
15      Q.    And the crime for which you got the 30 years
16  wasn't murder, but it was related to a Federal drug
17  conspiracy of some type?
18      A.    Yes.
19      Q.    Did you assassinate a witness?
20              MS. MATTAWAY:  Objection.
21      A.    No.
22              THE COURT:  He's answered already.  Next
23      question.
24      Q.    So any way, you're doing 30 years for a
25  murder related in some way, shape, or form to the drug

Andrew O'Brien-People-Cross        227

1    industry; is that correct?

2         A.    Technically I'm doing 30 years for

3    racketeering.

4         Q.    Okay.  And one aspect of the racketeering

5    enterprise was the murder of people, some involved --

6         A.    Person, a person.

7         Q.    A person.  Okay.  Now, in addition to that

8    matter, am I correct, that on March 11th of '88 you

9    pled guilty to the felony possession of a weapon; is

10   that correct?

11        A.    Yes.

12        Q.    And then in March of '89 a year later you

13   were convicted of cocaine possession?

14        A.    In '89.

15        Q.    March 9, 1989?

16        A.    March 9, 1989, where is that at?

17        Q.    Richmond which is Staten Island New York?

18        A.    No, no, no.  Richmond Virginia.

19        Q.    Richmond Virginia.  Forgive me, I assumed

20   that.  Are you from Virginia originally?

21        A.    No.

22        Q.    You spent sometime there?

23        A.    Yes.

24        Q.    So, in fact sir that was March of '89 and

25   then in July of '89 this happens?

Andrew O'Brien-People-Cross        228

1        A.    Yes.

2        Q.    And am I correct that when this happens you

3    were in some way either a fugitive or on a bench

4    warrant?

5        A.    Yes, I was a fugitive.

6        Q.    That was from the Richmond case or something

7    else?

8        A.    No, that was from my probation.

9        Q.    From?

10       A.    From the original gun charge.

11       Q.    From Brooklyn, Kings County?

12       A.    Yes.

13       Q.    In other words, you had failed to appear on

14   your probation matter?

15       A.    Yes.

16       Q.    You failed to report as they say?

17       A.    Yes.

18       Q.    Okay.  Now, I'll try to pretty much go along

19   in order as follows:

20            Now, you testified early on when you, meaning

21   the four of you, arrived at that theater that night

22   July 3rd, really the 2nd of '89, it's you, Dean, Earl,

23   and Shaka who is deceased?

24       A.    Right.

25       Q.    In fact, Shaka's real name is Shawn, am I

Andrew O'Brien-People-Cross          229

1    right?

2         A.    Yes.

3         Q.    And you said that all of you had arrived with

4    guns?

5         A.    Right.

6         Q.    But because of your flimsy T-shirt and the

7    breeze you felt that you could probably not conceal

8    yours?

9         A.    Right.

10         Q.    But the other three all kept their guns, had

11    their guns on them?

12         A.    As far as I knew.

13         Q.    Am I correct, when you first testified on

14    direct, when Ms. Mattaway questioned you, testified to

15    what you said in effect you all arrived with guns

16    because of your T-shirt issue, you left yours, the rest

17    all left the --

18         A.    I corrected myself.  There were two cars.  I

19    had to remember that we came in two different cars so I

20    don't know what Beckford and Shaka did when they left

21    their car.

22         Q.    I see.  Okay.  Now, let's address that now

23    then.  Am I correct that getting towards the end of the

24    incident as it were when you see that the man, the man

25    was shot?

Andrew O'Brien-People-Cross          230

1        A.    Right.

2        Q.    He was taking out a gun.  You appealed to

3    Patches to draw his gun, correct?

4        A.    I told him he got a gun.

5        Q.    Did you not then testify that you testified I

6    had no gun so I needed him to pull?

7        A.    I'm getting out of the way,

8        Q.    Let me address this gun issue then as

9    follows:

10            You recall getting together with a Federal

11   agent, a Special Agent Diego Redondo in the company of

12   the city detective Stradford and they debriefed you

13   whatever term an officer would use.  Do you recall

14   that?

15       A.    Yes.

16       Q.    By the way, you said it was '98, '99.  That

17   was not January of '01?

18       A.    January of '01.  No.  I said when I first got

19   in contact with Ms. Pheifer it was like '98.

20       Q.    Do you agree that you got together you had

21   there whatever you wanted to call it, this sit down

22   with the Federal agent and Detective Stradford?

23       A.    Yes.

24       Q.    In January of '01?

25       A.    Yes.

Andrew O'Brien-People-Cross          231

1      Q.    And on that occasion you discussed this
2  matter, I believe, at some length?
3      A.    Yes.
4      Q.    And am I correct that amongst other things
5  you indicated that you arrived along with Patchy, Dean,
6  Beckford, Shawn, and Earl?
7      A.    Yes.
8      Q.    Did you also at that time explain that there
9  were a couple of girlfriends with you?  There was
10  Maureen and her sister Winjie?
11      A.    Yes.
12      Q.    Were they there?
13      A.    Yes.
14      Q.    You mentioned them today?
15      A.    Yes.
16      Q.    Now, give me a moment and we'll discuss guns.
17  Do you recall at that time advising the Federal Agent
18  Redondo and the city Detective Stradford?
19      A.    Right.
20      Q.    That Patchy then pulled out his own gun?
21      A.    Yes.
22      Q.    Something you also recalled noting that
23  Worrell, meaning the dead guy Shaka, that Shaka was
24  armed with a .357 loaded with .38 long bullets?
25      A.    Yes.

