1    SUPREME COURT OF THE STATE OF NEW YORK

2    BRONX COUNTY :   CRIMINAL TERM :   PART 1

3    -----------------------------------------

4    THE PEOPLE OF THE STATE OF NEW YORK,

5             -against-                        IND. NO.
                                               3825/2006
6    RICARDO JIMENEZ,

7                      Defendant(s)            Trial

8    -----------------------------------------

9                              July 10, 2007

10                             851 Grand Concourse
                               Bronx, New York 10451
11
     B E F O R E:

12
             THE HONORABLE ROBERT TORRES,

13
                             JUSTICE.

14
     A P P E A R A N C E S:

15
             ROBERT T. JOHNSON, ESQ.
16           District Attorney, Bronx County
             BY:  LISA MATTAWAY, ESQ.,
17                DEBRA GUARNIERI, ESQ.
                  Assistant District Attorneys
18

19           PATRICK BRUNO, ESQ.
             BRIAN WILSON, ESQ.
20           Attorneys for the Defendant

21
     Also Present:  MR. JOSEPH SHMULEWITZ, Intern
22

23
                             Catherine Mercorella,
24       **FILED**           Senior Court Reporter

25       JUL 1 8

         SUPREME COURT CLERK'S OFFICE
              BRONX COUNTY

cm/a Summation - Defense

1                    THE CLERK:  Case on trial continues.

2                    THE COURT:  Is there anything I need to

3          address before we proceed?

4                    MR. BRUNO:  No, sir.  Thank you.

5                    THE COURT:  Bring the jury in, please.

6                    (Whereupon, the jury enters the

7          courtroom.)

8                    THE COURT:  Good morning, ladies and

9          gentlemen.  I hope you had a nice evening and a nice

10         day yesterday.  I do apologize for the delay bringing

11         you out.  It could not be helped.  It actually

12         related to matters having nothing to do with the case

13         before you.  There are some other matters I had to

14         address.  I do apologize.  We will now proceed to the

15         closing arguments.

16                   Mr. Bruno.

17                   MR. BRUNO:  Thank you, Sir.

18                   May it please his Honor, my colleague, Ms.

19         Guarnieri, Ms. Mattaway, our foreman, members of the

20         jury and our remaining alternates.  I start out by

21         sincerely thanking you for your service.  We took you

22         for close to a month now, we took you from your

23         families, your business, and you patiently listened

24         to us, waited for us, et cetera.  So, thank you

25         kindly.

1          I obviously have a number of comments to

2     make.  I will try within reason to follow the order

3     of the trial sharing with you what I think is

4     important and noteworthy.

5          The first witness was Kevin Morrissey, the

6     man from the barge.  He tells us -- well, to be

7     exact, he tells us that he gets arrested on 9/6/06,

8     September 6, after getting caught for another scam to

9     fund his Jersey shore trip.  In a crazy sort of way,

10    he was almost charming.  He's the eternal con man,

11    the eternal conniver.  He tells you candidly, I ended

12    up in jail on the barge trying to fund my vacation.

13         What I believe is significant is he's

14    arrested 9/6.  He meets Mr. Jimenez on the barge.

15    Jimenez gets locked up, if you recall, August 31.

16    So, they are arrested within a week.  That will be

17    significant in a moment.

18         As I already alluded to, this is a man who

19    is a con man.  It goes very much to credibility, to

20    how much weight you can give this guy based upon his

21    record.  We don't know before that.  I can't comment.

22    But, based on his record alone for the last 13 years,

23    he's supporting himself by fooling people, and I'm

24    not being trite.

25         In evaluating Morrissey, you have to say

1    to yourself, Is he fooling me?  Is he conning me?  Is

2    he cutting still another deal in this case, not to

3    pass a certified check but to pass phony testimony to

4    cut a deal in Queens.  It's that straight forward; it

5    really is.

6              And, he tells you that I have cases

7    pending.  All the same format.  Certified checks, I

8    used them to buy a car.  I then sell the car.  That's

9    my profit.  Quick turnover.  And, ironically, and I

10   would feel remiss if I didn't mention it, the irony

11   here sounds moralistic for one second, this is a guy

12   who could have made an exceptional living with the

13   family business.  You can make a few bucks being the

14   third generation selling Cadillacs, Pontiacs and

15   Buicks, but he chose not to.  All right.

16             Anyway, he has cases pending in Queens,

17   Nassau, Suffolk, Brooklyn and Bergen County, New

18   Jersey, and he needs a break in Queens, Queens being

19   the hard-noses, as it were.

20             With reference to this case, what does he

21   tell us?  Well, he first hooks up with Mr. Jimenez in

22   the context of being what we commonly call a

23   jailhouse lawyer.  He's going to assist Jimenez with

24   reference to his due process issue.  In layman's

25   terms, was he treated unfairly by not being

cm/a Summation - Defense

1  prosecuted for 18 years?  I'm not raising that as an

2  issue.  That's what the due process issue is.  And,

3  he's going to do whatever research; he's going to aid

4  Jimenez in whatever motions.  He thinks he's going to

5  assist me without my request, but that's not

6  offensive either.  They do it all the time.

7            In any event, the next pivotal point I

8  want to make, I want to, yeah, kind of drill on, as

9  it were, is he'll have you believe that he does his

10  lawyer work, his due process research, his research

11  on this case without ever looking at a bit of what we

12  use the term "discovery," a bit of the files, the

13  legal documents that we accumulate preparing for

14  trial.  No, no, I never touched them.  It's my policy

15  not just in this case.  I never.  I make it a policy

16  not to look at discovery.  He threw in the federal

17  term, the 3500 materials.

18            And what does he tell you that I think

19  also tells you a lot?  He's a sharp jailhouse lawyer.

20  All of a sudden, he tells you something very, very

21  dopey.  I make it a policy not to because then down

22  the road they could subpoena me to come in at a later

23  date.  And do what?  Say, yeah -- say, yeah --

24  forget him -- yeah, I looked at discovery for

25  Defendant Smith, and the discovery says the sky was

1       green that day?  Of course not.  Witnesses say that.

2       You don't bring in the jailhouse lawyer to quote what

3       some cop may have written or some witness may have

4       written in a written statement.  Of course not.  He

5       tried to give you a dopey justification.  Why?  You

6       know where I went with this.

7               Oh, he tells you, in fact in very good

8       lawyerese terms, no, no, no, no, in discussing this

9       with Jimenez and relating it to you, I rely upon oral

10      admissions.  In other words, he confessed to me.

11      Very slick.

12              And he tells you he's worked in that

13      context at least twice before, meaning so-called

14      cooperating, but I relied upon oral submissions.

15      Quite slick.

16              And he tells you -- well, I brought out as

17      another point, and you'll see a trend here, a lot of

18      stuff had to be dragged out by me not because I'm a

19      hero or genius.  It kind of sets a tone.  It will all

20      go to reasonable doubt at the end.  I elicit he sends

21      a letter to this marshal Craig Kane and, again, I

22      pointed out it's not like it's, Dear Craig, I got

23      some information for you.

24              Let's pull that together.  Think about it.

25      Common sense.  No need to be a lawyer, a judge.

cm/a Summation - Defense

1      Common sense.  Of all the people on the barge -- all

2      right? -- let's get to the nitty-gritty, he's telling

3      you that Mr. Jimenez confesses to him, breaks down,

4      says I did it.  Of all the people on the barge, is

5      that the type you're going to trust?  This white

6      collar, white bred con man from Long Island?  That's

7      who Jimenez is going to take under his arm and trust

8      and confide in that I did a murder?  Common sense.

9      That's the man he's going to trust and confide in?

10      Trivia.  Again, trivia.  That, I think, goes to what

11      his game plan was.

12           Two small points:  Gee, you know, I

13      thought it was an Irish attorney.  Why?  Because his

14      name was like Patrick or Brian, which ironically my

15      assistant here is Brian, but he didn't know that.  I

16      thought it was Patrick or Brian, one of those Irish

17      guys.  Where did he get that from?  As I brought out

18      facetiously, you didn't look at the discovery with

19      all my communications to Jimenez signed Patrick

20      Bruno?  No.  That couldn't be the reason.  And a

21      second point, maybe more compelling, when he writes

22      to Craig, the federal marshal buddy, it's perhaps you

23      should, in so many words, perhaps you should reach

24      out to the D.A. who looked into this, Anna Villa.

25           And during the course of this trial, you

1      garnered a lot of facts, I hope, but a basic

2      nitty-gritty fact, Miss Mattaway has had this matter

3      from the get go.  I submit to you, you're the jury, I

4      will say it repeatedly, you call it finally, but I

5      will submit to you, could it be this D.A. Anna Villa

6      got involved 18 years ago during the initial

7      investigation?  Could it be Anna Villa appeared in

8      the discovery?  Nah, the con man wouldn't let you

9      believe that.  No, no, that can't be.  Never looked

10     at it.  That's my policy.

11             Folks, a final comment on Morrissey, and

12     I'll move on.  Everything he told you -- again, no

13     hocus pocus, common sense -- everything he told you

14     appeared two places.  The first one I mentioned

15     repeatedly, the discovery, all the lawyer papers and

16     statements and minutes, but the second one -- from

17     when you walked in the courtroom for voir dire, the

18     judge told you what?  This case appeared in the

19     papers extensively 18 years ago and when there was

20     the arrest August 31, six days before they picked up

21     Morrissey.

22             What am I saying?  Everything he told you,

23     this whole confession, all those facts were in the

24     discovery and in the Post and the News, et cetera.

25     He wanted you to believe him.  You know, I'm not that

1     concerned with getting a break in Queens.  Not that

2     concerned?  Again, I had to elicit it.  You can get

3     one-and-a-half to three if you wrap them all up.

4     Queens is adamant at three-and-a-half to seven.  No,

5     it's not a big difference.  You judge what's not a

6     big difference.

7              Then the next witness was the Crime Scene

8     detective, Detective Victoria Burton, on the job

9     16-and-a-half years, with Crime Scene 13 years.  And,

10    again not critically, she had to kind of fill in

11    because the Crime Scene person, like many of the

12    people here, are long ago retired.

13             So, anyway, she tells you that Detective

14    Goodman, the original Crime Scene person 18 years

15    ago, goes to the scene and recovers a number of

16    ballistic items, and we'll have a lot of discussion

17    of ballistics as I go along.  I will try to keep it

18    concise.

19             Goodman recovers a .45 caliber shell,

20    meaning an empty spent shell from an automatic

21    weapon; one lead bullet, meaning a bullet that's been

22    fired, it's out of the shell, as it were; a firearm,

23    which I'll get to in a minute, which contained three

24    live entire cartridges and one spent, one empty,

25    shell.  And she confirms, Detective Burton, that this

1          off-duty officer Velazquez is the one who recovered

2          that weapon.

3                    Now, I had to elicit from her, because

4          she, like every other cop here, always had the cop

5          on.  Pardon the pun.  I'm not a ballistics expert.

6          When I needed to make a point, they got stupid about

7          guns.  I'll take care of that.  Not being cocky, I'll

8          take care of that.  I'll be the amateur ballistics

9          guy within the boundaries set by the court.

10                    But, anyway, she grudgingly tells you that

11          Velazquez recovers the gun, and I then had to give

12          her the voucher.  It's -- I'm sure you're bored by

13          now -- it's a Smith and Wesson Model 10 four inch.

14          How is it significant?  And I elicited from her and

15          one other cop before they got issued these Glocks a

16          couple of years ago that was the New York City P.D.

17          service weapon.

18                    MS. MATTAWAY:  Objection.

19                    THE COURT:  Overruled.

20                    MR. BRUNO:  Folks, it's in the transcript

21          repeatedly.  I made sure I got it in there.  What I'm

22          saying is she gets stupid about her service weapon.

23          Oh, I'm not a ballistics expert.  All right.  Enough

24          of that.

25                    Be that as it may, we elicit from her

1        certain distinctions.  An automatic like a .45

2        automatic, the classic army gun, a .45 automatic

3        ejects the shell, fires the bullet, the shell goes

4        flying out of the gun.  In a revolver, the shell, the

5        empty metal casing stays in one of the cylinders, the

6        round things.  Six of them, right?

7               How does it matter?  It matters because

8        now even if we stop there, and there were more, we

9        have at least two weapons in that theater.  We have

10       the .38 Special clutched in the hand of the dead man.

11       I mean, God rest him, but he died clutching a loaded

12       .38 Special.  And we have potentially a .45

13       automatic, which, again, not to leave off on a sour

14       note, but that was one of the points that Detective

15       Burton like, you know, oh, I'm not an expert now, the

16       point being, I say, well, the shell found on the

17       floor of the theater, the .45, that's consistent with

18       some .45 caliber weapon being in the theater.  And

19       what does she say?  No, not necessarily, no.

20              What do you mean, Detective?  Like

21       somebody came to the theater and just dropped an

22       empty .45 shell?

23              Yeah.

24              In addition, when she got stupid about the

25       lead bullet was after all my questions became pretty

1      clear the lead bullet comes from a revolver, a

2      jacketed bullet comes from an automatic.

3              Well, Detective, we got a lead bullet

4      found on the carpeting and we have an empty shell in

5      the .38, is that not consistent, obviously, that the

6      .38 fired the lead bullet?

7              No, no.  It doesn't mean that.

8              Somebody could have just put an empty

9      shell in the gun?

10             Well, jumping ahead, none other than --

11     we'll get to him -- O'Brien, the guy who's doing nine

12     thousand years tells you we went there strapped, we

13     all had loaded pieces.  So, they are going to put an

14     empty shell in the gun?  No.  That empty shell was

15     the mother, as it were, of the lead bullet on the

16     floor, I submit to you, because I'm not going to poke

17     a joke at the con job.  The minute I'm trying to make

18     a point, I'm not a ballistics expert.  Lady, you

19     carried that gun.  When you fired your .38, the shell

20     was in your gun.  End of story.

21             Oh, and here parenthetically there is

22     evidence of discharge in all six chambers.  Probably

23     not that night.  At some point in history, every

24     chamber of that gun was fired.  And, again, don't get

25     misled by my apparent anger, the point being I hope

1    it was obvious to you, and I will develop this, the

2    cops who testified except Serrano, who is retired,

3    you know, he's not looking for his extra gold bar,

4    the cops all, like they all got dumb the minute I was

5    asking something that maybe would help the case.

6    They all got dumb right at that point.  I hope you

7    noticed that.  That's why I sound hostile.  Okay.

8         The next witness, and I will try not to

9    sound too nasty, the next witness was Mike Centeno.

10   Let me start here.  Who was he kidding?  I'm going to

11   be a nice guy and gentleman.  I'm not going to call

12   him a dope, no.  I'm going to say what he was calling

13   you silently, you're all stupid, I'm stupid, the

14   judge is stupid.  You know, what he told you,

15   baloney, nonsense, because he told you stuff he

16   didn't see and I hope you refer -- I will read from

17   the minutes and all to show you how ridiculous.

18   Let's go through it.

19        He tells us he was an unarmed guard; that

20   night he was assigned to the ticket booth.  He tells

21   you that night there were ten guards on duty of which

22   eight were armed, two were unarmed.  He told you

23   later on parenthetically that all eight who were

24   armed were off-duty or moonlighting correction

25   officers.  He tells you he sees the argument and, by

1          the way, let's you know.  It makes it flow.  It's

2          crystal clear by now, whatever occurs was two steps.

3          There is an argument at the concession stand that

4          results in the shootout in the theater.  Easy.  He

5          sees the concession stand argument, he told you.  I

6          maintain he didn't, and you'll see why.

7                    The D.A. elicits the race, and you know we

8          can't escape race in this case.  Don't take anything

9          personally.  The D.A. elicits the race of the guy who

10         got shot and his friend.  I think we can now conclude

11         that it's Shaka, the deceased, and O'Brien.  Oh,

12         yeah, they're black guys.  Maybe coincidence, maybe

13         she was tired at that moment, we never hear a racial

14         description of the alleged perpetrator, but anything

15         I say obviously are in these minutes.  She'll hate

16         me, but you can have them all read.  It's in the

17         minutes.  The D.A. doesn't elicit what the

18         perpetrator looks like, what racial composition.

19         Why?  It will develop.

20                    Anyway, I know I went after him concerning

21         the theater.  How could you be sure this is the

22         theater?  I thought you caught on by now.  It didn't

23         matter.  It's just that it was -- forgive me -- a

24         demonstration of what you're dealing with.  You have

25         heard the book, the play, the movie, witness for the

cm/a Summation - Defense

1    prosecution.  He was the puppet for the prosecution.

2    He came here ready, willing and able to say anything

3    he thought the prosecution needed to be said.

4            Anyway, this is absolutely the theater.

5    Folks, I was there a number of times to prepare.

6    That is the theater.  That's not the point.  I don't

7    dispute the pictures, but why say that it definitely

8    is?

9            He tells you, I had to ask him, he tells

10   you he hasn't been there in a gazillion years, but I

11   know that's the theater.  Anyway, he tells you there

12   is the argument and that Greg Jones intervenes.

13   That's another problem here.  We cannot say with

14   certainty, but think about it, Greg Jones -- this all

15   occurs pretty fast.  It's obvious confrontation to

16   shooting is pretty fast.  And what do you hear down

17   the road -- and I will mention it later -- Greg Jones

18   was on parking lot patrol.  Greg Jones, I submit to

19   you, never was in the lobby for the argument.  He

20   comes after the radio call, but, anyway, no, that's

21   what she wants to hear, I'll say it.

22           So, Greg Jones intervenes, Jonesy.  He was

23   the boss.  Next thing I hear, because now they walk

24   towards me -- how convenient -- I hear the perp say,

25   as he puts it, in his parting shots to those guys and

1          to security, and says, I'm leaving for a gun, I'm

2          going out to get my gun.  And then he tells you the

3          guards now are like in a huddle, so to speak.  We are

4          all talking about that guy going for a gun.  We are

5          all talking, the guards, we are all talking about

6          that guy going for his gun.

7                    Now, you have, by his own testimony, eight

8          armed off-duty correction officers.  Give me a

9          moment.  And you know it's coming.  Nobody gets the

10         brainstorm, because it's baloney, let's watch this

11         guy, let's follow him at a distance.

12                   At Page 158, "So, now there is an obvious

13         argument.  One of the parties to the argument is

14         saying I'm going for my gun and you're telling us

15         none of the armed security people either followed him

16         or kept an eye for his return; is that correct?

17                   "Yeah, that's correct."

18                   The next thing, now we are starting like,

19         you know, stage two, next thing he tells you he hears

20         is pop, pop, pop, and a lady runs out of the theater

21         saying, "There's a guy shooting in there."  And this

22         becomes pivotal.  Let's pause here.  Why say he's

23         full of baloney?  You recall he says the guy running

24         out was a dark-skinned, male black, but now he's in

25         court and sitting between suit number one and suit

cm/a Summation - Defense

1       number two is Jimenez.  Well, I don't think Bruno I'm

2       going to identify.  I'm not going to identify Brian.

3       Yeah, the guy was a light-skinned guy, you know,

4       complexion like mine was his quote.  You know where

5       I'm going.

6                    He is a fair-complexioned Latino.  So is

7       Jimenez.  You got to now put Jimenez at the scene of

8       the crime.  You got to get around the fact that you

9       said that night it's a dark-complexioned black guy.

10                   Folks, I'll use the term repeatedly.  It

11      was a no brainer.  Who are you going to describe when

12      you're staring at Jimenez?  Who are you going to

13      describe from the stand?

14                   Let's get back on track.  He tells you the

15      guy running out is about six one, you know,

16      light-skinned like me, and he tells you, trivia but

17      absurd, and he's still holding the gun at shoulder

18      height.  Let's go back to the absurdity of this

19      racial issue in identifying the defendant.

20                   But, now, the D.A. never asked you what

21      was the apparent race or ethnicity of the taller,

22      slimmer guy?

23                   "ANSWER:" --  I love it -- "I assumed he

24      was my complexion.  I assumed he was black, a

25      light-skinned black person.

cm/a Summation - Defense

1                    "QUESTION:  I see.  Are you telling us
2          you're black?
3                    "No, no.  I'm Spanish.  But from afar I
4          assumed he was black.
5                    "QUESTION:  Well, now, it was towards the
6          end of your testimony you even -- you stated
7          referring to what would be the slender guy with the
8          girl, you stated, you know, light skinned like me.
9          So I don't understand.  If the man is complexioned
10         like you and you acknowledge you're Latino or
11         whatever term you want to use?
12                   "Yes.
13                   "Light skinned like me, and you
14         acknowledge you're a Latino, but then you told us the
15         tall, slim guy has your complexion, so, therefore, I
16         assume he's black.  I'm confused.
17                   "WITNESS:  Does he want me to answer why I
18         think the guy was black?
19                   "Yeah.
20                   "ANSWER:  I just took it for granted.
21         Black guys were arguing at the concession stand."
22                   I read that at length for a reason.  I
23         don't mean to bore you.  Think of the absurdity.  I'm
24         quite candidly pointing out the ridiculosity of his
25         position.  How does he try to get out of it?  Yes,

cm/a Summation - Defense

1    since I already described that the other parties were

2    black, I guess black people fought with black people.

3                    That's great reasoning.  That really goes

4    over big.  I don't want to the belabor it.  He tells

5    the detective -- I have a note on that -- he tells

6    the detective that night it was a male black guy,

7    dark complexion, male black guy.

8                    What he said -- I was going to comment

9    parenthetically, it's trivia -- but he did it and so

10   did one or two others -- "Do you recall discussing

11   this, being interviewed by a Detective Serrano that

12   night?

13                    "No, I don't recall detectives' names."

14                    Folks, if you doubt it, get the minutes.

15                    Son of a gun, Ms. Mattaway gets up on

16   redirect, Detective Serrano, Detective Serrano, he

17   places Detective Serrano when the People question

18   him.  Trivia, but it shows the mind set.  Puppet for

19   the prosecution.

20                    She's going to ask you to convict based

21   upon that clown.  The movie was Batman.  It wasn't

22   Bozo.

23                    Furthermore, I confront him, so to speak,

24   saying in effect, You never reported you were present

25   for the argument at all.  Your first involvement was

cm/a Summation - Defense

1        when somebody runs from the theater.

2                    No, no, no.

3                    Let's go to that absurd justification that

4        he gives.

5                    "QUESTION:  Eighteen years ago within

6        hours of the shooting as a security guard on duty

7        would you not have reported that to the investigating

8        cop, that I saw what lead up to this?

9                    "ANSWER:  I wasn't asked.  They didn't ask

10       me about it."

11                   Oh.  So, in other words, the cops had to

12       ask were you standing at the concession stand or at

13       the ticket booth, did you witness this at all.  Let's

14       develop that.  On redirect, and it's not mocking the

15       A.D.A., but on redirect a series of questions were

16       asked then, well, you know, now he's in the corner

17       again, the puppet for the prosecution, right now he's

18       in the corner again.

19                   How do you justify this?  Well, I didn't

20       have good training as a security guard.  I wasn't in

21       guard mode.  I see.  That justifies that.  So, again,

22       folks, not facetiously, not sarcastically, common

23       sense.

24                   If, God forbid, it was any of you, not

25       even as a guard, you were there to see the movie,

1    heaven forbid the cops come, it's obviously an

2    argument related to the shooting, you're just going

3    to tell the part about seeing the male black running

4    out of the theater?  You're not going to volunteer,

5    you know, these two guys were arguing earlier and

6    that lead to the shooting?  No.  That's his

7    justification:  They didn't ask me.  I wasn't in

8    guard mode.  He was poorly trained.  No.  Common

9    sense would have dictated.  He was never there to

10   observe the argument.

11            By the way, you may recollect -- I will

12   get to it, of course -- Serrano tells you that is the

13   substance of the interview.  His involvement starts

14   when the guy runs out of the theater.  Enough said.

15            Why did he show up?  Why did he testify?

16   Why did he resurrect 17 years later?  The only

17   thought I can give, because they are relishing it

18   here, Andy Warhol said, "Each of us will have 15

19   minutes of fame."  He sat here and did his Bozo the

20   Clown routine for about an hour, never mind 15

21   minutes.

22            The next witness was Andrew O'Brien.

23   Let's start here.  You really think his name is

24   O'Brien?  He's in the witness protection program now

25   for 12 years.  So, anyway, Andrew X testifies.  He

1    tells you that in October of '90 he commits a murder

2    that's related to a drug racketeering crime.  He has

3    apparently done 12 of those 30 years.  He tells you,

4    I have 18 more to go, and I elicited -- for some

5    reason it was a secret -- he got 30 years for

6    cooperating.  Facing life, he got 30 years.  All

7    right?  And he tells you on the night in question,

8    four of these friends are together:  Shaka, the

9    deceased; Smiles, which is Dean; Patchy, which is

10   Earl, and O'Brien.  And he tells you that that night

11   they all arrived armed.  They all had guns.  Well,

12   why?  Well, you know, in those days we ran the

13   streets.  We were selling drugs.  We always carried.

14             And he tells you that upon arrival, they

15   all exit the cars armed; however, he alleges -- I'm

16   going to get to that in a moment -- because he has a

17   thin T-shirt, because it's a breezy day, rather than

18   have the gun observed, he leaves his in the car, he

19   says.  It's trivia.  I maintain he didn't.  I'll get

20   to that.

21             Anyway, he tells you they go in the

22   theater and, as he puts it, he's the guy with the

23   mouth.  He says there is some confrontation with this

24   other guy and that he, O'Brien, takes up the

25   gauntlet, takes up the argument.

1           Let's stop here.  What I'm saying about

2     the gun, at this point it becomes trivia because at

3     least three of these other guys had guns.  Common

4     sense, do you believe this guy had no gun, meaning

5     O'Brien?  Think about it.  Of all the people with the

6     mouth like of his crowd, he's the one who is taking

7     on the guy.  He's the one putting his chest out for a

8     fight.  He's the one -- pardon the Latin -- who calls

9     the guy a pussy.  He's going to do that with no gun

10    on him?

11          At this point, I can't pass up a tiny bit

12    of comic relief at this moment.  Of all people,

13    O'Brien tells us, oh, those movies all look the same.

14    Touche, Centeno, touche.  All right.

15          So, he calls the guy that vulgar name.

16    He, the guy, in effect, in effect, says, I'm going

17    for my gun.  And what does O'Brien tell you?  I'm

18    thinking that's fine.  We're ready.  Why are you

19    ready, sir?  Well, there is four of us against one,

20    and we are strapped, which, again, like got by on

21    direct.  I elicited that.

22          What is strapped?  Like the cowboys, they

23    are carrying guns.  They strapped their six shooters

24    on.  They are all strapped or three are strapped,

25    according to him.

1            Anyway, they go and sit in the theater.

2       He, O'Brien, sits with the deceased, Shaka.  The

3       other two, Patchy and Smiles, are sitting right

4       behind them.  They are two and two.

5            As a bit of trivia, he forgets the fact

6       that they are there with a couple of girlfriends, but

7       I guess the girls were expendable.  They just left

8       them there.

9            Anyway, the next event was Patches or

10      Smiles, he's not sure, spots, as he puts it, spots

11      that same dude coming into the theater.  And what

12      happens?  They say that the perpetrator, and, by the

13      way, ultimately he also identifies Jimenez sitting

14      here, we'll get to that, he says the perpetrator

15      comes down the aisle close to where they are and

16      says, you know, After the movie, it's me and you, and

17      he says the guy turns and walks away.  Freeze that.

18           Now who is the aggressor?  So, anyway,

19      that's not good enough.  No. He says Patches gets up

20      and O'Brien gets up.  I forgot the term he used.

21      That made me edgy.  He was annoyed.  He took umbrage.

22      He took offense.  And he even says, O'Brien, he

23      pushes his way past Patches.  He wants to have his

24      confrontation now.  Now who is the aggressor?

25           You see, Folks, you're probably following

1    me.  Already there is a common thread here, and I

2    will develop it as I go along.

3                 Mr. Jimenez is not the perp.  He wasn't

4    there, but, you know, this male black Jamaican

5    Rastafarian, when they find him some day, he's got a

6    great defense.  They came after him with guns.  Think

7    about it.

8                 Anyway, there is this exchange.  It's all

9    milliseconds.  You got a gun, they claim the perp

10   says.  He says he's got a gun.  Now Patches is

11   prepared.  By the way, at this point Shaka is now

12   making his way up the aisle.  He's already in the

13   aisle, according to O'Brien's testimony.  It's all

14   there.  It's in the minutes.  And then something

15   interesting happens.

16                 Again, I don't mean to sound like too

17   heavy, but it's the old Freudian slip.  What does

18   O'Brien then testify?  Quote, so, anyway -- Page 202

19   -- "So, anyway, when I say, 'Yo, he got a gun, he got

20   a gun,' and the next thing you know the shooting just

21   -- they started shooting."  Pause.  "He just started

22   shooting."

23                 (Continued on the next page.)

24

25

Summations-Bruno                    671

1           MR. BRUNO:  The hold slip.  They started
2      shooting.  Then he corrects himself.  And thank
3      God Ms. Mercorella here was sharp.  She got that.
4      She got that.  Some reporters may have missed it.
5      "They started shooting.  He just started shooting.
6      Oh, and I felt like I got hit or grazed."
7      Inadvertently Shaka shot him.  Think about it.
8      This is a subject I want you to address.  Who
9      really did the shooting?  The front, the back.
10      Think about it.
11           By the way, a few lines later we have 207.
12      "I said yo he got a gun and Patchy went to reach
13      in his waist for whatever."  Not whatever.  It's a
14      gun.  "For whatever and that's when all the
15      shooting just happened, just started."
16           When they find that dark male Black, I want
17      to be his lawyer.  He's got a great defense.  And
18      again they just poor scared sheep.  They are
19      petrified by this so much so after being grazed in
20      his side and his arm, after leaving their dead
21      friend behind by the way with a couple of girls.
22      But they were expendable.  They chased the perp
23      and Patchy had his gun out and they are saying to
24      each other let's go get this guy.  And again
25      everybody alluded to it's already crystal clear, I

Summations-Bruno                    672

1    hope it's crystal clear toward the end of direct.
2    Can you identify that person in the shooting that
3    night and he identified Mr. Jimenez.  I don't want
4    to belabor it.  He's sitting there between the
5    book end.  Who are you going to identify?  He
6    tells you the first time I see the guy is that
7    night.  The next time is today.  Who is he going
8    to identify?  More interesting developments,
9    however, with Mr. O'Brien or whatever his name is.
10   He tells us that in 1996 he tells the feds about
11   this as part of a cooperation agreement.  He tells
12   us that.  Yeah, I'm cynical.  Let me develop this.
13   And then he says in '98 quite candidly, if we
14   believe straight forward it was '99, but in '98
15   Detective Pheifer the cold case lady detective
16   from the Brooklyn branch, she receives the
17   information from the feds.  You notice this cold
18   case stuff how it just breezes right along.  You
19   get stuff in '96.  The city picks it up in '98.
20   What are you doing in the mean time any way?  In
21   '01 Stradford gets around to it.  He follows up on
22   it.  What I'm alluding to is very interesting and
23   I don't know, it's a loose end, but it's food for
24   thought.  Think about it.  Detective Pheifer is
25   described in so many words as the cold case

Summations-Bruno                    673

1    detective from the Brooklyn office.  And what did

2    I ask O'Brien about?  It's in the record.  Are you

3    aware -- did you really get involved as part of

4    the cooperation agreement or were you dragged in

5    as the prime suspect in this murder?  And what do

6    I base that on?

7         Well, are you aware of a memo from Detective

8    Dave Carbone out of the Brooklyn office which says

9    in substance we're going to charge O'Brien with

10   murder one of which is ours and the ours is

11   referenced Shawn Worrell, Whitestone cinema.  Was

12   O'Brien dragged in as the perp?  Brooklyn office,

13   Pheifer, food for thought.  And you know he is a

14   real scary guy quite candidly.  It certainly

15   wasn't personal offense at all.  I relish what he

16   said, where have you been -- meaning me.  I'm out

17   of the loop.  When you're saying I'm going for it,

18   you ain't going to the car for brass knuckles.

19   There is going to be a shoot out.  I want to be

20   the lawyer when they get that dark skinned Black

21   guy.  They are there ready for a shoot out.

