UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
RICARDO JIMENEZ,
                              Petitioner,

                -v-

HAROLD GRAHAM, as Superintendent
of Auburn Correctional Facility, and THE
ATTORNEY GENERAL OF THE
STATE OF NEW YORK,
                              Respondents.
```

11-CV-6468 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this action, a petition for a writ of habeas corpus under 28 U.S.C. § 2254, Ricardo

Jimenez seeks relief from a state court conviction for second-degree murder.  Jimenez raises,

among other things, claims under *Brady v. Maryland*, 373 U.S. 83 (1963).  For the reasons that

follow, the petition is granted.

I.      **Background**

The following facts are taken from the operative petition (Dkt. No. 37 ("Pet.")) and

attached exhibits and are undisputed, unless otherwise noted.

On July 3, 1989, Sean Worrell was shot and killed during a showing of *Batman* at a

Bronx movie theater after an earlier confrontation with the shooter at the concession stand.  (Pet.

¶ 15.)  Several witnesses to the argument or the shooting described the perpetrator to the police

as a Black man with bleached blond stripes in his hair and a Jamaican accent.  (Pet. ¶ 15; Dkt.

Nos. 37-21 at 38, 39; 37-22 at 29.)  Within days of the shooting, a theater employee, Esco

Blaylock, was interviewed and stated that he witnessed both the confrontation and the shooting.

(Pet. ¶ 16.)  He additionally stated that the shooter's name was "Leon" and described him as

"5'10", 175 Lbs., high-top haircut with shaved sides and two blond streaks running along the side of the head but not meeting in the back . . . . [with] a gold tooth on the upper right side of the mouth that can be taken off.  Mr. Blaylock said that Leon looks Puerto Rican and can mimick [*sic*] a Jamaican accent . . . .  Leon drove a Maxima-Grey, 1989 . . . and lived at 1057 Boynton Avenue."[1]  (Dkt. No. 37-21 at 30.)  A few days later, Blaylock was again interviewed and stated that Leon had a girlfriend named Sharon Ramroop.  (Dkt. No. 37-21 at 33.)  When Ramroop was interviewed, she said she knew a Leon who was Jamaican and Indian, drove a gold Maxima, had a flat-top haircut, and dated a girl named Tamy.  (Dkt. No. 37-21 at 34.)  About a week after the shooting, Blaylock identified petitioner Ricardo Jimenez as the shooter in a single-photo identification procedure.  (Pet. ¶ 16.)

Jimenez was then detained.  But Blaylock failed to show up for a lineup the next day and recanted his claim of seeing the shooting.  (Pet. ¶ 16.)  Though there had been several individuals who claimed to have witnessed the confrontation and shooting, no other witnesses were called to view the lineup.  (Pet. ¶¶ 15–16, 217, 221; *see also* Dkt. Nos. 37-21 at 38, 39, 43; 37-22 at 29.) Jimenez was released.

Almost a decade passed.  Around 2000, NYPD Cold Case Detective Wendell Stradford spoke on the phone to an incarcerated individual, Andrew O'Brien, who had witnessed the shooting, and who had since been placed in protective custody pursuant to a cooperation agreement for an unrelated federal racketeering conviction in Virginia.  (Pet. ¶ 103.)  Stradford then contacted federal authorities and obtained some files about O'Brien.  (Pet. ¶ 103.)  After reviewing these documents, Stradford met with O'Brien, who identified Jimenez, with whom he

---

[1] According to police reports, Jimenez's last known address at the time was 875 Taylor Avenue.  (Dkt. No. 37-21 at 37.)

had no familiarity, as the shooter in an unrecorded and largely undocumented photo array procedure.  (Pet. ¶¶ 16–18, 103; Dkt. No. 37-17 at 50.)

However, the case remained dormant for another five years.  In 2006, Stradford re-interviewed Blaylock, who reversed course once more and selected Jimenez in a photo array. (Pet. ¶ 18.)  Jimenez was arrested in August 2006 and indicted for murder.  (Pet. ¶ 19.)  Soon after arriving at Rikers Island, Jimenez allegedly confided in a fellow incarcerated individual, Kevin Morrissey, that he was the shooter.  (Pet. ¶¶ 19, 145.)  In late September 2006, Morrissey attempted to contact Assistant United States Attorneys ("AUSAs") in the Eastern District of New York, where he had previously been prosecuted, requesting that the AUSAs contact Assistant District Attorney ("ADA") Anna Villa in the Bronx, who Morrissey claimed was handling the case against Jimenez.  (Pet. ¶ 142.)  Though there was no ADA named Anna Villa, ADA Ana Vizzo had represented the State in Jimenez's arraignment on September 1, 2006, and her name had been mentioned in a September 6, 2006 *New York Post* article about the case.  (Pet. ¶ 143 n.22; Dkt. No. 37-17 at 139.)

Trial commenced in New York Supreme Court, Bronx County, in June 2007.  In the absence of physical evidence, the case relied almost entirely on eyewitness identifications by Blaylock and O'Brien and the testimony of Morrissey.  (Pet. ¶ 19.)  On August 16, 2007, after five days of deliberation, the jury convicted Jimenez of second-degree murder.  Jimenez was sentenced to twenty-two years to life imprisonment.  (*Id.*)

On direct appeal to the First Department of the Appellate Division, Jimenez asserted various constitutional and non-constitutional claims.  On March 11, 2010, the Appellate Division affirmed the conviction.  *See People v. Jimenez*, 896 N.Y.S.2d 69 (1st Dep't 2010).  Jimenez

sought leave to appeal to the New York Court of Appeals, which was denied on June 30, 2010.

*See People v. Jimenez*, 15 N.Y.3d 752 (2010).

In September 2011, Jimenez initiated state collateral proceedings by filing a motion to

vacate his conviction in New York Supreme Court, Bronx County, under N.Y. Crim. Proc.

§ 440.10(1).  (*See* Dkt. No. 37-5 at 45.)  On March 4, 2014, the Bronx Supreme Court denied the

motion without a hearing.  (*See* Dkt No. 37-5 at 1–44.)  The Appellate Division reversed and

remanded in part, granting the vacatur motion "to the extent of remanding the matter for a

hearing on whether the People committed a violation pursuant to *Brady v. Maryland* by not

disclosing the terms of an agreement to assist in a sentence reduction for People's witness

Andrew O'Brien, if such an agreement existed."  *People v. Jimenez*, 37 N.Y.S.3d 225, 236 (1st

Dep't 2016) (citation omitted).  It explained, "Were defendant to establish at a hearing that the

prosecutor knew that O'Brien had been given a specific quid pro quo for his testimony, it could

be concluded that there is a reasonable probability that had the jury been aware of that fact, its

verdict would have been different, thus requiring reversal of the conviction and a new trial."  *Id.*

at 235.