Andrew O'Brien-People-Cross        232

1    Q.    Now, does that refresh your memory that in

2    fact at a minimum at least two of you were armed in

3    that theater?

4    A.    Yes.

5    Q.    You knew that in '01?

6    A.    I never disputed that.

7    Q.    You were getting a little coy here?

8              MS. MATTAWAY:  Objection.

9              THE COURT:  Sustained.

10   Q.    So in other words, having refreshed your

11   memory with your '01 statement, is it not a fact that

12   at a minimum Patches and Shaka were armed?

13   A.    Yes.

14   Q.    In fact, you even specify we also said about

15   the .357, you even specify that the other guy Patches

16   had a loaded 9 millimeter, right?

17   A.    I know he had a nine.  I know that.

18   Q.    9 millimeter?

19   A.    Yeah.

20   Q.    You know that.  You didn't say it on direct?

21   A.    What am I supposed to say?

22             THE COURT:  Ask a question.  Answer the

23        question Mr. O'Brien.

24   Q.    You knew it.  Let me move on.  Sorry to jump

25   around.  Did you not say when this argument first

Andrew O'Brien-People-Cross        233

1   starts in the popcorn line?

2       A.   Right.

3       Q.   Did you not say your comments were "yeah go,

4   we alright?"  You said "yeah go we're alright."  Did

5   you say that on direct?

6       A.   I said that to myself.  I'm thinking to

7   myself.  I'm with four dudes.  He's one person.

8       Q.   Yeah.  We're alright, meaning we're prepared

9   for this; am I correct?

10      A.   Yes.

11      Q.   You agree?

12      A.   Yes.

13      Q.   And you then elaborated on direct because the

14  DA asked you what does that mean.

15           Well, you know, there was four of us and we

16  are strapped, correct?

17      A.   I didn't say we was strapped.  I didn't have

18  no gun.  I told you that before.

19           MS. MATTAWAY:  Objection.  The witness

20      is trying to answer.

21      A.   Go ahead.

22      Q.   Go ahead.  There were four of us and we were

23  or are strapped, but I'm acknowledging I acknowledge

24  you testified that you were the one person without the

25  gun alright?

Andrew O'Brien-People-Cross          234

1      A.    Okay.

2      Q.    What I'm getting at is this.  There were four

3  of you.  That is why you were confident.  But also

4  persons in your group was strapped?

5      A.    Right.

6      Q.    For the juror's edification, am I correct

7  that the term strapped would be a street term for what

8  carrying a gun?

9      A.    Yes.

10      Q.    It goes back to the cowboys strapping on a

11  six gun, correct?

12      A.    Yes.

13      Q.    Now, is it clear without like bickering about

14  it at least two of you, at least two of you of your

15  party Shaka and Patches were armed in that theater?

16      A.    Yes.

17      Q.    Okay.  By the way, prior to all of us, prior

18  to getting involved in this case, you're in the Federal

19  witness program; am I correct?

20      A.    Yes.

21      Q.    Why did you cooperate in another matter, sir?

22            MS. MATTAWAY:  Objection.

23            THE COURT:  Sustained as to the way you

24      phrased that.

25      Q.    What was the reason you were placed in that

Andrew O'Brien-People-Cross          235

1    program?

2                        MS. MATTAWAY:  I object.

3                        THE COURT:  I'll allow it.  You may

4         answer.

5         A.    Because I cooperated.

6         Q.    Against whom?

7                        MS. MATTAWAY:  Objection.

8                        THE COURT:  Sustained.

9         Q.    Then all I ask when you say cooperated, it

10    wasn't -- you don't mean this is prior to this case?

11        A.    Yes.

12        Q.    You cooperated in the case in which you

13    ultimately were convicted?

14        A.    Right.

15        Q.    So in other words, is it fair to say you were

16    facing even -- thirty years is an awfully long time.

17    You were facing exposure of much more than the thirty?

18        A.    Yes.

19        Q.    And you had in fact cooperated against

20    co-defendants?

21        A.    Yes.

22        Q.    Now, you made reference to again in so many

23    words first bringing up the subject again meaning since

24    '89 you then said you addressed this again in '96; am I

25    correct?

Andrew O'Brien-People-Cross          236

1       A.    Yes.

2       Q.    You said in '96 this subject came up in

3  speaking with Federal authorities, correct?

4       A.    Yes.

5       Q.    Am I correct that at that time you were

6  wanted or being sought being investigated for numerous

7  murders between here and Virginia?

8       A.    No.

9                 MS. MATTAWAY:  I object.

10                THE COURT:  Overruled.  Next question.

11                MR. BRUNO:  I'm sorry.  You answered.

12                THE COURT:  He said no.  Next question.

13      Q.    Am I correct, in fact, that in March of '96

14  how this first comes to your attention is that you're

15  brought in as a suspect in this murder?