22   Parenthetically because again it got by the

23   prosecution.  This is a man who came to this case,

24   forget the conspiracy, forget that he's doing

25   thirty years.  Before this all occurs in March '88

Summations-Bruno                    674

1   he's got a felony gun conviction in Brooklyn that

2   he's warranted on that night by the way.  And in

3   '89 in Virginia he's like a multi state guy.  He's

4   very cosmopolitan.  In '89 he's got a Virginia

5   conviction for felony cocaine trafficking.

6          The next witness was Police Officer Rubeun

7   Velasquez.  He was the young fellow that night on

8   the job maybe a year and three or four months.

9   He's now on the job what nineteen years.  Again I

10  already tipped my hand.  You know, he testified

11  the same day.  I'm gonna keep it close to the

12  vest.  I'm not gonna give you anything you want to

13  hear.  Let's develop that.  He tells us, however,

14  he hears approximately three shots.  He tells us

15  grudgingly yeah the deceased had a weapon in his

16  hands when I discovered the body.  He won't

17  acknowledge.  Think back to what's in the minutes.

18  He's telling you that the victim, that Shaka is

19  right alongside his aisle when this happens.

20  Again, I don't think if you care if you're a cop

21  twelve minutes or if you're a local McDonald's

22  clerk you're gonna notice that the guy next to you

23  is shooting.  No, am I being dumb?  When I find

24  the body he had a gun in his hands, but I didn't

25  notice that he had a weapon drawn during this.

Summations-Bruno                              675

1    Again it's just annoying.  He tells us he came
2    here prepared.  He had reviewed the DA's material.
3    It's not improper to refresh your memory.  I then
4    give him documents to refresh his memory.  He
5    never would acknowledge things.
6         Well, according to that statement yeah it
7    says that the guy had the gun in his right hand
8    with the finger in the trigger guard ready to go.
9    That's according to the statement.  With all this
10   refreshing my recollection, I don't recall but
11   yeah now that you shove the statement in my hands
12   that's what the statement said.  What kind of cop
13   testimony is that?  You're a veteran cop.  That's
14   what you said that night.  Fess up, be a big boy.
15   No, I can't recall that the deceased had a gun
16   during the shootout.  And the same thing, I won't
17   belabor it, that was his service weapon.  Or the
18   guns, you're gonna recall it wasn't something like
19   esoteric Swiss automatic, they are floating
20   around.  No, Smith and Wesson model 10, four inch.
21   It was the twin for the gun he carried.  He was so
22   proud that he recall he made the distinction he
23   had the stainless.  At the time he made forty-two
24   dollars more and got the stainless version as
25   opposed to the blue.  That's all it came down to.

Summations-Bruno                    676

1   That's it.  Enough said.  But in any event, we got

2   him pinned down.  He recovered the gun from the

3   dead guy's hands loaded with three rounds, one

4   spent finger on the trigger guard.  It was like a

5   dentist pulling teeth, but we got that out of him.

6        The next witness was Detective Wendell

7   Stradford.  It should have been me and him after

8   the trial.  What a piece of work.  What a piece of

9   work.  He's the cold case detective.  He tells us

10  he's assigned in '99.  He gets contacted by the

11  person in the Brooklyn who was Pheifer and they

12  had the lead.  He first meets with O'Brien in

13  January of '01 then we get the following

14  nonesense.  I couldn't reach out to the initial

15  assigned Detective Serrano.  He had since retired.

16  I pressed him on cross.  Well, I eventually

17  located him.  Okay.  He didn't bother reaching out

18  to Velazquez.  This is this veteran cold case guy.

19  He's very impressed by himself.  There is a T.V.

20  show.  Now, he's hot stuff.  I had no contact with

21  these witnesses until '05, '06.  And what was his

22  trademark expression, I'm not gonna get personal.

23  You could laugh at me in the juryroom.

24  "Counselor, you're not understanding me.  You're

25  not understanding me."  Let's give a prime example

1    what I the dopey lawyer didn't understand.  I

2    asked him pages and pages of the same thing.

3    Bottom line, how did you get to O'Brien.  Oh

4    you're not understanding.  Let's see in a nutshell

5    after pages and pages of questions how he got to

6    O'Brien.  Let's outline that.

7              "QUESTION:  I think you said a lady

8    Detective Pheifer put onto the DEA drug

9    enforcement put you on to the DEA who then put you

10   onto O'Brien; is that correct?

11             "ANSWER:  Yes."

12         That was after about 15 or 20 questions.  Get

13   to the punch line.  This wasn't because of your

14   massive investigation.  You didn't beat the

15   pavement.  You didn't wear out the soles of your

16   shoe Dick Tracy.  Pheifer called you, hook up with

17   this fed, the feds hook up with O'Brien, end of

18   story.  No heaven forbid he'd help the bad guy,

19   no.  Gotta pull teeth.  Another gem the .45

20   caliber shell.  It wasn't lost.  It can't be

21   located.  What does that mean?

22         Well, I checked with the Bronx property

23   clerk, the Queens people headquarters and I never

24   got to see it.  That was his thing on direct.

25   Then I asked him -- I'm a very direct guy, you

Summations-Bruno                        678

1    know, was it lost.  No, no, no, it wasn't lost.

2    It never got located.  Did you locate it for the

3    trial?  No, it's still unlocated.  See, I admit

4    this is trivia, but again it goes to show you what

5    are they hiding.  Are they trying to build a case

6    on quicksand and they are singing so they need

7    guys like Stradford to be evasive, to be arrogant?

8    To show the real game, the perp is described

9    repeatedly male Black okay, sometimes Jamaican.

10   He couldn't acknowledge that without squeezing it

11   out of him.  So this is a quote.  Well, I asked

12   him about you said you had reviewed the whole

13   folder from '89.  Oh yeah.  I couldn't conclude

14   based upon descriptions in that folder what was

15   the race of the person sought.  I wasn't there.  I

16   see, that has all kinds of meaning.

17        In other words, only a cop who was there for

18   the shooting could conclude the race, no.  What's

19   the other interpretation?  I see all the cops then

20   Serrano, Horn, Schiffman, if they put that down we

21   can't trust that.

22        In other words, they might have said the perp

23   was a short Chinese guy, but they wanted to write

24   down dark complexion Black guy.  That's what it

25   means, okay.  After I pressed him pages of

Summations-Bruno                              679

1    questions, after I press him he says grudgingly

2    yeah the description that was given was for a male

3    Black.

4         Well, thank you sir.  You're on my Christmas

5    list.  Evasive obstructionist person.  I elicited

6    that the last DD-5 generated in this case was

7    number 40 which was closed out on July 17th, '89,

8    two weeks after this incident.  I maintain they

9    closed shop on this case.  He tries to dance

10   around well they were like scraps of paper and

11   memos.  Did you hear of anybody getting contacted

12   after the 17th of '89?  I didn't.  Again I pulled

13   out of him that Blaylock admitted to me he lied in

14   1989.  He then danced around that issue with me.

15   I quote -- cross examined him from the minutes of

16   the prior proceeding in which he acknowledges that

17   and what does he do.  Do you remember it was

18   great-- nothing personal.

19        Well, you know, but if you have that DD-5

20   that I'm relying upon give me my DD-5, I had to

21   give him his DD-5 if he acknowledges he said that

22   in the minutes.  It's absurd.  This is what they

23   are building their case on.  It's bad enough if

24   laymen come in and try to make a fool of you.

25   We've got cops playing mind games.  It's

Summations-Bruno                    680

1    outrageous trivia, but it shows the mentality.
2    You surmised they arrest Jimenez in the barber
3    shop in which he's working.  They arrest him in
4    the barber shop.  We're gonna split hairs.  It
5    wasn't a barber shop.  Was it on the sidewalk in
6    front of the front door?  No.  Was it a barber
7    shop he worked in?  You gotta paint a picture.
8    He's some sort of homeless bum.  The guy doesn't
9    work.  You know what makes a liar out of him and
10   it's in the minutes?  Morrissey tells you.  He had
11   to go to his job at the prison barber shop.  He
12   used his skills while in the barber shop.  Paint
13   the picture.  I arrested this worthless bum who
14   doesn't work.  They are so desperate in this case.
15   They are on quicksand and they are nervous.  On
16   redirect-- and this yeah this on a personal level
17   was like bad faith I thought.  On redirect there
18   is a series of questions.
19        Now, when you went out, you meaning
20   Stradford, were you seeking a male Black?  That
21   was ambiguous.  And he goes with ambiguity, no,
22   no.  Why Folks?  Let's cut it to the chase.  He's
23   not investigating in the traditional way.  He
24   rounds up a couple of people from '89 and at that
25   point they already have targeted Jimenez.  The

Summations-Bruno                    681

1     description didn't matter.  You could have said he
2     was a male orange person.  He knew he was going to
3     that barber shop for that guy.  So literally was
4     he looking for a male Black?  No.  But it
5     backfires because literally he was going for
6     Jimenez.  Is that a male Black?  His final
7     desperate attempt also to show the mind games that
8     were played.  This is by a cop, a veteran cop sir,
9     the amo on the voucher was it all .38 special?
10    Meaning to fit the gun.
11         Well, the first item yes.  The first item was
12    super.  It was the second or third item it was a
13    .38 super.  Well, Officer, again you carried that
14    gun that super, a .38 special super velocity?
15    What's the answer?  Oh, I wouldn't know that.  I'm
16    not a ballistic's expert.  I'm not the dope.  The
17    joke is on him.  That was his service weapon.
18         And then finally about ballistics.  For some
19    reason she asks him would a .45 fit a .38.  What's
20    the answer?  Oh, I wouldn't know.  I'm not a
21    ballistic's expert.  At this point folks I think
22    it's appropriate -- I'm not gonna discuss more
23    witnesses.  I'm going to digress for a moment.
24    I'm going to talk ballistics.  I make it clear not
25    as an expert, I'm not allowed to -- I'll just

Summations-Bruno                    682

1     offend the judge.  I can't testify as an expert so
2     I will discuss the facts in the case about guns
3     and amo and so on.  A few straight thoughts we
4     have in this case .38 special three live rounds
5     one spent.  Dead man's finger in the trigger
6     guard.  We have recovered on the floor of the
7     theater a lead bullet consistent with the empty
8     shell in the .38 special.  We have a spent .45
9     caliber shell consistent with another party with a
10    .45 weapon of some kind.  I doubt it was a machine
11    gun.  It would be too big.  Most likely .45
12    caliber army type gun.  What everybody glossed
13    over except the court officer Hazeley I'll get to
14    him.  What everybody glossed over including crime
15    scene, there is a bullet hole in the rear wall by
16    the way with front and rear.  Nobody got confused
17    in this case so I'm gonna call it screen and hall.
18    There is a bullet hole in the rear or hall side
19    wall.  The side you come in.  The side they claim
20    the perp was.  Did he shoot over his shoulder?
21    No.  Did he turn around and shot?  No.  There is a
22    bullet -- there was another bullet in that wall we
23    could safely conclude.  That means we have four
24    rounds that were fired.  Go over there in the
25    juryroom.  You have justification for four

Summations-Bruno                    683

1   different rounds that day.  Okay.  We have

2   O'Brien --

3              MS. MATTAWAY:  I objecct to

4   justification.

5              THE COURT:  Sustained.

6              MR. BRUNO:  I'll change that term.  You

7   could justify using the reasoning that there were

8   four different rounds fired that day.  We have

9   O'Brien grazed by someone.  We have O'Brien tell

10  us that at least three of his party were armed.

11  Like the other guy Patches had a nine millimeter.

12  He was ahead of the cops.  He was ahead of his

13  time.  We have the deceased and Patchy both had

14  guns and we have a statement by O'Brien that page

15  245 that Patchy was now at the top of the theater.

16  You heard like any movie there is a slope.  The

17  screen is the bottom.  The hallway is the top.

18  Patchy was at the top of the theater and reached

19  for his gun.  You know what's ironic?  And again

20  it's not personal attack.  These witnesses bent

21  over backwards not to acknowledge that the dead

22  guy and his crew had guns.  Think back.  The judge

23  will tell you my opening, her opening are not

24  evidence.  But far credible, the DA in her opening

25  in her opening madam prosecutor tells you the

Summations-Bruno                  684

1     deceased drew a gun.  The deceased fired a shot.
2     What were these cops hiding?  Enough guns and amo
3     for today.  The next witness in order was
4     Detective Serrano -- withdrawn.  Retired Detective
5     Serrano.  I don't know what he would have been
6     looking in '89, but I submit to you today retired
7     on his pension 74 years old, he's got no axe to
8     grind.  He came here and he testified to what he
9     testified to.  I read my reports.  This is what
10    was reported to me.  End of story.  Not saying
11    he's a good guy or a bad guy.  Let's be modest.
12    He had the luxury of being candid.  He didn't need
13    to be promoted to detective.  One, he didn't need
14    to look for a raise.  He owed the DA nothing.
15    What did he tell us?  I already said 74 years old.
16    He was on the job 38 years.  The day he went to
17    investigate this crime he was a cop 28 years and
18    four days.  You think he botched up the
19    investigation?  You think he wrote down dark
20    complexion male Black when they said the guy was
21    Japanese?  I don't think so.  He tells us he
22    reviewed the file, that the DA had proper, and you
23    know it was in front of him.  I gave him six or
24    seven or eight exhibits to refresh his
25    recollection.  What does he tell us to keep it

Summations-Bruno                685

1    very straight forward and perfectly interesting I
2    went by numbers.  Number one, he tells us that the
3    voucher of Police Officer Velasquez included a .38
4    special.  You heard about the gun included three
5    live one spent rounds.
6         Number two, he tells us that evening or
7    really that morning he authorizes what they call
8    the finest message switching system report.  All
9    points bulletin.  He authorizes that potential
10   perp we're looking for male Black dark skin.
11        Number three, he tells you he interviews Mike
12   Centeno.  Remember Mike the puppet.  He interviews
13   Mike.  The first activity he's involved in he
14   hears three pops from the Batman movie and sees a
15   male Black flee the theater and tuck a gun in his
16   waistband.  He goes on yes.  He reported he was a
17   male Black of dark complexion.
18        Number four, he interviews James Williams
19   another concessionaire that night.  He tells you
20   that two male Blacks with Rastaferian accents were
21   arguing.
22        Number five, he interviews Sean Bond another
23   popcorn seller.  He tells it was two male
24   Jamaicans engaged in the argument.
25        Number six, he interviews Esco Blaylock that

Summations-Bruno                    686

1    same morning.  He says it was a male Black --
2    excuse me, with a white hat who did this.  He
3    interviews number seven Christopher Cordero.  He
4    was the ticket taker that night.  It was a male
5    Black medium complexion.  He interviews number
6    eight Linda Salter, two different issues.  (A) the
7    guys involved in the argument.  We'll get to that
8    were two -- the guy involved in the argument was a
9    tall Jamaican and I know Ricardo Jimenez, reports
10   Salter.  I know Ricardo.  He was not the man
11   engaged in the argument that night.  You know
12   parenthetically Stradford said he tracked down a
13   whole bunch of witnesses and he guesses why Linda
14   Salter wasn't brought in.  Make a wild guess in
15   the juryroom.  I know Jimenez.  He wasn't the guy
16   in the argument.  I guess Stradford couldn't pick
17   her up in Delaware.  Anyway, number nine Robert
18   Kane another concessionaire that night.  It was a
19   tall male Black.  And again not personal attack,
20   but to show the desparation of the prosecution.
21   We gotta like claw our way out of the quicksand.
22   She gets up and her big thing well now Serrano in
23   reference to Ms. Salter she simply told you that
24   the guy or you said the guy you're describing was
25   not involved in the argument.  You didn't say he

Summations-Bruno                    687

1        wasn't the shooter.  Okay.

2             Now, be facetious.  What's the logical next

3        statement now?  In other words, I misquoted

4        Serrano, so Salter says the guy arguing at the

5        popcorn stand was not Ricardo, I know him.  Oh, so

6        in other words now, to make Linda Salter in error

7        it's clumsy to make her in error, the guys who

8        argue at the popcorn stand then the perpetrator

9        then hires an assassin to do the shooting in a

10       theater.  You follow me, the big discrepancy she

11       found that Salter didn't say and the shooter

12       wasn't Ricardo.

13            Well, folks, it's her case, her burden.

14       Every other witness says the obvious.  They argue

15       here the same guy in the argument is shooter and

16       dead guy.  Kind of crude by the way I said it, but

17       that was a big discrepancy.  The other big

18       discrepancy and I hope it wasn't intentionally

19       ambiguous was you heard -- when you heard from

20       Esco Blaylock.  I'm forced to digress to him for a

21       minute.  Blaylock testified in substance not one

22       but two different detectives interview him that

23       same morning.  Both detectives are male Black dark

24       complexion.  Then some days later we get on this

25       Leon story.  What's the ambiguity they created

Summations-Bruno                   688

1      with Serrano?  Well, didn't say that Leon was a
2      male Black.  No, didn't.  He said the perp that
3      night the two detectives was a male Black.
4      Sometime later, I guess, Blaylock gets together
5      with the rest of the crew to hear about Jamaicans
6      and Rastaferians.  Later he says well Leon is
7      really a Puerto Rican who can mimic Jamaicans.
8      Desparate desparate people trying to prove a case
9      as they drown in quicksand.  The next witness was
10     senior court officer Harold Hazeley.  One of the
11     colleagues of the officers present.  At that time
12     he was a moonlighting correction officer.  And
13     Hazeley was fairly brief, which I had already
14     alluded to with just about every other security
15     guy, they had observed the obvious, bullet hole in
16     the rear or.  For whatever reason crime scene
17     didn't find that important.  Maybe they lost it.
18     I don't know.  He confirmed that the theater like
19     every theater is built on a slope.  What's the
20     significance?  There is testimony that the bullet
21     hole in that rear wall is somewhere nine to ten
22     feet up.  Think about it.  The shooter shooting
23     that bullet I submit to you is at the low end of
24     the theater, the screen end, shooting up over
25     compensating is the term they use.  You over do

Summations-Bruno                    689

1     it.  The same way sometimes when you shoot down

2     hill.  You hit the guy's shin instead of his

3     chest.  And he tells you and I acknowledge we

4     can't pinpoint a time frame, but he tells you when

5     the radio call goes out in any event that there

6     was a shooting.  Jones is on parking lot patrol.

7     Again, at least somewhat contrary to Centeno.

8          All right.  I don't want to ignore her.  The

9     sister of the deceased testified Lisa Worrell.  I

10    have no comment.  She unfortunately was here to

11    confirm the death of her brother that she knew him

12    alive and that she then had to identify him.

13              (Continued on the next page)

14

15

16

17

18

19

20

21

22

23

24

25

jc-c      Summation - Defense

1              MR. BRUNO:  The next witness was Esco

2      Blaylock.  He tells you a lot that we've heard

3      over and over again.  There's an argument over

4      popcorn.  He tells you he knew Leon from,

5      quote, "around the way," that people pointed

6      him out, they were never introduced.

7              He tells you about the line, go get

8      what you're going to get.  He tells you about

9      the line, you're the one with the smart mouth

10     and words are exchanged.  He tells us further

11     that the deceased, Shaka, he doesn't know it

12     was Shaka, the deceased goes into the aisle to

13     get into the confrontation as it were.  He

14     tells us some double talk, I submit, about the

15     identification of Leon.  Let's get to that.

16              "Question: And how long, if you

17     remember, did you stay in the theater that

18     evening talking to police?

19              "Answer: Well, I told them what had

20     happened, because I was waiting for my

21     girlfriend to get off anyway.  So I told them

22     what I seen and they took down my statement.

23     They gave me their card and that was that.

24              "Question: And did you tell them

25     about Leon?

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 46 of 241
691
jc-c      Summation - Defense

1          "Answer: Well, eventually they came

2     back at a later date."

3          I don't want to give Blaylock credit

4     for too much intelligence, but do you see how

5     sleek that was?  I told them everything I seen,

6     but then again, perhaps the Freudian slip, I

7     tell them this Leon story at a later date.  All

8     this about getting fired is also very

9     interesting.  I'm told, don't talk, meaning

10    told by management, I'm told don't talk about

11    this, don't help the cops.  He gets fired

12    anyway by the 17th.  That's a pivotal date.  He

13    said within two weeks.  By July 17th, the date

14    of the last DD5, by July 17th, he's fired

15    anyway.

16         And he says interesting too, in other

17    words, about motive to lie, motive to change

18    the story, the timing is important, and then

19    I'll read it in a minute, he says he's

20    admonished by management right after the

21    incident, meaning July 3rd, the early hours of

22    the morning.

23         Let's look at this for a minute.

24         "Did there come a time when you

25    stopped talking to the police back in '89?

692

jc-c      Summation - Defense

1           "Answer: Yes.

2           "Why did you stop talking to the

3    police?

4           "Answer: Because two reasons.  My

5    employer, right after I gave my statement to

6    the police officers that night, they told

7    everyone not to cooperate, that they didn't see

8    anything."

9           So think about it.  Right after being

10   interviewed that night.  What does it mean?  I

11   submit you shouldn't believe him, but if that

12   aspect is believable, that because I'm

13   threatened by management, I stop talking, the

14   threat, again, common sense, no magic, the

15   threat is, after he's told Serrano and another

16   detective, remember two different interviews

17   that morning, that it was the male black, think

18   about it, think about it, all this Leon story,

19   and I admit, we never pinned him down, was days

20   or weeks later.  That morning, two statements,

21   both male black, two different detectives.

22          Just food for thought.  He tells us

23   he was a Federal security officer at the

24   airport.  He supposedly left the job alleging a

25   civil rights lawsuit.  Just to pin him down,

jc-c      Summation - Defense

1      especially after Officer Hazeley's testimony,

2      he says he never saw the perpetrator fire at

3      that back wall or over his shoulder obviously.

4      I think I already said it in the early morning

5      of July 3rd, he tells the detective who was a

6      male black, 5'10" to 6', 175 pounds, again, I

7      said about another with the parenthetically

8      happened, the same thing with him, maybe it was

9      part of the interview process, he couldn't

10     place Serrano any time I questioned him.  The

11     DA does redirect, Serrano, Serrano, Serrano.

12     Interesting.  All right.

13              With reference to management, because

14     it is significant, and, again, sincerely you're

15     the jury, I can't force my interpretation on

16     you, but he'll have you believe, and really

17     it's not a major point, he's already pinned

18     down with two statements on the 3rd, but he'll

19     have you believe, think about it, there's a

20     shoot out at a 12 movie multiplex, pretty major

21     movie in the Bronx, we all pass it on Bruckner.

22     There's a shoot out at a 12 movie multiplex on

23     Bruckner Boulevard, on opening night of Batman,

24     a lot of attention, again, you could surmise,

25     and the judge told you during voir dire, press

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 49 of 241
694
jc-c      Summation - Defense

1      had to be swarming that night, so look over

2      your shoulders and he'll have you believe,

3      management says don't cooperate.  They don't

4      want this solved?  What I'm saying, my opinion

5      doesn't count, yours does.  Think about it, as

6      management, don't you want to show the public

7      our theater is safe, you could come with your

8      family, there was this bizarre murder when

9      Batman opened, but come tomorrow with your

10     little kids when it's safe to see Batman.  No,

11     they want it covered up, so we all say, gee, I

12     dread going to the Whitestone theater anymore,

13     they had a theater and nobody cared.  Food for

14     thought.  He was threatened by management and

15     got fired anyway.

16            By the way, it's in there, maybe it's

17     trivial, I'm glad I caught it.  The DA asks him

18     all were warned, were others fired with you,

19     no.  I submit to you he got fired for his own

20     personal reasons.  And he vacillates on the

21     subject; I never stopped cooperating when they

22     called me, I made myself available, but then he

23     tells you sometime later, yeah, except that the

24     next call I received was from Stradford in

25     April of 2006.  Again, all American horse

695
jc-c      Summation - Defense

1    sense.

2              Do you think that with this murder,

3    with the press looking over your shoulder, the

4    cops just gave up on him?  On 7/17/89, like put

5    it on a shelf until Stradford reached out to

6    him in April '06?

7              No, I submit to you he fell off the

8    face of the earth and didn't want to get

9    involved, didn't want to perpetrate a fib he

10   created, and I'll get to that at the end.

11             He tells us grudgingly that he does

12   have a DWI case, but, again, double talk and

13   triple talk.  Doesn't get arrested, it's in

14   litigation.  That makes no sense.  Drunk

15   driving is very straightforward.  You're

16   driving a car, the cop is alleging you're

17   drunk, drunk driving, not litigation.  Either

18   you're stopped for it or you're not.  He says I

19   was involved.  Same thing; either you're the

20   driver or you're not.  They don't lock up your

21   17 year old kid in the back seat if you're a

22   drunk.  Either you did or didn't.  And I'm not

23   charged yet.  I don't know what that means,

24   you're charged at the scene.  Sir, you're

25   arrested for drunk driving.  They throw the

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 51 of 241
696
jc-c      Summation - Defense

1      cuffs on you and you're thrown in the car.

2      That's the point.  I don't care about drunk

3      driving quite candidly.  It was significant, I

4      submit, that O'Brien is cutting a deal that

5      could maybe minimize the balance of 30.  I

6      acknowledge, I submit to you that Morrissey

7      maybe has a motive to do one and a half instead

8      of three and a half.  This kid, he's not going

9      to do 25 years for DWI.  We all know that.  I

10     didn't bring it up for that reason.  I submit

11     to you, he was hiding and ducking the police.

12     How Stradford finally got his hands on him is

13     by tracking arrests.  Putting like a hold on

14     the criminal record system.  It was we finally

15     got him, they locked him up for DWI and go get

16     him, like enforcing a warrant.  That was the

17     break, I submit to you.  You know why I submit

18     that to you?  I was forced to fish around, but,

19     again, 3, 4, 6 questions, when did you get

20     arrested for the DWI, I don't recall, I don't

21     recall.  And then he kind of caught on where I

22     was going.  So then what does he say, no, I do

23     know, it was like in August.  He had to make it

24     after Stradford found him.  Because, yeah, he

25     caught onto where I was going.

jc-c        Summation - Defense

1              This thing with the girl, I submit

2     very important with the double talk and triple

3     talk and, again, at the risk of angering the

4     court reporters, they're taking the minutes

5     down for a reason.  They're all available to be

6     read to you.  You might want to have read back

7     to you at least this subject, because he goes

8     back and forth on the subject of the girlfriend

9     as follows:  On cross I ask him pretty direct

10    when I question him, I ask him pretty directly,

11    did you say in effect the context, the way in

12    which you knew of Leon, which was that you

13    believed, turns out it was an error, that he

14    was going with your girl, and he says

15    definitively no, there was no girlfriend issue

16    when I question him.  And he denies ever saying

17    that to Stradford, by the way.

18              Miss Mattaway gets up on redirect,

19    not improperly, and pursues this subject.  All

20    of a sudden, there's a whole long story, well,

21    yeah, no, there was a girlfriend issue, you

22    know, but it doesn't refer to Lisa, Lisa was

23    the girlfriend who was popping corn with him.

24    But they're not referring to Lisa, it's not the

25    same girlfriend you thought you were dating in

jc-c      Summation - Defense

1  common, no, no, no, they're discussing a
2  different girl.  And then he tells you the
3  following, rather than read it, I summarized it
4  right here, it wasn't a girlfriend, per se, it
5  was, you know, a lady friend, a girlfriend, a
6  best friend.  Folks, you figure that one out.
7  Not a girlfriend, per se, a lady friend, a
8  girlfriend, a best friend.  I asked him about
9  did you lie to the police, again, pursuant to
10  what Stradford acknowledged, well, I could have
11  changed my story after the threats by
12  management, but it was too late, I already gave
13  my testimony, and I wasn't about to go back on
14  that.  So those first two interviews, male
15  black, male black, no question.  So which I
16  don't follow why this even came up, again, so
17  when did you decide to change your story, after
18  I was threatened by management and reinforced
19  by the parents.
20          My question is this, again, I think
21  ambiguity was thrown into this purposely.  When
22  did you change your story?  Change to what?
23  They'll have you believe maybe the change was
24  about how old he was, because I was only 15,
25  how old you were, was the change about the

jc-c     Summation - Defense

1    color of the guy.  They'll have you believe or

2    not believe rather, no, he changed the story to

3    this whole thing about Leon.  Leon.  Who, by

4    the way, we have Ricardo, maybe Ricky, where

5    Leon fits in, I don't know.  Nowhere.  Did you

6    change the story to Leon?  Then he tells you,

7    well, I never said that Leon was the male black

8    5'10", 6'.

9          Ladies and gentlemen, why did Esco do

10   this?  I can't speculate.  I can propose to you

11   as follows:  I submit to you, think about it in

12   that context, he's a 15 year old guy, hormones

13   raging, testosterone flowing, and pointed out

14   to him that guy, that older guy is stealing

15   your girl.

16          This was a little way to twist the

17   knife in his back.  Never thinking it would get

18   to this point.  Don't forget, after two weeks

19   he's out of this.  He makes contact again in

20   front of Baruch in April '06.  And now he's

21   trapped in this case years later.

22          One final witness, very brief, the

23   coroner, Dr. Susan Ely.  Folks, I don't dispute

24   that this young man Shawn Worrell, Shaka, died

25   of two bullet wounds.  It was a lousy death for

jc-c      Summation - Defense

1    a young man.  However, there still is that

2    issue lurking in my mind, I hope you adopt it,

3    who fired the shots who wounded him, one or

4    both.  And in that context, hope it didn't get

5    by you what I think is one of the most

6    important points that the doctor makes is that

7    I normally can't testify or even speculate in

8    so many words on what shot is which, what went

9    first, meaning the one in the side and arm or

10   the one in the head.  But because of the

11   nature, remember because of the nature of the

12   wounds, I can give you a pretty intelligent

13   summary.  The wound in the side and the arm had

14   to be first.  Why?  Well, getting ahead,

15   because the head wound would instantly floor

16   you.  You'd have no control of anything.  Gets

17   very morbid, you just fall.  But the shot on

18   the side in the arm, you have some time left as

19   it were.

20           Remember she did the example with the

21   broom stick and all?  What am I getting at?

22   Sean Worrell gets shot first in the side,

23   because she says to you what, the arm had to be

24   somewhat straight out for the bullets to travel

25   the way they did.  Straight out, gripping a 38

701

jc-c        Summation - Defense

1        special.  Fingering the trigger card.

2                Few comments and I sit down.  This

3        has not become a game of who is a nice guy and

4        not.  I know at times I'm extremely blunt, it's

5        not a personality contest, it's not who is

6        pretty, smart, whose voice is more fascinating.

7        It's the facts.  And it's reasonable doubt.

8        You know, folks, quite candidly, any case I

9        tried, any case I've ever tried, and I'm doing

10       this for a couple of years now, any case I ever

11       tried, I could always have a verdict of he

12       might have done it, I got a 20 percent feeling

13       he did it, my gut is he did it.  I don't like

14       his tattoo, he's a bum, he's not a barber.  We

15       could convict on that, because we're human, but

16       that's not the job.

17                I don't mean to lecture to you.

18       What's pivotal here, listen to the judge's

19       charge about reasonable doubt.  This case is

20       crying out reasonable doubt.  Crying out.  I

21       urge upon you, you cannot in good conscience

22       convict upon the liars, yeah, in this case, and

23       the evasive cops.  What were they avoiding,

24       what were they covering up?  Like why all this

25       evasiveness?  Why?  Why does Centeno come and

jc-c        Summation - Defense

1      create a whole story?  Why did Blaylock have to

2      try to obscure this feeling about he might have

3      stolen my girl, and I'm 15 years old, and he's

4      an older guy, he's got a lot of nerve.  Motive

5      to lie, reasonable doubt.  And, yeah, we can't

6      escape it for perhaps too many times.  How do

7      you explain away eight different

8      identifications to Serrano?  Eight.  Male

9      black, male black, Jamaican, male black

10     Jamaican Rastafarian.

11              Folks, quite candidly, I always end

12     my summations in a criminal case the same way

13     and I share it with you now.  You heard from

14     the get go, this case is called People of the

15     State of New York against Jimenez in this case,

16     People of the State.  What does it mean?

17     Doesn't mean they're the good guys and we're

18     the bad guys.  The People refer always to

19     exactly that.  A crime occurs and it offends

20     all of the people because crime hurts us, hurts

21     our community.  What's the point I'm making?

22     They're not just the people, the people, all of

23     you, the judge, me, everyone in the audience,

24     all of the People of the State of New York were

25     offended by a crime.