On remand, the Bronx Supreme Court conducted a hearing in which it heard testimony

from Lisa Mattaway, the ADA who had tried the case against Jimenez, Detective Stradford, and

O'Brien.  (Pet. ¶ 23.)  The affidavit of David Novak, the AUSA in O'Brien's federal racketeering

case, was entered into the record by stipulation.  (*Id.*)  The court denied the vacatur motion once

more, concluding that there had been no *quid pro quo* agreement between Mattaway and O'Brien

and that the State had fully satisfied its *Brady* obligations.  (*See* Dkt. No. 37-3 at 1–4.)[2]  Leave to

---

[2] Jimenez moved to reargue this decision.  The Bronx Supreme Court orally denied the motion on April 3, 2019, and then on August 26, 2019, the court issued a written decision.  (*See* Dkt. No. 56-1.)

appeal to the Appellate Division was denied.  *See People v. Jimenez*, 2018 N.Y. Slip. Op.

87587(U) (1st Dep't 2018).  And leave to appeal to the New York Court of Appeals was denied.

*See People v. Jimenez*, 2019 N.Y. Slip Op. 66214(U) (1st Dep't 2019).

In the interim, Jimenez initiated federal habeas proceedings.  On September 9, 2011,

Jimenez filed a petition for a writ of habeas corpus in this Court.  (Dkt. No. 2.)  The Court stayed

all proceedings pending the outcome of the state court proceedings.  (*See* Dkt. No. 12.)  On April

24, 2019, after the stay was lifted, Jimenez filed an operative second amended petition for a writ

of habeas corpus.  (*See* Pet.)

## II.   Legal Standard

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty

Act ("AEDPA"), a federal court may not grant a petition for a writ of habeas corpus by a person

in state custody for any claim "adjudicated on the merits"

> unless the adjudication of the claim — (1) resulted in a decision
> that was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme
> Court of the United States; or (2) resulted in a decision that was
> based on an unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), "[c]learly established" federal law means "the holdings, as opposed

to the dicta," of the decisions of the United States Supreme Court "as of the time of the relevant

state-court decision."  *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v.*

*Taylor*, 529 U.S. 362, 412 (2000)).  A decision is "contrary to" clearly established federal law if

the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a

question of law or if the state court decides a case differently than [the Supreme Court] has on a

set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  A decision involves an

"unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*  In either case, habeas relief is permitted under § 2254(d)(1) only if there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Similarly, under § 2254(d)(2), a factual determination by a state court "will not be overturned . . . unless objectively unreasonable in light of the evidence presented in the state proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  State court findings of fact are presumed correct, and "the petitioner has the burden of rebutting this presumption by clear and convincing evidence." *Rice v. Collins*, 546 U.S. 333, 338–39 (2006).  Where "[r]easonable minds reviewing the record might disagree," that is not sufficient to displace the state court's determination. *Id.* at 341–42.  "The standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Cockrell*, 537 U.S. at 340).

## III.  Discussion

Jimenez's habeas petition raises several claims.  Because the Court concludes that Jimenez should be granted habeas relief, the Court addresses only Jimenez's successful claims.

### A.  Failure to Disclose O'Brien's Efforts to Reduce His Federal Sentence

Jimenez first seeks relief on the ground that the State violated *Brady* when it failed to disclose evidence suggesting that O'Brien was motivated to lie by the possibility of a sentence reduction.  The Court considers various sub-arguments raised by Jimenez with respect to this claim.

First, Jimenez contends that the Appellate Division unreasonably applied Supreme Court law by determining that *only* the failure to disclose a "specific *quid pro quo*" for O'Brien's testimony would violate *Brady*.  The Court agrees.  In its 2016 Opinion, the Appellate Division noted that the State had not turned over several documents, including (1) O'Brien's 1997 plea agreement in his Virginia federal case indicating that he was cooperating against his co-defendants and that a sentence reduction was possible; (2) a 1998 order granting a sentence reduction to O'Brien for that cooperation; (3) copies of letters written by O'Brien to a federal judge in 2006 and 2007 — including a few months before he testified in Jimenez's trial — seeking a further sentence reduction; and (4) emails between Novak and Mattaway discussing O'Brien's testimony in the trial and the fact that Mattaway knew he had been writing letters seeking leniency to the federal judge who had sentenced him.  *See Jimenez*, 37 N.Y.S.3d at 234. The court determined that based on this evidence, Jimenez had made a sufficient showing to warrant a hearing and directed the trial court to conduct a hearing "on whether the People committed a violation pursuant to *Brady* . . . by not disclosing the terms of an agreement to assist in a sentence reduction for People's witness Andrew O'Brien, if such an agreement existed."  *Id.* at 235.  It reasoned that had the State known that O'Brien had been given a "specific *quid pro quo* for his testimony," this would warrant reversal of the conviction and a new trial.  *Id.*

But *Brady* and its progeny require more than just the disclosure of *quid pro quo* agreements; they require that the prosecution disclose any evidence impeaching a witness's credibility.  *See, e.g.*, *Wearry v. Cain,* 577 U.S. 385, 394 (2016) (explaining that jurors "might have thought differently" about a witness had they known of "the possibility of a reduced sentence on an existing conviction"); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (concluding that failing to disclose "evidence that the defense might have used to impeach the

Government's witnesses by showing bias or interest . . . . falls within the *Brady* rule"); *Napue v. People of State of Ill.*, 360 U.S. 264, 270 (1959) (failure to disclose that the prosecution had promised a cooperating witness that a recommendation for a reduction of his sentence would be made if he testified against the defendant was material); *see also Annuziato v. Manson*, 566 F.2d 410, 414 (2d Cir. 1977) ("In evaluating bias and interest, the jury should be informed that the witness hopes for leniency.").

In *Davis v. Alaska*, the Supreme Court considered whether defense counsel had an adequate opportunity to cross-examine a witness on his motivation to testify against the defendant. 415 U.S. 308, 315 (1974). The Court explained that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17. It concluded that because counsel was "unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial," the defendant had been denied his constitutional right to effective cross-examination. *Id.* at 318. Here, the prosecution's failure to disclose these documents deprived Jimenez of an adequate opportunity to cross-examine O'Brien about his motivations for testifying.