16      A.    What?

17      Q.    Yes.

18      A.    No.  I think you got your paperwork mixed up.

19      Q.    Did you have any dealings with a Brooklyn

20  Detective Dave Carbone?

21      A.    Yes.

22      Q.    And you were aware of a memo to another

23  officer, another detective saying a perp named Andy

24  O'Brien from Virginia, we're going to charge him with

25  other homicides and one of them is ours?

Andrew O'Brien-People-Cross          237

1      A.   I don't know anything.

2      Q.   You're a party to such a --

3      A.   I never knew about that.

4      Q.   Brooklyn number 615948 Shawn Worrell?

5      A.   This is the first time I'm hearing this.

6      Q.   Victim Shawn, victim Worrell, that was Shaka,

7   right?

8      A.   This is the first time I'm hearing it.

9      Q.   Killed at Whitestone Cinema?

10     A.   This is the first time I'm hearing this.

11     Q.   First you're hearing it?

12     A.   Yes.

13          MS. MATTAWAY:  Objection, asked and

14     answered.

15          THE COURT:  Overruled.

16     Q.   We'll move on.  In other words, you're saying

17  you came forward in '96.  For your own regard, your

18  federal engagement, it wasn't because you were pulled

19  in as a suspect?

20     A.   No.

21     Q.   By the way, on the afternoon after this

22  occurred say about 1 o'clock on July 3, '89, did you

23  call Shaka's home?

24     A.   Yes.

25     Q.   And you spoke to his mom?

Andrew O'Brien-People-Cross          238

1      A.    No, it was his sister.

2      Q.    His sister.  Did you ask if Shaka had gotten

3    home yet?

4      A.    No.

5      Q.    Did you advise that sister that Shawn had

6    gotten into a little argument in the movies and you got

7    grazed?

8      A.    No.  I told him that he got shot in the movie

9    theater.

10     Q.    I see.  So would your answer then be that

11   again I mixed up paperwork?

12     A.    Yes, I guess so.  You must have.

13     Q.    Maybe I'm tired today.

14           MS. MATTAWAY:  Objection.

15           THE COURT:  Let's just ask questions and

16     avoid any commentary.

17     Q.    Now, on that popcorn line when this whole

18   incident is precipitated, you get into the argument

19   with the man; am I correct?

20     A.    Yes.

21     Q.    What was Shaka's position?  Was he getting

22   involved or basically laying back?

23     A.    He was laying back.

24     Q.    By the way, this person you had the beef

25   with, was it that he said -- you said he said like

Andrew O'Brien-People-Cross          239

1   arrogantly or rudely, what's up man or get out of the

2   line man; am I correct?

3        A.   Yes.

4        Q.   When you were first interviewed in '91, did

5   you say the incident was he said my boy?

6        A.   My man, it was disrespectful.

7        Q.   You were angry?

8        A.   Am I angry now?

9        Q.   No.  You were angry?

10       A.   Yeah.

11       Q.   And the man said he'd go for his piece?

12       A.   Yes.

13       Q.   But you guys were strapped so that was okay,

14   right?

15       By the way, as a minor point, when you look at the

16   exhibits, you said all these theaters tend to look the

17   same, right?

18       A.   Yes.

19       Q.   You said that the rug in that picture looked

20   familiar?

21       A.   Yes.

22       Q.   It's been eighteen years, you think it's the

23   same carpet?

24       A.   Probably not.  I'm just saying the movie

25   theater same carpet, same concession stand.

Andrew O'Brien-People-Cross          240

1      Q.    Every theater across the state, I know.   All

2    right.  So you then say that the person ultimately

3    comes into the actual theater where they started to

4    show the film?

5      A.    Yes.

6      Q.    And says in substance when the movie is over

7    it's you and me, correct?

8      A.    Yes.

9      Q.    Now, again, whatever street interpretation

10   that means we're gonna fight it out; is that correct?

11     A.    Yes.

12     Q.    At that point there is no reference to

13   shooting anyone?

14     A.    I don't know about fighting.  I don't know

15   about no fighting.

16     Q.    Okay.

17     A.    They don't fight in the street no more.  I

18   don't know where you been.

19     Q.    That's pretty sad you know.

20     A.    I feel so.

21                 (Continued on the next page)

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. BRUNO (Cont'd):

3         Q.     In other words, let me understand.  Your

4         perception is that a fight on the popcorn line,

5         it has to result in a shoot-out?

6         A.     Not that it has to, but if somebody

7         leaves and comes back, they didn't go to get

8         brass knuckles.  You ain't thinking that.  And

9         it's four of us.  This guy is being cocky.  He

10        is walking up with four guys.  He got to have a

11        gun.

12        Q.     I wasn't thinking.  That's true.

13        That's right.  Your streets understand that he

14        must be now armed.  So you guys getting ready to

15        pull, am I correct?

16        A.     I didn't have nothing to pull.

17        Q.     You didn't, but at a minimum Shaka and

18        Patchy had ?

19        A.     Shaka said "yo, this guy is bluffing,

20        don't even worry about it." They want to

21        continue watching the move.  Patchy was the one

22        who got up and started walking out the movie

23        theatre.