703

1              What's my last statement?  Ricardo

2    Jimenez is one of those people.  Give him a

3    fair and just verdict.  Reasonable doubt.  He

4    didn't do it.  Find that dark, black, Jamaican

5    Rastafarian and then convict him.  Find this

6    people innocent.

7              Thank you.  Bless you.

8              THE COURT:  Ladies and gentlemen,

9    we're going to take a very brief break.  You

10   can stretch your legs.  Do not discuss the case

11   amongst yourselves.  We shouldn't be more than

12   a few minutes, I'll see you then.

13              (Jurors exited the courtroom.)

14              THE COURT:  Counsel, step up for a

15   minute.

16              (Whereupon, there is a discussion

17       held off the record at the bench among the

18       Court, defense counsels and the assistant

19       district attorneys.)

20              THE COURT:  Bring the jury back in

21   briefly, please.

22              THE COURT OFFICER:  Jury entering.

23              (Jurors entered the courtroom.)

24              THE COURT:  Ladies and gentlemen, it

25   would be impractical and probably really unfair

jc-c      Summation - Defense

1     to you to try and push through People's

2     closing.  Your lunch has been ordered as you

3     know.  Although it probably will not be here

4     for another half hour or so, we're going to

5     stop until after you've had your lunch.

6              I remind you, do not discuss anything

7     about the case.  As soon as you finish your

8     lunch, we will continue with the People's

9     closing and go straight into my final

10    instructions to you.  Enjoy your lunch.

11             THE COURT OFFICER:  Jurors, step this

12    way.

13             (Jurors exited the courtroom.)

14             THE COURT:  Everybody back here at

15    2:15.

16             (Luncheon recess taken.)

17  A F T E R N O O N   S E S S I O N:

18             THE COURT:  On the record, everyone

19    is set to go?

20             MR. BRUNO:  Yes, sir.

21             THE COURT:  Jury in, please.

22             THE COURT OFFICER:  Jury entering.

23             (Jurors entered the courtroom.)

24             THE COURT:  Good afternoon.  I hope

25    you enjoyed the lunch.  We'll now proceed with

jc-c      Summation - Defense

1        the summation.

2                    Miss Mattaway?

3                    MS. MATTAWAY:   Thank you.

4                    Good afternoon, ladies and gentlemen.

5        I'll be giving a power point presentation and I

6        hope that will help explain some of the

7        arguments I will be making.

8                    This is the case of the People of the

9        State of New York versus Ricardo Jiminez, and

10       as Mr. Bruno told you, his client is one of the

11       people.  Well, so are all of you, and up until

12       January 2nd -- withdrawn, July 2nd, 1989, so

13       was Sean Worrell.

14                   July 3rd, 1989, you've all heard a

15       lot about this date.  On this date, Batman was

16       playing at the Whitestone Movie Theatre.

17       Defense counsel said that I actually am

18       drowning in quicksand.  Told you that before

19       the lunch break.  He's got it wrong.  If

20       there's anybody who's drowning in quicksand

21       right now, it's Ricardo Jimenez.

22                   And what is quicksand, anyway?

23       Quicksand is when you're walking and you think

24       everything is fine, and suddenly the ground

25       gives way and you drown in it and you can't get

jc-c          Summation - People

1    out.

2              I submit that's exactly what happened

3    to Ricardo Jimenez, because he thought he got

4    away with this murder for 17 years.  And

5    suddenly, I submit to you that on August 3rd,

6    2006, the ground gave way beneath his feet and

7    he was arrested by Detective Wendell Stradford.

8    Defense put forth a conspiracy theory this

9    morning.  All of the People's witnesses,

10   they're liars, they're stupid, they're dumb.

11   He called Mike Centeno, an investment banker, a

12   bozo.  How dare he?  How dare he?

13             He said they were evasive, and then

14   he comes up with this fourth shot.  You have

15   sat through five weeks of trial and not a

16   single witness has talked about a fourth shot.

17   Mr. Bruno came up with a fourth shot today.

18   Cooperation.  They're all evasive.

19             Do you really think that when this

20   shooting happened at the Whitestone Movie

21   Theater, a theater packed with patrons, that

22   people were just jumping up and down begging to

23   be picked as witnesses to talk to the police

24   officer?  You know that's not what happened.

25   You know there was pandemonium, and you heard

307

jc-c          Summation - People

1          it from the People's witnesses, and people were

2          screaming and running like crazy.  And I submit

3          to you, that it was not easy to find anybody

4          who was willing to cooperate.  And then as you

5          later learned, the investigation did stall and

6          it stalled for quite a long time.  And some

7          witnesses were contacted again after all these

8          years.  And some of them took the stand and

9          testified for you in court here in 2007.

10               Do you think people really, really

11         want to come into court, disrupting their

12         lives, recalling an event from 17 years ago and

13         tell you about something they saw?  You think

14         people want to be here any more than you want

15         to be here on jury duty?

16               My 1989 witnesses, who were they?

17         You heard from Esco, he came and made an

18         in-court ID of the defendant.  Mike Centeno,

19         the bozo according to defense counsel.  Officer

20         Ruben Velasquez.  Mr. Bruno smeared him as bad

21         cop.  I submit to you, back on that day in

22         1989, he was an off duty cop who was going to

23         see a movie with his fiance.  Andrew O'Brien,

24         he also made an in-court ID of the defendant as

25         the shooter.  Harold Hazeley, Detective

jc-c        Summation - People

1      Serrano, Lisa Worrell.  These were all people

2      involved back in the case in 1989 and they're

3      still here.

4              And defense counsel tried through

5      Detective Serrano to talk about a whole bunch

6      of people who didn't testify before you.  Sean

7      Bond, Linda Salter, all of these people.  Well,

8      you know something, they didn't testify, so you

9      can't consider that.

10             MR. BRUNO:  Objection, your Honor.

11             THE COURT:  I'll instruct the jury on

12     what they can and cannot consider.

13             Move on.

14             MS. MATTAWAY:  Let's look at Linda

15     Salter.  This mysterious woman who says if you

16     believe Detective Serrano testifying about a 17

17     year old DD5, a police report, she knew the

18     defendant, but he wasn't involved.  Mr. Bruno

19     talked this morning about people with motives

20     and axes to grind.

21             Do you think maybe there could have

22     been a reason why Linda Salter didn't want to

23     name Jimenez as a person involved in this

24     incident?  It's possible, right?

25             MR. BRUNO:  Objection to what's

jc-c         Summation - People

1    possible.

2              THE COURT:   Sustained.   Watch your

3    phraseology.

4              MS. MATTAWAY:   Yes, sir.

5              Defense counsel called stuff like

6    this trivial.   Do you remember.   He kept

7    calling it trivial.   Do you know what I call

8    it?   Pea soup.   We talked about this in voir

9    dire.   It doesn't really matter, because in the

10   end, it's about who did the shooting, right,

11   and whether or not I prove the case beyond a

12   reasonable doubt.   So do not get sidetracked by

13   the soup, by the flavor, it's about the

14   incident.

15             Who are my 2006 and 2007 witnesses?

16   We had Detective Stradford, Dr. Ely, Kevin

17   Morrissey, who also made an in-court ID of the

18   defendant.   My case consisted of several

19   witnesses.   Essentially they all revolved

20   around Esco Blaylock.   He really is the

21   linchpin of the People's case, but part of what

22   you also need to consider in order to arrive at

23   your verdict has to include the evidence of the

24   body identification.   You also heard about the

25   crime scene procedures that took place back in

jc-c          Summation - People

1      1989.  You heard from some of the witnesses who

2      were in the theater that night including Ruben

3      Velazquez and Andrew O'Brien, and of course

4      Esco Blaylock.  You heard from Mike Centeno and

5      Harold Hazeley, the two security guards.  You

6      heard about the arrest procedures and of course

7      you also heard about the admission defendant

8      made to Kevin Morrissey while in jail.

9            But what happened when I picked you?

10     We talked about being the kind of juror who

11     could put the puzzle pieces together to arrive

12     at what happened in this case.  So you have to

13     figure out who is important to my verdict and

14     maybe who is not so important, and I submit to

15     you the key testimony to focus on is Esco

16     Blalock, Officer Velazquez, Andrew O'Brien, you

17     need the autopsy evidence, and I will address

18     it.  You need to know a little bit about the

19     crime scene, because you may have questions

20     about these bullets.  Finally, though, finally,

21     it's crucial in this case that the defendant

22     chose to confess his secrets to Kevin

23     Morrissey.  And I will talk about him in a

24     little bit, but he is one of the pieces that

25     you can consider, and I urge you to consider.

jc-c        Summation - People

1              Now, Mike Centeno testified Mr. Bruno

2       called him a bozo, but Mike Centeno, I submit

3       to you, was perfectly candid with you.  He said

4       they don't pay me enough to chase guys with

5       guns.  And when he saw the defendant leaving

6       the theater with the gun out, he told you he

7       saw him, but he ducked into theater two, but

8       what's his motive?  Why would he lie?  Why

9       would he come into court after 17 years and

10      point out the wrong guy?  What's in it for him?

11      What is the deal he's making with the District

12      Attorney's office?  What is he getting out of

13      it?  Do you think Mike Centeno really wants to

14      send an innocent man or punish an innocent man?

15              I submit to you, he told you the

16      truth when he pointed out the defendant as the

17      person who he encountered running out of

18      theater one.  You know something --

19              MR. BRUNO:  Objection, your Honor.

20      There was no such identification.

21              THE COURT:  Sustained.

22              MS. MATTAWAY:  I suggest if you

23      really have a question about Mike Centeno and

24      what he said, you ask for his direct and his

25      cross, because it's all in the record.  The

712
Case 1:11-cv-06468-JPO  Document 37-26  Filed 04/24/19  Page 67 of 241
jc-c          Summation - People

1     court reporters have been taking down the

2     testimony throughout the whole trial, and if

3     Mr. Bruno maybe mischaracterized something a

4     witness said or you think I mischaracterized

5     something, don't go by what we said, because

6     it's the record that you can consider.

7              Ruben Velasquez, he told you that he

8     saw the deceased pushing his way through him.

9     He was in the same aisle as the deceased.  What

10    kind of view do you think he had?

11             He had a view to his side, the best

12    view was of the deceased, not to the back of

13    the theater.  But he says he hears the

14    commotion and sees the two muzzle flashes, and

15    they come from the rear of the theater.  Then

16    he sees Worrell's body face down in the aisle.

17             Why is this important?  Because you

18    know something?  I submit to you that whether

19    you're a cop or whether you're a civilian, the

20    very first muzzle flash, the very first one is

21    going to be the one that takes your attention.

22    Because nobody goes to a theater and suspects

23    there's going to be a shooting there.

24             So when the first shot rings out,

25    that's where your attention goes.  So I submit

713
Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 68 of 241
jc-c          Summation - People

1   to you, he is one of the key witnesses for the

2   People's case, and you can rely on him, because

3   I submit to you, being in the exact same aisle

4   as the deceased, if the deceased had shot

5   first, Officer Velazquez would have told you

6   that.

7           If he saw a muzzle flash right in the

8   same row that he was, coming from near him and

9   then perhaps two subsequent muzzle flashes

10  answering from the back of the theater, he

11  would have told you that.  But that's not what

12  he said he saw.  He said he saw two muzzle

13  flashes from the back of the theater.  And I

14  submit to you, whether you find Sean Worrell

15  did return fire to the first muzzle flash or

16  not, and that's for you to find or not find, it

17  doesn't really matter, because the first shot

18  came from Mr. Jimenez.  And Officer Velazquez

19  told you that.

20          Harold Hazeley, he testified he was

21  also in the Whitestone Theater that evening and

22  he marked a single bullet hole on the rear

23  wall.

24          Why is that important?  That's

25  important because as defense counsel reminds

314

jc-c          Summation - People

1    you, I opened in this case and I told you it is

2    the People's position, even though I was not

3    there, you weren't there, I believe, I submit,

4    I think Sean Worrell did fire a shot.  I think

5    he fired that shot.  I just don't think he

6    fired first and that's why we're here.

7               But Harold Hazeley marked the place

8    where he found a single bullet hole on the rear

9    wall of the theater.  The L next to it is taken

10   directly from the exhibit that's in evidence, I

11   submit to you, and that is the L marked by Esco

12   Blaylock.  Harold Hazeley didn't make that L,

13   Esco Blaylock made that L and he made it in

14   court to you.

15               (Transcript continued on next page.)

16

17

18

19

20

21

22

23

24

25

1          MS. MATTAWAY:  That bullet hole is in, I

2     submit, the approximate general direction of where

3     the defendant was standing when he shot that night.

4     The trouble is Sean Worrell didn't hit him.  He

5     missed.  So, I'm not going to stand here and say the

6     deceased didn't have a gun, the deceased didn't fire,

7     but you know something, the deceased isn't on trial.

8     He is.  He's the killer.

9          Deceased's friends, defense counsel

10    smeared them.  They are a bunch of thugs leaving

11    their girlfriends behind running from the theater.

12    You know something, these people laughed off the

13    threat at the popcorn stand.  They didn't believe it,

14    and you know how we can accept that?  Because Mike

15    Centeno didn't believe it either.  He's not with

16    them.  He heard the threat.  And the security guards,

17    they didn't follow him out to the car; and whether or

18    not you think that was negligence on their part or

19    something, you know something, that's not the trial.

20    This is a murder trial.  Keep your eye on the ball.

21    It's about shooting Sean Worrell.  Who did it?  He

22    did it.  That's the People's case.

23          However, these friends hadn't just been

24    dissed by a girl.  These friends had safety in

25    numbers.  You heard Andrew O'Brien tell you.  There

1          was four of us, one of him.  They laughed it off, and
2          what did they do?  When they got into words at the
3          popcorn counter, does it really matter if Andrew
4          O'Brien is the big mouth or Sean Worrell was the big
5          mouth?  It's pea soup.  That's what it is.  It's pea
6          soup.  What did they do?  They went in the theater.
7          They didn't go out to the parking lot and follow this
8          guy.  They didn't take him seriously.  They were all
9          strapped, according to Mr. Bruno, although Andrew
10         O'Brien --
11                  MR. BRUNO:  Objection.  A fact in
12         evidence.
13                  THE COURT:  Sustained.
14                  MS. MATTAWAY:  As I was about to say,
15         although Andrew O'Brien told he you he didn't take
16         his gun because he had a thin T-shirt and he didn't
17         want the bulge to show.  I submit, he was being
18         honest with you about that.  So, in any event,
19         though, there is four people with two girls, right?
20         They come up from Brooklyn to go see Batman.  They
21         don't know people in the Bronx.  They're there.
22         They're out not to look for trouble; they are out to
23         go see a movie.
24                  MR. BRUNO:  Objection as to what they are
25         looking for.

1                THE COURT:  Sustained.

2                MS. MATTAWAY:  Well, what did they do when

3       there was a threat at the popcorn stand made by the

4       defendant, I'm going to go get my gun?  Now, we heard

5       different variations of the same answer, words, but

6       they were all, "You got to do what you got to do" or

7       "Get what you're going to get," words like that.

8                What didn't they do?  Did they go out to

9       the parking lot?  No.  Did they send maybe some of

10      their group into the theater and one or two of them

11      stand in the lobby, standing guard in case the guy

12      came back?  No.  Did they position any of their group

13      at the front entrance of Theater 1, the theater they

14      knew they were in in case the guy came back?  No.

15      They didn't do any of that, did they?  They took

16      maybe popcorn and went to a movie and, I submit to

17      you, they had no idea what was coming, because if

18      they did, they were certainly in a position to do

19      something about it.

20               They had weapons.  They had numbers.  And,

21      I submit to you, they had a certain amount of street

22      smarts that if they thought there was a real threat,

23      they would have taken care of it or escalated it or

24      gone after him, but they didn't do that.  They were

25      not looking for trouble.  Again, I submit, in fact,

```
 1        they were hunted down, and how do we know they were
 2        hunted down?  Because who came after whom?  It is the
 3        defendant who came back in to take on this group, and
 4        you know something, think about it from the
 5        defendant's point of view for a moment.  What was he
 6        going to do?  He's taller than them.  He's there with
 7        a girl.  He gets into words with them.  He tries to
 8        cut the line.  He's from the neighborhood.
 9               MR. BRUNO:  Objection as to where he's
10        from.  A fact not in evidence.
11               THE COURT:  Sustained.
12               MS. MATTAWAY:  He puts the threat out
13        because, you see, he knows he has a gun, but he
14        doesn't know they have guns.  So, it's not an idle
15        threat on his part, is it?  He knows he's armed.
16        It's in his car, but he knows he has a gun.  He says,
17        I'm going to go get my gun, and he actually has a gun
18        to go get, but he doesn't know what they have or
19        doesn't know -- for all he knows, this is a bunch of
20        people he's starting up with, but he's the big man.
21        He can take on four people because he doesn't know
22        they have weapons, and I submit to you, that's how,
23        in a way, you can kind of believe the deceased's
24        friends through Andrew O'Brien's story because if you
25        think about it, if three of the four of them have
```

1        guns, why didn't they show them at the popcorn line?
2        Why didn't they say, We're strapped, to the guy who
3        made the threat, and the answer is, I submit to you,
4        because they didn't believe him.  And, in fact, I
5        submit, it's in the record, that Andrew O'Brien said
6        they were saying -- I believe it was Shaka actually
7        who said, He's bluffing.  He's bluffing.  They didn't
8        believe it.  They didn't shoot at him, even though
9        they were strapped, did they?
10               Now, counsel tried to argue to you
11        something about Patchy with his 9 millimeter.  Patchy
12        didn't shoot.  I submit to you you know Patchy didn't
13        shoot.
14               Now I've lost my signal.  I don't know
15        why.  I don't know why.  Sorry.  One moment, please.
16               (Brief pause in the proceedings.)
17               MS. MATTAWAY:  I apologize.
18               (Brief pause in the proceedings.)
19               MS. MATTAWAY:  I apologize for that.  I
20        will continue.  All right.
21               I was talking about the deceased's
22        friends.  What they don't do, I submit to you that
23        they actually showed an incredible amount of
24        restraint in this case, because if they were strapped
25        and once the shooting started, and again we know from

1          Ruben Velazquez that the shooting started with the

2          defendant, why didn't they answer fire?  And I submit

3          to you that it's because it happened too fast.  I

4          submit to you they did not perceive what was

5          happening, the horror of what was happening, and,

6          unfortunately, there really wasn't anything they

7          could do at that point because you see the theater

8          erupt in pandemonium and everybody is running and

9          what are these guys supposed to do, because there is

10         only one specific guy they want to get.  They want to

11         get the shooter who shot their friend, but he has

12         run.  People are screaming, running.  I submit to

13         you, it's pandemonium.  What are they going to do?

14              Now, in fact, Andrew O'Brien told you that

15         they even talked about this or he had words with

16         Patchy, I believe, or with Smiles, I don't remember,

17         we should go chase the guy, but they decided not to,

18         and one of the reasons he didn't do it, he said, is

19         because he was a fugitive.  I submit to you, this is

20         a person who is being honest with you because he

21         could very easily lie about all of this.

22              For all the people that Mr. Bruno

23         characterized as liars, it's very interesting that

24         Andrew O'Brien, with all of the issues he has, he

25         told you that he had a gun or he had friends who had

cm/d Summation - People

1      a gun, he could have done something about it.  They

2      discussed doing something about it and yet they

3      didn't.

4              Now, what happens in this case?  You know

5      that there was the argument at the popcorn stand.

6      You know that the defendant made his threats and that

7      then the deceased and his group went into the

8      theater.

9              What does Jimenez do?  He decides to go

10     out into the parking lot, go to his car and come

11     back.  Now, Esco Blaylock told you that he came back

12     into the theater, and what is he wearing?  A jacket.

13     He's wearing a jacket on July 3.  I submit to you, he

14     was wearing the jacket because the jacket concealed

15     the gun, and Esco Blaylock also told you that he left

16     his post at the popcorn stand and he went and he

17     stood behind the back right aisle and he did so

18     because he wanted to see some of Batman and what

19     happened?

20             He said that the door opened on the

21     opposite aisle, and the door is on a timer so it

22     closes very slowly, and the defendant was illuminated

23     by the light that came in from the door, and he

24     recognized him and he told you he knew him as Leon.

25     He also told you that he had recognized him back from

cm/d Summation - People

1        the popcorn stand.  He told you Leon was cutting the

2        line.

3                    Now, the one thing that defense counsel

4        didn't address in his summation, I'm going to

5        address, and that's the issue of identification.  He

6        talked around it.  He talked about race.  I submit to

7        you that this whole business about male black, male

8        Jamaican, Puerto Rican who looks black, it's really

9        irrelevant.

10                   MR. BRUNO:  Objection to Puerto Rican who

11       looks black, your Honor.  Not a fact in evidence.

12                   THE COURT:  Sustained.

13                   MS. MATTAWAY:  If you don't believe what I

14       say, ask for it in the record as to what Esco

15       Blaylock said in his statement to the police about

16       his description of Leon's race.  But, you know what

17       it is?  It's a label, what people are.  It's just a

18       label.  Bernie Williams, one block down, is he a male

19       black?  He's Puerto Rican.  Looks black.  Would you

20       describe him as black?  Would you describe him as

21       Hispanic?  Cameron Diaz, is she a hot, white blond

22       female or is she a Latina?  I mean, think about it.

23       Tiger Woods, what is he?  Is he a male black?  He's

24       Philippino.  What is his description?  What does it

25       matter?  Because if you know a person, if you know

cm/d Summation - People

1        and you see Cameron Diaz, you know it's Cameron Diaz.
2        It doesn't really matter what the description is of
3        her race because the world is a melting pot and many
4        people are multiracial, so you can be more than one
5        race, and it's actually kind of uncomfortable, I
6        submit, when you're asking a person who is of color
7        such as Mike Centeno about his complexion and how he
8        sees himself and do you see yourself as light skinned
9        or dark skinned and the shooter was dark skinned.  I
10       submit to you that, first of all, we can't lose sight
11       of the fact that this all happened at night in a dark
12       theater and nobody really looks whatever color they
13       really are when you're in darkness.
14                MR. BRUNO:  Objection, your Honor.
15       Testifying.
16                THE COURT:  Sustained.  Watch the way you
17       phrase things.
18                MS. MATTAWAY:  I submit, I submit it was a
19       dark theater, and I submit that the witness'
20       description of the defendant's complexion is not
21       necessarily --
22                MR. BRUNO:  Objection.  Not a fact in
23       evidence.
24                THE COURT:  Overruled.  Move on.
25                MS. MATTAWAY:  -- something that you

1      cannot reconcile with his in-court appearance and

2      this is why:  Because Esco Blaylock knew the

3      defendant.  He knew him.  If I know you, you can age

4      17 years, but I know you.  And if you ask me to put a

5      label on you, well, what is he to you?  Esco Blaylock

6      told you things about the defendant only someone who

7      knows him, I submit, could know.  How does he know he

8      has a removable gold tooth?  Where would he come up

9      with that?  He knows him by the name "Leon."  He

10     knows him.  One of the many bases of knowledge for

11     him to know, know who the defendant is, is because

12     Esco thought they knew the same woman, girl, woman,

13     Sharon, not Lisa McGainey.  That's his girlfriend.

14     But, they had a female friend in common, and I submit

15     to you, it's in the record.  If you don't believe me,

16     just ask for it.  But Esco told you that he thought

17     she was dating the defendant.  The point is this:

18     He's 15.  He's 15 at the time this happens.  Think

19     back to when you were 15.  What was important to you

20     if you were dating somebody?  I mean, defense counsel

21     talked about raging hormones.  Well, I submit that

22     the females in Esco Blaylock's life back when he was

23     15 were very important to him.

24             Not only that, do you remember when Esco

25     Blaylock was testifying about his job working at the

1       popcorn counter and how seriously he took it, and he
2       knew that he was running low and he has 20 bags on
3       reserve but the line was long, and what did Mr. Bruno
4       do when he testified?  I submit to you, he insulted
5       him.  Oh, that job, that important job you got fired
6       from.  How dare he.  How dare he.  How many of you
7       not only had jobs when you were teenagers that you
8       took seriously even if now you look back and said, I
9       can't believe I worked at McDonald's, but you did and
10      at the time if your boss yelled at you because you
11      showed up late, or you got fired, it was huge.  Do
12      you know if he contributed to his family income and
13      he needed that job and maybe that's why his parents
14      were --

15              MR. BRUNO:  Objection.  Calls for
16      speculation.

17              THE COURT:  Sustained.

18              MS. MATTAWAY:  Esco Blaylock told you his
19      parents told him not to cooperate with the police.
20      Okay.  Maybe it was just plain fear.  How many of you
21      with children or even without can imagine having a
22      teenager who comes home and says, Mom, Dad, I saw a
23      murder at work tonight and the cops want to speak to
24      me.  How excited do you think you would be over that
25      prospect?  I submit, not very.

1           And, in fact, it is possible you might

2      have the same reaction as Esco Blaylock's parents,

3      don't talk to them, don't talk to them.  And the

4      Whitestone theater, the Whitestone theater, Mr. Bruno

5      made some argument to you that the Whitestone theater

6      would not have leaned on its employees to not

7      cooperate because they have every reason of making

8      sure the theater was safe.  I say the reverse is true

9      for two reasons:  Number one, the last thing you want

10     if you have a thriving business is July 4 weekend you

11     have just opened a blockbuster at your theater, the

12     last thing you want are cops all around.  You don't

13     want yellow tape, because you know something, how

14     many of you, and it was just July 4 only a couple of

15     days ago, how many of you read the newspapers on the

16     4th of July?  I submit, a lot of you didn't, and I

17     submit that when this happened, yeah, a lot of people

18     knew about the shooting, maybe some people didn't,

19     and if the theater still wanted people to keep coming

20     to the Whitestone Cinema, the less, the less police

21     that were crawling around, the better.  So, the

22     sooner they could get the cops out of their theater,

23     the better for the Whitestone.

24           Mr. Bruno argued that the theater should

25     want their employees to cooperate.  Why wouldn't they

1          want to see, you know, a person getting caught for a

2          murder?  No, no, no, no.  They don't want the cops

3          anywhere near that, and that brings me to my second

4          argument about the Whitestone theater:  Corporate

5          dollars.

6                    Do you really think the Whitestone theater

7          wanted their theater shut down a single movie showing

8          more than necessary for the cops to investigate this

9          case?  I submit to you, they didn't.  The sooner they

10         could get things back to normal, the better, and

11         what's the second prong of my corporate America

12         argument?  Negligence.  Liability.  How about

13         security guards who let a bad guy go.  How about

14         security guards who let people with guns come into

15         the Whitestone, but that's not this trial.  You see,

16         this is the murder trial.  That's why Whitestone

17         didn't want people to cooperate, because something

18         really bad happened on their grounds that night in

19         the Whitestone and it is possible, I submit to you,

20         they could be held liable, but that's a different

21         trial, a different time.

22                    MR. BRUNO:  Objection, your Honor.

23                    THE COURT:  Sustained.  You are going far

24         afield.  Stay to the facts of the case.

25                    MS. MATTAWAY:  Esco Blaylock and Mike

1      Centeno both told you that management told them,

2      Don't talk to anybody.  Don't talk to anybody.

3                    MR. BRUNO:  Objection, not Centeno's

4      testimony.

5                    THE COURT:  Sustained.

6                    MS. MATTAWAY:  Harold Hazeley also worked

7      for them.  Ask for his testimony if you have a

8      question about this issue.

9                    Now, in any event, let's get to the

10     shooting -- just unplug it and take it out.  I

11     apologize, your Honor.

12                   (Brief pause in the proceedings.)

13                   MS. MATTAWAY:  Let's talk about the

14     shooting -- okay? -- the moment of the shooting.

15     What happens?  They're in their seats.  The defendant

16     comes to the back of the theater.  He calls out.

17     Now, what exact words he says, pea soup.  Doesn't

18     matter.  Whether he said you from the popcorn line,

19     whether he said you with the smart mouth, it doesn't

20     matter.  He calls out.  Now, how many of you have

21     ever seen a movie, and you were the one who went out

22     to get the stuff from the concession stand and

23     someone in your party held the seats with the coats

24     or whatever and you go into the dark theater and

25     you're trying to find them?  How easy is it?  Not

1    easy at all, unless the person in your party is

2    turning around and waving and letting you know we're

3    here, we are sitting here.  Right?  Because you can't

4    see.  It's hard.  You're squinting, you're looking,

5    and until the person in your party waves to you and

6    let's you know this is where you're sitting, you

7    can't find them, so how hard do you think this

8    defendant had to look to find the people?  He had to

9    look hard.  He had to really, really want to find

10   them, and he did.

11            I have to prove -- I have to prove

12   elements.  I have to prove them all.  If I don't

13   prove even one, he's not guilty.  If I prove them

14   all, he's guilty.  One of the elements I have to

15   prove, I submit to you, is an intent, and the judge

16   will define intent for you legally, but I'm going to

17   tell you now, how do you know that this defendant

18   intended to kill Sean Worrell?  How do you know he

19   meant to do it?

20            Let's look at the choices he made that

21   night, because he made a lot of choices.  It started

22   with the choice to cut the line.  It -- withdrawn.

23   He continued with the choice to engage in an argument

24   on the popcorn line.  It continued with the threat to

25   go get his gun.  At that point, they turn away.  They

1        go in the theater.  He had a choice, but what did he
2        choose to do?  He chooses to go to the car and get
3        the gun and, again, as I said before, this is a man
4        who had just been insulted in front of his girl, and
5        he knew he had a gun and he didn't know that they had
6        guns, so he made a choice.  He went to the car.  He
7        got the gun.  Then he chose to come back into the
8        theater.  Then he chose to walk down that long
9        corridor -- and the photographs are in evidence --
10       until he got to Theater 1 all the way on the end, and
11       what do we see as we are going to Theater 1?  We see
12       exit doors.
13              Do you think the little voice of his
14       conscience spoke up at that point and said, You don't
15       have to do this, go through the doors now?  No.  He
16       made another choice, and his choice was to turn away
17       from the exit doors on the left that are in evidence
18       in the photograph and to make a right and go into
19       Theater 1.  A choice.
20              It all goes to intent, and he made a
21       choice to stand at the back of the theater, and he
22       made a choice to call out and he made a choice to get
23       into words with O'Brien.
24              Now, defense counsel mocked those words
25       and he used them when he was busy smearing Detective

1     Wendell Stradford saying after the trial it's him and
2     me.  These are words said by a killer right before he
3     goes and takes a life.  How dare he.  And what does
4     he say?  After the movie, it's you and me.
5          So, maybe the beef was with Andrew O'Brien
6     and Patchy.  Maybe Shaka stood up to avenge his
7     friend.  Whatever it was, was Shaka the one in line?
8     Was Andrew O'Brien in line?  It's pea soup.  The
9     point is what happened.  As Jimenez goes to the back,
10    you heard from Ruben Velazquez, Shaka gets up and
11    what does he do?  He heads out into the aisle.
12         Now, this is where the forensics come in.
13    Dr. Ely's testimony, the autopsy report, it's
14    crucial.  What does she tell you?  She tells you that
15    bullet number 1 enters Shaka's body through his left
16    deltoid at his back.  What does she tell you?  She
17    takes a pole and she tells you that the one thing she
18    can say conclusively is that all three points have to
19    match up in space, and what do you know about shot
20    number 1?  Because the wound entered through the
21    back, but it exited through the right and it stayed
22    in his body.  It was a straight line.
23         MR. BRUNO:  Objection, your Honor.  No
24    bullet was found.
25         THE COURT:  Sustained.  Sustained.

1          MS. MATTAWAY:  It traveled through his

2     body.  It traveled through his body.  I meant it

3     stayed through his body on its path through him.

4     There is no bullet recovered in the body.  It

5     traveled in one path, but she said that because of

6     the trajectory of the bullet, the body had to be at a

7     90-degree angle to the gun, to the muzzle of the gun.

8     That's what she said, and she talked and she bent her

9     body and if you don't remember what she said, Page

10    612, 613 in the record, it's all in there, and she

11    demonstrated for you how the bullet went into his

12    body and how it came out, but the point was his left

13    side, his back was to the muzzle of the gun.  This

14    defendant, this coward of a shooter, did not even

15    give this guy a chance to turn around and face him.