The Appellate Division implicitly concluded that the suppressed documents alone, as opposed to an explicit *quid pro quo* agreement between the ADA or the AUSA and O'Brien, would not establish a violation of *Brady* because these documents were not material. This Court disagrees. The materiality inquiry under *Brady* turns on whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal quotation marks omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (a "reasonable

probability" is established "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial'" (quoting *Bagley*, 473 U.S. at 678)).  It "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434.  This inquiry necessarily turns on the strength of the evidence against the defendant.  *See Leka v. Portuondo*, 257 F.3d 89,104 (2d Cir. 2001).

As discussed at greater length below, the entire case turned on the testimony of two eyewitnesses, Blaylock and O'Brien, and the testimony of a jailhouse informant, Morrissey — all testifying eighteen years after the events in question.  The first eyewitness, Blaylock, originally described the shooter in a manner that did not match Jimenez, first identified Jimenez in a highly suggestive one-photo procedure, and had already once recanted his identification of Jimenez.  And as the Appellate Division determined, Morrissey's "basic untrustworthiness was evident and undisputed." *Jimenez*, 37 N.Y.S.3d at 233.[3]  Morrissey had numerous larceny and fraud convictions, had boasted about providing information in three homicide cases, and had served as an informant in as many as ten cases.  (Pet. ¶¶ 142, 154.)  Indeed, just months after

---

[3] Though the prosecution disclosed Morrissey's numerous state convictions, it failed to disclose his three federal convictions.  In the court files for these cases, there is significant documentation about Morrissey's mental health issues and his potential tendency to manipulate the truth for his benefit.  For instance, in one case from the early 1990s, the Honorable Charles P. Sifton explained that he had received "a report from a psychiatrist who says, within the bounds of medical certainty, that Morrissey is a faker, a malingerer who lies for his own advantage, and that he is not to be trusted."  (Dkt. No. 37-19 at 65.)  Morrissey later wrote to two federal judges complaining that there was a person named Ray Sanchez living inside his body who was making him do bad things.  (*See* Dkt. No. 37-19 at 71–73.)  And in a 1997 violation of supervised release hearing, Judge Sifton noted that Morrissey "has a history that on the streets you might call being a scammer."  (Dkt.No. 37-19 at 82–83.)  There are also many references to Morrissey's schizophrenia, psychiatric medications, and mental health support in Bureau of Prisons medical records.  (*See* Dkt. No. 37-20 at 1–37.)

Jimenez's trial, Morrissey testified against another individual who he claimed had also confessed to having committed the murder for which he was charged. *See Arroyo v. Eckert*, No. 18 Civ. 5819, 2020 WL 3884892, at *2 (S.D.N.Y. May 28, 2020) (report and recommendation).

O'Brien's eyewitness identification of Jimenez, with whom he had no familiarity and which he purported to be able to make eighteen years after the crime, was therefore pivotal to the State's case. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (determining that because a witness whose "reliability . . . may well be determinative of guilt or innocence, nondisclosure of evidence affecting [his] credibility falls within [the *Brady*] rule") (cleaned up); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (explaining the importance of cross-examination of testimony by individuals whose "memory might be faulty or who, in fact, might be perjurers"). Such circumstances are poles apart from a case in which the defendant's conviction was "supported by overwhelming evidence of guilt." *Leka*, 257 F.3d at 104. Rather, under such circumstances, there is a "reasonable probability" that disclosure of important evidence impeaching a key prosecution witness would have yielded a different verdict. *See, e.g.*, *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) (affirming materiality of evidence impeaching a witness who was "the centerpiece of the government's case"). Indeed, Mattaway herself stated in a letter of support for O'Brien that O'Brien's "testimony was crucial to the People's case." (Dkt. No. 37-14 at 18.) *See also Napue*, 360 U.S. at 270 ("Had the jury been apprised of the true facts, . . . it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which [the witness] was testifying.").

The State attempts to lessen the blow of its failure to disclose this information by pointing out that Jimenez's counsel mentioned in his summation that O'Brien was potentially

seeking a deal to reduce his thirty-year sentence.  (Dkt. No. 53 at 62.)  During summation, defense counsel stated, "It was significant, I submit, that O'Brien is cutting a deal that could maybe minimize the balance of 30."  (Dkt. No. 37-26 at 696:3–5.)  But this *supposition*, made by defense counsel while discussing a different witness's motivation to lie, is a far cry from what counsel could have elicited from O'Brien had the defense been aware of the relevant documents. These undisclosed documents included a 1997 plea deal in O'Brien's federal case, an order reducing O'Brien's sentence as a result of his testimony against his co-defendants, several letters from O'Brien to a federal judge seeking a sentence reduction, and emails between Novak and Mattaway about O'Brien's testimony in this case.  (*See* Dkt. Nos. 37-14 at 24–31; 37-15; 37-17 at 1–3; 37-17 at 3–7.)  At the hands of able counsel, this information could have elicited testimony from O'Brien that (1) he had previously testified in a case without a firm promise of receiving a sentence reduction, as reflected in his 1997 plea agreement; (2) he was intimately aware that his sentence could be reduced even *after* being sentenced under Federal Rule of Criminal Procedure 35, because the AUSA in his federal case, whom he was still in touch with, had filed a Rule 35 motion on his behalf; (3) he had in fact *received* such an order reducing his sentence from life to thirty years for cooperating against his co-defendants; (4) he was actively seeking a sentence reduction from the federal judge who had reduced his sentence originally[4]; (5) the AUSA and the ADA in Jimenez's case were in communication prior to Jimenez's trial about O'Brien's plan to testify; and (6) the ADA was not just putting a letter in his federal file but sending that letter to the AUSA who had previously filed a Rule 35 motion on O'Brien's behalf.

---

[4] In one of O'Brien's letters, he describes himself as a "desperate man" trying to obtain a lower sentence.  (Dkt. No. 37-17 at 5.)

Any mitigating effect of defense counsel's brief comment during summation was also outweighed by the ADA's questioning of O'Brien on his motivation to testify during direct examination.  Mattaway asked O'Brien, "What is your understanding of what if anything I can or will do for you in exchange for your testifying here today for us?"  (Dkt. No. 37-24 at 224:4–6.) O'Brien replied, "Well my understanding is that you'll just tell the Federal prosecutors that I cooperated with ya'll and that's it."  (Dkt. No. 37-24 at 224:7–9.)  Mattaway then immediately asked whether O'Brien was a "sentenced prisoner" and reiterated that he had "18 years to go." (Dkt. No. 37-24 at 224:10–13.)  Mattaway queried why O'Brien was testifying, and O'Brien stated that he was testifying for two reasons — first, because he "felt guilty"; and second, because he "had to cooperate with all law enforcement" under the terms of his "original agreement."  (Dkt. No. 37-24 at 224:16–225:18.)  He never mentioned that he had already received a sentence reduction, that it was possible to receive a reduction even after being sentenced, or that he was interested in and was pursuing another reduction.