24        Q.     I don't want to debate, sincerely, but a

25        minute ago you took the position like where I

**LORNA BECKFORD, Senior Court Reporter**

1          have been but -- I mean, there is no popcorn at

2          stake here, so I don't take an offence to where

3          I have been.  You have corrected me.

4                    The guy left.  It's obvious he is

5          armed.  That's your interpretation.  It's

6          obvious you are interpreting.  Patchy and Shaka

7          are going to be prepared to defend themselves,

8          in your perception.

9                    MS. MATTAWAY: Objection.

10                   THE COURT:  Sustained.

11         Q.    Let me ask.  Are you trying to say to

12         this jury, because it was kind of ambiguous on

13         direct -- are you trying to say to this jury

14         that neither Shaka or Patchy pulled there

15         weapons?

16         A.    What you mean, as far as what?

17         Q.    Had their guns out?

18         A.    Not when we first walked up the aisle.

19         Q.    At some point, did they have their guns

20         out?

21         A.    When I yell out he had a gun, yelled out

22         he had a gun, they pulled -- Patches reached for

23         his gun. Shaka was behind. I don't know what he

24         was reaching for.

25                   MS. MATTAWAY: Objection.  The witness

LORNA BECKFORD, Senior Court Reporter

1        is still trying to answer.

2        A.      Shaka is behind.  I didn't say I seen him

3        pull a gun?

4        Q.      On direct you stated that once the smoke

5        settled and it's over -- once the smoke settled

6        and you were leaving, you glanced at Shaka on

7        the floor, you said.

8        A.      Yes?

9        Q.      Did you notice clutching in his right

10       hand was his gun?  That you didn't notice?

11       A.      I didn't even notice he was dead.

12       Q.      There will be cops here to testify to

13       that.

14              MS. MATTAWAY: Objection.

15              THE COURT:  Sustained.

16       Q.      So you could tell the jury now,

17       definitively, that Patchy did pull his weapon?

18       A.      Yes.

19       Q.      And, again -- I know it's a millisecond.

20       It had to be.  But at the point that shots

21       started to ring out, is Patchy in front of you

22       or in the back of you?

23       A.      He is like on the other side of me, like

24       inches away from me.  Just right there.

25       Q.      Starting from the right, the way you

```
 1            gestured, it looks like he would have been just

 2            behind your right shoulder?

 3       A.      Just behind me.

 4       Q.      Am I correct?

 5       A.      Yes, just behind me

 6       Q.      Or similar?

 7       A.      I think it is the left.  I am not sure,

 8            but I think it's left.

 9       Q.      In other words, he is within, it might be

10            -- if I could summarize, he is within inches of

11            your shoulder--

12       A.      Yes.

13       Q.      --behind you?

14       A.      Yes.

15       Q.      And you are now confident that he had

16            drawn his weapon, his nine?

17       A.      Well, no, I wasn't confident of that.

18            The only time I seen the weapon is when -- after

19            the shots.

20       Q.      So his gun was out?

21            MS. MATTAWAY:  Objection.

22       A.      After the shots.

23            THE COURT:  Overruled.

24       Q.      In other words, your testimony today for

25            this jury is that at least two of your friends
```

LORNA BECKFORD, Senior Court Reporter

```
 1    are armed, they see a man pull a gun?

 2    A.      They didn't even see the gun.  I saw the

 3    gun.  I don't --

 4    Q.      It's a gun.  It's a gun.

 5            So you want to say to the jury that, in

 6    other words, that night in the showdown like you

 7    were the good guys.  They didn't fire.  They

 8    just pulled their guns.  They didn't fire.

 9    Correct?

10    A.      Patchy didn't have time to fire no shot

11    because after the shots people were jumping up.

12    You are going to shoot?  You got people running

13    in front of you.  Who you are going to shoot?

14    You just going to shoot anybody?

15    Q.      You know, sir, there is a good chance

16    that Patchy is the one that grazed you?

17            THE COURT:  Sustained.

18    Q.      This ain't Disneyland.

19            MS. MATTAWAY:  Objection.

20            THE COURT:  Sustained.  Move on.

21    Q.      You testified on direct, you are all now

22    at the top of the theater, meaning closer to the

23    door as opposed to the street.  Patchy reached

24    into his waistband for his gun?

25    A.      Right.
```

**LORNA BECKFORD, Senior Court Reporter**

```
 1          Q.      So we know he draw.

 2                  MS. MATTAWAY: Objection.

 3                  THE COURT:  Sustained.

 4                  MR. BRUNO: I am sorry.  I was thinking

 5          out loud.

 6                  THE COURT: Strike it.

 7          Q.      You are then saying -- you testified

 8          moments later that once again -- once this

 9          shooting ends, Patchy -- by the way, is Patches

10          or Patchy?

11          A.      Patchy.

12          Q.      Patchy?

13          A.      Yes.

14          Q.      Like "EE"?

15          A.      Yes.

16          Q.      Because the Feds call him Patchy.

17                  MS. MATTAWAY: Objection.

18                  THE COURT:  Overruled.  Move on.

19          Q.      That's what I am saying.

20                  THE COURT:  Move on.

21          Q.      So then the shooting terminates, and you

22          said Parchy chases after the guy with the gun?

23          A.      Yes.

24          Q.      Thereby shooting -- it is obvious that

25          Patchy has his gun out?
```

**LORNA BECKFORD, Senior Court Reporter**

1        A.      Yes.

2        Q.      Because you are chasing a guy with a gun,

3    right?