16    He was getting out of his seat.  He was getting out

17    of the aisle.  His back was to the shooter as he came

18    around the aisle seat.  He hurried out you heard from

19    Velazquez.

20          Now, what's interesting is part of what

21    Dr. Ely said about his right arm because that's the

22    question, isn't it?  What was the right arm doing?

23    Defense counsel demonstrated to you it was straight

24    out holding a .38.  I submit to you that's not what

25    happened at all because Dr. Ely told you the arm had

1    to be out somewhat and she did a little demonstration

2    with you.  Okay?  She told you about the ways the arm

3    could have been pointed.  It's in the record.  If you

4    don't remember, ask for it.  But, she said that the

5    only way that he could have been shot is if the arm

6    was out this way.

7              Now, what is the arm doing in this

8    position?  There is a couple of things it could have

9    been doing.  It could have been up in surrender.  He

10   could have been pushing off the seat back to get out,

11   and he could have been going to his waist to get out

12   his gun.  He could have been, but the one thing he

13   wasn't doing and we know he wasn't doing was turning

14   and pointing towards his shooter, because he never

15   got the chance, because right after shot one came

16   shot two, and we all know what shot two was about,

17   don't we?  Entry through the back, the back of the

18   head, exit through the front.  Here are the photos,

19   People's 17.

20             At first blush, you take a look at it and

21   it looks like the guy got shot in the forehead,

22   right?  But what did Dr. Ely tell you?  She said that

23   People's 17-A, the back of the head shot, is a

24   classic entrance wound because it's circular, and

25   17-B is a classic exit shot because it's star shaped

1       and, of course, they also examined the brain, and she

2       told you and the autopsy report is in evidence if you

3       want to take a look at it, but she told you the

4       bullet traveled back to front.  This man was shot in

5       the back of his head.

6                    Now, he's shot in the back of his head.

7       Why is that important?  Well, because if he's shot in

8       the back of the head and he falls face down, I'm

9       holding People's 1 now, it's important because he's

10      not facing the muzzle of the gun, and I submit to

11      you, the place he's facing, you can see quite clearly

12      in People's 1-A, is the exit door to the front of the

13      screen.

14                   I submit to you that in his final moments

15      Sean Worrell, he had no place to go but out.  He

16      wasn't going to run towards the gun.  He couldn't run

17      back in the row.  He couldn't get his gun out in

18      time, and Dr. Ely told you that with wound number one

19      -- I'm now holding People's 14 -- which entered

20      through the back, he had seconds to live.  She told

21      you that he could have died.  Wound number one was

22      fatal as well.  The cause of death to Sean Worrell is

23      bullet wound to heart and lung -- that's from wound

24      one -- and bullet wound to brain.

25                   But what's important is between receiving

1    bullet wound one and bullet wound two, could Sean
2    Worrell have returned fire?  Now, since none of the
3    witnesses really -- Andrew O'Brien, I believe, said
4    he saw him fire.  Esco Blaylock said he didn't see
5    him with a gun and neither did Ruben Velazquez, but
6    that's why I submitted to you that I think he shot in
7    between shots one and two, but it was too late
8    because shot one was already the shot that could have
9    killed him, so he was dying from shot one.

10   According to Dr. Ely, Sean Worrell had
11   seconds to live because this bullet passed through
12   his aorta, and she told you about that.  He was dying
13   from this, and I submit to you that is when the arm
14   was reaching, but he didn't get it out in time to
15   kill the person who killed him.

16   All he did was take a shot, and the shot,
17   as Harold Hazeley marked, I submit to you went wild,
18   and that is here in People's 8, 8-C.  There it is.
19   There is the red dot.  So, he got a shot off, and he
20   was fairly accurate, but it didn't kill his killer.

21   As Dr. Ely told you, he fell face down
22   because he had the unprotected fall abrasions on his
23   face, and you can see those in People's 17-B, and she
24   told you that after wound number two, he would not
25   have been able to do anything.

Summations-Mattaway                    736

1           MS. MATTAWAY:  She told you he just
2      would have fallen flat.  Once that bullet hit the
3      brain from back to front, he was incapacitated.
4      He would have fallen instantly.  You see by
5      process of elimination we know that there is no
6      way that the third shot of the three pops heard
7      the third shot was Sean Worrell.  It can't be the
8      third because he's dead.  He's done by wound
9      number two.  And we know it's not the first
10     because Esco Blaylock Rubeun Velasquez and Andrew
11     O'Brien and attention was on the muzzle flash from
12     the back.  The first muzzle flash came from the
13     back.
14          So I submit to you the middle shot the middle
15     of the three shots if the first shot is from the
16     defendant, that's wound one in the back shot
17     number two is either close simultaneously I submit
18     from shot one from the deceased and then the head
19     shot to the back of the brain.  Whether he's
20     shooting as he's running and turning we don't
21     know.  But the only thing we do know are the
22     forensics that don't lie.  The man is shot in the
23     back of the back and the back of the head.
24          Mr. Bruno talked about initial aggressor, who
25     was the initial aggressor.  I submit to you it

Summations-Mattaway                737

1    doesn't really matter.  You're not gonna hear the
2    judge tell you anything about justification or
3    self defense.  You won't hear it.  You said that
4    you could apply the law that you get from the
5    judge when we were picking you as jurors.  You
6    could apply the law even if you personally
7    disagree with it.  The judge will be giving you
8    law in a little bit and you are to apply the law
9    to the facts of this case.
10        Again, I have elements I have to prove.
11   There is only one charge to consider and it's
12   murder.  I have to prove that the defendant
13   intended, intended, we talked about intent -- all
14   the choices he made to cause the death.  You know
15   from Doctor Ely death was caused by bullet one.
16   It was also caused by bullet two or wound two.  So
17   he intended to kill him even with the first bullet
18   but the second bullet certainly did it.  Even if
19   you want to say he still could have fired after
20   the bullet in the back because he had a few
21   seconds there and finally I have to prove that the
22   person who was killed was Sean Worrell.  You heard
23   from his sister and you heard from Andrew O'Brien
24   who knew him Shaka.  It's Shaka.  Shaka as I said
25   is not on trial.  The issue is not whether or not

Summations-Mattaway                738

1    he was armed with a gun.  The issue is not whether
2    or not he took a shot to defend himself.  The
3    issue is whether or not I have proven to you it is
4    the defendant who did it.
5        I submit to you that I have.  He was
6    identified twice in court by Andrew O'Brien and
7    Esco Blaylock one of who knew him.  Esco knew him.
8    And we talked about that.  But what's the final
9    icing on the cake?  I submit to you is the
10   defendant's own words to Kevin Morrissey because
11   what does he do?  Remember the quicksand, right.
12   He's free.  He got away with this, 17 years.  And
13   then he's in jail in 2006 and he does meet up with
14   Kevin Morrissey on the barge and they chat.  And
15   yes Morrissey is an opportunist.  He's an
16   opportunist.  But when the defendant asks him to
17   help him with his case, he said well you gotta
18   tell me about your case before I help you.  What
19   does the defendant tell him?  He tells him, and
20   it's in the record.  If you forget what he says,
21   ask for it.  "I shot the kid.  Right.  I shot the
22   kid in the movie theater."  He says, "he shot at
23   me first."  He puts -- he puts a self defense
24   claim into it with Kevin Morrissey.  How would
25   Morrissey know that?  Defense counsel tries to

Summations-Mattaway                    739

1    make it like well Morrissey read some papers.  He

2    looked at some paperwork and he's testifying and

3    the defendant never said this to him in jail.  You

4    know this is not through.

5            MR. BRUNO:  Objection to what they know

6    as true.

7            THE COURT:  Sustained.  I will instruct

8    the jury how to evaluate the evidence at the

9    appropriate time.  Move on.

10           MS. MATTAWAY:  I submit to you that the

11   defendant talked to Kevin Morrissey in jail.  He

12   told him what happened.  If you don't remember

13   what Morrissey said about the defendant's

14   admission, ask for it because it's in the record.

15   But what's key about it?  What's key about Kevin

16   Morrissey?  Why is it important?  Because I submit

17   to you the defendant essentially identified

18   himself.  Right.  He doesn't say to Morrissey yeah

19   they got me here for a murder but I didn't do it.

20   They got the wrong guy.  He doesn't say that.  He

21   says to Morrissey I shot a kid 17 years ago.  You

22   see.  There is some things you never forget.

23   Defense counsel slammed my police witnesses.  Why

24   did it take seventeen years to get to this point.

25   Bad cops, bad cops.  Oh they are so bad.  Serrano,

Summations-Mattaway                740

1    oh Stradford, they are evasive.  He called them

2    almost every name in the book.  You know

3    something, it may be justice delayed but it's

4    justice.  And if it took seventeen years for us to

5    get to this point, we're here.  Ricardo Jimenez

6    shot and killed Sean Worrell in the Whitestone

7    cinema on July 3, 1989.  Esco Blaylock who was 15

8    at the time never forgot it.  Andrew O'Brien who

9    faced his own troubles in the years following and

10   yeah he's doing time for his own problems, he

11   never forgot it.  All of these witnesses who came

12   to court and testified for you I submit never

13   forgot it.  The stuff they did forget is pea soup.

14   The stuff they remember is the stuff you need to

15   base your verdict on.

16        There is no reasonable doubt.  No reasonable

17   doubt.  And if for some reason you have reasonable

18   doubt at all, well, one in court ID, two in court

19   ID's.  Esco says he knew him.  How about the fact

20   the defendant himself said to someone at Rikers I

21   shot a kid 17 years ago.  I shot a kid.  Who says

22   that?

23        Now, the man who was boasting at the

24   Whitestone Cinema at the popcorn counter seventeen

25   years ago, I'm gonna go get my gun.  He was

Summations-Mattaway                741

1       bluffing then?  I submit to you he was not
2       bluffing with Kevin Morrissey.  He generally
3       sought out his help to research his case.  But
4       Kevin Morrissey instead of helping him with his
5       case picked up a phone or wrote a letter or
6       however he did, how he called his agent dear
7       Craig, it's pea soup.  The point is he contacted
8       law enforcement authorities and yeah it could help
9       him.  Yeah he wants a phone call out of it to
10      Queens.  But the guy told him I shot a kid.  And
11      Kevin Morrissey had no reason to not believe
12      Ricardo Jimenez and I submit you shouldn't either.
13      And when the defendant says I shot a kid, he shot
14      a kid.  He intended to do it.  He did it.  He
15      killed Sean Worrell and I submit to you he's
16      guilty.  Thank you.
17              THE COURT:  Ladies and Gentlemen, I
18      anticipate that my charging you on the law will
19      take approximately thirty, thirty-five minutes.
20      Is there anyone in the jury box who would like to
21      take a brief break before I start that.
22              Everybody is okay.
23              Mr. Foreman, members of the jury, we
24      have now reached that point in the trial when you
25      are to assume your active functions as jurors.  I

Summations-Mattaway                    742

1    want to begin by thanking you for your patience,

2    your attention, your cooperation, and

3    understanding during the course of this trial.

4    The case has been capably presented by counsel on

5    both sides.  I want to thank them both also.

6        You have heard all the testimony in the case.

7    I shall endeavor to simplify the issues as much as

8    I can in submitting them to you.  I shall divide

9    my charge into two parts.  The first part will

10   concern general principles of law that apply to

11   this and all criminal cases.  The second part of

12   my charge will deal specifically to the charge

13   being submitted for your consideration.  During

14   these instructions, I will summerize the evidence.

15   If necessary I will refer to portion of the

16   evidence to explain the law that relates to it.

17   My reference to evidence or my failure to refer to

18   evidence expresses no opinion about the

19   truthfulness, accuracy, or importance of any

20   particular evidence.  It is up to you to determine

21   what happened in this case.

22       There have been some verbal exchanges between

23   counsel.  You must disregard these entirely.  In

24   other words, you are not to draw any inferences

25   from anything said by one counsel to the other.

Summations-Mattaway                    743

1      Such comments are not evidence.  During the course

2      of the trial you may have heard colloquy or

3      conversations between the court and counsel.  Bear

4      in mind such exchanges between the court and

5      counsel do not constitute evidence and must be

6      disregarded by you.  I will now state to you some

7      of the general principles of law applicable to

8      this and all criminal cases.  I charge you that

9      you must accept the principles of law as stated by

10     me whether you agree with them or not.  You have

11     no discretion whatsoever to depart from the

12     principles of law which I shall give you.  You and

13     I are sitting here together as judges.  You as a

14     judge of the facts, I as a judge of the law.  The

15     first and most cardinal principle for you as

16     jurors to remember is that you are the sole and

17     exclusive judges of the facts in this case.  In

18     that capacity you'll decide the facts coolly,

19     calmly, deliberately, and without fear or favor or

20     passion or prejudice or sympathy.

21          As sole and exclusive judges of the facts, it

22     is your sworn duty to decide the guilt or non

23     guilt of the defendant solely on the evidence

24     admitted during the trial and pass judgment upon

25     it in the determination of all the issues.

Summations-Mattaway                744

1           Your determination must not be based solely--
2      withdrawn.  I must say that again.  Your
3      determination must be solely based upon the
4      evidence submitted during a trial.  You must not
5      consider anything you may have seen or heard about
6      the case outside of this courtroom, including but
7      not limited to any news or media reports of any
8      kind.
9           You must not under any circumstances indulge
10     in speculation or guesswork.  There are rules of
11     evidence that precludes some kind of testimony and
12     you are not to speculate as to what the testimony
13     might have been.
14          In other words, do not try to play detective.
15     Do not try to surmise what you would do, or what
16     should have been done, or might have been done, or
17     could have been done.  Your own recollection,
18     understanding, and evaluation of the facts
19     presented by the evidence of this trial is what
20     controls, regardless of what counsel from either
21     side of the case may say about the facts and even
22     regardless of what I may say about the facts.
23          During summations both sides may have made
24     reference to items in evidence.  I tell you it is
25     your job to evaluate the evidence and determine

Summations-Mattaway                    745

1      what weight to give the evidence, if any.  I will

2      talk about evaluating the evidence in a few

3      minutes.

4          You are not to consider anything I have said

5      during the trial, or any questions I have asked,

6      or anything I may say to you during the course of

7      this charge, as indicative that I have any opinion

8      on the case one way or the other.  I have no power

9      to tell you what facts are or that one fact is

10     more important than another.  What witness is

11     truthful and what witness is untruthful.  These

12     are all matters within your own and exclusive

13     powers as the judges of the facts.  It is not my

14     responsibility to judge the evidence here.  It is

15     yours.  You and you alone are responsible for

16     deciding whether a defendant is guilty or not

17     guilty.  You are not bound to accept the arguments

18     of respective counsel.  If you find that any

19     argument urged by either counsel is reasonable and

20     logical and based upon the evidence as you recall

21     it, you find the argument consistent with that

22     evidence, you are free to accept the argument as

23     your own and to give it such weight as you deem

24     advisable.

25          On the other hand, if you find that any

Summations-Mattaway                    746

1    argument or conclusion is not based upon the

2    evidence, or that it is unreasonable, illogical or

3    inconsistent with the evidence, you may disregard

4    it entirely.

5         As to the law in the case, however, you as

6    jurors must not set up your own conceptions or

7    preconceived notions of what the law should be.

8    You must accept the law as I give it to you,

9    regardless of what either side may have said or

10   what you personally believe.  You must accept the

11   law as I give it o you without reservation; and

12   you must apply the law as given to you for your

13   own guidance in your determination of the issues

14   of facts.

15        There are certain presumptions of law that

16   apply to this and every criminal case to which I

17   must call your attention and which you must keep

18   in mind throughout your deliberations.

19        In this and every criminal case the accused

20   is presumed to be innocent and that presumption

21   remains with him throughout the trial unless and

22   until his guilt is proven beyond a reasonable

23   doubt.  That presumption of innocence continues

24   right through the trial and exists at this very

25   moment and accompanies you into the jury room.

Summations-Mattaway                    747

1      The only way it can be destroyed is by all of you
2      as jurors, agreeing on the basis of the evidence
3      that the defendant is guilty.  You must start by
4      saying he must be innocent; and only if the
5      evidence that you accept or believe convinces you
6      beyond a reasonable doubt that the presumption
7      must be discarded and a verdict of guilty returned
8      -- only then is the presumption destroyed.  No
9      defendant is required to prove his innocence.
10          Each element of the crime submitted to you,
11     as I will define the elements, must be proven
12     beyond a reasonable doubt by the prosecution.
13          If this burden is not fulfilled, you must
14     find the defendant not guilty.  If this burden is
15     fulfilled, you must find the defendant guilty.
16          The next principle is reasonable doubt.  What
17     is the meaning of the term "reasonable doubt"?
18     The law uses the term "proof beyond a reasonable
19     doubt," to tell you how convincing the evidence of
20     guilt must be to permit a verdict of guilty.  The
21     law recognizes that, in dealing with human
22     affairs, there are very few things in this world
23     that we know with absolute certainty.  Therefore,
24     the law does not require the People to prove a
25     defendant guilty beyond all possible doubt.

Summations-Mattaway                     748

1        On the other hand, it is not sufficient to
2   prove that a defendant is probably guilty.  In a
3   criminal case the proof of guilt must be stronger
4   than that.  It must be "beyond a reasonable
5   doubt".
6        A reasonable doubt is an honest doubt of the
7   defendant's guilt for which a reason exists based
8   upon the nature and quality of the evidence.  It
9   is an actual doubt, not an imaginate doubt.  It is
10   a doubt that a reasonable person, acting in a
11   matter of this importance, would be likely to
12   entertain because of the evidence that was
13   presented or because of the lack of convincing
14   evidence.
15        Proof of guilt beyond a reasonable doubt is
16   proof that leaves you so firmly convinced of the
17   defendant's guilt that you have no reasonable
18   doubt of the existence of any element of the crime
19   or of the defendant's identity as the person who
20   committed the crime.
21        In determining whether or not the People have
22   proven the defendant's guilt beyond a reasonable
23   doubt, you should be guided solely by a full and
24   fair evaluation of the evidence.  After carefully
25   evaluating the evidence, each of you must decide

Summations-Mattaway                    749

1    whether or not that evidence convinces you beyond

2    a reasonable doubt of the defendant's guilt.

3         Whatever your verdict may be, it must not

4    rest on baseless speculations.  Nor may it be

5    influenced in any way by bias, prejudice, sympathy

6    or by a desire to bring an end to your

7    deliberations or to avoid an unpleasant duty.

8         If you are not convinced beyond a reason

9    doubt that a defendant is guilty of a charged

10   crime, you must find the defendant not guilty of

11   that charged crime.  If you are convinced beyond a

12   reasonable doubt that a defendant is guilty of a

13   charged crime, you must find the defendant guilty

14   of that crime.

15        Under our system of jurisprudence, all cases

16   in this court are initiated by way of charges.

17   The charges are contained in the accusatory

18   instrument called an indictment.  An indictment is

19   merely a legal form by which a crime is charged.

20   It's nothing more than an accusation.  It has not

21   evidentiary or probative value whatsoever.  It is

22   neither evidence of anything nor does it prove

23   anything.

24        Under our system, trials are conducted by the

25   taking of testimony of witnesses who are examined

Summations-Mattaway                  750

1    under oath directly by the side calling them to

2    the witness stand.  The adverse party has a right

3    to cross-examine such witness after direct

4    examination is completed.

5         This sworn testimony elicited both on direct

6    and cross examination, plus whatever concessions

7    and stipulations were made during the trial by

8    counsel, plus, whatever exhibits the court

9    permitted to be received and marked in evidence is

10   all the evidence that there is in this case.  It

11   is only on this evidence that you are to make your

12   final determination of the facts.

13        Exhibits that were seen during the trial, or

14   marked for identification but not received in

15   evidence are not evidence, and thus are not

16   available for your inspection and consideration.

17   But testimony based on exhibits that were not

18   received in evidence may be considered by you.

19   It is just that the exhibit itself is not

20   available for your inspection and consideration.

21        Each and everyone of you has it within his or

22   her power to draw proper reasonable and just

23   inferences from the testimony, and the exhibits in

24   evidence and to determine the probabilities

25   arising from the case after carefully analyzing,

Summations-Mattaway                    751

1      weighing or considering the testimony of each

2      witness who has testified at this trial and all

3      the exhibits admitted into evidence in the case.

4           The defendant is entitled to every inference

5      in his favor which can reasonable be drawn from

6      the evidence; and where two inferences may be

7      drawn from the evidence, one consistent with guilt

8      and one consistent with innocence, the defendant

9      is entitled to the inference of innocence.

10          Other considerations that may cross your mind

11     such as on one hand sympathy or at the other

12     extreme, vengeance; or prejudice or bias of any

13     kind, these considerations are to be completely

14     disregarded by you.

15          Among the exhibits received in evidence are

16     photographs.  These photographs purport to depict

17     various locations or objects relative to the

18     issues in this case.  These photographs were

19     received in evidence to assist you in making your

20     evaluation of the testimony relating to the

21     locations scenes or objects depicted therein.  You

22     are the sole judges of the accuracy of these

23     photographs and you're the sole judges of the

24     weight to be given such photographs.  I remind you

25     that it is a responsibility of the District

Summations-Mattaway                    752

1    Attorney to present evidence on behalf of the
2    People.
3         In sustaining the burden of proof you are not
4    required to take any particular investigatory
5    steps or present any particular kind of evidence.
6         One of your chief functions as judges of the
7    fact is to determine the credibility of witnesses.
8    Because the facts depend on the testimony of the
9    witnesses.  You and you alone have the power to
10   say when a witness is truthful or not truthful or
11   what weight you should give that witness's
12   testimony.
13        You should consider the witness' means of
14   knowledge or observations as to the facts, their
15   interest or motive for testifying, the probability
16   or improbability of their testimony, their
17   intelligence or lack of intelligence, the manner
18   of testifying and their attitude.
19        You should ask yourselves was the witness
20   neutral, friendly, or hostile?  Was the witness
21   frank, honest, reliable and trustworthy in their
22   recital of the facts, or was the witness bias or
23   prejudice, or did the witness have a reason to
24   falsify?
25        There are many aids in determining whether a

Summations-Mattaway                    753

1     person is telling the truth.  You are to employ

2     any of them that you know of and that you see used

3     in your every day lives.

4         There is no particular formula for evaluating

5     the truthfulness and accuracy of another person's

6     statements or testimony.  You bring to this

7     process all your varied experiences.  In life, you

8     frequently decide the truthfulness and accuracy of

9     statements made to you by other people.  The same

10    factors you use in those decisions should be used

11    in this case when evaluating the testimony.

12        You also have a right to consider whether any

13    witness is actuated by bias or prejudice or has an

14    interest in the outcome of the case which might

15    permit that person to testify to something other

16    than the truth; whether to testify falsely or to

17    testify by giving a half truth.

18        You may consider whether a witness has an

19    interest in the outcome of a case or instead if a

20    witness has no such interest.  You are not

21    required to reject the testimony of an interested

22    witness, or to accept the testimony of a witness

23    who has no interest in the outcome of the case.

24    You may however, consider whether an interest in

25    the outcome, or lack of such interest, affected

Summations-Mattaway                 754

1    the truthfulness of the witness' testimony.

2        If in your deliberations you find that any

3    witness has willfully testified falsely as to any

4    material fact, you are at perfect liberty to

5    disregard the entire testimony or you may

6    disregard so much of the testimony that you

7    believe is untruthful and accept so much of the

8    testimony that you find to have been truthfully

9    given.  It is the quality of the testimony that is

10   controlling, not the quantity of the testimony or

11   the number of witnesses testifying.

12       Questions are not evidence.  It is the

13   answers given to the questions that constitutes

14   the evidence.  Inferences or suggestions contained

15   in a question do not make the fact when the answer

16   negates the inference or suggestion contained in

17   that question.

18       Whenever any inconsistencies appear in the

19   testimony of a witness it is your duty to

20   reconcile them if you are honestly able to do so.

21   You are not to reject as arbitrary the testimony

22   of any witness.  You should consider the testimony

23   of every witness carefully and determine whether

24   you will accept it or reject it in whole or in

25   part.

Summations-Mattaway                    755

1           Whenever you find conflicting testimony which

2      you are not able to reconcile, do not hesitate to

3      cast aside that which you deem exaggerated or

4      mistaken or willfully false and accept only that

5      portion which you deem to be true.

6           Testimony which was stricken from the record

7      or to which an objection was sustained must be

8      disregarded by you.

9           You may consider whether a witness made

10     statements at this trial that were inconsistent

11     with one another.

12          You may also consider whether a witness made

13     a previous statement inconsistent with his or her

14     testimony at trial.

15          You may consider whether a witness testified

16     to a fact here at trial that a witness omitted to

17     state, at a prior time, when it would have been

18     reasonable and logical for the witness to have

19     stated the fact.  In determining whether it would

20     have been reasonable and logical for the witness

21     to have stated the omitted fact, you may consider

22     whether the witness' attention was called to the

23     matter and whether the witness was asked about it.

24          If a witness has made such inconsistent

25     statements or omissions, you may consider whether

Summations-Mattaway                756

1    and to what extent they affect the truthfulness or

2    accuracy of that witness' testimony here at this

3    trial.

4        The contents of the prior inconsistent

5    statements are not proof of what happened.  You

6    made use evidence of a prior inconsistent

7    statement only to evaluate the truthfulness and

8    accuracy of the witness' testimony here at trial.

9        You may consider whether a witness' testimony

10   is consistent with the testimony of other

11   witnesses or with other evidence in the case.

12       If there were inconsistencies by and among

13   witnesses, you may consider whether they were

14   significant inconsistencies related to important

15   facts, or instead were they the kind of minor

16   inconsistencies that one might expect from

17   multiple witnesses to the same event.

18       You have heard testimony about witnesses

19   being talked to about the case before the witness

20   testified at trial.  The law does not prohibit

21   attorneys from either side of speaking to a

22   witness about the case before the witness

23   testifies, nor does it prohibit the attorneys from

24   reviewing with the witness the questions that will

25   be asked at trial.

Summations-Mattaway                757

1           You have also heard testimony that witnesses
2      read certain material pertaining to the case
3      before the witness testified at trial.  The law
4      does not prohibit a witness from doing so.  You
5      may consider whether a witness has been convicted
6      of a crime or has engaged in criminal conduct and
7      if so whether and to what extent it affects the
8      truthfulness of that witness' testimony.  You are
9      not required to reject the testimony of a witness
10     who has been convicted of a crime, who has engaged
11     in criminal conduct, or to accept the testimony of
12     a witness who has not.  You may however, consider
13     whether a witness's criminal conduct or conviction
14     has affected the truthfulness of that witness's
15     testimony here at this trial.
16           (Continued on the next page)
17
18
19
20
21
22
23
24
25

758
Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 113 of 241
jc-f      Jury Charge

1          THE COURT:  As you know, an issue in

2     the case is whether the defendant has been

3     correctly identified as the person who

4     committed the charged crime.

5          People have the burden of proving

6     beyond a reasonable doubt not only that a

7     charged crime was committed, but the defendant

8     is the person who committed that crime.  Thus,

9     even if you are convinced beyond a reasonable

10    doubt that a charged crime was committed by

11    someone, you cannot convict the defendant of

12    that crime unless you are also convinced beyond

13    a reasonable doubt that he is the person who

14    committed the crime.

15         In examining the testimony of any

16    witness who would identify that person, you

17    should determine whether that testimony is both

18    truthful and accurate.  With respect to whether

19    the identification is truthful, that is not

20    deliberately false, you must evaluate the

21    believability of the witness who made an

22    identification.  In doing so, you may consider

23    the various factors for evaluating the

24    believability of a witness' testimony that I

25    just listed for a you few moments ago.

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 114 of 241
759
jc-f     Jury Charge

1          With respect to whether the

2     identification is accurate, that is, not an

3     honest mistake, you must evaluate the witness'

4     intelligence and capacity for observation,

5     reasoning and memory and determine whether you

6     are satisfied that the witness is a reliable

7     witness who had an ability to observe or

8     remember the person in question.

9          Further, the accuracy of the witness'

10    testimony in identifying a person also depends

11    on the opportunity the witness had to observe

12    and remember that person.  Thus, in evaluating

13    the accuracy of identification testimony, you

14    should also consider such factors as what were

15    the lighting conditions under which the witness

16    made their observations.  What was the distance

17    between the witness and the perpetrator, did

18    the witness have an unobstructed view of the

19    perpetrator.  Did the witness have an

20    opportunity to see and remember the facial

21    features, body size, hair, skin color and

22    clothing of the perpetrator.  For what period

23    of time did the witness actually observe the

24    perpetrator during that time and what direction

25    were the witness and perpetrator facing, and

1      where was the witness' attention directed.  Did

2      the witness have a particular reason to look at

3      and remember the perpetrator.  Did the

4      perpetrator have distinct features that a

5      witness would be likely to notice and remember.

6      Did the witness have an opportunity to give a

7      description of the perpetrator.  If so, to what

8      extent did it match or not match the defendant

9      as you find the defendant's appearance to have

10     been on the day in question.  What was the

11     mental, physical and emotional state of the

12     witness before, during and after the

13     observation.  To what extent, if any, did the

14     conditions affect the witness' ability to

15     observe and accurately remember the

16     perpetrator.  Did the witness ever see the

17     person identified prior to the date in

18     question.  If so, how many times did the

19     witness see that person, and under what

20     circumstances.  And to what extent, if any, did

21     those prior observations affect the witness'

22     ability to accurately recognize and identify

23     such person as the perpetrator.  When and under

24     what circumstances did the witness identify the

25     defendant.  Was the identification of the

Case 1:11-cv-06468-JPO  Document 37-26  Filed 04/24/19  Page 116 of 241
761
jc-f     Jury Charge

1        defendant as the person in question suggestive

2        in some way to the witness before the witness

3        identified the person, or was the

4        identification free of any suggestions.

5              You will recall that Dr. Ely

6        testified about certain scientific and medical

7        and technical matters and gave an opinion of

8        such matters.  Ordinarily a witness is limited

9        to testify about facts and is not permitted to

10       give an opinion.  Where, however, scientific,

11       medical, technical or other specialized

12       knowledge will help the jury understand the

13       evidence, or to determine a fact in issue, a

14       witness with expertise in a specialized field

15       may render opinions about such matters.

16             You should evaluate the testimony of

17       any such witness just as you would the

18       testimony of any other witness.  You may accept

19       or reject such testimony in whole or in part

20       just as you may with respect to the testimony

21       of any other witness.

22             In deciding whether or not to accept

23       such testimony from an expert witness, you

24       should consider the following:  The

25       qualifications and believability of the

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 117 of 241
762
jc-f     Jury Charge

1    witness.  The facts and other circumstances on

2    which the witness' opinion was based.  The

3    accuracy or inaccuracy of any assumptions or

4    hypothetical fact upon which the opinion was

5    based.  The reasons given for the witness'

6    opinion.  Whether the witness' opinion is

7    consistent or inconsistent with other evidence

8    in the case.

9            In this case, you have heard

10   testimony of police officers.  Testimony of a

11   police officer should not be believed solely

12   and simply because the witness is a police

13   officer.  At the same time, a witness'

14   testimony should not be disbelieved solely and

15   simply because the witness is a police officer.

16   You must evaluate police officer's testimony in

17   the same way you would evaluate the testimony

18   of anyone else.

19           The defendant did not testify in this

20   case.  The fact that he did not testify is not

21   a factor from which any inferences unfavorable

22   to the defendant may be drawn.

23           I charge you in arriving at your

24   verdict, you are not to consider or speculate

25   concerning matters related to sentence or

jc-f     Jury Charge

1    punishment.  Such matters are solely within the

2    province of the court as a matter of law and

3    must not be permitted to have any bearing upon

4    your consideration of the guilt or non-guilt of

5    the defendant.

6              The count of murder in the second

7    degree is being submitted for your

8    consideration.  It is alleged that the

9    defendant, Ricardo Jimenez on or about

10   July 3rd, 1989 in the county of the Bronx with

11   intent to cause the death of a person, did

12   cause the death of Sean Worrell by shooting him

13   in the head and chest with a loaded pistol.

14             Under our law, a person is guilty of

15   murder in the second degree when with intent to

16   cause the death of another person, he causes

17   the death of such person.