Therefore, the Appellate Division's determination that all that would have been material under *Brady* was an explicit *quid pro quo* agreement was an "unreasonable application of . . . clearly established Federal law."  28 U.S.C. § 2254(d)(1).

Second, Jimenez contends that the hearing court unreasonably determined the facts and unreasonably applied Supreme Court law in concluding that the State fulfilled its *Brady* obligation in its disclosure about O'Brien.  The hearing court first concluded that "there was no *quid pro quo* agreement between the Bronx prosecutor's office and Mr. O'Brien and/or the federal prosecutor" that in exchange for O'Brien's testimony, either the ADA or the AUSA would seek a sentence reduction.  (Dkt. No. 37-3 at 4.)  This Court agrees with the State that it was not an unreasonable determination of the facts to reach that conclusion.  Given that O'Brien

was serving time for a federal conviction, Mattaway could certainly make no promises that in

exchange for his truthful testimony, she would personally seek a sentence reduction on his

behalf.  Nor is there any evidence that Novak promised O'Brien that he would certainly file a

Rule 35 motion if O'Brien testified in the Jimenez trial.

There *is* evidence that could contradict Mattaway's contention that she had no

understanding of why O'Brien wanted her to write a letter on her behalf.  During the hearing,

Mattaway testified that she did not know who the letter was going to be addressed to or what it

would be used for.  (Dkt. No. 37-3 at 62:20–24.)  But Mattaway emailed Novak prior to trial and

explained that she knew about O'Brien's letters to his sentencing judge requesting leniency and

that she would need any letters to the judge that contained information about his decision to

testify in the case.  (Dkt. No. 37-14 at 27.)  She also requested "any cooperation agreements he

has made in exchange for his testimony with the Federal government and any information

regarding favorable treatment he may have received in exchange for his cooperation."  (Dkt. No.

37-14 at 27.)  Novak also stated in his affidavit submitted to the court that he was "pretty sure"

he had spoken to Mattaway prior to trial about O'Brien and the potential for a sentence

reduction, warning her not to promise him anything.  (Dkt. No. 37-17 at 25.)  This recollection

was "based on a prior experience he had where someone had made a promise to a cooperating

witness of a sentencing reduction, the witness did not get the promised reduction, and a

'contract' was put out on Mr. Novak's life."  (*Id.*)  This is corroborated by Novak's email to

Mattaway following trial, in which he inquired whether she still planned to submit a letter on

O'Brien's behalf so Novak could decide whether to file another "sentence reduction motion" in

O'Brien's case.  (Dkt. No. 37-14 at 30.)  (In fact, Novak did file such a motion, which resulted in

another five-year sentence reduction for O'Brien.)  While this calls into question Mattaway's

statement that she had no idea why O'Brien wanted a letter from her, the Court cannot conclude that it was objectively unreasonable for the hearing court to determine that there was no *quid pro quo* agreement in place.

But with this background, the Court concludes that the state court's second holding — that there was "no *Brady* violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien" (Dkt. No. 37-3 at 4) — was an unreasonable application of *Brady*. The Supreme Court has consistently explained that the prosecutor plays a "special role . . . in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "This special status explains . . . the basis for the prosecution's broad duty of disclosure." *Id.*; *see also* 514 U.S. at 439 ("[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be." (citation omitted)); *United States v. Agurs*, 427 U.S. 97, 108 (1976) ("[T]he prudent prosecutor [should] resolve doubtful questions in favor of disclosure.").

About ten days before trial began, Mattaway gave defense counsel a witness list that provided this spartan description of O'Brien: "[C]urrently jailed in Federal Custody for Murder (unrelated) and serving 30 years. Has asked for a letter to be prepared by the undersigned that he can have put in his file stating that he testified for the Bronx District Attorney's Office." (Dkt. No. 37-14 at 16.)

In fact, this was not all the information Mattaway had about what O'Brien "asked for." As noted above, Mattaway was in communication with the AUSA who had previously filed a Rule 35 motion on O'Brien's behalf and was planning to send the letter to the AUSA; she was aware that O'Brien had cooperated in his previous case and had received certain benefits for that cooperation; and she had specifically inquired about letters O'Brien was writing to a federal

judge seeking a reduction in his thirty-year sentence, including potentially for testifying in Jimenez's trial.  (*See* Dkt. Nos. 37-14 at 24–31.)  The State therefore failed to make a "substantive" disclosure because it omitted several essential facts about O'Brien and the request for a letter to be placed in his file.[5]

As even the State acknowledges, the significance of the letter is muddied.  The letter's purpose could have been "for good time credit, a sentence reduction, [or] a parole reduction," or perhaps a more workaday perquisite like special prison privileges.  (Dkt. No. 53 at 54.)  Some of these benefits, of course, provide more of an inducement to lie than others.  But bereft of an answer to that crucial question — what precisely was O'Brien offered in exchange for his testimony? — the defense was unable to determine the import of the letter on O'Brien's "credibility as a witness."  *Giglio*, 405 U.S. at 154–55.  Thus, the prosecution's failure to disclose everything it knew about O'Brien's potential use of the letter, including the fact that he had cooperated in his federal case, had received a Rule 35 order reducing his sentence, had continued to seek a sentence reduction, and that the letter would be sent to the AUSA who had previously filed a Rule 35 motion on his behalf, violated *Brady*.

Moreover, under *Brady* and its progeny, a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case."  *Kyles*,

---

[5]  Several months after the trial, Novak wrote to Mattaway, stating, "you had indicated that you were going to send me a letter about Andrew O'Brien's cooperation with your office." (Dkt. No. 37-14 at 30.)  Novak said that he had never received the letter and wanted to "make a decision by X-Mas as to whether O'Brien merits a sentence reduction motion."  (*Id.*)  Mattaway responded that she had written a letter to Novak in October 2007 and attached a copy.  (*Id.*)  In the letter, she "urged [Novak] to give O'Brien whatever consideration [he] c[ould]."  (Dkt. No. 37-14 at 18.)  She explained that O'Brien "came through for me when I needed him and then some." (Dkt. No. 37-14 at 18.)  Novak subsequently moved for a second reduction of O'Brien's sentence under Rule 35(b), citing O'Brien's "recent assistance to the Bronx District Attorney's office." (Dkt. No. 37-14 at 22.)  The motion was granted, and O'Brien's sentence was reduced by another five years.  (*See* Dkt. No. 53 at 21.)