4        A.      Yes.

5        Q.      And you followed after Patchy?

6        A.      Yes.

7        Q.      On direct you testified you assumed the

8    shots came from the other guy?

9        A.      What you mean?

10       Q.      In other words, after the first shot you

11   took a--

12               THE COURT:  Sustained.  Don't say

13   anything.  That's struck from the record.

14       Q.      So then it's fair to say though once you

15   see the first muzzle flash and you take a dive,

16   you don't know who is shooting at whom.  Am I

17   correct?  Is that a fair statement?

18       A.      I guess you could say that.

19       Q.      There is no confusion here that that

20   incident we are talking about occurred on July 3

21   '89, correct?

22       A.      If there is any confusion.

23       Q.      I am saying -- withdrawn.  I will

24   rephrase.  This incident occurred July 3, '89?

25       A.      July 3, '89?

1        Q.      Correct.

2        A.      I guess.

3        Q.      So it's important -- withdrawn.

4                You were there the night that Shaka got

5        killed?

6        A.      Yes.

7        Q.      And today in court you identified this

8        man as the shooter, correct?

9        A.      Yes.

10       Q.      So let's just for this moment refer to

11       him, if that's the case.  That night that Shaka

12       was killed is the first time you ever saw that

13       man, correct?

14       A.      Yes.

15       Q.      And this is the second time you have seen

16       him in person?

17       A.      Yes.

18       Q.      18 years later?

19       A.      Yes.

20       Q.      And you come to court with your Feds with

21       your shackles and you identified him as the

22       shooter; is that correct?

23       A.      Yes.

24       Q.      Sir, you have been around.  Do you find--

25               MS. MATTAWAY: Objection.

 1                    THE COURT:  Sustained.

 2         Q.    Your record speaks for itself.  Do you

 3    find that believable?

 4                    MS. MATTAWAY Objection.

 5                    THE COURT:  Sustained.

 6                    MR. BRUNO:  I have nothing, further.

 7                    THE COURT:  Anything further?

 8                    MS. MATTAWAY: Yes.

 9    REDIRECT EXAMINATION

10    BY MS. MATTAWAY:

11         Q.    Mr. O'Brien, has the shooter's appearance

12    changed in any way in seventeen years to you?

13         A.    Yes.

14         Q.    What changed about the way he looks

15    today?

16         A.    He looks bigger.

17         Q.    Bigger?

18         A.    Gained weight.  Just bigger person.  His

19    face got fuller.

20         Q.    I'd like to ask you about the shots.

21    After the first shot, the one you saw with the

22    muzzle flash, do you remember what it sounded

23    like?

24         A.    If I remember what it sounded like?

25                    MR. BRUNO:  Objection.

1    Q.    The noise.

2             THE COURT:  Sustained.

3    Q.    You remember hearing -- I apologize --

4             THE COURT: Sustained as to noise.

5    Next question.

6    Q.    Did the shots that you heard after the

7    first one sound the same?

8    A.    Sounded similar to me.  Sounded the same

9    to me.  I couldn't tell no big difference.

10   Q.    Now, when Patchy was reaching for his gun

11   as you were going up the aisle, how far out of

12   his waistband did you see Parchy actually get

13   the gun?

14   A.    I didn't see the gun until we came up off

15   the floor.

16   Q.    Did you ever see Patchy fire the gun?

17   A.    No.

18   Q.    After you see Patchy reaching for the

19   gun, at what point did you dive?

20   A.    Basically like simultaneously.

21   Q.    When you dove, did you see where Patchy

22   went or what he was doing?

23   A.    No.  He dived on the other side.

24   Q.    When you say "the other side," you are

25   talking the other side of the aisle?

1    A.    We are standing in the aisle, so he dive

2    on one side, I dive on the other side.

3    Q.    Did you dive into people?

4    A.    I didn't hit no people.  He probably got

5    into the seats or whatever.

6          MR. BRUNO:  Objection as to what he

7    probably did?

8    A.    I don't know if he hit people or not.

9    Q.    From the direction you are diving, do you

10   see him diving?

11   A.    I could see him moving, yes, like moving.

12   Q.    All right.

13         Can you tell us, if you remember, what

14   you saw between the time --   Patchy is reaching

15   and he is diving, and you see him make a

16   movement to his waist, but he doesn't get the

17   gun out.  The next you see is he dives.  What is

18   he doing, if anything, in between?

19   A.    Well, when the shots rang out, we are

20   both down on the floor.  I go down, he goes

21   down.  And then, you know, then people started

22   running over us and everything.  And I seen he

23   had the gun in his hand by that time.

24   Q.    Okay.  Do you look across the aisle and

25   see him where he is?  Is that how you see him?

1          MR. BRUNO:  Objection to the leading.

2          THE COURT:  Sustained as to leading

3     nature of the question.

4          MS. MATTAWAY: I apologize.

5     Q.    Tell us what you see?

6     A.    He is not that far from me.  We is just

7     like right across each other.

8     Q.    Are you flat or are you crouching?  What

9     where you doing?

10    A.    We are basically flat, but then we are

11    getting up.