18             The term intent used in this

19   definition has its own special meaning in our

20   law.  Intent means conscious objective or

21   purpose.  Thus, a person acts with intent to

22   cause the death of another when that person's

23   conscious objective or purpose is to cause the

24   death of another.

25             In order for you to find the

764

jc-f     Jury Charge

1    defendant guilty of this crime, the People are

2    required to prove, from all the evidence in the

3    case, beyond a reasonable doubt both of the

4    following two elements:  One, that on or about

5    July 3rd, 1989, in the county of the Bronx, the

6    defendant Ricardo Jimenez caused the death of

7    Sean Worrell.  And, two, that the defendant did

8    so with the intent to cause the death of Sean

9    Worrell.

10        If you find that the People have

11    proven beyond a reasonable doubt both of these

12    elements, you must find the defendant guilty as

13    charged.

14        On the other hand, if you find that

15    the People have not proven beyond a reasonable

16    doubt either one or both of these elements, you

17    must find the defendant not guilty.

18        At this point in time, I'm going to

19    retire to the robing room with counsel for a

20    moment.  We'll just be a minute.  When I come

21    out, I will give you some final instructions

22    and then you will begin your deliberations.

23        Just excuse us for a moment.

24        (Whereupon, the following discussion

25        takes place on the record, in the robing

765
jc-f     Jury Charge

1           room, in the presence of the Court, the

2           defense counsels, the Assistant District

3           Attorneys and out of the hearing of the

4           jury:)

5                    THE COURT:  Exceptions?

6                    MR. BRUNO:  None by the defense,

7      sir.

8                    MS. MATTAWAY:  No, it's fine, thank

9      you.

10                   THE COURT:  Both sides have seen the

11     verdict sheet?

12                   MS. MATTAWAY:  No.

13                   THE COURT:  Will the parties

14     stipulate that if the jury should ask for the

15     exhibits, that we can give them the exhibits

16     without the need of reassembling everyone and

17     making a record?

18                   MR. BRUNO:  Yes, sir, for defense.

19                   MS. MATTAWAY:  That's fine.

20                   THE COURT:  With regards to

21     the alternates, should I assume we'll hold

22     onto them for at least the rest of the

23     afternoon?

24                   MS. MATTAWAY:  We came this far.

25                   MR. BRUNO:  Yes, that would make

Case 1:11-cv-06468-JPO   Document 37-26   Filed 04/24/19   Page 121 of 241
766
jc-f     Jury Charge

1    sense.

2              THE COURT:  Okay.  If there's nothing

3    else, I'll give them the final instructions and

4    send them out.

5              MS. MATTAWAY:  Thank you.

6              MR. BRUNO:  Thank you.

7              (Whereupon, the following takes place

8         on the record in open court in the hearing

9         and presence of the jury.)

10             THE COURT:  We now come to the point

11   in the trial when you are to begin your active

12   roles as jurors.

13             Your verdict must be unanimous.  That

14   means all 12 of you must agree.

15             Under our system of jurist prudence,

16   the first juror selected is known as the

17   foreperson.  Therefore, Mr. Johnson, you're the

18   foreperson.  The foreperson's opinion does not

19   carry any extra weight and his vote doesn't

20   carry any extra weight.  What we ask the

21   foreperson to do is if the jury sends out a

22   note, which I'll explain what I mean by that in

23   a few minutes, we ask the foreperson to sign

24   the note and date it.  It is not necessary that

25   the foreperson write the note, it is not

1          necessary that the foreperson agree with the

2          note, it is just a system we use to assure that

3          the note we're responding to is actually coming

4          from the jury and it helps us track what

5          happens.

6                    When you have reached a verdict, you

7          will reassemble in the courtroom.  The

8          foreperson will be asked to stand, will be

9          asked if the jury has reached a verdict, he

10         will say yes.  You'll be asked what the verdict

11         is, he will give the verdict.

12                   The jury will be asked as a group if

13         that's their verdict.  You can respond as a

14         group.  After that, either side may ask that

15         the jury be polled.  At which point, each

16         individual juror will be asked if that's your

17         verdict, and you will respond accordingly.

18                   And the foreperson may chair your

19         deliberations, but that is not necessary.  It

20         is actually not even necessary that you have a

21         chair for your deliberations.  You should

22         conduct your deliberations in any method that

23         you could think of if you feel comfortable.

24         Whatever you think works for you.

25                   The clerk has prepared a verdict

1        sheet and there's only one count being

2        submitted for your determination.  It's very

3        self-explanatory.

4                  When you have reached a verdict, all

5        12 of you have agreed, you will mark this sheet

6        in the appropriate column.  Please only mark it

7        with an X or Y.

8                  At no time, at any time you send any

9        note out to us, you should never include the

10       votes you're actually taking in terms of

11       numbers.

12                 Both sides have freely volunteered

13       that you can have anything read back that you

14       want to.  As I've alluded to during this

15       process, there's an official court reporter

16       taking down every word that's being said.  If

17       during your deliberations you would like any

18       part of the testimony read back to you, you

19       will then write us a note asking for that

20       testimony.  I encourage you to be as precise as

21       possible.  It makes our job a little easier.

22       If you ask for a read back of particular

23       testimony, particular point, it's going to take

24       a few minutes, we have to go through the

25       transcript and make sure we cover every area

jc-f     Jury Charge

1      where that may come up.  So usually it helps us

2      if you can be a little precise to accelerate

3      that process.

4                   During the course of your

5      deliberations, you could examine and inspect

6      any documents admitted into evidence.  Again,

7      you will send us out a note asking to see

8      whatever document it is or see all of them,

9      that's your choice.

10                  The same thing with my jury charge.

11     If you need any portion of the law read back to

12     you, you will send us out a note asking for

13     that.

14                  I know I have some smokers on the

15     jury.  If you need to smoke at any time during

16     the deliberations, just let the officer know,

17     you'll be escorted to a place where you could

18     smoke.  While those individuals are outside of

19     the jury room, deliberations should stop.  You

20     should only deliberate while all 12 of you are

21     together.

22                  If they have not done so already,

23     they will collect your cell phones.  Please

24     turn them off.  They'll obviously be given back

25     to you at the end of the day.

jc-f      Jury Charge

1              After several weeks of hearing me say

2      do not discuss the case amongst yourselves, I

3      am now directing you to retire to the jury room

4      and begin discussing the case for your

5      deliberations.

6                   THE COURT OFFICER:   Just 12 jurors

7      only.

8                   Alternates, do you have anything in

9      the jury room?   No.

10                  (Jurors exited the courtroom.)

11                  THE COURT OFFICER:   Three alternates

12      follow this officer.

13                  (Alternate jurors exited the

14      courtroom.)

15                  (Whereupon, deliberations commenced.)

16                  (Transcript continued on next page.)

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK

2    BRONX COUNTY :   CRIMINAL TERM :   PART 1

3    ------------------------------------------

4    THE PEOPLE OF THE STATE OF NEW YORK,

5              -against-                      IND. NO.
                                             3825/2006
6    RICARDO JIMENEZ,

7                        Defendant(s)         Trial

8    ------------------------------------------

9                             July 10, 2007

10                            851 Grand Concourse
                              Bronx, New York 10451
11
     B E F O R E:
12
             THE HONORABLE ROBERT TORRES,
13
                             JUSTICE.
14
     A P P E A R A N C E S:
15
             ROBERT T. JOHNSON, ESQ.
16           District Attorney, Bronx County
             BY:  LISA MATTAWAY, ESQ.,
17               DEBRA GUARNIERI, ESQ.
                 Assistant District Attorneys
18
19           PATRICK BRUNO, ESQ.
             BRIAN WILSON, ESQ.
20           Attorneys for the Defendant

21
     Also Present:  MR. JOSEPH SHMULEWITZ, Intern
22

23                           Catherine Mercorella,
                             Senior Court Reporter
24

25

Proceedings

1              (Whereupon, Court's Exhibit Roman

2        Numeral II, first jury note, was marked.)

3              THE COURT:  At this point I'm going to

4        bring the jury in and send them home.  We need the

5        alternates.  I'll send them home for the night, and

6        then I will make another brief record concerning this

7        before we break.

8              (Whereupon, the alternate jurors enter the

9        courtroom.)

10             THE COURT OFFICER:  Jury entering.

11             (Whereupon, the jury enters the

12       courtroom.)

13             THE COURT CLERK:  Case on trial continued.

14       All sworn jurors are present.

15             THE COURT:  I'm in receipt of a note:

16       "We, the jury, request, 1, the testimony of Detective

17       Serrano regarding any and all descriptions of

18       perpetrator, both defense and prosecution.  2,

19       testimony of Detective Stradford regarding any and

20       all descriptions of the perpetrator which lead to the

21       arrest of the defendant.  3, the testimony of Esco

22       Blaylock."

23             Due to the extent of what you're

24       requesting, rather than try to start it today, the

25       day is late, it has been a long day for you, we are

Proceedings

1      going to break at this time.  Obviously, you're going

2      to cease your deliberations.  Do not discuss the case

3      among yourselves and do not allow anyone to discuss

4      the case with you.  Do not visit the location.  This

5      goes for the main 12 and the alternates also.

6              I'm going to ask you to return here

7      tomorrow 10 o'clock.  When you come in, at that point

8      we'll start giving you the read back.  Enjoy your

9      evening.

10             (Whereupon, the jury and alternate

11     jurors exit the courtroom.)

12             THE COURT:  The record should reflect that

13     both parties were shown the note almost immediately

14     upon receiving it.  There has been some very brief

15     off-the-record discussion about how to respond to

16     this note.  I expressed my opinion that their second

17     request, in light of the way the testimony came out,

18     might be problematic as to how to respond or what we

19     pick out as a response, if anything.

20             MR. BRUNO:  May I be heard, your Honor,

21     when you're done on that subject?  I have a comment.

22             THE COURT:  Okay.  Go ahead.

23             MR. BRUNO:  Your Honor, I acknowledge we

24     had such a discussion off the record in preparation

25     for the jury coming in.  I did some very, very quick

1    work, and I'm in accord with what you said. In

2    essence, there is no description issue with reference

3    to this case in Detective Stradford's work, and I

4    went through the minutes at Page 329. The first

5    sentence is: "And when you started your

6    investigation after meeting with Mr. O'Brien, when

7    did you begin to look for Mr. Jimenez?" So, in other

8    words, as we said off the record, it's not a matter

9    of getting a description and then doing leg work

10   trying to narrow down what perpetrator I'm looking

11   for. From Stradford's point of view, and I said it

12   in summation, I'm sorry to quote myself, as I said in

13   summation, Stradford's job didn't involve

14   investigating who the killer may be. He's

15   immediately given Mr. Jimenez, so there is no

16   description issue.

17            So, my suggestion is with reference to

18   question 2 of the jury -- I would hope to reach some

19   agreement with the People -- that your Honor tell the

20   jury there is no description issue at the point that

21   Detective Stradford gets involved; he already has

22   been directed to Mr. Jimenez.

23            MS. MATTAWAY: May I be heard?

24            THE COURT: Sure.

25            MS. MATTAWAY: Your Honor, defense

1   counsel's view is wrong.  My quick review of the

2   record shows specifically that at Pages 374 and 375

3   the witness is specifically asked about descriptions.

4   It's not the only place in his testimony where this

5   happens, but specifically that's what I believe

6   they're asking for.  The witness is asked about the

7   description given to him -- this is regarding Esco

8   Blaylock -- about the person known to him as Leon in

9   2006, and the witness is asked at Line 20:  "Did you

10   have information from Mr. Blaylock as to the race of

11   Leon?"  And the answer is:  "Mr. Blaylock gave me a

12   description of the person known to him as Leon."  He

13   described him as a male Hispanic who could portray

14   himself to be Jamaican.  That is in the record,

15   Judge.  It's a description given to Stradford -- it's

16   not the only one -- and I think to just gloss over

17   this with the jury is to ignore what they want, which

18   I specifically state is this information which is in

19   the record at Pages 374 to 375, and there is more,

20   but the reality is it is now five minutes to 5:00.

21   This is a complicated note, and I do not think that

22   we are able to answer the jury's note at this time.

23          I think both sides need to carefully comb

24   through the respective witnesses' testimony,

25   Detective Serrano and Detective Stradford.  Clearly,

Proceedings

they want the entire testimony of Esco Blaylock, but regarding descriptions and identification, both sides have a right to comb through this material and to submit to the court what they think the jury is asking for.

Thank you.

THE COURT:  First of all, quite honestly, I object to your use of the words "gloss over." Certainly, from my perspective, I was making no effort to gloss over anything.  From my perspective, I was pointing out a potential difficulty in responding to a jury note.  I had no intention of making a decision right away or taking a position until I have had an opportunity to go over the transcript, but I believe I'm under an obligation -- I know I'm under an obligation to make sure all sides see the note, have an opportunity to be heard as to how they think the note should be responded to and I believe I'm under an obligation if I look at a note and perceive there may be an issue there that is unclear in my mind to at least call that to the attention of the parties so they have an opportunity to look at it and respond to it.  There is nobody here trying to gloss over anything.

What I was going to suggest is that we

Proceedings

1    break now.  I wanted to make a record about that

2    briefly.  We will break now.  I am directing the

3    parties to be here at 9:45 tomorrow because we have

4    to go over a lot of stuff, and I want to get this to

5    the jury as quickly as possible.  There is

6    substantial read back here, so even if we can't

7    resolve everything before we start, I want to be able

8    to at least start some of this read back as early as

9    possible tomorrow morning so if we can get in 15

10   minutes earlier we can hopefully reach an accord on

11   most of this, if not everything, and then we can

12   proceed.

13            If there is nothing else at this time,

14   everybody have a good evening, and I'll see you in

15   the morning.

16            MR. BRUNO:  Thank you.

17            MS. MATTAWAY:  Your Honor, is that 9:45?

18            THE COURT:  Yes.

19            MS. MATTAWAY:  Thank you.

20            (Whereupon, the trial is adjourned to July

21   11, 2007.)

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK

2    BRONX COUNTY :   CRIMINAL TERM :   PART 1

3    ------------------------------------------

4    THE PEOPLE OF THE STATE OF NEW YORK,

5                    -against-                    IND. NO.
                                                 3825/2006
6    RICARDO JIMENEZ,

7                         Defendant(s)        Trial

8    ------------------------------------------

9                              July 11, 2007

10                             851 Grand Concourse
                              Bronx, New York 10451
11
     B E F O R E:
12
              THE HONORABLE ROBERT TORRES,
13
                              JUSTICE.
14
     A P P E A R A N C E S:
15
              ROBERT T. JOHNSON, ESQ.
16            District Attorney, Bronx County
              BY:  LISA MATTAWAY, ESQ.,
17                 DEBRA GUARNIERI, ESQ. - A.M. Session only
                   Assistant District Attorneys
18
19            PATRICK BRUNO, ESQ.
              BRIAN WILSON, ESQ.
20            Attorneys for the Defendant

21
     Also Present:  MR. JOSEPH SHMULEWITZ, Intern
22

23                              Catherine Mercorella,
                              Senior Court Reporter
24

25

Proceedings

1               THE COURT:  On the record, this is the

2     case on trial.

3               (The defendant is not present.)

4               THE COURT:  My understanding is the

5     parties have agreed with respect to most of the read

6     back, but there may be a few areas you want to

7     discuss; is that correct?

8               MR. BRUNO:  Yes, sir.

9               MS. MATTAWAY:  Yes.

10              THE COURT:  Whoever wants to start, I'll

11    listen.

12              MR. BRUNO:  For this purpose, I waive my

13    client's production.

14              If I may, your Honor, I believe the first

15    issue we dispute would be Page 329 starting at Line

16    2.

17              Do you agree?

18              MS. MATTAWAY:  Are we starting with

19    Stradford?

20              MR. BRUNO:  Starting with Stradford

21    because it's chronological.

22              MS. MATTAWAY:  I just want the record to

23    be clear the jury's note asks for Serrano's first.  I

24    think we should respond to the note in the order that

25    the jurors wanted it.

Proceedings

1              THE COURT:  I'm going to do that, but

2       right now I'm just addressing the areas that we need

3       to address.

4              MS. MATTAWAY:  Okay.

5              MR. BRUNO:  I think the first number that

6       we have a disagreement on is 329 starting at Line 2.

7              MS. MATTAWAY:  I disagree.

8              MR. BRUNO:  That's why we're here.

9              THE COURT:  I understand you both

10      disagree.  It may be helpful to me -- I assume one of

11      you wants it in.

12             MR. BRUNO:  Yes, sir.  I wanted it in.

13      This was that page, in fact, I quoted yesterday as

14      being the essence of the issue.  I initially had said

15      that I thought none of the Stradford read back should

16      be offered.  I have already compromised by agreeing

17      to any of it, from my point of view.  In any event,

18      is it in front of you, sir, or do I have to quote it?

19             THE COURT:  No.  I have it.

20             MR. BRUNO:  I believe this is the very

21      essence of the issue where Stradford, in so many

22      words, is saying there is no identification issue.

23      By the time I get involved, I'm zeroed in to Jimenez.

24      So I think to leave that out loses the very essence

25      of the Stradford read back.

Proceedings

1           THE COURT:  Ms. Mattaway?

2           MS. MATTAWAY:  Your Honor, I believe the

3      time has come and gone for summation.  The jury's

4      note asks for descriptions, identification.  This

5      question and answer, Page 329, Lines 2 through 6 does

6      not address the jury's note, and it should not be

7      given to them.

8           MR. BRUNO:  Your Honor, if I may.

9           THE COURT:  Yes.

10          MR. BRUNO:  Well, we can't escape, because

11     it would be improper, in fact it was snuck in three

12     times, you have to realize, most respectfully, the

13     predicate for this question and answer is that

14     earlier it's made clear that Blaylock participated in

15     a photo array which is the essence of identification.

16          THE COURT:  This particular one I'm going

17     to reserve on.

18          Let me hear what the rest of them are.

19          MR. BRUNO:  Thank you, sir.

20          I believe our next disputed page, if you

21     agree, is 372, Line 13; am I correct?

22          MS. MATTAWAY:  Yes.

23          MR. BRUNO:  Your Honor, on this one I'm

24     maintaining that we should put in 372, Line 13

25     through 373, Line 6.  I'm sorry to add a

Proceedings

1    complication.  The People are disputing that at Line

2    6 the witness said the name "Carlo" instead of

3    "Ricardo."  We have already discussed this with the

4    reporter, and she is going to attempting to clarify

5    that one issue.

6              THE COURT:  And, again, the dispute is --

7    who wants it in and who wants it out?

8              MR. BRUNO:  I want it in, sir.

9              MS. MATTAWAY:  May I be heard?

10             THE COURT:  Go ahead.

11             MS. MATTAWAY:  Your Honor, I think Page

12   372, Lines 13 through 21, the problem is "Did you

13   ascertain that the person being sought ..." it

14   doesn't say were you given a description.  It's not

15   talking about race.  It's not talking about clothing.

16   I'm not sure that that's responsive to the jury's

17   question.

18             In any event, I definitely think that the

19   next page, 373 Lines 2 through 6 should not come in

20   because actively seeking a suspect does not go to the

21   identification or description that the detective had

22   for the perpetrator.

23             MR. BRUNO:  May I respond, your Honor?

24             THE COURT:  Go ahead.

25             MR. BRUNO:  Again -- and I'm not summing

Proceedings

1    up -- again, this all goes back to that initial

2    point.  We cannot escape the fact that the whole

3    concept of reading back Stradford is improper.

4    That's my initial position.  To preclude questions

5    and answers like these totally misleads the jury and

6    becomes totally unjust to the defendant.

7              I hope it's crystal clear.  In my mind, my

8    agreeing to any of these pages on Stradford is a

9    compromise with the People.  I'm not summing up.  I'm

10   not trying to be a bore.  Stradford gets into this

11   case with one person and one person only to pursue.

12   Descriptions become meaningless.  I don't mean to

13   requote my summation.  The witnesses at that point

14   could have said it's a nine foot tall Japanese man,

15   he was going out and arresting Jimenez.  So, to

16   preclude these questions is compounding what I

17   already believe was a gross impropriety having any

18   read back on Stradford.

19             THE COURT:  What's the next area?

20             MS. MATTAWAY:  374, Line 11 through 375,

21   Line 3.  I think it should come in.  Defense does

22   not.

23             MR. BRUNO:  Yes, your Honor.  On that one,

24   it's a similar argument.  Number one, when this is

25   discussed, we're going to description or the essence

Proceedings

1          of description, you know, helping a policeman to go

2          track down the suspect.  Here at this juncture all

3          the more, it's crystal clear that Stradford has

4          targeted and will attempt to locate Leon who it turns

5          out the witnesses identify as Ricardo Jimenez.

6                    In addition to compounding the

7          impropriety, Lines 2 and 3 on the next page where he

8          says, in essence, it's an Hispanic male who could

9          portray himself as a Jamaican, that's not even said

10         to Stradford.

11                   Again, your Honor wouldn't know this and,

12         not said rudely, that came up at the hearing.  All

13         Stradford did was quote Serrano from 18 years

14         earlier.  So, because the D.A. is trying to, you

15         know, follow it technically from her point of view,

16         if we follow the letter, the words of the jury's

17         note, "descriptions," Stradford wasn't then going out

18         and saying, Okay, let me go to my computer and track

19         down Latinos.

20                   THE COURT:  I don't want to get into that

21         much of the argument.  The issue is clear and in fact

22         the record is clear.  I believe I was the first one

23         to point to the difficulties with this testimony.

24                   MR. BRUNO:  Correct.

25                   THE COURT:  Any other areas?

Proceedings

1               MR. BRUNO:  Yes.

2               We then go to 382 -- I'm not sure what

3       line.  I'm wrong?

4               MS. MATTAWAY:  Yes.

5               The dispute is 382, Line 20.  There is a

6       problem with the question.  I don't think it makes

7       sense, and we need to find out from the reporter what

8       the question was.  I'm sorry.  Lines 16 through 19, I

9       think that has to be found out what the reporter took

10      down, but I think it shouldn't come in, 382, Line 20

11      through 383 Line 7, because that's description.  I'm

12      just not sure if that question before -- I mean, it's

13      not a question coupled with an answer, so maybe we

14      don't need to find out what it was, but I want Page

15      382, Line 20 through 383 Line 7, but I'm just

16      pointing the court to 382, Line 16:  "QUESTION:  Do

17      you want to tell us, in the course of looking at the

18      folder and interviews, you interviewed various

19      races?"  It doesn't make sense, and I objected, but

20      it wasn't answered anyway.

21              MR. BRUNO:  That part I agree to.  The

22      word probably should have been -- I don't know -- you

23      were seeking or considering people of various races.

24              With that aside, I object to the entire

25      testimony to which she refers, by the way, for the

Proceedings

1          same argument.  And also, again, it's not a personal

2          attack on Stradford, but your Honor just said -- your

3          Honor saw the point initially, I mean, built into

4          that answer -- Stradford was less than honest -- from

5          the day he walks in, he's looking for Jimenez.  That

6          very question and answer was his playing games, and

7          it doesn't go to the jury's note.

8                        In fact, I was cut off a few minutes ago.

9          If that's put in, questions like that are put in,

10         it's like Stradford then went to the computer and

11         like had to track down, for example, Latinos who

12         mimic Jamaicans.  That's not what happened.  So, we

13         are compounding the ambiguity and we are not

14         responding to the note.

15                        MS. MATTAWAY:  Your Honor, I, of course,

16         completely disagree with defense counsel's arguments.

17         The jury specifically wants the descriptions and

18         identifications the detectives had in this case, and

19         addressing defense counsel's prior argument,

20         Stradford was not testifying as to a 1989 DD5 from

21         Detective Serrano.

22                        MR. BRUNO:  Read the hearing minutes.

23                        MS. MATTAWAY:  The hearing is not the

24         record before this jury.  Page 374 states in Line 25,

25         "Mr. Blaylock gave me a description..."  it is first

Proceedings

1          person.  Detective Stradford specifically got a

2          description from Mr. Blaylock, and that is what the

3          jury wants to know.  They want to know, I submit,

4          what description Detective Stradford had.

5                    THE COURT:  374, I think you're leaving

6          out some sections, but I'll get to that later.

7                    The next area of controversy?

8                    MS. MATTAWAY:  That's it.  We are done

9          with this witness.

10                    MR. BRUNO:  I want to go into Serrano as

11         well.

12                    THE COURT:  Let me deal with this witness.

13         We'll do one witness at a time.

14                    MR. BRUNO:  May I be heard, your Honor?

15                    THE COURT:  Go ahead.

16                    MR. BRUNO:  Let me say the following, and

17         I don't mind if it's interpreted as error on my part:

18         I came in this morning hoping to maturely and

19         professionally reach a compromise.  In view of the

20         position the D.A. is taking, I now take the position

21         I took yesterday afternoon.  I am now urging the

22         court that your response to the jury's request for

23         any read back of Stradford should be a refusal to

24         read back anything; that you should admonish the jury

25         in your own words that since Stradford came into the

Proceedings

1    case with no need to investigate as to locating a

2    suspect or narrowing down a suspect, since he came

3    into the case with a conclusion as to whom he had to

4    pick up, albeit some years later, the only target was

5    Jimenez and any reference to descriptions just become

6    improper and irrelevant; that there is no answer to

7    that question.  The answer is he sought only Ricardo

8    Jimenez regardless of descriptions from 18 years ago.

9            MS. MATTAWAY:  May I be heard?

10           MR. BRUNO:  I withdraw any compromise to

11   any of these pages; and before she says it, it's not

12   a tantrum.  I had compromised hoping to maturely and

13   professionally compromise.  She wants it both ways.

14   She wants to have some testimony of improper

15   descriptions and not give me the benefit of what I'm

16   saying, that Stradford walked into this with a fait

17   d'accompli.

18           MS. MATTAWAY:  May I be heard?

19           THE COURT:  Go ahead.

20           MS. MATTAWAY:  Your Honor, the People

21   submit the defense is trying to have this court

22   marshal the evidence for the jury, and that is

23   something this court simply cannot and should not do.

24   So, therefore, then I must now put on the record

25   those items which defense counsel and I agreed before

Proceedings

1     the court took the bench should come in for

2     Stradford.

3              THE COURT:  I'm not doing that right now.

4              MS. MATTAWAY:  All right then.

5              THE COURT:  I know he withdrew his

6     consent.  Let's understand something, everybody.  I

7     don't need your consent.

8              MS. MATTAWAY:  That's true.

9              THE COURT:  All I have to do is listen to

10    you.  I can make the call all on my own.  Right now I

11    am focusing on the one, two, three, four, four basic

12    areas that started out as being in dispute.  I'll

13    deal with that, and then we'll deal with everything

14    else.

15             MS. MATTAWAY:  Yes, sir.

16             THE COURT:  So I'm clear, the People are

17    asking for 374, Line 11 to 375, Line 3?

18             MS. MATTAWAY:  Yes, sir.

19             THE COURT:  I assume there is areas of

20    dispute concerning Detective Serrano.

21             MR. BRUNO:  Yes, sir.

22             THE COURT:  I will listen to that now.

23             MR. BRUNO:  I believe the first would be

24    406, Line 16; is that correct?

25             MS. MATTAWAY:  Defense counsel wanted to

Proceedings

1       begin there, yes.

2                    MR. BRUNO:  Should I be heard on that,

3       your Honor?

4                    THE COURT:  Yes.

5                    MR. BRUNO:  The gist of my argument is

6       very simple.  Although it's not a reference to some

7       witness reporting that description, it's obviously

8       the end product of many, many descriptions.  In other

9       words, in layman's terms, it's saying after I spoke

10      to all my witnesses and garnered all their

11      descriptions, I put out an all points bulletin for a

12      male black with dark skin which was the message on

13      this finest message, so clearly that's a summary of

14      eight or nine descriptions that then follow, by the

15      way, you know, follow in the minutes.

16                   MS. MATTAWAY:  I submit it's nonresponsive

17      to the jury's note.  What he transmitted is

18      irrelevant.  The jury wants to know the description

19      given to Detective Serrano.

20                   THE COURT:  This one I can rule on right

21      away.  The jury's note says in reference to Detective

22      Serrano, regarding any and all descriptions of the

23      perpetrator.  I think this one falls within that

24      parameter.

25                   Anything else regarding Detective Serrano?

Proceedings

```
 1              MR. BRUNO:  I'm sorry, your Honor?  You're
 2      putting it in?
 3              THE COURT:  Technically, it should be Line
 4      15:  "QUESTION:  Thank you, sir.  Now, as a
 5      result..."
 6              MR. BRUNO:  Give me a moment off the
 7      record.
 8              (Discussion off the record.)
 9              MR. BRUNO:  So, your Honor, we are
10      agreeing that we end that section at 407, 13, but
11      then you pick up again, am I correct, at 15?
12              MS. MATTAWAY:  That has nothing to do with
13      description or identification.
14              THE COURT:  Any other points of
15      controversy?
16              MR. BRUNO:  Yes, your Honor.
17              I believe in dispute is 414, Line 9.  Am I
18      correct?  I believe I want it in, and she's disputing
19      it; am I correct?
20              MS. MATTAWAY:  414, Line 9 to where?
21      What's the end, 12?
22              MR. BRUNO:  Line 11 -- right, 12.  12 is
23      the answer.  Do you agree?  Because earlier you
24      disputed for some reason.
25              MS. MATTAWAY:  Obviously, I don't agree to
```

Proceedings

1      any of this, but this section you're talking about, I

2      would agree that's where it would end.

3                 THE COURT:  Why do you not agree to that?

4      I'm serious.

5                 MS. MATTAWAY:  Off the top of my head --

6      do you remember if this was his DD5?  Defense counsel

7      was showing him DD5s that were not necessarily his

8      own and asking him if he had a description at that

9      time.

10                THE COURT:  Again, the jury has asked for

11     any and all descriptions of the perpetrator.

12                MS. MATTAWAY:  Correct, and I submit that

13     it was descriptions given to the witness.  I had

14     objected to them at the time they were sought to be

15     introduced because they were not descriptions given

16     to him, but the court overruled my objection.

17                THE COURT:  They didn't ask for

18     descriptions given to the detective.  They asked for

19     any and all descriptions, and anything that relates

20     to a description I think has to go in.

21                MS. MATTAWAY:  All right, then, sir.

22                MR. BRUNO:  Thank you, sir.

23                Then, your Honor, I was right a few

24     minutes ago.  We agreed to other material between

25     those two pages that were in dispute.

Proceedings

1              MS. MATTAWAY:  No, we didn't.

2              THE COURT:  Again, all I want to hear is

3       what you are in dispute about.  I acknowledge, Mr.

4       Bruno, you have withdrawn your consent to this other

5       stuff.  When I came back in here, I wanted to know

6       what was originally in dispute.

7              Anything else involving Detective Serrano?

8              MR. BRUNO:  Yes.  There are a lot of

9       things.  We have a problem, then.  Your Honor, I'm

10      forced to address the reporter.  We have a dispute as

11      to what we agreed to.  I'm sorry, but I had it that

12      the only dispute -- that where we started, and in

13      effect you now said we could start at 406, Line 15, I

14      then understood we were in agreement from 407, Line

15      15.  That's my Centeno questioning right through.

16      Then I go through --

17             MS. MATTAWAY:  I never said that, sir.

18             MR. BRUNO:  Then we have to go step by

19      step.

20             Next in dispute is 407, Line 15.

21             MS. MATTAWAY:  Line 14 probably, right?

22             MR. BRUNO:  Yes.  Line 14 right through.

23             MS. MATTAWAY:  You said 15.

24             MR. BRUNO:  Right.  Line 14 right on

25      through.  Then I go through all these witnesses.