514 U.S. at 437; *see also United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with [her] office's investigation of the case.")  Of course, this requirement has its limitations:  The Second Circuit has declined to impose an "unlimited duty on a prosecutor" to learn of every piece of potentially favorable evidence known by some individual holding a government position.  *See, e.g.*, *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) (declining to impute to the AUSAs knowledge of FBI reports prepared by agents "uninvolved in the investigation or trial of the defendants-appellants"); *United States v. Quinn*, 445 F.2d 940 (2d Cir. 1971) (declining to impute the knowledge of a Florida prosecutor who had filed a *sealed* indictment against the key witness in the defendant's case to the New York AUSA).

But that is not this case.  Here, Mattaway had a personal connection both to O'Brien, who had asked her for the letter when they met, and to Novak, to whom she planned to send the letter. Both of those individuals knew exactly why O'Brien was seeking a letter in exchange for his testimony.  (*See, e.g.*, Dkt. No. 37-3 at 149 (O'Brien explaining that he wanted the letter because he was hopeful that Novak would file another Rule 35 motion); Dkt. No. 37-14 at 30 (Novak explaining that he wanted to make a decision soon about whether to file a motion for a sentence reduction in O'Brien's case and therefore would need a letter from Mattaway if she planned to write one for O'Brien).)  And what is more, the ADA, unlike defense counsel, was armed with the knowledge that O'Brien had sought a sentence reduction in the past after testifying against his co-defendants, Novak was the AUSA who had requested that sentence reduction, O'Brien had received a sentence reduction as a result, and O'Brien was continuing to seek leniency from his sentencing judge, potentially for testifying in Jimenez's trial.

The State's impulse is to put the onus on the defense to inquire about the purpose of the letter: "[N]othing prevented [defense counsel] from asking O'Brien what he intended to utilize the 'letter' for.  Nearly eight years of post-conviction litigation in this case could have been resolved with a single, simple question [that defense counsel] failed to ask at trial."  (Dkt. No. 53 at 51.)  But this argument turns *Brady* on its head.  "[I]t is the prosecutor's burden to make full disclosure of exculpatory material, not the defendant's."  *Leka*, 257 F.3d at 102.  A prosecutor has not complied with *Brady*'s strictures if she supplies only breadcrumbs, leaving the defense with the onerous task of guessing which trails will eventually lead to exculpatory evidence.  As noted above, the Supreme Court has instructed prosecutors to do precisely the opposite.  Thus, to the extent that Jimenez's defense can be faulted for failing to follow up on the letter, the error was "precipitated by the prosecution's failure to discharge its duty under *Brady*."  *Leka*, 257 F.3d at 101.

Further, notwithstanding the well-known fact that witnesses for the government will rarely agree to speak to defense counsel, the State's position is particularly problematic because O'Brien's participation in witness protection prevented the defense from any opportunity to potentially interview him before trial.  (*See* Dkt. No. 53 at 12 n.7, 28 n.16, 51.)  Thus, the defense could not ascertain the intended purpose of the letter except by fishing around during O'Brien's cross-examination.  This, of course, placed the defense in a challenging position.  It is difficult to fault defense counsel for declining to question a witness "cold" — an oftentimes "waste[ful]," if not outright "suicidal," endeavor.  *Leka*, 257 F.3d at 103.  The State, however, would put criminal defendants to a Hobson's choice: ask a question on cross-examination to which one does not know the answer, or refrain from asking the question at all.  *Brady* relieves defendants of the burden of such tactical guesswork.

17

Alternatively, the State resists the application of *Brady* by invoking the "essential facts" doctrine. Under that doctrine, evidence is not "suppressed" within the meaning of *Brady* "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (quoting *United States v. Gonzales*, 110 F.3d 936, 944 (2d Cir. 1997)). Here, the State argues that the defense already "had all the facts . . . needed . . . to be reasonably aware that O'Brien could or would have hoped to utilize th[e] letter to seek a further sentence reduction." (Dkt. No. 53 at 50.)

This argument misconstrues the "essential facts" doctrine. A prosecutor is excused from her *Brady* obligation only if, after an initial disclosure, "a reasonable defendant in [the] circumstances *should have known* the relevant facts." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015); *see also id.* (noting that the doctrine "speaks to facts already within the defendant's purview"). In other words, the doctrine applies only if Jimenez — armed with the knowledge that O'Brien had extracted a promise from Mattaway to write a letter — "should have" concluded that the letter was intended for a sentence reduction. But as the State itself acknowledges, that conclusion does not ineluctably follow from the bare fact of the letter's existence. (*See* Dkt. No. 53 at 54 (listing potential purposes for the letter, including "good time credit, a sentence reduction, a parole reduction, or some other prison benefit").) Nor could Mattaway be deemed a credible witness if it was beyond question that the only reason O'Brien would have asked for this letter is for a sentence reduction. Mattaway herself testified that she had no idea why O'Brien wanted the letter, even though, unlike the defense, she knew he was seeking leniency from his sentencing judge and had previously cooperated in his federal case. (Dkt. No. 37-3 at 62:20–24; Dkt. No. 37-14 at 27.) Accordingly, absent a more comprehensive

factual disclosure, the State cannot use the "essential facts" doctrine to evade its *Brady*

obligation.  That would amount to conditioning the *Brady* obligation on a criminal defendant's

"due diligence," and "[t]he Supreme Court has never required a defendant to exercise due

diligence to obtain *Brady* material."  *Lewis*, 790 F.3d at 121 (citing *Agurs*, 427 U.S. at 107).[6]

Therefore, the hearing court's conclusion that there was "no *Brady* violation concerning

the understanding between the Bronx prosecutor and Mr. O'Brien" (Dkt. No. 37-3 at 4) was an

unreasonable application of federal law.  28 U.S.C. § 2254(d)(1).