12    Q.    Do you see the gun in Patchy's hand when

13    he is getting up?

14    A.    Yes.

15    Q.    And what is he doing with the gun?

16    A.    He is like holding it and looking like

17    this (indicating), you know.  And people is

18    running and everything else.  And that's when he

19    gets up and start going after the guy.  I

20    started going behind him.

21    Q.    When Patchy is going, does he have the

22    gun?

23    A.    He has the gun out, but he has it like

24    like down (indicating).

25    Q.    Can you stand up and show us how he is

1    holding the gun?

2    A.    He has it like this (indicating), and he

3    is running up.  I guess he don't want people to

4    see it and everything.  We run up the aisle and

5    we seen the guy go like, he went through the

6    exit.  That's when security and everything was

7    walking by.  And I looked at Patchy.  That's

8    when he like, he put it in his pocket.

9    Q.    The record should reflect that the

10   witness stood and he made a motion like he was

11   holding a gun, but down at his side or in front

12   of him?

13   A.    Yes.

14   Q.    How was--

15   A.    Holding it by his leg because you got

16   people running around so, you know, and they

17   panicking, so you--

18   Q.    All right.  When you and Patchy were down

19   before the run out after the shooter, did Shaka

20   ever run past you?

21   A.    No. You are saying when, after the

22   shooting?

23   Q.    Yes.  Well, after--

24          MR. BRUNO:  Objection.  Shaka was

25   dead.

1        THE COURT:  Sustained.

2   Q.      Shaka always stayed behind you?

3   A.      Yes.

4   Q.      When Patchy was reaching for his gun, had

5   the first shot with the muzzle flash happened

6   already?

7   A.      No.

8        MR. BRUNO:  Objection.  Asked and

9   answered.  He is not sure.

10       THE COURT:  Sustained.

11  Q.      The muzzle flash that you saw, when you

12  saw it, were you standing up?

13       MR. BRUNO:  Objection.  Asked and

14  answered.  Dove after the first flash.

15       THE COURT:  Sustained.

16  Q.      Was Patch up?  Could you see?

17       MR. BRUNO:  Objection asked and

18  answered.

19       THE COURT:  Sustained.

20  Q.      When the shooter said earlier on when he

21  came down the aisle after the movies "it's me

22  and you," who is you?

23  A.      He was talking to me.

24  Q.      Just you or you and Patchy?

25       MR. BRUNO:  Objection, your Honor.

1          THE COURT:  Sustained.

2     Q.     When the shooter earlier at the popcorn

3     line called you "boy," is that before or after

4     you called him a "pussy"?

5     A.     He was talking to Shaka.  He wasn't

6     talking to me.

7     Q.     When he called Shaka "boy," was that

8     before or after you called him a "pussy"?

9     A.     That was before.

10          MR. BRUNO:  Objection.  Asked

11     answered.

12          THE COURT:  Overruled.

13     A.     That was before.

14     Q.     Apart from these words "boy, pussy," can

15     you tell us any other derogatory things you guys

16     were saying to each other?

17          MR. BRUNO:  Objection.  Beyond the

18     scope.

19          THE COURT:  Sustained.

20     Q.     Do you remember today what you told

21     Shaka's sister eighteen years ago on the phone?

22     A.     I remember telling her that her brother

23     got shot in the movie theatre, the Whitestone

24     Movie Theatre.

25     Q.     Do you remember what time of day you made

 1      the call?

 2      A.     I believe it was late that night.  I am

 3      not sure.  But I thought it was -- I am thinking

 4      it was late that night.

 5      Q.     You do remember calling Shaka's home

 6      though?

 7      A.     Yes.

 8      Q.     When you stated that you thought to

 9      yourself "yeah, we are all right" -- do you

10      remember when you said that in your testimony?

11      A.     Yes.

12      Q.     Why did you think you were all right?

13             MR. BRUNO:  Objection.  Asked and

14      answered about twelve times.

15             THE COURT:  Sustained.

16      Q.     Was it about the numbers or the guns.

17             MR. BRUNO:  Objection.  Asked and

18      answered.  It was both.  It was four of us,

19      three of us with guns?

20             MS. MATTAWAY:  I object to defense

21      counsel's characterization.

22             MR. BRUNO:  You have the minutes.

23      Asking twelve times doesn't change it.

24             THE COURT:  I am going to tell both of

25      you this one last time, there be none of

O'Brien-Peo-Redirect(Mattaway)     257

1      that in front of my courtroom from anybody.

2                    MR. BRUNO:  I apologize.

3                    THE COURT:  The objection to that

4      particular question is overruled.  You may

5      answer.

6      A.      Ask the question again, please?

7      Q.      You made a statement that you felt you

8      were all right?

9      A.      Yes.

10     Q.      Did you say that because it was a matter

11     of numbers, four versus one, or because you were

12     armed versus one?

13     A.      Probably both.

14     Q.      Probably both?

15     A.      Yes.

16     Q.      How did you know that Shaka was armed?

17     A.      Because I seen him with the gun earlier.

18     Q.      When was that?

19     A.      Earlier.

20                    THE COURT:  Sustained.  Next question.

21     Q.      At the time this happened, July 3 '89,

22     you were a fugitive?

23     A.      Yes.

24     Q.      Did law enforcement try to contact you,

25     at this time?