1          It's really right on through Page 414, which you just
2     granted, 414, Line 12.  Right.  I maintain that's all
3     included.
4               (Brief pause in the proceedings.)
5               THE COURT:  Ms. Mattaway, I assume you
6     dispute all of that or just parts of that?
7               MS. MATTAWAY:  I specifically dispute 413,
8     Lines 14 through 21.  It's not a description.  They
9     wanted descriptions.
10              MR. BRUNO:  Your Honor, I, of course,
11    would disagree.  If anything, it's like a negative
12    description.  Telling someone that Mr. Jimenez was
13    not the person is describing that it's who the person
14    isn't.
15              MS. MATTAWAY:  I submit description is
16    height, weight, race, clothing, hair, teeth.
17              THE COURT:  Give me a second.  I haven't
18    gotten to Line 14 yet.
19              (Brief pause in the proceedings.)
20              MS. MATTAWAY:  I also believe it should
21    begin at Page 410, Line 12.  Mr. Centeno never gave a
22    description, so everything is irrelevant as to him.
23    It should begin Page 410, Line 12.
24              MR. BRUNO:  No.  In fact, at 409, Line 1
25    there is reference to he describes a male black

Proceedings

```
 1        fleeing the theater and the People even summed up on

 2        that issue ironically.  So, if nothing else, Ms.

 3        Mattaway's argument just now would be in bad faith.

 4        She argued against herself in summation if that's the

 5        case.  She went so far as to improperly sum up that

 6        Centeno had identified the guy in court, and he

 7        didn't.

 8                    MS. MATTAWAY:  Summation is over.

 9                    MR. BRUNO:  I'm sorry?

10                    MS. MATTAWAY:  Summation is over.

11                    MR. BRUNO:  Yes, but unavoidably when one

12        makes intelligent points, one can still comment on

13        them.

14                    MS. MATTAWAY:  Then at the most, 408, Line

15        23 to 409 Line 3, but everything else about hearing

16        three pops, everything else is irrelevant to the

17        jury's note.

18                    MR. BRUNO:  If you want, you're free to

19        refer --

20                    THE COURT:  Off the record.

21                    (Discussion off the record.)

22                    THE COURT:  With regard to the section

23        that we just covered, Page 407, Lines 9 through 13 is

24        being read back.  Page 408, Line 23 to Page 409, Line

25        3 is being read back.  Page 410, Line 12 to Line 17
```

Proceedings

1       is being read back.  Page 412, Lines 6 to 9; Page

2       413, Lines 14 through 16; Page 414, Line 9 through

3       Line 12.

4                   Let's deal with the next section.

5                   MR. BRUNO:  I believe in contention is

6       Page 416 starting at Line 7.

7                   THE COURT:  416 starting at Line 7.

8                   MR. BRUNO:  And, as proposed, it would go

9       down to Page 417, Line 7.

10                  THE COURT:  Well, the question starting at

11      Line 16 I sustained even though you withdrew your

12      objection.

13                  MR. BRUNO:  I'm saying obviously but for

14      whatever material must come out.

15                  THE COURT:  And going to Page 417, what

16      line?

17                  MR. BRUNO:  It would go to Line 7, but

18      then it would pick up again -- this is my proposal,

19      by the way -- I propose it picks up again at 13 and

20      would have to continue through 6 on the next page.

21                  MS. MATTAWAY:  I disagree.

22                  MR. BRUNO:  I know.

23                  THE COURT:  I don't see any of this coming

24      in.

25                  MR. BRUNO:  I'm sorry?

Proceedings

1            THE COURT:  I don't see any of this coming

2       in as responsive to their question.

3            MS. MATTAWAY:  Thank you.

4            THE COURT:  Next question.

5            MR. BRUNO:  So then --

6            THE COURT:  Next question.

7            MR. BRUNO:  The next page in dispute is

8       Page 421, Lines 3 through 6.  I'm objecting.  The

9       People want to put it in.

10           MS. MATTAWAY:  No, no.  Wait.

11           MR. BRUNO:  I'm wrong?  Tell me if I'm

12      wrong.

13           MS. MATTAWAY:  I'm sorry.  Start at the

14      beginning.

15           MR. BRUNO:  Meaning, I believe in

16      contention is 421.  You want to put in 3 through 6?.

17           MS. MATTAWAY:  I thought it should start

18      at 420, Line 9.  I think that's all description.

19           MR. BRUNO:  In other words, we agreed.  We

20      already told Cathy we are putting in 9 through 25.

21      That was agreed; am I correct?

22           MS. MATTAWAY:  Yes.

23           MR. BRUNO:  So, that's not in contention.

24      The only little piece in contention that we are

25      addressing to the judge is 421, 3 through 6.

Proceedings

1           MS. MATTAWAY:  And, of course, 1 through 3

2     does not come in.  421, Lines 1 through 3 is not

3     responsive.

4           MR. BRUNO:  Right.  It's like 4, 5, 6 is

5     in contention.

6           MS. MATTAWAY:  Correct.

7           MR. BRUNO:  That's it, 4, 5, 6.

8           MS. MATTAWAY:  Wait a minute.  You didn't

9     want it.  I didn't have a problem.

10           MR. BRUNO:  Yes.

11           MS. MATTAWAY:  Just so we are clear.

12           THE COURT:  We are talking about 421,

13     Lines 4 through 6.  People think it goes in.

14           MR. BRUNO:  I say it doesn't.

15           THE COURT:  Defense says it doesn't.

16           MS. MATTAWAY:  Correct.

17           THE COURT:  It conjunction, the series of

18     questions that's conceded of going in on Page 420, I

19     believe it's Line 9, I think it's Lines 9 to 25, in

20     conjunction with that, I believe that Page 421, Lines

21     4 through 6 should also go in.

22           MR. BRUNO:  Should I continue, sir?

23           THE COURT:  Yes.

24           MR. BRUNO:  The next contention is 429,

25     Lines 9 through 16 -- I'm sorry.

Proceedings

1           MS. MATTAWAY:  423, Line 10.

2           MR. BRUNO:  We agreed on that.

3           MS. MATTAWAY:  I'm so confused.  I'm

4      sorry.

5           So, we are all in agreement until Page

6      429.

7           MR. BRUNO:  That's what I'm saying.

8           MS. MATTAWAY:  And what happens on 429?  I

9      ended Line 9.

10          MR. BRUNO:  Right.  And then I have it

11     that I wanted 9 through 16.

12          THE COURT:  It's sustained.  I don't think

13     it should come in personally.

14          MR. BRUNO:  Wait.  Well, that last

15     question is -- well, then Line 15, where he says,

16     "Yes."

17          THE COURT:  We'll end at Line 9.  It

18     doesn't really again go back directly to descriptions

19     and that one question starting at Line 16 was an

20     objection and it was sustained.

21          MR. BRUNO:  Then I show that as the last

22     -- am I correct that's the last dispute?

23          MS. MATTAWAY:  Yes.

24          MR. BRUNO:  That's the last issue we

25     raise.

Proceedings

1              MS. MATTAWAY:  That's the last thing we

2     disagree on.

3              THE COURT:  Okay.

4              MR. BRUNO:  Now, your Honor, in terms of

5     courtesy to the court, do you want the list of

6     everything we agreed to or it doesn't matter?

7              THE COURT:  No.

8              MR. BRUNO:  Thank you.

9              THE COURT:  We are going to take some time

10    out.  The reporter needs to go downstairs, go over

11    some stuff.  When she comes back, I'm going to bring

12    the jury out.  We will give them Detective Serrano's

13    read back.  That should take us definitely -- I am

14    assuming it will take us up to the lunch hour or

15    close to it.  We'll then break for lunch.  I'll give

16    you my rulings concerning Detective Stradford, and

17    then we'll finish the afternoon with the rest of the

18    read back.

19              MS. MATTAWAY:  Okay.  Thank you, sir.

20              (A recess was taken.)

21              (The defendant is now present.)

22              THE COURT:  Counsel, step up.

23              (An off-the-record discussion was

24           held at the bench.)

25              THE COURT:  Mr. Bruno, I assume that you

Proceedings

1       advised your client that we have been reviewing the

2       potential read back all morning?

3                       MR. BRUNO:  Yes, sir, I did.  All morning.

4                       THE COURT:  Will you bring the jury in.

5                       THE COURT OFFICER:  Alternates entering.

6                       (Whereupon, the alternate jurors

7       enter the courtroom.)

8                       (Whereupon, the jury enters the

9       courtroom.)

10                      THE COURT CLERK:  Case on trial continued,

11      People of the State of New York versus Ricardo

12      Jimenez.  Defendant, his attorney, the assistant

13      district attorney and sworn jurors are present in the

14      courtroom.

15                      THE COURT:  Good afternoon.

16                      First, I have received another note:  "We,

17      the jury, we need movie photo of hallway and

18      walkway."  Those photographs will be sent back in

19      with you when you go back into the jury room to

20      deliberate.  I do apologize for the delay.  The note

21      you sent out yesterday, we have been here all morning

22      going over the transcripts to pick out, make sure we

23      covered all the areas that address your questions.

24      At this point we will begin giving you that read

25      back.  We are going to begin by reading back your

Proceedings

1    first request, which is the testimony of Detective

2    Serrano regarding any and all descriptions of the

3    perpetrator, both defense and prosecution.

4              (Whereupon, the requested portion was read

5    by the reporter.)

6              THE COURT:  I think we'll stop at this

7    point.

8              Ladies and gentlemen, your lunch should be

9    arriving soon.  It's not here yet.  You have your

10   lunch.  I direct the jurors not to deliberate while

11   you're eating your lunch.  I think it's too important

12   a decision to make while you're asking someone to

13   pass the mustard or whatever.  Enjoy your lunch.

14   Relax.  In about an hour or so, we'll bring you back

15   out and continue the read back.

16             (Whereupon, the jury exits the courtroom.)

17             (Whereupon, the alternate jurors exit the

18   courtroom.)

19             THE COURT:  All right.  I'll see everybody

20   at 2:15.

21             (Whereupon, a luncheon recess was taken.)

22             A F T E R N O O N   S E S S I O N

23             (Whereupon, the courtroom is sealed.)

24             THE COURT:  The record should reflect that

25   I have already advised both sides that sometime

Proceedings

1      during the luncheon break I was informed by court
2      personnel that the juror we now have identified as
3      juror number 10, Miss Guerrero, indicated that there
4      is an odor, I believe an odor of alcohol, coming from
5      one of the other jurors.  The message really was
6      coming from the foreperson sitting right next to her.
7      The foreperson is not the individual sitting right
8      next to her, so I have advised both parties in
9      accordance with the mandates of CPL 270.35 I'm going
10     to conduct an in camera inquiry of each juror.
11             The record should reflect due to the
12     logistical layout of this particular courtroom, we
13     are conducting this inquiry in the courtroom itself,
14     but the courtroom has been sealed in effect creating
15     an in camera atmosphere.
16             My intention is to call them one at a time
17     in order, ask them if they have noticed any odors
18     come from their fellow jurors.  If so, who?  Do they
19     find it distracting?  Are they able to continue their
20     deliberations and when did they first notice the
21     odor?
22             I will then also ask have they noticed any
23     unusual behavior of any of the jurors; and if they
24     answer yes to that, I'll ask the same set of sub
25     questions.

Proceedings

1          Anything anybody wants to add to this or a

2     record anybody wants to make?

3          MR. BRUNO:  No, no, sir.  Thank you.  That

4     was a fair summary of the situation.

5          MS. MATTAWAY:  No.  Thank you.

6          THE COURT:  We can bring in juror number

7     1, Mr. Johnson.

8          (Whereupon, the juror enters the

9     courtroom.)

10          THE COURT:  Hi, Mr. Johnson.  You can just

11     stand there.  I have a couple of quick questions for

12     you.

13          Have you noticed any unusual or peculiar

14     odors come from any of the jurors?

15          THE JUROR:  Not that I know of.

16          THE COURT:  Not that you know of?

17          THE JUROR:  Um-um.

18          THE COURT:  Have you noticed any unusual

19     behavior among any of the jurors?

20          THE JUROR:  No.

21          THE COURT:  Okay.  I'm just going to ask

22     you do not discuss what I just asked you with any of

23     the other jurors.

24          THE JUROR:  Okay.

25          (Whereupon, the juror exits the

Proceedings

1            courtroom.)

2                        THE COURT:  Number 2, Miss Whalen.

3                        (Whereupon, the juror enters the

4            courtroom.)

5                        THE COURT:  This will be real quick, Miss

6            Whalen.

7                        Have you noticed any unusual odors coming

8            from any of the jurors?

9                        THE JUROR:  No.

10                       THE COURT:  No.

11                       Have you noticed any unusual behavior

12           coming from any of the jurors?

13                       THE JUROR:  Unusual behavior?  Not really.

14                       THE COURT:  Okay.  Thank you.  I'm just

15           going to ask you not to discuss those questions with

16           the other jurors.

17                       THE JUROR:  Okay.

18                       THE COURT:  Thank you.

19                       (Whereupon, the juror exits the

20           courtroom.)

21                       THE COURT:  Mr. Guzman.

22                       (Whereupon, the juror enters the

23           courtroom.)

24                       THE COURT:  Hi, how are you doing?

25                       THE JUROR:  Okay.

Proceedings

1              THE COURT:  I have two quick questions for
2       you.
3              THE JUROR:  Sure.
4              THE COURT:  Have you noticed any unusual
5       odors coming from any of the jurors?
6              THE JUROR:  No.
7              THE COURT:  Have you noticed any unusual
8       behavior on behalf of any of the jurors?
9              THE JUROR:  No.
10             THE COURT:  Okay.
11             Don't discuss those questions with anybody
12       else.
13             THE JUROR:  No problem.
14             (Whereupon, the juror exits the
15       courtroom.)
16             THE COURT:  Next is Santana.
17             (Whereupon, the juror enters the
18       courtroom.)
19             THE COURT:  Hi.  This will hopefully be
20       quick.
21             Have you noticed any unusual odors coming
22       from any of the other jurors?
23             THE JUROR:  No.
24             THE COURT:  Have you noticed any unusual
25       behavior by any of the jurors?

Proceedings

1              THE JUROR:  No.

2              THE COURT:  Okay.  That's it.  I'm just

3    going to ask you do not discuss those questions with

4    anybody else.

5              THE JUROR:  Okay.

6              (Whereupon, the juror exits the

7    courtroom.)

8              THE COURT:  Number 5, Franco.

9              (Whereupon, the juror enters the

10   courtroom.)

11             THE COURT:  Hi.  Just two quick questions

12   for you:  Have you noticed any unusual odors coming

13   from any of the jurors?

14             THE JUROR:  No.

15             THE COURT:  Have you noticed any unusual

16   behavior by any of the jurors?

17             THE JUROR:  No.

18             THE COURT:  I'm just going to ask you to

19   not discuss those questions with anybody else.

20             (Whereupon, the juror exits the

21   courtroom.)

22             THE COURT:  Mr. Knight.

23             (Whereupon, the juror enters the

24   courtroom.)

25             THE COURT:  Hi, Mr. Knight.  A couple of

Proceedings

```
 1          quick questions:  Have you noticed any unusual odors
 2          coming from any of the jurors?
 3                    THE JUROR:  No.
 4                    THE COURT:  Have you noticed any unusual
 5          behavior by any of the jurors?
 6                    THE JUROR:  No.
 7                    THE COURT:  Okay.  I'll ask you not to
 8          discuss those questions with anybody else, please.
 9                    THE JUROR:  Okay.
10                    (Whereupon, the juror exits the
11          courtroom.)
12                    THE COURT:  Number 7, Mr. Frye.
13                    (Whereupon, the juror enters the
14          courtroom.)
15                    THE COURT:  Hi, Mr. Frye.  A couple of
16          quick questions:  Have you noticed any unusual odors
17          among any of the jurors?
18                    THE JUROR:  No.
19                    THE COURT:  Have you noticed any unusual
20          behavior by any of the jurors?
21                    THE JUROR:  No.
22                    THE COURT:  Okay.  I'm just going to ask
23          you to not discuss those questions with anybody else.
24                    THE JUROR:  Okay.  I won't.
25                    THE COURT:  Thank you.
```

Proceedings

1                        (Whereupon, the juror exits the
2          courtroom.)
3                        THE COURT:  Juror number 8, Brooks.
4                        (Whereupon, the juror enters the
5          courtroom.)
6                        THE COURT:  Hi.
7                        THE JUROR:  Hi.
8                        THE COURT:  A couple of quick questions:
9          Have you noticed any unusual odors among any of the
10         jurors?
11                       THE JUROR:  No.
12                       THE COURT:  Have you noticed any unusual
13         behavior by any of the jurors?
14                       THE JUROR:  No.
15                       THE COURT:  Okay.  Thank you.  I'm going
16         to ask you do not discuss those questions with anyone
17         else.
18                       (Whereupon, the juror exits the
19         courtroom.)
20                       THE COURT:  Number 9, Mr. Vega.
21                       (Whereupon, the juror enters the
22         courtroom.)
23                       THE COURT:  Hi.  How are you doing?
24                       THE JUROR:  All right.
25                       THE COURT:  I have a couple of quick

Proceedings

```
1                    questions for you.
2                         THE JUROR:  Sure.
3                         THE COURT:  Have you noticed any unusual
4        odors among the jurors?
5                         THE JUROR:  No.
6                         THE COURT:  Have you noticed any unusual
7        behavior among the jurors?
8                         THE JUROR:  No.
9                         THE COURT:  Thank you.
10                        I'm going to ask you do not discuss those
11       questions with anybody else.
12                        (Whereupon, the juror exits the
13       courtroom.)
14                        THE COURT:  Miss Guerrero.
15                        (Whereupon, the juror enters the
16       courtroom.)
17                        THE COURT:  Hi.  How are you doing?
18                        THE JUROR:  Hi, Judge.
19                        THE COURT:  Did you notice any unusual
20       odors among your fellow jurors?
21                        THE JUROR:  Uh-hum.
22                        THE COURT:  One of them?
23                        THE JUROR:  Yeah, one of them.
24                        THE COURT:  Which one?
25                        THE JUROR:  Juror number 1.
```

Proceedings

```
 1              THE COURT:  Juror number 1?
 2              THE JUROR:  Uh-hum.
 3              THE COURT:  And can you describe the odor
 4       for us?
 5              THE JUROR:  It smells like alcohol.  Like,
 6       I mean, drinking alcohol.
 7              THE COURT:  Was today the first day you
 8       noticed that?
 9              THE JUROR:  I noticed it about a week
10       back, but I ignored it because I thought maybe it was
11       like a strong mint candy or something, but like he
12       would go to the restroom and come back and the odor
13       will be stronger.
14              THE COURT:  Do you find the odor
15       distracting to you?
16              THE JUROR:  It's annoying because he's
17       just there like sleeping, and he falls asleep, and
18       he's not -- he doesn't give any opinions, basically.
19       He just says -- he just said -- I guess he's being
20       negative, but he's like out of it and he's juror
21       number 1, so isn't he the one that's supposed to
22       make -- I don't know, take charge?  I guess that's
23       how you say it.
24              THE COURT:  It's not necessary that he
25       takes charge.
```

Proceedings

1              Do you think that this will affect you or

2     keep you from being able to deliberate and render a

3     verdict?

4              THE JUROR:  I don't think it will keep me

5     from deliberating.  I think I could still do it, but

6     it's upsetting.  It's upsetting.

7              THE COURT:  And based on where you sit in

8     the jury box, I assume this is a problem in the jury

9     room, not in the jury box?

10             THE JUROR:  Not here.  I'm in back of him.

11    Right now I'm sitting next to him.  Like we are right

12    next to each other.

13             THE COURT:  So, the problem is in the jury

14    room?

15             THE JUROR:  Every time he talks, he covers

16    his mouth.  The reason why I said something was

17    because before you come into court it says -- doesn't

18    it say, No shorts, no drinking, no this?  That's why

19    I thought maybe I should tell you.

20             THE COURT:  You did the right thing.

21             Is he the only one?

22             THE JUROR:  Yes.

23             THE COURT:  When you say seat number 1,

24    you are referring to Mr. Johnson, the foreperson?

25             THE JUROR:  Yeah.

Proceedings

1        THE COURT:  Anything you notice, anything

2    else you have noticed about Mr. Johnson or any of the

3    other jurors?

4        THE JUROR:  No, just him.  Him, he's out

5    of it.  Like, he just lays there.  He doesn't talk.

6    He doesn't give an opinion.  He just said, "Oh,

7    that's it.  I feel he's guilty.  That's it."  But he

8    doesn't -- like when I ask him questions, he doesn't

9    like respond to it.

10        THE COURT:  Okay.

11        THE JUROR:  Sorry.

12        THE COURT:  You can't get into the details

13    of your conversation.

14        Have you discussed this with any other

15    jurors?

16        THE JUROR:  Absolutely not.

17        THE COURT:  Okay.  Thank you.  You could

18    go back.  Do not discuss our conversation at all with

19    anyone.

20        (Whereupon, the juror exits the

21    courtroom.)

22        THE COURT:  Number 11, Bennett.

23        (Whereupon, the juror enters the

24    courtroom.)

25        THE COURT:  Hi.  How are you doing?

```
1                      THE JUROR:  Good.
2                      THE COURT:  I have a couple of questions
3           for you.
4                      THE JUROR:  Sure.
5                      THE COURT:  Have you noticed any odors
6           among any of the jurors?
7                      THE JUROR:  Any?
8                      THE COURT:  Odors.
9                      THE JUROR:  No.
10                     THE COURT:  Have you noticed any unusual
11          behavior?
12                     THE JUROR:  No.
13                     THE COURT:  Okay.  Thank you.
14                     THE JUROR:  Thank you.
15                     THE COURT:  Do not discuss those questions
16          with anyone else.
17                     (Whereupon, the juror exits the
18          courtroom.)
19                     THE COURT:  Number 12, Santiago.
20                     (Whereupon, the juror enters the
21          courtroom.)
22                     THE COURT:  Hi.  I have a couple of quick
23          questions for you.
24                     Have you noticed any odors among any of
25          the jurors?
```

1               THE JUROR:  Any what?  I'm sorry.

2               THE COURT:  Odors, smells.

3               THE JUROR:  Odors, no, sir.

4               THE COURT:  Have you noticed any unusual

5     behavior among any of the jurors?

6               THE JUROR:  No.

7               THE COURT:  Okay.  Thank you.  Just don't

8     discuss any of the questions with anybody inside.

9               THE JUROR:  Yes, sir.

10              THE COURT:  Thank you.

11              (Whereupon, the juror exits the

12    courtroom.)

13              THE COURT:  Based on Ms. Guerrero's

14    comment that she noticed this about a week ago, I am

15    going to interview the alternates also and ask them

16    the same questions.

17              (Whereupon, the alternate juror enters the

18    courtroom.)

19              THE COURT:  This is Miss Galarza.

20              Hi.  How are you doing?  I have some

21    questions for you.

22              During your time during the trial when you

23    were in the jury room, did you notice any unusual

24    odors among any of your fellow jurors?

25              THE JUROR:  No.

Proceedings

```
 1                      THE COURT:  Did you notice any unusual
 2          behavior among any of the jurors?
 3                      THE JUROR:  No.
 4                      THE COURT:  Okay.  Thank you.
 5                      I'm going to ask you not to discuss those
 6          questions with anyone else.  Thank you.
 7                      (Whereupon, the alternate juror exits the
 8          courtroom.)
 9                      THE COURT:  Miss Pryce.
10                      (Whereupon, the alternate juror enters the
11          courtroom.)
12                      THE COURT:  Hi.
13                      THE JUROR:  Hi.
14                      THE COURT:  You can get closer.  I don't
15          bite.  I have two quick questions for you, hopefully
16          quick.
17                      During the course of the trial when you
18          were in the jury room with the other jurors, did you
19          notice any odors, odors --
20                      THE JUROR:  Odors?
21                      THE COURT:  -- coming from any of the
22          jurors?
23                      THE JUROR:  No.
24                      THE COURT:  Did you notice any unusual
25          behavior?
```

Proceedings

1            THE JUROR:  No.

2            THE COURT:  Okay.  I'm just going to ask

3    you to not discuss these questions with anyone else.

4            THE JUROR:  Okay.

5            THE COURT:  Thank you.

6            Miss Cisse.

7            (Whereupon, the juror enters the

8    courtroom.)

9            THE COURT:  Hi.  How are you doing?

10           THE JUROR:  Hi.

11           THE COURT:  I have a couple of questions

12   for you.

13           THE JUROR:  Sure.

14           THE COURT:  During the course of the trial

15   when you were in the jury room with the other jurors,

16   did you notice any unusual odors coming from anyone?

17           THE JUROR:  No.

18           THE COURT:  Did you notice any unusual

19   behavior among anybody, any of the other jurors?

20           THE JUROR:  What do you mean by "unusual"?

21   That's a broad term.

22           THE COURT:  Did you notice or get the

23   feeling that any of the jurors might not have really

24   been paying attention or not capable of following the

25   trial or acting like they were out of it?

Proceedings

1              THE JUROR:  No.

2              THE COURT:  Okay.  Thank you.  I'm going

3       to ask you not to discuss these questions with anyone

4       else.

5              THE JUROR:  Okay.

6              THE COURT:  Thank you.

7              (Whereupon, the alternate juror exits the

8       courtroom.)

9              THE COURT:  Does either side wish to be

10      heard?  You want a minute to confer?

11             MR. BRUNO:  May I?

12             (Discussion off the record.)

13             MR. BRUNO:  May I be heard, sir?

14             THE COURT:  Go right ahead.

15             MR. BRUNO:  The only point I want to raise

16      at this point is that I understood, as did my

17      colleague, when you questioned number 2, Whalen, her

18      response was not one of certainty.  Her response was,

19      well, not really.  I would urge that you question her

20      a little further and a little more pointedly, perhaps

21      saying any indicia of someone being in a less than

22      attentive state, maybe drugs, alcohol, that type of

23      thing.

24             THE COURT:  Any position on that, Ms.

25      Mattaway?

Proceedings

1              MS. MATTAWAY:  She sits next to the guy,
2       so maybe that's not a bad idea.  Maybe she just
3       doesn't look at him either, though.  I don't know.
4       Just him or any juror?
5              MR. BRUNO:  Any juror.
6              THE COURT:  Anything else?
7              MR. BRUNO:  Nothing further.
8              THE COURT:  Anything from the People?
9              MS. MATTAWAY:  No.
10             THE COURT:  I will call Miss Whalen out
11      again and ask her point blank, she seemed to hesitate
12      for a moment, ask her what that was about, and I
13      would specifically ask her about the smell of
14      alcohol.
15             MR. BRUNO:  Thank you, sir.
16             (Whereupon, the juror enters the
17      courtroom.)
18             THE COURT:  Hi again.
19             THE JUROR:  Hi.
20             THE COURT:  Before when you were out here
21      you seemed to slightly hesitate before you answered
22      my question.
23             THE JUROR:  About?
24             THE COURT:  About the odor.  Was there a
25      reason why?

Proceedings

1                    THE JUROR:  I mean, you know, somebody was

2          sweating this morning and there was a little B.O.  It

3          was hot, so there was a little body odor, but nothing

4          that was alarming.

5                    THE COURT:  Have you at any time today or

6          any time prior to today detected the smell of alcohol

7          on anyone?

8                    THE JUROR:  No, I haven't.

9                    THE COURT:  Thank you.

10                   THE JUROR:  Sure.

11                   THE COURT:  Again, do not discuss these

12         questions with anybody else.

13                   THE JUROR:  Right.

14                   (Whereupon, the juror exits the

15         courtroom.)

16                   MR. BRUNO:  May I be heard now, sir?

17                   THE COURT:  Go right ahead.

18                   MR. BRUNO:  Your Honor, based upon the

19         statement of number 10, Miss Guerrero, but also

20         during the course of the trial I have noted that

21         number 1 looked -- well, a number of times was dozing

22         off, a number of times looked very heavy eye lidded,

23         under the circumstances I would respectfully urge

24         that we now excuse Mr. Johnson from his jury service

25         and put in his place the first remaining -- I think

1    she's number 2 -- but the first remaining alternate.

2    I think it's Miss Guzman.

3              MR. WILSON:  Galarza.

4              MR. BRUNO:  Galarza.

5              THE COURT:  Ms. Mattaway, do you wish to

6    be heard?

7              MS. MATTAWAY:  I believe it's the

8    defendant's choice to do this, but I think he has to

9    do it in writing.  To remove a sworn juror, he must

10   consent in writing.

11             THE COURT:  The substitution has to be in

12   writing.

13             MS. MATTAWAY:  Right.  It can't be just on

14   oral application.

15             THE COURT:  Do the People wish to make any

16   record beyond that?

17             MS. MATTAWAY:  We only have one juror out

18   of fifteen who seems to have a problem with it.  I

19   don't know if it's more prudent in light of this and

20   now that you have asked all the jurors the question

21   about odor, maybe now they will be more attentive for

22   that and maybe after the next session of read back

23   you may get a complaint, but I don't know.

24             The court has been down this road more

25   times than I have, so I leave it to the court's

Proceedings

```
 1          discretion at this point.
 2                    THE COURT:  Okay.  Give me a couple of
 3          minutes.
 4                    (Whereupon, a recess was taken.)
 5                    (Whereupon, the courtroom is no longer
 6          sealed.)
 7                    THE COURT:  I apologize to the individuals
 8          in the audience.  I'm going to ask you to leave once
 9          again.
10                    (Whereupon, the courtroom is sealed.)
11                    MS. MATTAWAY:  Your Honor, may I be heard
12          some more on this issue?
13                    THE COURT:  Yes, you may.
14                    The record should reflect the courtroom is
15          now sealed.
16                    MS. MATTAWAY:  I was just rereading my
17          notes about what -- they can't hear, right?
18                    THE COURT:  Their door is closed.  We'll
19          close --
20                    MS. MATTAWAY:  -- about what juror number
21          10 said, and this part where she said, "I could keep
22          deliberating, but it's upsetting."  I feel when I
23          read that, she's the one actually who may not be in a
24          position to continue to deliberate, not juror 1,
25          because no one else is noticing this.  It's bothering
```

Proceedings

1    her and rather than continue with deliberations, she

2    is the one who now wants to make an issue out of it

3    and I'm wondering if she's not the one who should be

4    brought out and talked to to say -- to explore her

5    statement, "I could keep deliberating, but it's

6    upsetting to me."  I don't know that she is competent

7    to continue to sit and maybe it's she who should be

8    replaced if she's the only one out of 15 people who

9    notices this and she's upset.  The behavior she's

10   describing you would think someone else would notice

11   that he's out of it, he lays there, he's sleeping.

12   No one else has said that, and you'd like to think

13   that the jurors are all conscientious and they would

14   all bring it to our attention if they noticed it.

15   So, I'm starting to doubt what she said.

16              That's all.

17              THE COURT:  Mr. Bruno, do you wish to be

18   heard about that?

19              MR. BRUNO:  I would take no position in

20   that.  If your Honor agrees to bring number 10 out

21   again, I certainly have no objection.

22              THE COURT:  I resealed the courtroom

23   because I was going to recall Mr. Johnson, juror

24   number 1.  I think I will call Miss Guerrero out

25   first.

Proceedings

1          Are there any specific questions either

2     side would like to ask, have me ask?

3          MR. BRUNO:  Your Honor, I think apropos of

4     the D.A.'s request, I think the obvious line of

5     questioning would be to the effect of if

6     hypothetically Mr. Johnson were not present as part

7     of this jury, would you have any objection whatsoever

8     to continuing as a juror.

9          MS. MATTAWAY:  Your Honor --

10          THE COURT:  Say that again.

11          MR. BRUNO:  I would address her to the

12     effect of if Mr. Johnson were excused from the jury,

13     would you then have any objection or reservations

14     about continuing in your jury service in this matter.

15          MS. MATTAWAY:  Your Honor, I believe it's

16     the opposite question.  If he were not replaced, can

17     you keep deliberating with him still on the jury, not

18     if he were replaced.  Is his presence upsetting you

19     so much that you cannot continue to deliberate.  You

20     previously told us it's upsetting to you.  Are you

21     unable to concentrate on the testimony and

22     deliberations because his presence is upsetting to

23     you, his behavior?

24          THE COURT:  Bring her out, and I am going

25     to ask her questions that are more geared to getting

Proceedings

1              a reaction than getting a response.

2                        MS. MATTAWAY:  Okay.

3                        THE COURT:  Miss Guerrero, please.

4                        (Whereupon, the juror enters the

5              courtroom.)

6                        THE COURT:  Ms. Guerrero, first of all,

7              I'm going to ask you to face the reporter so she can

8              hear you.

9                        THE JUROR:  Okay.

10                       THE COURT:  You referred to the actions by

11             Mr. Johnson as annoying.

12                       THE JUROR:  Yeah, annoying.

13                       THE COURT:  But you felt that you could

14             still deliberate; is that correct?

15                       THE JUROR:  Yes.

16                       THE COURT:  Are you confident that this

17             annoyance is not reaching a level that it would

18             prevent you from being able to reach a verdict?