### B.    Failure to Disclose 1997 FBI Report

Jimenez also argues that the State violated Brady by failing to disclose a 1997 FBI report

detailing several interviews with O'Brien.  Because that report does not include any mention by

O'Brien of the 1989 shooting of Worrell, Jimenez argues, it constituted significant impeachment

material.  Jimenez contends that the Appellate Division's conclusion that this did require reversal

was an unreasonable determination of the facts and unreasonable application of the law.  The

court first explained that "the report was primarily about O'Brien's involvement in gang activity

and the people who traveled in the same orbit with him . . . . There is no indication that it would

have been appropriate, in the context of the interview, for O'Brien to describe Worrell's murder

in detail or to offer that he had witnessed it."  *Jimenez*, 37 N.Y.S.3d at 233–34.  The court then

concluded that disclosure would not have "had a reasonable possibility of changing the outcome"

---

[6] The "essential facts" doctrine also excuses a prosecutor's *Brady* obligation if the
defendant had actual knowledge of the evidence at issue.  *See Lewis*, 790 F.3d at 121.  The State
argues that defense counsel had actual knowledge, as evidenced by his statement during closing
argument that it was "significant" that "O'Brien [wa]s cutting a deal that could maybe minimize
the balance of 30" years.  (Dkt. No. 53 at 52 (quoting Dkt. No. 37-26 at 51).)  But this
supposition, as discussed, bespeaks nothing about actual knowledge of O'Brien's intent.  *Cf.
DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) (recognizing possibility that defendant
had prior knowledge of *Brady* material only because of "the remarkable specificity of defense
counsel's *Brady*'s requests").

of trial.  *Id.* at 233.  The Court agrees with Jimenez that this is both an unreasonable

determination of the facts based on the record and an unreasonable application of *Brady*.

Pursuant to O'Brien's January 1997 plea agreement in the federal racketeering case,

O'Brien was required to "cooperate fully and truthfully with the United States, and provide all

information known to the defendant regarding any criminal activity." (Dkt. No. 37-15 at 4.)

Accordingly, over the course of four days in January and February 1997, O'Brien was

interviewed about his criminal history as well as any other criminal activities he was aware of.

(*See generally* Dkt. No. 37-14 at 32–63.)  After providing a detailed account of his criminal

history beginning in 1981 and information on the criminal activity of others, O'Brien was shown

dozens of photographs and identified many individuals, including Worrell.  (Dkt. No. 37-14 at

50.).  When shown a photograph of Sean Worrell, O'Brien was reported to have said the

following:  "Sean Morrell, also known as 'Shaka' – O'Brien said this individual was killed in the

Bronx, Whitestone Movie Theatre, and his mother lived on 45th Street in Brooklyn." (Dkt. No.

37-14 at 52.)  No other information about Worrell or his death is recorded in 1997 interview

notes.

The Appellate Division erred in determining that this was not a situation where O'Brien

would have been likely to disclose additional information about Worrell's death, including that

he was present at the theater and that he could, in fact, identify the perpetrator.  Several facts

support this Court's conclusion.  First, O'Brien was required to disclose under his plea

agreement *any* information he had on criminal activity that he was involved in or that he knew

about.  (Dkt. No. 37-15 at 4.)  This included being available for debriefing as the United States

may require and providing truthful information.  (*Id.*)  Second, O'Brien was specifically

interviewed by New York City Police Department Detective Jack Guinane and an FBI agent

"regarding homicides which occurred in New York City." (Dkt. No. 37-14 at 32.). He provided information on at least ten murders that occurred in New York during the same period that Worrell was murdered, including "rumors" he had heard about murders involving individuals other than his co-defendants. (Dkt. No. 37-14 at 32–34.) However, he did not mention the Worrell murder, which had occurred in 1989 and at which he later claimed he had not only been present for but could also identify the shooter.

Finally, during these interviews, O'Brien provided a detailed account of his criminal history beginning in 1981 and, contrary to the Appellate Division's conclusion that O'Brien primarily provided details about his *own* criminal activity in a gang, information on the criminal activity of others. This information was highly specific and included, for example, what type of truck an individual was driving when they started traveling to Virginia to make drug sales (Dkt. No. 37-14 at 38), discussions he had with individuals as far back as 1989 (Dkt. No. 37-14 at 39), and details about the criminal activities of several individuals, including the father of one of his friends (Dkt. No. 37-14 at 45). In particular, O'Brien provided significant information, incriminating or otherwise, about Dean Beckford, the leader of the Poison Clan, the gang to which O'Brien belonged, and about James Earl Howard. (*See generally* Dkt. No. 37-14 at 32– 63.) According to a later statement by O'Brien, both Beckford and Howard were at the theater the night of the Worrell murder, and in fact, O'Brien explained that Howard had even pulled out a gun that night. (Dkt. No. 37-18 at 1–3.) It is significant, therefore, that O'Brien failed to make any mention about the Worrell murder during his 1997 FBI interviews, even though he provided highly detailed information about criminal (and non-criminal) activities involving dozens of others — including two people who were at the theater on the night of the Worrell murder, one of whom had even allegedly engaged in criminal activity that very night. Perhaps even more

telling is the fact that O'Brien testified during Jimenez's trial that he had actually been the *instigator* of the confrontation with the shooter (*see* Dkt. No. 37-24 at 191:6–22), but he had made no mention of this incident when interviewed by law enforcement over the course of several days.

This Court also concludes that the Appellate Division unreasonably applied *Brady* in determining that the State's failure to disclose this report was not material.  As previously noted, the Supreme Court has "explained that evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Smith v. Cain*, 565 U.S. 73, 75 (2012) (internal quotation marks omitted).

Here, the materiality of the 1997 FBI Report is best understood in the context of the other evidence about how O'Brien came to be part of this case and the information about O'Brien's identification of Jimenez.  O'Brien testified that he first told federal authorities about his information on the Worrell murder around 1996.  (*See* Dkt. No. 37-24 at 221:17–222:4 ("I was being questioned by federal agents and they asked me, you know, of certain things that I knew about and this was one of them.").)  O'Brien explained that he had remained silent between 1989 and 1996 because it was not acceptable to cooperate with police officers.  (Dkt. No. 37-24 at 222:5–13.)  He then spoke to someone in the NYPD Cold Case Squad in 1998 and then to Detective Stradford around 1999 or 2000.  (Dkt. No. 37-24 at 223:1–16.)  Detective Stradford testified that he was informed by another officer about an individual who might have information on the Worrell shooting and he then had the federal authorities "produce some files for me that might have been related to the homicide in question."  (Dkt. No. 37-25 at 321:11–17; 322:4–11.)  After reviewing the files, he "contacted the F.B.I. again and made arrangements to meet

[O'Brien] and have myself and this agent go visit him to talk to him about it."  (Dkt. No. 37-25 at 322:17–19.)