**LORNA BECKFORD, Senior Court Reporter**

1    A.    Yes.  I believe they did.

2    Q.    And were you cooperative within days of

3    this incident?

4    A.    No.

5    Q.    Why not?

6    A.    Because more than likely they would

7    arrested me.  I would have been arrested.

8    Q.    Why would you have been arrested him?

9    A.    Because I was a fugitive.

10   Q.    But did you think you would be arrested

11   for anything to do with this incident?

12   A.    No.

13   Q.    And do you know how much time you faced

14   for being a fugitive for violating your

15   probation?

16   A.    I guess five years.

17        MR. BRUNO:  Objection as to his

18   guessing.

19        THE COURT:  Sustained.

20   A.    I didn't know at the time.

21   Q.    How long had you been wanted for the gun

22   charge at the time this happened?

23   A.    '89.  Probably a year, a year and a half

24   or something.

25        MR. BRUNO:  Objection, your Honor.

**LORNA BECKFORD, Senior Court Reporter**

1              THE COURT:  I will allow that.  Next

2       question.

3       Q.     Apart from the time that you cooperated

4       with law enforcement against your codefendants

5       on your other case and today, have you done this

6       any other time?

7              THE COURT: Done what any other time?

8              MS. MATTAWAY: Testifying in court.

9       A.     Between then and now?

10      Q.     Yes.

11      A.     No.

12             MS. MATTAWAY:  Nothing further.

13  RE-CROSS-EXAMINATION

14  BY MR. BRUNO:

15      Q.     So let's start with your last answer when

16      you said "between then and now, no."

17             Did you cooperate prior to being a

18      cooperating witness on the conspiracy on which

19      you were convicted?

20      A.     No.

21      Q.     Now, couple of questions.

22             You indicated that at the time of the

23      this incident, meaning roughly early July '89,

24      you didn't want to cooperate with authorities

25      because you were a fugitive, correct?

1    A.    Yes.

2    Q.    Let's clarify something.

3          Number one, the District Attorney

4    referred to your predicament as being wanted on

5    gun charges, correct?

6    A.    Yes.

7    Q.    Am I correct that's a mistake.  You

8    already had pled guilty and had commenced

9    probation about four months earlier.  Am I

10   correct?

11   A.    Four months earlier?

12   Q.    Yes.  Let me see if I am correct.  If I

13   misspoke, I will admit it.

14         Withdrawn.  A year earlier, am I correct

15   that on March 11, 1988 you took a plea of guilty

16   to possession of a weapon in Brooklyn?

17   A.    Yes.

18   Q.    So it wasn't out of being wanted for a

19   gun, it said you pled guilty and didn't complete

20   your probation period; am I correct?

21   A.    Yes.

22   Q.    And let me understand again.  I think you

23   are familiar with the system.  You didn't

24   cooperate in the murder case in which your good

25   buddy was a victim?

1      A.      Right.

2      Q.      You agreed to punishment for not

3      reporting to probation, which is minimal?

4      A.      That's not the only thing.

5      Q.      You had more cooking?

6      A.      Because I said earlier back then we

7      didn't cooperate with the police. This is what I

8      said.

9      Q.      So it wasn't that you were wanted for a

10     year and a half, and it wasn't that you were

11     afraid of going to jail for your simple

12     violation of probation, correct?

13     A.      No.  That wasn't it.

14     Q.      So, in other words, now you are telling

15     us, now that I ask, the bigger factor is--

16     A.      I said this earlier though.

17             MS.  MATTAWAY:  Objection.

18             THE COURT:  Mr. Bruno, you ask

19     questions, not make comments.

20     Q.      Now, the bigger or biggest factor in your

21     mind was that it shouldn't be resolved with the

22     authorities, it should be resolved with street

23     justice; is that correct?

24     A.      At the time, yes.

25     Q.      By the way, you were asked about these

1      phone calls.  Again, the next afternoon or

2      evening you called Shaka's home, correct?

3      A.      I don't know if it's next evening.  I

4      thought it was the same night.

5      Q.      And you reached his sister you said?

6      A.      Yes.

7      Q.      Was his sister's name Dickie?

8      A.      I am not sure.

9      Q.      You are not sure.  Okay.  You said you

10     told her he had been shot?

11     A.      Yes.

12     Q.      You didn't call and say is he home, like

13     you were trying to get information?

14     A.      No.

15     Q.      You didn't tell her you had a grazed

16     wound?

17     A.      No.

18     Q.      Did you call later that same day and

19     pretty much ask the same thing, is Shaka home

20     yet?

21     A.      No.

22     Q.      Did you give her a beeper number to reach

23     you if she needed you?

24     A.      I probably gave her a beeper number.

25     Q.      It's turns out it was a phony beeper

1          number?

2          A.     I don't know about that.  A beeper number

3          and everything, I can't remember that far back

4          the beeper.

5                    MR. BRUNO:  I have nothing further.

6                    THE COURT:  Anything else.

7                    MS. MATTAWAY:  Yes.

8     REDIRECT EXAMINATION

9     BY MS. MATTAWAY:

10          Q.     Have you had any contact with Shaka's

11          family since that phone call?