19                       THE JUROR:  I'm confident that we could

20             reach a verdict without just having to like, I guess,

21             start over, I guess.  I mean, I feel like I can --

22             that we could deliberate.

23                       THE COURT:  The annoying factor with

24             Mr. Johnson notwithstanding?

25                       THE JUROR:  What happened?

Proceedings

1    THE COURT:  In other words, you could
2    ignore --
3    THE JUROR:  I could ignore that,
4    definitely.
5    THE COURT:  And you could still reach a
6    verdict?
7    THE JUROR:  Yes.
8    THE COURT:  Recognizing that he's annoying
9    to you, do you feel that you could still go through
10    the process and complete the process and render a
11    verdict?
12    THE JUROR:  Yeah, definitely.
13    THE COURT:  Okay.  Thank you.  You could
14    return.
15    (Whereupon, the juror exits the
16    courtroom.)
17    THE COURT:  Mr. Johnson, please.
18    MR. BRUNO:  Your Honor, may we approach
19    for this questioning?
20    THE COURT:  Sure.
21    (Whereupon, the juror enters the
22    courtroom.)
23    THE COURT:  Mr. Johnson, I'm just going to
24    ask you to face the reporter.  It's easier for her to
25    hear you.

Proceedings

```
 1                    Mr. Johnson, do you feel that there is
 2         anything either going on in the jury room or with
 3         yourself that may affect your ability to deliberate?
 4                    THE JUROR:  Um-um.
 5                    THE COURT:  You have to answer yes or no.
 6                    THE JUROR:  Oh, I'm sorry.  No.
 7                    THE COURT:  And you feel comfortable that
 8         you have been attentive throughout the trial?
 9                    THE JUROR:  Yes.
10                    THE COURT:  To the point that it wouldn't
11         distract you or make it more difficult for you to
12         deliberate?
13                    THE JUROR:  No.
14                    THE COURT:  Okay.
15                    Is there anything going on in that jury
16         room on a personal level?  Don't tell us anything
17         about the actual deliberations, but any personal
18         dynamics going on in the jury room that are making
19         you feel uncomfortable?
20                    THE JUROR:  Um-um, not to me.
21                    THE COURT:  Any parties have any
22         questions?
23                    MS. MATTAWAY:  I don't.
24                    MR. BRUNO:  I don't.
25                    MR. WILSON:  No.
```

Proceedings

1       THE COURT:  Okay.  Return and, again, do

2   not discuss these questions with anyone.

3       (Whereupon, the juror exits the

4   courtroom.)

5       MS. MATTAWAY:  I didn't smell anything.

6   We approached.  We were standing close to this juror.

7   I didn't smell anything, personally.

8       MR. BRUNO:  Nor did I.

9       THE COURT:  Okay.  You guys want to take a

10  minute to think before you say anything?

11      (Brief pause in the proceedings.)

12      THE COURT:  I'm ready when you guys are.

13      MR. BRUNO:  My thoughts are on one hand

14  juror number 10 is not going to make such an

15  allegation lightly.  Plus, I don't know if the record

16  was clear earlier on this point.  I think we might

17  have all ignored it.  I mean, she was serious enough

18  about this that she also during the lunch break asked

19  and was escorted to, I think, a pharmacy or something

20  to obtain some kind of stomach or headache remedy

21  saying that this conduct of the other juror lead her

22  to this ill feeling.

23      Your Honor, under the circumstances, I'd

24  rather exercise great caution and rid ourselves of a

25  juror who may have been drinking not only today but

1    on at least one other occasion as alluded to by Miss

2    Guerrero.

3            In addition, as I said, I, as well as my

4    cocounsel, have observed this juror being, shall we

5    say, sleepy and/or sluggish on numerous occasions

6    during the trial.

7            COURT OFFICER ELAINE DARRIGO:  Miss

8    Guerrero, I was told she needed to go to get Alka

9    Seltzer.  She never linked the two issues.  We went

10   to get Alka Seltzer; and then as we were going, she

11   mentioned to me this issue with Mr. Johnson.  So, I

12   can't say that those two things were linked.

13           MR. BRUNO:  And I didn't mean to misquote

14   you.

15           COURT OFFICER ELAINE DARRIGO:  It's okay.

16   Sometimes it's like telephone.  One person says

17   something.  So I don't know whether it was linked or

18   not.  You would have to ask her that definitively to

19   find out.  I would not be able to say that for sure

20   that she said that to me.

21           MS. MATTAWAY:  May I be heard, your Honor?

22           THE COURT:  Go right ahead.

23           MS. MATTAWAY:  I believe that now that

24   both juror number 10 and juror number 1 have been

25   brought out, that it would be inappropriate to

1       replace juror number 1.  Juror number 10 specifically

2       stated that she could continue and she could

3       deliberate and this, while annoying to her, to quote

4       the judge's words, was not something that will keep

5       her from her duty as a juror, and I think that's the

6       only standard you need to look at and juror number 1

7       came out and categorically denied any problem.  So,

8       you can't just do that when there is an allegation

9       raised if it has then been explored and denied, so I

10      believe it is not appropriate based on what happened

11      most recently to replace juror number 1.

12                  THE COURT:  Based on the record made, I am

13      declining to remove any of the jurors at this time.

14                  Specifically with regard to Mr. Johnson, I

15      did note that both times when he was called out here

16      he seems to slur his responses a little bit.  If

17      memory serves me correctly, that was his demeanor

18      during the voir dire process.  There was no

19      noticeable odor by the court coming from him

20      generally or when he first was brought out

21      individually.  He spoke directly to the court face to

22      face and we were probably no more than about 18 to 24

23      inches apart.

24                  During the course of the trial, I did

25      notice that Mr. Johnson did have his head down many

1      times, did have his eyes closed, but I equally

2      noticed that at various times during the testimony

3      when he would have his head down or his eyes closed,

4      that either something would be said or something

5      would happen, his eyes would open, he would

6      immediately be focused on whoever was saying whatever

7      was being said at the time and seemed to me very

8      aware of what was going on, certainly not indicative

9      of somebody nodding off.

10             I will note that at this point many, if

11     not all the jurors, at various times have had their

12     head down, their eyes closed, the courtroom has

13     tended to be very hot, especially during the last few

14     days.  It's a situation I have obviously been

15     observing.

16             At no time did I make any observations

17     that would cause me concern that someone was actually

18     asleep or not paying attention to what was

19     transpiring in the courtroom.

20             We are going to proceed with the jury as

21     it is now.  I do have an outstanding ruling to make.

22     We could open up the courtroom again, and I'll make

23     that ruling.

24             (Whereupon, the courtroom is unsealed.)

25             THE COURT:  Actually, before I render my

1   ruling, I would note when we were going through the

2   transcripts preparing to give the read back a

3   question was raised concerning Page 373 as to what

4   the parties believed was a typographical error of

5   some type.  I would also note that the court reporter

6   who happened to transcribe that page did call my

7   chambers -- I am assuming just before the luncheon

8   break, I don't know exactly when -- and did leave a

9   message that it was just an error and has reprinted

10  the page with the correct indication.  I'm

11  specifically referring to Line 6 of 373, change here

12  from Carlo Jimenez to Ricardo Jimenez, and I assume

13  everybody has received that newly-printed page?

14           MR. BRUNO:  Yes, sir.  Thank you.

15           THE COURT:  Now, there is basically four

16  sections of read back of Detective Stradford's

17  testimony that have been called into question.  I'm

18  going to deal with Pages 372 to 373 first.  I believe

19  that defense was requesting Line 13 on Page 372

20  through Line 6 of Page 373.  I am granting that

21  request only to the extent of including Page 372,

22  Lines 19 to 21.

23           (Brief pause in the proceedings.)

24           THE COURT:  I apologize for jumping

25  around, but it will be clear why I'm jumping around

Proceedings

1   in a minute.

2              With regard to Page 382, I believe the

3   People are requesting Page 382, Line 20 to 383, Line

4   7.

5              MS. MATTAWAY:  Yes, sir.

6              THE COURT:  I am granting that request;

7   however, starting on Page 382 at Line 23 and going

8   through Page 383, Line 7.

9              And the People have requested the read

10  back Page 374, Line 11 to 375, Line 3 and defense has

11  requested read back of 329, Lines 2 to 6.  The People

12  oppose the request for 329 referring back to the

13  actual request of the jury.

14             Let me state at the risk of repeating

15  myself, one of the difficulties with the jury's

16  request is that Detective Stradford at least twice on

17  direct testimony, once on redirect and I believe once

18  on recross, I believe, made it very clear that in

19  this case it wasn't a matter of following up on the

20  description, it was an actual name of a person he had

21  which I think is reflected in the People's request of

22  the read back on Page 374 and 375, if you read that

23  request in its entirety.

24             Given that, I believe it would be -- it

25  could conceivably be misleading to grant the People's

1  request for the read back on Page 374 and 375 and
2  deny the defendant's read back on 329.  I think when
3  you take all that in its total context, they both
4  should be given to the jury.  Again, that's why I
5  jumped around, because those two had to come
6  together.
7           Now we have a new note.  Why don't you
8  guys come and look at this.
9           (An off-the-record discussion was
10          held at the bench.)
11          THE COURT:  If everybody is ready, I'll
12 bring the jury back.  We will complete the read back
13 of Mr. Blaylock at which point I will send them back
14 to deliberate for a while at their request; and when
15 I send them back to deliberate for a while, we'll
16 send in the rest of the exhibits.
17          Jury, please.
18          THE COURT OFFICER:  Judge, should I get
19 the alternates first?
20          THE COURT:  Yes, please.
21          While we are waiting for the alternates,
22 do you want to mark these?
23          (Whereupon, Court's Exhibits Roman
24 Numerals III and IV, jury note number 2 and jury note
25 number 3, respectively, were marked.)

Proceedings

1           THE COURT OFFICER:  Alternates entering.

2           (Whereupon, the alternate jurors enter the

3     courtroom.)

4           THE COURT OFFICER:  Jury entering.

5           (Whereupon, the jury enters the

6     courtroom.)

7           THE COURT:  I have received another note:

8     "We, the jury, request the photos that reflect the

9     actual crime scene of 1989 including photographs of

10    the deceased's body in the aisle.  2, request

11    People's 8."  Then it goes on to read:  "Can we

12    please take time to deliberate in between hearing the

13    end of Blaylock's testimony and the

14    previously-requested testimony from Detective

15    Stradford?"  And we will adhere to that request.

16          We will now finish the read back of the

17    remaining portion of Mr. Blaylock's testimony.

18          (Whereupon, the requested portion was read

19    by the reporter.)

20          THE COURT:  In accordance with your

21    request, you can go back to the jury room, continue

22    your deliberations.  The last photographs and

23    exhibits you asked for will be taken in to you now.

24          When you're ready for the rest of the read

25    back, send out a note and let us know.

Proceedings

```
 1                        THE COURT OFFICER:  Jurors step back,
 2        please.
 3                        (Whereupon, the jury exits the courtroom.)
 4                        (Whereupon, the alternate jurors exit the
 5        courtroom.)
 6                        (Whereupon, Court's Exhibit Roman Numeral
 7        V, jury note number 4, was marked.)
 8                        (Brief pause in the proceedings.)
 9                        THE COURT OFFICER:  Alternates entering.
10                        (Whereupon, the alternate jurors enter the
11        courtroom.)
12                        (Whereupon, the jury enters the
13        courtroom.)
14                        THE COURT:  We have another note:  "We,
15        the jury, request that before we hear Detective
16        Stradford's testimony, we hear again the testimony of
17        Detective Serrano regarding any and all descriptions
18        Esco Blaylock gives about the perpetrator.  After we
19        hear Detective Serrano's testimony, we would like to
20        deliberate before we hear Detective Stradford's
21        testimony."
22                        We'll now give you that portion of
23        Detective Serrano's testimony you requested.
24                        (Whereupon, the requested portion was read
25        by the reporter.)
```

Proceedings

1     THE COURT:  You may return to the jury

2     room to continue your deliberations.

3                 (Whereupon, the jury exits the courtroom.)

4                 THE COURT:  Counsel want to step up?

5                 (An off-the-record discussion was

6           held at the bench.).

7                 THE COURT OFFICER:  Alternates entering.

8                 (Whereupon, the alternate jurors enter the

9     courtroom.)

10                THE COURT OFFICER:  Jury entering.

11                (Whereupon, the jury enters the

12    courtroom.)

13                THE COURT:  I have a note:  "We, the jury,

14    need, request a break for the night."

15                We will suspend deliberations at this

16    point.  Again I remind you do not discuss the case

17    among yourselves once you leave the jury room.  Do

18    not allow anyone to discuss the case with you.  Do

19    not visit the location.  I'll see you back here

20    tomorrow morning, 10 o'clock.

21                (Whereupon, the jury exits the courtroom.)

22                (Whereupon, the alternate jurors exit the

23    courtroom.)

24                THE COURT:  I'll see everyone else back

25    here tomorrow morning, 10 o'clock.

Proceedings

1                    Before counsel leave.

2                    MR. BRUNO:  You want us to come up?

3                    THE COURT:  Yes.

4                    (Whereupon, an off-the-record discussion

5        was held.)

6                    (Whereupon, the case is adjourned to July

7        12, 2007.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK

2    BRONX COUNTY :   CRIMINAL TERM :   PART 1

3    -------------------------------------------

4    THE PEOPLE OF THE STATE OF NEW YORK,

5              -against-                    IND. NO.
                                            3825/2006
6    RICARDO JIMENEZ,

7                   Defendant(s)            Trial

8    -------------------------------------------

9                              July 12, 2007

10                             851 Grand Concourse
                               Bronx, New York 10451
11
     B E F O R E:
12
              THE HONORABLE ROBERT TORRES,
13
                               JUSTICE.
14
     A P P E A R A N C E S:
15
              ROBERT T. JOHNSON, ESQ.
16            District Attorney, Bronx County
              BY:  LISA MATTAWAY, ESQ.,
17                 Assistant District Attorney

18
              PATRICK BRUNO, ESQ.
19            BRIAN WILSON, ESQ.
              Attorneys for the Defendant
20

21   Also Present:  MR. JOSEPH SHMULEWITZ, Intern

22

23                             Catherine Mercorella,
                               Senior Court Reporter
24

25

Proceedings

1                      (Whereupon, Court's Exhibit Roman Numeral
2           VI, jury note number 5, was marked.)
3                      THE COURT:  Okay.  I'm going to bring the
4           jury in.  We are going to give them this one piece of
5           read back which I believe is not very long.  So, we
6           will proceed from there.
7                      (Whereupon, the alternates jurors enter
8           the courtroom.)
9                      (Whereupon, the jury enters the
10          courtroom.)
11                     THE COURT:  We have another note:  "We,
12          the jury, request to hear the previously-requested
13          testimony of Detective Stradford.  We would then like
14          to deliberate.  After deliberations, we would like to
15          hear Andrew O'Brien's description of the perpetrator,
16          the argument in front of the concession stand and the
17          subsequent argument and shooting in the theater."
18                     We will now proceed giving you the
19          previously-requested testimony of Detective
20          Stradford.
21                     (Whereupon, the requested portion was
22          read by the reporter.)
23                     THE COURT:  You may retire back to the
24          jury room and continue your deliberations.  Send us a
25          note when you want the rest of that read back.

Proceedings

1              (Whereupon, the alternate jurors exit the

2        courtroom.)

3              (Whereupon, the jury exits the

4        courtroom.)

5              A F T E R N O O N   S E S S I O N

6              (Whereupon, Court's Exhibit Roman Numerals

7        VI, VII and VIII, jury notes numbers 5, 6 and 7,

8        respectively, were marked.)

9              THE COURT CLERK:  Case on trial continued.

10       All parties are present with the exception of the

11       sworn jurors.

12             THE COURT:  Before we do anything, the

13       last jury note received yesterday, the note that read

14       "We, the jury, need, request a break for the night"

15       was not marked.  As a result, the first note we

16       received this morning was originally mismarked, so

17       the last note we received last night asking for the

18       break is Court's Exhibit VI.  The first note received

19       this morning essentially asking for Detective

20       Stradford's testimony is Court's Exhibit VII and the

21       very last note received asking for O'Brien's --

22       asking to hear O'Brien's testimony is Court's Exhibit

23       VIII.  I would also note that that exhibit was

24       received at approximately 12:48 P.M. today, July 12,

25       but whoever wrote it out in the jury put July 11.

Proceedings

1      That takes care of the housekeeping.

2                Do we have an agreement as to what is

3      being read back, what portions of Mr. O'Brien's

4      testimony are read back?

5                MR. BRUNO:  There are a few disputes, your

6      Honor.

7                You made the list.  You just want to go

8      through it?

9                MS. MATTAWAY:  Yes.

10               THE COURT:  Go ahead.

11               MS. MATTAWAY:  Your Honor, I believe that

12     the read back testimony should start at Page 190,

13     Line 24.

14               THE COURT:  Give me a second.

15               MR. BRUNO:  That's agreed so far, sir.

16               MS. MATTAWAY:  That is agreed?

17               MR. BRUNO:  Yes.  The starting point is

18     agreed.

19               MS. MATTAWAY:  I believe it should go

20     through 191, Line 22 -- well --

21               MR. BRUNO:  Your Honor, if I may, it makes

22     it a lot easier to follow.  In a nutshell, I said we

23     should start where she said, 190, but I said we

24     should go nonstop through 217, Line 15 whereas the

25     People object to certain portions.

Proceedings

1                  MS. MATTAWAY:  Yes.

2                  THE COURT:  Okay.  So let me hear.  The

3    first, I assume, is 191, Line -- what did you say?

4                  MS. MATTAWAY:  192, Line 11 I think should

5    be the first break.  That is when we begin marking

6    photographs, and I believe that's irrelevant and

7    nonresponsive.  And I think we should pick back up at

8    193, Line 5.

9                  MR. BRUNO:  That's fine.  That I would

10   agree to.

11                MS. MATTAWAY:  Okay.

12                MR. BRUNO:  The next objection was you

13   wanted to take out 193, 21 through 25; am I correct?

14                MS. MATTAWAY:  No, no.  I was fine with

15   that.

16                MR. BRUNO:  Okay.  So, let's continue.

17                MS. MATTAWAY:  My next objection was to

18   194, Line 21 through 195, 1, because I thought it was

19   state of mind and I didn't think it was responsive.

20                MR. BRUNO:  Well, your Honor, as an

21   overview, not said in a belligerent way, you will see

22   a pattern.  She basically wants to take out

23   everything that refers to the victim and his

24   accomplices having guns, being strapped, any

25   reference to their being armed, and you'll see a

1    pattern.  I think it's quite significant.
2            I mean, for example, he tells us that the
3    reason I said, yeah, go for it or go for your weapon
4    is we're all strapped.  That's an intrinsic part of
5    the argument and what escalates the argument.
6            MS. MATTAWAY:  I submit argument refers to
7    words uttered, not state of mind, your Honor.
8            THE COURT:  As to the specific section we
9    are talking about now, 194, Line 21, I agree with the
10   People.  It should not come in.
11           MR. BRUNO:  So, you're taking out 21
12   through 25, sir?
13           THE COURT:  Actually, to Line 1 of the
14   next page.
15           MS. MATTAWAY:  Correct.
16           MR. BRUNO:  Okay.
17           THE COURT:  Is someone keeping track of
18   this?
19           MS. MATTAWAY:  Yes.  I am.
20           Now, I personally believe that the next
21   section should stop at 195, Line 12, because it is my
22   position that the defendant has gone out the door for
23   his gun, so anything after that line is not what the
24   jury wants.
25           MR. BRUNO:  That's fine.  I agree.

Proceedings

1          MS. MATTAWAY:  But my notes, I don't pick

2     this up again until 199, 15 when they are finally

3     back sitting in the theater, and I submit everything

4     in between is irrelevant or nonresponsive, I should

5     say, to the jury's note.

6          MR. BRUNO:  Well, no.  I say it should

7     pick up immediately, but at a minimum, 196, 14

8     clearly says, "And which movie theater did you go

9     to?"  I think that's the first step of activity

10    involving the deal.

11         MS. MATTAWAY:  I submit they want the

12    argument and shooting in the theater, not where the

13    people took seats.

14         THE COURT:  At this point I agree with Ms.

15    Mattaway.  They seem to be rather specific as to what

16    they are looking at.

17         MS. MATTAWAY:  So to recap, I believe the

18    previous section ends at 195, 9 and picks up again at

19    199, 15 when they are all seated in the theater and

20    the incident begins after the photographs with the

21    seats have been marked.

22         MR. BRUNO:  I thought we stopped at 12 on

23    195.

24         MS. MATTAWAY:  I'm sorry.  Did I misspeak?

25    12.  I apologize.

Proceedings

1          MR. BRUNO:  Then you're saying go where?

2          MS. MATTAWAY:  199, 15, "So what happened

3     after you were sitting in the theater?" my question.

4          MR. BRUNO:  You see, again, your Honor,

5     for example, for the sake of argument at 197, Line 7

6     I think it's significant how they sit, because we

7     have a lot of vivid testimony about one or more of

8     the victim's accomplices getting up and who's drawing

9     guns, who's saying reach for your gun, so I think

10    it's quite significant, for example, that they sit

11    two and two on the aisle -- withdrawn.  It's not

12    necessarily the aisle.  I misspoke.

13         THE COURT:  I, again, disagree with

14    defense.  I believe the jury's note is rather

15    specific.  Descriptions are relevant to this

16    particular area, the subsequent argument and shooting

17    in the theater, not necessarily where anybody was.

18    So, that should not go in.

19         MS. MATTAWAY:  199, 15 is where I believe

20    it should start, but I agree.  I think it should go

21    all the way now through to 210, Line 18.  So, it's

22    the last seven pages counsel and I are arguing about

23    of that section.

24         MR. BRUNO:  See, again I disagree and it's

25    part of that pattern.  She wants to effectively cut

Proceedings

1      out the fact that at a minimum Patchy is now armed,

2      gun drawn, pursuing the alleged shooter.  I think

3      that's part and parcel of the, quote, unquote, shoot

4      out.

5                MS. MATTAWAY:  I submit they want the

6      argument and the shooting, and what Patchy was doing

7      is irrelevant.  The shooting is between the defendant

8      and the victim, and the argument words are not in

9      this section.

10               MR. BRUNO:  Also, your Honor, as a side

11     issue, we can't escape the fact -- and, again, I'll

12     be yelled at I'm summing up again -- we can't escape

13     the fact, at least the way the scenario unfolds,

14     there is potential that one or more of the victim's

15     accomplices shot or grazed O'Brien.  So, I think this

16     becomes part and parcel of the jury's question about

17     describe the shooting in the theater.

18               MS. MATTAWAY:  I believe this section

19     adequately addresses that because it ends after he

20     feels he was shot.  Shaka's position on the floor or

21     Patchy's chasing the defendant I submit is

22     nonresponsive.

23               THE COURT:  Well, on this one I think we

24     go down to Page 210, down to Line 22.

25               MS. MATTAWAY:  Okay.  Yes, sir.

1          THE COURT:  I believe we read the

2     preceding questions and answers.  That last two

3     questions and answers are just part of that overall

4     scenario, but I will stop on Line 22 on Page 210.

5          MS. MATTAWAY:  Your Honor, continuing, I

6     believe it picks up again at 212, Lines 1 through 3,

7     then continues 17 through 213, Line 6 striking the

8     last part of the answer on Page 213 as per the

9     court's instruction.

10          MR. BRUNO:  Again, my contention would

11     obviously be we go nonstop to 217, Line 15.

12          THE COURT:  The section that we are

13     skipping on Page 212 was all sustained anyway, so it

14     wouldn't be read back.

15          MS. MATTAWAY:  Correct, but the bottom of

16     Page 213 starting Line 16 is when Mr. O'Brien

17     describes his injuries.  I feel it's nonresponsive to

18     the jury's note.

19          MR. BRUNO:  Again, your Honor, this read

20     back has being incredibly sanitized to the benefit of

21     the People.

22          THE COURT:  People want to stop where on

23     213?

24          MS. MATTAWAY:  213, Line 15 or perhaps at

25     Line 20 because that ends him talking about shooting

Proceedings

1   or the timing of the shots, but certainly describing

2   his injuries.  This defendant is not charged with

3   shooting Mr. O'Brien.

4            MR. BRUNO:  Then why did you present that?

5   And so the record is clear, because it becomes

6   significant now in terms of why I'm asking for this,

7   I didn't -- as the D.A. was eliciting that testimony,

8   I didn't think it was for -- there was, for example,

9   no attempted murder charge.  On the other hand, I

10   didn't object intentionally because it certainly goes

11   to the fact that a very, very realistic and

12   intelligent interpretation of the testimony could be

13   that the deceased shot O'Brien inadvertently but that

14   the deceased shot O'Brien and again the D.A. is

15   trying to sanitize the record so that the jurors

16   can't consider that or that potentially the

17   perpetrator winged O'Brien but missed the deceased

18   and one of his accomplices shot him.

19            THE COURT:  I think on 213 we'll go to

20   Line 20.

21            MS. MATTAWAY:  Your Honor, I believe it

22   should pick up at 214, Line 25, and I believe that it

23   should go through 217, 11.

24            Then the next section, 12 through 15 --

25            THE COURT:  Wait.  Wait.

Proceedings

1          MS. MATTAWAY:  -- is I.D.

2          THE COURT:  Are you consenting to that so

3     far?

4          MS. MATTAWAY:  How far did you want to go

5     on 217?

6          MR. BRUNO:  I agree to 11.

7          MS. MATTAWAY:  Okay, to 11, right, and

8     then we disagreed.  I believe the identification in

9     court is responsive.  Counsel disagreed.  Lines 12

10    through 15 on Page 217 actually continuing down

11    though Line 25 and Line 1 on 218.

12         MR. BRUNO:  Yes, the identification in

13    court -- if I recall, maybe I'm wrong, if I recall,

14    they asked for description.  The identification in

15    court is not a description.  It's a matter of picking

16    out the fair-complexioned male Hispanic sitting

17    between two white guys with suits on.

18         THE COURT:  In this regard, again, the

19    jury's note is very specific.  They want descriptions

20    of the subsequent argument and the shooting.  I would

21    not allow that portion, the in-court identification.

22         MS. MATTAWAY:  So, we stop at Line 11,

23    sir?

24         THE COURT:  Correct.

25         MS. MATTAWAY:  Okay.

Proceedings

1           Now, the People submit that the next time
2   read back continues from this point should not begin
3   until Page 232, Line 25, but I believe Mr. Bruno
4   disagrees.
5           MR. BRUNO:  The defense says we should
6   next go to 218, 3 through 19.
7           MS. MATTAWAY:  And I submit it's post
8   shooting, and it's nonresponsive.
9           MR. BRUNO:  I submit again it's another
10  example of trying to sanitize the read back to the
11  gross benefit of the People.
12          THE COURT:  I agree with the People and,
13  again, I think the jury's note is very specific.  Is
14  that the only objection the defense has are those
15  pages?
16          MR. BRUNO:  I'd ask for one moment.
17          THE COURT:  Sure.
18          (Brief pause in the proceedings.)
19          MR. BRUNO:  I had maintained that we
20  should next pick up at 229, Line 22, and I'm saying
21  we should go to 229, Line 22 and continue to 230 at
22  Line 7.
23          MS. MATTAWAY:  And I submit that the trial
24  testimony was clear that the witness, Mr. O'Brien,
25  did not notice or know that Shaka was shot until

1    after the shooting and, therefore, everything on Page

2    230 was after the shooting when he asked Patchy to

3    pull his gun, so it is therefore nonresponsive to the

4    jury's note which wants the shooting, in other words,

5    prior to Shaka being discovered dead.

6              THE COURT:  I'm sorry.  Mr. Bruno, where

7    did you want to stop on Page 230?

8              MR. BRUNO:  I was saying stop at 230, Line

9    7.

10             THE COURT:  I would agree with Mr. Bruno

11   as to that.  It appears that it is describing the

12   actual shooting incident.

13             MS. MATTAWAY:  Okay.

14             THE COURT:  So, it should go in.

15             MS. MATTAWAY:  229, 22 through 230, Line 7

16   is in?

17             THE COURT:  Correct.

18             MS. MATTAWAY:  Okay.

19             MR. BRUNO:  What did you say about 232?

20             MS. MATTAWAY:  I think it shouldn't start

21   until Line 25.

22             MR. BRUNO:  I see.

23             MS. MATTAWAY:  Second word.

24             MR. BRUNO:  Well, I'm saying to start at

25   Line 1 because it makes reference to who was armed

Proceedings

1      within the theater.

2                    MS. MATTAWAY:  And I say they want the

3      shooting and the argument, and I submit that whether

4      or not people were armed in the theater is similar to

5      the seats they had in the theater, it's not what the

6      jury wants.  They know who was armed by now.  They

7      just want to know the timing of the shots and things

8      like that, I believe.

9                    MR. BRUNO:  Your Honor, what we have here

10     is a shooting in a crowded theater in which there is

11     potentially as many as four rounds that we can

12     account for.  To say it's irrelevant whether the

13     accomplices of the deceased had guns and may have

14     fired is just, I mean, foolish.

15                    MS. MATTAWAY:  It's not summations, sir;

16     it's responding to a jury note.

17                    MR. BRUNO:  Listen.  Don't mention

18     summations again.  If you want to bring in more

19     pictures of popcorn like a horse's ass, feel free to.

20     That was most undignified, opening night, popcorn and

21     theater tickets.  That comforted the victim's family.

22     That's how serious this murder was.  It's opening

23     night, popcorn and tickets.

24                    Don't comment on summation again because

25     I'll tell you how silly yours was.

Proceedings

1            THE COURT:  Are you guys finished?

2            MR. BRUNO:  Yes, sir.  Thank you.

3            THE COURT:  Can I go back to what I have

4       to do?

5            MR. BRUNO:  Yes, sir.  Thank you.  Forgive

6       me.  This is two days already about summation.

7            THE COURT:  We need to finish this and

8       give them their read back.

9            We will pick up on Page 232 at Line 24

10      technically.  Again, this is information we are

11      responding to the jury's specific request.

12           MS. MATTAWAY:  I believe it should

13      continue to 233, Line 2.

14           MR. BRUNO:  No.  I, of course, disagree

15      for the same reasons.  Again, it's so blatant.  She's

16      sanitizing because following that is the part about,

17      yeah, go ahead.  See, all that talking is what

18      escalates the argument and the resulting level of

19      violence.  I mean, just skipping the page, you don't

20      go into we don't care, I was strapped, we are four

21      dudes, he was one.  I mean, to ignore that is to just

22      try to make this like there is one aggressor and that

23      these people stood there as though they were saying

24      their evening prayers, and that's just not giving the

25      jury the proper interpretation.

Proceedings

1              Anyway, in any event, my proposal was that

2      we start as the D.A. indicated, but then we end at

3      234, 16.

4              THE COURT:  Ms. Mattaway, where do you

5      want to end?

6              MS. MATTAWAY:  I wanted to end at 233,

7      Line 2, and I compare any thoughts Mr. O'Brien had to

8      himself or any testimony between himself and counsel

9      about who was strapped or whether they were strapped

10     is akin to the seats they had in the theater.  It's

11     not responsive to the jury's question, which is they

12     wanted to know the argument and the shooting.

13             THE COURT:  Well, we are going to end at

14     Page 233, Line 7.  The next question relates to what

15     the witness said at the time of the confrontation.

16             MR. BRUNO:  Your Honor, if you would allow

17     it, this last decision of yours I really must

18     elaborate on.  I think you have compounded, most

19     respectfully, compounded the error.  Now you're

20     saying, okay, we'll go to Line 7 in which he's saying

21     in substance, I'm not concerned because we're four

22     dudes.  It's obvious more dramatic is the fact they

23     are strapped.  You're in effect cutting out the

24     compelling reason why he didn't care about a man

25     possibly going for a gun.

Proceedings

1           THE COURT:  Your exception is noted for

2      the record, but, again, the jury has made a specific

3      request describing the events.  I'm including that

4      extra thing because it contains his comment to the

5      individual he had the confrontation with at the

6      concession stand which is, I believe, in line with

7      the jury's specific request.  The rest of it does not

8      go to their request.  Your exception is noted for the

9      record.

10          Next section.

11          MS. MATTAWAY:  I submit it should begin --

12     withdrawn.