But both O'Brien's and Stradford's testimony is contradicted by — or at least undermined by and therefore impeachable through — the FBI report:  nothing in the FBI report indicates that O'Brien provided any substantive information about the Worrell murder to federal authorities around 1996.  As already explained, the only information he provided in the 1997 interview was that Worrell had been killed at a Whitestone movie theater and his mother lived in the Bronx.  (Dkt. No. 37-14 at 52.)  No other documents from that period about O'Brien's knowledge of the murder were produced to defense counsel.  (Pet. ¶¶ 105–06.)  In fact, the only other document from this period that was disclosed, three days before the start of testimony and in the middle of *voir dire*, was a March 1996 note from an NYPD Brooklyn detective who had reached out to Bronx detectives informing them that O'Brien himself was a suspect in this case.  (*See* Dkt. No. 37-17 at 45 (detective stating that he had been "investigating numerous homicides from N.Y. to Virginia" and had information on the Worrell murder, including that the "[perp's] name [is] Andy O'Brien – Virginia.").)  Though the note mentioned "paperwork" that the Brooklyn detective had on this homicide, nothing else was provided to the defense, and defense counsel was unable to investigate this information any further given its late disclosure.  (Pet. ¶ 137.)[7]

---

[7] Apparently based on the information in this note, defense counsel asked O'Brien during trial if he had been "brought in as a suspect" for Worrell's murder.  (*See* Dkt. No. 37-24 at 236:13–237:8.)  After O'Brien said no, defense counsel moved on.  It is worth noting that if this note had been turned over in advance of trial — as opposed to during *voir dire* — this too could have been a potentially fruitful avenue for impeachment evidence against O'Brien.  (*See* Pet. ¶ 140 (defense listing the value of the note.)  At the very least, defense counsel could have requested any additional *Brady* material surrounding the details of the note had it been disclosed earlier.

The 1997 FBI Report, therefore, could have been used as an effective means to question the credibility of O'Brien and Stradford in a variety of ways. First, defense counsel could have questioned O'Brien as to why he provided no substantive information about a murder of a friend he allegedly witnessed and could help solve, even though he was required to provide all information about criminal activity he engaged in or witnessed under his plea agreement, was specifically asked about murders in New York City during the period Worrell was killed, and was even questioned about the victim himself.

Second, defense counsel could have made the point that apparently only after O'Brien had received a Rule 35 sentence reduction and realized how cooperating could help him did he reach out to law enforcement about the Worrell murder, suggesting an ulterior motive for providing information. (Dkt. No. 37-17 at 1.)

Third, defense counsel could have questioned Stradford about how he decided to meet with O'Brien. Though Stradford testified that he had first reached out to O'Brien after reading some documents about O'Brien's knowledge of the cold case, there is nothing in the 1997 FBI Report that would suggest that O'Brien had any substantive information about the Worrell murder and no other documents indicating O'Brien's knowledge of the Worrell murder were turned over to defense counsel.[8] It also puts the circumstances of Stradford's initial meeting with O'Brien into question. In January 2001, the FBI agent working with Stradford sent a request to federal authorities in Virginia to interview O'Brien (with Stradford) because O'Brien had "witnessed the [Worrell] murder being committed by RICARDO JIMINEZ [sic]." (Dkt. No. 37-17 at 46.) At the interview, O'Brien described the shooter in vague terms: "[M]ale, slim

---

[8] Post-conviction counsel confirmed with the U.S. Attorney's Office for the Eastern District of Virginia that there are no other federal reports on debriefings with O'Brien that mention the Worrell Shooting. (Dkt. No. 37-10 at 57–58.)

build, taller than O'Brien, squarish hair cut – but not a boxtop like O'Brien's."  (Dkt. No. 37-17 at 50.)  He then identified Jimenez in a photo array.  (*Id.*)  Of course, O'Brien had only allegedly once come into contact with Jimenez — eighteen years earlier at the movie theater — and certainly did not yet know his name.  (Pet. ¶ 106 n.15.)  Armed with the knowledge that O'Brien had not provided any substantive information about the Worrell murder prior to this meeting, defense counsel could have questioned the credibility of both witnesses based on Stradford's comment that O'Brien had information that Jimenez shot Worrell and O'Brien's cursory description of Jimenez.  In sum, the 1997 FBI Report casts doubt on the circumstances surrounding how O'Brien first became involved in this case and calls into question the credibility of Stradford as a witness and O'Brien's alleged eyewitness identification.

### C.    Collective Review of *Brady* Claims

Finally, even if, *individually*, each piece of undisclosed information discussed above would not have affected the outcome of the trial, that is not the correct approach to analyzing materiality.  Rather, the Court must review the materiality of the suppressed evidence "collectively, not item by item."  *Kyles*, 514 U.S. at 434; *see also id.* ("[T]he prosecution, which alone can know what is undisclosed, must be assigned the . . . responsibility to gauge the net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.").

Here, it cannot be stressed enough that the case against Jimenez was weak.  The first eyewitness, Esco Blaylock, initially said he saw the shooting and claimed that the perpetrator was a Black man[9] named Leon who dated his friend, Sharon Ramroop, had a high-top haircut

---

[9] Though it is not precisely clear from the Petition, the record suggests that Jimenez is not best described as Black but is a fair- or medium-skinned Latino.  (*See* Pet. ¶ 21 n.3 (witness who viewed a photo of Jimenez signed a statement saying he was not the shooter and that the shooter

blond streaks running through his hair, drove a Maxima, and lived on Boynton Avenue.  (*See* Dkt. No. 37-21 at 30.)  When police interviewed Ramroop, she said she knew a Jamaican/Indian man with a flat-top haircut named Leon who drove a Maxima, but she had not seen him in months, and that Leon dated a woman named Tamy.  (Dkt. No. 37-21 at 34.)  She was not present at the movie theater the night of the Worrell shooting.  A week after the shooting, Blaylock and Ramroop — both only fifteen years old at the time — were brought to a Bronx precinct without their parents.  A report of this encounter explained that after being unable to pick anyone out, the teens were put in a room and "exchanged information relative to the descriptions originally furnished by various witnesses," and that "[i]t now appears that Esco Blaylock knows the perpetrator as Leon, and Sharon Ramroop knows the perpetrator as Ricky." (Dkt. No. 37-21 at 36.)  Another report explains that Ramroop then picked out a picture of Manuel Jimenez and said that "his brother was Ricky, the person being sought."  (Dkt. No. 37-21 at 37.)[10]  Police then showed Blaylock a single photo of Jimenez, whom Blaylock identified as the shooter.[11]  The report explained that Jimenez's last known address was 875 Taylor Avenue.

---

was a Black individual); Pet. ¶ 219 (another witness who was working at the concessions stand that night stating that the dispute at the stand involved Black men and did not include Jimenez); Pet. ¶ 220 (witness describing the shooter as a Black male); Dkt. No. 37-22 at 11 (photo of Jimenez).)