12          A.     No. There was only one thing back then.

13          Shaka had a cousin that I seen in the street,

14          and we sat down and talked about it.  That was

15          it.

16          Q.     All right.  But his family who you

17          reached, the sister, were you close with her?

18                    MR. BRUNO:  Objection.  Beyond the

19          scope and irrelevant.

20                    THE COURT:  Sustained.

21          Q.     Had you called Shaka at home at that

22          number that you called that day?

23          A.     Excuse me?

24          Q.     Had you previously called him at that

25          number?  That's how you had his number?

```
 1          A.    I think Patchy had his number.  I never
 2     called that house.
 3          Q.    What made you decide to call his home?
 4          A.    Well, because I knew that he was there in
 5     the movie theatre dead and his family might want
 6     to know, so I called there.
 7               MS.  MATTAWAY:  Nothing further.
 8               MR. BRUNO:  May I?
 9               THE COURT:  Go ahead.
10  RE-CROSS EXAMINATION
11  BY MR. BRUNO:
12          Q.    Two things, sir.
13               You said you knew he was dead in the
14     theatre so you wanted the family to know,
15     correct?
16          A.    Yes.
17          Q.    Would it shock you to know there was a
18     missing person's case open on Shaka for two days
19     because nobody knew where he was then?
20               THE PEOPLE:  Objection.
21               THE COURT:  Sustained.
22          Q.    Do you realize they had to take his body
23     to the morgue as John Doe?
24               MR. MATTAWAY:  Objection.
25               THE COURT:  Mr. Bruno, stop.
```

**LORNA BECKFORD, Senior Court Reporter**

1        Q.      You were close with his sister you said?

2                        MS. MATTAWAY: Objection.

3                        THE COURT:  That's not his testimony.

4        Q.      You realize the person you called wasn't

5        the sister, it was his cousin.

6                        MS. MATTAWAY: Objection.

7                        THE COURT:  Sustained.

8                        MR. BRUNO:  Nothing further.

9                        THE WITNESS: I don't understand.

10                       MR. BRUNO: Excuse me?

11                       THE WITNESS: I said I don't understand

12       the difference.  What's the difference.

13                       MR. BRUNO:  I though he said

14       something--

15                       THE COURT:  Mr. Bruno, you will be

16       fine.  Watch your commentary.

17                       Ladies and gentlemen of the jury, we

18       are going to break for lunch.  As always, do not

19       discuss the case among yourselves.  Do not allow

20       anyone to discuss the case with you.  Keep an

21       open mind.

22                       I will see back here at 2:15.

23                       (Whereupon, the jury exits the

24       courtroom).

25                       THE COURT:  I will see everybody at

LORNA BECKFORD, Senior Court Reporter

1    2:15.

2                    *         *         *         *

3                    (Whereupon, the following takes place

4    in open court, on the record, in the presence of

5    Court, counsel, and the defendant, out of the

6    presence of the jury:)

7                    MR. BRUNO:  I have a statement for the

8    record before we break, if you please.

9                    Shall I proceed?

10                   THE COURT:  Go ahead.

11                   MR. BRUNO:  This is an extremely

12   serious matter, this trial is, and I want the

13   record to be crystal clear as to following.

14   Well, I hate to make such a statement, but the

15   People have proceeded in extremely bad faith

16   thus far.  Their conduct with the last witness

17   was one of the worst examples for the following

18   reason:

19                   I have now stated repeatedly in other

20   context that it's undisputed the victim died

21   clutching the stolen .38 caliber pistol,

22   literally clutching it.  The off duty cop, as he

23   told you, recovered it, and it's vouchered with

24   a spent round, I note.

25                   The District Attorney embarked not

LORNA BECKFORD, Senior Court Reporter

1      once, but half a dozen times on a line of

2      questioning in which she is trying to eradicate

3      the possibility that the victim was armed and,

4      in fact, fired.  That's extreme bad faith.

5              She may be terrified that there is a

6      strong self-defense issue here.  But as an

7      officer of the court, as a prosecutor, she is

8      obligated to act in good faith.  To actively

9      pursue a line of questioning trying to

10     obliterate and ignore an obvious fact that she

11     is very much cognizant of, I mean, it wasn't

12     some street witness, it wasn't some person doing

13     30 years, it was a city cop who recovers the gun

14     and vouchers it.  Their conduct is outrageous,

15     and I want the record crystal clear as to the

16     bad faith conduct in this trial.

17             THE COURT:  Ms. Mattaway, you wish to

18     respond?

19             MS. MATTAWAY:  I am not terrified of

20     anything.

21             MR. BRUNO:  Well, your actions don't

22     speak that way.

23             THE COURT:  Stop the commentary.  I

24     will make that appropriate rulings when I deem

25     it necessary.

**LORNA BECKFORD, Senior Court Reporter**

Colloquy                    268

1              I will see everybody back here at

2       2:15.  I strongly suggest that neither one of

3       you drink any coffee.  You are hyper enough as

4       it is.  And, again, everybody do not

5       misinterpret my demeanor.  You do not want to

6       cross me. I happen to grow up on the same street

7       that everybody else in this case comes from.

8                    L U N C H   R E C E S S

9              (Continued on the next page.)

10              *          *          *          *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LORNA BECKFORD, Senior Court Reporter