13          We both agreed on the next two sections,

14     and I believe it should start next at 242, 11 and

15     continue to 243, 11.

16          MR. BRUNO:  And I propose we start at 242

17     11, but that we then end at 245, 25.

18          MS. MATTAWAY:  Your Honor, can I just

19     state I actually agree with counsel now that I read

20     it, Line 16 on Page 243.  I apologize.  I missed the

21     sustained thing.  I think it should go through 245,

22     14.

23          Is that what you said, Counsel?

24          MR. BRUNO:  Give me one moment.  I said

25     245, 25.

1      MS. MATTAWAY:  You're right because this

2  is sustained.  I concur with counsel, sir.

3      So, we are starting at 242, 11 going

4  through 245, 25; is that what we're saying?

5      MR. BRUNO:  Yes.  We agree to it, if his

6  Honor approves, sure.

7      Next in dispute is 246, correct?

8      MS. MATTAWAY:  Yes.

9      MR. BRUNO:  I was urging that we read 246,

10  21 through 247, 6.

11      MS. MATTAWAY:  And I submit this is post

12  shooting when Patchy is chasing him.  It's irrelevant

13  -- I'm sorry, nonresponsive.

14      THE COURT:  It appears to me to be post

15  shooting also.

16      MR. BRUNO:  Am I correct we have agreed to

17  247, 14 through 18?

18      MS. MATTAWAY:  Yes.

19      MR. BRUNO:  My notes show the next bone of

20  contention is on 249.

21      MS. MATTAWAY:  I believe it should start

22  with the redirect at Line 11 on Page 249 when the

23  witness describes the defendant's appearance in

24  court.

25      MR. BRUNO:  You see, again, what I argued

Proceedings

1    in one other instance, this goes to present

2    appearance, not a description that he may have given,

3    and, again, one cannot escape that the identification

4    in court was a ground ball.  I mean, you know, it was

5    a matter of choosing.  At that point, he had to

6    choose Jimenez or one of the court officers.

7            THE COURT:  On this one, I tend to agree

8    with defense.  Those first couple of questions are

9    referring to the identification and, again, it's not

10    what the jury asked for, so we will not start at Line

11    11; we'll start at Line 20.

12            MS. MATTAWAY:  So, it's 249, Line 20.

13            I believe it should go through 251, 23.

14            MR. BRUNO:  251, Line 23?

15            MS. MATTAWAY:  That's what I said.  And

16    then continuing 252, 5 through 20.

17            MR. BRUNO:  Well, going through to 250, 23

18    I would agree.

19            Then where do you say to pick up?

20            MS. MATTAWAY:  251, 23, you mean?  251,

21    Line 23 then continuing right into 252, 20.

22            MR. BRUNO:  I lost you.

23            MS. MATTAWAY:  I'm sorry.

24            MR. BRUNO:  I believe we were starting at

25    250, Line 6.  That's what threw me off.

Proceedings

1           MS. MATTAWAY:  Yes.

2           MR. BRUNO:  Then you're saying go nonstop

3    through 251 -- I would say through --

4           MS. MATTAWAY:  You should stop at 252,

5    Line 20 because that's after the shooting, where

6    Patchy is going after the shooting.  It's after the

7    shooting.  It's not responsive.

8           MR. BRUNO:  Again, it's a blatant attempt

9    to sanitize for your benefit.

10          Your Honor, the D.A.'s proposals are

11   consistently trying to escape the fact -- maybe I'm

12   wrong.  My interpretation as what we are calling the

13   shooting has to at least include until these parties

14   vacate the theater.

15          THE COURT:  It includes up until the point

16   the people are vacating the theater, not the actual

17   event as they vacate the theater.

18          MR. BRUNO:  So where do we stop on 252?

19          MS. MATTAWAY:  I believe we should stop at

20   Line 20.

21          MR. BRUNO:  Well, except if you want to

22   split hairs, Line 21, when Patchy is going, that

23   applies when he's first trying to get off the floor

24   and trying to exit the theater.  They say were you

25   flat, are you crouching, blah, blah, blah.  So if we

Proceedings

1        want to make the door sill of the theater the cutoff,

2        then we have to go to 24.

3                      THE COURT:  We'll stop at Line 20.

4                      MR. BRUNO:  20?

5                      THE COURT:  Yes.  If we go to Line 24, it

6        also forces us to go into a whole rendition of him

7        standing up and demonstrating and again it's not what

8        the jury has asked for.

9                      MS. MATTAWAY:  Counsel and I agreed then

10       to the next section, Judge, on Pages 254 and 255

11       except I believe it should or do we concur it should

12       stop at 13 on Page 255?

13                      MR. BRUNO:  On 254 where are you saying to

14       start?

15                      THE COURT:  I thought we agreed.

16                      MR. BRUNO:  We didn't agree to anything on

17       that page for some reason.

18                      MS. MATTAWAY:  I'm sorry.  I apologize.

19                      MR. BRUNO:  I have us starting again.

20                      MS. MATTAWAY:  Okay, 254.

21                      MR. BRUNO:  I'm saying start with the

22       first question, start with Line 2.

23                      MS. MATTAWAY:  254, Line 2.

24                      MR. BRUNO:  Muzzle flash clearly is in the

25       theater.

Proceedings

1          MS. MATTAWAY:  I agree.

2          MR. BRUNO:  I'm saying start at Line 2.

3     Do we agree?

4          MS. MATTAWAY:  Yes, we agree.

5          MR. BRUNO:  Let me see how far we should

6     go, however.  Then I have marked that we would stop

7     at 255, 13.

8          MS. MATTAWAY:  I agree.

9          MR. BRUNO:  So then we agree on that.  I

10    think that's the end -- no, it's not.  I'm sorry.  I

11    have us next going to 257, 7.

12         MS. MATTAWAY:  One moment.  Page 257?

13         MR. BRUNO:  7 through 17.

14         MS. MATTAWAY:  I don't think that needs to

15    come in.

16         MR. BRUNO:  Okay.

17         MS. MATTAWAY:  I think that's going back

18    to his state of mind, and I think it's ambiguous, at

19    which time he felt he was all right.

20         MR. BRUNO:  But a couple of statements ago

21    when he said because we were four dudes, that was

22    okay, but now because there are guns mentioned,

23    again, your Honor, I think we can't escape the

24    pattern.  The last ruling of yours that I took strong

25    exception to was when we cut it off, we were four

Proceedings

1    dudes, but it includes strapped.  Never mind what I

2    was thinking.  Now he says right now you made your

3    statement, you felt you were all right, but then we

4    mentioned that dirty word gun.  Now it's

5    objectionable.  So, you know, I think we have to

6    include 7 through 17.

7              THE COURT:  On this one I'll agree with

8    the People for the reasons I have already mentioned

9    several times.

10             MR. BRUNO:  I believe that was the end; am

11   I correct?

12             MS. MATTAWAY:  That's it.  We're done.

13             MR. BRUNO:  Most respectfully, I have to

14   make the following statement for the record, not

15   because you ruled against me, obviously, because I

16   believe it was, most respectfully, improper.

17             I want the record clear that all of the

18   portions that you would not admit that I requested, I

19   most respectfully feel that your rulings were

20   improper.  The only result was, you have heard it

21   already, the only result was we have now very

22   carefully, methodically excised from the record just

23   about every reference to the victim and his

24   accomplices being heavily armed.  I believe we can't

25   escape their being heavily armed as a factor in the

Proceedings

1    argument escalating, the violence that escalated and

2    then again, as much as its being overlooked, there is

3    clear indicia, not just a wild defense counsel, there

4    is clear indicia that one or more of the injuries or

5    death could have very likely been caused by the

6    victim and/or his accomplices and that's been totally

7    excised and sanitized from this read back.

8              THE COURT:  Do you wish to be heard?

9              MS. MATTAWAY:  No, sir.

10             THE COURT:  At the risk of sounding

11   redundant, my rulings were based on the jury's

12   request which I believe was very specific and speaks

13   for itself.

14             Your exception to my ruling is noted.

15             We'll take a brief break and then we'll

16   bring them in to give them the read back.  They have

17   been informed we were working on pulling out the read

18   back.

19             (A recess was taken.)

20             THE COURT OFFICER:  You want the

21   alternates?

22             THE COURT:  Yes, get the alternates.

23             (Whereupon, the alternates enter the

24   courtroom.)

25             (Whereupon, the jury enters the

Proceedings

1    courtroom.)

2                THE COURT:  Good afternoon.  I hope you

3    had a good lunch.  It took us a little bit longer to

4    put together this final read back than we

5    anticipated.  I do apologize, but we'll now proceed

6    with the last note we received from you which says:

7    "We, the jury, request to hear the

8    previously-requested testimony of Andrew O'Brien.

9    Afterwards, we'll return to deliberate.  We'll now

10   give you that read back.

11               (Whereupon, the requested portion was read

12   by the reporter.)

13               THE COURT:  You may return to the jury

14   room and continue your deliberations.

15               (Whereupon, the jury exits the courtroom.)

16               (Whereupon, the alternate jurors exit the

17   courtroom.)

18               (Whereupon, a recess was taken.)

19               (Whereupon, the alternate jurors enter the

20   courtroom.)

21               (Whereupon, the jury enters the

22   courtroom.)

23               THE COURT:  We have another note:  "We,

24   the jury, need to break for the night.  Would like to

25   return tomorrow."

Proceedings

1              We'll suspend deliberations at this time.
2    I remind you at this point do not discuss the case
3    any further either among yourselves or with anyone
4    else.  Do not visit the location.  I believe I told
5    you already you should only deliberate when all 12 of
6    you are together.  Have a good evening.  I'll see you
7    tomorrow morning.
8              (Whereupon, the jury exits the courtroom.)
9              (Whereupon, the alternate jurors exit the
10   courtroom.)
11             THE COURT:  Okay.  I'll see you tomorrow.
12             (Whereupon, Court's Exhibit Roman Numeral
13   IX, jury note number 8, was marked.)
14             (Whereupon, the trial is adjourned to July
15   13, 2007.)
16
17
18
19
20
21
22
23
24
25

INDICTMENT NUMBER 3825-06     865

1

SUPREME COURT OF THE STATE OF NEW YORK

2

COUNTY OF THE BRONX  :  TRIAL TERM, PART 1

3

--------------------------------------X

4

THE PEOPLE OF THE STATE OF NEW YORK,

5

          - against -

6                                          VERDICT
RICARDO JIMENEZ,

7

                    Defendant (s)

8

--------------------------------------X

9

10                         851 Grand Concourse,
                          Bronx, New York.

11
                          July 13, 2007

12

B E F O R E :

13
                    HON. ROBERT TORRES,

14

15                                       J U S T I C E.

16

17  A P P E A R A N C E S:  (Same as previously noted.)

18

19                         MAUREEN NEVILLE, CSR
                          Official Court Reporter

20

21              (Jury note marked Court Exhibit 10, this

22       date.)

23              COURT OFFICER:  Jury entering.

24              (Jury enters courtroom.)

25              COURT CLERK:  Case on trial, indictment

Proceedings                          866

1    three-eight-two-five of 2006, People of the State

2    of New York versus Ricardo Jimenez.

3             The record should reflect the presence

4    of the A.D.A., the defense attorney, the defendant

5    and members of the sworn jury.

6             THE COURT:  Be seated.

7             We have received a note:  We the jury

8    have reach a verdict.

9             Will the foreperson please stand.

10            COURT CLERK:  Members of the jury, how

11   say you as to count number one of the indictment

12   charging the defendant, Ricardo Jimenez, with the

13   crime of murder in the second degree, do you find

14   the defendant guilty or not guilty?

15            JURY FOREPERSON:  We find the defendant

16   guilty.

17            COURT CLERK:  Verdict stands recorded,

18   your Honor.

19            THE COURT:  Do you wish to poll the

20   jury?

21            MR. BRUNO:  Please do, sir.

22            THE COURT:  Poll the jury, please.

23            COURT CLERK:  You may be seated.

24            Members of the jury, harken to your

25   verdict as it stands recorded, you have said

Proceedings                    867

1          through your foreperson, each of you have said

2          that you find the defendant, Ricardo Jimenez,

3          guilty of murder in the second degree.

4                    Juror number one, is that verdict?

5                    JUROR NUMBER ONE:  Yes, guilty.

6                    COURT CLERK:  Juror number two, is that

7          juror verdict; yes or no?

8                    JUROR NUMBER TWO:  Yes.

9                    COURT CLERK:  Juror number three, is

10         that your verdict?

11                   JUROR NUMBER THREE:  Yes.

12                   COURT CLERK:  Juror number four, is that

13         your verdict?

14                   JUROR NUMBER FOUR:  Yes.

15                   COURT CLERK:  Juror number five, is that

16         your verdict?

17                   JUROR NUMBER FIVE:  Yes.

18                   COURT CLERK:  Juror number six, is that

19         your verdict?

20                   JUROR NUMBER SIX:  Yes.

21                   COURT CLERK:  Juror number seven, is

22         that your verdict?

23                   JUROR NUMBER SEVEN:  Yes.

24                   COURT CLERK:  Juror number eight, is

25         that your verdict?

Proceedings                    868

```
 1                  JUROR NUMBER EIGHT:  Yes.
 2                  COURT CLERK:  Juror number nine, is that
 3      your verdict?
 4                  JUROR NUMBER NINE:  Yes.
 5                  COURT CLERK:  Juror number ten, is that
 6      your verdict?
 7                  JUROR NUMBER TEN:  Yes.
 8                  COURT CLERK:  Juror number eleven, is
 9      that your verdict?
10                  JUROR NUMBER ELEVEN:  Yes.
11                  COURT CLERK:  Juror number 12, is that
12      your verdict?
13                  JUROR NUMBER:  Yes.
14                  COURT CLERK:  Verdict stands as
15      recorded, your Honor.
16                  THE COURT:  I wish to thank the jury for
17      your service. I'm going to infringe on you a few
18      more minutes and ask you to go back to the jury
19      room and wait for me.
20                  (Jurors exit).
21                  THE COURT:  Defendant will be remanded
22      for sentence.  Any date as of August 6th will be
23      fine.
24                  MS. MATTAWAY:  Within the first two
25      weeks preferably.
```

Proceedings                        869

1                   MR. BRUNO:  How is August 6th, your

2      Honor?

3                   MS. MATTAWAY:  That's fine for me.

4                   THE COURT:  August 6th.  Defendant is

5      remanded.

6                   MS. MATTAWAY:  The record should

7      reflect the members of the deceased's family will

8      wish to make a victim impact statement on that

9      date.

10                  I will also file it in writing.

11                  MR. BRUNO:  Thank you, sir.

12                  THE COURT:  Thank you all.

13                  August 6th for sentence.

14                           *****

15     CERTIFIED THAT THE FOREGOING is a true

16     and correct transcript of the original

17     stenographic minutes.

18     _Catherine Mercorella_____

19

20

21

22

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF BRONX: CRIMINAL TERM: PART 40

3   ------------------------------------------X
                                              :Indictment
4   THE PEOPLE OF THE STATE OF NEW YORK        :No. 3825/06
                                              :
5              -against-                       :
                                              :
6   RICARDO JIMENEZ,                           :125.25
                                              :
7              Defendant.                      :Sentencing

7   ------------------------------------------X

8
                                    851 Grand Concourse
9                                   Bronx, New York

10                                  August 16, 2007

11   B E F O R E:

12           HONORABLE ROBERT TORRES,

13                      Supreme Court Justice

14   A P P E A R A N C E S:

15           ROBERT T. JOHNSON, ESQ.
             District Attorney Bronx County
16           BY:   LISA MATTAWAY, ESQ.
                   Assistant District Attorney
17
             PATRICK L. BRUNO, ESQ.
18           Attorney for Defendant
             99 Tulip Avenue
19           Floral Park, New York

20              *         *         *

21                      BONNIE DUNEFSKY
                        Senior Court Reporter

22

23

24   FILED

     MAY 1 2
25
     SUPREME COURT CLERK'S OFFICE
     BRONX COUNTY

Proceedings

1          THE CLERK:  Calendar number nine,

2     indictment 3825 of 2006, and calendar number 10,

3     docket 25231C of 2006, both belonging to defendant

4     Ricardo A. Jimenez.  Defendant is produced and before

5     the court.  Counsels, appearances.

6          MR. BRUNO:  For the defendant, Patrick L.

7     Bruno, 99 Tulip Avenue, Floral Park, New York.  Good

8     afternoon, sir.

9          MS. MATTAWAY:  Lisa Mattaway for the Office

10    of the District Attorney.  Good afternoon, sir.

11         THE COURT:  Good afternoon.  Before we get

12    started with the real business at hand, let me deal

13    with this misdemeanor first.  My understanding is that

14    there is no disposition on this and --

15         MR. BRUNO:  Yes, there is no disposition.

16         THE COURT:   -- it will go to trial.

17         MR. BRUNO:  Yes, sir, no disposition.

18         THE COURT:  Misdemeanor matter, calendar

19    number 10, 25231 of 2006 is being adjourned to T-1 for

20    September 18 for trial.

21         MR. BRUNO:  Thank you.

22         MS. MATTAWAY:  Thank you, sir.

23         THE COURT:  With regards to the sentence

24    matter, there is a pending motion I need to address

25    before we proceed.  Does either side wish to add

Proceedings

1    anything to their moving papers before I address the

2    motion?

3                    MR. BRUNO:  The defendant has nothing to

4    add.  Thank you.

5                    MS. MATTAWAY:  The People rely on the

6    record and the papers filed with this Court.

7                    THE COURT:  The records should reflect that

8    the People's original response has not reached the

9    Court.  However, when Mr. Bruno checked in early this

10   morning, he was kind enough to lend me his copy for a

11   few minutes.  I made a copy of it and I read the

12   People's response.  I am prepared to render a decision

13   at this time in light of reading the People's

14   response.  I am not handing out the written decision I

15   have because based on that response, I need to add a

16   couple of lines, nothing that will, that affects my

17   ruling directly.  I will provide both sides the

18   written decision, should be in the file -- actually,

19   I'll mail each one of you a copy, and that should be

20   out no later than tomorrow afternoon.

21                   MR. BRUNO:  Thank you.

22                   THE COURT:  The motion pursuant to Criminal

23   Procedure Law 330.30(2) was filed before the Court,

24   requesting that the verdict be set aside based on

25   inappropriate conduct by jurors.  I have reviewed the

Proceedings

1   moving papers, the statute, the appropriate case law.

2   I have now reviewed the People's response.  I have

3   also reviewed the trial transcripts starting when the

4   jury started their deliberations through verdict and

5   all the jury notes and the responses thereto and the

6   interactions.  My written decision will contain my

7   actual -- will be the decision, but for the purposes

8   of this proceeding, the motion is being denied.

9            I do not believe the allegations rise to

10  the level of -- do not set forth a legal basis to

11  entertain such a motion.  Therefore, no hearing would

12  be required.  I will also note that in the middle of

13  these deliberations each individual juror,

14  deliberating juror, as well as each alternate, there

15  was an occasion that they were individually

16  interviewed because of some issues raised by this very

17  same juror, and they had ample opportunity to call

18  various matters to the Court.  They did not avail

19  themselves of that.

20           I do not see holding a hearing that would

21  change anything.  I also note for the record at this

22  time that juror number 10, that the jury was polled,

23  and juror number 10 did affirm the guilty verdict.

24           Based on the findings and legal arguments

25  contained in my written decision, the motion is

Proceedings

1    denied.

2              MR. BRUNO:  Please note my exception, of

3    course, sir.

4              THE COURT:  So noted.  Are there any other

5    matters I need to address before we proceed with the

6    sentence?

7              MR. BRUNO:  No, your Honor.

8              MS. MATTAWAY:  No, sir.

9              THE COURT:  Both sides have read the

10   presentence report?

11             MS. MATTAWAY:  Yes, sir.

12             THE COURT:  And Mr. Bruno, for the purposes

13   of this proceeding, you waive any statutory time?

14             MR. BRUNO:  I have read the presentence

15   report.  I waive any further delay for sentencing,

16   sir.

17             THE CLERK:  Mr. Jimenez, you are being

18   arraigned for sentencing on indictment 3825 of 2006.

19   Before the judge passes sentence in this matter, the

20   Court will allow the district attorney's office to

21   make a statement in regards to your sentence, the

22   Court will then allow your defense counsel to make a

23   statement, and finally the Court will allow you to

24   make a statement in regard to your sentence.

25             People.

Proceedings

 1              MS. MATTAWAY:  Your Honor, this defendant
 2      stands here before you about to be sentenced convicted
 3      of murder in the second degree.  The People, of
 4      course, recommend that you impose the statutory
 5      sentence.  As the People stated on the date of the
 6      verdict, many members of the deceased's family,
 7      specifically his mother, his children, his sister, who
 8      testified at trial as a witness, and additionally, his
 9      fiance, would like to make statements before this
10      Court.  Four of those people are present, the
11      deceased's mother, his two children, and his sister.
12              On behalf of the deceased's fiance, Tanya
13      Anderson, I'd like to read a brief statement that she
14      gave to me to read into the record.
15              "The day Sean was killed was one of the
16      worst days of my life.  The only way I was able to
17      survive was to look at our child Adeile and realize I
18      had to be strong for her.  You took away a father, a
19      son, a brother, my future husband.  You sir
20      Mr. Ricardo deserve to sit in a cell for the rest of
21      your life.  You destroyed a family because you were
22      unable to control your anger.  Your family may be
23      hurting now, but they can see you, write you.  We are
24      not afforded that luxury.  I continue to suffer the
25      pain of Sean's vicious murder.  I'm so glad after all

Proceedings

1     this time and long years, you were finally caught.

2     Now we the family can finally have some closure."

3              At this time, your Honor, I would ask the

4     deceased's mother, Marva M-A-R-V-A Worrell, to step

5     forward.

6              MS. MARVA WORRELL:  Today I want to thank

7     Judge Torres --

8              THE COURT:  Can you speak just a little bit

9     louder, please?  I'm having trouble hearing you.

10             MS. MARVA WORRELL:  Judge Torres, thank

11    you.  Lisa Mattaway, you did a wonderful job.  Today

12    as I stand here, there are no witness.  We both lost,

13    his family and mine.  The --

14             THE COURT:  The reporter has to take down,

15    ma'am, what you're saying, and she is having trouble

16    hearing you also.  So I know it's difficult, but we

17    need to take this down, so just speak a little bit

18    louder.  It will help.

19             MS. MARVA WORRELL:  Today there are no

20    witness.  We are lost on both sides, my family and

21    also his family.  All I ask God is to forgive him.

22    Eighteen years is a long time for a family.  We have

23    lost so much in the 18 years.  We have grieved, we

24    have suffered.  Today I ask God to have mercy on him

25    as he had mercy on his family, and I thank everyone,

Proceedings

1        the jury, Lisa Mattaway, and everyone involved in this

2        case.  It's been a long hard hall, and I thank God for

3        this day.  Thank you.

4                    THE COURT:  Thank you.

5                    MS. MATTAWAY:  At this time I ask the

6        deceased's 19 year-old daughter, Adeile Anderson, to

7        step forward.

8                    MS. ADEILE ANDERSON:  It's been 18 years,

9        one month, one week and four days since my father was

10       murdered in cold blood.  I'm not going to say that my

11       life was great without my father, but it wasn't the

12       best, but me as a daughter, I would never know how it

13       feels to have a father daughter relationship and I

14       would never get to know how my father really was even

15       though my family members say I act just like him.

16       Long story short this man has no idea what he has put

17       me and my family through, and he will never know, but

18       he will have the rest of his years coming to him

19       thinking about it in his cell, and that's all I have

20       to say.

21                   THE COURT:  Thank you.

22                   MS. MATTAWAY:  At this time I ask the

23       deceased's 18 year-old daughter, Shanice Cyprien, to

24       step forward, please.

25                   MR. BRUNO:  May I be heard, your Honor?  I

Proceedings

1      thought the statute calls for one spokesperson to be

2      agreed upon.

3                  THE COURT:  Let's just finish this now.   It

4      would be counterproductive to stop now.  Go ahead.

5                  MS. CYPRIEN:  Again, it's been 18 years

6      since my father Sean Worrell's murder, and the

7      devastation of our loss still lives til this very day.

8      We are more than happy to know that justice is being

9      served on behalf of my father's case, but the truth is

10     no matter what happens, my father will never be --

11     will never come back.  My sister and I were extremely

12     young when our father died, so the thought of him is

13     just another memory, is just lost memories.  When I

14     realized that I would never get to hear my father's

15     voice or even just give him a hug and not being able

16     to have the opportunity to do those things, it leaves

17     you with empty emotions.  There really is no happiness

18     and joy for me because all I want is something I never

19     had and will never have ever and that is the

20     opportunity for my father to be here today.

21                 THE COURT:  Is that it, Ms. Mattaway?

22                 MS. MATTAWAY:  Yes.  Finally I ask the

23     deceased's sister, Lisa Worrell, to step forward.

24                 MR. BRUNO:  Your Honor, I once again renew

25     my objection.  This is way beyond what the statute

Proceedings

1    calls for.

2              THE COURT:  So noted.

3              MS. LISA WORRELL:  First I'd like to thank

4    Judge Torress, the district attorney Lisa Mattaway,

5    Detective Stratford and the jurors for all their

6    dedication and hard work during this trial.  On July

7    3, 1989 something life altering happened to my brother

8    Sean Anthony Worrell was murdered.  My brother was --

9    it was so devastating to my family and most

10   importantly to my mother.  I watched my mother grieved

11   every day and every night and wanted so much to ease

12   her pain.  I prayed and I prayed and asked God to

13   grant me a son to help her through this time.  One

14   year later my son was born, October 24, 1990.  Once

15   again I saw a smile on my mother's face and I was

16   happy to do that for her.  You sir have took away a

17   son, a father, a brother, and uncle and most

18   importantly a life.  You showed no remorse and no

19   respect for human life.  I pray today that this

20   sentencing, my brother can finally get justice that he

21   deserves.  Thank you.

22             MS. MATTAWAY:  Thank you.

23             THE COURT:  Mr. Bruno.

24             MR. BRUNO:  Yes.  Your Honor, I start out

25   by saying, perhaps out of respect and deference to the

Proceedings

1       Worrell family, that I too come here acknowledging,

2       I'm a husband, a father, a brother, an uncle, a

3       nephew, etcetera, and I understand their pain, but my

4       role here today is one role.  I'm the attorney, the

5       advocate for Mr. Jimenez, so I'm compelled to

6       emphasize the two following points:

7              Number one, since all these people just

8       spoke beyond the statute, I must point out and remind

9       your Honor that this wasn't some mugging in a dark

10      alley, it wasn't a stick-up where they shot the owner

11      of a mom and pop store -- because this impacts on

12      sentence.  This wasn't some cold-blooded bizarre

13      murder.  This was a silly argument in a theater in

14      which the dead guy, Sean Worrell, died, clutching a

15      .38 special that he had fired.  The cops in the case

16      chose to try to sweep it under the carpet at trial,

17      but they cannot escape clutching a .38 special stolen

18      from a Pennsylvania cop with one spent round in it.

19              In addition, he goes to this theater.  A

20      person would go to enjoy a movie with your family.

21      Not only was he armed, but the three hoods he was with

22      were all armed, one with a nine millimeter, one with a

23      357, and the fourth weapon was not identified.  This

24      wasn't a shooting of some innocent store owner, some

25      little old lady.  Forgive me, but it was the shooting

Proceedings

1   of a young man with three hoodlum friends who were

2   out, ready, willing and able to shoot and to do

3   mayhem.   That's my first point.

4                    The second point, your Honor, people are

5   saying thank you to the jury, thank you to the DA.

6   It's not sour grapes.   I tried a zillion cases.   This

7   was the most shocking verdict ever because -- and he

8   speaks for himself.   This is a fair complexion Latino

9   man.   Eight witnesses right after the murder

10  identified the shooter as a male black.   Eight,

11  including the witness they relied on most of all,

12  Blalock(ph).   Blalock for the first six days after the

13  shooting maintained it was a male black.   All of a

14  sudden it's Ricardo Jimenez.   He maintains his

15  innocence, and I thought the verdict was an outrage.

16  I have never ever taken such a position.   I normally

17  just defer to the jury.   This verdict was an outrage.

18                    Your Honor, I know the parameters of the

19  law.   I feel terrible to have to ask for such big

20  numbers.   All I can ask you for, and I feel disabled

21  by it, I wish I could ask you for probation.   I ask

22  you to sentence my client to the minimum of 15 years

23  to life.

24                    Nothing further.   Thank you.

25                    THE COURT:   Mr. Jimenez, you have a right

Proceedings

1    to be heard before I pronounce sentence.  You can

2    consult with your attorney before you say anything.

3                  THE DEFENDANT:  All I can say right now is

4    I'm sorry for the family, what happened to their

5    family, but I didn't do it.  I never was there at that

6    movie theater when that happened.  The court system is

7    unfair, unfair trial.  You need to look deep into the

8    case.  We both had loss, my family, their brother,

9    their brother, father, nephew.  The court system needs

10   to look deeper into it.  Person sitting down there

11   done this is sitting down in federal prison, David

12   Rosario.  That's the person sitting down -- that's who

13   they want to convict for this.  The only one who knows

14   right now is me and Sean Worrell who's in his grave

15   right now.  He knows the truth and the person that

16   really did it.  I mean that's it.  He sits in federal

17   prison right now.  That's all I can say.  I'm sorry to

18   the family.  My family is at loss also now.  I got

19   kids.  That's it.  That's it.

20                  THE COURT:  I've read the presentence

21   report.  The record should reflect that I've received,

22   I forget exactly how many now, I think it's over 30

23   letters from apparently friends, family of the

24   deceased.  Sentencing is one of the more difficult

25   aspects of what I do for a living.  While it's nice to

1       hear members of the deceased's family thank the Court,

2       because the reality is the Court doesn't get thanked

3       for anything too often, there is no thanks needed.  I

4       did not do anything.  I just did my job.  I presided

5       over a trial and did everything within my powers to

6       assure that there was a fair trial to all concerned.

7                This particular trial was interesting.  It

8       was a very old case.  It had a lot of witnesses and a

9       lot of interesting aspects to it.  I really should say

10      disturbing aspects of it.  It is undisputed that over

11      an argument over a bag of popcorn a life was lost.

12      Undisputed because individuals, rather than use some

13      common sense, use some brains, chose the easy way we

14      solve all our problems is with a gun.  It happened 18

15      years ago, and things have just gotten worse.  This is

16      a tragic situation for everyone involved, family and

17      friends of the deceased's family and friends of the

18      defendant, the community at large.  So we're clear, my

19      community.  This is my community.  I appreciate

20      everyone's position in this case, and I appreciate,

21      Mr. Jimenez, that you maintain that it wasn't you.  It

22      is clear at minimum there was a ridiculous argument

23      over a bag of popcorn, somebody decided to go out and

24      get a gun.  It was equally clear that there were other

25      individuals that were also carrying firearms and shots

Proceedings

1    were fired and somebody ended up dead.  There is

2    nothing that I can say or do that's going to change

3    any of that.  There is nothing that anybody could say

4    or do at this point that could change any of that.

5            The jury found that to their satisfaction

6    beyond a reasonable doubt that individual was

7    yourself.  In the course of your life you've had many

8    contacts with the criminal justice system.  You've had

9    many convictions.  From everything I've seen, you have

10   not been the most productive member of society.  Some

11   of the things I have to take into account when I

12   sentence someone.  It is difficult for people to hear,

13   I do not take into account necessarily the background

14   of the deceased.  I do take into account the facts and

15   circumstances surrounding the incident.  When I go out

16   and speak to community groups, I always tell them no

17   matter what I say in the courtroom, there is always

18   people who are upset with me.  I accept that.  I chose

19   to do this for a living.  To a very large extent, what

20   my sentence will be in this case is irrelevant.  It's

21   not going to change anything, not going to make

22   anything better or worse one way or the other.

23           That being said, I sentence you to a term

24   of imprisonment of 22 years to life.  The mandatory

25   surcharges must be imposed.

Proceedings

1          MR. BRUNO:  Good day, your Honor.

2          THE COURT:  Good day.

3                    *         *         *

4

5     The foregoing is hereby certified to be a true and

6     accurate transcript of the proceedings as transcribed

7     from the stenographic notes.

8

9

10

11                    BONNIE DONEFSKI

12                    Senior Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25