[10] In 2012, Ramroop swore in an affidavit that based on the photograph she had just viewed (which was a photo of Jimenez), she did not know and had never known the person in the photograph, nor had she ever identified a photo of an individual named Leon or Ricky.  (Dkt. No. 37-22 at 11.)

[11] This procedure, known as a "show-up," has been found to be highly suggestive by both courts and experts.  *See, e.g.*, *United States v. Wade*, 388 U.S. 218, 234 (1967) (referring to a show-up procedure and explaining that "[i]t is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police"); Committee on Scientific Approaches to Understanding and Maximizing the Validity and Reliability of Eyewitness Identification in Law Enforcement and the Courts, *Identifying the Culprit: Assessing Eyewitness Identification* (National Research Council 2014), at 28 ("Courts consider show-ups highly suggestive, and prosecutors urge the police to exercise caution when conducting them."); Emily West & Vanessa Meterko, *Innocence Project: DNA Exonerations,*

(Dkt. No. 37-21 at 37.)  Blaylock later failed to show up for a line-up and then recanted his statement that he was actually present for the shooting.  (Dkt. No. 37-22 at 17.)  Blaylock was once again contacted by the police about seventeen years later and recanted his earlier recantation.[12]  At trial, he referred to Jimenez as "Leon."  (Dkt. No. 37-25 at 527:5–12.)

Several other witnesses told police that they had seen the argument or the shooting.  (Pet. ¶¶ 15–16.)  One witness, who had been working at the concessions stand at the time of the encounter, told police that he saw two Black males arguing and that "they had words in Rastafarian."  (Dkt. No. 37-21 at 38.)  Another witness, who had also been working at the stand and witnessed the confrontation, was shown a photograph of Jimenez and told police that she had seen Jimenez "on other occasions but he was not one of the males which had the argument at the concession stand."  (Dkt. No. 37-21 at 39.)  She described the man as Black and Jamaican, tall and thin with a flat-top haircut and in his early twenties.  (*Id.*)  A third witness stated that he "saw a male Black, dark skin, wearing white shorts and a white top" run out of the theater right after the shooting and get into a small car.  (Dkt. No. 37-21 at 43.)  And a fourth witness stated

---

*1989-2014: Review of Data and Findings From the First 25 Years*, 79 Albany L. Rev. 717 (2016) (about 15% of DNA exonerations involving eyewitness misidentification involved show-ups).

    [12] There is evidence that the 2006 identification by Blaylock was also problematic.  In a 2012 interview with an investigator, Blaylock explained that during the 2006 identification procedure, the police put many photos on a table and asked if anyone looked familiar.  Blaylock picked one person.  Later in the interview he explained that he was shown multiple photo arrays and that the photograph of the person he ultimately identified was included in each array.  He likened the procedure to a "Where's Waldo" game.  (Dkt. No. 37-21 at 2.)  Neither procedure is recommended by eyewitness identification experts.  *See generally* Gary Wells *et al.*, *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 L. & Hum. Behavior 3 (2020) (providing recommendations for identification procedures); *see also id.* at 25 (explaining that placing the same suspect in multiple arrays can lead to a commitment effect where "a mistaken identification in an initial identification procedure tends to be repeated in a second identification procedure if that lineup contains the mistakenly identified person").

that he was in line during the confrontation and described the suspect as a Black male with short, cropped hair and a thin blond streak of hair on the side of his head.  (Dkt. No. 37-22 at 29.)  No witness besides Blaylock was called in to view a lineup after the shooting, nor did any of these witnesses testify at trial to what they had seen.  (Pet. ¶ 16, Dkt. No. 37-21 at 40–41, 44–45.)

The second eyewitness was Andrew O'Brien, who at the time was serving a thirty-year sentence for a federal conviction.  (Pet. ¶¶ 16–18, 103.)  O'Brien identified Jimenez, whom he did not know, eighteen years after the crime.  (Pet. ¶¶ 16–18.)  There is some evidence that he had originally been a suspect in the Worrell murder.  (Dkt. No. 37-17 at 45.)  Furthermore, though O'Brien testified that he first came forward with information about the shooting in 1997, the contemporaneous documents do not support this claim.  In fact, the documents suggest that O'Brien did not provide law enforcement with any substantive information about the murder until around 2000, even though he was specifically asked about New York homicides in the 1980s and about the victim himself in a 1997 interview.  O'Brien had served as a cooperator in his federal case and had received a reduction from life to thirty years' imprisonment as a result of an earlier Rule 35 motion.  (Pet. ¶ 103.)  And as a result of his testimony in Jimenez's trial, O'Brien received an additional five-year sentence reduction.

Finally, Kevin Morrissey testified that shortly after Jimenez was arrested and placed at Rikers Island, Jimenez confessed that he had been the shooter.  At trial, he stated that Jimenez told him that he had been at the movies when he got into an argument with a Jamaican man.  Morrissey then said that Jimenez confided that he ran to his car to get a gun because he thought the man was armed, returned to the theater, yelled at the Jamaican man, and the man shot at him.  He then shot back, hit the man, and returned to his vehicle.  (Dkt. No. 37-24 at 32:6–17.)  After this disclosure, Morrissey wrote to federal authorities to get connected to a Bronx ADA named

Anna Villa because he had information on the "*Batman* shooting." (Dkt. No. 37-18 at 128–34.)
But just a few weeks prior, the *New York Post* had published an article describing in great detail
what had allegedly happened on the night of the Worrell shooting. This information included:
(1) that Ricardo Jimenez was the individual accused of the crime; (2) that the perpetrator and
Worrell had argued about a bag of popcorn and Jimenez then said that he was going to get a gun
from his car; (3) that Jimenez returned to the theater and shouted at Worrell; and (4) that both
Jimenez and Worrell shot at each other. (Dkt. No. 37-18 at 139.) And, as noted above, there
was evidence, some of which was undisclosed to the defense, that Morrissey tended to lie for his
own benefit, had numerous fraud and larceny convictions, and had a history of mental health
problems.

In sum, "[t]his entire case rests on two highly suspect eyewitness identifications and a
jailhouse snitch — common factors in wrongful convictions." (Dkt. No. 56 at 3.)

After considering the collective import of the undisclosed evidence about O'Brien's
motivation to testify and the information surrounding how O'Brien first came to be a part of this
case, the Court concludes that the state courts unreasonably applied established federal law in
determining that there was no *Brady* violation.

29

**IV.     Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is GRANTED.

Jimenez is ordered to be released unless the State provides him with a new trial within 120 days

after the date of this Order and Opinion.

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: July 15, 2022
           New York, New York

_____
                           J. PAUL OETKEN
                   United States District Judge

30